**EXHIBIT 9 – PART 2 OF 4**

## KAISER ALUMINUM & CHEMICAL CORPORATION
### NORTHWEST REGIONAL HEADQUARTERS

334 EAST TRENT AVENUE, SUITE 300 • SPOKANE, WA 99202
PHONE: (509) 242-1047 • FAX (509) 242-1048

---

**FACSIMILE TRANSMITTAL SHEET**

TO: Wayne Nelson  
FROM: Joe Heerner  
FAX NUMBER: (360) 992-3204  
DATE: Feb. 2, 2001  
COMPANY: Clark County PUD  
TOTAL NO. OF PAGES INCLUDING COVER: 5  
PHONE NUMBER:  
PHONE NUMBER: (509) 242-1074  
RE:

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY

WAYNE - LETTER STATING OUR CONVERSATION TODAY. IF YOU HAVE ANY QUESTIONS FEEL FREE TO CALL ME THIS WEEKEND CELL # (509) 995-1487 OR THROUGH DANA.

THANKS,
Joe

CC: DANA ZENTZ
252-5093

***IMPORTANT***
The information contained in this facsimile message is privileged and confidential information intended only for the use of the addressed persons above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please destroy it and notify us immediately by telephone. Thank you.

*KAISER ALUMINUM*
NORTHWEST REGIONAL HEADQUARTERS

February 2, 2001

**VIA FAX**

Mr. Wayne Nelson
General Manager
Clark County PUD
(360) 992-3204

Re: Kaiser's Remarketing Agreement

Dear Mr. Nelson:

This letter will confirm our conversations on February 2, 2001 with you and Mr. Dana Zentz of EES Consulting regarding Kaiser's right to remarket energy under its 1996 Power Sales Contract with BPA. Under the contract, Kaiser may request remarketing by submitting a notice to BPA stating the Qualifying Purchaser (which would be Clark County PUD (PUD) in this instance), the start and end date of the sale, the price, the delivery point, and any other terms. BPA may either implement the sale to the PUD or, at its option, may choose to purchase the energy for its own use at the same terms and conditions. If the sale is for one month or less, BPA has 24 hours after Kaiser's notice to decide if it wants to purchase the energy; if the sale is for more than one month but no greater than 6 months, then BPA has 2 days to decide.

If the sale to the PUD is implemented by BPA, then BPA will contract with the PUD for the sale of the energy at the price, terms and conditions stated in

1

304 EAST TRENT, SUITE 300 SPOKANE WA 99202 (509) 342-1050

Kaiser's notice and other standard terms that BPA may request. The energy purchased by the PUD will be federal energy and the PUD's payment will be made to BPA. The energy will be delivered under Kaiser's PTP agreement with BPA. The POI will be the "BPA's System POI" and the point of delivery will be moved from Kaiser's facilities on a non-firm basis to the point of delivery named in Kaiser's notice and the PUD's contract with BPA. BPA will pay Kaiser for the remarketed energy under the terms of Kaiser's 1996 Power Sales Contract and a separate Confirmation Agreement with BPA consistent with the terms of Kaiser's notice. Therefore, pursuant to our discussions, the PUD and Kaiser (Parties) have agreed to the following:

Kaiser will submit a request to BPA on Friday, February 2, 2001 at approximately 4:30 p.m. PST to remarket 140 Mw of energy for the months of August 2001 and September 2001. BPA will have 48 hours to respond to this request and notify Kaiser if i) they will purchase the energy under the terms agreed to between the Parties or ii) facilitate the sale to the PUD.

With regard to the remarketing request, the PUD has requested that Kaiser's offer remain open until 12:00 noon on Tuesday, February 6, 2001, to allow the Board to approve the necessary financing arrangements for payment. This is acceptable, provided that Kaiser has the right to withdraw the offer at any time before the PUD executes a Confirmation Agreement with BPA.

2

Provided Kaiser can secure short-term firm transmission utilizing its PTP transmission agreement with BPA, BPA will deliver the energy to the ALCOA substation or other points as mutually agreed to by the Parties.

The Parties agree that the PUD shall pay to BPA on March 15, 2001 the amount of $63,934,878.00 as shown in the attached monetization table or if a different payment date is mutually agreed to by the Parties then the payment amount shall be adjusted consistent with the attached table.

Sincerely,

*Joseph P. Hoemer*

Joseph P. Hoemer
Energy Supply Manager

Please indicate your acceptance of the terms of this agreement by signing below and returning a copy to me. Fax: (509) 242-1098

_____

_____
Date

cc:   Mr. Dane Zentz, EES Consulting

3

## Clark Public Utility Power Reconstruction Monetization
### February 2, 2001

| Month | Days | MW | dollars | Purchase Price | Undiscounted Cash Flow |
|---|---|---|---|---|---|
| Aug | 31 | 140 | 104,160 | $325.00 | $ 33,852,000 |
| Sep | 30 | 140 | 100,800 | $325.00 | $ 32,760,000 |
| Oct | | | | | |
| | | | | | $ 66,612,000 |

### Discount Calculation

| Curve Date | Total Rate | Discount Factor | Discounted Cash Flow |
|---|---|---|---|
| Sep-01 | 6.50% | 0.9634 | $ 32,578,241 |
| Oct-01 | 6.50% | 0.9572 | $ 31,356,634 |
| Nov-01 | | | |
| | | | $ 63,934,878 |

07/16/02  13:22 FAX                                                                                              ☒002

Contract No. 95MS-94861
October 30, 1995

# POWER SALES AGREEMENT
## between the
## UNITED STATES OF AMERICA
## DEPARTMENT OF ENERGY
### acting by and through the
## BONNEVILLE POWER ADMINISTRATION
### and
## KAISER ALUMINUM & CHEMICAL CORPORATION

### Index to Sections

| Section | | Page |
|---|---|---|
| 1 | Effective Date and Term | 3 |
| 2. | Deliveries of Firm Power Between the Effective Date and Commencement Date | 3 |
| 3. | Commencement of Deliveries of Firm Power | 4 |
| 4 | Termination of Prior Contract and Other Contracts | 4 |
| 5. | Termination of This Agreement | 5 |
| 6. | Definitions | 9 |
| 7. | Exhibits; Interpretation | 16 |
| 8. | Contract Revisions and Waivers | 17 |
| 9. | Purchase and Sale of Annual Take-or-Pay Firm Energy | 18 |
| 10. | Monthly, Weekly, Daily, and Hourly Amounts of Firm Power | 19 |
| 11 | Rate Test Compliance | 22 |
| 12. | Rates and Charges | 23 |
| 13. | Billing and Payment | 23 |
| 14. | Relief from Take-or-Pay Obligation | 27 |
| 15. | Unauthorized Increase Charges | 28 |
| 16. | Changes in Firm Power Amounts | 29 |
| 17. | Reserves | 29 |
| 18. | Curtailment or Remarketing | 36 |
| 19. | Load Regulation, Unbundled Products, and Other Transmission Products | 42 |
| 20. | Provisions Relating to Delivery of Firm Power | 45 |
| 21. | Assignment of Agreement | 45 |
| 22. | Dispute Resolution | 45 |
| 23. | Force Majeure | 49 |

### Index to Sections

| Section | | Page |
|---|---|---|
| 24. | Notices | 50 |
| 25. | Hold Harmless | 51 |
| 26. | Damages for Failure by BPA to Deliver | 51 |
| 27 | Obligations During Performance of This Agreement | 52 |
| 28 | Third Parties | 52 |
| 29 | Severability | 52 |
| 30 | Entire Agreement | 53 |
| 31. | Signature Clause | 54 |
| Exhibit A | (General Contract Provisions) | 16 |
| Exhibit B | (Fees for Remarketing) | 16 |
| Exhibit C | (Rate Schedule) | 16 |
| Exhibit D | (Monthly Amounts of Firm Power) | 16 |
| Exhibit E | (Points of Delivery) | 16 |
| Exhibit F | (Unrecoverable Costs and Transfer Costs) | 16 |
| Exhibit G | (Stability Reserve Scheme(s)) | 16 |
| Exhibit H | (Arbitration Procedures) | 16 |
| Exhibit I | (Use of Facilities Charge) | 16 |

This POWER SALES AGREEMENT, executed __11/6__, 1995, by the UNITED STATES OF AMERICA (Government), Department of Energy, acting by and through the BONNEVILLE POWER ADMINISTRATION (BPA or Bonneville), and KAISER ALUMINUM & CHEMICAL CORPORATION (Company), a corporation incorporated under the laws of the State of Delaware. BPA and the Company are hereinafter sometimes referred to individually as "Party" and collectively as "Parties."

WITNESSETH:

WHEREAS pursuant to section 5(d) of the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act), BPA is authorized to sell power to the Company; and

WHEREAS on August 31, 1981, BPA and the Company entered into Contract No. DE-MS79-81BP-90351, hereinafter referred to as "Prior Contract"; and

WHEREAS this Agreement provides for the termination of the Prior Contract; and

07/16/02  13:22 FAX                                                              ☒004

6.  **DEFINITIONS**

   (a) "Agreement" means this Power Sales Agreement, Contract No 95MS-94861.

   (b) "Commencement Date" means the date that deliveries commence under this Agreement.

   (c) "Contract Demand" means the maximum integrated hourly rate of delivery that the Company may request under this Agreement and is equal to 669.54 megawatts. The Contract Demand shall not be increased except through:

   (1) a process conducted pursuant to section 5(d)(3) of the Northwest Power Act that provides for BPA to acquire increased reserves from its direct service industrial companies; or

   (2) a technological allowance which BPA shall grant upon the Company's demonstration to BPA that such allowance meets the criteria for a technological allowance under the Prior Contract.

   (d) "Contract Year" means the period that begins on October 1 and ends on the following September 30.

   (e) "Control Area" or "Load Control Area" means the electrical (not necessarily geographical) area within which a controlling utility operating under all North American Electric Reliability Council standards has the responsibility to adjust its generation on an instantaneous basis to match internal load and power flow across interchange boundaries to other Control Areas. A utility operating a Control Area is called a "controlling utility."

(f) "Demand" means the maximum integrated hourly rate of delivery during each month of each Contract Year for Firm Power deliveries under this Agreement, as specified in Exhibit D.

(g) "Effective Date" means the date that this Agreement is signed by BPA.

(h) "Event" means the period during which BPA restricts service to the Company under this Agreement to obtain Operating Reserves or Stability Reserves. The Event shall commence with the reduction in deliveries to the Company under this Agreement due to a BPA request for Operating Reserves or a transfer trip or signal that initiates Stability Reserves restriction. Unless reinstated as provided herein, the Event shall end when BPA's dispatcher notifies the Company that the load restricted for such reserves can be restored to service. Notwithstanding the foregoing, the Event will end (subject to reinstatement as provided herein) when system conditions occur that would result in tripping the Company for undervoltage or underfrequency load shedding. Any BPA restriction or series of BPA restrictions that make up an SR Event shall be treated as part of a single Event.

After an Event has ended, the Event shall be reinstated and continue as follows:

(1) if the Event Magnitude was less than (Federal Load) × (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 10 hours;

(2) if the Event Magnitude was equal to or greater than (Federal Load) × (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 21 hours;

07/16/02  13:22 FAX                                                      ☒006

 (3) if the Event Magnitude was equal to or greater than (Federal Load) x (30 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 42 hours;

 (4) if the Event Magnitude was equal to or greater than (Federal Load) x (60 minutes), then the Event shall be reinstated if BPA requests Reserves again within 84 hours; and

 (5) if the Event Magnitude was equal to or greater than (Federal Load) x (90 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 126 hours.

(i) "Event Duration" means the total cumulative Event Minutes of the Event.

(j) "Event Magnitude" means a value calculated for each Event as the sum of: (Requested Operating Reserves × Event Minutes associated with the use of Operating Reserves) + (Amount of Load Tripped for Stability Reserves × duration of the SR Event in minutes) for each restriction during the Event. The Event Magnitude shall not include loads restricted pursuant to operating reserves and stability reserve rights that BPA has under other contracts.

(k) "Event Magnitude Limit" means the Federal Load multiplied by 90 minutes.

(l) "Event Minute(s)" means the minute(s) of restriction (or any portion thereof) during an Event.

(m) "Excess Firm Energy" means Firm Energy that would have been delivered to the Company for service to its expected Plant Load but is excess due to a reduction in the Company's actual Plant Load.

(n) "Federal Load" means an hourly amount of energy equal to the lesser of (1) 50 percent of the Process Load operating immediately prior to the Event,

or (2) the sum of (A) 50 percent of the Firm Energy either scheduled to the Company, remarketed to other Qualified Purchasers, used by BPA, or any combination thereof, plus (B) 50 percent of the energy scheduled by Washington Water Power Company under its Firm Energy Sale Agreement with BPA, Contract No. 95MS-95104, provided, that the amount under section 6(n)(2)(B) shall not exceed 58 average megawatts.

(o)  "FERC" means the Federal Energy Regulatory Commission, or its successor.

(p)  "Firm Energy" means the Federal energy that the Company has agreed to purchase from BPA under this Agreement.

(q)  "Firm Power" means the monthly amounts of Demand and Firm Energy (HLH and LLH) purchased by the Company under this Agreement.

(r)  "Heavy Load Hours" or "HLH" means those hours that begin at 6 a.m. and end at 10 p.m., Monday through Saturday.

(s)  "Light Load Hours" or "LLH" means all hours that are not HLH.

(t)  "Material Plant Damage" means the inability of the Company to resume industrial production at all or any portion of its plant because of damage to plant production facilities resulting from a restriction; for example, the inability to resume electrolysis in one or more pots without rebuilding or substantially repairing such pot(s).

(u)  "Non-Federal Service" means, for the purposes of section 18(a) of this Agreement, the monthly amounts of demand, HLH energy and LLH energy that the Company chooses to acquire from non-Federal entities to serve a portion of its Plant Load during the term of this Agreement. The Company agrees that such amounts must be supplied to the Plant Load. The Company

07/18/02  13:23  FAX                                                                    ☒008

may purchase additional amounts of non-Federal energy that will not be used in calculating the amount of curtailed energy

(v) "Occurrence" means a system condition that results in the need for Reserves

(w) "Operating Reserves" means nonspinning reserves, provided by the Company under this Agreement, that are necessary to enable BPA either to reestablish its load/resource balance after loss of generation or transmission facilities, or to meet any of its other existing nonspinning operating reserve obligations. Operating Reserves provided under this Agreement shall not include, without limitation: (1) Stability Reserves provided by the Company in this Agreement; (2) operating reserves provided by the Company in any other contract; and (3) any other reserves that BPA has acquired under other arrangements.

(x) "Plant Load" means the total electrical energy load at Company facilities eligible for BPA service during any given time period whether the Company has chosen to serve its load with BPA power or non-Federal power.

(y) "Process Load" means, for an aluminum facility or a chlor-alkali facility, the electrolytic load.

(z) "Qualified Purchaser" shall mean a utility or entity which: (1) is capable of performing the financial obligations undertaken for a sale or for an option to buy; (2) meets BPA's standards of service, including having an available transmission path; and (3) if required by State or Federal law, the purchaser has received all necessary approvals from appropriate regulatory bodies to conduct the transaction with BPA.

(aa) "Rate Schedule" means the Industrial Firm Power Rate Schedule (IP-96.5), the Point-to-Point Transmission Rate Schedule, exclusive of the Delivery Charge therein (PTP-96.5), Ancillary Products and Services Rate Schedule

07/16/02  13:23 FAX                                                              ⌀009

      (APS-96), a rate schedule that includes the fixed curtailment fee for the option specified in section 18(a), and the General Rate Schedule Provisions established by BPA, and applicable to sales under this Agreement. When such Rate Schedule has received interim or final approval by FERC, then it shall be attached hereto as Exhibit C.

(bb)   "Rate Test" means: (1) the calculation of whether the total average price in mills per kilowatthour, using the Rate Schedule, to determine if such total average price is less than or equal to the price specified in section 11(a) of this Agreement; (2) the determination of whether the fixed curtailment fee, for purposes of section 18(a) of this Agreement, is less than or equal to the amount specified in section 11(b); and (3) the determination of whether the use-of-facilities charge, as may be revised pursuant to section 8(b)(2) and Exhibit I, is less than or equal to the amount determined pursuant to section 11(c). The Rate Test is further described in section 11 of this Agreement.

(cc)   "Requested Operating Reserves" means the amount of Operating Reserves, pursuant to section 17, that the BPA dispatcher requests the Company to trip for purposes of providing Operating Reserves.

(dd)   "Reserves" means the Stability Reserves and Operating Reserves provided by the Company under this Agreement.

(ee)   "SR Event" means the period during which BPA implements a Stability Reserve restriction. An SR Event shall be an Event for all purposes. The beginning of the SR Event shall be identified by a transfer trip or other signal from BPA to the Company restricting delivery of energy under this Agreement. Unless reinstated as provided herein, the end of the SR Event shall be identified by the BPA dispatcher's notification to Company that delivery of all energy to which Company is entitled under this Agreement can be restored. Notwithstanding the foregoing, the Event will end (subject to