IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>KAISER ALUMINUM CORPORATION,<br>A Delaware Corporation, *et al.*,<br><br>　　　　　Debtors.<br><br>KAISER ALUMINUM & CHEMICAL CORPORATION,<br><br>　　　　　Movant<br><br>vs.<br><br>PUBLIC UTILITY NO. 1 OF CLARK COUNTY, d/b/a CLARK PUBLIC UTILITIES,<br><br>　　　　　Respondent. | Jointly Administered<br><br>Bankruptcy Case No. 02-10429<br><br>Chapter 11<br><br>District Court No. 05-836 |

**BRIEF IN SUPPORT OF EMERGENCY MOTION OF CLARK
PUBLIC UTILITIES FOR STAY OF FURTHER
PROCEEDINGS RELATED TO THE DEBTORS' MOTION
FOR AN ORDER DISALLOWING CLAIMS PENDING
<u>DETERMINATION OF MOTION TO WITHDRAW REFERENCE</u>**

Frederick B. Rosner, Esquire
Jaspan Schlesinger Hoffman, LLP
913 North Market Street
Wilmington, DE  19801

George H. Williams, Esquire
Bracewell & Guiliani LLP
2000 K Street
Suite 5000
Washington, DC  20006

William A. Wood, III, Esquire
Bracewell & Guiliani LLP
711 Louisiana Street, Suite 2300
Houston, TX  77002

Christopher Graham, Esquire
Louis A. Curcio, Esquire
Philip I. Bezanson, Esquire
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, NY  10281

**Table of Contents**

Table of Authorities ....................................................................................................................... ii

I.   PRELIMINARY STATEMENT ...........................................................................................2

II.  BACKGROUND ....................................................................................................................4

   A.   The Clark/Kaiser Transaction. ......................................................................................4

   B.   Clark's Claims Against Kaiser Arising Out of the Transaction. ...................................6

      1.   Clark's Claim for the Unauthorized Sale of Power Claim. ....................................6

      2.   Clark's Claim Based Upon Kaiser's Unjust and Unreasonable Rates. ..................................................................................................................8

   C.   The Claims Objection and Clark's Motion to Withdraw the Reference.....................11

   D.   The Bankruptcy Court's Refusal to Grant a Stay. .......................................................12

III. RELIEF REQUESTED..........................................................................................................13

IV.  BASIS FOR RELIEF............................................................................................................13

   A.   The District Court Should Stay the Claims Objection................................................14

      1.   The District Court Will Likely Grant Clark's Motion to Withdraw the Reference ...........................................................................................................15

         (a)   The Motion Was Timely Filed...............................................................15

         (b)   Withdrawal is Mandatory Under Section 157(d).....................................16

            (i)   Resolution of Clark's Claims Requires Consideration of the FPA.............................................................................................16

            (ii)  Consideration of the Federal Power Act Is Substantial and Material ..............................................................17

         (c)   The District Court May Also Exercise Discretion and Withdraw the Reference ..........................................................................21

      2.   Clark Will Suffer Irreparable Harm if the Stay is Not Granted ...........................24

      3.   Kaiser Will Not be Substantially Harmed By the Stay........................................25

      4.   The Public Interest Will be Served By Granting the Stay ...................................25

15784

V.     CONCLUSION ..............................................................................................................26

## Table of Authorities

**Federal Cases**

Cal. Ex. Rel Lockyer v. Transcanada Power, L.P., 110 Federal Appx. 839
    (9th Cir. Oct. 12, 2004) .......................................................................................... 9
Electrical District No. 1 v. FERC, 774 F.2d 490 (D.C. Cir. 1985) ............................... 20
Hatzel & Buehler, Inc. v. Orange & Rockland Utilities, Inc.,
    107 B.R. 34 (D. Del. 1989) .............................................................................. 16, 18
Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992 (5th Cir. 1985) ................... 21
In re CM Holdings, Inc., 221 B.R. 715 (D. Del. 1998) ...................................... 15, 16, 17
In re Eagle Enterprises, Inc., 259 B.R. 83 (Bankr. E.D. Pa. 2001) ......................... 14, 24
In re Interco, Inc., 135 B.R. 359 (Bankr. E.D. Mo. 1991) ............................................. 14
In re Hughes-Bechtol, Inc 1989 WL 222726 (Bankr. S.D. Ohio Oct. 6 1989) ............. 24
In re Leedy Mortgage Co., Inc., 62 B.R. 303 (E.D. Pa. 1986) ...................................... 22
In re NDEP Corp., 203 B.R. 905 (D. Del. 1996) ........................................................... 21
In re Oil Co., Inc., 140 B.R. 30 (E.D.N.Y. 1992) .......................................................... 15
In re Pan Am Corp., et al., 163 B.R. 41 (S.D.N.Y. 1993) ............................................. 22
In re Pittsburgh Corning Corp., 277 B.R. 74 (Bankr. W.D. Pa. 2002) ......................... 22
In re Pruitt, 910 F.3d 1160 (3d Cir. 1990) .................................................................... 21
In re Smith Corona Corp., SCM, 205 B.R. 712 (D. Del. 1996) .................................... 16
In re Tammaro, Inc., 56 B.R. 999 (D.N.J. 1986) ..................................................... 25, 26
In re Texaco, Inc., 84 B.R. 911 (S.D.N.Y. 1988) .......................................................... 18
In re White Motor Corp., 42 B.R. 693 (N.D. Ohio 1984) ........................................ 16, 26
Mellon v. Del. & Hudson Ry. Co. (In re Del & Hudson Ry. Co.),
    122 B.R. 887 (D. Del. 1991) ................................................................................. 22
Roth v. Bank of the Commonwealth, 583 F.2d 527 (6th Cir. 1978) ............................... 24

**Federal Statutes**

16 U.S.C. § 791 ................................................................................................................ 2
16 U.S.C. § 824 ................................................................................................................ 2
16 U.S.C. § 824(a) ........................................................................................................... 9
16 U.S.C. § 824(b)(1) ................................................................................................. 6, 17
16 U.S.C. § 824(c) ...................................................................................................... 9, 19
16 U.S.C. § 824(e)-(f) ................................................................................................ 6, 20
16 U.S.C. § 824d(a) ....................................................................................................... 20
16 U.S.C. § 824d(c) ......................................................................................................... 7
16 U.S.C. § 824d(d) ......................................................................................................... 7
16 U.S.C. § 824e(a) ........................................................................................................ 20
16 U.S.C. § 825 ................................................................................................................ 2
16 U.S.C. § 825l ............................................................................................................. 11

16 U.S.C. § 825p ............................................................................................................................ 9
28 U.S.C. § 1334(c) ..................................................................................................................... 13
28 U.S.C. § 157(d) ................................................................................................................ *passim*

**Federal Rules**

Federal Rule of Bankruptcy Procedure 5011(c) ................................................................. 13, 21

**Other Authorities**

Automated Power Exchange, Inc., 82 FERC ¶ 61,287................................................................ 18
Cent. Maine Power Co., 56 FERC ¶ 61,200 (1991) ..................................................................... 7
Notice of Interim Procedures to Support Industry Reliability
    Efforts and Request for Comments, 91 FERC ¶ 61,189 (2000) ...................................... 19
Prior Notice and Filing Requirements Under Part II of the Federal Power
    Act, 64 FERC ¶ 61,139 (1993) .......................................................................................... 7
Puget Sound Energy, Inc., 96 FERC ¶ 63,044, at 65,300 (2001) ................................................. 8
Puget Sound Energy, Inc. v. All Jurisdicitonal Sellers of Energy, 103 FERC ¶
    61,348 (2003).................................................................................................................... 9
Removing Obstacles to Increased Electric Generation and Natural Gas Supply in
    the Western United States, 94 FERC ¶ 61,272 (Mar. 14, 2001)................................. 7, 18
San Diego Gas & Electric, 96 FERC ¶61,120 (July 25, 2002)................................................... 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>KAISER ALUMINUM CORPORATION,<br>A Delaware Corporation, *et al.*,<br><br>　　　　　Debtors.<br><br>KAISER ALUMINUM & CHEMICAL CORPORATION,<br><br>　　　　　Movant<br><br>vs.<br><br>PUBLIC UTILITY NO. 1 OF CLARK COUNTY, d/b/a CLARK PUBLIC UTILITIES,<br><br>　　　　　Respondent. | Jointly Administered<br><br>Bankruptcy Case No. 02-10429<br><br>Chapter 11<br><br>District Court No. 05-836 |

**BRIEF IN SUPPORT OF EMERGENCY MOTION OF CLARK
PUBLIC UTILITIES FOR STAY OF FURTHER
PROCEEDINGS RELATED TO THE DEBTORS' MOTION
FOR AN ORDER DISALLOWING CLAIMS PENDING
<u>DETERMINATION OF MOTION TO WITHDRAW REFERENCE</u>**

Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities ("<u>Clark</u>"), pursuant to Rule 5011(c) of the Federal Rules of Bankruptcy Procedure, respectfully requests the United States District Court for the District of Delaware (the "<u>District Court</u>") to stay further proceedings commenced by debtor Kaiser Aluminum and Chemical Corporation's ("<u>Kaiser</u>") Motion for an Order Disallowing Claims Filed by Clark Public Utilities, filed on October 10, 2005 (copy attached as Exh. 1, the "<u>Claims Objection</u>"). In support of this Emergency Motion to Stay Further Proceedings in the Claims Objection (the "Emergency Motion"), Clark respectfully states as follows:

15784

# I.
# PRELIMINARY STATEMENT

Clark makes this Emergency Motion so that its Motion to Withdraw Reference of the Debtors' Motion for an Order Disallowing Claims Filed by Clark Public Utilities (the "Motion to Withdraw"), which was filed by Clark on October 24, 2005, can be adjudicated by this Court without being mooted by a Bankruptcy Court decision on the Claims Objection while the Motion to Withdraw is *sub judice* with this Court.  The Motion to Withdraw seeks to withdraw the reference to the Bankruptcy Court so that significant issues under the Federal Power Act, 16 U.S.C. § 791 *et seq.*,[1] (the "FPA") raised in Clark's proofs of claim, and contested by the Claims Objection, may be resolved by this Court.

Clark has two claims against Kaiser arising out of a power sale transaction that occurred in February 2001 -- the height of the energy crisis on the West Coast and in the Pacific Northwest.  First, Clark has a claim for "disgorgement" within the meaning of the FPA because Kaiser sold power to Clark without the FPA-required authority from FERC.  Second, Clark is entitled to a "refund" within the meaning of the FPA for the unjust and unreasonable rate Kaiser charged Clark for the power Clark purchased from Kaiser.

Clark previously sought a stay from the Bankruptcy Court, pursuant to Bankruptcy Rule 5011(c). (Docket No. 7596.)  The Bankruptcy Court refused to grant Clark's Emergency Motion (*see* Order dated November 21, 2005 (Docket No. 7777, attached as Exh. 2) reasoning that "unless and until the District Court physically does an order that withdraws the reference, I keep going. So you're not going to get a stay, and I am going to keep going[.]" (*See* Tr. from hearing held on November 14, 2005 ("Tr.") at 18-19).  However, this Court should grant Clark's Emergency Motion because Clark satisfies the standard that has been adopted by the Third

---

[1] Specifically, 16 U.S.C. §§ 824 & 825.

Circuit with respect to Bankruptcy Rule 5011(c) for stays of bankruptcy proceedings pending District Court determination of a motion to withdraw the reference.

A stay should be granted because it is likely that the District Court will withdraw the reference to the Bankruptcy Court because the substance of Clark's claims and Kaiser's Claims Objection exclusively concerns interpreting non-bankruptcy Federal law -- *i.e.*, the FPA. Indeed, the legal substance underlying Clark's claims against Kaiser concern only the FPA, which the Bankruptcy Court recognized -- "I agree that the claim is based on the Federal Power Act." Tr. at 16. The Bankruptcy Court also noted that "[FERC is] the regulatory agency with the expertise and I really think the issue belongs there." *Transcript of* March 17, 2003 Hearing at 21-22.

Failure to grant Clark's Emergency Motion would also irreparably harm Clark. Failure to stay the Bankruptcy Court's determination of the Claims Objection while this Court has not yet had the opportunity to determine whether the reference should be withdrawn to the Bankruptcy Court would force Clark to engage in potentially duplicative litigation and expose it to potentially inconsistent rulings; without a stay, Clark will be forced to litigate the merits of the Claims Objection before the Bankruptcy Court and then litigate the merits again before this Court if the reference to the Bankruptcy Court is withdrawn. Clark could be further harmed if the Bankruptcy Court issues a final ruling on the Claims Objection before this Court rules on the Motion to Withdraw, as Clark's right to seek withdrawal of the reference could be mooted by a Bankruptcy Court ruling.

Conversely, neither Kaiser nor other creditors would be harmed by a stay of the Claims Objection proceeding. Kaiser's Second Amended Plan of Reorganization (the "Plan") anticipates that holders of some general unsecured claims will receive distributions after the Plan's Effective Date, for example, if disputed claims may become allowed claims months after

15784                                              3

the Plan is confirmed. As such, the general unsecured creditors holding allowed claims before and after the Effective Date will receive their distribution under the Plan even if the Claims Objection is stayed. Staying the Claims Objection, therefore, will not hinder Kaiser's ability to solicit acceptances from the general unsecured creditor class.

Public interest also favors granting the Emergency Motion. Congress strongly favors the District Court adjudicating purely non-bankruptcy Federal law issues like those raised in Clark's claims and in the Claims Objection. To stay this proceeding and not expend judicial resources that could potentially render this Court's adjudication moot would therefore be in the public interest.

## II.
## BACKGROUND[2]

A.   The Clark/Kaiser Transaction

Clark is a customer-owned municipal corporation operating under the laws of the state of Washington and providing electricity to approximately 170,000 customers throughout Clark County, Washington. In 1981, Clark entered into a power contract with the Bonneville Power Administration ("BPA"), which expired on June 30, 2001. In 2000, Clark sought to purchase power from BPA beyond June 30, 2001. Due to an internal accounting change, BPA would only offer Clark a requirements contract beginning on October 1, 2001. Clark was able to find power from other sources for the month of July, but faced a looming two-month gap (August and September 2001) in its supply portfolio. Because of the well-publicized and documented volatility in the energy market in early 2001, as well as the prospect that the rates for electrical

---

[2] The procedural history surrounding Clark's claims against Kaiser is complex and need not, in Clark's view, be discussed here. In short, Clark sought relief from the automatic stay shortly after Kaiser filed for relief under the Bankruptcy Code. Clark's request was denied without prejudice and later, after Clark renewed its motion for relief, granted for the limited purpose of submitting certain additional discovery and facts to the FERC in the Puget Sound Proceeding that is discussed in Section II(B)(2) below.

15784                                                          4

power could go even higher in August and September 2001, Clark was compelled to fill this gap as soon as possible. Consequently, on February 2, 2001, Clark entered into a remarketing letter agreement (the "Remarketing Agreement," copy attached as Exh. 3) with Kaiser. Under the Remarketing Agreement, Clark committed to purchase from Kaiser 140 Megawatts of power for the period August 1, 2001 through September 30, 2001, at the rate of $325 per Megawatt hour (the "Transaction").

In order to meet its supply obligation under the Remarketing Agreement, Kaiser assigned some of its rights to power under a contract it maintained with BPA (the "BPA/Kaiser PSA," copy attached as Exh. 4). Pursuant to Kaiser's direction, BPA delivered certain of Kaiser's excess power to Clark under terms and conditions set by Kaiser.[3] To complete the Kaiser Transaction, BPA entered into two confirmation agreements, one with Clark (the "Clark Confirmation Agreement," copy attached as Exh. 5) and another with Kaiser (the "Kaiser Confirmation Agreement," copy attached as Exh. 6) confirming the terms agreed to by Kaiser and Clark in the Remarketing Agreement. The Clark Confirmation Agreement stipulated that Clark would pay $64,080,603 to BPA on March 28, 2001 for the remarketed Kaiser power. *See* Exh. 5 at 2. Thereafter, in accordance with the Kaiser Confirmation Agreement, BPA would transfer $59,842,404 to Kaiser, with the balance of $4,238,199 to be retained by BPA to cover the costs of the remarketed Kaiser power. *See* Exh. 6 at 1. Kaiser was responsible for the costs of transmitting the remarketed Kaiser power to Clark. *See* Exh. 5 at 2.

---

[3] This power sale was subject to FERC's jurisdiction. Under Section 18(b)(2) of the BPA/Kaiser PSA, Kaiser had the right to elect to remarket excess power it did not use by finding its own purchaser for such excess power or by requesting that BPA find a purchaser. (*See* BPA/Kaiser PSA at § 18(b)(2)). If Kaiser found its own purchaser -- as it did in finding Clark -- BPA had a first option to repurchase the power. *Id.* at § 18(b)(4)(B). However, if BPA did not exercise that option, BPA was required to deliver the power to Kaiser's purchaser on Kaiser's terms and conditions. BPA did not exercise its option of repurchasing Kaiser's excess power and was therefore obligated to follow Kaiser's direction.

15784                                                                 5

As a consequence of the extraordinarily high price Clark paid for Kaiser's power, Clark was forced to raise rates to its customers by twenty percent. Kaiser, on the other hand, profited $59,842,404 from the Transaction.

B.  Clark's Claims Against Kaiser Arising Out of the Transaction

Clark has two claims against Kaiser arising out of the Transaction. First, Clark has a claim against Kaiser for Kaiser's unauthorized sale of power to Clark, which is governed by sections 201 and 205 of the FPA. Second, Clark has a claim against Kaiser for the unjust and unreasonable rate Kaiser charged Clark for the power it sold to Clark, which is governed by section 205 of the FPA. Clark preserved its claims in Kaiser's bankruptcy case by filing two proofs of claim on or before the deadline for doing so. Kaiser has objected to both proofs of claim in the Claims Objection.

1. Clark's Claim for the Unauthorized Sale of Power Claim

On January 30, 2003, Clark filed Claim No. 7245 (the "Unauthorized Sale Claim"; copy attached as Exh. 7), which alleges that Kaiser violated the FPA when it sold Clark 140 Megawatts of power for the period August 1, 2001 through September 30, 2001. This power sale was subject to FERC's jurisdiction as a "sale of electric energy at wholesale in interstate commerce" under Section 201(b)(1) of the FPA. 16 U.S.C. § 824(b)(1). As such, it was subject to prior notice and authorization requirements under the FPA. Clark avers that Kaiser's sale of the power violated the FPA by not complying with Section 205(c), which requires public utilities[4] to file schedules "showing all rates and charges for any . . . sale subject to the jurisdiction of the Commission [FERC], and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate

---

[4] A "public utility" is an entity (not otherwise exempt, such as a state or federal instrumentality) that engages in jurisdictional activity under the FPA. 16 U.S.C. § 824(e)-(f) (2004). Because Kaiser is not otherwise exempt, it is a public utility for purposes of this proceeding.

to such rates, charges, classifications, and services." 16 U.S.C. § 824d(c). Kaiser also did not comply with Section 205(d), which requires FERC approval of a rate or charge before it can go into effect. 16 U.S.C. § 824d(d).

As set forth in the Unauthorized Sale Claim, Kaiser made a "jurisdictional" power sale to Clark by assigning Clark Kaiser's rights to receive power from the BPA under the BPA/Kaiser PSA. According to FERC opinions, a customer such as Kaiser makes a "jurisdictional" sale of power when such customer reduces its power purchases from one party, such as the BPA, and then redirects that jurisdictional power (or assigns the rights to such jurisdictional power) to another party, such as Clark, under terms set by the customer (*i.e., Kaiser*). *See Removing Obstacles to Increased Electric Generation and Natural Gas Supply in the Western United States*, 94 FERC ¶ 61,272, at 61,972 (Mar. 14, 2001), *order on rehearing*, 95 FERC ¶ 61,225, at 61,771 (May 16, 2001), *order on rehearing*, 96 FERC ¶ 61,155, at 61,678-79 (Jul. 27, 2001) ("Removing Obstacles Orders").

The appropriate remedy for the unauthorized sale of power is for the seller to disgorge to the buyer all revenues in excess of costs. *See Cent. Maine Power Co.*, 56 FERC ¶ 61,200, at 61,817-18 (1991), *rehearing denied in part*, 57 FERC ¶ 61,083, at 61,304 (1991) (announcing that FERC would strictly enforce its filing requirement and ensure compliance by requiring sellers that did not meet such requirements to refund all amounts collected in excess of costs); *see also Prior Notice and Filing Requirements Under Part II of the Federal Power Act,* 64 FERC ¶ 61,139, at 61,979-80 (1993), *order on rehearing,* 65 FERC ¶ 61,081 (1993) (implementing disgorgement remedy of revenues collected for time period during which rate was collected without FERC's authorization). In this case, due to the instability of the West Coast and Pacific Northwest power markets in 2001, Clark paid $64,080,603 to Kaiser for power that

cost Kaiser only $4,200,000. As such, Clark is entitled to a claim for disgorgement of $59,706,317 plus interest of $4,010,000, as of February 12, 2002, the date Kaiser filed its bankruptcy petition (the "Petition Date") for a total of $63,716,317.[5]

Kaiser has claimed that BPA, not Kaiser, was the "seller" of jurisdictional power to Clark and argues that the Confirmation Agreement between Clark and BPA creates a sale by BPA to Clark. *Comments of Kaiser Aluminum & Chemical Corp.*, submitted in FERC Docket No. EL01-10 (Oct. 31, 2001), copy attached as Exh. 8 at 4-5; *Prepared Answering Testimony of Joseph P. Hoerner for Kaiser*, submitted in FERC Docket No. EL01-10 (Mar. 20, 2003), copy attached as Exh. 9 at 5. Kaiser also asserts that it "cannot . . . resell federal power." Exh. 8 at 4. In the alternative, Kaiser has argued that if the transaction took place between Kaiser and Clark, and not between BPA and Clark, Kaiser did not make a "sale" to Clark, but rather "reduce[d] its load," therefore never taking title to the power. Exh. 8 at 6.

Legal resolution of the disparate arguments between Clark and Kaiser requires substantial and material interpretation and implementation of the FPA, FERC's prior rulings, FERC's rules, and the policy considerations surrounding the federally regulated energy market; such interpretation and implementation should be performed by the District Court pursuant to 28 U.S.C. § 157(d).

2. Clark's Claim Based Upon Kaiser's Unjust and Unreasonable Rates

On January 30, 2003, Clark also filed claim no. 3122, seeking a refund of the unjust and unreasonable rate Kaiser charged Clark for power, (the "Unreasonable Rate Claim"; copy

---

[5] Contrary to the allegations in Kaiser's Claims Objection, the Puget Sound Proceeding has nothing to do with Kaiser's unauthorized sale of power that forms the basis for proof of claim no. 7245. The Puget Sound Proceeding only concerns whether market dysfunctions in the Pacific Northwest resulted in "unjust and unreasonable" rates being charged by sellers in jurisdictional sales. *See Puget Sound Energy, Inc.*, 96 FERC ¶ 63,044, at 65,300 (2001). The Puget Sound Proceeding does *not* address whether sellers such as Kaiser were authorized to make "jurisdictional" power sales in the first place.

15784                                                           8

attached as Exh. 10). The Unreasonable Rate Claim alleges that the $325 per Megawatt hour that Kaiser charged Clark was an unjust and unreasonable rate under the FPA and FERC regulations. The legal determination of whether a seller of electrical power has charged a just and reasonable rate under the FPA falls within FERC's exclusive jurisdiction.[6] The specific determination of whether the rate Kaiser charged Clark under the Transaction was just and reasonable is currently before the Court of Appeals for the Ninth Circuit. *See Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement,* 103 FERC ¶ 61,348 (2003), order denying rehearing, 105 FERC ¶ 61,183 (2003), order denying request for rehearing, 106 FERC ¶ 61,109 (2004), appeal docketed, No. 03-74139 (9th Cir. Nov. 14, 2003).

On or about October 26, 2000, Puget Sound Energy Inc., another utility company affected by electrical power market volatility in the Pacific Northwest, filed a complaint with FERC pursuant to Section 206 of the FPA for an order capping the prices for power and capacity sales in the Pacific Northwest during the period of December 1, 2000 through June 20, 2001. This action was captioned *Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Pool Agreement,* Docket No. EL01-10-000, *et al.* In response to this complaint, FERC instituted a generic proceeding (the "Puget Sound Proceeding") to determine whether sellers of electrical power in the Pacific Northwest charged buyers unjust and unreasonable rates for such power and to determine the just and reasonable

---

[6] Federal Courts (not the Bankruptcy Court) have exclusive jurisdiction over matters involving the FPA. *See Cal. Ex. Rel Lockyer v. Transcanada Power, L.P.,* 110 Federal Appx. 839, 841 (9th Cir. Oct. 12, 2004) (citing 16 U.S.C. § 825p). Within the Federal Courts, FERC itself has the "exclusive authority to determine the reasonableness of wholesale [electricity] rates" under the FPA. 16 U.S.C. § 824(a) & (c); *Cal. Ex. Rel. Lockyer,* 110 Fed. Appx. At 841.

rate (a so-called "ceiling price") for all spot market sales in the Pacific Northwest from December 2000 through June 2001.[7]

Clark intervened in the Puget Sound Proceeding and alleged that Kaiser charged Clark unjust and unreasonable rates for the power it purchased from Kaiser pursuant to the Remarketing Agreement. Clark sought an order from FERC requiring Kaiser to pay to Clark a refund in an amount equal to the excess price charged by Kaiser over just and reasonable electricity rates. The Puget sound Proceeding did not address whether Kaiser lacked authority to enter into the sale in the first place.

In 2001, FERC ordered "a preliminary evidentiary proceeding" to explore settlement and to establish "the extent of potential refunds."[8] The preliminary evidentiary proceeding was referred to an Administrative Law Judge, who ultimately closed the proceeding with a recommended finding that no refunds were justified because there was no market manipulation.[9] On December 19, 2002, the Commissioners of FERC issued an Order on Motions to Reopen Evidentiary Record (the "December 19th Order") in the Puget Sound Proceeding, which reopened that proceeding for the submission of additional evidence. FERC issued the December 19th Order because new information regarding alleged intentional manipulation of the western power markets had come to light since the record in the Puget Sound Proceeding was closed by the Administrative Law Judge. Clark was able to participate in the new evidentiary submission to a very limited degree.[10]

---

[7] Exactly what constitutes a "spot market sale" was left for resolution in the *Puget Sound Proceeding*.

[8] San Diego Gas & Electric, 96 FERC ¶61,120, at 61,520 (July 25, 2002).

[9] The Administrative Law Judge did not take up the issue of whether Kaiser was an authorized seller under the FPA.

[10] After the December 19th Order was issued, on January 7, 2003, Clark filed an Emergency Motion for Limited Relief from the Automatic Stay Protecting Kaiser to permit Clark to conduct additional discovery and submit modified proposed findings of fact in the Puget Sound Proceedings. The Bankruptcy Court denied Clark's

On June 25, 2003, FERC issued a decision terminating the Puget Sound Proceedings and denying refunds to any party based on the broad policy determination that FERC considered it impossible to order a remedy that would be equitable to all entities that participated in the Pacific Northwest market. *Puget Sound Energy, Inc.,* 103 FERC ¶ 61,348, at 62,367 (2003). FERC's decision did not address the specifics of Clark's claim against Kaiser. The Puget Sound Proceedings have been appealed to the Ninth Circuit. Clark is not a party to the appeal, because the Bankruptcy Court did not permit Clark to file a request for a rehearing with FERC (*see* Docket No. 2616), which is a prerequisite to an appeal. FPA § 313, 16 U.S.C. § 8251 (2004). This does not, however, effect Clark's right to relief as an affected entity under any FERC order on remand from the Ninth Circuit if it grants the appeal of the Puget Sound Proceeding. Therefore, Clark submits that its Unreasonable Rate Claim must be decided by this Court or preserved until such time as FERC both decides that the Transaction is properly before it in the Puget Sound proceeding and establishes the just and reasonable rate.

C.   The Claims Objection and Clark's Motion to Withdraw the Reference

On October 10, 2005, Kaiser filed the Claims Objection. Kaiser's sole argument for disallowing Clark's claims is that the June 25 FERC Decision in the Puget Sound Proceeding "eliminated any prospect for Clark to recover" from Kaiser. (Claims Objection at ¶17.) But the Claims Objection ignores the fact that Clark has and filed *two* claims against Kaiser -- only one of which (the Unreasonable Rate Claim) was asserted in the Puget Sound Proceeding. The other claim (the Unauthorized Sale Clam) was not and will not be adjudicated in the Puget Sound

---

emergency motion, but allowed Clark to seek clarification from FERC as to whether the December 19th Order applied to Clark's Unreasonable Rate Claim against Kaiser. On February 23, 2003 FERC clarified that it would be appropriate for Clark to seek additional discovery, which the Bankruptcy Court allowed, but greatly curtailed. Clark's discovery was generally limited to Clark's transaction with Kaiser. Furthermore, the Bankruptcy Court allowed Kaiser to comment on Clark's discovery and accepted all of Kaiser's comments and revisions. *See* Docket No. 2000.

15784                                                11