may purchase additional amounts of non-Federal energy that will not be used
in calculating the amount of curtailed energy

(v)     "Occurrence" means a system condition that results in the need for Reserves.

(w)     "Operating Reserves" means nonspinning reserves, provided by the Company
under this Agreement, that are necessary to enable BPA either to reestablish
its load/resource balance after loss of generation or transmission facilities, or
to meet any of its other existing nonspinning operating reserve obligations.
Operating Reserves provided under this Agreement shall not include, without
limitation: (1) Stability Reserves provided by the Company in this
Agreement; (2) operating reserves provided by the Company in any other
contract; and (3) any other reserves that BPA has acquired under other
arrangements.

(x)     "Plant Load" means the total electrical energy load at Company facilities
eligible for BPA service during any given time period whether the Company
has chosen to serve its load with BPA power or non-Federal power.

(y)     "Process Load" means, for an aluminum facility or a chlor-alkali facility, the
electrolytic load.

(z)     "Qualified Purchaser" shall mean a utility or entity which: (1) is capable of
performing the financial obligations undertaken for a sale or for an option to
buy; (2) meets BPA's standards of service, including having an available
transmission path; and (3) if required by State or Federal law, the purchaser
has received all necessary approvals from appropriate regulatory bodies to
conduct the transaction with BPA.

(aa)    "Rate Schedule" means the Industrial Firm Power Rate Schedule (IP-96.5),
the Point-to-Point Transmission Rate Schedule, exclusive of the Delivery
Charge therein (PTP-96.5), Ancillary Products and Services Rate Schedule

07/18/02  13:23 FAX                                                                          ☒009

(APS-96), a rate schedule that includes the fixed curtailment fee for the option specified in section 18(a), and the General Rate Schedule Provisions established by BPA, and applicable to sales under this Agreement. When such Rate Schedule has received interim or final approval by FERC, then it shall be attached hereto as Exhibit C.

(bb)    "Rate Test" means: (1) the calculation of whether the total average price in mills per kilowatthour, using the Rate Schedule, to determine if such total average price is less than or equal to the price specified in section 11(a) of this Agreement; (2) the determination of whether the fixed curtailment fee, for purposes of section 18(a) of this Agreement, is less than or equal to the amount specified in section 11(b); and (3) the determination of whether the use-of-facilities charge, as may be revised pursuant to section 8(b)(2) and Exhibit I, is less than or equal to the amount determined pursuant to section 11(c). The Rate Test is further described in section 11 of this Agreement.

(cc)    "Requested Operating Reserves" means the amount of Operating Reserves, pursuant to section 17, that the BPA dispatcher requests the Company to trip for purposes of providing Operating Reserves.

(dd)    "Reserves" means the Stability Reserves and Operating Reserves provided by the Company under this Agreement.

(ee)    "SR Event" means the period during which BPA implements a Stability Reserve restriction. An SR Event shall be an Event for all purposes. The beginning of the SR Event shall be identified by a transfer trip or other signal from BPA to the Company restricting delivery of energy under this Agreement. Unless reinstated as provided herein, the end of the SR Event shall be identified by the BPA dispatcher's notification to Company that delivery of all energy to which Company is entitled under this Agreement can be restored. Notwithstanding the foregoing, the Event will end (subject to

Contract No. 95MS-94861

reinstatement as provided herein) when system conditions occur that result in tripping the Company for undervoltage or underfrequency load shedding. If such undervoltage or underfrequency load shedding signal is received by the Company prior to Event Minute 3 of the SR Event, then the restriction shall be deemed an event of Force Majeure until service is restored.

After an SR Event has ended, the SR Event shall be reinstated and continue as follows:

(1)    if the SR Event duration was 5 Event Minutes or less, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 2 hours or less of the last SR Event Minute;

(2)    if the SR Event duration was more than 5 Event Minutes but not more than 15 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 4 hours or less of the last SR Event Minute;

(3)    if the SR Event duration was more than 15 SR Event Minutes but not more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 6 hours or less of the last SR Event Minute; and

(4)    if the SR Event duration was more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 8 hours or less of the last SR Event Minute.

(ff)    "Stability Reserves" means those reserves, provided by the Company under this Agreement, that are necessary to ensure the stability of the Federal Columbia River Transmission System against losses of transmission facilities

Contract No. 95MS-94861

☑011

pursuant to the scheme(s) in Exhibit G or any additional scheme(s) adopted
pursuant to section 17 herein. Stability Reserves provided under this
Agreement shall not include, without limitation: (1) stability reserves
provided by the Customer in the General Transmission Agreement or in
other agreements; (2) operating reserves or forced outage reserves that BPA
has acquired under this Agreement or under other agreements; and (3) any
other reserves that BPA has acquired under other arrangements.

(gg)   "Take-or-Pay Obligation" means the obligation, as modified by section 14, of
the Company to pay for the Firm Power purchased by the Company under
this Agreement. On an annual basis, the amounts of HLH and LLH Firm
Energy that the Company agrees to purchase from BPA is specified in
section 9(b) of this Agreement. The monthly amounts of HLH and LLH Firm
Energy shall be as specified in Exhibit D. The monthly Demand amounts, for
the purposes of this Take-or-Pay Obligation, shall be the monthly Demand
amounts specified in Exhibit D. If the calculation of the Take-or-Pay
Obligation for a Contract Year for which Demands are not yet required to be
specified under section 10(a) becomes relevant, then the Demands for such
Contract Year shall be calculated by dividing the annual HLH Firm Energy,
if any, for each such Contract Year, as specified in section 9(b), by the
number of HLH in a Contract Year. Weekly, daily, and hourly amounts of
HLH and LLH Firm Energy are the amounts submitted by the Company
pursuant to section 10 of this Agreement

7.     EXHIBITS; INTERPRETATION

Exhibit A (General Contract Provisions), Exhibit B (Fees for Remarketing),
Exhibit C (Rate Schedule), Exhibit D (Monthly Amounts of Firm Power), Exhibit E
(Points of Delivery), Exhibit F (Unrecoverable Costs and Transfer Costs), Exhibit G
(Stability Reserve Scheme(s)), Exhibit H (Arbitration Procedures), and Exhibit I
(Use-of-Facilities Charge) are attached hereto and made a part of this Agreement. If
there is a conflict between the body of this Agreement and any exhibit, then the

Contract No. 95MS-94861

(c)    **Other Purchases**

This Agreement does not limit the Company's right to purchase power from BPA, consistent with Federal statutes, under other agreements, or to purchase power from third parties.

(d)    **Minimum Demand for Transmission**

A Company may elect to specify a minimum level of Demand for transmission for any month for the remaining term of this Agreement at the time the Company makes its submission of monthly amounts of Firm Power. Any request to specify a minimum level of Demand made after February 1, 1996, shall be subject to available transmission capacity as described in section 10(a). The Company may assign any excess minimum Demand for transmission consistent with terms for Assignment of Transmission Service under BPA's Point-to-Point Transmission Service Tariff. The amount of minimum Demand for transmission as elected or assigned shall be specified in Exhibit D.

10.    **MONTHLY, WEEKLY, DAILY, AND HOURLY AMOUNTS OF FIRM POWER**

(a)    **Monthly Amounts of Firm Power**

Not later than the February 1, immediately prior to October 1 of each Contract Year, the Company shall specify monthly amounts of Demand and HLH and LLH Firm Energy for such Contract Year. The total of the monthly amounts of HLH and LLH Firm Energy shall equal the annual amounts specified in section 9(b) for such Contract Year. The Company may set its Demand in each month in the 1996-1997 Contract Year at any level up to its Contract Demand. Any increase in amounts of Demand for a specific month in a later Contract Year above the greater of: (1) the amount of Demand for such month in the previous Contract Year; or (2) the minimum level of Demand for transmission specified in Exhibit D; is subject to BPA's determination of available transmission capacity. If additional generating resources integrated at points with transmission capacity available to the

Company's points of delivery are available for BPA's use or purchase, then BPA shall determine that transmission capacity is available under this Agreement. BPA shall also treat as available any transmission capacity made available by the Company to BPA through a reduction in demand under any other transmission agreement with BPA. If BPA determines that firm transmission capacity is not available for the Company's request, BPA will notify the Company within 60 days of the approved level of Demand. Each year, Exhibit D shall be revised to reflect the amounts specified by the Company, consistent with this section 10(a).

(b)    **Weekly, Daily, and Hourly Amounts of Firm Power**
The Company shall either: (i) provide advance submittals of weekly, daily, and hourly amounts of Firm Energy and any Excess Firm Energy pursuant to section 10(b)(1), which will remain as submitted unless changed pursuant to section 10(b)(2); or (ii) provide such submittals pursuant to the terms of section 10(b)(2) only.

(1)    **Advance Submittals of Weekly, Daily, and Hourly Amounts of Firm Energy**
The Company may submit weekly, daily, and hourly amounts in advance of, but not later than allowed under section 10(b)(2). Such advance submittals shall specify HLH and LLH amounts of Firm Energy to be delivered hereunder until the Company changes its submittal. The Company may change any advance submittal pursuant to section 10(b)(2). All advance submittals shall include a beginning and ending hour.

07/16/02  13:24 FAX                                                                    ☒014

(6)    **Makeup Power**

At the Company's request, BPA shall sell and deliver to the Company
energy in excess of the amount shown in Exhibit D (Makeup Power),
at the applicable energy charge only established for Firm Energy in
the Industrial Firm Power Rate in the Rate Schedule, to the extent
that such energy is needed by the Company to restore its operations
following a restriction. Such Makeup Power shall not subject the
Company to any Unauthorized Increase or other charge

18.    CURTAILMENT OR REMARKETING

The Company shall have a one-time option, at the time the Company makes its first
submission of monthly amounts of Firm Power pursuant to section 10(a) of this
Agreement, to either: curtail its purchases pursuant to section 18(a); or remarket
Excess Firm Energy pursuant to section 18(b). Following the Company's election,
BPA and the Company shall operate under the terms and conditions of either
section 18(a) or section 18(b), as applicable.

(a)    **Curtailment of Excess Firm Energy for a Fixed Fee**

The Company may curtail its Plant Load below the sum of its Take-or-Pay
Obligation plus any amount of Non-Federal Service the Company identifies
at the time it elects this curtailment option. BPA shall relieve the Company
of its Take-or-Pay Obligation for Demand and Firm Energy for any such
curtailed amounts and the Company shall pay BPA the fixed curtailment fee
in mills per kilowatthour for each kilowatthour of such curtailed amounts, as
specified in the Rate Schedule. Selection of this curtailment option shall
relieve the Company of its obligation to pay the use-of-facilities charge
specified in Exhibit I for amounts of curtailed energy.

(1)    The Company shall provide BPA as much notice as possible, but not
less than 48 hours, of any curtailment of Firm Power usage.

(2)    If the Company chooses to use Non-Federal Service for part of its Plant Load, the Company shall specify the monthly amounts of demand, HLH energy, and LLH energy of Non-Federal Service, if any, for the term of this Agreement. BPA shall not be obligated to serve these specified monthly amounts, and any service to these amounts shall be subject to an Unauthorized Increase charge, as provided for in section 15(c).

(3)    Curtailed energy shall be equal to the Company's Take-or-Pay Obligation for Firm Energy reduced by the relief from take-or-pay provisions of section 14, minus the Measured Energy for Firm Power delivered under this Agreement.

(4)    Election of this curtailment option operates to assign the Company's right to transmit an amount of energy equal to the curtailed energy to BPA.

(b)    **Remarketing Excess Firm Energy Without a Fixed Fee**

(1)    **Notice and Request to Remarket**
The Company shall request that BPA remarket Excess Firm Energy by notifying BPA of:

(A)    the amount and minimum duration of Excess Firm Energy to be remarketed; and

(B)    the manner pursuant to section 18(b)(2) in which the Company wants BPA to remarket the Excess Firm Energy.

(2)    **Remarketing Options**
The Company may select one or more of the following options for remarketing Excess Firm Energy:

(A)    The Company may identify one or more Qualified Purchasers that have agreed to purchase some or all of the Excess Firm Energy under specified terms and conditions at agreed-upon prices or price formulas and for agreed-upon amounts and durations. The Company shall provide BPA at least the notice specified in section 18(b)(3) prior to the date that deliveries are to begin under each proposed sale.

(B)    The Company may arrange in advance for a Qualified Purchaser(s) to purchase any Firm Power that becomes Excess Firm Energy during any period for which the Company and a Qualified Purchaser may agree. The Company shall provide BPA at least the notice specified in section 18(b)(3) prior to the date on which the prearrangement becomes effective. In addition, the Company shall notify BPA as required in section 10(b) when deliveries are to begin under the arrangement.

(C)    The Company may request that BPA find purchasers for the Excess Firm Energy. If the Company chooses, it may request that BPA seek sales of specified amounts for daily, weekly, monthly, or other specified durations, and the Company may specify minimum prices or price ranges for the sales. BPA and the Company shall agree on the price of the sale at the time of the transaction unless the daily limitations in section 18(b)(4)(E) apply. BPA shall promptly notify the Company of the sales made on the Company's behalf.

(D)    The Company and BPA may agree to a price for use in crediting the Company's wholesale power bill under section 18(b)(4). BPA shall have discretion to dispose of or use

such Excess Firm Energy without regard to the procedures associated with other options for disposal, and the Company shall have no further rights with respect to such Excess Firm Energy that is subject to such agreement

(3)    **Applicability of Preference Provisions**

Excess Firm Energy remarketed by BPA shall be subject to applicable statutory provisions regarding preference. BPA shall notify the Company within the time period specified below if BPA or another Qualified Purchaser with public preference has elected to perform the agreement.

| Duration of Sale | Minimum Notice Period to Notify BPA | Maximum Period for BPA to Respond to Company |
|---|---|---|
| Up to 1 month | 48 hours | 24 hours |
| Up to 6 months | 7 days | 2 days |
| Over 6 months | 14 days | 7 days |
| Prearrangements under section 18(b)(2)(B) | 21 days | 14 days |

(4)    **Crediting the Company's Wholesale Power Bill**

(A)    During months when Excess Firm Energy is being remarketed by BPA, such power shall continue to be included in the amount of Firm Power billed by BPA as if delivered to the Company.

(B)    BPA may sell the Excess Firm Energy to the Qualified Purchaser(s) as arranged by the Company under options section 18(b)(2)(A) and section 18(b)(2)(B) or dispose of such power on whatever alternative terms that BPA may separately arrange. In either event, BPA shall credit the Company for the Excess Firm Energy revenues based on the price(s) agreed to

☒018

between the Company and the Qualified Purchaser(s) net of
the amounts specified in section 18(b)(4)(C).

(C)     BPA shall determine the revenues for Excess Firm Energy
delivered during a month by subtracting from the amount paid
by the Qualified Purchaser (or the amount agreed to be paid or
credited if BPA elects not to remarket to the Qualified
Purchaser, disposes of or uses the Excess Firm Energy under
section 18(b)(2)(D), or remarkets the Excess Firm Energy
under section 18(b)(2)(C)): (i) any applicable transmission
charges or losses specified in section 18(b)(4)(F); and (ii) the
remarketing fee, as specified in Exhibit B. The fee or the
pro rata share of the fee that the Company would have paid to
another entity under a transaction under section 18(b)(2)(B)
shall be deducted from revenues when BPA elects to retain the
Excess Firm Energy for itself.  No charges shall apply under
section 18(b)(4)(C)(i) and section 18(b)(4)(C)(ii) when BPA uses
such Excess Firm Energy for its own use or disposes of such
Excess Firm Energy under section 18(b)(2)(D).

(D)     BPA shall credit the Company's wholesale power bill for
revenues from sales of Excess Firm Energy in the month in
which BPA uses such Excess Firm Energy for its own use or
disposes of such Excess Firm Energy under section 18(b)(2)(D),
BPA is paid for such Excess Firm Energy under
section 18(b)(2)(C), or BPA is paid for such Excess Firm Energy
by the Qualified Purchaser.  If the amount of the credit during
any month exceeds the power bill amount, then BPA shall pay
the Company the amount of the difference.

(E)     BPA shall credit the Company for sales made under
section 18(b)(2)(C) on Company's behalf subject to the

40                          Contract No. 95MS-94861

@019

limitations in this paragraph   For sales of 1 month duration or
less, if BPA notified the Company at the start of a transaction
that it was subject to daily remarketing limitations and BPA is
simultaneously remarketing power for the Company and
selling nonfirm energy on a daily basis, then the Company
shall receive credit for the energy that BPA remarkets on the
Company's behalf on such days at BPA's average sale price for
nonfirm energy (including remarketed energy) for such day;
provided, however, BPA shall have no obligation to credit
the Company at such average daily price to the extent that the
total amount of Excess Firm Energy remarketed under similar
contract provisions for the Company and other entities
providing for daily remarketing limitations exceeds the
following limits:

| If BPA's actual daily average sales (excluding remarketed amounts) are: | | Limit to total amount of remarketed energy |
| equal to or greater than (aMW) | but less than (aMW) | (aMW) |
|---|---|---|
| 0 | 600 | 25% of BPA actual sales |
| 600 | 1,000 | 200 |
| 1,000 | 1,500 | 250 |
| 1,500 | 3,000 | 300 |
| 3,000 | 4,000 | 400 |
| 4,000 | 5,000 | 500 |
| 5,000 | - - | 600 |

In the event the above limits are exceeded, the Company shall
be credited for its pro rata share of remarketed energy at the
average daily price. All sales of remarketed energy for each
day under the daily remarketing limitations shall be
considered made under a single active schedule to determine
remarketing fees. Sales of remarketed energy under the daily
remarketing limitations shall be considered made over the
southern intertie during the months of April through July, and

in the Pacific Northwest during other months. The Company may request that BPA remarket the remainder of its Excess Firm Energy at the best available price for additional energy, or the Company may arrange to store the Excess Firm Energy for sale at another time. BPA shall not discriminate against the Company in the storage or disposal of such remaining Excess Firm Energy.

(F)   There are no additional transmission charges for Excess Firm Energy except when:

(i)    BPA incurs incremental transfer costs, including losses,

(ii)   the Qualified Purchaser receiving delivery would have paid a charge for low-voltage delivery higher than the charge, if any, paid by the Company.

The Company shall pay such incremental costs. Any deliveries of Excess Firm Energy over BPA's interties shall be charged BPA's standard intertie tariffs. Losses will be valued at the price of the remarketed power.

## 19.   LOAD REGULATION, UNBUNDLED PRODUCTS, AND OTHER TRANSMISSION PRODUCTS

(a)    **Purchase of Load Regulation**

If the Company is within BPA's Control Area, or if BPA provides load regulation services to the Company through a third party, the Company shall purchase load regulation from BPA. The charge for load regulation shall be as specified in Exhibit C.



**Department of Energy**

Bonneville Power Administration
P.O  Box 3621
Portland, Oregon  97208-3621

POWER BUSINESS LINE

March 23, 1998

In reply refer to: PSB/Spokane

Amendatory Agreement No. 1 to
Contract No. 95MS-94861

Mr. Peter Forsyth
Vice President, NW External Affairs
Kaiser Aluminum & Chemical Corporation
825 NE. Multnomah, Suite 960
Portland, OR  97232

Dear Mr Forsyth:

This letter agreement (Amendatory Agreement) constitutes an amendment to Contract No. 95MS-94861
(Power Sales Agreement) between the Bonneville Power Administration (BPA) and Kaiser Aluminum &
Chemical Corporation (Company). BPA and the Company are hereinafter sometimes referred to
individually as "Party" and collectively as "Parties." BPA and the Company have executed an interim
transmission services agreement (hereinafter referred to as "Interim PTP Service Agreement") under
which BPA has provided Point-to-Point Transmission Service over the Federal Columbia River
Transmission System (FCRTS) pursuant to the terms and conditions of the Point-to-Point Transmission
Services tariff and the 1996 Point-to-Point Firm Transmission Rate Schedule (PTP-96). The Parties are
negotiating the terms and conditions of a final transmission service agreement (Final PTP Service
Agreement) which will supersede the Interim PTP Service Agreement. The Parties have agreed to
amend the Power Sales Agreement as follows:

    1.    **EFFECTIVE DATE.** This Amendatory Agreement, when executed, shall become
effective as of the date that the Interim PTP Service Agreement becomes effective.

    2.    **DEFINITIONS.** All capitalized terms used herein shall be as defined in the Power
Sales Agreement or, if not defined in the Power Sales Agreement, as defined in the General Rate
Schedule Provisions, unless otherwise specified in this Amendatory Agreement.

    "PTP Service Agreement" shall mean the Interim or Final PTP Service Agreement, as
applicable.

    3.    **AMENDMENT OF POWER SALES AGREEMENT.** The Power Sales Agreement is
amended as follows:

        (a)    Section 8(b)(2) is deleted and replaced by the following:

☑022

4

section 14, minus the Measured Energy for Firm Power delivered under this Agreement."

(k)     A new section 18(b)(1)(C) is added as follows:

"(C)    the assignment to BPA of that portion of its rights under the PTP Service Agreement, associated with the energy to be remarketed and necessary to allow BPA to use such assigned rights to remarket Excess Firm Energy for the Company, subject to the assignment provisions of the Point-to-Point Transmission Services tariff and the terms of section 18(b)(4)(F)."

(l)     Section 19(d) is deleted and replaced by the following:

"(d)    Unbundled Products and Other Transmission Services. BPA shall offer to the Company the ancillary services, the network integration transmission product, the point-to-point transmission product, and the intertie transmission products that BPA offers to its utility customers. BPA may offer to the Company other unbundled services. If the Company elects to purchase such products, the Parties agree to amend the appropriate provisions of this Agreement and/or the PTP Service Agreement."

(m)     Section 19(f) is deleted in its entirety.

(n)     Section 20(a) is deleted and replaced by the following:

"(a)    Delivery to Company's Firm Load. BPA shall make available Firm Power at the points of interconnection specified in Exhibit C-1 of the PTP Service Agreement. Delivery of such Firm Power over the Network to the Company's Plant Load shall be as provided for in the PTP Service Agreement."

(o)     Section 20(b) is deleted and replaced by the following:

"(b)    Other Provisions Relating to Delivery. Other provisions applicable to delivery (1) at the points of interconnection specified in Exhibit C-1 of the PTP Service Agreement shall be as specified in Exhibit A of this Agreement, and (2) over the Network to the Company's Plant Load shall be as specified in the PTP Service Agreement."

(p)     Section 26 is deleted and replaced by the following:

"26.    DAMAGES FOR FAILURE BY BPA TO DELIVER. In the event BPA fails to deliver the hourly amounts of Firm Energy scheduled by the Company under this Agreement to the plant's Point of Delivery, and such delivery is not restricted by BPA pursuant to its Reserve rights under this Agreement, or pursuant to the curtailment rights under the PTP Service Agreement, or such delivery is not excused by section 4(f) of Exhibit A, BPA shall pay the Company (on the date payment by the Company for the Firm Energy would otherwise have been due under this Agreement):

Contract No. 95MS-94861



(POOR QUALITY ORIGINAL(S))

**Department of Energy**
Bonneville Power
Administration
P.O. Box 3621
Portland, OR 97208-3621

**POWER BUSINESS LINE**
Trader and Scheduling Phones

| | | | |
|---|---|---|---|
| Date: | February 06, 2001 | Brenda Anderson | (503) 230-5610 |
| To: | Clark Public Utilities | Dan Le | (503) 230-3144 |
| | 1200 Ft Vancouver | Young Linn | (503) 230-5133 |
| | Vancouver, WA 98668 | Bill Lamb | (503) 230-3135 |
| | | Mark Miller | (503) 230-4003 |
| Attn: | James Sanders | David Mills | (503) 230-7558 |
| Phone: | 360-992-3452 | BPA Trading Floor Fax | (503) 230-7363 |
| Fax: | 360-992-3140 | BPA Preschedule Fax | (503) 230-5000 |
| | | BPA SW Preschedule | (503) 230-5615 |
| Presch: | 503-251-5198 | BPA NW Preschedule | (503) 230-3413 |
| Real Time: | 503-251-5224 | BPA S. Idaho Presch. | (503) 230-4311 |
| PSRRT | 503-251-5201 | BPA Real Time | (503) 230-5341 |
| FAX: | | | or 230-4194 |

## CONFIRMATION AGREEMENT

The following memorializes the terms of a transaction agreed to by Bonneville Power Administration (BPA) and Clark Public Utilities (CPU). Transactions hereunder are in accordance with reference contract or enabling agreement DE-MS79-81BP90489.

Transaction Date: 2/6/01          Traders:   Mark Miller (BPA) and James Sanders (CPU)

BPA Contract:      01PB-24068

---

Seller of Energy:      BPA
Buyer of Energy:      Clark Public Utilities
Product:          Surplus firm power
Point of Delivery:    Alcoa Substation
Alternate Point      Where the Federal generating system interconnects with BPA's transmission
of Delivery:      network  Customer will provide transmission from the Federal generating system
              Energy taken to an alternate POD is take-or-pay and liquidated damages do not
              apply.  Customer is responsible for payment of energy if transmission is curtailed
              to APOD.

| Start of Term | End of Term | Demand Limit | Hours | Amount (MWH/hr) | Total MWh | Price | Holiday Excluded | Revenue / Cost |
|---|---|---|---|---|---|---|---|---|
| 8/1/01 | 8/31/01 | 140 | ALL | 140 | 104,160 | $325.00 | | |
| 9/1/01 | 9/30/01 | 140 | ALL | 140 | 100,800 | $325.00 | | |

Energy Transaction Total:                    See Additional Provisions below

Page 1 of 2 CPU 01PB-24068

**Additional Provisions**
Transmission will be provided under Kaiser Aluminum & Chemical Corp. (KACS) Contract No. 96MS-96107. Payment for transmission will remain with KACS.

CPU shall pay to BPA $64,080,603.00 on March 16, 2001, which represents net payment/NPV of full payment for all energy purchased under this agreement. This confirmation agreement shall be modified on or before March 15, 2001, if a change to the payment date is required.

**Scheduling**
All energy will be shown in Pacific Prevailing Time
~ HLHs are defined as HE 0700 – HE 2200, Monday through Saturday (excludes Sundays and NERC holidays)
~ LLHs are defined as HE 0100 – HE 0600, HE 2300 and HE 2400, Monday through Saturday and all day Sundays and NERC holidays.
~ All or FLH is defined as HE 0100 – HE 2400.

Energy shall be prescheduled, with source and sink identified, by 1000, or as mutually agreed, on the day that both parties observe as a workday preceding the date of delivery. Schedules may only be changed due to uncontrollable forces as defined by the reference contract or by mutual agreement of both parties.

**Billing**
Billing and payment under this agreement shall be made consistent with and as a specific item in the Wholesale Power Bill.

Unless otherwise specified in this Agreement, all administrative and operational provisions required to perform this Agreement shall be those described in the reference contract, including provisions related to delivery, scheduling (if applicable), billing, payments, metering, access to facilities, dispute resolution, uncontrollable forces, continuity of services, and contract interpretations.

This confirmation agreement contains all of the terms and conditions of this transaction and expressly limits acceptance to the terms stated herein, and any additional or different terms proposed by Clark Public Utilities are rejected unless expressly agreed to in writing by BPA.

If the above accurately reflects your understanding of our agreement, please indicate your approval by signing a copy of this agreement and returning via fax to BPA.

AGREED AND ACCEPTED

Bonneville Power Administration

Clark Public Utilities

David E. Mills

Name: Wayne kn plch

Manager, Trading Floor

Title: Grand Manger / CEO

Date: 2/8/01

Date: 2-8-0/

Page 2 of 2 CPU 01PB-24068

'POOR QUALITY ORIGINAL(S)



**Department of Energy**
Bonneville Power
Administration
P.O. Box 3621
Portland, OR 97208-3621

**POWER BUSINESS LINE**
Trader and Scheduling Phones

| | |
|---|---|
| Brenda Anderson | (503) 230-5610 |
| Dan Le | (503) 230-3144 |
| Young Linn | (503) 230-3183 |
| Bill Lamb | (503) 230-3135 |
| Mark Miller | (503) 230-4003 |
| David Mills | (503) 230-7688 |
| BPA Trading Floor Fax | (503) 230-7463 |
| BPA Preschedule Fax | (503) 230-3039 |
| BPA SW Preschedule | (503) 230-3915 |
| BPA NW Preschedule | (503) 230-3813 |
| BPA S. Idaho Presch. | (503) 230-4311 |
| BPA Real Time | (503) 230-3311 |
| | or 230-4194 |

Date:   February 06, 2001
To:     Kaiser Aluminum & Chemical Corporation
        534 East Tront Avenue, Suite 300
        Spokane, WA 99202

Attn:   Joseph Hoerner
Fax:    509-242-1098

Presch: 509-495-4011
Real Time: 509-495-8534
PS/RT FAX: 509-495-8976

## CONFIRMATION AGREEMENT

The following memorializes the terms of a transaction agreed to by Bonneville Power Administration (BPA) and Kaiser Aluminum & Chemical Corporation (KACS). Transactions hereunder are in accordance with reference contract or enabling agreement 95MS-94861.

Transaction Date: 2/6/01        Traders:   Mark Miller (BPA) and Joseph Hoerner (KACS)

BPA Contract:   01PB-24067

Seller of Energy:   Kaiser Aluminum & Chemical Corporation
Buyer of Energy:    BPA
Product:            Firm power
Point of Delivery:  Mid-Columbia

| Start of Term | End of Term | Demand Limit | Hours | Amount (MWH/hr) | Total MWh | Price | Holiday Excluded | Revenue / Cost |
|---|---|---|---|---|---|---|---|---|
| 8/1/01 | 8/31/01 | 140 | ALL | 140 | 104,160 | $325.00 | | $33,852,000.00 |
| 9/1/01 | 9/30/01 | 140 | ALL | 140 | 100,800 | $325.00 | | $32,760,000.00 |
| Energy Transaction Total: | | | | | | | | $59,842,404.00 |
| | | | | | | | | See Additional Provisions |

## Additional Provisions

Energy Transaction Total to be paid to KACS upon receipt of payment from Clark Public Utilities for corresponding sale of remarketed energy (Contract 01PB-24068).

BPA shall pay to KACS $59,842,404 on March 30, 2001, which represents the net payment to KACS (NPV of this purchase of 140 MW equalling $61,080,003 less NPV of IP 96 rate equalling $1,238,199). This confirmation agreement shall be modified on or before March 15, 2001, if a change to the payment date is required.

This contract books out sale to Sale to KACS under contract 95MS-94861

Page 1 of 2 KACS 01PB-24067

FEB-09-01 14:13 From:KAISER AL RW EXT AFFAIRS

Scheduling

All energy will be shown in Pacific Prevailing Time.
- HLHs are defined as HE 0700 – HE 2200, Monday through Saturday (excludes Sundays and NERC holidays).
- LLHs are defined as HE 0100 – HE 0600, HE 2300 and HE 2400, Monday through Saturday and all day Sundays and NERC holidays
- All or FLH is defined as HE 0100 – HE 2400.

Energy shall be prescheduled, with source and sink identified, by 1000, or as mutually agreed, on the day that both parties observe as a workday preceding the date of delivery. Schedules may only be changed due to uncontrollable forces as defined by the reference contract or by mutual agreement of both parties.

Billing

Billing and payment under this agreement shall be made consistent with and as a specific item in the Wholesale Power Bill

Unless otherwise specified in this Agreement, all administrative and operational provisions required to perform this Agreement shall be those described in the reference contract, including provisions related to delivery, scheduling (if applicable), billing, payments, metering, access to facilities, dispute resolution, uncontrollable forces, continuity of services, and contract interpretation.

This confirmation agreement contains all of the terms and conditions of this transaction and expressly limits acceptance to the terms stated herein, and any additional or different terms proposed by Kaiser Aluminum & Chemical Corporation are rejected unless expressly agreed to in writing by BPA.

If the above accurately reflects your understanding of our agreement, please indicate your approval by signing a copy of this agreement and returning via fax to BPA

---

### AGREED AND ACCEPTED

Bonneville ~~Power~~ Administration      Kaiser Aluminum & Chemical Corporation

David E. Mills      Name: S. P. Tozzi[?]

Manager, Trading Floor      Title: V.P. Primum Metals

Date __2/7/01__      Date: 2/9/01

---

NO. 562    D882                    BPA → 912509242189B    13:51    Feb/03/2001

EXHIBIT 5 TO ATTACHMENT A
TO PROOF OF CLAIM OF CLARK PUBLIC UTILITIES

Interest Calculations*

| $59,706,317 | (difference between cost of power to Kaiser and the amount Clark Public Utilities paid for such power) |
|---|---|
| $1,346,377.45 | 2nd Quarter of 2001 @ 9.02% |
| $1,189,001.22 | 3rd Quarter of 2001 @ 7.79% |
| $1,058,108.83 | 4th Quarter of 2001 @ 6.80% |
| $416,512.71 | 1st Quarter of 2002 (pre-petition period of 42 days @ 5.64%) |
| $476,014.53 | 1st Quarter of 2002 (post-petition period of 48 days @ 5.64%) |
| $767,098.37 | 2nd Quarter of 2002 @ 4.78% |
| $771,393.23 | 3rd Quarter of 2002 @ 4.75% |
| $780,553.53 | 4th Quarter of 2002 @ 4.75% |
| $768,206.40 | 1st Quarter of 2003 @ 4.62% |

*Interest is calculated in accordance with 18 C.F.R. § 35.19a(a)(2). Interest on the claim continues to accrue pursuant to 18 C.F.R. § 35.19a(a)(2). The interest rates used were the applicable interest rates from FERC's website [http://www.ferc.gov/gas/interest.htm]

# Thacher Proffitt

Thacher Proffitt & Wood
11 West 42nd Street
New York, New York 10036
212 789 1200

Fax: 212 789 3500
www.tpwlaw.com

Direct Dial: 212 789 1466
lcurcio@tpwlaw.com

January 29, 2003

**BY FEDERAL EXPRESS**

Kaiser Aluminum Claims Processing Department
Logan & Company, Inc.
546 Valley Road
Upper Montclair, New Jersey 07043

Re:     *In re Kaiser Aluminum and Chemical Corporation*
        Case No. 02-10430(JKF)
        Proof of Claim of Clark Public Utilities (Claim #2)

To Whom It May Concern:

With respect to the above referenced matter, enclosed for filing please find one original and one copy of Clark Public Utilities' Proof of Claim (Claim #2) against the debtor Kaiser Aluminum and Chemical Corporation. Kindly file the original Proof of Claim, and file-stamp and return the copy to the undersigned in the enclosed self-addressed, prepaid Federal Express envelope. In addition, please note that this Proof of Claim relates to one of Clark Public Utilities' two claims against Kaiser. The Proof of Claim for Clark Public Utilities' other claim (Claim #1) will be sent simultaneously under separate cover.

If you have any questions, please do not hesitate to contact me. Thank you in advance for your assistance.

Very truly yours,

Louis A. Curcio

Enclosures