**EXHIBIT 8**

ORIGINAL

## ANDREWS & KURTH L.L.P.
ATTORNEYS

HOUSTON
WASHINGTON, D.C.
DALLAS
LOS ANGELES
NEW YORK
THE WOODLANDS
LONDON

1701 PENNSYLVANIA AVENUE, N.W.
SUITE 300
WASHINGTON, D.C. 20006 5805

TELEPHONE: 202.662.2700
FACSIMILE: 202.662.2739

KENNETH L. WISEMAN
DIRECT: 202.662.2715

FILED
01 OCT 31 PM 3:22
REGULATORY COMMISSION

October 31, 2001

David P. Boergers
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Re: *Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy And/Or Capacity, etc.*, Docket Nos. EL01-10-000, El01-10-001

Dear Mr. Boergers:

Enclosed please find an original and fourteen (14) copies of Comments of Kaiser Aluminum & Chemical Corporation. Also included are three (3) extra copies of this filing. Please time and date stamp these copies and return them to the messenger.

If there are any questions, please contract me at the number listed above.

Very truly yours,

Kenneth L. Wiseman
Attorney for
Kaiser Aluminum & Chemical Corporation

Enclosures

011102-0476-1

WAS:90502.1

**DOCKETED**

ORIGINAL

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

FILED
01 OCT 31 PM 3: 22
REGULATORY COMMISSION

| | | |
|---|---|---|
| Puget Sound Energy, Inc., | ) | |
| Complainant, | ) | |
| | ) | |
| v. | ) | Docket Nos.  EL01-10-000 |
| | ) | EL01-10-001 |
| All Jurisdictional Sellers of Energy And/or | ) | |
| Capacity, Etc., | ) | |
| Respondents. | | |

**COMMENTS OF KAISER ALUMINUM & CHEMICAL CORPORATION**

Pursuant to the procedural schedule established in this proceeding by the Commission,[1] Kaiser Aluminum & Chemical Corporation ("Kaiser") hereby files its comments to the "Recommendations and Proposed Findings of Fact," of the Presiding Judge in the captioned proceeding, 96 FERC ¶63,044 (September 24, 2001) (hereinafter, "R & PFF").

### I. INTRODUCTION AND SUMMARY

The R & PFF concluded generally that no refunds were warranted or due for transactions in the Pacific Northwest ("PNW"), that the PNW power market is competitive and that the relevant prices were not unjust and unreasonable, but instead arose from a number of factors aside from the exercise of market power. Kaiser agrees with the foregoing conclusions. Considering the extraordinarily compressed time period for the preliminary evidentiary hearings in this proceeding, the enormity of the volume of transactions at issue and the record here, the Presiding Judge did a commendable job of distilling and resolving these issues which have a wide-ranging impact.

---

[1] "Notice of Opportunity For Public Comment On Administrative Law Judge's Recommendations And Proposed Findings of Fact," *Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy, etc.*, Docket Nos. EL01-10-000, *et al.*, (October 10, 2001).

WAS:90457.1



DOCKETED

Because the Presiding Judge concluded that refunds were unnecessary, and given the highly expedited procedural schedule, it is understandable that she did not delve into particular claims for refunds by individual power purchasers. As a consequence, she did not need to dwell in detail upon the claims of Clark Public Utilities ("CPU") that refunds should be paid by Kaiser based on a sale Kaiser did not make.

Even if the Commission were to modify the fundamental findings of the Presiding Judge on the issues of broad applicability that were referenced above, there is no refund liability for Kaiser given its particular circumstances. Particularly, the record shows that

- Kaiser did not sell the power at issue; instead, Bonneville Power Administration ("BPA") sold the power to CPU which is the basis for CPU's refund claim;
- the sales of which CPU complained were beyond the Commission's jurisdiction under the Federal Power Act ("FPA");
- the contract between BPA and Kaiser is a retail contract, which is not with the scope of the Commission's FPA jurisdiction; and
- Kaiser's conduct helped *solve* the predicament in which load-serving entities found themselves, rather than exacerbate it.

Of course, the issues discussed below need not be addressed by the Commission if the recommendations and findings of the R & PFF referenced above are adopted and affirmed by the Commission.

## II. FACTS

BPA in 1995 entered into a retail Power Sales Agreement (with attendant take-or-pay obligations) to supply power for Kaiser's aluminum production facilities (Exh. KACC-1, p.2:19-22; p.3:7). Thereafter, Kaiser curtailed purchases of power from BPA when Kaiser's aluminum production was reduced (*id.*, p.6:1-5). Under the Power Sales Agreement, once Kaiser curtails purchases of federal power from BPA, BPA has a wide range of options (Exh. KACC-2, Power Sales Agreement, Sections 18(b)(2)(A)-(D) and Section 18(b)(4)(B)). For instance, BPA can sell

2

the power to a third party, whether or not Kaiser endorses the transaction. Kaiser cannot obligate BPA to sell to any particular entity. In fact, Kaiser cannot compel BPA to sell the power to any third party (Exh. KACC-1, p.4:7 – p.5:7; p.6:17-19). Indeed, BPA simply can retain the power (*see* Exh. KACC-2, Power Sales Agreement, Section 18(b)(2)(D)). Subsequently, BPA can sell quantities of power supplemented by the power Kaiser declined to purchase (Exh. BPA-2, p.5:22-24). BPA can sell the quantity of power (equivalent to the quantity curtailed by Kaiser) to a party recommended by Kaiser, or to other parties, as BPA determines. BPA ultimately establishes the price at which a transaction is to occur between it and a third party purchaser (Exh. KACC-1, p.5:19-22). If Kaiser identifies for BPA a potential qualified purchaser of power, BPA will net Kaiser's take-or-pay obligations to BPA against revenues that would be attributable to that potential buyer.

In this instance, Kaiser notified BPA that CPU was a potential purchaser of power, willing to take power under certain terms and conditions. BPA contacted CPU, and following discussions, they ultimately agreed that BPA would sell power to CPU. CPU now claims that Kaiser should be subject to refund liability because of BPA's sale of power to CPU.

### III. ARGUMENT

#### A. BPA SOLD THE POWER AT ISSUE

BPA, not Kaiser, sold the power to CPU (*see e.g.*, Exh. KACC-1, p.3:15-18; p.5:14-18). Kaiser is not liable for refunds because it did not sell the power at issue. CPU, perhaps realizing the serious jurisdictional issues posed by attempting to assert jurisdiction over the seller of power to CPU (namely BPA), attempts to finesse the jurisdictional problem by claiming instead that there was a "sale of power from Kaiser to Clark" (Exh. NPG-55; p.6:2). But this contention

conflicts with the operative language of the contracts, as well as the understanding of both Kaiser and BPA.

Under applicable precedent, Kaiser's activities clearly were not jurisdictional. Kaiser did not sell the power, and lacks the general indicia used by the Commission to determine whether jurisdiction exists under the FPA. Typically, the cases look to a number of factors in assessing whether the Commission's jurisdiction should attach, including whether an entity ultimately determines:

- the price at which power is sold (*Automated Power Exchange, Inc.*, 82 FERC ¶61,287 at p. 62,108 (1999), *rehearing denied*, 84 FERC ¶61,020 (1998), *aff'd*, *Automated Power Exchange, Inc. v. FERC*, 204 F.3d 1144 (D.C. Cir. 2000));
- who will buy the power (*id.*, at p. 62,107);
- the terms and conditions of the purchase (*id.*); and
- unit commitment and scheduling (*id.*).

The cases further examine whether the entity in question takes title to and contracts with the buyer for the sale of the power. *Id.* at p. 62,108.[2]

Judged under the applicable factors, Kaiser's role cannot give rise to CPU's refund claim. Critical and undisputed record facts demonstrate that:

- The operative Confirmation Agreement identifies BPA as the Seller and Clark as the Buyer. (Exh. NPG-56, referencing "a transaction agreed to by . . . BPA . . . and . . . CPU . . . .");
- BPA insisted upon the right to sell the federal power at issue (Exh. KACC-1, p.3:17-18); Kaiser cannot and did not resell federal power (Exh. KACC-1, p.8:13); and

---

[2] As the Court of Appeals in the *Automated Power Exchange* case noted, non-jurisdictional brokers have another attribute in common: ". . . . once a compatible counterpart has been identified, and the broker either commences, or even concludes, negotiations, at some point the broker steps back from the transaction, which is concluded directly between principals. Thus, while the broker may have facilitated price negotiations, the principals have not bound themselves to accept the price the broker negotiates." *Automated Power Exchange, Inc. v. FERC*, 204 F.3d 1144, 1149 n.7 (D.C. Cir. 2001). By the terms of the contract and its own admission, BPA was not bound to accept the price, or other terms, that Kaiser might recommend.

4

- Kaiser ultimately did not decide what entity would purchase power from BPA (Exh. KACC-1, p.5:5-7).

Kaiser did not sell the power at issue; BPA did. (Exh. KACC-1 p.3:15-18; p.5:14-18; p.8:11-13; p.9:3-7; p.10:4). BPA, the seller, could determine to sell that power to any willing buyer, or retain the power for its own purposes (Exh. KACC-1, p.5:19-22; Exh. KACC-2, Power Sales Agreement, Sections 18(b)(2)(D) (originally pp. 38-39 of contract) and 18(b)(4)(B) (originally pp. 39-40 of contract)), and was not obligated to sell power to CPU or to any other buyer that Kaiser could suggest to BPA. In other words, only when BPA and CPU agreed to terms and conditions was the transaction consummated and binding. Exh. KACC-1, p.8:15-18; p.9:4-6.

As BPA's testimony acknowledges, "Kaiser is correct that . . . BPA could dispose of the remarketed power to other parties under terms and conditions, including price, that differ from those proposed by Kaiser." Exh. BPA-2, p.4:17-23. BPA disavowed prior testimony suggesting that "BPA is contractually obligated to remarket . . . on only the terms and conditions, including price established by Kaiser"; these contentions, BPA now recognizes, "were incorrect." *Id.* Obviously, Kaiser did not ultimately determine to whom the power was sold (or even if the power was indeed to be sold); BPA admits that it has on a number of occasions disregarded Kaiser's suggestions on this score (Exh. BPA-2, p.5:18-20), as BPA is contractually entitled to do (Exh. KACC-2, Power Sales Agreement, Sections 18(b)(2)(D) and 18(b)(4)(B)). Clearly, Kaiser could not ultimately determine the price at which BPA sold the power; that authority resided with BPA under the contract. Similarly, BPA is contractually entitled to enter into terms and conditions of a contract without regard to Kaiser's suggestions (*id.*). Moreover, Kaiser is not

authorized by contract to commit and schedule BPA's units.[3] Kaiser's role in the BPA-CPU transaction is at best advisory. *See, e.g. Idaho Power Co.*, 74 FERC ¶61,149 at 61,524 (1996); *Bechtel Power Corp.*, 60 FERC ¶61,156, at 61,572 (1992); *LG&E Power Marketing Inc.*, 68 FERC ¶61,247 (1994), *Citizens Energy Corp.*, 35 FERC ¶61,198 (1986).

Thus, with respect to each of the foregoing and legally determinative factors, Kaiser is not engaged in a jurisdictional activity when BPA enters into a contract to sell power to CPU, and BPA performs its contractual obligations.

No doubt, CPU will claim in its comments, as it did before the Presiding Judge, that BPA was not a seller, but rather acted as Kaiser's agent. CPU raised this claim before the Presiding Judge to attempt to come within the scope of the Commission's ruling in EL01-47-005 that a transaction is subject to the Commission's jurisdiction where a load reduction in a retail sale is tied to a wholesale sale to a third-party, and the wholesale sale to the third-party is subject to the Commission's jurisdiction under the FPA.[4]

However, the load reduction that was made by Kaiser was not "tied" to a sale to CPU. As the facts discussed above show, BPA did not act as Kasier's agent because BPA had no obligation to sell power to CPU in any quantity, at any price or even at all, based upon any directive by Kaiser. Rather, Kaiser chose to reduce its load from BPA, and BPA made its own independent decision to sell to CPU. Further, when BPA determined to sell energy to CPU, the sale that was made was not pursuant to the Commission's FPA jurisdiction. As a result, the

---

[3] The relationship can become even more attenuated, as some buyers in the Pacific Northwest were "matched with" the quantities made available "through market brokers." Exh. BPA-1 p.11:1-7.

[4] *Removing Obstacles to Increased Electric Generation and Natural Gas Supply in the Western United States*, 96 FERC ¶ 61,155 at 61,679 (2001).

Commission should reject attempts by CPU to alter the facts to try improperly to invoke the Commission's jurisdiction.

### B. BECAUSE BPA WAS THE SELLER, THE SALES REVENUES ARE NOT SUBJECT TO REFUND

The Commission's jurisdictional grant under the FPA is clearly defined, at least in this respect. Under section 201(e), "[t]he term 'public utility' when used in [Parts II and III of the FPA] means any person who owns or operates facilities subject to the jurisdiction of the Commission under this" Part (other than facilities subject to such jurisdiction solely by reason of FPA Section 210, 211 or 212).[5] BPA is not a "public utility" within the meaning of Section 201(e) because Section 201(f)[6] excludes BPA facilities from the Commission's jurisdiction.

Section 201(f) of the FPA states:

> No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one of more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agency, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.[7]

Of course, that means that the authorization contained in FPA Section 206 to investigate and revise "any rate, charge, or classification demanded, observed, charged or collected by any public utility ... ."[8] does not extend to transactions involving BPA.

In contrast, when Congress intended to expand jurisdiction under the FPA beyond "public utilities," it has expressly so provided, as it did for the limited mandatory transmission

---

[5] 16 U.S.C. § 824(e).
[6] 16 U.S.C. § 824(f).
[7] *Id.*
[8] 16 U.S.C. § 824(e).

access order authority under FPA sections 210 through 212.[9] The obligations of those provisions apply not only to a jurisdictional "public utility" as defined in FPA Section 201(e),[10] but to an "electric utility" which clearly subsumes non-public utilities as described in FPA Section 3(22).[11] Moreover, FPA Section 201(b)(2)[12] states that orders under FPA Sections 210 or 211 "shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than" the specified purposes of those sections.

Indeed, additional legislative history hammers this point home. FPA Part II was enacted in 1935. The Senate Committee on Interstate Commerce,[13] after reviewing the language ultimately embodied in FPA Section 201(f), explained that the relevant language "expressly excludes from the operation of the Act the United States, the States, municipalities, and all of their agencies. It is designed to make perfectly clear that no compulsory powers may be exerted upon public projects or upon privately owned projects for the benefit of public plants".[14]

Kaiser recognizes that the Commission has asserted jurisdiction over California non-public utilities. The Commission's assertion of jurisdiction over California non-public utilities (whatever its fate on rehearing or judicial appeal) is a far different animal than asserting jurisdiction over the non-public utilities involved in the Pacific Northwest transactions. Unlike the sales of California non-public utilities, which were to a "centralized single clearing price auction that sets wholesale prices for both public utilities and non-public utilities" with "market rules set by the Commission" and "administered by the public utilities subject to the

---

[9] 16 U.S.C. §§ 824(j)-824(k).
[10] 16 U.S.C. § 824(e).
[11] 16 U.S.C. § 796(22).
[12] 16 U.S.C. § 824(b)(2).
[13] S. Rep. No. 621, 74th Cong., 1st Sess. (May 13, 1935) ("1935 Senate Report").
[14] *Id.* at 19.

Commission's jurisdiction," sales in the Pacific Northwest were made pursuant to bilateral contracts voluntarily entered into between willing buyers and willing sellers.[15] Moreover, most of the California power output was mandated to be sold into the spot market, and thus was unavailable for forward transactions which, the Commission has emphasized, can buffer the effects of the volatile short-term transactions.[16] In contrast, many of the Pacific Northwest market participants utilized forward contracts buying power weeks, months or even years in advance of its consumption. Unfortunately, some purchasers (such as CPU) did not make the most economically advantageous use of these opportunities, but their failure was voluntary and the result of their decisions to accept business risks, not the result of statutory prohibitions on forward contracting.

The California ISO and PX markets were largely the progeny of California statutory and regulatory requirements approved by the Commission under Part II of the FPA.[17] By contrast, the Northwest wholesale power market, which has existed for decades, is largely the product of the existence of the regional transmission system and the Northwest's hydroelectric generation base.[18] That is why the facts and law surrounding Northwest bilateral sales are so different from any sales made to the California ISO.

---

[15] *E.g.*, Exhibit No. NPG-1 at 7, ll. 14-17 ("The Pacific Northwest operates as a true commodity market where prices are set by bilateral negotiation, rather than administered by a separate authority.").

[16] *See San Diego Gas & Electric Co. v. Sellers of Energy, et al.* 95 FERC ¶61,418 at p. 62,546 (2001).

[17] *See Pacific Gas and Electric Company, et al.*, 81 FERC ¶61,122 (1997); *Pacific Gas and Electric Company, et al.*, 80 FERC ¶61,128 (1997); *Pacific Gas and Electric Company, et al.*, 77 FERC ¶61,265 (1996); *Pacific Gas and Electric Company, et al.*, 77 FERC ¶61,204 (1996); *Pacific Gas and Electric Company, et al.*, 77 FERC ¶61,077 (1996).

[18] *See* Exhibit No. NPG-1 at 17, l. 22 through 18, l. 1 ("We have two decades of experience with bulk power markets in the Pacific Northwest."). *See also*, Exhibit No. ENR-1 at 10: 22 through 11: 6 (Bonneville Power Administration's "surplus energy has been the backbone of trading in the PNW. California has no similar institution, and the three California IOUs serve eighty percent of the State's load.").

Moreover, the Commission's July 25 Order justified refund authority with respect to the California non-jurisdictional sellers because they:

> [H]ad executed the *pro forma* agreements established by the Commission that indicated, in part, their willingness to comply with the terms of the FERC-jurisdictional ISO or PX tariffs. These factors undermine possible claims that non-public utility sellers of energy could reasonably have relied on their sales for resale of electricity into the centralized California ISO and PX spot markets not properly being subject to FERC jurisdiction.[19]

In contrast, the Commission has reached precisely the opposite conclusion with respect to the Pacific Northwest. Indeed, the Presiding Judge, having heard the evidence concerning the circumstances of the PNW market, stated that

> the rationale previously used by the Commission to assert jurisdiction over non-jurisdictional entities does not [seem] to apply to this market because of the differences between the Pacific Northwest and the California ISO/PX. . . . If refunds are ordered and the non-jurisdictional entities are excluded, this would differentiate sellers subject to refunds in the market. . . .[20]

The Commission has unequivocally stated that it lacks FPA jurisdiction over the sales of such as those here at issue, finding that "[w]e cannot assert jurisdiction over nonpublic utility members of the WSPP."[21] Case law describing the Commission's lack of jurisdiction over the power sales of non-jurisdictional entities outside the context of California is little short of overwhelming.[22]

---

[19] 96 FERC ¶61,120 at 61,513-14.

[20] R & RFF, *slip op.* at p.158.

[21] *Western Systems Power Pool*, 55 FERC ¶61,495 at 62,713 (1991).

[22] *See e.g., Northern California Power Agency v. FPC*, 514 F.2d 184 (D.C. Cir.), *cert denied*, 423 U.S. 863 (1975); *New York State Electric & Gas Corp. v. FERC*, 638 F. 2d 388 (2nd Cir. 1980), *cert denied, Penn Yan v. New York State Electric & Gas Corp.*, 454 U.S. 821 (1981); *California Independent System Operator Corporation*, 94 FERC ¶61,343 (2001); *South California Public Service Authority*, 75 FERC ¶61,209 (1996).

Consequently, sales by BPA -- such as that challenged by CPU -- are not subject to the Commission's FPA jurisdiction. Non-jurisdictional sales can hardly produce refund exposure. Consequently, CPU's claims are not cognizable under the FPA.

### C. THE COMMISSION'S FPA JURISDICTION DOES NOT EXTEND TO DIRECT RETAIL SALES

BPA makes retail sales for direct consumption by Kaiser. (Exh. KACC-1, p.3). Kaiser does not have any right to power under the 1995 Contract other than power it consumes in its manufacturing operation. Thus, BPA's power sales to Kaiser do not involve a "sale of electric energy at wholesale" which the FPA defines as "a sale of electric energy to any person for resale" within the meaning of Sections 201(b)(1) and 201(d)(1) of the FPA.

The Commission's jurisdictional reach clearly does not extend to retail sales. The FPA's jurisdictional grant relates to "the sale of electric energy at wholesale in interstate commerce." FPA Section 201(b)(1). The United States Courts of Appeals for various circuits have held that for purposes of assessing the reach of the FPA, retail sales are the domain of state, not federal regulators (if indeed such sales are to be regulated at all). *See, e.g., Richmond Power & Light, et al. v. FPC*, 481 F.2d 490, 493 (D.C. Cir. 1973) (sales to retail customers, such as industrial users, "are not subject to regulation under the Federal Power Act"). Thus, the terms of the retail sale contract between BPA and Kaiser -- including provisions addressing pricing, volumes, take-or-pay obligations, payments and credits -- are beyond the scope of FPA regulation.

Perhaps because of this, CPU tries an end-run to attempt to transform the sale by BPA into a sale by Kaiser. However, CPU's strategy is nothing more than a transparent attempt to attempt to alter the pillars of its contract to try to bring it within the scope of the Commission's

FPA jurisdiction, notwithstanding the facts. Of course, the facts cannot be altered to create jurisdiction where it is lacking.

### D. CPU'S CLAIM IS WELL BEYOND THE SCOPE OF PUGET SOUND'S ORIGINAL COMPLAINT

The Presiding Judge correctly found (R & PFF slip op. at 185-86) that the Puget Sound Complaint filed October 26, 2001 could not be refurbished or claimed by squatters such as the Northwest Net Purchasers, given the constraints inherent in the Commission's FPA case law. The Presiding Judge's conclusion is sound, and Kaiser incorporates by reference here the arguments contained in the Comments of TFG on this point. In addition to the reasons identified by the Presiding Judge, there are independent reasons why the Puget Sound Complaint does not apply to the transactions here at issue.

For starters, the Complaint made clear from the very first sentence that its remedy sought a price cap for "wholesale," not retail, transactions.[23] The Complaint, when discussing the relief sought, repeatedly references "wholesale" markets, using the term more than a dozen times.[24] Given that the Complaint cited as its legal authority FPA Section 206, wholesale transactions, not retail sales, clearly were contemplated.

Second, the Complaint sought to involve the then-"jurisdictional" sellers. Because, as of the time the Complaint was filed, neither BPA nor Kaiser could have reasonably been characterized as a "jurisdictional" seller of energy or capacity under the FPA, the Puget Sound Complaint again, by its terms, cannot apply to Kaiser. Indeed, Kaiser is not a seller of energy or

---

[23] *See* "Complaint of Puget Sound Energy, Inc.," *Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity, [etc ]*," Docket No. EL01-10 (October 26, 2001) (first and second sentences).

[24] *See, e.g., id.*, pp.1-2, 10, 12-13.

capacity, as explained supra, and thus could not have been fairly understood to fall within the scope of the Puget Sound Complaint.

Therefore, in the unlikely event that the findings of the R & PFF are modified on this issue, the status of Kaiser nonetheless would remain beyond the terms of the Complaint based upon Kaiser's particular facts.

### E. Kaiser Should Not Be Punished For Having Assisted The Market (By Curtailing Its Consumption) In Alleviating Higher Prices

Aside from the contractual provisions demonstrating the absence of Kaiser's ability to control the terms of any sale (or in fact to even determine whether a sale would take place), and the jurisdictional problems associated with CPU's claim, there are important policy reasons why refunds should not be ordered from Kaiser. First, requiring refunds will send the wrong message to industrial customers contractually entitled to take power from BPA. The cooperation of industrial customers significantly assists BPA and other utilities in maximizing the amount of power available to the market when the market is seeking additional energy (for instance, because of a relatively dry year).

The record establishes that "in the face of rising [electricity] prices in the PNW since the summer of 2000, almost all of these [price-sensitive, energy intensive] industries have suspended operations." (Exh. ENR-1 at 12.) Kaiser, along with other end-use consumers, chose to curtail or close their industrial operations. Because BPA had the opportunity to sell additional power on the open market, supply was increased, helping to reduce otherwise prevailing prices in Pacific Northwest electricity markets. The Western power crisis has alleviated due to a significant drop in consumption; in the PNW, many industrial customers agreed to shut their plants down. (*Id.* at 20.) The actions of Kaiser and other large industrial customers to curtail operations, therefore,

13

helped PNW markets balance supply and demand such that prices corrected "with extraordinary speed." (*Id.* at 21.)

But under the approach advocated by CPU, industrial customers will be discouraged from cooperating in the future. Of course, instead of curtailing operations, thereby releasing BPA from its obligation to supply Kaiser, Kaiser could have elected to continue operations and thus continued to take power. If CPU's relief is granted, industrial customers such as Kaiser will have a greater incentive to consume that power, and avoid any contingent financial exposure. This result would reduce the aggregate amount of power available for sale on the open market at just the time when the market is signaling that it needs additional supplies. This could result in area-wide blackouts rather than voluntary, economic curtailments by industrial customers.

Additionally, CPU's contracting practices contributed to its need to enter the market and approach BPA to obtain significant amounts of power, as CPU's testimony demonstrates (Exh. NPG-55, p.3:8-21). CPU made a decision concerning suppliers in 1996 which led to the need to enter the market at a time of higher prices (*id.*, and at p.4:10 - p.5:7). The consequences of CPU's decision belong with CPU, not with Kaiser, which took action to try to alleviate the consequences of CPU's procurement strategy and subsequent shortage.

14

## IV. <u>CONCLUSION</u>

**WHEREFORE**, for the foregoing reasons, Kaiser respectfully requests that the Commission affirm the recommendations and Proposed Findings of Fact contained at pages 185-89 of the R & PFF.

Respectfully submitted,

*/s/ Kenneth L. Wiseman*

| | |
|---|---|
| Michael Early | Kenneth L. Wiseman |
| 1300 SW 5th Avenue | Mark F. Sundback |
| Suite 1750 | Andrews & Kurth L.L.P. |
| Portland, Oregon 97201 | 1701 Pennsylvania Avenue, NW |
| (503) 402-8705 | Suite 300 |
| | Washington, DC 20006 |
| | (202) 662-2700 |

**Attorneys for Kaiser Aluminum & Chemical Corporation**

October 31, 2001

15

WAS:90457.1

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have served the foregoing Comments of Kaiser Aluminum & Chemical Corporation upon each person designated on the official service list compiled by the Secretary in this proceeding.

DATED at Washington, D.C. this 31st day of October, 2001.

Kenneth L. Wiseman
Andrews & Kurth L.L.P.
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-662-2700

16

WAS:90457.1