**EXHIBIT 9**

Docket No. EL01-10<br>
Exhibit Kaiser-1<br>
Page 1 of 13

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Puget Sound Energy, Inc., | ) | |
| Complainant, | ) | |
| v. | ) | Docket No. EL01-10-007 |
| All Jurisdictional Sellers of Energy And/or Capacity at Wholesale Into Electric Energy And/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement, | ) | |
| Respondents. | | |

PREPARED ANSWERING TESTIMONY OF
JOSEPH P. HOERNER
FOR
KAISER ALUMINUM & CHEMICAL CORPORATION

1  Q.  PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.

2  A.  I am Joseph P. Hoerner. My business address is:

3      Joseph P. Hoerner
4      Director, Raw Materials Purchasing
5      Global Commodity Products
6      Kaiser Aluminum & Chemical Corporation
7      1111 Airline Highway
8      Gramercy, Louisiana 70052

9  Q.  ARE YOU THE SAME JOSEPH HOERNER WHO PREVIOUSLY SUBMITTED

10 TESTIMONY IN THIS PROCEEDING ON BEHALF OF KAISER ALUMINUM AND

11 CHEMICAL CORPORATION?

12 A.  Yes.

Docket No. EL01-10
Exhibit Kaiser-1
Page 2 of 13

1  **Q. HAVE YOU REVIEWED THE SUBMISSION OF CLARK PUBLIC UTILITIES**

2  **MADE ON MARCH 4, 2003?**

3  A.     Yes.  I have reviewed the Submission along with all accompanying documents including

4  prepared testimony and exhibits.

5  **Q. DO YOU HAVE ANY GENERAL OBSERVATIONS?**

6  A.     Yes.  My general observation is that the Submission contains numerous misstatements of

7  the facts.  Those misstatements are with respect both to the events of February 2001, as well as to

8  matters about which I testified in a deposition that Clark took on February 19, 2003.

9  **Q. CAN YOU GIVE ME AN EXAMPLE OF A MISSTATEMENT OF THE EVENTS**

10 **OF FEBRUARY 2001?**

11 A.     The first such misstatement is set forth at page 1 of Clark's submission where Clark

12 states: "Clark entered into a wholesale power transaction, on February 2, 2001, with Kaiser

13 Aluminum and Chemical Corp. ("Kaiser") for the delivery of 140 MW of power per day during

14 August and September 2001, for a price of $325 per MWH."  Similarly, at page 12 of its

15 Submission, Clark states: "[o]n February 2, 2001, Clark entered into an agreement with Kaiser to

16 purchase 140 MW of power for the period August 1, 2001 through September 30, 2001, at the

17 rate of $325 per MWH."  It simply is wrong to state that Kaiser ever entered into a wholesale

18 power transaction with Clark or to suggest that such an event occurred on February 2, 2001.  I

19 would note that Clark's reference to the February 2, 2001 date relates to a letter agreement of

20 that date between Kaiser and Clark.  However, that letter agreement clearly does not constitute a

21 wholesale power transaction.

200303205013 Received FERC OSEC 03/20/2003 07:12 AM Docket# EL01-10

1 Q. **WILL YOU PROVIDE DETAILS TO EXPLAIN THE BASIS FOR YOUR**

2 **TESTIMONY THAT CLARK MISSTATED THE FACTS IN ASSERTING THAT IT**

3 **ENTERED INTO A WHOLESALE POWER TRANSACTION WITH KAISER?**

4 A. Before providing the details, it is helpful to first discuss the background behind the

5 February 2, 2001 letter agreement between Kaiser and Clark. My prior testimony in this

6 proceeding, which was marked as KACC-1, was admitted into evidence on September 6, 2001.

7 It contains a thorough discussion of the fact that Kaiser entered into a contract with the BPA in

8 1995, the relevant excerpts of which previously were admitted into evidence as KACC-2. The

9 agreement between Kaiser and BPA was a take-or-pay contract. However, BPA agreed that to

10 mitigate the take-or-pay obligation when power available under the contract would be excess to

11 Kaiser's needs due to a reduction in Kaiser's plant operations, Kaiser could release energy back

12 to BPA. BPA could take the power for its own use or sell the power to a third-party purchaser.

13 In either event, BPA would provide a credit to Kaiser against its take-or-pay obligation. Under

14 this remarketing clause, Kaiser could identify a potential purchaser and request that BPA sell the

15 released power to the identified potential purchaser. However, BPA was under no obligation to

16 sell the power to the party identified by Kaiser. Additionally, even if BPA sold power to the

17 party identified by Kaiser, BPA was under no obligation to sell the power pursuant to any terms

18 that might have been requested by Kaiser. Rather, BPA, unilaterally, had the right to negotiate

19 whatever terms it wished with the prospective purchaser. This is evident from Section

20 18(b)(4)(B) of the contract between Kaiser and BPA which provides that "BPA may sell the

21 Excess Firm Energy to the Qualified Purchaser(s) as arranged by the Company under options

22 section 18(b)(2)(A) and section 18(b)(2)(B) *or dispose of such power on whatever terms that*

23 *BPA may separately arrange."* Emphasis added. *See* Exh. KACC-2, p. 39. BPA's witness in

1 the prior phase of this proceeding, Mr. Stephen Oliver, corroborated that point. He testified that

2 "under the remarketing provision in its power sales contract BPA could dispose of the

3 remarketed power to other parties under terms and conditions, including price, that differ from

4 those proposed by Kaiser." Exh. BPA-2 at 4.

5 With that background, it is appropriate to discuss the February 2, 2001 letter agreement

6 between Clark and Kaiser. In January 2001, a consultant for Clark, Mr. Dana Zentz, contacted

7 me and told me that Clark was in need of power for August and September 2001, and he knew

8 that BPA might have a block of federal power to sell because Kaiser had curtailed its

9 manufacturing operations. After Kaiser and Clark both conducted price discovery, on February

10 2, 2001, Kaiser entered into a letter agreement with Clark under which Kaiser agreed to "submit

11 a request to BPA by Friday, February 2, 2001 at approximately 4:30 p.m. to remarket 140 Mw of

12 energy for the months of August and September 2001." Exh. NPG-55A, p. 2. However, as the

13 letter made clear "BPA may either implement the sale to [Clark] or, at its option, may choose to

14 purchase the energy for its own use . . . ." *Id.*, p.1. I drafted that letter agreement and signed it

15 on behalf of Kaiser. I never intended it to set forth an agreement for Kaiser to sell power to

16 Clark, and I believe that Clark understood that the letter agreement was not a contract under

17 which Kaiser was agreeing to sell power to Clark. The letter agreement merely was an

18 agreement by Kaiser to submit a request to BPA requesting that BPA elect to sell power to Clark,

19 and the letter made clear that BPA had no obligation to assent to Kaiser's request. As a result, I

20 do not believe that the letter agreement constitutes a "wholesale power transaction" or that Clark

21 regarded it as such at the time it signed the agreement. I would note that consistent with Kaiser's

22 commitment that was made in the letter agreement with Clark, on February 2, 2001, Kaiser

200303205013 Received FERC OSEC 03/20/2003 08:12:00 AM Docket#EL01-10-007

1 submitted a notice to BPA wherein it requested that BPA remarket the energy that Kaiser did not

2 need to Clark. *See* Exh. BPA-3.

3 **Q. DO YOU HAVE EVIDENCE THAT CLARK PURCHASED POWER FROM BPA,**

4 **NOT KAISER?**

5 A. Yes. Exh. BPA-5 is a Confirmation Agreement between BPA and Clark. The

6 Confirmation Agreement specifies that it "memorializes the terms of a transaction agreed to by

7 Bonneville Power Administration (BPA) and Clark Public Utilities (CPU)." Exh. BPA-5, p. 1.

8 It further identifies the "Seller of Energy" as BPA and the "Buyer of Energy" as Clark Public

9 Utilities. *Id.* It further provides for the sale of 140 MW of energy in all hours during the months

10 of August and September 2001 at a price of $325. *Id.* There is no similar agreement between

11 Clark and Kaiser.

12 **Q. CAN YOU IDENTIFY FOR ME THE OTHER INSTANCES WHERE CLARK**

13 **MISSTATED THE FACTS?**

14 A. I will discuss representative examples. For instance, at page 13, Clark states that "BPA

15 entered into a Confirmation Agreement with Clark confirming that BPA would serve a

16 middleman role . . . ." As discussed above, the Confirmation Agreement to which Clark refers

17 already is in the record as Exh. BPA-5. There is nothing in that agreement that states or suggests

18 that BPA would serve as a "middleman role."

19 **Q. WHAT ABOUT THE REPRESENTATION THAT IS MADE AT PAGE 21 –22 OF**

20 **THE SUBMISSION THAT "KAISER WAS INVOLVED IN NEGOTIATING THE**

21 **TERMS OF THE CONFIRMATION AGREEMENT?"**

22 A. That statement is wrong. It also is contrary to testimony I provided in my deposition.

23 The following exchange took place during the deposition:

Docket No. EL01-10  
Exhibit Kaiser-1  
Page 6 of 13

| | |
|---|---|
| 1 | Q. Okay, great. |
| 2 | Did Clark participate in the negotiation and drafting of these confirmations? This |
| 3 | is obviously a confirmation agreement between Jim Sanders of Clark, and Mark |
| 4 | Miller [of BPA] and -- Mark Miller and James Sanders are two identified parties, |
| 5 | so did Clark participate in the drafting of this or was this just something that you |
| 6 | and Mr. Miller were negotiating? |
| 7 | A. I don't know if Clark participated in it, and it was something that Mr. Miller |
| 8 | and I *were not negotiating*. |

9   Exhibit Clark-3, p. 124: lines 11-23.  Emphasis added.

10   **Q. WHAT DOES CLARK RELY UPON FOR ITS ASSERTION?**

11   A.   BPA faxed me two drafts of its Confirmation Agreement with Clark. However, the fact

12   that BPA faxed the drafts to me does not mean that I was negotiating with BPA to establish any

13   terms or conditions between BPA and Clark. And when Clark's counsel asked me about my

14   receipt of the drafts, I acknowledged that I reviewed them, but I reiterated that "Kaiser never was

15   negotiating with Bonneville . . . ." *Id.*, p. 125: lines 11-12.  I also previously had informed

16   Clark's counsel that:

> 17   I don't know what Bonneville did beyond the contractual arrangement I had with
> 18   them. They did not involve me in any discussions that they would have with
> 19   qualified purchasers; they didn't share information with Kaiser.
>
> 20   So, beyond the contractual arrangement that Kaiser had with Bonneville, I had no
> 21   idea what they did with the qualified purchaser.

22   Exh. Clark–3, p. 88: lines 3-13.

23   **Q. CAN YOU IDENTIFY ANY OTHER MISSTATEMENTS OF THE FACTS?**

24   A.   Another one is at page 15 of Clark's Submission that says that "Kaiser agreed to pay

25   BPA for transmission to deliver Kaiser's power to Clark." That statement purports to rely on

26   testimony I provided in my deposition. Unfortunately, the statement again misstates both my

27   testimony and the facts.

Docket No. EL01-10<br>
Exhibit Kaiser-1<br>
Page 7 of 13

1 **Q. PLEASE EXPLAIN.**

2 A. I explained at my deposition that Kaiser had a transmission agreement with BPA that was

3 a separate contract from the Kaiser/BPA commodity contract. Exh. Clark-3, p. 37:25. I also

4 explained that the transmission agreement had a take-or-pay commitment. *Id.*, p. 38: lines 1-2. I

5 testified that the expenses associated with the transmission agreement represented a sunk cost to

6 Kaiser. *Id.*, p. 38: lines 6-7. As a result, we assigned our transmission rights to BPA, and BPA

7 managed that transmission. *Id.*, p. 38: lines 3-6. I further explained that even if BPA had elected

8 not to sell power to Clark, Kaiser still would have assigned the transmission agreement to BPA.

9 *Id.*, p.56: line 24 – p. 58: line 24.

10    This testimony shows that, contrary to what Clark states in its Submission, Kaiser did not

11 agree to pay BPA for transmission to deliver power to Clark. Rather, Kaiser had a long-term

12 transmission agreement that was entered into with BPA long before Clark ever approached

13 Kaiser, and Kaiser had paid the costs associated with that transmission agreement independent of

14 anything associated with Clark.

15 **Q. ARE THERE ANY OTHER MISSTATEMENTS THAT YOU WOULD LIKE TO**

16 **DISCUSS?**

17 A. Yes. Another concerns the following passage:

18    Kaiser, not BPA, identified the buyer (Clark) and established the terms of the sale
19    in the Kaiser/Clark Agreement. *Exhibit NPG-55A*. Kaiser did so in accordance
20    with its rights under Section 18(b)(2)(A) of the BPA/Kaiser Power Sales
21    Agreement, which gave Kaiser the right to identify a potential buyer and specify
22    the price and the other terms of the sale. *Exhibit KACC-2* at 38. Pursuant to the
23    BPA/Kaiser Power Sales Agreement, Kaiser specified the term of the sale in a
24    Notice to BPA, directing it to deliver the specified power to Clark in exchange for
25    Clark's $64 million payment to Kaiser (less BPA's approximately $4 million
26    charges for originally providing the power).

27 Clark Submission at 14-15 (footnotes omitted).

1   **Q.**   **WHAT IS WRONG WITH THE STATEMENTS IN THAT PASSAGE?**

2   A.   It is true that Kaiser identified Clark as a Qualified Purchaser to which BPA could make a

3 sale if BPA would so choose. However, everything else is wrong. Kaiser did not establish the

4 terms of any sale that would take place. In fact, Section 18(b)(2)(A) of Kaiser's agreement with

5 BPA did not permit Kaiser to "specify" the price and terms of any sale that BPA might make to

6 Clark. Kaiser also did not "direct[]" BPA to do anything. Again, under the agreement between

7 BPA and Kaiser, BPA reserved to itself the right to *"dispose of such power on whatever terms*

8 *that BPA may separately arrange."* Emphasis added. *See* Exh. KACC-2, p. 39. As a result,

9 BPA had unilateral control over the decision to make the sale and to establish the price and other

10 terms of any agreement if it would choose to enter into an agreement with Clark or any other

11 party. The quoted language from the BPA/Kaiser power sales agreement also addresses other

12 statements that Clark has made such as the statement that: "if BPA does not exercise [the] option

13 [to take the power itself], BPA must deliver the power to Kaiser's purchaser on Kaiser's terms

14 and conditions." Clark Submission at 12.

15     Further, I also would point out that there was no agreement for BPA to deliver power to

16 Clark in exchange for a payment by Clark of $64 million to Kaiser less $4 million to BPA. The

17 price set forth in Kaiser's notice to BPA established a credit that Kaiser would receive for not

18 purchasing federal power, and Kaiser's receipt of that credit was not dependent upon any sale to

19 Clark or for that matter to any other party. Section 18(b)(4)(B) of the agreement between BPA

20 and Kaiser establishes that fact in that it provides that regardless whether BPA sells power to the

21 Qualified Purchaser recommended by Kaiser or disposes of power "on whatever alternative

22 terms that BPA may separately arrange," "BPA shall credit [Kaiser] for the Excess Firm Energy

23 revenues based on the price(s) agreed to between [Kaiser] and the Qualified Purchaser(s) net of

1  the amount specified in section 18(b)(4)(C)." Exh. KACC-2, p. 39. Thus, even if BPA never

2  had made any sale to Clark, Kaiser was entitled to credits in the specified amount of

3  approximately $60 million. In other words, once Kaiser submitted its February 2, 2001 notice to

4  BPA, Kaiser was out of the picture and was entitled to receive the approximate $60 million

5  credit from BPA regardless what decision BPA thereafter made with respect to making a sale to

6  Clark. Further, Clark never paid any amount of money to Kaiser; it paid money to BPA in

7  exchange for BPA having agreed to sell Clark power.

8  **Q.  IN YOUR PRIOR ANSWER, YOU TESTIFIED THAT IF BPA HAD NOT**

9  **EXERCISED THE OPTION TO TAKE POWER ITSELF, BPA WAS NOT REQUIRED**

10 **TO DELIVER THE POWER TO KAISER'S PURCHASER ON KAISER'S TERMS AND**

11 **CONDITIONS. HOWEVER, AT PAGE 21 OF ITS SUBMISSION, CLARK REFERS TO**

12 **TESTIMONY OFFERED BY A WITNESS FROM BPA, STEVEN OLIVER, AND**

13 **STATES THAT MR. OLIVER "SAID THAT BPA WAS OBLIGATED TO CARRY OUT**

14 **THE TRANSACTION BASED ON THE PRICE <u>SET BY KAISER</u>." WHY SHOULD**

15 **THE COMMISSION NOT ACCEPT MR. OLIVER'S INTERPRETATION OF THE**

16 **CONTRACT RATHER THAN YOURS?**

17 A.  I have reviewed Mr. Oliver's testimony that was referenced by Clark, and Mr. Oliver did

18 not make the statement that "BPA was obligated to carry out the transaction based on the price

19 set by Kaiser." In fact, his testimony sets forth the exact opposite conclusion. In rebuttal

20 testimony, Mr. Oliver addressed what he perceived might be an incorrect interpretation of direct

21 testimony he previously had submitted. In the rebuttal testimony, Mr. Oliver stated:

22  To the extent my responsive testimony at p. 11 implied that BPA is contractually
23  obligated to remarket unused Kaiser power only on the terms and conditions,
24  including price, established by Kaiser in its remarketing notice, it was incorrect.

Docket No. EL01-10
Exhibit Kaiser-1
Page 10 of 13

1   Exh. BPA-2, p. 5.

2   **Q.  IN SEVERAL PLACES IN ITS SUBMISSION, CLARK CRITICIZES KAISER**

3   **FOR NOT ADDRESSING CLARK'S ARGUMENT THAT KAISER RECEIVED $60**

4   **MILLION IN EXCHANGE FOR THE SALE OF POWER. FOR INSTANCE, IT RAISES**

5   **THIS ARGUMENT AT PAGE 20 OF ITS SUBMISSION. DO YOU HAVE A RESPONSE**

6   **TO THAT ARGUMENT?**

7   A.  Yes. My testimony above demonstrates that this argument is based upon another

8   misstatement by Clark. As I explained above, Kaiser received $60 million from BPA, not Clark,

9   and the $60 million Kaiser received was an amount that BPA was obligated to pay to Kaiser

10  whether or not BPA sold power to Clark or any one else for that matter. So BPA's payment of

11  $60 million to Kaiser arose from contractual obligations independent of any transaction that BPA

12  ultimately consummated with Clark.

13  **Q.  BUT WHAT ABOUT CLARK'S CLAIM, FOR INSTANCE AT PAGES 20 TO 21**

14  **OF ITS SUBMISSION, THAT KAISER ADMITTED IN FILINGS WITH THE SEC**

15  **THAT THE $60 MILLION KAISER RECEIVED BECAUSE OF THE SALE TO CLARK**

16  **IS INCLUDED IN $20 MILLION THAT KAISER REPORTED AS HAVING GAINED**

17  **FROM SALES OF POWER IN THE FIRST QUARTER OF 2001?**

18  A.  I do not have personal knowledge of the basis for Kaiser's statements in its filings with

19  the SEC. Because I did not have personal knowledge as to that matter, the section of my

20  deposition that Clark refers to as support for this claim at page 21 of its submission actually

21  refers to a statement of counsel. I am advised that this represents another misstament by Clark,

22  and I am advised that it will be addressed in the submission that Kaiser is submitting along with

23  this testimony.

Docket No. EL01-10<br>
Exhibit Kaiser-1<br>
Page 11 of 13

1 **Q. HAVE YOU ADDRESSED ALL THE MISSTATEMENTS IN CLARK'S**
2 **SUBMISSION?**
3 A. I have addressed a number of them, but not all. For instance, most of the misstatements
4 that I have addressed are repeated in slightly varied forms throughout Kaiser's submission. I
5 have not addressed each such instance because a discussion of each such instance would be
6 repetitive. There also may be some less prominent misstatements that I have not addressed. I
7 also have not addressed Clark's legal arguments. I understand that counsel also will address
8 those arguments in the submission that will accompany this testimony.

9 **Q. DURING YOUR DEPOSITION, COUNSEL FOR CLARK ASKED YOU WHAT**
10 **ROLE CLARK PLAYED IN DETERMINING THE $325 PER MWH PRICE THAT WAS**
11 **CONTAINED IN KAISER'S FEBRUARY 2, 2001 REMARKETING NOTICE TO BPA.**
12 **DO YOU RECALL THAT QUESTION?**
13 A. Yes.

14 **Q. WILL YOU EXPLAIN THE ROLE THAT CLARK PLAYED IN SETTING THAT**
15 **PRICE?**
16 A. As I explained in my deposition, when I was discussing with Mr. Dana Zentz, Clark's
17 consultant, the price Kaiser would submit to BPA in its remarketing notice, Mr. Zentz wanted to
18 make sure that the price was at a level that would guarantee Clark the greatest chance that BPA
19 would remarket the Excess Firm Energy to Clark. Therefore, after we each had done our
20 separate price discovery, we determined that the price would be at a discount from the prices we
21 had been quoted on an assumption that if BPA did sell to Clark, the power would be staying in
22 the Pacific Northwest. However, Mr. Zentz on behalf of Clark was concerned that the discount
23 not be too deep as to influence BPA to sell the power to a different purchaser.

Docket No. EL01-10
Exhibit Kaiser-1
Page 12 of 13

1   **Q.   WHAT WERE THE PRICE QUOTES THAT YOU OBTAINED IN YOUR PRICE**

2   **DISCOVERY?**

3   A.   As reflected in Exh. Clark-4 at pages KACC-01 through 10, the price discovery I

4   received for the third quarter of 2001 were in a range from $330 to $380. As a result, the $325

5   per MWH price Kaiser put in the remarketing notice to BPA was a discount off the price quotes.

6   **Q.   DID THE FACT THAT THE REMARKETING NOTICE INCLUDED A PRICE**

7   **AT SUCH A DISCOUNT CAUSE A CONCERN TO CLARK?**

8   A.   I believe so because a methodology that we discussed and that Clark decided to use to

9   provide itself a better chance of preserving its ability to purchase power from BPA based upon a

10   $325 per MWH price was to pay BPA a lump-sum payment, discounted to reflect a net present

11   value.

12   **Q.   DID THE FEBRUARY 2, 2001 LETTER AGREEMENT BETWEEN KAISER**

13   **AND CLARK REQUIRED KAISER TO KEEP ITS REMARKETING REQUEST TO**

14   **BPA OPEN UNTIL 12:00 NOON ON FEBRUARY 6, 2001 BUT ALLOW KAISER TO**

15   **WITHDRAW IT AT ANY TIME BEFORE CLARK EXECUTED A CONFIRMATION**

16   **AGREEMENT WITH BPA?**

17   A.   Yes.

18   **Q.   WHY WAS THAT RIGHT OF TERMINATION INCLUDED IN THE LETTER**

19   **AGREEMENT?**

20   A.   Counsel for Clark asked me about that issue during my deposition, and I could not recall

21   the reason. I have since thought about it more, and I still do not recall the reason that term was

22   included in the letter agreement. Whatever the reason was, it was at most tangential to what

Docket No. EL01-10<br>
Exhibit Kaiser-1<br>
Page 13 of 13

1   Kaiser was attempting to accomplish by the letter agreement, which was to submit a request to

2   BPA for BPA to elect to sell the power Kaiser was releasing to Clark.

3   **Q.    DOES THIS CONCLUDE YOUR TESTIMONY AT THIS TIME?**

4   A.    Yes.

**Affidavit of Joseph P. Hoerner**

State of Louisiana )
)
Parish of St. James )

BEFORE ME, the undersigned authority, on this day personally appeared Joseph P. Hoerner, who being first duly sworn, under oath deposes and says:

That he is the Joseph P. Hoerner offering the foregoing testimony and that all statements of fact contained therein are true and correct to the best of his knowledge, information and belief.

_____
Joseph P. Hoerner

Subscribed and sworn before me, a Notary Public for the State of Louisiana, Parish of St. James, this __ day of March 2003.

_____
Notary Public

My Commission Expires: _____

Submission Contents

HOERNER.doc
HOERNER.doc·················································· 1-14