# EXHIBIT 10

UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | | PROOF OF CLAIM

| Name of Debtor | Case Numbers: |
|---|---|
| Kaiser Aluminum and Chemical Corp. | 02-10430(JKF) |
| | (Jointly Administered under Case No. 02-10429(JKF)) |

Note: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

KAISER ALUMINUM CORP.
B.C.D.D.
02-10429 THRU 02-10443

| Name of Creditor (The person or other entity to whom the debtor owes money or property): | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | CLAIM NO.: 3122 |
|---|---|---|
| Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities | ☐ Check box if you have ever received any notices from the bankruptcy court in this case. | |
| 602125 | ☐ Check box if the address differs from the address on the envelope sent to you by the Court. | THIS SPACE IS FOR COURT USE ONLY |

Name and address where notices should be sent:
Thacher Proffitt & Wood     Attn:     Christopher F. Graham, Esq.
11 West 42nd Street                          Deirdre A. Dillon, Esq.
New York, New York 10036
Tel: (212) 789-1200
Fax: (212) 789-3500

Account or other number by which creditor identifies debtor: | Check here if this claim ☐ replaces / ☐ amends a previously filed claim
(where applicable, date prior claim filed _____)

| 1. | Basis for Claim | ☐ Retiree benefits as defined in 11 U.S.C § 1114(a) |
|---|---|---|
| ☐ | Goods sold | ☐ Wages, salaries, and compensation (fill out below) |
| ☐ | Services performed | Your SS# _____ |
| ☐ | Money loaned | |
| ☐ | Personal injury/wrongful death | Unpaid compensation for services performed |
| ☐ | Taxes | from_____ to_____ |
| ☒ | Other (Describe Briefly) (See Attachment A) | (date)        (date) |

| 2. | Date debt was incurred: | 3. | If court judgment, date obtained: N/A |
|---|---|---|---|
| | (See Attachment A) | | |

4.     Total Amount of Claim at Time Case Filed:          (See Attachment A)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 5. | Secured Claim. | 6. | Unsecured Priority Claim. |
|---|---|---|---|
| ☐ | Check this box if claim is secured by collateral (including a right of setoff) | ☐ | Check this box if you have an unsecured priority claim |
| | | ☐ | Amount entitled to priority $_____ |
| | Brief Description of Collateral: | ☐ | Specify the priority of the claim: |
| | ☐ Real Estate  ☐ Motor Vehicle | ☐ | Wages, Salaries, or commissions (up to $4000),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C § 507(a)(3). |
| | ☐ Other | ☐ | Contribution to an employee benefit plan - 11 U.S.C. § 507(a)(4) |
| | | ☐ | Up to $1,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6) |
| | Value of Collateral:     $_____ | ☐ | Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7) |
| | | ☐ | Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8) |
| | Amount of arrearage and other charges at time case filed included in secured claim, if any: | ☐ | Other Specify applicable paragraph of 11 U.S.C. § 507(a)(___) |
| | | | *Amounts are subject to adjustment on _____ and every 3 years thereafter with respect to cases commenced on or after the date of adjustment |

| 7. | Credits: The amounts of all payments on this claim has been credited and deducted for making this proof of claim | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|
| 8. | Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contract, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If documents are not available, explain. If the documents are voluminous, attach a summary. See Attachment A and Exhibits thereto. | RECEIVED JAN 30 PM 1:53 KAISER ALUMINUM COMPANY, INC. |
| 9. | Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | |

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| January 28, 2003 | Wayne Nelson
Chief Executive Officer
Clark Public Utilities |

Penalty for presenting fraudulent claims: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C §§ 152 and 3571.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    )
                                          )
                                          )     Case No. 02-10430 (JKF)
KAISER ALUMINUM AND CHEMICAL              )
    CORPORATION,                          )
                                          )     Chapter 11
                                          )
              Debtor.                     )

ATTACHMENT A TO PROOF OF CLAIM OF
PUBLIC UTILITY DISTRICT NO. 1 OF CLARK COUNTY

Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities ("Clark Public

Utilities") files this Proof of Claim against Kaiser Aluminum and Chemical Corporation

("Kaiser" or "Debtor").[1]

1.    **Claim and Grounds for Liability**

Clark Public Utilities is a customer-owned municipal corporation operating under the

laws of the State of Washington and providing electricity to approximately 160,000 customers

throughout Clark County, Washington.

In 1981, Clark Public Utilities entered into a power contract with the Bonneville Power

Administration ("BPA") that expired on June 30, 2001. In 2000, when Clark Public Utilities

sought to purchase power from BPA under its long-term subscription process beyond June 30,

2001, BPA would only offer Clark Public Utilities a net requirements contract beginning on

October 1, 2001 because BPA had decided to change its standard contract expiration date from

---

[1]    Clark Public Utilities is also filing another separate proof of claim to preserve its rights against Kaiser resulting from Kaiser's sale of power to Clark Public Utilities in violation of the Federal Power Act, as explained more fully in the other proof of claim

June 30 to September 30 to coincide with BPA's fiscal year. This change in the effective commencement date of the new BPA contract created a two-month gap, *i.e.*, August and September 2001, in Clark Public Utilities' supply portfolio.

Because of the well-publicized and documented extreme volatility in the market in early 2001, as well as the prospect that the rates for electrical power could go even higher in August and September 2001, Clark Public Utilities, like any prudent public utility, was compelled to fill this gap as soon as possible. Consequently, on February 2, 2001, Clark Public Utilities entered into a remarketing letter agreement (the "February 2nd Remarketing Agreement," copy attached as Exhibit 1) with Kaiser to purchase from Kaiser 140 Megawatts of power for the period August 1, 2001 through September 30, 2001, at the rate of $325 per Megawatt hour.

The electrical power that Kaiser committed to sell to Clark Public Utilities was to be obtained by Kaiser assigning some of its rights to jurisdictional power (*i.e.*, power subject to FERC's jurisdiction) under a contract with BPA (the "BPA/Kaiser PSA," copy attached as Exhibit 2). Under Section 18(b)(2) of the BPA/Kaiser PSA, Kaiser had the right to elect to remarket excess power it did not use by *finding its own purchaser for such excess power or by requesting that BPA find a purchaser.* (*See* BPA/Kaiser PSA at § 18(b)(2)). If Kaiser found its own purchaser -- as it did in finding Clark Public Utilities -- BPA had a first option to remarket the power. (*Id.* at § 18(b)(4)(B)). However, if BPA did not exercise that option, BPA was required to deliver the power to Kaiser's purchaser on Kaiser's terms and conditions. BPA did not exercise its option of remarketing Kaiser's excess power, but instead delivered Kaiser's power to Clark Public Utilities, pursuant to Kaiser's direction and under terms and condition set by Kaiser.

2

Following the February 2nd Remarketing Agreement, BPA entered into two confirmation agreements, one with Clark Public Utilities (the "Clark Confirmation Agreement," copy attached as Exhibit 3) and another with Kaiser (the "Kaiser Confirmation Agreement," copy attached as Exhibit 4) confirming the terms agreed to by Kaiser and Clark Public Utilities in the February 2nd Remarketing Agreement. The Clark Confirmation Agreement stipulated that Clark Public Utilities would pay $64,080,603 to BPA on March 28, 2001 for the remarketed Kaiser power (*See* Exh. 3). Thereafter, in accordance with the Kaiser Confirmation Agreement, BPA would transfer $59,842,404 to Kaiser, with the balance of $4,238,199 to be retained by BPA to cover the costs of the remarketed Kaiser power (*See* Exh. 4). Further, Kaiser, not the BPA, was responsible for the costs of transmitting the remarketed Kaiser power to Clark Public Utilities (*See* Exh. 3).

In consequence of the extraordinarily high price Clark Public Utilities paid for the remarketed Kaiser power, Clark Public Utilities was forced to raise rates to its customers by twenty percent.

On or about October 26, 2000, Puget Sound Energy Inc., another utility company affected by electrical power market volatility, filed a complaint with the Federal Energy Regulatory Commission ("FERC") pursuant to Section 206 of the Federal Power Act ("FPA") for an order capping the prices for power and capacity sales in the Pacific Northwest during the period of December 1, 2000 through June 20, 2001. This action is captioned *Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Pool Agreement,* Docket No. EL01-10-000, *et al.* In response to this Complaint, FERC instituted a

generic FERC proceeding (the "Puget Sound Proceeding") to determine whether sellers of

electrical power in the Pacific Northwest charged buyers unjust and unreasonable rates for such

power and to determine the just and reasonable rate (a so-called "ceiling price") for all spot

market sales in the Pacific Northwest from December 2000 through June 2001.

Clark Public Utilities intervened in the Puget Sound Proceeding (which it was authorized

to do by an Order of the Administrative Law Judge presiding over the Puget Sound Proceeding

issued on August 21, 2001 (*see* Exh. 5)) and alleged that Kaiser charged Clark Public Utilities

unjust and unreasonable rates for the power it purchased from Kaiser pursuant to the February

2nd Remarketing Agreement.[2]   Clark Public Utilities sought an order from FERC requiring

Kaiser to pay to Clark Public Utilities a refund in an amount equal to the excess price charged by

Kaiser over just and reasonable electricity rates.   Since Kaiser filed for relief under the

---

2        Kaiser has vigorously argued in related proceedings that it was not a "seller" of power within the meaning
of the FPA because it merely remarketed power and obtained a "credit" for doing so. As of the date of this proof of
claim, FERC has not ruled on the issue of whether Kaiser was a seller of power in the Puget Sound Proceeding.
However, pursuant to repeated FERC rulings, the remarketing of power is within the jurisdiction of FERC *See
infra* Thus, FERC in the Puget Sound Proceeding has authority to order a refund in favor of Clark and against
Kaiser. *See Removing Obstacles to Increased Electric Generation and Natural Gas Supply in the Western United
States*, 94 FERC ¶ 61,272 (March 14, 2001), *order on rehearing*, 95 FERC ¶ 61,225 (May 16, 2001), *order on
rehearing*, 96 FERC ¶ 61,155, at 678-79 (July 27, 2001) (collectively, all three orders are referred to as the
"Removing Obstacle Orders"). *See also Automated Power Exchange, Inc*, 82 FERC ¶ 61,287 ("APX"), *reh
denied* 84 FERC ¶ 61,020 (1998), *aff'd, Automated Power Exchange, Inc v. FERC*, 204 F.3d 1144 (D.C. Cir.
2000), where the Commission relied on who designated the buyer and determined the terms and conditions of a
purchase to identify the jurisdictional seller of the power at issue.
         In the transaction at issue, Kaiser designated the purchaser, Clark Public Utilities, and determined the terms
and conditions under which the power sale would be made. Further, Kaiser's assignment and release of the power
due to it under the BPA/Kaiser PSA to Clark Public Utilities constituted a sale subject to FERC's jurisdiction. *See
Notice of Interim Procedures to Support Industry Reliability Efforts and Request for Comments*, 91 FERC ¶ 61,189
(2000) and the Removing Obstacles Orders, specifically 94 FERC at 61,972, all of which make clear that secondary
market releases [involving a sale by a customer of the right to receive power] are subject to FERC's jurisdiction.
         In addition, Kaiser has admitted it "sold" power in the Pacific Northwest *See* Kaiser's Statement of
Consolidated Income issued on April 12, 2002 which reports $229.2 million in "net gains from power *sales*" during
2001 (emphasis added); *see also* Kaiser's 2000 annual report on page 4 which states in part "Recognizing the
opportunity provided by skyrocketing energy prices in western North America, the company aggressively curtailed
smelting capacity in the Pacific Northwest, executed power *sales* amounting to $208 million, and received those
proceeds in 2000 and early 2001. During the first quarter of 2001, we *sold* the majority of our remaining Northwest
power for an additional $260 million " (emphasis added)

Bankruptcy Code, Clark Public Utilities has not proceeded in the Puget Sound Proceeding against Kaiser

In 2001, FERC ordered "a preliminary evidentiary proceeding" to explore settlement and to establish "the extent of potential refunds."[3]  On December 19, 2002, the Commissioners of FERC issued an Order on Motions to Reopen Evidentiary Record (the "December 19th Order") in the Puget Sound Proceeding, which reopened that proceeding for the submission of additional evidence  FERC issued the December 19th Order because new information regarding alleged intentional manipulation of the western power markets had come to light since the record in the Puget Sound Proceeding was closed by the Administrative Law Judge  Clark Public Utilities requested relief from the automatic stay to participate in the reopened Puget Sound Proceeding, but such request was denied by the Bankruptcy Court

A possible outcome of the Puget Sound Proceeding is that FERC will establish a ceiling price for all electricity spot market sales in the western United States, other than California, for the period December 2000 through June 2001.  Upon setting such a price cap, FERC would then order all sellers, such as Kaiser, to refund any amounts paid in excess of such ceiling price  Because the February 2nd Remarketing Agreement for the sale of power by Kaiser to Clark Public Utilities was entered into on February 2, 2001 (*i.e*, within the December 2000 through June 2001 period covered by the Puget Sound Proceeding), Clark Public Utilities may be entitled to relief as a net purchaser of power should FERC act in the Puget Sound Proceeding to order refunds of amounts paid in excess of just and reasonable rates

---

3 San Diego Gas & Electric, 96 FERC ¶61,120 at 61,520 (July 25, 2002).

Clark Public Utilities files this Proof of Claim to preserve its right (i) to claim a refund, if ordered by FERC in the Puget Sound Proceeding, from Kaiser or (ii) for a judicial determination of a just and reasonable rate for the electrical power sold by Kaiser to Clark Public Utilities if FERC does not do so in the Puget Sound Proceeding. Because FERC has not set the just and reasonable rates for the power Clark Public Utilities purchased from Kaiser, Clark Public Utilities cannot specify an exact amount in this Proof of Claim ("Claim") at this point in time. However, Clark Public Utilities will file an amended Proof of Claim (and specifically reserves the right to do so) if FERC issues a decision in the newly reopened Puget Sound Proceeding and orders Kaiser to refund to Clark Public Utilities the amount paid by Clark Public Utilities in excess of the just and reasonable rate established by FERC. In the event that FERC does not set a just and reasonable rate for the electrical power Kaiser sold to Clark Public Utilities in the Puget Sound Proceeding, Clark Public Utilities will seek a judicial determination as to the just and reasonable rate for such power as part of the allowance of this claim.

The basis for the Claim was determined after diligent efforts of Clark Public Utilities and its attorneys and after their investigation and analysis of the Claim. This Proof of Claim is filed with full reservation of rights as set forth herein, including the right to assert additional or amended proofs of claim based on information and/or documents subsequently discovered or subsequently obtained.

## 2.    No Judgment

No judgment has been rendered on the Claim set forth herein as of the date of this Proof of Claim.

3.    **Credits**

The amount of all known payments or credits with respect to the Claim set forth in this Proof of Claim have been credited and deducted from the amounts owed as set forth herein.

4.    **Setoff**

The Claim set forth in this Proof of Claim (or any other claims Clark Public Utilities may have against the Debtor) is not subject to any known setoffs or counterclaims.

5.    **Recoupment**

Clark Public Utilities reserves all recoupment rights with respect to the Claim set forth herein or any other claims

6.    **Non-Waiver and Reservation of Rights**

This Proof of Claim is filed pursuant to the order (the "Bar Date Order") entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") requiring certain proofs of claim against the Debtor to be filed by January 31, 2003 (the "Bar Date") Clark Public Utilities is filing this claim to protect its rights, claims and interests.

Clark Public Utilities specifically reserves the right to amend, modify and supplement this Proof of Claim in any manner whatsoever, including, without limitation, the right to assert administrative claims and priority claims under Bankruptcy Code Sections 503 or 507 (or alternatively, Clark Public Utilities hereby asserts such priority to the fullest extent permitted by law), to file additional proofs of claim for additional claims, and to assert, without limitation, any claim to which Clark Public Utilities might be entitled, at law or in equity, or to show any further or additional payments, credits or setoffs which may occur or be discovered after the date hereof with respect to the Claim set forth herein or any other claims   Clark Public Utilities further specifically reserves the right to amend and supplement this Proof of Claim to account for

7

additional discovered facts after full disclosure of all relevant facts in this bankruptcy or in the Puget Sound Proceeding including any decisions or rulings rendered by FERC in such proceeding. Clark Public Utilities reserves all rights accruing to it, and the filing of this Proof of Claim is not intended to be and shall not be construed as:

i)    an election of a remedy;

ii)   a waiver of any past, present or future defaults or events of default;

iii)  a waiver or limitation of any rights, claims or defenses of Clark Public Utilities, including, but not limited to, the right to challenge the Bankruptcy Court's jurisdiction to hear any disputes arising out of the Claim or to make any motions to have such disputes resolved in a forum other than the Bankruptcy Court[4];

iv)   a waiver of any of Clark Public Utilities' claims against any other parties liable to Clark Public Utilities; or

v)    a submission to the jurisdiction of the Bankruptcy Court.

7.    **Notices**

All notices concerning this Proof of Claim should be sent to:

>     Lee C. Goldstein, Esq.
>     THE LAW OFFICES OF LEE C. GOLDSTEIN, ESQ.
>     615 West 18[th] Street
>     Wilmington, DE 19802
>     (302) 654-2632

with copies to:

---

4      As determination of this Claim requires the interpretation of another federal statute, the FPA, in addition to the Bankruptcy Code, the amount of the Claim most likely will be determined by the United States District Court. *See* 28 U.S.C. § 157(d)

Christopher F. Graham, Esq.
Deirdre A. Dillon, Esq.
THACHER PROFFITT & WOOD
11 West 42nd Street
New York, NY 10036
(212) 789-1200

George H. Williams, Esq.
Robert C. Platt, Esq.
CAMERON MCKENNA LLP
2175 K Street, NW, Fifth Fl.
Washington, D.C. 20037
(202) 466-0060

and

Mr. Wayne Nelson
Chief Executive Officer
Clark Public Utilities
1200 Fort Vancouver Way
Vancouver, WA 98663

9

# KAISER ALUMINUM & CHEMICAL CORPORATION
## NORTHWEST REGIONAL HEADQUARTERS

554 EAST TRENT AVENUE, SUITE 300 • SPOKANE, WA 99202
PHONE: (509) 242-1847 • FAX (509) 242-1890

### FACSIMILE TRANSMITTAL SHEET

| TO: Wayne Nelson | FROM: Joe Heavner |
|---|---|
| FAX NUMBER: (360) 992-3204 | DATE: Feb. 7, 2001 |
| COMPANY: Clark County Pud | TOTAL NO. OF PAGES INCLUDING COVER: 5 |
| PHONE NUMBER: | PHONE NUMBER: (509) 242-1874 |
| RE: | |

☐ URGENT     ☐ FOR REVIEW     ☐ PLEASE COMMENT     ☐ PLEASE REPLY

WAYNE— LETTER STATING OUR CONVERSATION
TODAY. IF YOU HAVE ANY QUESTIONS
FEEL FREE TO CALL ME THIS WEEKEND
CELL # (509) 995-1487 OR THROUGH DANA.

                THANKS,
                  JOE

CC: DANA ZEUTE
    252 - 5093

***IMPORTANT***
The information contained in this facsimile message is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please destroy it and notify us immediately by telephone. Thank you.

**KAISER ALUMINUM**
NORTHWEST REGIONAL HEADQUARTERS

February 2, 2001

**VIA FAX**

Mr. Wayne Nelson
General Manager
Clark County PUD
(360) 992-3204

Re: Kaiser's Remarketing Agreement

Dear Mr. Nelson:

This letter will confirm our conversations on February 2, 2001 with
you and Mr. Dana Zentz of EES Consulting regarding Kaiser's right to remarket
energy under its 1996 Power Sales Contract with BPA. Under the contract,
Kaiser may request remarketing by submitting a notice to BPA stating the
Qualifying Purchaser (which would be Clark County PUD (PUD) in this instance),
the start and end date of the sale, the price, the delivery point, and any other
terms. BPA may either implement the sale to the PUD or, at its option, may
choose to purchase the energy for its own use at the same terms and conditions.
If the sale is for one month or less, BPA has 24 hours after Kaiser's notice to
decide if it wants to purchase the energy; if the sale is for more then one month
but no greater than 6 months, then BPA has 2 days to decide.

If the sale to the PUD is implemented by BPA, then BPA will contract with
the PUD for the sale of the energy at the price, terms and conditions stated in

1

Kaiser's notice and other standard terms that BPA may request. The energy purchased by the PUD will be federal energy and the PUD's payment will be made to BPA. The energy will be delivered under Kaiser's PTP agreement with BPA. The POI will be the "BPA's System POI" and the point of delivery will be moved from Kaiser's facilities on a non-firm basis to the point of delivery named in Kaiser's notice and the PUD's contract with BPA. BPA will pay Kaiser for the remarketed energy under the terms of Kaiser's 1996 Power Sales Contract and a separate Confirmation Agreement with BPA consistent with the terms of Kaiser's notice. Therefore, pursuant to our discussions, the PUD and Kaiser (Parties) have agreed to the following:

Kaiser will submit a request to BPA on Friday, February 2, 2001 at approximately 4:30 p.m. PST to remarket 140 Mw of energy for the months of August 2001 and September 2001. BPA will have 48 hours to respond to this request and notify Kaiser if i) they will purchase the energy under the terms agreed to between the Parties or ii) facilitate the sale to the PUD.

With regard to the remarketing request, the PUD has requested that Kaiser's offer remain open until 12:00 noon on Tuesday, February 6, 2001, to allow the Board to approve the necessary financing arrangements for payment. This is acceptable, provided that Kaiser has the right to withdraw the offer at any time before the PUD executes a Confirmation Agreement with BPA.

Provided Kaiser can secure short-term firm transmission utilizing its PTP transmission agreement with BPA, BPA will deliver the energy to the ALCOA substation or other points as mutually agreed to by the Parties.

The Parties agree that the PUD shall pay to BPA on March 15, 2001 the amount of $83,934,678.00 as shown in the attached monetization table or if a different payment date is mutually agreed to by the Parties then the payment amount shall be adjusted consistent with the attached table.

Sincerely,

Joseph P. Hoemer

Joseph P. Hoemer

Energy Supply Manager

Please indicate your acceptance of the terms of this agreement by signing below and returning a copy to me. Fax: (509) 242-1098

_____

_____

Date

cc:    Mr. Dana Zentz, EES Consulting

3

**Clark Public Utility Power Remarketing Magnitude**
**February 7, 2001**

| Month | Days | MW | MWhrs | Purchase Price | Undiscounted Cash Flow |
|---|---|---|---|---|---|
| Aug | | | | | |
| Sep | 31 | 140 | 104,160 | $325.00 | $ 33,852,000 |
| Oct | 30 | 140 | 100,800 | $325.00 | $ 32,760,000 |
| | | | | | $ 66,612,000 |

**Discount Calculation**

| Curve Date | Total Rate | Discount Factor | Discounted Cash Flow 3/1/01 |
|---|---|---|---|
| Sep-01 | 6.50% | 0.9624 | $ 31,578,244 |
| Oct-01 | 6.50% | 0.9572 | $ 31,356,634 |
| Nov-01 | | | |
| | | | $ 63,934,878 |

07/16/02  13:22 FAX                                                 ☑002

Contract No. 95MS-94861
October 30, 1995

# POWER SALES AGREEMENT

## between the

## UNITED STATES OF AMERICA

## DEPARTMENT OF ENERGY

### acting by and through the

## BONNEVILLE POWER ADMINISTRATION

### and

## KAISER ALUMINUM & CHEMICAL CORPORATION

### Index to Sections

| Section | | Page |
|---|---|---|
| 1. | Effective Date and Term | 3 |
| 2. | Deliveries of Firm Power Between the Effective Date and Commencement Date | 3 |
| 3. | Commencement of Deliveries of Firm Power | 4 |
| 4. | Termination of Prior Contract and Other Contracts | 4 |
| 5. | Termination of This Agreement | 5 |
| 6. | Definitions | 9 |
| 7. | Exhibits; Interpretation | 16 |
| 8. | Contract Revisions and Waivers | 17 |
| 9. | Purchase and Sale of Annual Take-or-Pay Firm Energy | 18 |
| 10. | Monthly, Weekly, Daily, and Hourly Amounts of Firm Power | 19 |
| 11. | Rate Test Compliance | 22 |
| 12. | Rates and Charges | 23 |
| 13. | Billing and Payment | 23 |
| 14. | Relief from Take-or-Pay Obligation | 27 |
| 15. | Unauthorized Increase Charges | 28 |
| 16. | Changes in Firm Power Amounts | 29 |
| 17. | Reserves | 29 |
| 18. | Curtailment or Remarketing | 36 |
| 19. | Load Regulation, Unbundled Products, and Other Transmission Products | 42 |
| 20. | Provisions Relating to Delivery of Firm Power | 45 |
| 21. | Assignment of Agreement | 45 |
| 22. | Dispute Resolution | 45 |
| 23. | Force Majeure | 49 |

## Index to Sections

| Section | | Page |
|---|---|---|
| 24. | Notices | 50 |
| 25. | Hold Harmless | 51 |
| 26. | Damages for Failure by BPA to Deliver | 51 |
| 27. | Obligations During Performance of This Agreement | 52 |
| 28. | Third Parties | 52 |
| 29. | Severability | 52 |
| 30. | Entire Agreement | 53 |
| 31. | Signature Clause | 54 |
| | | |
| Exhibit A | (General Contract Provisions) | 16 |
| Exhibit B | (Fees for Remarketing) | 16 |
| Exhibit C | (Rate Schedule) | 16 |
| Exhibit D | (Monthly Amounts of Firm Power) | 16 |
| Exhibit E | (Points of Delivery) | 16 |
| Exhibit F | (Unrecoverable Costs and Transfer Costs) | 16 |
| Exhibit G | (Stability Reserve Scheme(s)) | 16 |
| Exhibit H | (Arbitration Procedures) | 16 |
| Exhibit I | (Use of Facilities Charge) | 16 |

This POWER SALES AGREEMENT, executed ___11/6___, 1995, by the UNITED STATES OF AMERICA (Government), Department of Energy, acting by and through the BONNEVILLE POWER ADMINISTRATION (BPA or Bonneville), and KAISER ALUMINUM & CHEMICAL CORPORATION (Company), a corporation incorporated under the laws of the State of Delaware. BPA and the Company are hereinafter sometimes referred to individually as "Party" and collectively as "Parties."

## WITNESSETH:

WHEREAS pursuant to section 5(d) of the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act), BPA is authorized to sell power to the Company; and

WHEREAS on August 31, 1981, BPA and the Company entered into Contract No. DE-MS79-81BP-90351, hereinafter referred to as "Prior Contract"; and

WHEREAS this Agreement provides for the termination of the Prior Contract; and

6.    **DEFINITIONS**

(a)    "Agreement" means this Power Sales Agreement, Contract No. 95MS-94861.

(b)    "Commencement Date" means the date that deliveries commence under this Agreement.

(c)    "Contract Demand" means the maximum integrated hourly rate of delivery that the Company may request under this Agreement and is equal to 669.54 megawatts.  The Contract Demand shall not be increased except through:

    (1)    a process conducted pursuant to section 5(d)(3) of the Northwest Power Act that provides for BPA to acquire increased reserves from its direct service industrial companies; or

    (2)    a technological allowance which BPA shall grant upon the Company's demonstration to BPA that such allowance meets the criteria for a technological allowance under the Prior Contract.

(d)    "Contract Year" means the period that begins on October 1 and ends on the following September 30.

(e)    "Control Area" or "Load Control Area" means the electrical (not necessarily geographical) area within which a controlling utility operating under all North American Electric Reliability Council standards has the responsibility to adjust its generation on an instantaneous basis to match internal load and power flow across interchange boundaries to other Control Areas.  A utility operating a Control Area is called a "controlling utility."

(f)    "Demand" means the maximum integrated hourly rate of delivery during each month of each Contract Year for Firm Power deliveries under this Agreement, as specified in Exhibit D.

(g)    "Effective Date" means the date that this Agreement is signed by BPA.

(h)    "Event" means the period during which BPA restricts service to the Company under this Agreement to obtain Operating Reserves or Stability Reserves. The Event shall commence with the reduction in deliveries to the Company under this Agreement due to a BPA request for Operating Reserves or a transfer trip or signal that initiates Stability Reserves restriction. Unless reinstated as provided herein, the Event shall end when BPA's dispatcher notifies the Company that the load restricted for such reserves can be restored to service. Notwithstanding the foregoing, the Event will end (subject to reinstatement as provided herein) when system conditions occur that would result in tripping the Company for undervoltage or underfrequency load shedding. Any BPA restriction or series of BPA restrictions that make up an SR Event shall be treated as part of a single Event.

After an Event has ended, the Event shall be reinstated and continue as follows:

(1)    if the Event Magnitude was less than (Federal Load) × (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 10 hours;

(2)    if the Event Magnitude was equal to or greater than (Federal Load) × (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 21 hours;

    (3)  if the Event Magnitude was equal to or greater than (Federal Load) × (30 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 42 hours;

    (4)  if the Event Magnitude was equal to or greater than (Federal Load) × (60 minutes), then the Event shall be reinstated if BPA requests Reserves again within 84 hours; and

    (5)  if the Event Magnitude was equal to or greater than (Federal Load) × (90 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 126 hours.

  (i)  "Event Duration" means the total cumulative Event Minutes of the Event

  (j)  "Event Magnitude" means a value calculated for each Event as the sum of: (Requested Operating Reserves × Event Minutes associated with the use of Operating Reserves) + (Amount of Load Tripped for Stability Reserves × duration of the SR Event in minutes) for each restriction during the Event. The Event Magnitude shall not include loads restricted pursuant to operating reserves and stability reserve rights that BPA has under other contracts.

  (k)  "Event Magnitude Limit" means the Federal Load multiplied by 90 minutes.

  (l)  "Event Minute(s)" means the minute(s) of restriction (or any portion thereof) during an Event.

  (m)  "Excess Firm Energy" means Firm Energy that would have been delivered to the Company for service to its expected Plant Load but is excess due to a reduction in the Company's actual Plant Load.

  (n)  "Federal Load" means an hourly amount of energy equal to the lesser of (1) 50 percent of the Process Load operating immediately prior to the Event,

☑007

or (2) the sum of (A) 50 percent of the Firm Energy either scheduled to the Company, remarketed to other Qualified Purchasers, used by BPA, or any combination thereof, plus (B) 50 percent of the energy scheduled by Washington Water Power Company under its Firm Energy Sale Agreement with BPA, Contract No. 95MS-95104, provided, that the amount under section 6(n)(2)(B) shall not exceed 58 average megawatts.

(o)    "FERC" means the Federal Energy Regulatory Commission, or its successor.

(p)    "Firm Energy" means the Federal energy that the Company has agreed to purchase from BPA under this Agreement.

(q)    "Firm Power" means the monthly amounts of Demand and Firm Energy (HLH and LLH) purchased by the Company under this Agreement.

(r)    "Heavy Load Hours" or "HLH" means those hours that begin at 6 a.m. and end at 10 p.m., Monday through Saturday.

(s)    "Light Load Hours" or "LLH" means all hours that are not HLH.

(t)    "Material Plant Damage" means the inability of the Company to resume industrial production at all or any portion of its plant because of damage to plant production facilities resulting from a restriction; for example, the inability to resume electrolysis in one or more pots without rebuilding or substantially repairing such pot(s).

(u)    "Non-Federal Service" means, for the purposes of section 18(a) of this Agreement, the monthly amounts of demand, HLH energy and LLH energy that the Company chooses to acquire from non-Federal entities to serve a portion of its Plant Load during the term of this Agreement. The Company agrees that such amounts must be supplied to the Plant Load. The Company

12                          Contract No. 95MS-94861