may purchase additional amounts of non-Federal energy that will not be used
in calculating the amount of curtailed energy

(v)    "Occurrence" means a system condition that results in the need for Reserves

(w)    "Operating Reserves" means nonspinning reserves, provided by the Company
under this Agreement, that are necessary to enable BPA either to reestablish
its load/resource balance after loss of generation or transmission facilities, or
to meet any of its other existing nonspinning operating reserve obligations.
Operating Reserves provided under this Agreement shall not include, without
limitation: (1) Stability Reserves provided by the Company in this
Agreement; (2) operating reserves provided by the Company in any other
contract; and (3) any other reserves that BPA has acquired under other
arrangements.

(x)    "Plant Load" means the total electrical energy load at Company facilities
eligible for BPA service during any given time period whether the Company
has chosen to serve its load with BPA power or non-Federal power.

(y)    "Process Load" means, for an aluminum facility or a chlor-alkali facility, the
electrolytic load.

(z)    "Qualified Purchaser" shall mean a utility or entity which: (1) is capable of
performing the financial obligations undertaken for a sale or for an option to
buy; (2) meets BPA's standards of service, including having an available
transmission path; and (3) if required by State or Federal law, the purchaser
has received all necessary approvals from appropriate regulatory bodies to
conduct the transaction with BPA.

(aa)   "Rate Schedule" means the Industrial Firm Power Rate Schedule (IP-96.5),
the Point-to-Point Transmission Rate Schedule, exclusive of the Delivery
Charge therein (PTP-96.5), Ancillary Products and Services Rate Schedule

(APS-96), a rate schedule that includes the fixed curtailment fee for the option specified in section 18(a), and the General Rate Schedule Provisions established by BPA, and applicable to sales under this Agreement. When such Rate Schedule has received interim or final approval by FERC, then it shall be attached hereto as Exhibit C.

(bb)  "Rate Test" means: (1) the calculation of whether the total average price in mills per kilowatthour, using the Rate Schedule, to determine if such total average price is less than or equal to the price specified in section 11(a) of this Agreement; (2) the determination of whether the fixed curtailment fee, for purposes of section 18(a) of this Agreement, is less than or equal to the amount specified in section 11(b); and (3) the determination of whether the use-of-facilities charge, as may be revised pursuant to section 8(b)(2) and Exhibit I, is less than or equal to the amount determined pursuant to section 11(c). The Rate Test is further described in section 11 of this Agreement.

(cc)  "Requested Operating Reserves" means the amount of Operating Reserves, pursuant to section 17, that the BPA dispatcher requests the Company to trip for purposes of providing Operating Reserves.

(dd)  "Reserves" means the Stability Reserves and Operating Reserves provided by the Company under this Agreement.

(ee)  "SR Event" means the period during which BPA implements a Stability Reserve restriction. An SR Event shall be an Event for all purposes. The beginning of the SR Event shall be identified by a transfer trip or other signal from BPA to the Company restricting delivery of energy under this Agreement. Unless reinstated as provided herein, the end of the SR Event shall be identified by the BPA dispatcher's notification to Company that delivery of all energy to which Company is entitled under this Agreement can be restored. Notwithstanding the foregoing, the Event will end (subject to

reinstatement as provided herein) when system conditions occur that result in tripping the Company for undervoltage or underfrequency load shedding. If such undervoltage or underfrequency load shedding signal is received by the Company prior to Event Minute 3 of the SR Event, then the restriction shall be deemed an event of Force Majeure until service is restored.

After an SR Event has ended, the SR Event shall be reinstated and continue as follows:

(1)    if the SR Event duration was 5 Event Minutes or less, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 2 hours or less of the last SR Event Minute;

(2)    if the SR Event duration was more than 5 Event Minutes but not more than 15 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 4 hours or less of the last SR Event Minute;

(3)    if the SR Event duration was more than 15 SR Event Minutes but not more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 6 hours or less of the last SR Event Minute; and

(4)    if the SR Event duration was more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 8 hours or less of the last SR Event Minute.

(ff)    "Stability Reserves" means those reserves, provided by the Company under this Agreement, that are necessary to ensure the stability of the Federal Columbia River Transmission System against losses of transmission facilities

pursuant to the scheme(s) in Exhibit G or any additional scheme(s) adopted pursuant to section 17 herein. Stability Reserves provided under this Agreement shall not include, without limitation: (1) stability reserves provided by the Customer in the General Transmission Agreement or in other agreements; (2) operating reserves or forced outage reserves that BPA has acquired under this Agreement or under other agreements; and (3) any other reserves that BPA has acquired under other arrangements.

(gg) "Take-or-Pay Obligation" means the obligation, as modified by section 14, of the Company to pay for the Firm Power purchased by the Company under this Agreement. On an annual basis, the amounts of HLH and LLH Firm Energy that the Company agrees to purchase from BPA is specified in section 9(b) of this Agreement. The monthly amounts of HLH and LLH Firm Energy shall be as specified in Exhibit D. The monthly Demand amounts, for the purposes of this Take-or-Pay Obligation, shall be the monthly Demand amounts specified in Exhibit D. If the calculation of the Take-or-Pay Obligation for a Contract Year for which Demands are not yet required to be specified under section 10(a) becomes relevant, then the Demands for such Contract Year shall be calculated by dividing the annual HLH Firm Energy, if any, for each such Contract Year, as specified in section 9(b), by the number of HLH in a Contract Year  Weekly, daily, and hourly amounts of HLH and LLH Firm Energy are the amounts submitted by the Company pursuant to section 10 of this Agreement.

## 7.    EXHIBITS; INTERPRETATION

Exhibit A (General Contract Provisions), Exhibit B (Fees for Remarketing), Exhibit C (Rate Schedule), Exhibit D (Monthly Amounts of Firm Power), Exhibit E (Points of Delivery), Exhibit F (Unrecoverable Costs and Transfer Costs), Exhibit G (Stability Reserve Scheme(s)), Exhibit H (Arbitration Procedures), and Exhibit I (Use-of-Facilities Charge) are attached hereto and made a part of this Agreement. If there is a conflict between the body of this Agreement and any exhibit, then the

(c)  **Other Purchases**

This Agreement does not limit the Company's right to purchase power from BPA, consistent with Federal statutes, under other agreements, or to purchase power from third parties.

(d)  **Minimum Demand for Transmission**

A Company may elect to specify a minimum level of Demand for transmission for any month for the remaining term of this Agreement at the time the Company makes its submission of monthly amounts of Firm Power. Any request to specify a minimum level of Demand made after February 1, 1996, shall be subject to available transmission capacity as described in section 10(a). The Company may assign any excess minimum Demand for transmission consistent with terms for Assignment of Transmission Service under BPA's Point-to-Point Transmission Service Tariff. The amount of minimum Demand for transmission as elected or assigned shall be specified in Exhibit D.

## 10.  MONTHLY, WEEKLY, DAILY, AND HOURLY AMOUNTS OF FIRM POWER

(a)  **Monthly Amounts of Firm Power**

Not later than the February 1, immediately prior to October 1 of each Contract Year, the Company shall specify monthly amounts of Demand and HLH and LLH Firm Energy for such Contract Year. The total of the monthly amounts of HLH and LLH Firm Energy shall equal the annual amounts specified in section 9(b) for such Contract Year. The Company may set its Demand in each month in the 1996-1997 Contract Year at any level up to its Contract Demand. Any increase in amounts of Demand for a specific month in a later Contract Year above the greater of: (1) the amount of Demand for such month in the previous Contract Year; or (2) the minimum level of Demand for transmission specified in Exhibit D; is subject to BPA's determination of available transmission capacity. If additional generating resources integrated at points with transmission capacity available to the

07/18/02  13:24 FAX                                                              ☒013

Company's points of delivery are available for BPA's use or purchase, then BPA shall determine that transmission capacity is available under this Agreement. BPA shall also treat as available any transmission capacity made available by the Company to BPA through a reduction in demand under any other transmission agreement with BPA. If BPA determines that firm transmission capacity is not available for the Company's request, BPA will notify the Company within 60 days of the approved level of Demand. Each year, Exhibit D shall be revised to reflect the amounts specified by the Company, consistent with this section 10(a).

(b)     **Weekly, Daily, and Hourly Amounts of Firm Power**

The Company shall either: (i) provide advance submittals of weekly, daily, and hourly amounts of Firm Energy and any Excess Firm Energy pursuant to section 10(b)(1), which will remain as submitted unless changed pursuant to section 10(b)(2); or (ii) provide such submittals pursuant to the terms of section 10(b)(2) only.

(1)     **Advance Submittals of Weekly, Daily, and Hourly Amounts of Firm Energy**

The Company may submit weekly, daily, and hourly amounts in advance of, but not later than allowed under section 10(b)(2). Such advance submittals shall specify HLH and LLH amounts of Firm Energy to be delivered hereunder until the Company changes its submittal. The Company may change any advance submittal pursuant to section 10(b)(2). All advance submittals shall include a beginning and ending hour.

(6)    **Makeup Power**

At the Company's request, BPA shall sell and deliver to the Company energy in excess of the amount shown in Exhibit D (Makeup Power), at the applicable energy charge only established for Firm Energy in the Industrial Firm Power Rate in the Rate Schedule, to the extent that such energy is needed by the Company to restore its operations following a restriction. Such Makeup Power shall not subject the Company to any Unauthorized Increase or other charge.

18.    **CURTAILMENT OR REMARKETING**

The Company shall have a one-time option, at the time the Company makes its first submission of monthly amounts of Firm Power pursuant to section 10(a) of this Agreement, to either: curtail its purchases pursuant to section 18(a); or remarket Excess Firm Energy pursuant to section 18(b). Following the Company's election, BPA and the Company shall operate under the terms and conditions of either section 18(a) or section 18(b), as applicable.

(a)    **Curtailment of Excess Firm Energy for a Fixed Fee**

The Company may curtail its Plant Load below the sum of its Take-or-Pay Obligation plus any amount of Non-Federal Service the Company identifies at the time it elects this curtailment option. BPA shall relieve the Company of its Take-or-Pay Obligation for Demand and Firm Energy for any such curtailed amounts and the Company shall pay BPA the fixed curtailment fee in mills per kilowatthour for each kilowatthour of such curtailed amounts, as specified in the Rate Schedule. Selection of this curtailment option shall relieve the Company of its obligation to pay the use-of-facilities charge specified in Exhibit I for amounts of curtailed energy.

(1)    The Company shall provide BPA as much notice as possible, but not less than 48 hours, of any curtailment of Firm Power usage.

☒015

(2)    If the Company chooses to use Non-Federal Service for part of its
Plant Load, the Company shall specify the monthly amounts of
demand, HLH energy, and LLH energy of Non-Federal Service, if any,
for the term of this Agreement. BPA shall not be obligated to serve
these specified monthly amounts, and any service to these amounts
shall be subject to an Unauthorized Increase charge, as provided for in
section 15(c).

(3)    Curtailed energy shall be equal to the Company's Take-or-Pay
Obligation for Firm Energy reduced by the relief from take-or-pay
provisions of section 14, minus the Measured Energy for Firm Power
delivered under this Agreement.

(4)    Election of this curtailment option operates to assign the Company's
*right to transmit an amount of energy equal to the curtailed energy to*
BPA.

(b)    **Remarketing Excess Firm Energy Without a Fixed Fee**

(1)    **Notice and Request to Remarket**
The Company shall request that BPA remarket Excess Firm Energy
by notifying BPA of:

(A)    the amount and minimum duration of Excess Firm Energy to
be remarketed; and

(B)    the manner pursuant to section 18(b)(2) in which the Company
wants BPA to remarket the Excess Firm Energy.

(2)    **Remarketing Options**
*The Company may select one or more of the following options for*
*remarketing Excess Firm Energy:*

☒016

(A)     The Company may identify one or more Qualified Purchasers
        that have agreed to purchase some or all of the Excess Firm
        Energy under specified terms and conditions at agreed-upon
        prices or price formulas and for agreed-upon amounts and
        durations. The Company shall provide BPA at least the notice
        specified in section 18(b)(3) prior to the date that deliveries are
        to begin under each proposed sale.

(B)     The Company may arrange in advance for a Qualified
        Purchaser(s) to purchase any Firm Power that becomes Excess
        Firm Energy during any period for which the Company and a
        Qualified Purchaser may agree. The Company shall provide
        BPA at least the notice specified in section 18(b)(3) prior to the
        date on which the prearrangement becomes effective. In
        addition, the Company shall notify BPA as required in
        section 10(b) when deliveries are to begin under the
        arrangement.

(C)     The Company may request that BPA find purchasers for the
        Excess Firm Energy. If the Company chooses, it may request
        that BPA seek sales of specified amounts for daily, weekly,
        monthly, or other specified durations, and the Company may
        specify minimum prices or price ranges for the sales. BPA and
        the Company shall agree on the price of the sale at the time of
        the transaction unless the daily limitations in
        section 18(b)(4)(E) apply. BPA shall promptly notify the
        Company of the sales made on the Company's behalf.

(D)     The Company and BPA may agree to a price for use in
        crediting the Company's wholesale power bill under
        section 18(b)(4). BPA shall have discretion to dispose of or use

such Excess Firm Energy without regard to the procedures associated with other options for disposal, and the Company shall have no further rights with respect to such Excess Firm Energy that is subject to such agreement

(3)    **Applicability of Preference Provisions**
Excess Firm Energy remarketed by BPA shall be subject to applicable statutory provisions regarding preference. BPA shall notify the Company within the time period specified below if BPA or another Qualified Purchaser with public preference has elected to perform the agreement.

| Duration of Sale | Minimum Notice Period to Notify BPA | Maximum Period for BPA to Respond to Company |
|---|---|---|
| Up to 1 month | 48 hours | 24 hours |
| Up to 6 months | 7 days | 2 days |
| Over 6 months | 14 days | 7 days |
| Prearrangements under section 18(b)(2)(B) | 21 days | 14 days |

(4)    **Crediting the Company's Wholesale Power Bill**

(A)    During months when Excess Firm Energy is being remarketed by BPA, such power shall continue to be included in the amount of Firm Power billed by BPA as if delivered to the Company.

(B)    BPA may sell the Excess Firm Energy to the Qualified Purchaser(s) as arranged by the Company under options section 18(b)(2)(A) and section 18(b)(2)(B) or dispose of such power on whatever alternative terms that BPA may separately arrange  In either event, BPA shall credit the Company for the Excess Firm Energy revenues based on the price(s) agreed to

Contract No. 95MS-94861

☒018

between the Company and the Qualified Purchaser(s) net of the amounts specified in section 18(b)(4)(C).

(C)    BPA shall determine the revenues for Excess Firm Energy delivered during a month by subtracting from the amount paid by the Qualified Purchaser (or the amount agreed to be paid or credited if BPA elects not to remarket to the Qualified Purchaser, disposes of or uses the Excess Firm Energy under section 18(b)(2)(D), or remarkets the Excess Firm Energy under section 18(b)(2)(C)): (i) any applicable transmission charges or losses specified in section 18(b)(4)(F); and (ii) the remarketing fee, as specified in Exhibit B. The fee or the pro rata share of the fee that the Company would have paid to another entity under a transaction under section 18(b)(2)(B) shall be deducted from revenues when BPA elects to retain the Excess Firm Energy for itself. No charges shall apply under section 18(b)(4)(C)(i) and section 18(b)(4)(C)(ii) when BPA uses such Excess Firm Energy for its own use or disposes of such Excess Firm Energy under section 18(b)(2)(D).

(D)    BPA shall credit the Company's wholesale power bill for revenues from sales of Excess Firm Energy in the month in which BPA uses such Excess Firm Energy for its own use or disposes of such Excess Firm Energy under section 18(b)(2)(D), BPA is paid for such Excess Firm Energy under section 18(b)(2)(C), or BPA is paid for such Excess Firm Energy by the Qualified Purchaser. If the amount of the credit during any month exceeds the power bill amount, then BPA shall pay the Company the amount of the difference.

(E)    BPA shall credit the Company for sales made under section 18(b)(2)(C) on Company's behalf subject to the

limitations in this paragraph. For sales of 1 month duration or less, if BPA notified the Company at the start of a transaction that it was subject to daily remarketing limitations and BPA is simultaneously remarketing power for the Company and selling nonfirm energy on a daily basis, then the Company shall receive credit for the energy that BPA remarkets on the Company's behalf on such days at BPA's average sale price for nonfirm energy (including remarketed energy) for such day; **provided, however,** BPA shall have no obligation to credit the Company at such average daily price to the extent that the total amount of *Excess Firm Energy remarketed under similar* contract provisions for the Company and other entities providing for daily remarketing limitations exceeds the following limits:

| If BPA's actual daily average sales (excluding remarketed amounts) are: | | Limit to total amount of remarketed energy |
|---|---|---|
| equal to or greater than (aMW) | but less than (aMW) | (aMW) |
| 0 | 600 | 25% of BPA actual sales |
| 600 | 1,000 | 200 |
| 1,000 | 1,500 | 250 |
| 1,500 | 3,000 | 300 |
| 3,000 | 4,000 | 400 |
| 4,000 | 5,000 | 500 |
| 5,000 | - - | 600 |

In the event the above limits are exceeded, the Company shall be credited for its pro rata share of remarketed energy at the average daily price. All sales of remarketed energy for each day under the daily remarketing limitations shall be considered made under a single active schedule to determine remarketing fees. Sales of remarketed energy under the daily remarketing limitations shall be considered made over the southern intertie during the months of April through July, and

in the Pacific Northwest during other months.  The Company
may request that BPA remarket the remainder of its Excess
Firm Energy at the best available price for additional energy,
or the Company may arrange to store the Excess Firm Energy
for sale at another time.  BPA shall not discriminate against
the Company in the storage or disposal of such remaining
Excess Firm Energy.

(F)     There are no additional transmission charges for Excess Firm
Energy except when:

(i)     BPA incurs incremental transfer costs, including losses,

(ii)    the Qualified Purchaser receiving delivery would have
paid a charge for low-voltage delivery higher than the
charge, if any, paid by the Company.

The Company shall pay such incremental costs.  Any deliveries
of Excess Firm Energy over BPA's interties shall be charged
BPA's standard intertie tariffs.  Losses will be valued at the
price of the remarketed power.

## 19.  LOAD REGULATION, UNBUNDLED PRODUCTS, AND OTHER TRANSMISSION PRODUCTS

(a)     **Purchase of Load Regulation**

If the Company is within BPA's Control Area, or if BPA provides load
regulation services to the Company through a third party, the Company shall
purchase load regulation from BPA.  The charge for load regulation shall be
as specified in Exhibit C.

07/18/02  13:25 FAX                                                      ☑021



**Department of Energy**
Bonneville Power Administration
P.O Box 3621
Portland, Oregon 97208-3621

*POWER BUSINESS LINE*

March 23, 1998

In reply refer to: PSB/Spokane

Amendatory Agreement No. 1 to
Contract No. 95MS-94861

Mr. Peter Forsyth
Vice President, NW External Affairs
Kaiser Aluminum & Chemical Corporation
825 NE. Multnomah, Suite 960
Portland, OR 97232

Dear Mr. Forsyth:

This letter agreement (Amendatory Agreement) constitutes an amendment to Contract No. 95MS-94861 (Power Sales Agreement) between the Bonneville Power Administration (BPA) and Kaiser Aluminum & Chemical Corporation (Company). BPA and the Company are hereinafter sometimes referred to individually as "Party" and collectively as "Parties." BPA and the Company have executed an interim transmission services agreement (hereinafter referred to as "Interim PTP Service Agreement") under which BPA has provided Point-to-Point Transmission Service over the Federal Columbia River Transmission System (FCRTS) pursuant to the terms and conditions of the Point-to-Point Transmission Services tariff and the 1996 Point-to-Point Firm Transmission Rate Schedule (PTP-96). The Parties are negotiating the terms and conditions of a final transmission service agreement (Final PTP Service Agreement) which will supersede the Interim PTP Service Agreement. The Parties have agreed to amend the Power Sales Agreement as follows:

      1.      **EFFECTIVE DATE.** This Amendatory Agreement, when executed, shall become effective as of the date that the Interim PTP Service Agreement becomes effective.

      2.      **DEFINITIONS.** All capitalized terms used herein shall be as defined in the Power Sales Agreement or, if not defined in the Power Sales Agreement, as defined in the General Rate Schedule Provisions, unless otherwise specified in this Amendatory Agreement.

      "PTP Service Agreement" shall mean the Interim or Final PTP Service Agreement, as applicable.

      3.      **AMENDMENT OF POWER SALES AGREEMENT.** The Power Sales Agreement is amended as follows:

            (a)      Section 8(b)(2) is deleted and replaced by the following:

☒022

4

section 14, minus the Measured Energy for Firm Power delivered under this Agreement."

(k)     *A new section 18(b)(1)(C) is added as follows:*

"(C)     the assignment to BPA of that portion of its rights under the PTP Service Agreement, associated with the energy to be remarketed and necessary to allow BPA to use such assigned rights to remarket Excess Firm Energy for the Company, subject to the assignment provisions of the Point-to-Point Transmission Services tariff and the terms of section 18(b)(4)(F)."

(l)     Section 19(d) is deleted and replaced by the following:

"(d)     **Unbundled Products and Other Transmission Services.** BPA shall offer to the Company the ancillary services, the network integration transmission product, the point-to-point transmission product, and the intertie transmission products that BPA offers to its utility customers. BPA may offer to the Company other unbundled services. If the Company elects to purchase such products, the Parties agree to amend the appropriate provisions of this Agreement and/or the PTP Service Agreement."

(m)     *Section 19(f) is deleted in its entirety.*

(n)     Section 20(a) is deleted and replaced by the following:

"(a)     **Delivery to Company's Firm Load.** BPA shall make available Firm Power at the points of interconnection specified in Exhibit C-1 of the PTP Service Agreement. Delivery of such Firm Power over the Network to the Company's Plant Load shall be as provided for in the PTP Service Agreement."

(o)     Section 20(b) is deleted and replaced by the following:

"(b)     **Other Provisions Relating to Delivery.** Other provisions applicable to delivery (1) at the points of interconnection specified in Exhibit C-1 of the PTP Service Agreement shall be as specified in Exhibit A of this Agreement, and (2) over the Network to the Company's Plant Load shall be as specified in the PTP Service Agreement."

(p)     Section 26 is deleted and replaced by the following:

"26.     **DAMAGES FOR FAILURE BY BPA TO DELIVER.** In the event BPA fails to deliver the hourly amounts of Firm Energy scheduled by the Company under this Agreement to the plant's Point of Delivery, and such delivery is not restricted by BPA pursuant to its Reserve rights under this Agreement, or pursuant to the curtailment rights under the PTP Service Agreement, or such delivery is not excused by section 4(f) of Exhibit A, BPA shall pay the Company (on the date payment by the Company for the Firm Energy would otherwise have been due under this Agreement):

Contract No. 95MS-94861

[POOR QUALITY ORIGINAL(S)]



**Department of Energy**
Bonneville Power
Administration
P.O. Box 3621
Portland, OR 97208-3621

**POWER BUSINESS LINE**
Trader and Scheduling Phones

| | | | |
|---|---|---|---|
| Date: | February 06, 2001 | Brenda Anderson | (503) 230-5610 |
| To: | Clark Public Utilities | Dan Le | (503) 230-3144 |
| | 1200 Ft Vancouver | Young Linn | (503) 230-3183 |
| | Vancouver, WA 98668 | Bill Lamb | (503) 230-3135 |
| | | Mark Miller | (503) 230-4003 |
| Attn: | James Sanders | David Mills | (503) 230-7588 |
| Phone: | 360-992-3452 | BPA Trading Floor Fax | (503) 230-7463 |
| Fax: | 360-992-3140 | BPA Preschedule Fax | (503) 230-3039 |
| | | BPA SW Preschedule | (503) 230-3915 |
| Presch: | 503-251-5198 | BPA NW Preschedule | (503) 230-3913 |
| Real Time: | 503-251-5224 | BPA S. Idaho Presch. | (503) 230-4311 |
| PS/RT | 503-251-5201 | BPA Real Time | (503) 230-3341 |
| FAX: | | | or 230-4194 |

## CONFIRMATION AGREEMENT

The following memorializes the terms of a transaction agreed to by Bonneville Power Administration
(BPA) and Clark Public Utilities (CPU). Transactions hereunder are in accordance with reference
contract or enabling agreement DE-MS79-81BP90489.

**Transaction Date:** 2/6/01          **Traders:** Mark Miller (BPA) and James Sanders (CPU)

**BPA Contract:** 01PB-24068

---

| | |
|---|---|
| Seller of Energy: | BPA |
| Buyer of Energy: | Clark Public Utilities |
| Product: | Surplus firm power |
| Point of Delivery: | Alcoa Substation |
| Alternate Point | Where the Federal generating system interconnects with BPA's transmission |
| of Delivery: | network. Customer will provide transmission from the Federal generating system. Energy taken to an alternate POD is take-or-pay and liquidated damages do not apply. Customer is responsible for payment of energy if transmission is curtailed to APOD. |

| Start of Term | End of Term | Demand Limit | Hours | Amount (MWH/hr) | Total MWh | Price | Holiday Excluded | Revenue /Cost |
|---|---|---|---|---|---|---|---|---|
| 8/1/01 | 8/31/01 | 140 | ALL | 140 | 104,160 | $325.00 | | |
| 9/1/01 | 9/30/01 | 140 | ALL | 140 | 100,800 | $325.00 | | |
| Energy Transaction Total: | | | | | | See Additional Provisions below | | |

**Additional Provisions**
Transmission will be provided under Kaiser Aluminum & Chemical Corp. (KACS) Contract No. 96MS-96107. Payment for transmission will remain with KACS.

CPU shall pay to BPA $64,080,603.00 on March 28, 2001, which represents net payment/NPV of full payment for all energy purchased under this agreement. This confirmation agreement shall be modified on or before March 15, 2001, if a change to the payment date is required.

**Scheduling**
All energy will be shown in Pacific Prevailing Time.
~ HLHs are defined as HE 0700 – HE 2200, Monday through Saturday (excludes Sundays and NERC holidays)
~ LLHs are defined as HE 0100 – HE 0600, HE 2300 and HE 2400, Monday through Saturday and all day Sundays and NERC holidays
– All or FLH is defined as HE 0100 – HE 2400.

Energy shall be prescheduled, with source and sink identified, by 1000, or as mutually agreed, on the day that both parties observe as a workday preceding the date of delivery. Schedules may only be changed due to uncontrollable forces as defined by the reference contract or by mutual agreement of both parties.

**Billing**
Billing and payment under this agreement shall be made consistent with and as a specific item in the Wholesale Power Bill.

Unless otherwise specified in this Agreement, all administrative and operational provisions required to perform this Agreement shall be those described in the reference contract, including provisions related to delivery, scheduling (if applicable), billing, payments, metering, access to facilities, dispute resolution, uncontrollable forces, continuity of services, and contract interpretation.

This confirmation agreement contains all of the terms and conditions of this transaction and expressly limits acceptance to the terms stated herein, and any additional or different terms proposed by Clark Public Utilities are rejected unless expressly agreed to in writing by BPA.

If the above accurately reflects your understanding of our agreement, please indicate your approval by signing a copy of this agreement and returning via fax to BPA.

---

AGREED AND ACCEPTED

| Bonneville Power Administration | Clark Public Utilities |
|---|---|
| _signature_ | _signature_ |
| David E. Mills | Name: Wayne _____ |
| Manager, Trading Floor | Title: General Manager / CEO |
| Date: 2/7/01 | Date: 2-8-01 |

Page 2 of 2 CPU 01PB-24065



'POOR QUALITY ORIGINAL(S)

**Department of Energy**
Bonneville Power
Administration
P.O. Box 3621
Portland, OR 97208-3621

**POWER BUSINESS LINE**
Trader and Scheduling Phones

| | |
|---|---|
| Brenda Anderson | (503) 230-5610 |
| Dan Le | (503) 230-3144 |
| Young Linn | (503) 230-3183 |
| Bill Lamb | (503) 230-3135 |
| Mark Miller | (503) 230-4003 |
| David Mills | (503) 230-7585 |
| BPA Trading Floor Fax | (503) 230-7463 |
| BPA Preschedule Fax | (503) 230-3039 |
| BPA SW Preschedule | (503) 230-3915 |
| BPA NW Preschedule | (503) 230-3813 |
| BPA S. Idaho Presch. | (503) 230-4311 |
| BPA Real Time | (503) 230-3341 |
| | or 230-4194 |

Date:        February 06, 2001
To:          Kaiser Aluminum & Chemical Corporation
             534 East Tront Avenue, Suite 300
             Spokane, WA 99202

Attn:        Joseph Hoerner
Fax:         509-242-1098

Presch:      509-495-4011
Real Time:   509-495-8534
PS/RT FAX:   509-495-8975

## CONFIRMATION AGREEMENT

The following memorializes the terms of a transaction agreed to by Bonneville Power Administration (BPA) and Kaiser Aluminum & Chemical Corporation (KACS). Transactions hereunder are in accordance with reference contract or enabling agreement 95MS-94861.

Transaction Date:  2/6/01          Traders:   Mark Miller (BPA) and Joseph Hoerner (KACS)
BPA Contract:      01PB-24067

---

Seller of Energy:     Kaiser Aluminum & Chemical Corporation
Buyer of Energy:      BPA
Product:              Firm power
Point of Delivery:    Mid Columbia

| Start of Term | End of Term | Demand Limit | Hours | Amount (MWH/hr) | Total MWh | Price | Holiday Excluded | Revenue / Cost |
|---|---|---|---|---|---|---|---|---|
| 8/1/01 | 8/31/01 | 140 | ALL | 140 | 104,160 | $325.00 | | $33,852,000.00 |
| 9/1/01 | 9/30/01 | 140 | ALL | 140 | 100,800 | $325.00 | | $32,760,000.00 |
| Energy Transaction Total: | | | | | | | | **$59,842,404.00** |
| | | | | | | | | See Additional Provisions |

**Additional Provisions**

Energy Transaction Total to be paid to KACS upon receipt of payment from Clark Public Utilities for corresponding sale of remarketed energy (Contract 01PB-24068).

BPA shall pay to KACS $59,842,404 on March 30, 2001, which represents the net payment to KACS (NPV of this purchase of 140 MW equalling $61,080,603 less NPV of IP 96 rate equalling $1,238,199). This confirmation agreement shall be modified on or before March 15, 2001, if a change to the payment date is required

This contract books out sale to Sale to KACS under contract 95MS-94861.

Page 1 of 2 KACS 01PB-24067

Scheduling

All energy will be shown in Pacific Prevailing Time.
~HLHs are defined as HE 0700 – HE 2200, Monday through Saturday (excludes Sundays and NERC holidays).
~LLHs are defined as HE 0100 – HE 0600, HE 2300 and HE 2400, Monday through Saturday and all day Sundays and NERC holidays.
~All or FLH is defined as HE 0100 – HE 2400.

Energy shall be prescheduled, with source and sink identified, by 1000, or as mutually agreed, on the day that both parties observe as a workday preceding the date of delivery. Schedules may only be changed due to uncontrollable forces as defined by the reference contract or by mutual agreement of both parties.

Billing

Billing and payment under this agreement shall be made consistent with and as a specific item in the Wholesale Power Bill.

Unless otherwise specified in this Agreement, all administrative and operational provisions required to perform this Agreement shall be those described in the reference contract, including provisions related to delivery, scheduling (if applicable), billing, payments, metering, access to facilities, dispute resolution, uncontrollable forces, continuity of services, and contract interpretation.

This confirmation agreement contains all of the terms and conditions of this transaction and expressly limits acceptance to the terms stated herein, and any additional or different terms proposed by Kaiser Aluminum & Chemical Corporation are rejected unless expressly agreed to in writing by BPA.

If the above accurately reflects your understanding of our agreement, please indicate your approval by signing a copy of this agreement and returning via fax to BPA

| AGREED AND ACCEPTED | |
|---|---|
| Bonneville Power Administration | Kaiser Aluminum & Chemical Corporation |
| David E. Mills | Name: S. P. Brauth |
| Manager, Trading Floor | Title: V.P. Program  Affairs |
| Date 0/8/01 | Date: 2/9/01 |

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Puget Sound Energy, Inc.,
  Complainant,

   v.

All Jurisdictional Sellers of Energy and/or Capacity
at Wholesale Into Electric Energy
and/or Capacity Markets in the Pacific
Northwest, Including Parties to the
Western Systems Power Pool Agreement,
   Respondents.

Docket Nos. EL01-10-000
    EL01-10-001

ORDER GRANTING MOTIONS TO INTERVENE OUT OF TIME
(Issued August 21, 2001)

*A number of motions for leave to intervene have been filed in this proceeding.*[1]
The claim for late filing is that the July 25, Commission Order[2] expanded the scope,
changed the interests of the parties, or was the first notice that they would have a
significant interest in the outcome of this proceeding. Movants assert that they have a
direct interest in the case which cannot be protected by any one else in the proceeding. In
their motions these parties claim that there is good cause for granting the late
interventions, since the proceeding just started and will not be disrupted by the late
interventions, and the parties will not be prejudiced. The parties filing late interventions
state that they will take the record as it now stands.

---

[1] Arizona Electric Power Cooperative, Inc ; Salt River Project Agriculture
Improvement and Power District; Express Pipeline Partnership; Public Utility Districts
No 1 of Benton, Franklin and Grays Harbor Counties In Washington; Clark Public
Utilities; Northern California Power Agency; IdaCorp Energy, LP; Morgan Stanley
Capital Group, Inc ; Clatskanie People's Utility District; Tenaska Power Services Co. and
PG&E Energy Trading Power, LP.

[2] *San Diego Gas & Electric Company*, 96 FERC ⌂ 61, 120 (2001)("July 25
Order").

Docket Nos. EL01-10-000                    2
         EL01-10-001

     Pinnacle West Capital Corporation, Arizona Public Service Company, Puget Sound Energy, Inc. Coral Power, LC, Kaiser Aluminum & Chemical Corporation, Morgan Stanley Capital Group, Inc., Enron Power Marketing, Inc. and Enron Energy Services, Inc. ("Joint Parties") oppose the motion to intervene filed by Clark Public Utilities ("Clark"). The Joint Parties assert that Clark has no legitimate basis to intervene because Clark alluded to one power purchase transaction which will be delivered outside the relevant time period determined by the Commission

     Clark filed a motion for permission to submit response to objection to motion to intervene. According to Clark, its transaction occurred in the forward market, and payment was made before delivery, its contract was for a single transaction executed in February 2001, with payment made in March 2001, both within the Commission's refund period. Although power was not delivered until August and September, Clark maintains that the transaction occurred when payment was made.

### DISCUSSION

     Replies to answers are normally not allowed. *See generally*, Rule 213 of the Commission's Rules, 18 C.F.R. ▯ 385.213 (a)(2). However, I find that good cause has been established to allow Clark to respond to the Joint Parties objection. Accordingly, Clark's motion for permission to submit response to objection to motion to intervene is GRANTED

     I find that the argument raised by Joint Parties are merciless. Clark's arguments are persuasive, this proceeding is about price and to exclude transactions based on the delivery date misses the point of the proceeding. Clark paid its price during the relevant refund period. In the July 25 Order an evidentiary proceeding was established to facilitate development of a factual record concerning the reasonableness of charges for spot market bilateral sales in the Pacific Northwest for the period beginning December 25, 2001 through June 20, 2001. *San Diego Gas & Electric*, 96 FERC ▯ 61, 120 slip op. at 43 (2001). Therefore, I find that Clark's transaction gives it standing to intervene in this proceeding

     Additionally, based on the guidelines established in the July 25 Commission Order, and pursuant to Rule 214 (d), 18 C.F.R. ▯ 385.214(d), I find that there is good cause for granting the late interventions filed in this proceeding. Movants represent interests which may be directly affected by the outcome of this proceeding. Moreover, movants interests cannot be adequately represented by other parties in the proceeding. Grant of the motions will not disrupt or delay, or cause any prejudice to, or additional

Docket Nos  EL01-10-000          3
            EL01-10-001

burdens upon, the existing parties to the proceeding    Accordingly, **IT IS ORDERED,** that the oppositions are **DENIED** and the motions to intervene out of time, **ARE GRANTED  IT IS FURTHER ORDERED,** that intervenors must accept the record that was developed prior to the late interventions

SO ORDERED.

                              **Carmen A. Cintron**
                         **Presiding Administrative Law Judge**

# Thacher
# Proffitt

Thacher Proffitt & Wood
11 West 42nd Street
New York, New York 10036
212 789 1200

Fax: 212 789 3500
www.tpwlaw.com

Direct Dial: 212 789 1466
lcurcio@tpwlaw.com

January 29, 2003

**BY FEDERAL EXPRESS**

Kaiser Aluminum Claims Processing Department
Logan & Company, Inc.
546 Valley Road
Upper Montclair, New Jersey 07043

> Re:    *In re Kaiser Aluminum and Chemical Corporation*
> Case No. 02-10430(JKF)
> Proof of Claim of Clark Public Utilities (Claim #1)

To Whom It May Concern:

With respect to the above referenced matter, enclosed for filing please find one original and one copy of Clark Public Utilities' Proof of Claim (Claim #1) against the debtor Kaiser Aluminum and Chemical Corporation. Kindly file the original Proof of Claim, and file-stamp and return the copy to the undersigned in the enclosed self-addressed, prepaid Federal Express envelope. In addition, please note that this Proof of Claim relates to one of Clark Public Utilities' two claims against Kaiser. The Proof of Claim for Clark Public Utilities' other claim (Claim #2) will be sent simultaneously under separate cover.

If you have any questions, please do not hesitate to contact me. Thank you in advance for your assistance.

Very truly yours,

Louis A. Curcio

Enclosures