Kaiser Aluminum Corporation and Subsidiary Companies
**STATEMENTS OF CONSOLIDATED CASH FLOWS**

| (In millions of dollars) | Year Ended December 31, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| Cash flows from operating activities: | | | |
| Net income (loss) | $ 16.8 | $ (54.1) | $ .6 |
| Adjustments to reconcile net income to net cash (used) provided by operating activities: | | | |
| Depreciation and amortization (including deferred financing costs of $4.4, $4.3 and $3.9) | 81.3 | 93.8 | 103.0 |
| Non-cash impairment charges (Notes 1 and 6) | 63.3 | 19.1 | 45.0 |
| Gain on involuntary conversion at Gramercy facility | - | (85.0) | - |
| Gains - real estate related (2000); sale of interests in AKW L.P. (1999) | (39.0) | (50.5) | - |
| Non-cash benefit for income taxes | - | - | (8.3) |
| Equity in loss (income) of unconsolidated affiliates, net of distributions | 13.1 | (4.9) | .1 |
| Minority interests | (3.0) | (3.1) | (.1) |
| (Increase) decrease in trade and other receivables | (168.8) | 21.7 | 61.5 |
| Decrease (increase) in inventories | 125.8 | (2.6) | 24.8 |
| Decrease (increase) in prepaid expenses and other current assets | 20.8 | (66.9) | 30.1 |
| (Decrease) increase in accounts payable (associated with operating activities) and accrued interest | (29.7) | 58.8 | (3.2) |
| Increase (decrease) in payable to affiliates and other accrued liabilities | 68.9 | 19.6 | (45.3) |
| Decrease in accrued and deferred income taxes | (10.2) | (55.2) | (26.2) |
| Net (used) provided by long-term assets and liabilities | (69.4) | 15.7 | (23.9) |
| Other | 14.7 | 4.3 | 12.6 |
| Net cash provided (used) by operating activities | 84.6 | (89.3) | 170.7 |
| Cash flows from investing activities: | | | |
| Capital expenditures, net of accounts payable of $34.6 in 2000 | (261.9) | (68.4) | (77.6) |
| Gramercy-related property damage insurance recoveries | 100.0 | - | - |
| Net proceeds from disposition of property and investments | 66.9 | 74.8 | 6.7 |
| Other | .2 | (3.3) | (3.5) |
| Net cash (used) provided by investing activities | (94.8) | 3.1 | (74.4) |
| Cash flows from financing activities: | | | |
| Borrowings under credit agreement, net | 20.0 | 10.4 | - |
| Repayments of long-term debt | (4.4) | (.6) | (8.9) |
| Redemption of minority interests' preference stocks | (2.8) | (1.6) | (8.7) |
| Incurrence of financing costs | (.4) | - | (.6) |
| Capital stock issued | - | .1 | .1 |
| Decrease in restricted cash, net | - | .8 | 4.3 |
| Net cash provided (used) by financing activities | 12.4 | 9.1 | (13.8) |
| Net increase (decrease) in Cash and cash equivalents during the year | 2.2 | (77.1) | 82.5 |
| Cash and cash equivalents at beginning of year | 21.2 | 98.3 | 15.8 |
| Cash and cash equivalents at end of year | $ 23.4 | $ 21.2 | $ 98.3 |
| Supplemental disclosure of cash flow information: | | | |
| Interest paid, net of capitalized interest of $6.5, $3.4 and $3.0 | $ 105.3 | $ 105.4 | $ 106.3 |
| Income taxes paid | 19.6 | 24.1 | 16.8 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

Brought to you by Global Reports

KAISER ALUMINUM CORPORATION AND SUBSIDIARY COMPANIES
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
*(In millions of dollars, except share amounts)*

### 1. Summary of Significant Accounting Policies

*Principles of Consolidation.* The consolidated financial statements include the statements of Kaiser Aluminum Corporation ("Kaiser" or the "Company") and its majority owned subsidiaries. The Company is a subsidiary of MAXXAM Inc. ("MAXXAM") and conducts its operations through its wholly-owned subsidiary, Kaiser Aluminum & Chemical Corporation ("KACC"). KACC operates in all principal aspects of the aluminum industry-the mining of bauxite (the major aluminum bearing ore), the refining of bauxite into alumina (the intermediate material), the production of primary aluminum, and the manufacture of fabricated and semi-fabricated aluminum products. Kaiser's production levels of alumina, before consideration of the Gramercy incident (see Note 2), and primary aluminum exceed its internal processing needs, which allows it to be a major seller of alumina and primary aluminum to domestic and international third parties (see Note 14).

The preparation of financial statements in accordance with generally accepted accounting principles requires the use of estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities known to exist as of the date the financial statements are published, and the reported amounts of revenues and expenses during the reporting period. Uncertainties, with respect to such estimates and assumptions, are inherent in the preparation of the Company's consolidated financial statements; accordingly, it is possible that the actual results could differ from these estimates and assumptions, which could have a material effect on the reported amounts of the Company's consolidated financial position and results of operation.

Investments in 50%-or-less-owned entities are accounted for primarily by the equity method. Intercompany balances and transactions are eliminated.

Net sales and cost of products sold for 1999 and 1998 have been restated to conform to a new accounting principle that requires freight charges ($39.3 in 1999 and $46.0 in 1998) to be included in cost of products sold.

*Liquidity/Cash Resources.* KACC has significant near-term debt maturities. KACC's ability to make payments on and refinance its debt depends on its ability to generate cash in the future. In addition to being impacted by power sales and normal operating items, the Company's and KACC's near-term liquidity and cash flows will also be affected by the Gramercy incident, net payments for asbestos-related liabilities and possible proceeds from asset dispositions. For discussions of these matters, see Notes 2, 7, 8 and 12.

*Recognition of Sales.* Sales are recognized when title, ownership and risk of loss pass to the buyer. No changes were required to the Company's revenue recognition policy as a result of Staff Accounting Bulletin 101, "Revenue Recognition in Financial Statements", which became effective during 2000.

*Earnings per Share.* Basic earnings per share is computed by dividing the weighted average number of common shares outstanding during the period, including the weighted average impact of the shares of common stock issued during the year from the date(s) of issuance.

Diluted earnings per share for the years ended December 31, 2000 and 1998 include the dilutive effect of outstanding stock options (3,000 shares and 41,000 shares, respectively). The impact of outstanding stock options was excluded from the computation of diluted loss per share for the year ended December 31, 1999, as its effect would have been antidilutive.

*Cash and Cash Equivalents.* The Company considers only those short-term, highly liquid investments with original maturities of 90 days or less to be cash equivalents.

Brought to you by Global Reports

*Inventories.* Substantially all product inventories are stated at last-in, first-out (" LIFO" ) cost, not in excess of market value. Replacement cost is not in excess of LIFO cost. Inventories at December 31, 2000, have been reduced by LIFO inventory charges totaling $24.1 ($.6 in cost of products sold and $23.5 in non-recurring operating items, net). The non-recurring LIFO charges result primarily from the Washington smelters' curtailment ($4.5), the exit from the can body stock product line ($11.1) and the delayed restart of the Gramercy facility ($7.0). Other inventories, principally operating supplies and repair and maintenance parts, are stated at the lower of average cost or market. Inventory costs consist of material, labor, and manufacturing overhead, including depreciation. Inventories consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Finished fabricated products | $   54.6 | $  118.5 |
| Primary aluminum and work in process | 126.9 | 189.4 |
| Bauxite and alumina | 88.6 | 124.1 |
| Operating supplies and repair and maintenance parts | 126.1 | 114.1 |
|  | $  396.2 | $  546.1 |

*Depreciation.* Depreciation is computed principally by the straight-line method at rates based on the estimated useful lives of the various classes of assets. The principal estimated useful lives of land improvements, buildings, and machinery and equipment are 8 to 25 years, 15 to 45 years, and 10 to 22 years, respectively.

*Stock-Based Compensation.* The Company applies the intrinsic value method to account for a stock-based compensation plan whereby compensation cost is recognized only to the extent that the quoted market price of the stock at the measurement date exceeds the amount an employee must pay to acquire the stock. No compensation cost has been recognized for this plan as the exercise price of the stock options granted in 2000, 1999 and 1998 were at or above the market price. The pro forma after-tax effect of the estimated fair value of the grants would be to reduce net income in 2000 by $2.2, increase the net loss in 1999 by $1.8 and reduce net income in 1998 by $1.5. The fair value of the 2000, 1999 and 1998 stock option grants were estimated using a Black-Scholes option pricing model.

*Other Income (Expense).* Amounts included in other income (expense) in 2000, 1999 and 1998, other than interest expense and gain on involuntary conversion at the Gramercy facility, included the following pre-tax gains (losses):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2000 | 1999 | 1998 |
| Asbestos-related charges (Note 12) | $  (43.0) | $  (53.2) | $  (12.7) |
| Gain on sale of Pleasanton complex (Note 4) | 22.0 | - | - |
| Lease obligation adjustment (Note 12) | 17.0 | - | - |
| Mark-to-market gains (losses) (Note 13) | 11.0 | (32.8) | - |
| Gain on sale of interests in AKW L.P. (Note 3) | - | 50.5 | - |
| Environmental cost insurance recoveries (Note 12) | - | - | 12.0 |
| All other, net | (11.3) | (.4) | 4.2 |
|  | $   (4.3) | $  (35.9) | $    3.5 |

*Deferred Financing Costs.* Costs incurred to obtain debt financing are deferred and amortized over the estimated term of the related borrowing. Such amortization is included in Interest expense.

34

Brought to you by Global Reports

*Foreign Currency.* The Company uses the United States dollar as the functional currency for its foreign operations.

*Derivative Financial Instruments.* Hedging transactions using derivative financial instruments are primarily designed to mitigate KACC's exposure to changes in prices for certain of the products which KACC sells and consumes and, to a lesser extent, to mitigate KACC's exposure to changes in foreign currency exchange rates. KACC does not utilize derivative financial instruments for trading or other speculative purposes. KACC's derivative activities are initiated within guidelines established by management and approved by KACC's and the Company's boards of directors. Hedging transactions are executed centrally on behalf of all of KACC's business segments to minimize transaction costs, monitor consolidated net exposures and allow for increased responsiveness to changes in market factors.

Most of KACC's hedging activities involve the use of option contracts (which establish a maximum and/or minimum amount to be paid or received) and forward sales contracts (which effectively fix or lock-in the amount KACC will pay or receive). Option contracts typically require the payment of an up-front premium in return for the right to lock-in a minimum or maximum price. Forward sales contracts do not require an up-front payment and are settled by the receipt or payment of the amount by which the price at the settlement date varies from the contract price. Consistent with accounting guidelines in place through December 31, 2000, any interim fluctuations in option prices prior to the settlement date were deferred until the settlement date of the underlying hedged transaction, at which time they were reflected in net sales or cost of products sold (as applicable) together with the related premium cost. No accounting recognition was accorded to interim fluctuations in prices of forward sales contracts. Hedge (deferral) accounting would have been terminated (resulting in the applicable derivative positions being marked-to-market) if the level of underlying physical transactions ever fell below the net exposure hedged. This did not occur in 1998, 1999 or 2000. Deferred gains or losses as of December 31, 2000, were included in Prepaid expenses and other current assets and Other accrued liabilities (see Note 13).

Beginning with the quarterly period ending March 31, 2001, the Company will begin reporting derivative activities consistent with Statement of Financial Accounting Standards ("SFAS") No. 133, *Accounting for Derivative Instruments and Hedging Activities.* SFAS No. 133, which has been adopted as of January 1, 2001, requires companies to recognize all derivative instruments as assets or liabilities in the balance sheet and to measure those instruments at fair value. Under SFAS No. 133, the Company will be required to "mark-to-market" all of its hedging positions at each period-end. This contrasts with guidance under pre-2001 accounting principles which generally only required certain "non-qualifying" hedging positions to be marked-to-market. Changes in the market value of the Company's open hedging positions resulting from the mark-to-market process will represent unrealized gains or losses. Such unrealized gains or losses will change, based on prevailing market prices at each subsequent balance sheet date, until the transaction date occurs. Under SFAS No. 133, these changes will be reflected as an increase or reduction in stockholders' equity through either other comprehensive income or net income, depending on the nature of the hedging instrument used. To the extent that changes in market value of the Company's hedging positions are initially recorded in other comprehensive income, such changes will reverse out of other comprehensive income (net of any fluctuations in other "open" positions) and will be reflected in net income when the subsequent physical transactions occur. As of December 31, 2000, the amount of the Company's other comprehensive income adjustments were not significant so there was not a significant difference between net income and comprehensive income. However, differences between comprehensive income and net income may become significant in future periods as a result of SFAS No. 133. In general, SFAS No. 133 will result in material fluctuations in comprehensive income, net income and stockholders' equity in periods of price volatility, despite the fact that the Company's cash flow and earnings will be "fixed" to the extent hedged. This result is contrary to the intent of the Company's hedging program, which is to "lock-in" a price (or range of prices) for products sold/used so that earnings and cash flows are subject to reduced risk of volatility.

Brought to you by Global Reports

SFAS No. 133 requires that as of the date of the initial adoption, the difference between the market value of derivative instruments recorded on the Company's consolidated balance sheet and the previous carrying amount of those derivatives be reported in net income or other comprehensive income, as appropriate, as the cumulative effect of a change in accounting principle. As previously discussed, this impact will be reflected in the Company's first quarter 2001 financial statements. The adoption of SFAS No. 133 will result in a pre-tax benefit of $21.2 to other comprehensive income and an essentially offsetting pre-tax charge of $18.9 to earnings, such that the net effect of the adoption of SFAS No. 133 on stockholders' equity will be small. See Note 13 for additional discussions regarding the Company's derivatives.

*Fair Value of Financial Instruments.* The Company estimates the fair value of its outstanding indebtedness to be $798.3 and $970.5 as of December 31, 2000 and 1999, respectively, based on quoted market prices for KACC's $9^7/_8\%$ Senior Notes due 2002 (the "$9^7/_8\%$ Notes"), $12^3/_4\%$ Senior Subordinated Notes due 2003 (the "$12^3/_4\%$ Notes"), and $10^7/_8\%$ Senior Notes due 2006 (the "$10^7/_8\%$ Notes"), and the discounted future cash flows for all other indebtedness, using the current rate for debt of similar maturities and terms. The Company believes that the carrying amount of other financial instruments is a reasonable estimate of their fair value, unless otherwise noted.

**2. Incident at Gramercy Facility**

In July 1999, KACC's Gramercy, Louisiana alumina refinery was extensively damaged by an explosion in the digestion area of the plant. A number of employees were injured in the incident, several of them severely. In connection with the settlement of the U.S. Mine Safety and Health Administration's ("MSHA") investigation of the incident, KACC is paying a fine of $.5 but denied the alleged violations. As a result of the incident, alumina production at the facility was completely curtailed. Construction on the damaged part of the facility began during the first quarter of 2000. Initial production at the plant commenced during the middle of December 2000. The plant is expected to increase production progressively to approximately 75% of its newly rated estimated annual capacity of 1,250,000 tons by the end of March 2001. At February 28, 2001, the plant was operating at 70% of capacity. Based on current estimates, construction at the facility is expected to be completed during the third quarter of 2001.

KACC has significant amounts of insurance coverage related to the Gramercy incident. Deductibles and self-retention provisions under the insurance coverage for the incident total $5.0, which amounts were charged to Other non-recurring operating items, net in 1999 (Note 6). KACC's insurance coverage has five separate components: property damage, clean-up and site preparation, business interruption, liability and workers' compensation. The insurance coverage components are discussed below.

*Property Damage.* KACC's insurance policies provide that KACC will be reimbursed for the costs of repairing or rebuilding the damaged portion of the facility using new materials of like kind and quality with no deduction for depreciation. In 1999, based on discussions with the insurance carriers and their representatives and third party engineering reports, KACC recorded a pre-tax gain of $85.0, representing the difference between the minimum expected property damage reimbursement amount of $100.0 and the net carrying value of the damaged property of $15.0. The reimbursement amount was classified as a receivable in Other assets at December 31, 1999. The full amount of the receivable was collected in 2000. Additional recoveries are possible. See "Timing and Amount of Additional Insurance Recoveries" below.

Brought to you by Global Reports

*Clean-up and Site Preparation.* The Gramercy facility incurred incremental costs for clean-up and other activities during 1999 and 2000. These clean-up and site preparation activities have been offset by accruals of approximately $24.0, of which $10.0 were accrued in 2000, for estimated insurance recoveries.

*Business Interruption.* KACC's insurance policies provide for the reimbursement of specified continuing expenses incurred during the interruption period plus lost profits (or less expected losses) plus other expenses incurred as a result of the incident. Operations at the Gramercy facility and a sister facility in Jamaica, which supplies bauxite to Gramercy, will continue to incur operating expenses until full production at the Gramercy facility is restored. Through December 2000, KACC purchased alumina from third parties, in excess of the amounts of alumina available from other KACC-owned facilities, to supply these customers' needs as well as to meet intersegment requirements. The excess cost of such open market purchases was substantially offset by insurance recoveries. However, the insurers have alleged that certain sublimits within KACC's insurance coverage have been reached, and, accordingly, any additional excess purchase costs incurred in 2001 will be substantially unreimbursed. However, as the facility is approaching 75% of its newly rated production capacity, any such unreimbursed costs will be limited. The insurers have also asserted that no additional business interruption amounts are due after November 30, 2000. After considering all of the foregoing items, KACC recorded expected business interruption insurance recoveries totaling $151.0, of which $110.0 was recorded in the year ended December 31, 2000, as a reduction of Cost of products sold, which amounts substantially offset actual expenses incurred during these periods. Such business interruption insurance amounts represent estimates of KACC's business interruption coverage based on discussions with the insurance carriers and their representatives and are therefore subject to change. See "Timing and Amount of Additional Insurance Recoveries" below.

 Depreciation expense for the first six months of 1999 was approximately $6.0. KACC suspended depreciation at the facility starting in July 1999 since production had been completely curtailed. However, in accordance with an agreement with KACC's insurers, during the second half of 2000, the Company recorded a depreciation charge of $14.3, of which $1.5 was recorded in the fourth quarter, representing the previously unrecorded depreciation related to the undamaged portion of the facility for the period from July 1999 through November 2000. However, this charge did not have any impact on the Company's operating results as the Company has reflected (as a reduction of depreciation expense) an equal and offsetting insurance receivable (incremental to the amounts discussed in the preceding paragraph) since the insurers have agreed to reimburse the Company this amount. Since production at the facility was partially restored during December 2000, normal depreciation has commenced. Such depreciation will exceed prior historical rates primarily due to the capital costs on the newly constructed assets.

*Liability.* The incident has also resulted in more than ninety individual and class action lawsuits being filed against KACC and others alleging, among other things, property damage, business interruption losses by other businesses and personal injury. The aggregate amount of damages sought in the lawsuits and other claims cannot be determined at this time; however, KACC does not currently believe the damages will exceed the amount of coverage under its liability policies.

Brought to you by Global Reports

*Workers' Compensation.* While it is presently impossible to determine the aggregate amount of claims that may be incurred, KACC currently believes that any amount in excess of the coverage limitations will not have a material effect on the Company's consolidated financial position or liquidity. However, it is possible that as additional facts become available, additional charges may be required and such charges could be material to the period in which they are recorded.

*Timing and Amount of Additional Insurance Recoveries.* Through December 31, 2000, the Company had recorded $289.3 of estimated insurance recoveries related to the property damage, clean-up and site preparation and business interruption aspects of the Gramercy incident and had collected $252.6 of such amounts. Through February 2001, an additional $10.0 had been received with respect to the estimated recoveries at year-end 2000 and an additional $7.0 is expected in March 2001. The remaining balance of approximately $20.0 and any additional amounts possibly due to KACC are not expected to be recovered until KACC and the insurers resolve their differences. KACC and the insurers are currently negotiating an arbitration agreement as a means of resolving their differences. The Company anticipates that the remaining issues will not be resolved until late 2001 or early 2002. KACC and the Company continue to believe that a minimum of approximately $290.0 of insurance recoveries are probable, that additional amounts are owed to KACC by the insurers, and that the likelihood of any refund by KACC of amounts previously received from the insurers is remote. However, no assurances can be given as to the ultimate outcome of this matter or its impact on the Company's and KACC's near-term liquidity and results of operations.

    Neither KACC nor the Company intend to record any additional insurance-related recoveries in 2001 unless and until agreed to by the insurers or until the arbitration process is completed. As such, the Company's and KACC's future operating results will be adversely affected until all of the additional costs/lost profits related to the Gramercy plant's start-up and return to full production are eliminated or until any amounts related to 2001 ultimately determined to be due to KACC through negotiation with the insurers or as a part of the arbitration process are received.

*Other.* During the third quarter of 2000, KACC incurred approximately $11.5 of normal recurring maintenance expenditures for the Gramercy facility (which amounts were reflected in Other non-recurring operating items, net - see Note 6) that otherwise would have been incurred in the ordinary course of business over the next one to three years. The Company chose to incur these expenditures now to avoid normal operational outages that otherwise would have occurred once the facility resumes production.

Brought to you by Global Reports

### 3. Investments In and Advances To Unconsolidated Affiliates

Summary of combined financial information is provided below for unconsolidated aluminum investments, most of which supply and process raw materials. The investees are Queensland Alumina Limited (" QAL") (28.3% owned), Anglesey Aluminium Limited (" Anglesey") (49.0% owned) and Kaiser Jamaica Bauxite Company (49.0% owned). The equity in income (loss) before income taxes of such operations is treated as a reduction (increase) in Cost of products sold. At December 31, 2000 and 1999, KACC's net receivables from these affiliates were not material.

KACC was a founding partner (during 2000) in MetalSpectrum, LLC, an independent neutral online site to serve manufacturers, distributors and customers in the specialty metals business. Since KACC's interest in MetalSpectrum is less than 10%, it is being accounted for on the cost basis.

On April 1, 1999, KACC sold its 50% interest in AKW L.P. (" AKW") to its partner for $70.4, which resulted in the Company recognizing a net pre-tax gain of $50.5 (included in Other income (expense) - Note 1). The Company's equity in income of AKW was $2.5 and $7.8 for the years ended December 31, 1999 and 1998, respectively.

*Summary of Combined Financial Position*

|  | December 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Current assets | $ 350.1 | $ 370.4 |
| Long-term assets (primarily property, plant, and equipment, net) | 327.3 | 344.1 |
| Total assets | $ 677.4 | $ 714.5 |
| Current liabilities | $ 144.1 | $ 120.4 |
| Long-term liabilities (primarily long-term debt) | 331.4 | 368.3 |
| Stockholders' equity | 201.9 | 225.8 |
| Total liabilities and stockholders' equity | $ 677.4 | $ 714.5 |

*Summary of Combined Operations*

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2000 | 1999 | 1998 |
| Net sales | $ 602.9 | $ 594.9 | $ 659.2 |
| Costs and expenses | (617.1) | (582.9) | (651.7) |
| Benefit (provision) for income taxes | (4.5) | .8 | (2.7) |
| Net income (loss) | $ (18.7) | $ 12.8 | $ 4.8 |
| Company's equity in income (loss) | $ (4.8) | $ 4.9 | $ 5.4 |
| Dividends received | $ 8.3 | $ - | $ 5.5 |

The Company's equity in income differs from the summary net income (loss) due to varying percentage ownerships in the entities and equity method accounting adjustments. Prior to December 31, 2000, KACC's investment in its unconsolidated affiliates exceeded its equity in their net assets and such excess was being amortized to Depreciation and amortization. At December 31, 2000, the excess investment had been fully amortized. Such amortization was approximately $10.0 for each of the years ended December 31, 2000, 1999 and 1998.

Brought to you by Global Reports

The Company and its affiliates have interrelated operations. KACC provides some of its affiliates with services such as management and engineering. Significant activities with affiliates include the acquisition and processing of bauxite, alumina, and primary aluminum. Purchases from these affiliates were $235.7, $223.7 and $235.1, in the years ended December 31, 2000, 1999 and 1998, respectively.

**4. Property, Plant, and Equipment**

The major classes of property, plant, and equipment are as follows:

|  | December 31, 2000 | December 31, 1999 |
|---|---|---|
| Land and improvements | $ 130.7 | $ 166.1 |
| Buildings | 197.2 | 230.0 |
| Machinery and equipment | 1,702.8 | 1,519.7 |
| Construction in progress | 130.3 | 67.7 |
|  | 2,161.0 | 1,983.5 |
| Accumulated depreciation | (984.9) | (929.8) |
| Property, plant, and equipment, net | $ 1,176.1 | $ 1,053.7 |

KACC evaluated the recoverability of the approximate $200.0 carrying value of its Washington smelters, as a result of the change in the economic environment of the Pacific Northwest associated with the reduced power availability and higher power costs for KACC's Washington smelters under the terms of the new contract with the Bonneville Power Administration ("BPA") starting in October 2001 (see Note 7). The Company determined that the expected future undiscounted cash flows of the Washington smelters were below their carrying value. Accordingly, during the fourth quarter of 2000, KACC adjusted the carrying value of its Washington smelting assets to their estimated fair value, which resulted in a non-cash impairment charge of approximately $33.0 (which amount was reflected in Other non-recurring operating items, net - see Note 6). The estimated fair value was based on anticipated future cash flows discounted at a rate commensurate with the risk involved.

During September 2000, KACC sold its Pleasanton, California, office complex because the complex had become surplus to the Company's needs. Net proceeds from the sale were approximately $51.6 and resulted in a net pre-tax gain of $22.0 (included in Other income (expense) - see Note 1).

In May 2000, KACC acquired the assets of a drawn tube aluminum fabricating operation in Chandler, Arizona. Total consideration for the acquisition was $16.1, consisting of cash payments of $15.1 and assumed current liabilities of $1.0. The purchase price was allocated to the assets acquired based on their estimated fair values, of which approximately $1.1 was allocated to property, plant and equipment and $2.8 was allocated to receivables, inventory and prepaid expenses. The excess of the purchase price over the fair value of the assets acquired (goodwill) was approximately $12.2 and is being amortized on a straight-line basis over 20 years. Total revenues for the Chandler facility were approximately $13.8 for the year ended December 31, 1999 (unaudited).

During the quarter ended March 31, 2000, KACC, in the ordinary course of business, sold certain non-operating properties for total proceeds of approximately $12.0. The sale did not have a material impact on the Company's operating results for the year ended December 31, 2000.

Brought to you by Global Reports

In February 2000, KACC completed the sale of the Micromill assets and technology for a nominal payment at closing and possible future payments based on subsequent performance and profitability of the Micromill technology. The sale did not have a material impact on the Company's 2000 operating results. As a result of the changes in strategic course in the further development and deployment of KACC's Micromill technology, the carrying value of the Micromill assets was reduced by recording impairment charges of $19.1 and $45.0 in 1999 and 1998, respectively (see Note 6).

**5. Labor Dispute, Settlement and Related Costs**

As previously reported, prior to the settlement of the labor dispute discussed below, KACC was operating five of its U.S. facilities with salaried employees and other employees as a result of the September 30, 1998, strike by the United Steelworkers of America ("USWA") and the subsequent "lock-out" by KACC in January 1999. The labor dispute was settled in September 2000. A significant portion of the issues were settled through direct negotiations between KACC and the USWA and the remaining issues were settled pursuant to an agreed-upon arbitration process. Under the terms of the settlement, USWA members generally returned to the affected plants during October 2000. The new labor contract, which expires in September 2005, provides for a 2.6% average annual increase in the overall wage and benefit packages, results in the reduction of at least 540 hourly jobs at the five facilities (from approximately 2,800 on September 30, 1998), allows KACC greater flexibility in using outside contractors and provides for productivity gains by allowing KACC to utilize the knowledge obtained during the labor dispute without many of the work-rule restrictions that were a part of the previous labor contract. The Company has recorded a one-time pre-tax charge of $38.5 in its results of operations for the year ended December 31, 2000, to reflect the incremental, non-recurring impacts of the labor settlement, including severance and other contractual obligations for non-returning workers. At December 31, 2000, the total remaining liability associated with the labor settlement charge was $16.3. It is anticipated that substantially all remaining costs will be incurred during 2001 or early 2002. See Note 14 for the allocation of the labor settlement charge by business unit.

During the period of the strike and subsequent lock-out, the Company continued to accrue certain benefits (such as pension and other postretirement benefit costs/liabilities) for the USWA members, which accruals were based on the terms of the previous USWA contract. The difference between the amounts accrued for the returning workers and the amounts agreed to in the settlement with the USWA resulted in an approximate $33.6 increase in KACC's accumulated pension obligation and an approximate $33.4 decrease in KACC's accumulated other postretirement benefit obligations. In accordance with generally accepted accounting principles, these amounts will be amortized to expense over the employees' expected remaining years of service.

On March 1, 2001, in connection with the USWA settlement agreement, KACC redeemed all of its Cumulative (1985 Series A) and Cumulative (1985 Series B) Preference Stock. See Note 11.

Brought to you by Global Reports

**6. Non-Recurring Operating Items, Net (other than labor settlement)**

The income (loss) impact associated with non-recurring operating items, net, other than the labor settlement charge, for 2000, 1999 and 1998 was as follows:

|  | Business Segment | Year Ended December 31, 2000 | 1999 | 1998 |
|---|---|---:|---:|---:|
| Net gains from power sales (Note 7) | Primary Aluminum | $ 159.5 | $  - | $  - |
| Impairment charge - |  |  |  |  |
|   Washington smelters (Note 4) | Primary Aluminum | (33.0) | - | - |
| Gramercy related items: |  |  |  |  |
|   Incremental maintenance (Note 2) | Bauxite & Alumina | (11.5) | - | - |
|   Insurance deductibles, etc. (Note 2) | Bauxite & Alumina | - | (4.0) | - |
|  | Corporate | - | (1.0) | - |
|   LIFO inventory charge (Note 1) | Bauxite & Alumina | (7.0) | - | - |
| Impairment charges associated with |  |  |  |  |
|   product line exits | Flat-Rolled Products | (12.6) | - | - |
|  | Engineered Products | (5.6) | - | - |
| Restructuring charges | Bauxite & Alumina | (.8) | - | - |
|  | Primary Aluminum | (3.1) | - | - |
|  | Corporate | (5.5) | - | - |
| Micromill impairment (Note 4) | Micromill | - | (19.1) | (45.0) |
| Incremental strike-related costs | Bauxite & Alumina | - | - | (11.0) |
|  | Primary Aluminum | - | - | (29.0) |
|  | Flat-Rolled Products | - | - | (16.0) |
|  | Engineered Products | - | - | (4.0) |
|  |  | $ 80.4 | $ (24.1) | $ (105.0) |

    The $12.6 impairment charge reflected by KACC's Flat-Rolled products segment in 2000 includes a $11.1 LIFO inventory charge (see Note 1), of which $3.6 was recorded in the fourth quarter of 2000, and a $1.5 charge to reduce the carrying value of certain assets to their estimated net realizable value as a result of the segment's decision to exit the can body stock product line. The $5.6 impairment charge recorded by KACC's Engineered products segment in 2000 includes a $.9 LIFO inventory charge (all in the fourth quarter of 2000) and a $4.7 charge to reduce the carrying value of certain machining facilities and assets, which are no longer required as a result of the segment's decision to exit a marginal product line, to their estimated net realizable value.

    The restructuring charges recorded by KACC's Primary aluminum segment in 2000 represent employee benefit and other costs for approximately 50 job eliminations reflecting a reduced emphasis on technology sales and reduced salaried employee requirements at KACC's Tacoma facility, given its current curtailment. The Corporate portion of the restructuring charges in 2000 represent employee benefit and other costs associated with the consolidation or elimination of certain corporate staff functions. The Corporate restructuring initiatives in 2000 involve a group of approximately 50 employees. As of December 31, 2000, the total remaining liability associated with both restructuring efforts was $2.8. It is anticipated that all remaining costs will be incurred during 2001.

    The incremental strike-related costs in 1998 reflect the adverse impact on the Company's profitability due to the USWA strike in September 1998.

Brought to you by Global Reports

### 7. Pacific Northwest Power Sales and Operating Level

*Power Sales.* In response to the unprecedented high market prices for power in the Pacific Northwest, KACC temporarily curtailed the primary aluminum production at the Tacoma and Mead, Washington smelters during the second half of 2000 and sold a portion of the power that it had under contract through September 30, 2001. As a result of the curtailments, KACC avoided the need to purchase power on a variable market price basis and will receive cash proceeds sufficient to more than offset the cash impact of the potline curtailments over the period for which the power was sold. To implement the curtailment, KACC temporarily curtailed the two and one-half operating potlines at its Tacoma smelter and two and one-half out of a total of eight potlines at its Mead smelter in June 2000 and temporarily curtailed the remaining Mead potlines during the fourth quarter of 2000. One-half of a potline at the Tacoma smelter was already curtailed. The Company recorded net pre-tax gains of approximately $159.5 in 2000, of which $103.2 was recorded in the fourth quarter, as a result of these power sales. The net gain amounts were composed of gross proceeds of $207.8, of which $88.0 (included in Receivables - other at December 31, 2000) was received through February 28, 2001. The gross proceeds were offset by employee-related expenses, incremental excess power costs, a non-cash LIFO inventory charge and other fixed commitments, which amounts are expected to be paid through September 2001. The resulting net gains have been reflected in Other non-recurring operating items, net (see Note 6).

As previously announced, in a series of transactions completed during the first quarter of 2001, KACC agreed to sell a substantial majority of the remaining power that it had under contract through September 2001. These power sales, before consideration of any applicable non-energy costs (which have yet to be determined), are expected to result in pre-tax gains of approximately $260.0 in the first quarter of 2001. Approximately one-half of the net proceeds are expected to be received in late March 2001, with the balance being received periodically through October 2001. Based on the forward price for power experienced during the first quarter of 2001, the value of the remaining power that KACC has under contract that can be sold is estimated to be between $20.0 and $40.0.

*Future Power Supply.* During October 2000, KACC signed a new power contract with the BPA under which the BPA will provide KACC's operations in the State of Washington with power during the period October 2001 through September 2006. The contract will provide KACC with sufficient power to fully operate KACC's Trentwood facility as well as approximately 40% of the combined capacity of KACC's Mead and Tacoma aluminum smelting operations. Power costs under the new contract are expected to exceed the cost of power under KACC's current BPA contract by between 20% to 60% and, perhaps, by as much as 100% in certain periods. Additional provisions of the new BPA contract include a take-or-pay requirement, an additional cost recovery mechanism under which KACC's base power rate could be increased and clauses under which KACC's power allocation could be curtailed, or its costs increased, in certain instances. KACC does not have any remarketing rights under the new BPA contract. KACC has the right to terminate the contract until certain pricing and other provisions of the BPA contract are finalized, which is expected to be mid-2001.

Depending on the ultimate price for power under the terms of the new BPA contract or the availability of an alternate power supply at an acceptable price, KACC may be unable to operate the Mead and Tacoma smelters in the near or long-term. Under KACC's contract with the USWA, KACC is liable for certain severance and supplemental unemployment benefits for laid-off workers. Costs related to the period from January 1, 2001 to September 30, 2001 have been accrued to the extent the costs were fixed and determinable. However, the Company may become liable for additional costs. In particular, the Company would become liable for certain early retirement benefits for USWA workers at the Mead and Tacoma facilities if such facilities are not restarted prior to late 2002 or early 2003. Such costs could be significant and would adversely impact the Company's operating results and liquidity.

Brought to you by Global Reports

**8. Long-Term Debt**

Long-term debt and its maturity schedule are as follows:

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 and After | December 31, 2000 Total | December 31, 1999 Total |
|---|---|---|---|---|---|---|---|---|
| Credit Agreement | $ 30.4 |  |  |  |  |  | $ 30.4 | $ 10.4 |
| 9⅞% Senior Notes due 2002, net |  | $224.8 |  |  |  |  | 224.8 | 224.6 |
| 10⅞% Senior Notes due 2006, net |  |  |  |  |  | $225.5 | 225.5 | 225.6 |
| 12¾% Senior Subordinated Notes due 2003 |  |  | $400.0 |  |  |  | 400.0 | 400.0 |
| Alpart CARIFA Loans - (fixed and variable rates) due 2007, 2008 |  |  |  |  |  | 56.0 | 56.0 | 60.0 |
| Other borrowings (fixed and variable rates) | 1.2 | .2 | .2 | $ .2 | $ .2 | 50.7 | 52.7 | 52.2 |
| Total | $ 31.6 | $225.0 | $400.2 | $ .2 | $ .2 | $332.2 | 989.4 | 972.8 |
| Less current portion |  |  |  |  |  |  | 31.6 | .3 |
| Long-term debt |  |  |  |  |  |  | $957.8 | $972.5 |

*Credit Agreement and Liquidity.* The Company and KACC have a credit agreement, as amended, (the "Credit Agreement") which provides a secured, revolving line of credit through August 15, 2001. KACC is able to borrow under the facility by means of revolving credit advances and letters of credit (up to $125.0) in an aggregate amount equal to the lesser of $300.0 (reduced from $325.0 in December 2000) or a borrowing base relating to eligible accounts receivable and eligible inventory. As of December 31, 2000, $155.3 (of which $69.3 could have been used for letters of credit) was available to KACC under the Credit Agreement. The Credit Agreement is unconditionally guaranteed by the Company and by certain significant subsidiaries of KACC. Interest on any outstanding balances will bear a spread (which varies based on the results of a financial test) over either a base rate or LIBOR, at KACC's option. The interest rate at December 31, 2000 was 11.0%. As of February 28, 2001, there were $94.0 of borrowings outstanding under the Credit Agreement and remaining availability of approximately $120.0. However, proceeds of approximately $130.0 related to 2001 power sales are expected to be received at or near March 30, 2001, and an additional $130.0 of power proceeds will be received periodically through October 2001 with respect to other power sales made during the first quarter of 2001.

It is the Company's and KACC's intention to extend or replace the Credit Agreement prior to its expiration. However, in order for the Credit Agreement to be extended, on a short-term basis, beyond August 2001, KACC will have to have a plan to mitigate the $225.0 million of 9⅞% Notes, due February 2002. For the Credit Agreement to be extended past February 2003, both the 9⅞% Notes and the 12¾% Notes, due February 2003, will have to be retired and/or refinanced. As of February 28, 2001, KACC had received approval from the Credit Agreement lenders to purchase up to $50.0 of the 9⅞% Notes. As of February 28, 2001, KACC has purchased approximately $1.0 of 9⅞% Notes.

44

Brought to you by Global Reports

As previously disclosed, KACC is considering the possible sale of part or all of its interests in certain operating assets. The contemplated transactions are in various stages of development. KACC expects that at least one operating asset will be sold. KACC has multiple transactions under way. It is unlikely, however, that it would consummate all of the transactions under consideration. Further, there can be no assurance as to the likelihood, timing or terms of such sales. The Company would expect to use the proceeds from any such sales for debt reduction, capital spending or some combination thereof.

*Alpart CARIFA Loans.* In December 1991, Alumina Partners of Jamaica ("Alpart") entered into a loan agreement with the Caribbean Basin Projects Financing Authority ("CARIFA"). As of December 31, 2000, Alpart's obligations under the loan agreement were secured by two letters of credit aggregating $59.7. KACC was a party to one of the two letters of credit in the amount of $38.8 in respect of its ownership interest in Alpart. Alpart has also agreed to indemnify bondholders of CARIFA for certain tax payments that could result from events, as defined, that adversely affect the tax treatment of the interest income on the bonds.

During March 2000, Alpart redeemed $4.0 principal amount of the CARIFA loans. During March 2001, Alpart redeemed an additional $34.0 principal amount of the CARIFA loans and, accordingly, KACC's letter of credit securing the loans was reduced to $15.3. The March 2001 redemption had a modest beneficial effect on the unused availability remaining under the Credit Agreement as the additional Credit Agreement borrowings of $22.1 required for KACC's share of the redemption were more than offset by a reduction in the amount of letters of credit outstanding.

*Debt Covenants and Restrictions.* The Credit Agreement requires KACC to comply with certain financial covenants and places restrictions on the Company's and KACC's ability to, among other things, incur debt and liens, make investments, pay dividends, undertake transactions with affiliates, make capital expenditures, and enter into unrelated lines of business. The Credit Agreement is secured by, among other things, (i) mortgages on KACC's major domestic plants (excluding KACC's Gramercy alumina plant); (ii) subject to certain exceptions, liens on the accounts receivable, inventory, equipment, domestic patents and trademarks, and substantially all other personal property of KACC and certain of its subsidiaries; (iii) a pledge of all the stock of KACC owned by Kaiser; and (iv) pledges of all of the stock of a number of KACC's wholly owned domestic subsidiaries, pledges of a portion of the stock of certain foreign subsidiaries, and pledges of a portion of the stock of certain partially owned foreign affiliates.

The obligations of KACC with respect to its 9 7/8% Notes, its 10 7/8% Notes and its 12 3/4% Notes are guaranteed, jointly and severally, by certain subsidiaries of KACC. The indentures governing the 9 7/8% Notes, the 10 7/8% Notes and the 12 3/4% Notes (collectively, the "Indentures") restrict, among other things, KACC's ability to incur debt, undertake transactions with affiliates, and pay dividends. Further, the Indentures provide that KACC must offer to purchase the 9 7/8% Notes, the 10 7/8% Notes and the 12 3/4% Notes, respectively, upon the occurrence of a Change of Control (as defined therein), and the Credit Agreement provides that the occurrence of a Change in Control (as defined therein) shall constitute an Event of Default thereunder.

The Credit Agreement does not permit the Company, and significantly restricts KACC's ability, to pay dividends on their common stock.

*Restricted Net Assets of Subsidiaries.* Certain debt instruments restrict the ability of KACC to transfer assets, make loans and advances, and pay dividends to the Company. The restricted net assets of KACC totaled $87.0 and $70.7 at December 31, 2000 and 1999, respectively.

45

Brought to you by Global Reports

### 9. Income Taxes

Income (loss) before income taxes and minority interests by geographic area is as follows:

|  | Year Ended December 31, | | |
|---|---:|---:|---:|
|  | 2000 | 1999 | 1998 |
| Domestic | $ (96.6) | $ (81.8) | $ (93.6) |
| Foreign | 122.0 | (8.1) | 77.7 |
| Total | $ 25.4 | $ (89.9) | $ (15.9) |

Income taxes are classified as either domestic or foreign, based on whether payment is made or due to the United States or a foreign country. Certain income classified as foreign is also subject to domestic income taxes.

The (provision) benefit for income taxes on income (loss) before income taxes and minority interests consists of:

|  |  | Federal | Foreign | State | Total |
|---|---|---:|---:|---:|---:|
| 2000 | Current | $ (1.9) | $ (35.3) | $ (.3) | $ (37.5) |
|  | Deferred | 35.5 | (8.9) | (.7) | 25.9 |
|  | Total | $ 33.6 | $ (44.2) | $ (1.0) | $ (11.6) |
| 1999 | Current | $ (.5) | $ (23.1) | $ (.3) | $ (23.9) |
|  | Deferred | 43.8 | 7.1 | 5.7 | 56.6 |
|  | Total | $ 43.3 | $ (16.0) | $ 5.4 | $ 32.7 |
| 1998 | Current | $ (1.8) | $ (16.5) | $ (.2) | $ (18.5) |
|  | Deferred | 44.4 | (12.5) | 3.0 | 34.9 |
|  | Total | $ 42.6 | $ (29.0) | $ 2.8 | $ 16.4 |

A reconciliation between the (provision) benefit for income taxes and the amount computed by applying the federal statutory income tax rate to income (loss) before income taxes and minority interests is as follows:

|  | Year Ended December 31, | | |
|---|---:|---:|---:|
|  | 2000 | 1999 | 1998 |
| Amount of federal income tax (provision) benefit based on the statutory rate | $ (8.9) | $ 31.2 | $ 5.6 |
| Revision of prior years' tax estimates and other changes in valuation allowances | (1.8) | 1.1 | 8.3 |
| Percentage depletion | 3.0 | 2.8 | 3.2 |
| Foreign taxes, net of federal tax benefit | (3.2) | (3.2) | (1.9) |
| Other | (.7) | .8 | 1.2 |
| (Provision) benefit for income taxes | $ (11.6) | $ 32.7 | $ 16.4 |

Brought to you by Global Reports

The components of the Company's net deferred income tax assets are as follows:

|  | December 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Deferred income tax assets: |  |  |
| Postretirement benefits other than pensions | $ 267.4 | $ 274.7 |
| Loss and credit carryforwards | 125.2 | 119.3 |
| Other liabilities | 143.7 | 146.3 |
| Other | 181.5 | 193.9 |
| Valuation allowances | (122.3) | (125.6) |
| Total deferred income tax assets-net | 595.5 | 608.6 |
| Deferred income tax liabilities: |  |  |
| Property, plant, and equipment | (105.1) | (101.6) |
| Other | (26.2) | (69.6) |
| Total deferred income tax liabilities | (131.3) | (171.2) |
| Net deferred income tax assets | $ 464.2 | $ 437.4 |

    The principal component of the Company's net deferred income tax assets is the tax benefit, net of certain valuation allowances, associated with the accrued liability for postretirement benefits other than pensions. The future tax deductions with respect to the turnaround of this accrual will occur over a 30-to-40-year period. If such deductions create or increase a net operating loss, the Company has the ability to carry forward such loss for 20 taxable years. Accordingly, the Company believes that a long-term view of profitability is appropriate and has concluded that this net deferred income tax asset will more likely than not be realized.

    A substantial portion of the valuation allowances provided by the Company relates to loss and credit carryforwards. To determine the proper amount of valuation allowances with respect to these carryforwards, the Company evaluated all appropriate factors, including any limitations concerning their use and the year the carryforwards expire, as well as the levels of taxable income necessary for utilization. With regard to future levels of income, the Company believes, based on the cyclical nature of its business, its history of operating earnings, and its expectations for future years, that it will more likely than not generate sufficient taxable income to realize the benefit attributable to the loss and credit carryforwards for which valuation allowances were not provided.

    As of December 31, 2000 and 1999, $56.0 and $39.1, respectively, of the net deferred income tax assets listed above are included in the Consolidated Balance Sheets in the caption entitled Prepaid expenses and other current assets. Certain other portions of the deferred income tax liabilities listed above are included in the Consolidated Balance Sheets in the captions entitled Other accrued liabilities and Long-term liabilities.

Brought to you by Global Reports

The Company and its domestic subsidiaries file consolidated federal income tax returns. During the period from October 28, 1988, through June 30, 1993, the Company and its domestic subsidiaries were included in the consolidated federal income tax returns of MAXXAM. The tax allocation agreements of the Company and KACC with MAXXAM terminated pursuant to their terms, effective for taxable periods beginning after June 30, 1993. However, payments or refunds for periods prior to July 1, 1993 related to certain jurisdictions could still be required pursuant to the Company's and KACC's respective tax allocation agreements with MAXXAM. In accordance with the Credit Agreement, any such payments to MAXXAM by KACC would require lender approval, except in certain specific circumstances.

At December 31, 2000, the Company had certain tax attributes available to offset regular federal income tax requirements, subject to certain limitations, including net operating loss and general business credit carryforwards of $84.9 and $1.0, respectively, which expire periodically through 2019 and 2011, respectively, foreign tax credit (" FTC" ) carryforwards of $67.1, which expire primarily in 2004 and 2005, and alternative minimum tax (" AMT" ) credit carryforwards of $25.8, which have an indefinite life. The Company also has AMT net operating loss and FTC carryforwards of $45.3 and $89.8, respectively, available, subject to certain limitations, to offset future alternative minimum taxable income, which expire periodically through 2019 and 2005, respectively.

### 10. Employee Benefit and Incentive Plans

*Pension and Other Postretirement Benefit Plans.* Retirement plans are non-contributory for salaried and hourly employees and generally provide for benefits based on formulas which consider such items as length of service and earnings during years of service. The Company's funding policies meet or exceed all regulatory requirements.

The Company and its subsidiaries provide postretirement health care and life insurance benefits to eligible retired employees and their dependents. Substantially all employees may become eligible for those benefits if they reach retirement age while still working for the Company or its subsidiaries. The Company has not funded the liability for these benefits, which are expected to be paid out of cash generated by operations. The Company reserves the right, subject to applicable collective bargaining agreements, to amend or terminate these benefits. Assumptions used to value obligations at year-end and to determine the net periodic benefit cost in the subsequent year are:

|  | Pension Benefits | | | Medical/Life Benefits | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 2000 | 1999 | 1998 | 2000 | 1999 | 1998 |
| Weighted-average assumptions as of December 31, | | | | | | |
| Discount rate | 7.75% | 7.75% | 7.00% | 7.75% | 7.75% | 7.00% |
| Expected return on plan assets | 9.50% | 9.50% | 9.50% | - | - | - |
| Rate of compensation increase | 4.00% | 4.00% | 5.00% | 4.00% | 4.00% | 4.00% |

In 2000, the average annual assumed rate of increase in the per capita cost of covered benefits (i.e., health care cost trend rate) is 8.0% for all participants. The assumed rate of increase is assumed to decline gradually to 5.0% in 2009 for all participants and remain at that level thereafter.

Brought to you by Global Reports