IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PUBLIC UTILITY NO. 1 OF CLARK COUNTY,
d/b/a CLARK PUBLIC UTILITIES,

                Plaintiff,

vs.

KAISER ALUMINUM & CHEMICAL
CORPORATION,

                Defendant.

Civil Action No. 05-836 (JJF)

**BRIEF IN RESPONSE TO BRIEF AND EMERGENCY MOTION OF CLARK
PUBLIC UTILITIES FOR STAY OF FURTHER PROCEEDINGS RELATED
TO THE DEBTORS' MOTION FOR AN ORDER DISALLOWING CLAIMS
<u>PENDING DETERMINATION OF MOTION TO WITHDRAW REFERENCE</u>**

Daniel J. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

ATTORNEYS FOR DEFENDANT KAISER
ALUMINUM & CHEMICAL CORPORATION

# TABLE OF CONTENTS

Page

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .................................. 2

SUMMARY OF ARGUMENT .................................................................................................... 4

FACTUAL BACKGROUND ...................................................................................................... 7

I.      The Power Sales Agreement Between KACC and the BPA ........................................... 7

II.     Consultations Between Clark and KACC ...................................................................... 9

III.    Clark's Agreement with BPA ........................................................................................ 10

IV.     The Puget Sound Proceeding Before the Administrative Law Judge ........................... 10

V.      The Puget Sound Proceeding Before the FERC and the Proceedings in the
        Bankruptcy Court .......................................................................................................... 12

VI.     The Motion to Disallow Clark's Claims ....................................................................... 15

ARGUMENT ............................................................................................................................. 17

VII.    The Emergency Stay Motion Should Be Denied Because the Motion to Withdraw
        the Reference Is Meritless and Clark Will Not Suffer any Irreparable Harm if the
        Emergency Stay Motion is Denied ............................................................................... 17

        A.      The Legal Standard ........................................................................................... 17

        B.      Clark Will Not Prevail on the Merits of the Motion to Withdraw the
                Reference ........................................................................................................... 18

                1.      Mandatory Withdrawal of the Reference Is Inapplicable Because
                        Resolution of the Motion to Disallow Does Not Require an
                        Interpretation  of the Federal Power Act or Any Other Federal
                        Statute .................................................................................................... 18

                2.      There Are No Reasons for the District Court to Exercise its
                        Discretion and  Withdraw the Reference ............................................... 23

        C.      Clark Will Not Suffer Irreparable Harm If the Emergency Stay Motion Is
                Denied ............................................................................................................... 25

        D.      KACC Will Be Harmed If the Emergency Motion Is Granted ......................... 26

        E.      The Public Interest Will Be Served By Denying the Emergency Stay
                Motion ................................................................................................................ 26

CONCLUSION .......................................................................................................................... 27

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

Cemer v. Marathon Oil Co.,
  583 F.2d 830 (6th Cir. 1978) ...................................................................................20

Churchill v. Star Enterprises,
  183 F.3d 184 (3d Cir. 1999)...................................................................................19

Cohen v. Superior Oil Corp.,
  90 F.2d 810 (3d Cir. 1937)...................................................................................20

In re Columbia Gas System, Inc.,
  134 B.R. 808 (D. Del. 1991)...................................................................................18

Connecticut Valley Electric Co.,
  208 F.3d 1037 (D.C. Cir. 2000)...................................................................................21

In re Continental Airlines,
  138 B.R. 442 (D. Del. 1992)...................................................................................18

In re Eagle Enterprises, Inc.,
  259 B.R. 83 (Bankr. E.D. Pa. 2001) ...................................................................................17

First Options of Chicago, Inc. v. Kaplan,
  913 F. Supp. 377 (E.D. Pa. 1996)...................................................................................20

Hanson v. Hunt Oil Co.,
  505 F.2d 1237 (8th Cir. 1974) ...................................................................................20

Hatzel & Buehler, Inc. v. Central Hudson Gas & Electric,
  106 B.R. 367 (D. Del. 1989)...................................................................................24

In re Homeland Stores, Inc.,
  204 B.R. 427 (Bankr. D. Del. 1997) ...................................................................................18

In re Interco, Inc.,
  135 B.R. 359 (Bankr. E.D. Mo. 1991)...................................................................................17, 18

Mississippi Power & Light Co. v. Moore,
  487 U.S. 354 (1988)...................................................................................22

Niagara Mohawk Power Corp. v. Federal Power Commission,
  379 F.2d 153 (D.C. Cir. 1967)...................................................................................21

# TABLE OF AUTHORITIES
### (continued)

Page

In re Pruitt,
    910 F.2d 1160 (3d Cir. 1990)................................................................24

Refior v. Lansing Drop Forge Co.,
    134 F.2d 894 (6th Cir. 1943) ............................................................20

In re Richmond Metal Finishers, Inc.,
    36 B.R. 270 (Bankr. Va. 1984)..........................................................27

Williams Natural Gas,
    83 FERC 63,015.......................................................................19, 20

In re Winstar Communications, Inc.,
    321 B.R. 761 (D. Del. 2005)..............................................................24

## STATE CASES

In re Big V Holding Corp.,
    Case No. 00-04372, 2002 WL 1482392 (D. Del. July 11, 2002) .......................24

In re Polaroid Corp.,
    Case No. 02-1353, 2004 WL 253477 (Bankr. D. Del. 2004) ...........................18

## FEDERAL STATUTES

28 U.S.C. § 1334(c) ...............................................................................17

28 U.S.C. 157(d) ...........................................................................18, 23, 24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PUBLIC UTILITY NO. 1 OF CLARK COUNTY,
d/b/a CLARK PUBLIC UTILITIES,

                Plaintiff,

vs.

KAISER ALUMINUM & CHEMICAL
CORPORATION,

                Defendant.

Civil Action No. 05-836 (JJF)

**BRIEF IN RESPONSE TO BRIEF AND EMERGENCY MOTION OF CLARK
PUBLIC UTILITIES FOR STAY OF FURTHER PROCEEDINGS RELATED
TO THE DEBTORS' MOTION FOR AN ORDER DISALLOWING CLAIMS
<u>PENDING DETERMINATION OF MOTION TO WITHDRAW REFERENCE</u>**

        Kaiser Aluminum & Chemical Corporation ("KACC"), one of the debtors and

debtors in possession (collectively, the "Debtors") in the chapter 11 proceedings that are being

jointly administered in the United States Bankruptcy Court for the District of Delaware (the

"Bankruptcy Court") under Case No. 02-10429 (JKF), hereby files, pursuant to Rules 7.1.2. and

7.1.3. of the Local Rules of Civil Practice and Procedure of the United States District Court for

the District of Delaware, this brief in response to the brief and emergency motion of Public

Utility District No. 1 of Clark County d/b/a Clark Public Utilities ("Clark") for a stay of further

proceedings in the Bankruptcy Court related to the Debtors' motion for an order disallowing

Clark's claims pending determination of Clark's motion to withdraw reference. In support

hereof, KACC respectfully states as follows:

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This is a response to an emergency motion to stay proceedings in the Bankruptcy Court pending this Court's determination of Clark's motion to withdraw the reference on KACC's Verified Motion to Disallow Claims filed by Clark Public Utilities, a claim objection that seeks to disallow and expunge two proofs of claim filed by Clark in KACC's bankruptcy case.

Clark has asserted two claims against KACC, each claim arising from Clark's purchase of power for the months of August and September 2001. Prior to the commencement of KACC's chapter 11 case, Clark intervened in a Federal Energy Regulatory Commission ("FERC") proceeding commonly known as the Puget Sound Proceeding and alleged that KACC had sold power to Clark and in doing so violated the Federal Power Act by charging Clark unjust and unreasonable rates for the August and September 2001 power (the "Unreasonable Rate Claim"). Clark lost on the merits of the Unreasonable Rate Claim before a FERC Administrative Law Judge. Almost nine months later, Clark for the first time sought to assert a new theory of liability — that KACC also purportedly violated the Federal Power Act by making a jurisdictional sale of power without obtaining prior FERC authorization (the "Unauthorized Sale Claim"). Specifically, in June 2002, Clark sought relief from the automatic stay to pursue the Unauthorized Sale Claim. The Bankruptcy Court denied that motion, and Clark did not appeal the decision. On June 25, 2003, the FERC issued a final decision in the Puget Sound Proceeding denying Clark relief on the merits of the Unreasonable Rate Claim. The FERC decision has since been appealed to the Ninth Circuit, but Clark is not a party to that appeal.

In January 2003, prior to the FERC decision, Clark filed two proofs of claim in KACC's bankruptcy case, one for amounts allegedly due if it were successful on the Unreasonable Rate Claim and the other for amounts allegedly due if it were successful on the Unauthorized Sale Claim. The FERC's decision constituted a final judgment on the merits of the

Unreasonable Rate Claim, and because the Unauthorized Sale Claim could have been brought in

the same proceeding as the Unreasonable Rate Claim but was not, the FERC's decision precludes

any attempt by Clark to litigate the Unauthorized Sale Claim. Accordingly, on October 10,

2005, KACC filed its Verified Motion to Disallow Claims Filed by Clark Public Utilities (the

"Motion to Disallow") (D.I. 7480), a straightforward claims objection seeking an order

expunging Clark's proofs of claim from the registry. Clark responded by filing (i) an objection to

the Motion to Disallow; (ii) a motion to withdraw the reference for the Motion to Disallow;

(iii) a motion for determination that the Motion to Disallow was a non—core proceeding; and

(iv) an emergency motion to stay proceedings in the Bankruptcy Court relating to the Motion to

Disallow pending this Court's determination of the motion to withdraw the reference.

At a hearing before the Bankruptcy Court on November 14, 2005, the Bankruptcy

Court heard argument regarding (i) the Motion to Disallow; (ii) the motion for determination that

the Motion to Disallow is a non-core proceeding; and (iii) the emergency motion to stay. After

argument, the Court determined that (i) there was no basis to grant the emergency motion to stay

and it should be denied, and (ii) the Motion to Disallow is a core proceeding. The Bankruptcy

Court also stated that it would like additional briefing regarding the applicability of res judicata

to resolve the Motion to Disallow, and asked KACC to file a motion for summary judgment. A

telephonic hearing regarding the motion for summary judgment is scheduled for January 12,

2006.

On September 7, 2005, certain of the Debtors, including KACC, filed their

Second Amended Joint Plan of Reorganization and an accompanying disclosure statement with

the Bankruptcy Court. Voting on the Second Amended Joint Plan of Reorganization has been

completed, and all creditor classes entitled to vote have approved the Second Amended Joint

Plan of Reorganization by overwhelming majorities. A hearing to consider confirmation of the Second Amended Joint Plan of Reorganization has been scheduled on January 9 and 10, 2006, and distributions to creditors should commence shortly after the plan goes effective.

The motion to withdraw the reference was docketed with this Court on December 5, 2005, and Clark simultaneously filed, among other things, the Emergency Motion of Clark Public Utilities for Stay of Further Proceedings Related to the Debtors' Motion for an Order Disallowing Claims Pending Determination of Motion to Withdraw Reference (the "Emergency Stay Motion") and a brief in support of the Emergency Stay Motion (the "Brief in Support of Emergency Stay Motion"), asking this Court to stay proceedings in the Bankruptcy Court related to the Motion to Disallow pending this Court's determination of the motion to withdraw the reference. KACC submits this brief in response to the Emergency Stay Motion.

## SUMMARY OF ARGUMENT

Well over a year before KACC filed its motion to disallow and expunge Clark's claims from the Debtors' claim registry, the litigation to establish whether or not Clark had any such claims had come to a conclusion. Clark lost on the merits of the Unreasonable Rate Claim before a FERC Administrative Law Judge (the "ALJ"), Clark lost on the merits before the Federal Energy Regulatory Commission (the "FERC"), and, presumably in an effort to finally bring an end to the matter and avoid any further expenditure of estate resources, the Bankruptcy Court denied Clark relief from the automatic stay to file a petition for re-hearing and appeal the decision of the FERC. Clark did not appeal the Bankruptcy Court's order foreclosing Clark's ability to appeal the FERC's decision.

Nonetheless, Clark now apparently views KACC's motion to expunge Clark's claims as having somehow opened the door for Clark to relitigate the merits of its claims. Furthermore, recognizing that the Bankruptcy Court had expressed serious doubts about the

validity of the claims at three different hearings at which Clark requested relief from the automatic stay to pursue additional discovery and/or assert new theories before the FERC, Clark has moved to have the reference withdrawn, seeking to have this Court, rather than the Bankruptcy Court, adjudicate KACC's request to expunge the claims.

In furtherance of these efforts to gain a second bite at the apple and after the Bankruptcy Court denied Clark's request for a stay pending a decision on the motion to withdraw the reference, Clark filed the Emergency Stay Motion, seeking to have this Court stay proceedings in the Bankruptcy Court on KACC's request to disallow and expunge Clark's claims pending resolution of the motion to withdraw the reference. Because Clark has no chance of prevailing on the merits of the motion to withdraw the reference, the Emergency Stay Motion should be summarily denied, and the Bankruptcy Court should be allowed to proceed with the Motion to Disallow to avoid any further unnecessary expenditure of estate resources and to allow distributions to legitimate creditors to proceed in a timely manner.

The lynchpin of Clark's forum shopping efforts is Clark's assertion that adjudication of the motion to disallow the Unauthorized Sale Claim and the Unreasonable Rate Claim requires a material and substantial interpretation of the Federal Power Act, thereby mandating withdrawal of the reference. Specifically, Clark asserts that because the Unauthorized Sale Claim was not adjudicated in the FERC proceeding, disallowance of the claim now requires the Court to make a determination of whether KACC was a "seller" of power in a transaction governed by the Federal Power Act and whether KACC sold power without authority. Also, despite the fact that the FERC has ruled against Clark on the merits of the Unreasonable Rate Claim, Clark asserts that the disallowance of the Unreasonable Rate Claim now requires the Court to engage in a material and substantial interpretation of the Federal Power Act to

determine whether Clark paid a just and reasonable rate for the August and September 2001

power, i.e., to apparently reconsider the exact request for relief expressly rejected by the FERC

in the Puget Sound Proceeding.

Contrary to Clark's assertions, the disallowance of Clark's claims does not require

an interpretation of the Federal Power Act or any other federal statute. Rather, the resolution of

the Motion to Disallow requires nothing more than the straightforward application of

well-established principles of bankruptcy law and claim preclusion. Quite simply, the

Unauthorized Sale Claim is precluded because it could have been brought in the Puget Sound

Proceeding but was not. The Unreasonable Rate Claim has already been decided on the merits

and that litigation, at least as far as Clark is concerned, is at an end or should be brought to an

end by the Bankruptcy Court.

Moreover, even if Clark were somehow correct that its claims are not precluded

and cannot be disallowed without reaching the merits of the claims, as explained below and as

Clark previously asserted in pleadings before the Bankruptcy Court, only the FERC can grant

Clark any relief with respect to the transaction involving Clark and KACC. Thus, if Clark's

Unauthorized Sale Claim was not already precluded, which it clearly is, neither this Court nor

the Bankruptcy Court could adjudicate the claim in any event. Rather, a new FERC proceeding

would have to be commenced. That new proceeding would involve the same facts, the same

parties, the same transaction and the same legal issue — whether KACC was the "seller" — as

the Puget Sound Proceeding, which Clark has already lost on the merits.

Thus, there is no reason whatsoever for this Court to withdraw the reference on

what amounts to a routine request to expunge claims that have long ago been finally adjudicated

in another forum. Moreover, because Clark's Unauthorized Sale Claim would not, in any event,

be adjudicated by this Court if Clark is somehow correct that it is not precluded, Clark will suffer

no prejudice if the Bankruptcy Court proceeds with the motion to disallow Clark's claims.

Accordingly, the Emergency Stay Motion should be denied so that distributions to legitimate

creditors under the Second Amended Joint Plan of Reorganization are not potentially delayed.

### FACTUAL BACKGROUND[1]

### I.    The Power Sales Agreement Between KACC and the BPA

Upon information and belief, Clark is a customer-owned municipal corporation

that provides electricity to approximately 170,000 customers in Clark County, Washington.

Prior to 1996, Clark purchased all of its power through requirements contracts with the

Bonneville Power Administration (the "BPA") — the sole federal power marketing agency in the

Pacific Northwest and the region's major wholesaler of electricity. In late 1996, however, Clark

began purchasing power from other suppliers. Clark timed its agreements with these suppliers so

that they would expire on or about July 31, 2001 to coincide with the expiration of its other

supply contracts. Clark planned to negotiate a new contract with the BPA effective July 31,

2001 that would satisfy its future power needs. In 1998, however, the BPA announced that it

would henceforth change the anniversary/termination date of its contracts from July 31 to

October 1 to coincide with its fiscal year. Therefore, any new contract that Clark signed with the

---

[1]    The facts in this section, the vast majority of which, including all material facts, are
undisputed, are drawn from previous pleadings filed with the Bankruptcy Court,
including the Objection of KACC to Motion of Public Utility District No. 1 of Clark
County for Limited Relief From the Automatic Stay (D.I. 795), the Declaration of Joseph
Patrick Hoerner (the "Hoerner Dec."), attached thereto as Exhibit A, and the Objection of
KACC to Motion of Public Utility District No. 1 of Clark County for Limited Relief
From the Automatic Stay (D.I. 1580). A copy of those two objections, which include the
Hoerner Dec., are attached hereto collectively as Exhibit A and incorporated herein by
reference. For ease of reference, the citations to the relevant paragraphs of the Hoerner
Dec. are included, where applicable.

BPA would not become effective until October 1, 2001, leaving Clark with a two-month gap in its power supply. Clark was apparently unaware of the change in the BPA's policy until it initiated contract negotiations with the BPA sometime late in the year 2000. At that time, Clark began searching for a source of power for the months of August and September 2001.

KACC owns an aluminum rolling mill and previously owned two primary aluminum reduction smelters in Washington State. To secure power for those facilities, KACC executed a five-year Power Sales Agreement with the BPA for service from October 1, 1996 to September 30, 2001 (the "PSA"). Well into the term of the PSA, as a result of business conditions, KACC began reducing production at its Washington facilities and, as a direct result of those reductions, curtailing its power purchases from the BPA. Under the PSA, if KACC desired to curtail purchases from the BPA, it had to provide the BPA notice of the amount and duration of the curtailment. It also could request that the BPA sell the power to another entity. Further, KACC had the option to identify a designated third-party that was willing to pay a specified price for the power, or KACC could request that the BPA find a purchaser for the power. (Hoerner Dec. ¶¶ 2-4).

In the event that KACC curtailed its purchases from the BPA, the BPA thus had a wide range of options. The BPA could sell the power to a different purchaser with public preference on the same terms as KACC's notice; the BPA could retain the power for its own use or dispose of the power on whatever alternative terms the BPA might separately arrange; or the BPA could offer a contract for sale of the power to the entity identified in KACC's notice. (Hoerner Dec. ¶ 5).

If the BPA chose to sell the power to the entity designated in KACC's notice, the BPA would offer a power sales contract to the entity and, if accepted, the BPA also would agree

with KACC for crediting of the payments under the terms of the PSA. If the BPA elected to sell

to a different buyer at a different price or retain the power for its own use, the BPA would still

credit KACC for sale revenue based on the price in KACC's notice. The notice price established

the mitigation to KACC for not purchasing the federal power; the notice did not determine the

price or to whom the BPA would sell the power. (Hoerner Dec. ¶ 6).

Thus, KACC did not have a right, contractual or otherwise, to dictate whether the

BPA would sell the power to a third-party or retain it for its own use. KACC likewise did not

have the right, contractual or otherwise, to determine to whom the BPA would sell the power if

the BPA chose to sell it to a third-party. Additionally, KACC did not have (i) the right to

establish the price at which the BPA would sell the power to parties that bought power from the

BPA or (ii) the right to sell the power itself. In fact, the BPA insisted that the BPA itself had to

be the seller of any federal power that KACC did not take. (Hoerner Dec. ¶ 7).

## II.    Consultations Between Clark and KACC

In January 2001, a consultant contacted KACC on behalf of Clark. The

consultant was aware that because of KACC's reduced operations at its Washington facilities, the

BPA might have a block of federal power for sale that would otherwise belong to KACC under

the PSA. Thereafter, KACC and Clark independently approached other potential buyers and

sellers to determine a market price for power for August and September 2001. They each

obtained price information so that KACC could name Clark as a party willing to buy power from

the BPA at a specified price in the notice KACC would provide to the BPA of curtailment of

KACC's own August and September 2001 purchases. The price ultimately set forth in the notice

was below the market quotes Clark had received from other sellers. (Hoerner Dec. ¶ 8).

After the consultant and KACC negotiated regarding what would be an acceptable

price for Clark's purchase of such available power, KACC sent Clark a letter on February 2,

2001 outlining how the sale from the BPA to Clark might be implemented. A factor precipitating the letter was Clark's concern with KACC's creditworthiness and desired clarification that Clark's power sale contract, if offered, would be with the BPA for federal power, and not with KACC. (Hoerner Dec. ¶ 9).

## III.    Clark's Agreement with BPA

Also on February 2, 2001, KACC provided notice to the BPA that it intended to curtail its purchases under the PSA for the months of August and September 2001 and identified Clark as a potential purchaser of the curtailed power. Pursuant to the terms of the PSA, the BPA elected to sell Clark a block of power from the PSA for a term commencing on August 1, 2001 and terminating on September 30, 2001. (Hoerner Dec. ¶ 10).

## IV.    The Puget Sound Proceeding Before the Administrative Law Judge

Upon information and belief, on or about October 26, 2000, Puget Sound Energy, Inc. ("Puget Sound"), a utility company in the Pacific Northwest, filed a complaint with the FERC seeking the imposition of a cap on the price that could be charged for energy sold under the Western Systems Power Pool Agreement into Pacific Northwest Power Markets (the "Puget Sound Proceeding").[2]  The FERC issued an order in the Puget Sound Proceeding on July 25, 2001 initiating an evidentiary proceeding to develop a factual record on whether there might have been unjust and unreasonable charges for spot market bilateral sales of energy in the Pacific Northwest during the period December 25, 2000 through June 20, 2001 and assigning the matter to the ALJ. On August 7, 2001, more than nine months after Puget Sound filed its complaint,

---

[2]     The FERC proceeding is styled <u>Puget Sound Energy, Inc. v. All Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement</u>, FERC Docket No. EL01-10-000, <u>et al.</u>

Clark filed a motion for leave to intervene out of time in the Puget Sound Proceeding, alleging

that KACC had violated the Federal Power Act by charging Clark unjust and unreasonable rates

for the power Clark purchased for the months of August and September 2001 (the Unreasonable

Rate Claim). Clark requested that the FERC compel KACC to refund any amounts charged in

excess of a just and reasonable rate. The ALJ permitted Clark to intervene in the Puget Sound

Proceeding. (Hoerner Dec. ¶¶ 13-15). KACC opposed Clark's request for a refund by, among

other things, explaining that the BPA, not KACC, had sold the electricity in question to Clark.

     After Clark and KACC each submitted prepared testimony, an evidentiary hearing

was held before the ALJ at which a record was developed concerning the circumstances faced in

Pacific Northwest power markets during the period December 25, 2000 through June 20, 2001

and the claims of individual litigants seeking refunds. Clark and KACC were given the

opportunity during that evidentiary hearing to conduct live cross-examination of each other's

witnesses. Thereafter, each party filed post-hearing briefs and proposed findings of fact with the

ALJ. (Hoerner Dec. ¶ 22).

     The ALJ issued her Recommendations and Proposed Findings of Fact to the full

commission on September 1, 2001 (the "ALJ Decision"). The ALJ concluded that the prices in

the Pacific Northwest during the relevant time period were the result of a number of factors,

including a shortage of supply, excess demand, a drought, increased natural gas prices and price

signals from California markets. She also concluded that the Pacific Northwest was a

competitive market, and that the transactions at issue in the case resulted from bilateral

agreements between the parties. Accordingly, the ALJ found that no refunds should be ordered,

and she recommended that the FERC terminate the Puget Sound Proceeding. (Hoerner Dec.

¶ 23).

After the issuance of the ALJ Decision, numerous parties, including Clark and KACC, submitted comments to the full Commission advocating their various positions to the FERC. For its part, Clark disagreed with the ALJ Decision and requested that the FERC order refunds from KACC to Clark either in the Puget Sound Proceeding or in another proceeding before the FERC, entitled <u>Investigation of Wholesale Rates of Public Utility Sellers of Energy and Ancillary Services in the Western Systems Coordinating Council</u>, FERC Docket No. EL01-68, initiated by the FERC in April 2001 (the "WSCC Proceeding"). This alternative suggestion was somewhat odd in that neither Clark nor KACC were parties to the WSCC Proceeding.[3] (Hoerner Dec. ¶ 24). All of these actions occurred prior to KACC's commencement of its chapter 11 case on February 12, 2002.

## V.  The Puget Sound Proceeding Before the FERC and the Proceedings in the Bankruptcy Court

On June 14, 2002, Clark filed in the Bankruptcy Court a Motion for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (D.I. 644) to (i) allow the FERC to issue orders allowing additional discovery in the Puget Sound Proceeding, and (ii) permit Clark to pursue an additional claim against KACC (a claim not previously articulated in any other forum) that KACC had violated the Federal Power Act by making a jurisdictional sale of power without obtaining prior FERC authorization (the Unauthorized Sale Claim). This request to belatedly pursue the Unauthorized Sale Claim was an obvious attempt by Clark to re-cast its claim under a new theory after it had become obvious that the Unreasonable Rate Claim would not succeed. The Official Committee of Unsecured Creditors (the "Creditors' Committee") and KACC filed objections to Clark's motion (D.I. 783,

---

[3]        Clark later sought to intervene in the WSCC Proceeding, but Clark's request was denied.

795), arguing, among other things, that Clark already had a full opportunity to present and litigate its claims and that lifting the automatic stay to permit Clark to bring a new proceeding to assert the Unauthorized Sale Claim would give Clark an unwarranted second bite at the apple. On September 17, 2002, the Bankruptcy Court entered an order denying Clark's motion for limited relief from the automatic stay (D.I. 1090). Clark did not appeal that order.

On December 19, 2002, in the wake of disclosures regarding Enron Corporation's manipulation of wholesale electrical prices in the California market, the FERC granted a motion filed by the City of Tacoma to reopen the evidentiary record in the Puget Sound Proceeding. The FERC issued an order allowing parties in the Puget Sound Proceeding to conduct additional discovery and submit any additional evidence to the FERC by February 28, 2003 (the "Discovery Order"). On January 7, 2003, Clark filed its Emergency Motion for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (D.I. 1555), seeking relief from stay to conduct additional discovery and submit modified proposed findings of fact in the Puget Sound Proceeding. The Creditors' Committee and KACC filed objections (D.I. 1574, 1580). At a hearing on January 15, 2003, the Bankruptcy Court denied Clark's emergency motion, but allowed Clark to seek clarification from the FERC as to whether the Discovery Order applied to Clark's dispute with KACC.

On February 3, 2003, the FERC issued a clarification to the Discovery Order and concluded that it would be appropriate, subject to bankruptcy court authorization, to allow Clark to seek additional discovery regarding its transaction with KACC. Thereafter, on February 5, 2003, Clark filed an Emergency Motion for Reconsideration of Motion Dated January 7, 2003 Requesting Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (D.I. 1725). The Bankruptcy Court issued an oral order on February 11, 2003,

granting Clark limited discovery regarding its transaction with KACC, (D.I. 1739), and on

March 17, 2003, the Bankruptcy Court entered an Order Granting in Part and Denying in Part the

Emergency Motion of Clark County for Reconsideration of January 7, 2003 Motion (D.I. 2000).

        After considering the additional evidence provided pursuant to the terms of the

Discovery Order, the FERC issued a decision on June 25, 2003, terminating the Puget Sound

Proceeding and denying refunds to any party (the "June 25th FERC Decision"). The FERC

concluded that "appropriate relief was provided by institution of the West-wide mitigation plan

in June 2001 and that the equities do not justify refunds." (June 25th FERC Decision at 2). The

FERC also adopted the conclusions of the ALJ that:

> [i]f the position of the refund claimants is accepted, they would be
> relieved of the consequences of their conscious economic decisions
> at the expense of a functioning competitive market in which a vast
> majority of the [Pacific Northwest] purchasers during this period
> accept responsibility for the choices they made.

(June 25th FERC Decision at ¶ 41) (modifications in the original).[4]

        On July 18, 2003, Clark filed another Emergency Motion for Limited Relief from

the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (D.I. 2598) in the

Bankruptcy Court to permit Clark to file a request for rehearing with the FERC as a jurisdictional

prerequisite to an appeal of the FERC's decision to the United States Circuit Court of Appeals for

the Ninth Circuit. KACC filed an objection (D.I. 2612), arguing that allowing Clark "to continue

pursuing its increasingly specious litigation will impose yet further inappropriate burdens on the

Debtors' estates" and that the time had arrived for the Court "to conclude Clark's actions in this

matter." (Objection at 2). The Bankruptcy Court entered an order denying Clark's motion on

---

[4]    A copy of the June 25th FERC Decision is attached hereto as Exhibit B and incorporated
herein by reference.

July 23, 2003. (D.I. 2616). Clark did not appeal that order . The June 25th FERC Decision is currently on appeal before the Ninth Circuit Court of Appeals, but Clark is not a party to that appeal.

## VI.  The Motion to Disallow Clark's Claims

On January 30, 2003, Clark filed two proofs of claim against KACC (collectively, the "Clark Claims"). One claim, Claim No. 3122, asserts a general, unsecured claim against KACC in an unliquidated amount for any refund ordered by the FERC in the Puget Sound Proceeding (i.e., the Unreasonable Rate Claim). The other claim, Claim No. 7245, asserts a general, unsecured claim for $63,716,317 for any disgorgement or refund ordered by the FERC for KACC's alleged violation of the Federal Power Act for making a jurisdictional sale of power without prior FERC authorization (i.e., the Unauthorized Sale Claim).

Given that the June 25th FERC Decision established that KACC has no liability to Clark in respect of the transaction at issue and that the Bankruptcy Court had presumably brought an end to Clark's further pursuit of its claims by denying Clark's request to appeal to the Ninth Circuit Court of Appeals, KACC filed the Motion to Disallow.

On October 24, 2005, Clark filed in the Bankruptcy Court (i) its Motion to Withdraw the Reference (D.I. 7572); and (ii) a brief and motion for determination that the Motion to Disallow is a non-core proceeding (D.I. 7582),[5] and on October 25, 2005, Clark filed (iii) a response (D.I. 7593) (the "Response to the Motion to Disallow") to the Motion to Disallow; (iv) an emergency motion (the "Bankruptcy Court Emergency Stay Motion") (D.I. 7596) requesting that the Court stay adjudication of the Motion to Disallow pending

---

[5] The Bankruptcy Court later required Clark to file a separate motion for a determination that the Motion to Disallow is a non-core proceeding. Clark filed that motion on November 21, 2005 (D.I. 7775).

determination of the motion to withdraw the reference; and (v) a motion to shorten notice (D.I. 7595) requesting that the Court shorten notice with respect to the Bankruptcy Court Emergency Stay Motion.

On November 3, 2005, KACC filed (i) a Brief in Response to the Motion to Withdraw the Reference (D.I. 7644); and (ii) a response to Clark's brief and motion for determination that the Motion to Disallow is a non-core proceeding (D.I. 7645). On November 4, 2005, the Creditors' Committee filed joinders in support of KACC's November 3 filings (D.I. 7646, 7647).

At the November 14, 2005 omnibus hearing, the Bankruptcy Court granted Clark's motion to shorten notice with respect to the Bankruptcy Court Emergency Stay Motion and heard argument regarding the Bankruptcy Court Emergency Stay Motion. The Court also heard argument regarding (i) the Motion to Disallow and (ii) Clark's brief and motion for determination that the Motion to Disallow is a non-core proceeding. After argument, the Court (i) determined that the Bankruptcy Court Emergency Stay Motion should be denied; (ii) stated that it would like additional briefing regarding the applicability of res judicata to resolve the Motion to Disallow, and asked KACC to file a motion for summary judgment;[6] and (iii) determined that the Motion to Disallow is a core proceeding.[7]

---

[6]    The Bankruptcy Court required KACC to file the motion for summary judgment by December 2, 2005, Clark to file its response brief by December 22, 2005 and KACC to file any reply thereto by December 29, 2005. The Bankruptcy Court also scheduled a telephonic hearing on January 12, 2005 to hear argument regarding the summary judgment motion.

[7]    Although Clark's brief and motion for determination that the Motion to Disallow is a non-core proceeding was scheduled to be heard at the December 19, 2005 omnibus hearing, the Bankruptcy Court explained its view that the Motion to Disallow is a core proceeding at the November omnibus hearing and Clark agreed that an order reflecting the Court's determination could be entered, obviating the need for argument on the

On December 5, 2005, the Motion to Withdraw the Reference was docketed with

the District Court, and Clark simultaneously filed (i) the Emergency Stay Motion; (ii) the Brief

in Support of Emergency Stay Motion; and (iii) the motion for an expedited hearing for the

Emergency Stay Motion. Concurrently with those pleadings, Clark's counsel also filed a letter

requesting that all pleadings be forwarded to the duty judge for immediate consideration.

## ARGUMENT

**VII.    The Emergency Stay Motion Should Be Denied Because the Motion to Withdraw the Reference Is Meritless and Clark Will Not Suffer any Irreparable Harm if the Emergency Stay Motion is Denied**

### A.    The Legal Standard

Rule 5011(c) of the Federal Rules of Bankruptcy Procedure provides:

The filing of a motion for withdrawal of a case or proceeding or for abstention pursuant to 28 U.S.C. § 1334(c) shall not stay the administration of the case or any proceeding therein before the bankruptcy judge except that the bankruptcy judge may stay, on such terms and conditions as are proper, proceedings pending disposition of the motion. A motion for stay ordinarily shall be presented first to the bankruptcy judge. A motion for a stay or relief from a stay filed in the district court shall state why it has not been presented to or obtained from the bankruptcy judge. Relief granted by the district judge shall be on such terms and conditions as the judge deems proper.

Rule 5011(c) explicitly provides that courts are not required to stay proceedings

pending resolution of a motion to withdraw the reference. Rather, "[t]he question is more

properly couched in terms of whether the Bankruptcy Court should stay the proceedings pending

the district court's decision." In re Eagle Enters., Inc., 259 B.R. 83, 86 (Bankr. E.D. Pa. 2001)

(citing In re Interco, Inc., 135 B.R. 359, 361 (Bankr. E.D. Mo. 1991)). The moving party bears

---

(continued ...)

motion at the December 19, 2005 hearing. The Bankruptcy Court entered an order determining that the Motion to Disallow is a core proceeding on November 28, 2005 (D.I. 7804).

the burden of proof that a stay of the proceedings in the bankruptcy court would be proper.  Id.

(citing In re TJN, Inc., 207 B.R. 499, 501 (Bankr. D.S.C. 1996)).  The moving party must

demonstrate: "the likelihood of prevailing on the merits, i.e., that the pending motion will be

granted; that movant will suffer irreparable harm if the stay is denied; that the other party will

not be substantially harmed by the stay; and that the public interest will be served by granting the

stay." Id. (citing 9 Collier on Bankruptcy, ¶ 5011.03[2][a], 5011-16,17 (Matthew Bender 15th

Ed. Revised 2000) (quoting Interco, 135 B.R. at 361).  Generally, in the context of a motion to

stay, a court may deny the stay if a movant fails to establish any one of the four prongs.  See In

re Polaroid Corp., Case No. 02-1353, 2004 WL 253477 at *1 (Bankr. D. Del. 2004).

**B.    Clark Will Not Prevail on the Merits of the Motion to Withdraw the Reference**

      1.    Mandatory Withdrawal of the Reference Is Inapplicable Because Resolution of the Motion to Disallow Does Not Require an Interpretation of the Federal Power Act or Any Other Federal Statute.

Under 28 U.S.C. 157(d), "[t]he district court shall on timely motion of a party, so

withdraw a proceeding if the court determines that resolution of the proceeding requires a

consideration of both Title 11 and other laws of the United States regulating organizations or

activities affecting interstate commerce." 28 U.S.C. 157(d).  This district deems withdrawal

mandatory when "(1) consideration of federal law outside of the Bankruptcy Code is necessary

to resolve the case or proceeding, and (2) such consideration of federal law outside the

Bankruptcy Code is 'substantial and material.'" In re Homeland Stores, Inc., 204 B.R. 427, 430

(Bankr. D. Del. 1997); In re Continental Airlines, 138 B.R. 442, 444-45 (D. Del. 1992).  The

party seeking withdrawal of the reference "bears the burden of demonstrating that a substantial

and material consideration of nonbankruptcy law is necessary to resolve the case." Continental

Airlines, 138 B.R. at 445. Further, the mere application of settled law does not mandate withdrawal of the reference. In re Homeland stores, Inc., 204 B.R. at 430; In re Columbia Gas Sys., Inc., 134 B.R. 808, 811 (D. Del. 1991).

Clark argues that withdrawal of the reference is mandatory because resolution of KACC's objections to Clark's claims requires a substantial and material interpretation of the Federal Power Act: "whether Kaiser was a 'seller,' whether Kaiser was authorized to sell power, and whether the rate charged by Kaiser was 'just and reasonable' are all issues that can only be decided after interpreting and considering the FPA." (Brief in Support of Emergency Stay Motion at 17.) This argument, however, is premised entirely on Clark's erroneous assumption that it is free to pursue its Unauthorized Sale Claim, presumably based on the fact that, in denying Clark's claim for a refund in the Puget Sound Proceeding, neither the ALJ nor the FERC reached the issue of whether KACC was a "seller" of power. As explained below and in KACC's brief in response to the motion to withdraw the reference, however, the Unauthorized Sale Claim is unquestionably precluded at this point by the June 25th FERC Decision, and the disallowance of that claim does not require an interpretation of the Federal Power Act or any other federal statute for that matter. Rather, disallowance of the Unauthorized Sale Claim requires nothing more than the straightforward application of well-established principles of claim preclusion.

The purpose of claim preclusion is to avoid piecemeal litigation of claims arising from the same events. Churchill v. Star Enters., 183 F.3d 184, 194 (3d Cir. 1999). Thus, where there is "no escaping from the fact that [a plaintiff] has relied on different legal theories to seek redress from the [same defendant] for a single course of wrongful conduct . . . [by] splitting a cause of action," claim preclusion will prohibit the prosecution of the second cause of action. Id. at 195. "A claim is barred in a FERC proceeding by administrative res judicata if: (1) the prior

proceeding involved the same cause of action as the current proceeding; (2) the same parties were involved in both proceedings; and, (3) there was a final judgment on the merits in the previous action." Williams Natural Gas, 83 FERC 63,015 at p. 65,116 (1998). "When the above three factors are met in a FERC proceeding, '[t]he original judgment on the merits is conclusive not only as to matters actually raised but also to matters which could have been raised and litigated.'" Id. (citing Williams Natural Gas Co., 72 FERC 63,006 at p. 65,135 (1995)).

    All three elements of claim preclusion are unquestionably satisfied here. First, the June 25th FERC Decision is a final judgment on the merits of the Unreasonable Rate Claim. Although the June 25th FERC Decision has been appealed, it is settled law that the pendency of an appeal does not alter the res judicata effect of an otherwise final federal judgment. Cohen v. Superior Oil Corp., 90 F.2d 810, 811-12 (3d Cir. 1937); Refior v. Lansing Drop Forge Co., 134 F.2d 894, 896 (6th Cir. 1943); First Options of Chicago, Inc. v. Kaplan, 913 F. Supp. 377, 382n.7 (E.D. Pa. 1996).[8] Additionally, Clark does not dispute that KACC and Clark were the parties in the Puget Sound Proceeding and would be the parties in any proceeding on the Unauthorized Sale Claim. Finally, the Unauthorized Sale Claim arises from the same cause of action as the Unreasonable Rate Claim — claims involve the same cause of action when the plaintiffs rely "on different legal theories to seek redress . . . for a single course of wrongful conduct." Id. at 195; See also Cemer v. Marathon Oil Co., 583 F.2d 830, 832 (6th Cir. 1978) (same.); Hanson v. Hunt Oil Co., 505 F.2d 1237, 1240 (8th Cir. 1974) (same).

    Clark could have brought the Unauthorized Sale Claim in the Puget Sound Proceeding. The ALJ placed no limits on Clark's ability to raise arguments or assert claims prior to closing of the evidentiary record, and in her Order on Issues, entered on August 23, 2001, the

ALJ specified the following as an issue for trial: "Did any seller exercise market power, or violate any conditions or limitations of its market based tariffs or agreements entered into under the Western Systems Power Pool Agreement?" (Order of Issues at 874762). A violation of a market-based tariff obviously would encompass an allegation that a party was required, but failed, to file a market-based tariff and was therefore an unauthorized seller. Indeed, the only obstacle preventing Clark from asserting the Unauthorized Sale Claim at the Puget Sound Proceeding was the fact that Clark had not yet thought of it. It was only after Clark had lost before the ALJ on the merits of its Unreasonable Rate Claim that Clark began a desperate search for a new, and hopefully more successful, theory of liability. Clark's attempt to now initiate a new proceeding based on the exact same sale transaction is a classic example of splitting a cause of action, and a textbook case for the application of claim preclusion — a doctrine expressly designed to compel a plaintiff to bring all claims arising out of the same course of conduct in the same action. Accordingly, the Unauthorized Sale Claim is precluded, and disallowance of the Unauthorized Sale Claim merely requires the Bankruptcy Court to apply well-established principles of claim preclusion. The Federal Power Act is not implicated and an interpretation of that statute is not required to resolve KACC's objection to the Unauthorized Sale Claim.

Furthermore, even if the Unauthorized Sale Claim were not somehow precluded, which it clearly is, neither the Bankruptcy Court nor this Court could adjudicate that claim. If there is a violation of the Federal Power Act, only the FERC has the statutory authority and the broad discretion to fashion a remedy. See Niagara Mohawk Power Corp. v. Fed. Power Comm'n., 379 F.2d 153, 158 (D.C. Cir. 1967) (the FERC has broad statutory authority to fashion remedies in the public interest); Connecticut Valley Elec. Co., 208 F.3d 1037, 1044 (D.C. Cir.

---

(continued...)

[8]     Furthermore, as noted above, Clark is not even a party in the appeal.

2000) (same). In fact, although Clark now represents to this Court that it can adjudicate the

Unauthorized Sale Claim, Clark previously represented to the Bankruptcy Court that the FERC

has "exclusive jurisdiction" to hear Clark's claims and "[o]nly FERC can decide

whether . . . Kaiser violated the FPA by selling the power to Clark Public Utilities."

(Memorandum of Law in Support of Motion for Relief From Stay (D.I. 645) at 1, 12.) It is

absurd, however, to think that Clark could commence a new FERC proceeding at this point

involving the same transaction, the same parties and the same facts as were involved in the Puget

Sound Proceeding.

Clark also contends that its Unreasonable Rate Claim "may only be resolved after

substantial and material consideration of Section 205(a) of the FPA, which requires that sales be

at rates determined by FERC to be 'just and reasonable.'" (Brief in Support of Emergency Stay

Motion at 20). As noted above, Clark's Unreasonable Rate Claim has already been fully

adjudicated, with the FERC determining that no refund is warranted.[9] And the Bankruptcy Court

refused to permit Clark to file a petition for re-hearing to appeal the June 25th FERC Decision.

The only issue to be determined in connection with the Motion to Disallow is

whether the Bankruptcy Court intended to bring an end to Clark's further pursuit of the

Unreasonable Rate Claim when it precluded Clark from appealing or, if the Bankruptcy Court

did not intend at that time to necessarily foreclose Clark's ability to further litigate the claim if

there is a reversal and remand, whether it should be brought to an end now and the Unreasonable

Rate Claim be disallowed given (a) the extremely remote probability of Clark ever being entitled

---

[9]    Furthermore, as Clark well knows, only the FERC has jurisdiction to determine whether a
rate is just and reasonable. Mississippi Power & Light Co. v. Moore, 487 U.S. 354, 371
(1988).

to a refund and (b) the potentially lengthy delay in distributions to legitimate creditors that would result from Clark's participation in a remanded proceeding.

Indeed, the Bankruptcy Court already found in conjunction with Clark's motions for relief from stay that Clark has "very little chance or likelihood of success on the merits" of the Unreasonable Rate Claim. (Tr. of January 15, 2003 Hr'g. at 23.) Success on the Unreasonable Rate Claim would require a series of unlikely events: (a) the Ninth Circuit, on a very deferential standard of review, would have to reverse the June 25th FERC Decision and remand for further proceedings; (b) Clark would have to prevail in its contention that it could participate on remand notwithstanding it was not a party on appeal; (c) the FERC would have to make a determination that KACC was the "seller" of power to Clark; and (d) after previously deciding that refunds were neither justified nor possible, the FERC would have to reverse itself and order refunds in the 500,000 transactions at issue in the Puget Sound Proceeding. Additionally, absent disallowance of the Unreasonable Rate Claim, KACC will potentially be required to reserve (and withhold from distribution) equity in the reorganized entity sufficient to cover the claim. Any such reserve could hold up a portion of distributions to legitimate creditors for an extended period of time. The Puget Sound Proceeding has already been on appeal to the Ninth Circuit for more than two years, and in the highly unlikely event that the Ninth Circuit issues a decision in the near future and reverses and remands the Puget Sound Proceeding, it could be years before the litigation after remand is concluded.

The decision whether to disallow the Unreasonable Rate Claim on these grounds should be decided by the Bankruptcy Court, applying traditional principles of bankruptcy law applicable to the claims allowance and disallowance process. There is certainly no issue requiring an interpretation of the Federal Power Act, let alone a material and substantial

consideration of the statute. Therefore, withdrawal of the reference is not mandated by 28 U.S.C. 157(d).

        2.      There Are No Reasons for the District Court to Exercise its Discretion and Withdraw the Reference

Under 28 U.S.C. 157(d), the "district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. 157(d). The requirement that cause be shown to justify withdrawal of the reference suggests "that Congress intended to have bankruptcy proceedings adjudicated in bankruptcy court, unless rebutted by a contravening policy." Hatzel & Buehler, Inc. v. Central Hudson Gas & Elec., 106 B.R. 367, 371 (D. Del. 1989); In re Winstar Communications, Inc., 321 B.R. 761, 763 (D. Del. 2005). Accordingly, the moving party bears the burden to show cause. In re Big V Holding Corp., Case No. 00-04372, 2002 WL 1482392, at *3 (D. Del. July 11, 2002). Although the statute itself does not define "cause," the Third Circuit has stated that a court should consider "the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process." In re Pruitt, 910 F.2d 1160, 1168 (3d Cir. 1990). Courts should also consider whether the proceedings are core or non-core, and whether the parties have requested a jury trial. Hatzel & Buehler, 106 B.R. at 371; Big V Holding, 2002 WL 1482392 at *3.

No cause exists for this Court to exercise its discretion and withdraw the reference. First, the Bankruptcy Court has already determined that the Motion to Disallow is a core proceeding, and Clark has not requested a jury trial, nor does it have a right to do so. Furthermore, all of the factors under In re Pruitt, 910 F.2d 1160, 1168 (3[d] Cir. 1990), counsel

against the exercise of discretion to withdraw the reference. Promoting uniformity in bankruptcy administration can best be served by leaving to the bankruptcy courts the determination of whether specific claims should be disallowed in light of the status of the litigation of the merits of the claims in another forum and the status of the bankruptcy proceeding. Reducing forum shopping and confusion likewise counsels against withdrawal of the reference. Here, it is apparent that Clark seeks to have this Court consider the disallowance of its claims only because the Bankruptcy Court has already expressed serious reservations about the merits of those claims. Moreover, given that the Bankruptcy Court has already conducted three hearings on motions for relief from the automatic stay relating to the Clark Claims and a preliminary hearing on the Motion to Disallow, the Bankruptcy Court is already familiar with the claims and is in the best position to adjudicate the request for disallowance expeditiously and efficiently. Indeed, the request for disallowance of the Unreasonable Rate Claim depends in part on what the Bankruptcy Court intended when it denied Clark relief from stay to participate in the appeal to the Ninth Circuit.

There is no reason at all for this Court to withdraw the reference, and Clark certainly has not met its burden to demonstrate that it has a "likelihood" of success on the merits. The Emergency Stay Motion should be denied solely on these grounds.

### C.    Clark Will Not Suffer Irreparable Harm If the Emergency Stay Motion Is Denied

Clark suggests that it will be irreparably harmed if the Emergency Stay Motion is denied because: (a) it may be required to litigate the substance of its claims in front of both the Bankruptcy Court and then this Court (if the reference is withdrawn); and (b) this Court's adjudication of the merits of Clark's claims could be mooted. These assertions are meritless.

As an initial matter, Clark will not be required to litigate the merits of its claims in this Court, because, as explained above, to the extent that Clark's claims have somehow not already been precluded, only the FERC can grant Clark relief with respect to the transaction involving KACC and Clark. Thus, denying the Emergency Stay Motion cannot possibly moot the Court's adjudication of the merits of Clark's claims. Denial of the Emergency Stay Motion will at most moot this Court's adjudication of the preclusion issues raised in the Motion to Disallow. But as discussed above, the Bankruptcy Court is in a better position to adjudicate those issues in any event. In addition, Clark will not be required to litigate the issue of whether its claims are precluded in both this Court and the Bankruptcy Court. Either the Bankruptcy Court will rule on the Motion to Disallow before this Court rules on the motion to withdraw the reference, mooting the motion to withdraw the reference, or this Court will withdraw the reference, or more likely deny the motion to withdraw the reference, before the Bankruptcy Court rules.

Clark has failed to demonstrate that it will suffer any harm if this Court does not grant a stay, let alone irreparable harm.

### D.    KACC Will Be Harmed If the Emergency Motion Is Granted

In contrast to the lack of any harm to Clark, KACC will suffer harm if the Emergency Stay Motion is granted. The confirmation hearing on the Debtors' Second Amended Joint Plan of Reorganization is scheduled for January 9 and 10, 2006, and distributions to creditors should begin shortly after the plan goes effective. If the Emergency Stay Motion is granted and there is a substantial delay in the adjudication of the Motion to Disallow, KACC would be required to reserve equity in the reorganized entity sufficient to cover the full potential amount of the Clark Claims, and that reserve would delay a portion of distributions to legitimate creditors until the Motion to Disallow is adjudicated.

**E.    The Public Interest Will Be Served By Denying the Emergency Stay Motion**

Clark argues that the public interest "strongly favors this Court adjudicating the

purely non-bankruptcy Federal law issue raised in Clark's claim." (Brief in Support of

Emergency Stay Motion at 26.) This assertion is wrong as a matter of law because, as already

explained and as Clark has previously represented to the Bankruptcy Court, if Clark's

Unauthorized Sale Claim were not already precluded, only the FERC could grant Clark any

relief with respect to that claim. If any public interest is implicated here, it is the public interest

in seeing the purposes and policies of the Bankruptcy Code effectuated to help debtors

reorganize. In re Richmond Metal Finishers, Inc., 36 B.R. 270, 273 (Bankr. Va. 1984).

Potentially delaying distributions to legitimate creditors pending a ruling on Clark's form-

shopping efforts is contrary to that public interest.

**CONCLUSION**

For all the foregoing reasons, the Court should summarily deny the Emergency

Stay Motion.

Dated:  December 15, 2005
        Wilmington, Delaware

Respectfully submitted,


Daniel K. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701


       -and-

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

ATTORNEYS FOR DEFENDANT KAISER
ALUMINUM & CHEMICAL CORPORATION