# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Jointly Administered** |
| | : | |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION,** | : | |
| **a Delaware Corporation, et al.,** | : | **Chapter 11** |
| | : | |
| **Debtors** | : | **Hearing Date: 07/23/02 @ 12:30 p.m.** |

**OBJECTION OF DEBTOR AND DEBTOR IN POSSESSION KAISER
ALUMINUM AND CHEMICAL CORPORATION TO MOTION
OF PUBLIC UTILITY DISTRICT NO. 1 OF CLARK COUNTY
FOR LIMITED RELIEF FROM THE AUTOMATIC STAY (D.I. 644)**

Kaiser Aluminum & Chemical Corporation ("KACC"), one of the above-

captioned debtors and debtors in possession (collectively, the "Debtors"), hereby files this

Objection to the Motion of Public Utility District No. 1 of Clark County for Limited Relief from

the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (D.I. 644) (the

"Motion"), filed by the Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities

("Clark"). In support hereof, Kaiser respectfully submits the Declaration of Joseph Patrick

Hoerner, which is attached hereto as Exhibit A and incorporated herein by reference (the

"Hoerner Dec."), and states as follows:

**Preliminary Statement**

1.      Clark's Motion should be denied because as demonstrated below, Clark

seeks simply to relitigate issues that it has already lost on the merits before an Administrative

Law Judge and that are presently on review by the Federal Energy Regulatory Commission (the

"FERC" or the "Commission"). The automatic stay should be maintained at least until such time

as the FERC rules on the review of the Administrative Law Judge's decision.

DLI-5704355v3

2.      As noted in Clark's Motion, there is pending before the FERC a proceeding, which among things, involves a dispute between KACC and Clark regarding purchases of electricity that were made by Clark for delivery during August and September 2001. Clark claims that KACC was the seller of the electricity, and in the ongoing proceeding before the FERC, Clark has sought an order from the FERC requiring KACC to refund amounts associated with the alleged sales. The FERC proceeding is styled Puget Sound Energy, Inc. v. All Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement, FERC Docket No. EL01-10-000, et al. ("the Puget Sound Proceeding").

3.      Clark's claim that KACC was the seller of that electricity, however, contradicts both the transactional documents that identify the Bonneville Power Administration ("BPA") as the seller of the electricity and the correspondence between KACC and Clark that identify BPA as the seller. (Hoerner Dec., ¶ 7). These facts are not discussed in the Clark Motion, nor are a host of other facts that show that Clark's request to obtain money from KACC has no merit.

4.      More important, however, Clark's and KACC's versions of the facts were already presented to the FERC at an evidentiary hearing in the Puget Sound Proceeding. Although Clark references the fact that a FERC Administrative Law Judge (the "ALJ") has issued a recommendation based upon the evidentiary record that was developed at that hearing, Clark does not disclose that the ALJ's recommendation, which was based upon the evidentiary presentations as well as a voluminous record that addresses the overall market circumstances in the Pacific Northwest where the electricity was produced and consumed, would bar the payment of any amount to Clark. Puget Sound Energy, Inc. v. All Sellers of Energy and/or Capacity at

Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement, 96 FERC ¶ 63,044 (2001) (the "Recommended Decision").  The Recommended Decision currently is pending before the full Commission.

    5.  Notwithstanding these facts, or more probably because of them, Clark filed its Motion seeking to have the Court lift the automatic stay (a) to allow Clark to seek authority from the FERC to conduct additional discovery and present additional evidence if the record in the Puget Sound Proceeding is re-opened, (b) to permit the FERC to order KACC to issue a refund in the Puget Sound Proceeding, or alternatively in a separate proceeding in which the FERC is conducting an investigation into the wholesale rates of sellers in the Western Systems Coordinating Council (the "WSCC Proceeding"),[1] if the FERC orders refunds in those proceedings and (c) to file a new complaint against KACC that would be based upon the same facts but would allege a new theory of liability, i.e., that KACC violated the Federal Power Act by selling power to Clark without requisite authority having been obtained from the FERC.  Of course, the foundation for this new complaint would be that KACC in fact was the seller to Clark, which is already squarely at issue in the Puget Sound Proceeding.

    6.  Clark has not raised anything in its Motion that has not previously been raised before the FERC or of which the FERC is not well aware.  All of the facts relied upon by Clark for its new complaint are before the FERC in the Puget Sound Proceeding.  What Clark

---

[1]  This separate proceeding is styled Investigation of Wholesale Rates of Public Utility Sellers of Energy and Ancillary Services in the Western Systems Coordinating Council, FERC Docket No. EL01-68, and was initiated by the FERC in April 2001.  Clark did not seek to intervene in the WSCC Proceeding until late January 2002.  The FERC rejected Clark's attempt to intervene as untimely because of the potential for Clark's late

thus seeks through its Motion is an opportunity for a second bite at the apple. Specifically, Clark

seeks an order lifting the automatic stay so that it can relitigate issues that, at least preliminarily,

have been decided against it by the FERC ALJ.

7.    There will be an enormous cost to KACC if Clark is allowed to start down

the trail of relitigation. There will be the cost of filing appropriate pleadings (including

pleadings to dismiss Clark's new complaint), conducting and responding to discovery,

participation in evidentiary hearings and the filing of post-hearing briefs. Resolution of the

matter also likely would be delayed if a new proceeding is opened or an existing docket is re-

opened. Moreover, all of this extra cost and effort will be for naught if the FERC issues a

decision in the Puget Sound Proceeding finding that KACC was not the seller of the electricity or

orders that Clark is entitled to a refund. Indeed, because Clark's proposed new complaint seeks

the same damages as sought in the Puget Sound Proceeding, Clark even states in its Motion that,

if it is permitted to proceed with its new complaint, it would not seek to recover in the aggregate

in the two proceedings any more than the profit KACC made on the sale (i.e., Clark will only

seek one recovery). (Memorandum of Law at 9). Furthermore, given the fact that it is still in the

very early stages of the Debtors' chapter 11 proceedings, Clark will not be prejudiced if the

automatic stay is maintained at least until the FERC rules in the Puget Sound Proceeding.

8.    As explained in more detailed below, Clark's Motion fails to establish

sufficient "cause" for lifting the automatic stay and should be denied.

---

(continued...)

    intervention to cause substantial prejudice to other parties. Thus, Clark is not even a
    party to the WSCC Proceeding.

## Factual Background

### *The Power Sales Agreement Between KACC and BPA*

9.      KACC owns two primary aluminum smelters and an aluminum rolling mill in Washington State. (Hoerner Dec., ¶ 2). In order to obtain electric energy for its Washington facilities, in 1995 KACC signed a five-year Power Sales Agreement (the "PSA") with BPA for service from October 1, 1996 through September 30, 2001. The PSA obligated BPA to deliver electric energy to KACC and imposed a take-or-pay obligation upon KACC. The power sold under the PSA was "federal power" sold under the authority granted to the BPA by the Pacific Northwest Electric Power Planning and Conservation Act (the "Northwest Power Act"). (Hoerner Dec., ¶ 3).

10.     Subsequent to entering into the PSA, KACC reduced production from its Washington facilities. As a direct consequence of reducing operations, KACC curtailed purchases of power from BPA. Under the PSA, if KACC desired to curtail purchases from BPA, it had to provide BPA notice of the amount and duration of the curtailment. It also could request that BPA sell the power to another entity. Further, KACC had the option to identify a designated third-party that was willing to pay a specified price for the power, or KACC could request that BPA find a purchaser for the power. (Hoerner Dec., ¶ 4).

11,     In the event KACC curtailed its purchases from BPA, BPA thus had a wide range of options. BPA could sell the power to a different purchaser with public preference on the same terms as KACC's notice; BPA could retain the power for its own use or dispose of the power on whatever alternative terms BPA might separately arrange; or BPA could offer a contract for sale of the power to the entity identified in KACC's notice. (Hoerner Dec., ¶ 5).

12.     If BPA choose to sell the power to the entity designated in KACC's notice, BPA would offer a power sales contract to the entity and, if accepted, BPA also would agree

with KACC for crediting of the payments under the terms of the PSA. If BPA elected to sell to a different buyer at a different price or retain the power for its own use, BPA would still credit KACC for sale revenue based on the price in KACC's notice. The notice price thus established the mitigation to KACC for **not** purchasing the federal power; the notice did **not** determine the price or to whom BPA would sell the power. (Hoerner Dec., ¶ 6).

13.    Thus, KACC did not have a right, contractual or otherwise, to dictate whether BPA would sell the power to a third-party or retain it for its own use. KACC likewise did not have the right, contractual or otherwise, to determine to whom BPA would sell the power if BPA chose to sell it to a third-party. Additionally, KACC did not have the right to establish the price at which BPA would sell the power to parties that bought power from BPA. KACC also did not have the right to sell the power itself. In fact, BPA insisted that BPA itself had to be the seller of any federal power that KACC did not take. (Hoerner Dec., ¶ 7).

### *Consultations Between Clark and KACC*

14.    In January 2001, a consultant for Clark contacted KACC. The consultant advised KACC that Clark needed electricity for August and September 2001 and he was aware that BPA might have a block of federal power for sale because KACC had curtailed its manufacturing operations. Thereafter, KACC and Clark independently approached other potential buyers and sellers to determine a market price for power for August and September 2001. They each obtained price information so that KACC could name Clark as a party willing to buy power from BPA at a specified price in the notice KACC would provide to BPA of curtailment of KACC's own August and September 2001 purchases. The price ultimately set forth in the notice was below the market quotes Clark had received from other sellers. (Hoerner Dec., ¶ 8).

15.    On February 2, 2001, at the request of Clark's consultant, KACC provided Clark with a letter indicating how a sale from BPA to Clark would be implemented if BPA chose to sell power to Clark. A factor precipitating the letter was Clark's concern with KACC's creditworthiness and desired clarification that Clark's power sale contract, if offered, would be with BPA for federal power, and not with KACC. (Hoerner Dec., ¶ 9).

### *Clark's Agreement With BPA*

16.    On February 2, 2001, KACC also submitted a notice to BPA indicating that it intended to curtail purchases for August and September 2001. The notice identified Clark as a potential purchaser at the below market price developed based upon Clark's and KACC's market intelligence. (Hoerner Dec., ¶ 10).

17.    After receiving KACC's notice, BPA elected to sell power to Clark. Consistent with the BPA's election to sell power to Clark, BPA and Clark executed an agreement that unambiguously identifies BPA as the Seller and Clark as the Buyer for a term commencing on August 1, 2001 and terminating on September 30, 2001. (Hoerner Dec., ¶ 12).[2]

### *Proceedings Before the FERC*

18.    On October 26, 2000, Puget Sound Energy, Inc. ("Puget Sound") filed with the FERC a complaint in which it asked the FERC to place a cap on the price that could be charged for energy sold under the Western Systems Power Pool Agreement into Pacific

---

[2]    In the past, BPA had not in all instances sold power to a qualified buyer identified in similar types of notices KACC had submitted to BPA. Sometimes BPA decided to retain the energy for its own use or sell the power under terms unknown to KACC. In other instances, the third party would decide not to sign a power sale agreement with BPA, which it could do because prior to entering into the agreement with BPA, the third party had no obligation to purchase the power. (Hoerner Dec., ¶ 11).

Northwest wholesale power markets. It was this complaint that initiated the Puget Sound Proceeding. (Hoerner Dec., ¶ 13).

19.     Subsequent to the interventions of many parties in the proceeding, the filing of almost 150 pleadings and ultimately unsuccessful settlement discussions before the FERC's Chief Administrative Law Judge, on July 25, 2001, the FERC issued an order initiating an evidentiary proceeding to develop a factual record on whether there may have been unjust and unreasonable charges for spot market bilateral sales of energy in the Pacific Northwest during the period December 25, 2000 through June 20, 2001. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator Corporation and the California Power Exchange, et al., 96 FERC ¶ 61,120 at 61,520 (2001). (Hoerner Dec., ¶ 14).

20.     Following the issuance of that order, Clark filed a motion for leave to intervene out of time in the Puget Sound Proceeding. Clark's motion was granted, and on August 17, 2001, Clark filed prepared testimony in the proceeding. (Hoerner Dec., ¶ 15).

21.     Clark's prepared testimony filed in the Puget Sound Proceeding at the FERC contains the same factual allegations that Clark raises in support of its request for relief from the automatic stay. Similarly, the draft complaint that Clark seeks to file at the FERC, attached as Exhibit 4 to the Affidavit of Wayne Nelson in support of Clark's Motion, raises the same factual allegations that previously were raised by Clark in the Puget Sound Proceeding.[3]

---

[3]     For instance, the factual allegations in paragraphs 3 through 8 of the Motion, paragraphs 3 through 9 of the Nelson Affidavit and pages 4 and 5 of the draft complaint are the same allegations made on page 3, lines 9-21, page 4, lines 1-13 and page 5, line 11 through page 6 line 15 in the Prepared Direct Testimony of Wayne Nelson on behalf of Clark filed in the Puget Sound Proceeding. See Hoerner Dec., ¶ 17; Exhibit 4 to Hoerner Dec. Clark's claim that it was unable to locate a supplier with enough capacity to serve Clark's

22.    Subsequent to the filing of Clark's prepared testimony in the Puget Sound Proceeding, KACC filed prepared answering testimony. KACC's answering testimony explained the contractual arrangements between KACC and BPA under the PSA. (Hoerner Dec., ¶ 21). KACC also explained that BPA, not KACC, had sold the electricity in question to Clark. KACC's testimony concluded that the PSA and the agreement between BPA and Clark showed that KACC had no control over the terms and conditions of BPA's sale of power to Clark, and, as a result, Clark should not be due any money from KACC. A copy of KACC's prepared testimony filed in the Puget Sound Proceeding is attached as Exhibit 5 to Hoerner Dec.

23.    Following the submission of the prepared testimony, an evidentiary hearing was held before the FERC ALJ in which a record was developed on the circumstances faced in Pacific Northwest power markets during the period December 25, 2000 through June 20, 2001. Clark and KACC were given the opportunity during that evidentiary hearing to conduct live cross-examination of each other's witnesses. Thereafter, each party filed post-hearing briefs and proposed findings of fact with the ALJ. (Hoerner Dec., ¶ 22).

24.    The ALJ subsequently issued her recommendations to the full Commission. In her Recommended Decision, the ALJ concluded that the prices in the Pacific Northwest during the relevant time period were the result of a number of factors, including a

---

(continued…)

needs, however, is not entirely consistent with its representation to the FERC that "suppliers willing to make a commitment [for the August/September 2001 time period] were fairly scarce." Exhibit 4 to Hoerner Dec at page 5, lines 12-14. Additionally, Clark conveniently fails to advise the Court that the prices then available from sources other than the BPA-marketed power ranged from $350 to $500 per MWh, and "prices for those months were predicted to exceed $1000 for daily purchases in those months." Id. at page 5, lines 15-18. Thus, Clark's own testimony at the FERC corroborated KACC's position that the price Clark paid for the electricity in question was at a discount from prevailing prices.

shortage of supply, excess demand, a drought, increased natural gas prices and price signals from California markets. Recommended Decision, 96 FERC at 65,385. She also concluded that the Pacific Northwest is a competitive market, and that the transactions at issue in the case resulted from bilateral agreements between the parties. Id. She further concluded that "[u]nder these circumstances, the prices charged were not unjust or unreasonable and refunds should not be ordered in this proceeding." Id. Thus, she recommended that the Commission terminate the proceeding. Id.

25.    After the issuance of the Recommended Decision, numerous parties, including Clark and KACC, submitted comments to the full Commission advocating their various positions to the FERC. For its part, Clark disagreed with the ALJ's recommendations and requested that the FERC order refunds from KACC to Clark either in the Puget Sound Proceeding, or alternatively suggested that refunds be ordered in the WSCC Proceeding. This alternative suggestion was somewhat odd in that neither Clark nor KACC were parties to the WSCC Proceeding.[4] (Hoerner Dec., ¶ 24).

26.    Moreover, following the filing of its Comments on the Recommended Decision, Clark decided to ignore the Commission's procedural schedule and filed an additional pleading on November 20, 2001. Apparently dissatisfied with its prior efforts, Clark's belated November 20, 2001 pleading recapitulated its prior points, although re-arranged in the new pleading, much as Clark once again desires to try yet another reformulation of its claims. (Hoerner Dec., ¶ 25).

---

[4]    As noted in footnote 1, supra, Clark did later seek to intervene in the WSCC Proceeding, but Clark's request was denied.

27.    Currently, the ALJ's Recommended Decision in the Puget Sound Proceeding is pending before the full Commission.  (Hoerner Dec., ¶ 26).

## Argument

### *The Standards for Relief from the Automatic Stay*

28.    The automatic stay is an essential element of the reorganization process as it "prevents the dissipation or diminution of the bankrupt's assets while rehabilitative efforts are undertaken *and prohibits the proliferation of numerous claims in different forums against the debtor.*"  S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In re S.I. Acquisition, Inc.), 817 F.2d 1142, 1146 (5th Cir. 1987) (citing H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 340 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6297- 98) (emphasis added).  Therefore, relief from the stay may only be granted for good reason.  See In re Stranahan Gear Company, Inc., 67 B.R. 834, 836 (Bankr. E.D. Pa. 1986).

29.    Section 362(d)(1) permits the Court to lift or modify the stay only for "cause."  The Bankruptcy Code does not define the term "cause."  Rather, a determination of whether cause exists for relief from the automatic stay is a matter for the court's discretion in light of all the circumstances presented.  See In re Robert Frank-Leonard Wilson, 116 F.3d 87, 90 (3d Cir. 1997).

30.    Courts in this District have stated that at least three factors should be considered to determine cause under section 362(d)(1) to lift the stay to allow a party to continue to prosecute a claim in litigation:

      (a)    Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;

      (b)    Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and

(c)     The probability of the creditor prevailing on the merits.

In re Pursuit Athletic Footwear, Inc., 193 B.R. 713, 718 (Bankr. D. Del. 1996); see In re

Integrated Health Servs., Inc., No. 00-389-MWF, 2000 Bankr. LEXIS 1319, at *5 (Bankr. D.

Del. Aug. 11, 2000). The Movant bears the burden of proof with respect to whether cause exists

to lift the stay. In re Pacor, Inc., 74 B.R. 20, 22 (E.D. Pa. 1987). Only then does the burden shift

to the Debtors to rebut this showing. In re Pursuit Athletic Footwear, 193 B.R. at 718; In re

Salvatore J. Mazzeo, 167 F.3d 139, 142 (2d Cir. 1999). Furthermore, courts have recognized

that, early in a debtor's chapter 11 cases, an unsecured, unliquidated claimholder should not be

permitted to pursue litigation against the debtor in another court unless extraordinary

circumstances are shown. See, e.g., In re I. Burack, Inc., 132 B.R. 814, 817 (Bankr. S.D.N.Y.

1991) (stating that during the exclusivity period, "an unsecured, unliquidated claimholder should

not be permitted to pursue litigation against the debtor in another court unless extraordinary

circumstances are shown."); In re Pioneer Commercial Funding Corp., 114 B.R. 45 (Bankr.

S.D.N.Y. 1990) (same).

31.     As described below, each of the factors here weighs heavily against lifting

the automatic stay at this stage, and Clark has certainly not established the requisite

extraordinary circumstances.

### *Cause Does Not Exist to Lift the Stay*

32.     To support its assertion that there is "cause" to lift the stay in this case,

Clark argues that (a) the FERC is a highly specialized agency designed to deal exclusively with

issues arising from wholesale power sales and therefore is uniquely qualified to resolve the

dispute between Clark and KACC, (b) resolution by the FERC will completely resolve all the

issues between KACC and Clark and (c) without relief from the automatic stay, Clark's claim

never can be properly liquidated and, hence, asserted in this bankruptcy case. (Memorandum at

10-12). While it may be true that Clark's purported claims are within FERC's exclusive jurisdiction to establish just and reasonable charges for electric energy sold at wholesale, Clark ignores (a) the lack of hardship on Clark if the stay is maintained given the current status of the Puget Sound Proceeding and the fact that Clark has already had a full opportunity to present its claims, (b) the prejudice to the Debtors if Clark is permitted to assert its new complaint and (c) the complete lack of merit to Clark's claim that KACC was the seller of the electricity. Each of these factors, however, strongly favor keeping the stay in place.

33.    With respect to the hardship on Clark if the stay is maintained, any hardship is of Clark's own making. Moreover, Clark clearly is wrong in arguing that its claim never can be properly and fully liquidated if the Court does not grant it the opportunity to seek to reopen the Puget Sound Proceeding or file a new complaint with the FERC.

34.    As is shown above, Clark has had ample opportunity to litigate its claim before the FERC, and the ALJ's Recommended Decision that would reject Clark's claim currently is pending before the Commission. There is nothing more to do in that docket in terms of discovery or hearings.[5] However, if the Court lifts the automatic stay, Clark intends to seek additional discovery. (Motion at 1). The only purpose in obtaining additional discovery would be to attempt to introduce it into evidence. Thus, Clark presumably intends to move the FERC to reopen the record so that Clark can relitigate the issues it at least preliminarily has lost in the Puget Sound Proceeding as reflected in the ALJ's Recommended Decision.

---

[5]    Certain parties, not including Clark, have filed a request for the FERC to reopen the record in the Puget Sound Proceeding based upon activities that they allege may have been undertaken by Enron Corp. and which, according to them, may have affected prices in the Pacific Northwest. However, if the proceeding is reopened for that purpose, the evidence adduced would have nothing to do with the dispute between Clark and KACC.

35.    While relitigation in the Puget Sound Proceeding in itself would be a waste of administrative economy, Clark also wants the opportunity to relitigate the issues in a new proceeding that it would initiate at the FERC by the filing of a new complaint that would be based upon the very same factual circumstances at issue in the Puget Sound Proceeding. Clark's claimed need to file a new complaint is that it now wishes to argue that KACC violated the Federal Power Act by selling power to Clark without having obtained FERC authorization to make such sales. Of course, the predicate for the claim is precisely the issue that currently is before the FERC in the Puget Sound Proceeding: Did KACC or BPA sell power to Clark? And, Clark's alleged need to file a new complaint is illusory. FERC has access to its own files and regularly takes official notice of their contents.[6] Thus, the FERC surely is aware that KACC never has applied for, nor has the FERC granted it, authority to sell power in interstate commerce. Thus, Clark's feigned need to raise the absence of KACC's authorization to sell power is simply an excuse to enable Clark to attempt to get a second bite at the apple.

36.    It goes without saying that judicial economy weighs against allowing a party to relitigate issues. FERC's policy also strongly disfavors relitigation. The FERC has a

---

[6]    See 18 C.F.R. 385.508(d) (permitting official notice); Nevada Power Co., et al v. Duke Energy Trading and Marketing, L.L.C., 99 FERC ¶ 61,047 (2002); California Independent System Operator Corp., 98 FERC ¶ 61,335 n.34 (2002) (taking official notice of a deposition); Kern River Gas Transmission Co., 95 FERC ¶ 61,022 n.3 (2001) (taking official notice of record in another docket); System Energy Resources, Inc., 92 FERC ¶ 61,119 nn.23, 26 (accord); Iroquois Gas Transmission System, L.P., 96 FERC ¶ 61,261 at p. 61,948 n.74 (1999) (Commission relies on reports filed with FERC outside of the docket in which ruling was issued); Williams Natural Gas Co., 77 FERC ¶ 61,277 at 62,193(1996) (Commission relies on report in its files not part of the record in the proceeding); Kentucky Utilities Co., 85 FERC ¶ 61,274 at p. 62,109 n.32 (1998); Transcontinental Gas Pipe Line Corp., 60 FERC ¶ 63,001 at p. 65,030 (1992) (official notice of materials in Commission's files outside of the proceeding); Entergy Services, Inc., 58 FERC ¶ 61,234 at p. 61,752 (1992) (official notice of materials in Commission files in another matter).

"long-standing" policy prohibiting parties from relitigating issues absent a showing of changed circumstances. <u>Alamito Co.</u>, 43 FERC ¶ 61,274 at 61,753 (1988) ("Absent a showing of significant change in circumstances, the relitigation of an issue is simply not justified. Sound public policy reasons support the Commission's policy against relitigation of issues."). <u>See also</u> <u>Central Kansas Power Co.</u>, 5 FERC ¶ 61,291 at 61,621 (1978) (affirming the ALJ's conclusion that to decide issues previously afforded a full hearing "would ill serve the goal of administrative efficiency and would not further the interests of the parties").

37.     Here, Clark neither has asserted, nor can claim, that there are changed circumstances justifying relitigation of its dispute with KACC. The issues as to whether KACC was the seller of the power and whether amounts are due to Clark in respect of such putative sales (and thus the liquidation of Clark's claim) are already before the FERC in the Puget Sound Proceeding, and the FERC can decide the issues based upon the existing record and the ALJ's Recommended Decision. The interests of judicial economy, expeditious resolution of litigation and FERC policy weigh heavily against allowing Clark to attempt to reopen these issues at FERC either in the context of seeking additional discovery and procedures in the Puget Sound Proceeding or in a context of filing a new complaint.

38.     Furthermore, at a minimum the stay should be maintained until the FERC rules in the Puget Sound Proceeding. The ruling will certainly affect Clark's new theory for its claims and could completely moot the need for a new proceeding (<u>e.g.</u>, if the FERC rules that KACC was not the seller). There is likewise no need for Clark to rush to liquidate its new claim at this early stage of the Debtors' chapter 11 cases. No claims bar date has been set and given the complicated issues involved — including asbestos liabilities and a myriad of legacy cost issues — the Debtors' restructuring and claim resolution process will take a substantial period of

time.  Maintenance of the stay until the FERC at least has the opportunity to rule in the Puget

Sound Proceeding will not prejudice Clark.  Substantial prejudice, however, would be

occasioned on the Debtors if the stay is lifted.

      39.    With respect to the potential prejudice to the Debtors, Clark contends that

the expenses to litigate will be minimal because "[KACC's] attorneys are fully familiar with the

facts of the generic dispute and already have responded to Clark Public Utilities' claims."

(Memorandum at 10).  But if Clark is given the opportunity to file a new complaint with the

FERC, rather than being at the conclusion of a proceeding that resolves the dispute (the Puget

Sound Proceeding), the parties will be at the nascent stages of a new proceeding.  As a result,

KACC's lawyers will need to undertake all of the activities associated with a new proceeding

commencing with preparation of appropriate pleadings to be filed at the FERC seeking dismissal

of the complaint on the ground that it constitutes relitigation of the Puget Sound Proceeding.

And, if the FERC nonetheless allows the complaint proceeding to go forward, the process that

would ensue presumably would encompass several rounds of discovery by both sides, the filing

of prepared testimony and a new evidentiary hearing.[7]  Additionally, it is likely that BPA will

need to be joined as a necessary party to that litigation, necessitating additional procedures to

attempt to accomplish that result.[8]  Moreover, given that there are utilities other than Clark that

---

[7]     For instance, if the FERC matter were to be re-opened, a natural question would be, if (as Clark indicates) BPA's change in contract anniversary dates was a policy as of 1998, why was Clark unaware of that policy or unwilling to act to protect itself contractually in light of that policy until 2000.  See Exh. 4, p. 4 to Affidavit of Wayne Nelson in Support of Motion.  Clearly, Clark is on the prowl for relief from its own failure to act in a prudent and informed fashion, and wants to burden KACC because of Clark's failings.  Similarly, KACC will want to explore what other offers were made to sell power to Clark.

[8]     Indeed, Wayne Nelson, who submitted an affidavit in support of Clark's Motion, was quoted in a recent newspaper article as warning that the new litigation could take years and run up legal bills of several hundred thousand dollars.

purchased electricity from BPA as a result of KACC's curtailment, it is possible that these other utilities will be encouraged to seek to intervene in a new FERC proceeding to raise their own new claims against KACC. Such an occurrence would result in additional discovery and delay. Contrary to Clark's claims in its Motion, substantial prejudice to the Debtors will likely occur if the stay is lifted.

       40.    In addition to the lack of hardship to Clark if the stay is maintained and the substantial prejudice to the Debtors if the stay is lifted, Clark is very unlikely to succeed on the merits. As already explained, Clark's new claim is merely an attempt by a litigant, dissatisfied with how it presented its case initially, to recast its claim. And even if Clark's new claim is not summarily dismissed on preclusion grounds, there is no merit, based on the unambiguous documentation, to the assertion that KACC was the seller.

[Remainder of page intentionally left blank]

## Conclusion

All these factors overwhelmingly support maintaining the stay, and Clark's

Motion should therefore be denied.

Dated: July 16, 2002
Wilmington, Delaware.

Respectfully submitted,

_Patrick Leathem_

Daniel J. DeFranceschi (DE 2732)
Paul N. Heath (DE 3704)
Patrick M. Leathem (DE 4114)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Richard I. Werder, Jr. (OH I.D. 0011533)
Kevyn D. Orr (FL I.D. 384208)
JONES, DAY, REAVIS & POGUE
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone: (216) 469-3939
Facsimile: (216) 579-0212

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
JONES, DAY, REAVIS & POGUE
2727 North Harwood Street
Dallas, Texas 75201-1515
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                        :    **Jointly Administered**
                                              :
                                              :    **Case No. 02-10429 (JKF)**
                                              :
KAISER ALUMINUM CORPORATION,  :
a Delaware Corporation, et al.,               :    **Chapter 11**
                                              :
                                              :
       Debtors                                :

**DECLARATION OF JOSEPH PATRICK HOERNER IN SUPPORT OF
OBJECTION OF KAISER ALUMINUM & CHEMICAL CORPORATION
TO MOTION OF PUBLIC UTILITY DISTRICT NO. 1 OF CLARK
COUNTY FOR LIMITED RELIEF FROM THE AUTOMATIC STAY (D.I. 644)**

I, Joseph Patrick Hoerner, hereby declare that the following is true to the best of my knowledge, information and belief:

1.    I am Energy Supply Manager of Kaiser Aluminum & Chemical Corporation ("Kaiser"). I am familiar with the facts and circumstances set forth herein and submit this affidavit in support of the Objection to Motion Of Public Utility District No. 1 of Clark County For Limited Relief From the Automatic Stay protecting Kaiser.

2.    Kaiser owns two primary aluminum smelters and an aluminum rolling mill in Washington State.

3.    In 1995, Kaiser signed a five (5) year Power Sales Agreement ("PSA") with the Bonneville Power Administration ("BPA") for service from October 1, 1996 through September 30, 2001. Relevant excerpts from the PSA are attached hereto in Exhibit 1. The PSA obligated BPA to deliver and sell electric energy to Kaiser and imposed a take-or-pay obligation upon Kaiser. The power sold under the PSA was "federal power" sold under the authority granted to the BPA by the Pacific Northwest Electric Power Planning and Conservation Act ("Northwest Power Act").

4.    Subsequent to entering into the PSA, Kaiser reduced production from its Washington facilities. As a direct consequence of reducing operations, Kaiser curtailed purchases of power from BPA. Under the PSA, if Kaiser desired to curtail purchases from BPA, it had to provide BPA notice of the amount and duration of the curtailment. To determine the "damages" that Kaiser would pay BPA, or the "credit" that BPA would pay Kaiser, for the curtailed power under the take-or-pay contract provision, the contract provided a means to determine market prices as of the time of the curtailment. To determine the contact "damages" or "credit" amount, Kaiser had the contractual option to identify a third-party that was willing to pay a specified price to purchase the curtailed power from BPA, or Kaiser could request that BPA find a purchaser for the power.

5.    In the event Kaiser curtailed its purchases from BPA, BPA thus had a wide range of options. BPA could sell the power to a different purchaser with public preference on the same terms as Kaiser's notice; BPA could retain the power for its own use or dispose of the power on whatever alternative terms BPA might separately arrange; or BPA could offer a contract for sale of the power to the entity identified in Kaiser's notice.

6.    If BPA choose to sell the power to the entity designated in Kaiser's notice, BPA would offer a power sales contract to the entity. But whether BPA choose to sell the power to that entity or whether BPA elected to sell the power to a different buyer at a different price or retain the power for its own use, BPA would still credit Kaiser based on the price in Kaiser's notice. The notice price thus established the contract mitigation to Kaiser for **not** purchasing the federal power; the notice did **not** determine the price or to whom BPA would sell the power.

7.    Thus, Kaiser did not have a right, contractual or otherwise, to dictate whether BPA would sell the power to a third-party or retain it for its own use. Kaiser did not

have the right, contractual or otherwise, to determine to whom BPA would sell the power if BPA chose to sell it to a third-party. Additionally, Kaiser did not have the right to establish the price at which BPA would sell the power to parties that bought power from BPA. Kaiser also did not have the right to sell the power itself. In fact, BPA insisted that BPA itself had to be the seller of any federal power that Kaiser did not take.

8.     In January 2001, a consultant for Clark contacted Kaiser. He advised Kaiser that Clark needed electricity for August and September 2001, and he was aware that BPA might have a block of federal power for sale because Kaiser had curtailed its manufacturing operations. Thereafter, Kaiser and Clark independently approached other potential buyers and sellers to determine a reasonable market price for power for August and September 2001. We each obtained price information so that Kaiser could name Clark as a party willing to buy power from BPA at a specified price in the notice Kaiser would provide to BPA for curtailment of Kaiser's August and September 2001 purchases. The price ultimately set forth in the notice was below the market quotes Clark had received from other sellers.

9.     On February 2, 2001, at the request of Clark's consultant, Kaiser provided Clark with a letter indicating how a sale from BPA to Clark would be implemented if BPA chose to sell power to Clark. A factor precipitating the letter was that Clark was concerned with Kaiser's creditworthiness and wanted clarification that Clark's power sale contract, if offered, would be with BPA for federal power, and not with Kaiser. A copy of the February 2, 2001 letter is attached hereto as Exhibit 2.

10.     On February 2, 2001, Kaiser also submitted a notice to BPA indicating that it intended to curtail purchases for August and September 2001. The notice identified Clark

as a potential purchaser at the below market price developed based upon Clark's and Kaiser's market intelligence.

11.    In the past, BPA had not in all instances sold power to the qualified buyer identified in similar notices Kaiser had submitted to BPA. Sometimes BPA decided to retain the energy for its own use or sell the power under terms unknown to Kaiser. In other instances, the third party would decide not to sign a power sale agreement with BPA, which it could do because prior to entering into the agreement with BPA, the third party had no obligation to purchase the power.

12.    After receiving Kaiser's notice, BPA elected to sell power to Clark. Accordingly, BPA, not Kaiser, entered into an agreement to sell power to Clark during August and September 2001. Consistent with the BPA's election to sell power to Clark, BPA and Clark executed an agreement that unambiguously identifies BPA as the Seller and Clark as the Buyer for a term commencing on August 1, 2001 and terminating on September 30, 2001. That agreement is attached hereto as Exhibit 3.

13.    On October 26, 2000, Puget Sound Energy, Inc. ("Puget Sound") filed with the Federal Energy Regulatory Commission ("FERC") a complaint in which it asked the FERC to place a cap on the price that could be charged for energy sold into Pacific Northwest wholesale power markets. It was this complaint that initiated the Puget Sound Proceeding.

14.    Subsequent to the interventions of many parties in the proceeding, the filing of almost 150 pleadings and ultimately unsuccessful settlement discussions before the FERC's Chief Administrative Law Judge, on July 25, 2001, the FERC issued an order initiating an evidentiary proceeding to develop a factual record on whether there may have been unjust and unreasonable charges for spot market bilateral sales of energy in the Pacific Northwest during the

period December 25, 2000 through June 20, 2001. <u>San Diego Gas & Electric Company v.</u> <u>Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent</u> <u>System Operator Corporation and the California Power Exchange, et al.</u>, 96 FERC ¶61,120 at 61,520 (2001).

15.    Following the issuance of that order, Clark filed a motion for leave to intervene out of time in the Puget Sound Proceeding. Clark's motion was granted, and on August 17, 2001, Clark filed prepared testimony in the proceeding.

16.    Clark's prepared testimony filed in the Puget Sound Proceeding at the FERC contains the same factual allegations that Clark raises in support of its request for relief from the automatic stay protection of the Bankruptcy Code.

17.    For instance, in Paragraph 3 of Clark's Motion, it describes how in 1996, it began purchasing power from suppliers other than BPA, and it timed those purchases to expire on or about July 31, 2001, at which time it wanted an option to enter into a new contract with BPA. The same factual claims are raised in Paragraphs 3 through 5 of the Nelson Affidavit and page 4 of Clark's draft Complaint. These allegations correspond to the allegation raised at page 3, lines 9-15 in the Prepared Direct Testimony of Wayne Nelson on behalf of Clark filed in the Puget Sound Proceeding. A copy of Mr. Nelson's prepared testimony in the Puget Sound Proceeding is attached hereto as Exhibit 4.

18.    In Paragraph 4 of the Motion, Clark describes how BPA changed its standard contract expiration date such that it would not enter into a new contract with Clark with an effective date earlier than October 1, 2001, necessitating Clark finding another source of electricity to fill the two-month gap of August and September 2001. The same factual claims are raised in Paragraph 6 of the Nelson Affidavit and page 4 of Clark's draft complaint. These

allegations correspond to the allegation raised at page 3, lines 15-21 in the Prepared Direct Testimony of Wayne Nelson on behalf of Clark filed in the Puget Sound Proceeding. See Exhibit 4.

  19. In Paragraphs 5 and 6 of its Motion, Clark describes how at the time it began the process of finding alternate supplies to provide power during the two month gap, the western power market was in a tumultuous state, experiencing prices that had risen substantially and price volatility. The same factual claims are raised in Paragraph 7 of the Nelson Affidavit and pages 4-5 of the draft Complaint. These allegations correspond to the allegation raised at page 4, lines 1-13 in the Prepared Direct Testimony of Wayne Nelson on behalf of Clark filed in the Puget Sound Proceeding. See Exhibit 4.

  20. In Paragraphs 7 and 8 of the Motion, Clark states that it was unable to locate a supplier with enough capacity to serve Clark's needs. Clark goes on to claim that it entered into a letter agreement with Kaiser for the sale of 140 MW of power at a rate of $325 per MWh. The same factual claims are raised in Paragraphs 8 through 9 of the Nelson Affidavit and page 5 of the draft Complaint. These allegations generally correspond to the allegation raised at page 5, line 11 through page 6, line 15 in the Prepared Direct Testimony of Wayne Nelson on behalf of Clark filed in the Puget Sound Proceeding. See Exhibit 4. However, Clark now raises for the first time the claim that it was unable to locate a supplier with enough capacity to serve Clark's needs. Before the FERC, Clark previously represented that "suppliers willing to make a commitment [for the August/September 2001 time period] were fairly scarce." Exhibit 4 at page 5, lines 12-14. Additionally, Clark conveniently fails to advise the Court that the prices then available from sources other than the BPA-marketed power ranged from $350 to $500 per MWh, and "prices for those months were predicted to exceed $1000 for daily purchases in those

months." Id. at page 5, lines 15-18. Thus, Clark's own testimony at the FERC corroborated Kaiser's position that power from sellers other than BPA was available and the price Clark paid to BPA for the electricity in question was at a discount from prevailing prices.

21.    Subsequent to the filing of Clark's prepared testimony in the Puget Sound Proceeding, Kaiser filed prepared answering testimony. Kaiser's answering testimony explained the contractual arrangements between Kaiser and BPA under the PSA. The explanation of the contractual arrangements between Kaiser and BPA corresponds to Paragraphs 3 through 7, supra. Kaiser also explained that BPA, not Kaiser, had sold the electricity in question to Clark. That explanation corresponds to Paragraphs 8 through 10, supra. Kaiser's testimony concluded that the PSA and the agreement between BPA and Clark showed that Kaiser had no control over the terms and conditions of BPA's sale of power to Clark, and, as a result, Clark should not be due any money from Kaiser. A copy of Kaiser's prepared testimony filed in the Puget Sound Proceeding is attached hereto as Exhibit 5.

22.    Following the submission of the prepared testimony, an evidentiary hearing was held before a FERC ALJ in which a record was developed on the circumstances faced in Pacific Northwest power markets during the period December 25, 2000 through June 20, 2001. Clark and Kaiser were given the opportunity during that evidentiary hearing to conduct live cross-examination of each other's witnesses. Thereafter, each party filed post-hearing briefs and proposed findings of fact with the ALJ.

23.    The ALJ subsequently issued her recommendations to the full Commission. In her Recommended Decision, the ALJ concluded that the prices in the Pacific Northwest during the relevant time period were the result of a number of factors, including a shortage of supply, excess demand, a drought, increased natural gas prices and price signals from