California markets. Recommended Decision, 96 FERC at 65,385. She also concluded that the Pacific Northwest is a competitive market, and that the transactions at issue in the case resulted from bilateral agreements between the parties. Id. She further concluded that "[u]nder these circumstances, the prices charged were not unjust or unreasonable and refunds should not be ordered in this proceeding." Id. Thus, she recommended that the Commission terminate the proceeding. Id.

24.    After the issuance of the Recommended Decision, numerous parties, including Clark and Kaiser, submitted comments to the full Commission advocating their various positions to the FERC. For its part, Clark disagreed with the ALJ's recommendations and requested that the FERC order refunds from Kaiser to Clark either in the Puget Sound Proceeding, or alternatively suggested that refunds be ordered in the WSCC Proceeding. This alternative suggestion was somewhat odd in that at the time that Clark made the suggestion, neither it nor Kaiser were parties to the WSCC Proceeding. Even today, neither are parties and Clark's motion to intervene in the WSCC Proceeding has been denied.

25.    Moreover, following the filing of its Comments on the Recommended Decision, Clark decided to ignore the Commission's procedural schedule and filed an additional pleading on November 20, 2001. Apparently dissatisfied with its prior efforts, Clark's belated November 20, 2001 pleading recapitulated its prior points, although re-arranged in the new pleading, much as Clark once again desires to try yet another reformulation of its claims.

26.     Currently, the ALJ's Recommended Decision in the Puget Sound

Proceeding is pending before the full Commission.

I declare under penalty of perjury that the following is true and correct.


Dated:  July 16, 2002                    _____

                                         Joseph Patrick Hoerner

EXHIBIT 1

07/16/02  13:22 FAX
☒002

Contract No. 95MS-94861
October 30, 1995

# POWER SALES AGREEMENT

## between the

## UNITED STATES OF AMERICA

## DEPARTMENT OF ENERGY

### acting by and through the

## BONNEVILLE POWER ADMINISTRATION

### and

## KAISER ALUMINUM & CHEMICAL CORPORATION

### Index to Sections

| Section | | Page |
|---|---|---|
| 1. | Effective Date and Term | 3 |
| 2. | Deliveries of Firm Power Between the Effective Date and Commencement Date | 3 |
| 3. | Commencement of Deliveries of Firm Power | 4 |
| 4. | Termination of Prior Contract and Other Contracts | 4 |
| 5. | Termination of This Agreement | 5 |
| 6. | Definitions | 9 |
| 7. | Exhibits; Interpretation | 16 |
| 8. | Contract Revisions and Waivers | 17 |
| 9. | Purchase and Sale of Annual Take-or-Pay Firm Energy | 18 |
| 10. | Monthly, Weekly, Daily, and Hourly Amounts of Firm Power | 19 |
| 11. | Rate Test Compliance | 22 |
| 12. | Rates and Charges | 23 |
| 13. | Billing and Payment | 23 |
| 14. | Relief from Take-or-Pay Obligation | 27 |
| 15. | Unauthorized Increase Charges | 28 |
| 16. | Changes in Firm Power Amounts | 29 |
| 17. | Reserves | 29 |
| 18. | Curtailment or Remarketing | 36 |
| 19. | Load Regulation, Unbundled Products, and Other Transmission Products | 42 |
| 20. | Provisions Relating to Delivery of Firm Power | 45 |
| 21. | Assignment of Agreement | 45 |
| 22. | Dispute Resolution | 45 |
| 23. | Force Majeure | 49 |

## Index to Sections

| Section |  | Page |
|---|---|---|
| 24. | Notices ................................................................................ | 50 |
| 25. | Hold Harmless ..................................................................... | 51 |
| 26. | Damages for Failure by BPA to Deliver .............................. | 51 |
| 27. | Obligations During Performance of This Agreement ........... | 52 |
| 28. | Third Parties ....................................................................... | 52 |
| 29. | Severability ......................................................................... | 52 |
| 30. | Entire Agreement ................................................................ | 53 |
| 31. | Signature Clause ................................................................ | 54 |

| Exhibit A | (General Contract Provisions) ........................ | 16 |
|---|---|---|
| Exhibit B | (Fees for Remarketing) .................................. | 16 |
| Exhibit C | (Rate Schedule) ............................................. | 16 |
| Exhibit D | (Monthly Amounts of Firm Power) ................. | 16 |
| Exhibit E | (Points of Delivery) ....................................... | 16 |
| Exhibit F | (Unrecoverable Costs and Transfer Costs) .... | 16 |
| Exhibit G | (Stability Reserve Scheme(s)) ....................... | 16 |
| Exhibit H | (Arbitration Procedures) ................................ | 16 |
| Exhibit I | (Use-of-Facilities Charge) ............................. | 16 |

This POWER SALES AGREEMENT, executed __11 / 6__ , 1995, by the UNITED STATES OF AMERICA (Government), Department of Energy, acting by and through the BONNEVILLE POWER ADMINISTRATION (BPA or Bonneville), and KAISER ALUMINUM & CHEMICAL CORPORATION (Company), a corporation incorporated under the laws of the State of Delaware. BPA and the Company are hereinafter sometimes referred to individually as "Party" and collectively as "Parties."

## WITNESSETH:

WHEREAS pursuant to section 5(d) of the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act), BPA is authorized to sell power to the Company; and

WHEREAS on August 31, 1981, BPA and the Company entered into Contract No. DE-MS79-81BP-90351, hereinafter referred to as "Prior Contract"; and

WHEREAS this Agreement provides for the termination of the Prior Contract; and

☑004

## 6. DEFINITIONS

(a)    "Agreement" means this Power Sales Agreement, Contract No. 95MS-94861.

(b)    "Commencement Date" means the date that deliveries commence under this Agreement.

(c)    "Contract Demand" means the maximum integrated hourly rate of delivery that the Company may request under this Agreement and is equal to 669.54 megawatts. The Contract Demand shall not be increased except through:

    (1)    a process conducted pursuant to section 5(d)(3) of the Northwest Power Act that provides for BPA to acquire increased reserves from its direct service industrial companies; or

    (2)    a technological allowance which BPA shall grant upon the Company's demonstration to BPA that such allowance meets the criteria for a technological allowance under the Prior Contract.

(d)    "Contract Year" means the period that begins on October 1 and ends on the following September 30.

(e)    "Control Area" or "Load Control Area" means the electrical (not necessarily geographical) area within which a controlling utility operating under all North American Electric Reliability Council standards has the responsibility to adjust its generation on an instantaneous basis to match internal load and power flow across interchange boundaries to other Control Areas. A utility operating a Control Area is called a "controlling utility."

☑005

07/16/02  13:22 FAX

(f)  "Demand" means the maximum integrated hourly rate of delivery during each month of each Contract Year for Firm Power deliveries under this Agreement, as specified in Exhibit D.

(g)  "Effective Date" means the date that this Agreement is signed by BPA.

(h)  "Event" means the period during which BPA restricts service to the Company under this Agreement to obtain Operating Reserves or Stability Reserves. The Event shall commence with the reduction in deliveries to the Company under this Agreement due to a BPA request for Operating Reserves or a transfer trip or signal that initiates Stability Reserves restriction. Unless reinstated as provided herein, the Event shall end when BPA's dispatcher notifies the Company that the load restricted for such reserves can be restored to service. Notwithstanding the foregoing, the Event will end (subject to reinstatement as provided herein) when system conditions occur that would result in tripping the Company for undervoltage or underfrequency load shedding. Any BPA restriction or series of BPA restrictions that make up an SR Event shall be treated as part of a single Event.

After an Event has ended, the Event shall be reinstated and continue as follows:

(1)  if the Event Magnitude was less than (Federal Load) x (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 10 hours;

(2)  if the Event Magnitude was equal to or greater than (Federal Load) x (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 21 hours;

07/16/02  13:22 FAX                                                    ☑006

(3)   if the Event Magnitude was equal to or greater than (Federal Load) x (30 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 42 hours;

(4)   if the Event Magnitude was equal to or greater than (Federal Load) x (60 minutes), then the Event shall be reinstated if BPA requests Reserves again within 84 hours; and

(5)   if the Event Magnitude was equal to or greater than (Federal Load) x (90 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 126 hours.

(i)   "Event Duration" means the total cumulative Event Minutes of the Event.

(j)   "Event Magnitude" means a value calculated for each Event as the sum of: (Requested Operating Reserves x Event Minutes associated with the use of Operating Reserves) + (Amount of Load Tripped for Stability Reserves x duration of the SR Event in minutes) for each restriction during the Event. The Event Magnitude shall not include loads restricted pursuant to operating reserves and stability reserve rights that BPA has under other contracts.

(k)   "Event Magnitude Limit" means the Federal Load multiplied by 90 minutes.

(l)   "Event Minute(s)" means the minute(s) of restriction (or any portion thereof) during an Event.

(m)   "Excess Firm Energy" means Firm Energy that would have been delivered to the Company for service to its expected Plant Load but is excess due to a reduction in the Company's actual Plant Load.

(n)   "Federal Load" means an hourly amount of energy equal to the lesser of (1) 50 percent of the Process Load operating immediately prior to the Event,

or (2) the sum of (A) 50 percent of the Firm Energy either scheduled to the Company, remarketed to other Qualified Purchasers, used by BPA, or any combination thereof, plus (B) 50 percent of the energy scheduled by Washington Water Power Company under its Firm Energy Sale Agreement with BPA, Contract No. 95MS-95104, **provided**, that the amount under section 6(n)(2)(B) shall not exceed 58 average megawatts.

(o)    "FERC" means the Federal Energy Regulatory Commission, or its successor.

(p)    "Firm Energy" means the Federal energy that the Company has agreed to purchase from BPA under this Agreement.

(q)    "Firm Power" means the monthly amounts of Demand and Firm Energy (HLH and LLH) purchased by the Company under this Agreement.

(r)    "Heavy Load Hours" or "HLH" means those hours that begin at 6 a.m. and end at 10 p.m., Monday through Saturday.

(s)    "Light Load Hours" or "LLH" means all hours that are not HLH.

(t)    "Material Plant Damage" means the inability of the Company to resume industrial production at all or any portion of its plant because of damage to plant production facilities resulting from a restriction; for example, the inability to resume electrolysis in one or more pots without rebuilding or substantially repairing such pot(s).

(u)    "Non-Federal Service" means, for the purposes of section 18(a) of this Agreement, the monthly amounts of demand, HLH energy and LLH energy that the Company chooses to acquire from non-Federal entities to serve a portion of its Plant Load during the term of this Agreement. The Company agrees that such amounts must be supplied to the Plant Load. The Company

may purchase additional amounts of non-Federal energy that will not be used in calculating the amount of curtailed energy

(v)   "Occurrence" means a system condition that results in the need for Reserves.

(w)   "Operating Reserves" means nonspinning reserves, provided by the Company under this Agreement, that are necessary to enable BPA either to reestablish its load/resource balance after loss of generation or transmission facilities, or to meet any of its other existing nonspinning operating reserve obligations. Operating Reserves provided under this Agreement shall not include, without limitation: (1) Stability Reserves provided by the Company in this Agreement; (2) operating reserves provided by the Company in any other contract; and (3) any other reserves that BPA has acquired under other arrangements.

(x)   "Plant Load" means the total electrical energy load at Company facilities eligible for BPA service during any given time period whether the Company has chosen to serve its load with BPA power or non-Federal power.

(y)   "Process Load" means, for an aluminum facility or a chlor-alkali facility, the electrolytic load.

(z)   "Qualified Purchaser" shall mean a utility or entity which: (1) is capable of performing the financial obligations undertaken for a sale or for an option to buy; (2) meets BPA's standards of service, including having an available transmission path; and (3) if required by State or Federal law, the purchaser has received all necessary approvals from appropriate regulatory bodies to conduct the transaction with BPA.

(aa)  "Rate Schedule" means the Industrial Firm Power Rate Schedule (IP-96.5), the Point-to-Point Transmission Rate Schedule, exclusive of the Delivery Charge therein (PTP-96.5), Ancillary Products and Services Rate Schedule

Ø 009

07/16/02  13:23 FAX

(APS-96), a rate schedule that includes the fixed curtailment fee for the option specified in section 18(a), and the General Rate Schedule Provisions established by BPA, and applicable to sales under this Agreement. When such Rate Schedule has received interim or final approval by FERC, then it shall be attached hereto as Exhibit C.

(bb)   "Rate Test" means: (1) the calculation of whether the total average price in mills per kilowatthour, using the Rate Schedule, to determine if such total average price is less than or equal to the price specified in section 11(a) of this Agreement; (2) the determination of whether the fixed curtailment fee, for purposes of section 18(a) of this Agreement, is less than or equal to the amount specified in section 11(b); and (3) the determination of whether the use-of-facilities charge, as may be revised pursuant to section 8(b)(2) and Exhibit I, is less than or equal to the amount determined pursuant to section 11(c). The Rate Test is further described in section 11 of this Agreement.

(cc)   "Requested Operating Reserves" means the amount of Operating Reserves, pursuant to section 17, that the BPA dispatcher requests the Company to trip for purposes of providing Operating Reserves.

(dd)   "Reserves" means the Stability Reserves and Operating Reserves provided by the Company under this Agreement.

(ee)   "SR Event" means the period during which BPA implements a Stability Reserve restriction. An SR Event shall be an Event for all purposes. The beginning of the SR Event shall be identified by a transfer trip or other signal from BPA to the Company restricting delivery of energy under this Agreement. Unless reinstated as provided herein, the end of the SR Event shall be identified by the BPA dispatcher's notification to Company that delivery of all energy to which Company is entitled under this Agreement can be restored. Notwithstanding the foregoing, the Event will end (subject to

☑010

reinstatement as provided herein) when system conditions occur that result in tripping the Company for undervoltage or underfrequency load shedding. If such undervoltage or underfrequency load shedding signal is received by the Company prior to Event Minute 3 of the SR Event, then the restriction shall be deemed an event of Force Majeure until service is restored.

After an SR Event has ended, the SR Event shall be reinstated and continue as follows:

(1)    if the SR Event duration was 5 Event Minutes or less, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 2 hours or less of the last SR Event Minute;

(2)    if the SR Event duration was more than 5 Event Minutes but not more than 15 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 4 hours or less of the last SR Event Minute;

(3)    if the SR Event duration was more than 15 SR Event Minutes but not more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 6 hours or less of the last SR Event Minute; and

(4)    if the SR Event duration was more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 8 hours or less of the last SR Event Minute.

(ff)    "Stability Reserves" means those reserves, provided by the Company under this Agreement, that are necessary to ensure the stability of the Federal Columbia River Transmission System against losses of transmission facilities

Contract No. 95MS-94861

pursuant to the scheme(s) in Exhibit G or any additional scheme(s) adopted pursuant to section 17 herein. Stability Reserves provided under this Agreement shall not include, without limitation: (1) stability reserves provided by the Customer in the General Transmission Agreement or in other agreements; (2) operating reserves or forced outage reserves that BPA has acquired under this Agreement or under other agreements; and (3) any other reserves that BPA has acquired under other arrangements.

(gg)  "Take-or-Pay Obligation" means the obligation, as modified by section 14, of the Company to pay for the Firm Power purchased by the Company under this Agreement. On an annual basis, the amounts of HLH and LLH Firm Energy that the Company agrees to purchase from BPA is specified in section 9(b) of this Agreement. The monthly amounts of HLH and LLH Firm Energy shall be as specified in Exhibit D. The monthly Demand amounts, for the purposes of this Take-or-Pay Obligation, shall be the monthly Demand amounts specified in Exhibit D. If the calculation of the Take-or-Pay Obligation for a Contract Year for which Demands are not yet required to be specified under section 10(a) becomes relevant, then the Demands for such Contract Year shall be calculated by dividing the annual HLH Firm Energy, if any, for each such Contract Year, as specified in section 9(b), by the number of HLH in a Contract Year. Weekly, daily, and hourly amounts of HLH and LLH Firm Energy are the amounts submitted by the Company pursuant to section 10 of this Agreement.

7.  **EXHIBITS; INTERPRETATION**

Exhibit A (General Contract Provisions), Exhibit B (Fees for Remarketing), Exhibit C (Rate Schedule), Exhibit D (Monthly Amounts of Firm Power), Exhibit E (Points of Delivery), Exhibit F (Unrecoverable Costs and Transfer Costs), Exhibit G (Stability Reserve Scheme(s)), Exhibit H (Arbitration Procedures), and Exhibit I (Use-of-Facilities Charge) are attached hereto and made a part of this Agreement. If there is a conflict between the body of this Agreement and any exhibit, then the

(c)   **Other Purchases**

This Agreement does not limit the Company's right to purchase power from BPA, consistent with Federal statutes, under other agreements, or to purchase power from third parties.

(d)   **Minimum Demand for Transmission**

A Company may elect to specify a minimum level of Demand for transmission for any month for the remaining term of this Agreement at the time the Company makes its submission of monthly amounts of Firm Power. Any request to specify a minimum level of Demand made after February 1, 1996, shall be subject to available transmission capacity as described in section 10(a). The Company may assign any excess minimum Demand for transmission consistent with terms for Assignment of Transmission Service under BPA's Point-to-Point Transmission Service Tariff. The amount of minimum Demand for transmission as elected or assigned shall be specified in Exhibit D.

10.   **MONTHLY, WEEKLY, DAILY, AND HOURLY AMOUNTS OF FIRM POWER**

(a)   **Monthly Amounts of Firm Power**

Not later than the February 1, immediately prior to October 1 of each Contract Year, the Company shall specify monthly amounts of Demand and HLH and LLH Firm Energy for such Contract Year. The total of the monthly amounts of HLH and LLH Firm Energy shall equal the annual amounts specified in section 9(b) for such Contract Year. The Company may set its Demand in each month in the 1996-1997 Contract Year at any level up to its Contract Demand. Any increase in amounts of Demand for a specific month in a later Contract Year above the greater of: (1) the amount of Demand for such month in the previous Contract Year; or (2) the minimum level of Demand for transmission specified in Exhibit D; is subject to BPA's determination of available transmission capacity. If additional generating resources integrated at points with transmission capacity available to the

☑ 013

Company's points of delivery are available for BPA's use or purchase, then BPA shall determine that transmission capacity is available under this Agreement. BPA shall also treat as available any transmission capacity made available by the Company to BPA through a reduction in demand under any other transmission agreement with BPA. If BPA determines that firm transmission capacity is not available for the Company's request, BPA will notify the Company within 60 days of the approved level of Demand. Each year, Exhibit D shall be revised to reflect the amounts specified by the Company, consistent with this section 10(a).

(b)    **Weekly, Daily, and Hourly Amounts of Firm Power**
The Company shall either:  (i) provide advance submittals of weekly, daily, and hourly amounts of Firm Energy and any Excess Firm Energy pursuant to section 10(b)(1), which will remain as submitted unless changed pursuant to section 10(b)(2); or (ii) provide such submittals pursuant to the terms of section 10(b)(2) only.

(1)    **Advance Submittals of Weekly, Daily, and Hourly Amounts of Firm Energy**
The Company may submit weekly, daily, and hourly amounts in advance of, but not later than allowed under section 10(b)(2).  Such advance submittals shall specify HLH and LLH amounts of Firm Energy to be delivered hereunder until the Company changes its submittal.  The Company may change any advance submittal pursuant to section 10(b)(2).  All advance submittals shall include a beginning and ending hour.

(6)     **Makeup Power**

At the Company's request, BPA shall sell and deliver to the Company energy in excess of the amount shown in Exhibit D (Makeup Power), at the applicable energy charge only established for Firm Energy in the Industrial Firm Power Rate in the Rate Schedule, to the extent that such energy is needed by the Company to restore its operations following a restriction. Such Makeup Power shall not subject the Company to any Unauthorized Increase or other charge.

18. **CURTAILMENT OR REMARKETING**

The Company shall have a one-time option, at the time the Company makes its first submission of monthly amounts of Firm Power pursuant to section 10(a) of this Agreement, to either: curtail its purchases pursuant to section 18(a); or remarket Excess Firm Energy pursuant to section 18(b). Following the Company's election, BPA and the Company shall operate under the terms and conditions of either section 18(a) or section 18(b), as applicable.

(a)    **Curtailment of Excess Firm Energy for a Fixed Fee**

The Company may curtail its Plant Load below the sum of its Take-or-Pay Obligation plus any amount of Non-Federal Service the Company identifies at the time it elects this curtailment option. BPA shall relieve the Company of its Take-or-Pay Obligation for Demand and Firm Energy for any such curtailed amounts and the Company shall pay BPA the fixed curtailment fee in mills per kilowatthour for each kilowatthour of such curtailed amounts, as specified in the Rate Schedule. Selection of this curtailment option shall relieve the Company of its obligation to pay the use-of-facilities charge specified in Exhibit I for amounts of curtailed energy.

(1)    The Company shall provide BPA as much notice as possible, but not less than 48 hours, of any curtailment of Firm Power usage.

☑015

(2)    If the Company chooses to use Non-Federal Service for part of its Plant Load, the Company shall specify the monthly amounts of demand, HLH energy, and LLH energy of Non-Federal Service, if any, for the term of this Agreement. BPA shall not be obligated to serve these specified monthly amounts, and any service to these amounts shall be subject to an Unauthorized Increase charge, as provided for in section 15(c).

(3)    Curtailed energy shall be equal to the Company's Take-or-Pay Obligation for Firm Energy reduced by the relief from take-or-pay provisions of section 14, minus the Measured Energy for Firm Power delivered under this Agreement.

(4)    Election of this curtailment option operates to assign the Company's right to transmit an amount of energy equal to the curtailed energy to BPA.

(b)    **Remarketing Excess Firm Energy Without a Fixed Fee**

(1)    **Notice and Request to Remarket**
The Company shall request that BPA remarket Excess Firm Energy by notifying BPA of:

(A)    the amount and minimum duration of Excess Firm Energy to be remarketed; and

(B)    the manner pursuant to section 18(b)(2) in which the Company wants BPA to remarket the Excess Firm Energy.

(2)    **Remarketing Options**
The Company may select one or more of the following options for remarketing Excess Firm Energy:

07/16/02  13:24 FAX                                                  ☑016

(A)    The Company may identify one or more Qualified Purchasers that have agreed to purchase some or all of the Excess Firm Energy under specified terms and conditions at agreed-upon prices or price formulas and for agreed-upon amounts and durations.  The Company shall provide BPA at least  the notice specified in section 18(b)(3) prior to the date that deliveries are to begin under each proposed sale.

(B)    The Company may arrange in advance for a Qualified Purchaser(s) to purchase any Firm Power that becomes Excess Firm Energy during any period for which the Company and a Qualified Purchaser may agree.  The Company shall provide BPA at least the notice specified in section 18(b)(3) prior to the date on which the prearrangement becomes effective.  In addition, the Company shall notify BPA as required in section 10(b) when deliveries are to begin under the arrangement.

(C)    The Company may request that BPA find purchasers for the Excess Firm Energy.  If the Company chooses, it may request that BPA seek sales of specified amounts for daily, weekly, monthly, or other specified durations, and the Company may specify minimum prices or price ranges for the sales.  BPA and the Company shall agree on the price of the sale at the time of the transaction unless the daily limitations in section 18(b)(4)(E) apply.  BPA shall promptly notify the Company of the sales made on the Company's behalf.

(D)    The Company and BPA may agree to a price for use in crediting the Company's wholesale power bill under section 18(b)(4).  BPA shall have discretion to dispose of or use

07/16/02  13:24 FAX                                                    ☒017

such Excess Firm Energy without regard to the procedures associated with other options for disposal, and the Company shall have no further rights with respect to such Excess Firm Energy that is subject to such agreement.

(3)    **Applicability of Preference Provisions**

Excess Firm Energy remarketed by BPA shall be subject to applicable statutory provisions regarding preference. BPA shall notify the Company within the time period specified below if BPA or another Qualified Purchaser with public preference has elected to perform the agreement.

| Duration of Sale | Minimum Notice Period to Notify BPA | Maximum Period for BPA to Respond to Company |
|---|---|---|
| Up to 1 month | 48 hours | 24 hours |
| Up to 6 months | 7 days | 2 days |
| Over 6 months | 14 days | 7 days |
| Prearrangements under section 18(b)(2)(B) | 21 days | 14 days |

(4)    **Crediting the Company's Wholesale Power Bill**

(A)    During months when Excess Firm Energy is being remarketed by BPA, such power shall continue to be included in the amount of Firm Power billed by BPA as if delivered to the Company.

(B)    BPA may sell the Excess Firm Energy to the Qualified Purchaser(s) as arranged by the Company under options section 18(b)(2)(A) and section 18(b)(2)(B) or dispose of such power on whatever alternative terms that BPA may separately arrange. In either event, BPA shall credit the Company for the Excess Firm Energy revenues based on the price(s) agreed to

Contract No. 95MS-94861

⚐018

between the Company and the Qualified Purchaser(s) net of the amounts specified in section 18(b)(4)(C).

(C)    BPA shall determine the revenues for Excess Firm Energy delivered during a month by subtracting from the amount paid by the Qualified Purchaser (or the amount agreed to be paid or credited if BPA elects not to remarket to the Qualified Purchaser, disposes of or uses the Excess Firm Energy under section 18(b)(2)(D), or remarkets the Excess Firm Energy under section 18(b)(2)(C)): (i) any applicable transmission charges or losses specified in section 18(b)(4)(F); and (ii) the remarketing fee, as specified in Exhibit B. The fee or the pro rata share of the fee that the Company would have paid to another entity under a transaction under section 18(b)(2)(B) shall be deducted from revenues when BPA elects to retain the Excess Firm Energy for itself.  No charges shall apply under section 18(b)(4)(C)(i) and section 18(b)(4)(C)(ii) when BPA uses such Excess Firm Energy for its own use or disposes of such Excess Firm Energy under section 18(b)(2)(D).

(D)    BPA shall credit the Company's wholesale power bill for revenues from sales of Excess Firm Energy in the month in which BPA uses such Excess Firm Energy for its own use or disposes of such Excess Firm Energy under section 18(b)(2)(D), BPA is paid for such Excess Firm Energy under section 18(b)(2)(C), or BPA is paid for such Excess Firm Energy by the Qualified Purchaser.  If the amount of the credit during any month exceeds the power bill amount, then BPA shall pay the Company the amount of the difference.

(E)    BPA shall credit the Company for sales made under section 18(b)(2)(C) on Company's behalf subject to the

07/16/02  13:25 FAX                                              ☑019

limitations in this paragraph. For sales of 1 month duration or less, if BPA notified the Company at the start of a transaction that it was subject to daily remarketing limitations and BPA is simultaneously remarketing power for the Company and selling nonfirm energy on a daily basis, then the Company shall receive credit for the energy that BPA remarkets on the Company's behalf on such days at BPA's average sale price for nonfirm energy (including remarketed energy) for such day; **provided, however,** BPA shall have no obligation to credit the Company at such average daily price to the extent that the total amount of Excess Firm Energy remarketed under similar contract provisions for the Company and other entities providing for daily remarketing limitations exceeds the following limits:

| If BPA's actual daily average sales (excluding remarketed amounts) are— | | Limit to total amount of remarketed energy |
|---|---|---|
| equal to or greater than (aMW) | but less than (aMW) | (aMW) |
| 0 | 600 | 25% of BPA actual sales |
| 600 | 1,000 | 200 |
| 1,000 | 1,500 | 250 |
| 1,500 | 3,000 | 300 |
| 3,000 | 4,000 | 400 |
| 4,000 | 5,000 | 500 |
| 5,000 | -- | 600 |

In the event the above limits are exceeded, the Company shall be credited for its pro rata share of remarketed energy at the average daily price. All sales of remarketed energy for each day under the daily remarketing limitations shall be considered made under a single active schedule to determine remarketing fees. Sales of remarketed energy under the daily remarketing limitations shall be considered made over the southern intertie during the months of April through July, and

in the Pacific Northwest during other months. The Company may request that BPA remarket the remainder of its Excess Firm Energy at the best available price for additional energy, or the Company may arrange to store the Excess Firm Energy for sale at another time. BPA shall not discriminate against the Company in the storage or disposal of such remaining Excess Firm Energy.

(F)    There are no additional transmission charges for Excess Firm Energy except when:

(i)    BPA incurs incremental transfer costs, including losses,

(ii)    the Qualified Purchaser receiving delivery would have paid a charge for low-voltage delivery higher than the charge, if any, paid by the Company.

The Company shall pay such incremental costs. Any deliveries of Excess Firm Energy over BPA's interties shall be charged BPA's standard intertie tariffs. Losses will be valued at the price of the remarketed power.

## 19. LOAD REGULATION, UNBUNDLED PRODUCTS, AND OTHER TRANSMISSION PRODUCTS

(a)    **Purchase of Load Regulation**

If the Company is within BPA's Control Area, or if BPA provides load regulation services to the Company through a third party, the Company shall purchase load regulation from BPA. The charge for load regulation shall be as specified in Exhibit C.



### Department of Energy

Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208-3621

POWER BUSINESS LINE

March 23, 1998

In reply refer to: PSB/Spokane

Amendatory Agreement No. 1 to
Contract No. 95MS-94861

Mr. Peter Forsyth
Vice President, NW External Affairs
Kaiser Aluminum & Chemical Corporation
825 NE. Multnomah, Suite 960
Portland, OR 97232

Dear Mr. Forsyth:

This letter agreement (Amendatory Agreement) constitutes an amendment to Contract No. 95MS-94861 (Power Sales Agreement) between the Bonneville Power Administration (BPA) and Kaiser Aluminum & Chemical Corporation (Company). BPA and the Company are hereinafter sometimes referred to individually as "Party" and collectively as "Parties." BPA and the Company have executed an interim transmission services agreement (hereinafter referred to as "Interim PTP Service Agreement") under which BPA has provided Point-to-Point Transmission Service over the Federal Columbia River Transmission System (FCRTS) pursuant to the terms and conditions of the Point-to-Point Transmission Services tariff and the 1996 Point-to-Point Firm Transmission Rate Schedule (PTP-96). The Parties are negotiating the terms and conditions of a final transmission service agreement (Final PTP Service Agreement) which will supersede the Interim PTP Service Agreement. The Parties have agreed to amend the Power Sales Agreement as follows:

1.    **EFFECTIVE DATE.** This Amendatory Agreement, when executed, shall become effective as of the date that the Interim PTP Service Agreement becomes effective.

2.    **DEFINITIONS.** All capitalized terms used herein shall be as defined in the Power Sales Agreement or, if not defined in the Power Sales Agreement, as defined in the General Rate Schedule Provisions, unless otherwise specified in this Amendatory Agreement.

"PTP Service Agreement" shall mean the Interim or Final PTP Service Agreement, as applicable.

3.    **AMENDMENT OF POWER SALES AGREEMENT.** The Power Sales Agreement is amended as follows:

(a)    Section 8(b)(2) is deleted and replaced by the following:

☒022

4

section 14, minus the Measured Energy for Firm Power delivered under this Agreement."

(k)    A new section 18(b)(1)(C) is added as follows:

"(C)   the assignment to BPA of that portion of its rights under the PTP Service Agreement, associated with the energy to be remarketed and necessary to allow BPA to use such assigned rights to remarket Excess Firm Energy for the Company, subject to the assignment provisions of the Point-to-Point Transmission Services tariff and the terms of section 18(b)(4)(F)."

(l)    Section 19(d) is deleted and replaced by the following:

"(d)   Unbundled Products and Other Transmission Services.  BPA shall offer to the Company the ancillary services, the network integration transmission product, the point-to-point transmission product, and the intertie transmission products that BPA offers to its utility customers.  BPA may offer to the Company other unbundled services. If the Company elects to purchase such products, the Parties agree to amend the appropriate provisions of this Agreement and/or the PTP Service Agreement."

(m)    Section 19(f) is deleted in its entirety.

(n)    Section 20(a) is deleted and replaced by the following:

"(a)   Delivery to Company's Firm Load.  BPA shall make available Firm Power at the points of interconnection specified in Exhibit C-1 of the PTP Service Agreement. Delivery of such Firm Power over the Network to the Company's Plant Load shall be as provided for in the PTP Service Agreement."

(o)    Section 20(b) is deleted and replaced by the following:

"(b)   Other Provisions Relating to Delivery.  Other provisions applicable to delivery (1) at the points of interconnection specified in Exhibit C-1 of the PTP Service Agreement shall be as specified in Exhibit A of this Agreement, and (2) over the Network to the Company's Plant Load shall be as specified in the PTP Service Agreement."

(p)    Section 26 is deleted and replaced by the following:

"26.   DAMAGES FOR FAILURE BY BPA TO DELIVER.  In the event BPA fails to deliver the hourly amounts of Firm Energy scheduled by the Company under this Agreement to the plant's Point of Delivery, and such delivery is not restricted by BPA pursuant to its Reserve rights under this Agreement, or pursuant to the curtailment rights under the PTP Service Agreement, or such delivery is not excused by section 4(f) of Exhibit A, BPA shall pay the Company (on the date payment by the Company for the Firm Energy would otherwise have been due under this Agreement):

EXHIBIT 2

**KAISER ALUMINUM**
NORTHWEST REGIONAL HEADQUARTERS

February 2, 2001                                    VIA FAX

Mr. Wayne Nelson
General Manager
Clark County PUD
(360) 992-3204

Re: Kaiser's Remarketing Agreement

Dear Mr. Nelson:

This letter will confirm our conversations on February 2, 2001 with you and Mr. Dana Zentz of EES Consulting regarding Kaiser's right to remarket energy under its 1996 Power Sales Contract with BPA. Under the contract, Kaiser may request remarketing by submitting a notice to BPA stating the Qualifying Purchaser (which would be Clark County PUD (PUD) in this instance), the start and end date of the sale, the price, the delivery point, and any other terms. BPA may either implement the sale to the PUD or, at its option, may choose to purchase the energy for its own use at the same terms and conditions. If the sale is for one month or less, BPA has 24 hours after Kaiser's notice to decide if it wants to purchase the energy; if the sale is for more than one month but no greater than 6 months, then BPA has 2 days to decide.

If the sale to the PUD is implemented by BPA, then BPA will contract with the PUD for the sale of the energy at the price, terms and conditions stated in

Kaiser's notice and other standard terms that BPA may request. The energy purchased by the PUD will be federal energy and the PUD's payment will be made to BPA. The energy will be delivered under Kaiser's PTP agreement with BPA. The POI will be the "BPA's System POI" and the point of delivery will be moved from Kaiser's facilities on a non-firm basis to the point of delivery named in Kaiser's notice and the PUD's contract with BPA. BPA will pay Kaiser for the remarketed energy under the terms of Kaiser's 1996 Power Sales Contract and a separate Confirmation Agreement with BPA consistent with the terms of Kaiser's notice. Therefore, pursuant to our discussions, the PUD and Kaiser (Parties) have agreed to the following:

Kaiser will submit a request to BPA on Friday, February 2, 2001 at approximately 4:30 p.m. PST to remarket 140 Mw of energy for the months of August 2001 and September 2001. BPA will have 48 hours to respond to this request and notify Kaiser if i) they will purchase the energy under the terms agreed to between the Parties or ii) facilitate the sale to the PUD.

With regard to the remarketing request, the PUD has requested that Kaiser's offer remain open until 12:00 noon on Tuesday, February 6, 2001, to allow the Board to approve the necessary financing arrangements for payment. This is acceptable, provided that Kaiser has the right to withdraw the offer at any time before the PUD executes a Confirmation Agreement with BPA.

☑025

Provided Kaiser can secure short-term firm transmission utilizing its PTP transmission agreement with BPA, BPA will deliver the energy to the ALCOA substation or other points as mutually agreed to by the Parties.

The Parties agree that the PUD shall pay to BPA on March 15, 2001 the amount of $53,934,878.00 as shown in the attached monetization table or if a different payment date is mutually agreed to by the Parties then the payment amount shall be adjusted consistent with the attached table.

Sincerely,

Joseph P. Hoerner

Energy Supply Manager

Please indicate your acceptance of the terms of this agreement by signing below and returning a copy to me. Fax: (509) 242-1098

_____

_____

Date

cc:   Mr. Dana Zentz, EES Consulting

3