☒026

# Clark Public Utility Power Remarketing Monetization
## February 1, 2001

| Month | Days | MW | MWhrs | Purchase Price | Undiscounted Cash Flow |
|---|---|---|---|---|---|
| Aug | 11 | 140 | 104,160 | $335.00 | $ 33,852,000 |
| Sep | 10 | 140 | 108,800 | $325.00 | $ 32,760,000 |
| Oct | | | | | |
| | | | | | $ 66,612,000 |

### Discount Calculation

| Curve Date | Total Rate | Discount Factor | Discounted Cash Flow |
|---|---|---|---|
| Sep-01 | 6.50% | 0.9624 | $ 32,578,244 |
| Oct-01 | 6.50% | 0.9572 | $ 31,356,634 |
| Nov-01 | | | |
| | | | $ 63,934,878 |

3/16/01

EXHIBIT 3

POOR QUALITY ORIGINAL(S)



**Department of Energy**
Bonneville Power
Administration
P.O. Box 3621
Portland, OR  97208-3621

**POWER BUSINESS LINE**
Trader and Scheduling Phones

| | |
|---|---|
| Brenda Anderson | (503) 230-6810 |
| Dan Le | (503) 230-3144 |
| Young Linn | (503) 230-3163 |
| Bill Lamb | (603) 230-3125 |
| Mark Miller | (503) 230-4003 |
| David Mills | (503) 230-7558 |
| BPA Trading Floor Fax | (503) 230-7463 |
| BPA Preschedule Fax | (503) 230-3039 |
| BPA SW Preschedule | (503) 230-3915 |
| BPA NW Preschedule | (503) 230-3913 |
| BPA S. Idaho Presch. | (503) 230-4311 |
| BPA Real Time | (503) 230-3341 |
| | or 230-4194 |

| | |
|---|---|
| Date: | February 06, 2001 |
| To: | Clark Public Utilities |
| | 1200 Ft Vancouver |
| | Vancouver, WA  98068 |
| | |
| Attn: | James Sanders |
| Phone: | 360-992-3452 |
| Fax: | 360-992-3140 |
| | |
| Presch: | 503-251-5198 |
| Real Time: | 503-251-4324 |
| PS/RT | 503-251-5201 |
| FAX: | |

## CONFIRMATION AGREEMENT

The following memorializes the terms of a transaction agreed to by Bonneville Power Administration (BPA) and Clark Public Utilities (CPU).  Transactions hereunder are in accordance with reference contract or enabling agreement DE-MS79-81BP90489.

Transaction Date:  2/6/01           Traders:  Mark Miller (BPA) and James Sanders (CPU)

BPA Contract:  01PH-24068

---

| | |
|---|---|
| Seller of Energy: | BPA |
| Buyer of Energy: | Clark Public Utilities |
| Product: | Surplus firm power |
| Point of Delivery: | Alcoa Substation |
| Alternate Point | Where the Federal generating system interconnects with BPA's transmission |
| of Delivery: | network.  Customer will provide transmission from the Federal generating system. Energy taken to an alternate POD is take-or-pay and liquidated damages do not apply.  Customer is responsible for payment of energy if transmission is curtailed to APOD. |

| Start of Term | End of Term | Demand Limit | Hours | Amount (MWH/hr) | Total MWh | Price | Holiday Excluded | Revenue / Cost |
|---|---|---|---|---|---|---|---|---|
| 8/1/01 | 8/31/01 | 140 | ALL | 140 | 104,160 | $325.00 | | |
| 9/1/01 | 9/30/01 | 140 | ALL | 140 | 100,800 | $325.00 | | |

Energy Transaction Total:                                    See Additional Provisions below

Page: 1 of 2 CPU 01PB-24068

Sent by: CLARK PUD ENERGY RESOURCES        3609923140;        02/09/01  4:39PM; JetFax #905; Page 3/3

**Additional Provisions**
Transmission will be provided under Kaiser Aluminum & Chemical Corp. (KACS) Contract No. 06MS-96107. Payment for transmission will remain with KACS.

CPU shall pay to BPA $64,080,608.00 on March 28, 2001, which represents net payment/NPV of full payment for all energy purchased under this agreement. This confirmation agreement shall be modified on or before March 15, 2001, if a change to the payment date is required.

**Scheduling**
All energy will be shown in Pacific Prevailing Time
– HLHs are defined as HE 0700 – HE 2200, Monday through Saturday (excludes Sundays and NERC holidays)
– LLHs are defined as HE 0100 – HE 0600, HE 2300 and HE 2400, Monday through Saturday and all day Sundays and NERC holidays.
– All or FLH is defined as HE 0100 – HE 2400.

Energy shall be prescheduled, with source and sink identified, by 1000, or as mutually agreed, on the day that both parties observe as a workday preceding the date of delivery. Schedules may only be changed due to uncontrollable forces as defined by the reference contract or by mutual agreement of both parties.

**Billing**
Billing and payment under this agreement shall be made consistent with and as a specific item in the Wholesale Power Bill.

Unless otherwise specified in this Agreement, all administrative and operational provisions required to perform this Agreement shall be those described in the reference contract, including provisions related to delivery, scheduling (if applicable), billing, payments, metering, access to facilities, dispute resolution, uncontrollable forces, continuity of services, and contract interpretation.

This confirmation agreement contains all of the terms and conditions of this transaction and expressly limits acceptance to the terms stated herein, and any additional or different terms proposed by Clark Public Utilities are rejected unless expressly agreed to in writing by BPA.

If the above accurately reflects your understanding of our agreement, please indicate your approval by signing a copy of this agreement and returning via fax to BPA.

**AGREED AND ACCEPTED**

| Bonneville Power Administration | Clark Public Utilities |
| --- | --- |
| David E. Mills | Name: Wayne L. Nelson |
| Manager, Trading Floor | Title: General Manager/CEO |
| Date: 2/8/01 | Date: 2-8-01 |

Page 2 of 2 CPU 01PB-24068

EXHIBIT 4

07/16/02  13:26 FAX                                                ☒029

Exhibit No. PNG___(WWN-1)

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Puget Sound Energy, Inc.,                )
                                         )
        Complainant,                     )
                                         )
        v.                               )        Docket Nos. EL01-10-000
                                         )        and EL01-10-001
All Jurisdictional Sellers of Energy     )
And/or Capacity at Wholesale Into        )
Into Electric Energy And/or Capacity     )
Markets in the Pacific Northwest,        )
Including Parties to the Western         )
Systems Power Pool Agreement,            )
                                         )

PREPARED DIRECT TESTIMONY OF
WAYNE W. NELSON
WITNESS FOR
CLARK PUBLIC UTILITIES

1   Q.   PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.

2   A.   My name is Wayne W. Nelson.  I am the Chief Executive Officer of Clark

3        Public Utilities at 1200 Ft. Vancouver Way, Vancouver, WA.  Mailing

4        address Post Office Box 8900, Vancouver, WA 98668.

5   Q.   PLEASE DESCRIBE YOUR EDUCATION AND EXPERIENCE

6   A.   I received a Bachelor's degree in Political Science from the University of

7        Washington and a JD degree from the Northwestern School of Law in

8        Portland, Oregon.  I practiced law in the private sector from 1978 until

9        1989.  In 1989 I became General Counsel for Clark PUD and held that

10       position until January of 1999 when I became the Chief Executive Officer for

Exhibit No. PNG___(WWN-1) page 2

1          Clark. I have held the positions of CEO and General Counsel since that time.

2      Q.    WHAT IS THE PURPOSE OF YOUR TESTIMONY?

3      A.    My testimony will address the power purchase transaction entered into by

4            Clark Public Utilities ("Clark") in February of 2001.  Simply put, I will

5            describe (1) the situation that Clark faced, (2) the actions that Clark took, (3)

6            the reasons why Clark took those actions, and (4) the consequences of

7            those actions.

8      Q.    DO YOU PRESENT ANY EXHIBITS?

9      A.    Yes. Exhibit PNG__ (WWN-2) is the letter agreement between Clark and

10           Kaiser. Exhibit PNG__ (WWN-3) is a BPA confirmation of the transaction.

11     Q.    PLEASE DESCRIBE CLARK.

12     A.    Clark is a customer-owned public utility district providing electric, water and

13           wastewater service in Clark County, Washington.  The utility is a municipal

14           corporation organized under the laws of the State of Washington and was

15           formed by a vote of the people in 1938.  The utility consists of four separate

16           operating systems, electric, generation, water and wastewater.  Clark

17           provides electric service to about 152,000 customers, water service to

18           nearly 25,000 customers, and wastewater service to about 600 customers.

19           The generating system consists of the 248 MW River Road Generating Plant

20           with a combined cycle, combustion turbine that entered commercial

21           operation in late 1997.  The utility is governed by a three-member elected

22           board of commissioners. Each member serves a six-year term with one of

Exhibit No. PNG___(WWN-1)  page 3

1       the positions open every two years.

2   Q.   WHO DOES CLARK SERVE?

3   A.   Clark serves the electrical needs within the political boundaries of Clark

4        County, Washington.  In CY 2000, the utility sold approximately 4.2 billion

5        kWh to residential, commercial and industrial customers located within Clark

6        County.  Clark's historical peak load occurred in December of 1996 at

7        approximately 1,063 MW.

8   Q.   WHAT WAS CLARK'S POWER SUPPLY ACQUISITION STRATEGY.

9   A.   With minor exceptions, the utility was a requirements customer of the

10       Bonneville Power Administration (BPA) from its beginning through 1996.  In

11       1981, Clark entered into power contracts with BPA which expired on July

12       31, 2001.  In 1996, Clark elected to diversify its power supply and

13       constructed the River Road Generating Plant mentioned above and entered

14       into five-year power supply contracts with Avista Energy and PacifiCorp to

15       replace most of the BPA contract amount through July 31, 2001.  In

16       1998,while Clark was relying primarily on non-BPA arrangements, BPA

17       decided to extend all of its contracts by two-months to shift its contract

18       expiration date to September 30 to coincide with its fiscal year  As a result,

19       in 2000 when Clark sought to return to BPA under its subscription process,

20       BPA would only offer Clark a net requirements contract beginning on

21       October 1, 2001, which created a two-month gap in Clark's supply portfolio.

22  Q.   PLEASE DESCRIBE THE CALIFORNIA ENERGY CRISES AND ITS EFFECT ON

Exhibit No. PNG___(WWN-1)  page 4

1    THE NORTHWEST MARKET.

2    A.    The dysfunctional market in California had a profound effect on the markets

3    available to Northwest utilities.  The existence of north/south intertie

4    capacity brought the Northwest trading hubs into the turmoil existing in

5    California.  Any utility, Clark included, that needed to purchase power at one

6    of the trading hubs was subject to incredible volatility that mirrored the

7    California markets.

8    Q.    PLEASE DESCRIBE THE SITUATION THAT CLARK FACED IN THE FALL AND

9    WINTER OF 2000.

10   A.    The fall and winter of 2000 witnessed extreme volatility in both the natural

11   gas and electric markets caused by the instability in the California markets

12   for both these commodities.  Clark saw natural gas on the daily spot market

13   reach $40 per MMBTU and electricity reach $5,000 per MWH.  During that

14   same period of time, Clark discussed  with BPA, a potential purchase for the

15   months of August and September to fill the above-mentioned gap in ITS

16   resource picture due to the shift in BFA's  contract expiration date.  Until the

17   effects of the dysfunctional California market were felt in the Northwest, it

18   had been Clark's intent to purchase market-based power during those two

19   months possibly on a daily basis to fill in the gap.  When it became obvious

20   that the California situation had made that a very risky proposition, Clark

21   approached the BPA to make a purchase under its TACUL rate schedule (i.e.,

22   "Targeted Adjustment Charge for Uncommitted Loads") that was offered to

Exhibit No. PNG___(WWN-1)  page 5

1    cover those utilities that had a gap in their resource picture due to  BPA's

2    shift in contract year.  In early 2001,  BPA informed Clark that due to the

3    volatility of the markets in California the TACUL rate schedule would have to

4    be based on market rates in effect at the time.  Clark then set about

5    attempting to find an alternate source that would not be subject to that

6    volatility and would be a firm delivery for the months of August and

7    September 2001.  Clark's understanding from marketers and consultants

8    was that it would  be difficult to find such an alternate source in view of the

9    volatility resulting from the California market.

10   Q.    WHAT DID CLARK DO?

11   A.    With the assistance of EES Consulting, Inc. (EES), Clark sought out suppliers

12   willing to provide power for the August/September period.  Due to the

13   volatility of the market, suppliers willing to make a commitment that far out

14   were fairly scarce.  Based upon the information from EES's surveys, it

15   became evident that Clark would need to tie up the supply since the futures

16   prices for August/September 2001 were ranging from $350 to $500 for

17   those months and prices were predicted to exceed $1000 for daily

18   purchases in those months.

19   In late January, EES was made aware of the availability of power from Kaiser

20   Aluminum and Chemical Corporation (Kaiser). Kaiser would sell power to

21   Clark in essence by redirecting part of Kaiser's BPA purchases to Clark.

22   Kaiser elected to shut down its facilities rather than take its contract

Exhibit No. PNG___(WWN-1)  page 6

1    entitlement from BPA, and sell its BPA entitlement into the market that

2    existed in early 2001.  The sale of power from Kaiser to Clark was

3    memorialized in a letter agreement setting the price and terms for the

4    purchase.  Exhibit PNG___ (WWN-2)

5    Q.   HOW MUCH POWER WAS COVERED BY THE CONTRACT?

6    A.   The contract provided for 140 MW of average power, with 104,160 MWh in

7         August and 100,800 MWh in September.

8    Q.   WHAT WAS THE PRICE AND OTHER TERMS?

9    A.   The price was $325 per MWH for all MWH, take or pay.  The contract called

10        for BPA delivery to Clark, as an alternate Point of Delivery, on a non-firm

11        basis.

12   Q.   HOW WAS PAYMENT MADE UNDER THE CONTRACT?

13   A.   The contract called for payment for the power  on March 15, 2001, with

14        deliveries to begin August 1, 2001.  Clark paid the full amount,

15        $64,080,603 by wire transfer to BPA which, in turn, paid Kaiser.

16   Q.   DOES CLARK HAVE A BPA CONFIRMATION OF THIS TRANSACTION?

17   A.   Clark's obligation to purchase this power is memorialized in BPA

18        Confirmation Agreement #01PB-24068 dated 2/6/2001. A copy of the

19        confirmation is Exhibit PNG ___ (WWN-3).

20   Q.   WHY DID CLARK ENTER INTO THE CONTRACT TO PURCHASE POWER

21        FROM KAISER?

22   A.   Clark has an obligation to serve its customers, and, hence, was obligated to

07/16/02  13:27 FAX                                                    ☑035

1    assure that it had sufficient power to meet its customer's needs for the

2    August/September period. The deficiency Clark faced for that period could

3    only be fully met by purchasing additional supplies, and not by demand

4    reduction.   Clark was, as a result, forced to pay whatever the market

5    dictated to provide those customers with electricity.  Clark sought to

6    purchase Kaiser's full BPA entitlement of 190 MW to meet Clark's needs.

7    However, Kaiser was only willing to sell 140 MW to Clark. As a result,

8    shortly after entering into its agreement with Kaiser, Clark began the process

9    of installing temporary generators at a site within Clark County to provide 50

10   MW of electricity for the August/September period at a cost of $140 per

11   MWh.  That installation was complete and the units are currently available

12   for service.

13   Q.   WHAT WAS THE RESULT?

14   A.   In order to provide sufficient electricity for the needs of Clark's customers in

15        the months of August and September, Clark was forced to pay $64 million

16        for 140 average megawatts.  Clark did not have sufficient funds on hand to

17        make the up-front lump-sum payment that Kaiser demanded. As a result,

18        Clark was compelled to borrow the money to finance the Kaiser transaction.

19   Q.   THANK YOU, I HAVE NO FURTHER QUESTIONS.

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Puget Sound Energy, Inc., et al.    )    Docket Nos. EL01-10-000
                                    )                EL01-10-001

## AFFIDAVIT OF WITNESS

I, Wayne W. Nelson, being duly sworn, depose and say that the

statements and exhibits contained in the testimony on behalf of Clark Public

Utilities in this proceeding are true and correct to the best of my knowledge,

information and belief.

Executed on this _16th_ day of August, 2001.


_____
                            Wayne W. Nelson

COUNTY OF _Clark_
STATE OF WASHINGTON, to-wit:

Subscribed and sworn to before me this __ day of August, 2001.

My Commission Expires: __11|1|01__

_____
                            Notary Public

# KAISER ALUMINUM & CHEMICAL CORPORATION
## NORTHWEST REGIONAL HEADQUARTERS

534 EAST TRENT AVENUE, SUITE 300 • SPOKANE, WA 99202
PHONE: (509) 242-1067 • FAX (509) 242-1098

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: Wayne Nelson | FROM: Joe Hoerner |
| FAX NUMBER: (360) 992-3204 | DATE: Feb. 2, 2001 |
| | TOTAL NO. OF PAGES INCLUDING COVER: 5 |
| COMPANY: Clark County PUD | |
| PHONE NUMBER: | PHONE NUMBER: (509) 242-1077 |
| RE: | |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY

WAYNE- LETTER STATING OUR CONVERSATION TODAY. IF YOU HAVE ANY QUESTIONS FEEL FREE TO CALL ME THIS WEEKEND Cell # (509) 995-1487 OR THROUGH DANA.

THANKS,
JOE

CC: DANA ZENTE
252-5093

***IMPORTANT***

The information contained in this facsimile message is privileged and confidential information intended only for the use of the individual named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please destroy it and notify us immediately by telephone. Thank you.

Page 2 of 3

## *KAISER ALUMINUM*
NORTHWEST REGIONAL HEADQUARTERS

February 2, 2001                              **VIA FAX**

Mr. Wayne Nelson
General Manager
Clark County PUD
(360) 992-3204

Re: Kaiser's Remarketing Agreement

Dear Mr. Nelson:

This letter will confirm our conversations on February 2, 2001 with you and Mr. Dana Zentz of EES Consulting regarding Kaiser's right to remarket energy under its 1996 Power Sales Contract with BPA. Under the contract, Kaiser may request remarketing by submitting a notice to BPA stating the Qualifying Purchaser (which would be Clark County PUD (PUD) in this instance), the start and end date of the sale, the price, the delivery point, and any other terms. BPA may either implement the sale to the PUD or, at its option, may choose to purchase the energy for its own use at the same terms and conditions. If the sale is for one month or less, BPA has 24 hours after Kaiser's notice to decide if it wants to purchase the energy: if the sale is for more than one month but no greater than 6 months, then BPA has 2 days to decide.

If the sale to the PUD is implemented by BPA, then BPA will contract with the PUD for the sale of the energy at the price, terms and conditions stated in

1

Kaiser's notice and other standard terms that BPA may request. The energy purchased by the PUD will be federal energy and the PUD's payment will be made to BPA. The energy will be delivered under Kaiser's PTP agreement with BPA. The POI will be the "BPA's System POI" and the point of delivery will be moved from Kaiser's facilities on a non-firm basis to the point of delivery named in Kaiser's notice and the PUD's contract with BPA. BPA will pay Kaiser for the remarketed energy under the terms of Kaiser's 1996 Power Sales Contract and a separate Confirmation Agreement with BPA consistent with the terms of Kaiser's notice. Therefore, pursuant to our discussions, the PUD and Kaiser (Parties) have agreed to the following:

Kaiser will submit a request to BPA on Friday, February 2, 2001 at approximately 4:30 p.m. PST to remarket 140 Mw of energy for the months of August 2001 and September 2001. BPA will have 48 hours to respond to this request and notify Kaiser if i) they will purchase the energy under the terms agreed to between the Parties or ii) facilitate the sale to the PUD.

With regard to the remarketing request, the PUD has requested that Kaiser's offer remain open until 12:00 noon on Tuesday, February 6, 2001, to allow the Board to approve the necessary financing arrangements for payment. This is acceptable, provided that Kaiser has the right to withdraw the offer at any time before the PUD executes a Confirmation Agreement with BPA.

Provided Kaiser can secure short-term firm transmission utilizing its PTP transmission agreement with BPA, BPA will deliver the energy to the ALCOA substation or other points as mutually agreed to by the Parties.

The Parties agree that the PUD shall pay to BPA on March 15, 2001 the amount of $53,934,878.00 as shown in the attached monetizaton table or if a different payment date is mutually agreed to by the Parties then the payment amount shall be adjusted consistent with the attached table.

Sincerely,

Joseph P. Hoemer

Energy Supply Manager

Please indicate your acceptance of the terms of this agreement by signing below and returning a copy to me. Fax: (509) 242-1098

_____

_____

Date

cc:    Mr. Dana Zentz, EES Consulting

3

07/16/02  13:28 FAX  ☒041

## Clark Public Utility Power Remarketing Monetization
### February 2, 2001

| Month | Days | MW | kWhrs | Purchase Price | Undiscounted Cash Flow |
|-------|------|-----|---------|----------------|------------------------|
| Aug | 11 | 140 | 104,160 | $325.00 | $ 33,852,000 |
| Sep | | | | | |
| Oct | 10 | 140 | 100,800 | $325.00 | $ 32,760,000 |
| | | | | | $ 66,612,000 |

**Discount Calculation**

| Curve Date | Total Rate | Discount Factor | Discounted Cash Flow |
|------------|-----------|-----------------|----------------------|
| Sep-01 | 6.50% | 0.9624 | $ 32,578,244 |
| Oct-01 | 6.50% | 0.9572 | $ 31,356,634 |
| Nov-01 | | | |
| | | | $ 63,934,878 |

2/1681

07/16/02  13:28 FAX

☑042



Department of Energy
Bonneville Power
Administration
P.O. Box 3621
Portland, OR 97208-3621

**POWER BUSINESS LINE**
Trader and Scheduling Phones

| | |
|---|---|
| Brenda Anderson | (503) 230-5610 |
| Dan ?? | (503) 230-3144 |
| Young Linn | (503) 230-3163 |
| Bill Lamb | (503) 230-5135 |
| Mark Miller | (503) 230-4003 |
| David Mills | (503) 230-7588 |
| BPA Trading Floor Fax | (503) 230-7463 |
| BPA Preschedule Fax | (503) 230-5039 |
| BPA SW Preschedule | (503) 230-3915 |
| BPA NW Preschedule | (502) 230-3813 |
| BPA S. Idaho Presch. | (503) 230-4311 |
| BPA Real Time | (503) 230-3341 |
| | or 230-4194 |

Date:     February 06, 2001
To:     Clark Public Utilities
1200 Ft Vancouver
Vancouver, WA  98668

Attn:     James Sanders
Phone:     360-992-3452
Fax:     360-992-3140

Presch:     503-251-5198
Real Time:     503-251-5224
PS/RT     503-251-5203
FAX:

## CONFIRMATION AGREEMENT

The following memorializes the terms of a transaction agreed to by Bonneville Power Administration (BPA) and Clark Public Utilities (CPU). Transactions hereunder are in accordance with reference contract or enabling agreement DE-MS79-81BP90489.

Transaction Date:  2/6/01          Traders:   Mark Miller (BPA) and James Sanders (CPU)

BPA Contract:     01PB-24068

Seller of Energy:     BPA
Buyer of Energy:     Clark Public Utilities
Product:     Surplus firm power
Point of Delivery:     Mid-Columbia
Alternate Point     Where the Federal generating system interconnects with BPA's transmission
of Delivery:     network. Customer will provide transmission from the Federal generating system.
Energy taken to an alternate POD is take-or-pay and liquidated damages do not
apply. Customer is responsible for payment of energy if transmission is curtailed
to APOD.

| Start of Term | End of Term | Demand Limit | Hours | Amount (MWH/hr) | Total MWh | Price | Holiday Excluded | Revenue / Cost |
|---|---|---|---|---|---|---|---|---|
| 8/1/01 | 8/31/01 | 140 | ALL | 140 | 104,160 | $325.00 | | $33,852,000.( |
| 9/1/01 | 9/30/01 | 140 | ALL | 140 | 100,800 | $325.00 | | $32,760,000.( |
| Energy Transaction Total: | | | | | | | | $64,080,608.0 |

See Additional Provisions below

**Additional Provisions**

Transmission will be provided under Kaiser Aluminum & Chemical Corp. (KACS) Contract No. 96MS-96107. Payment for transmission will remain with KACS.

CPU shall pay to BPA $64,050,603.00 on March 28, 2001, which represents net payment/NPV of full payment for all energy purchased under this agreement. This confirmation agreement shall be modified on or before March 15, 2001, if a change to the payment date is required.

**Scheduling**

All energy will be shown in Pacific Prevailing Time.
- HLHs are defined as HE 0700 – HE 2200, Monday through Saturday (excludes Sundays and NERC holidays).
- LLHs are defined as HE 0100 – HE 0600, HE 2300 and HE 2400, Monday through Saturday and all day Sundays and NERC holidays.
- All or FLH is defined as HE 0100 – HE 2400.

Energy shall be prescheduled, with source and sink identified, by 1000, or as mutually agreed, on the day that both parties observe as a workday preceding the date of delivery. Schedules may only be changed due to uncontrollable forces as defined by the reference contract or by mutual agreement of both parties.

**Billing**

Billing and payment under this agreement shall be made consistent with and as a specific item in the Wholesale Power Bill.

Unless otherwise specified in this Agreement, all administrative and operational provisions required to perform this Agreement shall be those described in the reference contract, including provisions related to delivery, scheduling (if applicable), billing, payments, metering, access to facilities, dispute resolution, uncontrollable forces, continuity of services, and contract interpretation.

This confirmation agreement contains all of the terms and conditions of this transaction and expressly limits acceptance to the terms stated herein, and any additional or different terms proposed by Clark Public Utilities are rejected unless expressly agreed to in writing by BPA.

If the above accurately reflects your understanding of our agreement, please indicate your approval by signing a copy of this agreement and returning via fax to BPA.

---

**AGREED AND ACCEPTED**

Bonneville Power Administration                    Clark Public Utilities

_(signature)_                                       _(signature)_

David E. Mills                                      Name: Wayne Nelson

Manager, Trading Floor                              Title: General Manager / CEO

Date: 2/8/01                                        Date: 2-8-01

---

(APS-96), a rate schedule that includes the fixed curtailment fee for the option specified in section 18(a), and the General Rate Schedule Provisions established by BPA, and applicable to sales under this Agreement. When such Rate Schedule has received interim or final approval by FERC, then it shall be attached hereto as Exhibit C.

(bb)    "Rate Test" means: (1) the calculation of whether the total average price in mills per kilowatthour, using the Rate Schedule, to determine if such total average price is less than or equal to the price specified in section 11(a) of this Agreement; (2) the determination of whether the fixed curtailment fee, for purposes of section 18(a) of this Agreement, is less than or equal to the amount specified in section 11(b); and (3) the determination of whether the use-of-facilities charge, as may be revised pursuant to section 8(b)(2) and Exhibit I, is less than or equal to the amount determined pursuant to section 11(c). The Rate Test is further described in section 11 of this Agreement.

(cc)    "Requested Operating Reserves" means the amount of Operating Reserves, pursuant to section 17, that the BPA dispatcher requests the Company to trip for purposes of providing Operating Reserves.

(dd)    "Reserves" means the Stability Reserves and Operating Reserves provided by the Company under this Agreement.

(ee)    "SR Event" means the period during which BPA implements a Stability Reserve restriction. An SR Event shall be an Event for all purposes. The beginning of the SR Event shall be identified by a transfer trip or other signal from BPA to the Company restricting delivery of energy under this Agreement. Unless reinstated as provided herein, the end of the SR Event shall be identified by the BPA dispatcher's notification to Company that delivery of all energy to which Company is entitled under this Agreement can be restored. Notwithstanding the foregoing, the Event will end (subject to

reinstatement as provided herein) when system conditions occur that result in tripping the Company for undervoltage or underfrequency load shedding. If such undervoltage or underfrequency load shedding signal is received by the Company prior to Event Minute 3 of the SR Event, then the restriction shall be deemed an event of Force Majeure until service is restored.

After an SR Event has ended, the SR Event shall be reinstated and continue as follows:

(1)     if the SR Event duration was 5 Event Minutes or less, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 2 hours or less of the last SR Event Minute;

(2)     if the SR Event duration was more than 5 Event Minutes but not more than 15 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 4 hours or less of the last SR Event Minute;

(3)     if the SR Event duration was more than 15 SR Event Minutes but not more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 6 hours or less of the last SR Event Minute; and

(4)     if the SR Event duration was more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 8 hours or less of the last SR Event Minute.

(ff)    "Stability Reserves" means those reserves, provided by the Company under this Agreement, that are necessary to ensure the stability of the Federal Columbia River Transmission System against losses of transmission facilities

pursuant to the scheme(s) in Exhibit G or any additional scheme(s) adopted pursuant to section 17 herein. Stability Reserves provided under this Agreement shall not include, without limitation: (1) stability reserves provided by the Customer in the General Transmission Agreement or in other agreements; (2) operating reserves or forced outage reserves that BPA has acquired under this Agreement or under other agreements; and (3) any other reserves that BPA has acquired under other arrangements.

(gg)  "Take-or-Pay Obligation" means the obligation, as modified by section 14, of the Company to pay for the Firm Power purchased by the Company under this Agreement. On an annual basis, the amounts of HLH and LLH Firm Energy that the Company agrees to purchase from BPA is specified in section 9(b) of this Agreement. The monthly amounts of HLH and LLH Firm Energy shall be as specified in Exhibit D. The monthly Demand amounts, for the purposes of this Take-or-Pay Obligation, shall be the monthly Demand amounts specified in Exhibit D. If the calculation of the Take-or-Pay Obligation for a Contract Year for which Demands are not yet required to be specified under section 10(a) becomes relevant, then the Demands for such Contract Year shall be calculated by dividing the annual HLH Firm Energy, if any, for each such Contract Year, as specified in section 9(b), by the number of HLH in a Contract Year. Weekly, daily, and hourly amounts of HLH and LLH Firm Energy are the amounts submitted by the Company pursuant to section 10 of this Agreement.

7.  **EXHIBITS; INTERPRETATION**

Exhibit A (General Contract Provisions), Exhibit B (Fees for Remarketing), Exhibit C (Rate Schedule), Exhibit D (Monthly Amounts of Firm Power), Exhibit E (Points of Delivery), Exhibit F (Unrecoverable Costs and Transfer Costs), Exhibit G (Stability Reserve Scheme(s)), Exhibit H (Arbitration Procedures), and Exhibit I (Use-of-Facilities Charge) are attached hereto and made a part of this Agreement. If there is a conflict between the body of this Agreement and any exhibit, then the

(c)   **Other Purchases**

This Agreement does not limit the Company's right to purchase power from BPA, consistent with Federal statutes, under other agreements, or to purchase power from third parties.

(d)   **Minimum Demand for Transmission**

A Company may elect to specify a minimum level of Demand for transmission for any month for the remaining term of this Agreement at the time the Company makes its submission of monthly amounts of Firm Power. Any request to specify a minimum level of Demand made after February 1, 1996, shall be subject to available transmission capacity as described in section 10(a). The Company may assign any excess minimum Demand for transmission consistent with terms for Assignment of Transmission Service under BPA's Point-to-Point Transmission Service Tariff. The amount of minimum Demand for transmission as elected or assigned shall be specified in Exhibit D.

10.   **MONTHLY, WEEKLY, DAILY, AND HOURLY AMOUNTS OF FIRM POWER**

(a)   **Monthly Amounts of Firm Power**

Not later than the February 1, immediately prior to October 1 of each Contract Year, the Company shall specify monthly amounts of Demand and HLH and LLH Firm Energy for such Contract Year. The total of the monthly amounts of HLH and LLH Firm Energy shall equal the annual amounts specified in section 9(b) for such Contract Year. The Company may set its Demand in each month in the 1996-1997 Contract Year at any level up to its Contract Demand. Any increase in amounts of Demand for a specific month in a later Contract Year above the greater of: (1) the amount of Demand for such month in the previous Contract Year; or (2) the minimum level of Demand for transmission specified in Exhibit D; is subject to BPA's determination of available transmission capacity. If additional generating resources integrated at points with transmission capacity available to the

07/16/02  13:29 FAX                                                      ☑048

Company's points of delivery are available for BPA's use or purchase, then BPA shall determine that transmission capacity is available under this Agreement. BPA shall also treat as available any transmission capacity made available by the Company to BPA through a reduction in demand under any other transmission agreement with BPA. If BPA determines that firm transmission capacity is not available for the Company's request, BPA will notify the Company within 60 days of the approved level of Demand. Each year, Exhibit D shall be revised to reflect the amounts specified by the Company, consistent with this section 10(a).

(b) **Weekly, Daily, and Hourly Amounts of Firm Power**

The Company shall either: (i) provide advance submittals of weekly, daily, and hourly amounts of Firm Energy and any Excess Firm Energy pursuant to section 10(b)(1), which will remain as submitted unless changed pursuant to section 10(b)(2); or (ii) provide such submittals pursuant to the terms of section 10(b)(2) only.

(1) **Advance Submittals of Weekly, Daily, and Hourly Amounts of Firm Energy**

The Company may submit weekly, daily, and hourly amounts in advance of, but not later than allowed under section 10(b)(2). Such advance submittals shall specify HLH and LLH amounts of Firm Energy to be delivered hereunder until the Company changes its submittal. The Company may change any advance submittal pursuant to section 10(b)(2). All advance submittals shall include a beginning and ending hour.

07/16/02   13:29 FAX                                                      ☑049

(6) **Makeup Power**

At the Company's request, BPA shall sell and deliver to the Company energy in excess of the amount shown in Exhibit D (Makeup Power), at the applicable energy charge only established for Firm Energy in the Industrial Firm Power Rate in the Rate Schedule, to the extent that such energy is needed by the Company to restore its operations following a restriction. Such Makeup Power shall not subject the Company to any Unauthorized Increase or other charge.

18. **CURTAILMENT OR REMARKETING**

The Company shall have a one-time option, at the time the Company makes its first submission of monthly amounts of Firm Power pursuant to section 10(a) of this Agreement, to either: curtail its purchases pursuant to section 18(a); or remarket Excess Firm Energy pursuant to section 18(b). Following the Company's election, BPA and the Company shall operate under the terms and conditions of either section 18(a) or section 18(b), as applicable.

(a) **Curtailment of Excess Firm Energy for a Fixed Fee**

The Company may curtail its Plant Load below the sum of its Take-or-Pay Obligation plus any amount of Non-Federal Service the Company identifies at the time it elects this curtailment option. BPA shall relieve the Company of its Take-or-Pay Obligation for Demand and Firm Energy for any such curtailed amounts and the Company shall pay BPA the fixed curtailment fee in mills per kilowatthour for each kilowatthour of such curtailed amounts, as specified in the Rate Schedule. Selection of this curtailment option shall relieve the Company of its obligation to pay the use-of-facilities charge specified in Exhibit I for amounts of curtailed energy.

(1) The Company shall provide BPA as much notice as possible, but not less than 48 hours, of any curtailment of Firm Power usage.

(2)    If the Company chooses to use Non-Federal Service for part of its Plant Load, the Company shall specify the monthly amounts of demand, HLH energy, and LLH energy of Non-Federal Service, if any, for the term of this Agreement. BPA shall not be obligated to serve these specified monthly amounts, and any service to these amounts shall be subject to an Unauthorized Increase charge, as provided for in section 15(c).

(3)    Curtailed energy shall be equal to the Company's Take-or-Pay Obligation for Firm Energy reduced by the relief from take-or-pay provisions of section 14, minus the Measured Energy for Firm Power delivered under this Agreement.

(4)    Election of this curtailment option operates to assign the Company's right to transmit an amount of energy equal to the curtailed energy to BPA.

(b)    **Remarketing Excess Firm Energy Without a Fixed Fee**

    (1)    **Notice and Request to Remarket**
The Company shall request that BPA remarket Excess Firm Energy by notifying BPA of:

        (A)    the amount and minimum duration of Excess Firm Energy to be remarketed; and

        (B)    the manner pursuant to section 18(b)(2) in which the Company wants BPA to remarket the Excess Firm Energy.

    (2)    **Remarketing Options**
The Company may select one or more of the following options for remarketing Excess Firm Energy:

(A)     The Company may identify one or more Qualified Purchasers
        that have agreed to purchase some or all of the Excess Firm
        Energy under specified terms and conditions at agreed-upon
        prices or price formulas and for agreed-upon amounts and
        durations.  The Company shall provide BPA at least  the notice
        specified in section 18(b)(3) prior to the date that deliveries are
        to begin under each proposed sale.

(B)     The Company may arrange in advance for a Qualified
        Purchaser(s) to purchase any Firm Power that becomes Excess
        Firm Energy during any period for which the Company and a
        Qualified Purchaser may agree.  The Company shall provide
        BPA at least the notice specified in section 18(b)(3) prior to the
        date on which the prearrangement becomes effective.  In
        addition, the Company shall notify BPA as required in
        section 10(b) when deliveries are to begin under the
        arrangement.

(C)     The Company may request that BPA find purchasers for the
        Excess Firm Energy.  If the Company chooses, it may request
        that BPA seek sales of specified amounts for daily, weekly,
        monthly, or other specified durations, and the Company may
        specify minimum prices or price ranges for the sales.  BPA and
        the Company shall agree on the price of the sale at the time of
        the transaction unless the daily limitations in
        section 18(b)(4)(E) apply.  BPA shall promptly notify the
        Company of the sales made on the Company's behalf.

(D)     The Company and BPA may agree to a price for use in
        crediting the Company's wholesale power bill under
        section 18(b)(4).  BPA shall have discretion to dispose of or use