such Excess Firm Energy without regard to the procedures associated with other options for disposal, and the Company shall have no further rights with respect to such Excess Firm Energy that is subject to such agreement.

(3)    **Applicability of Preference Provisions**

Excess Firm Energy remarketed by BPA shall be subject to applicable statutory provisions regarding preference. BPA shall notify the Company within the time period specified below if BPA or another Qualified Purchaser with public preference has elected to perform the agreement.

| Duration of Sale | Minimum Notice Period to Notify BPA | Maximum Period for BPA to Respond to Company |
|---|---|---|
| Up to 1 month | 48 hours | 24 hours |
| Up to 6 months | 7 days | 2 days |
| Over 6 months | 14 days | 7 days |
| Prearrangements under section 18(b)(2)(B) | 21 days | 14 days |

(4)    **Crediting the Company's Wholesale Power Bill**

(A)    During months when Excess Firm Energy is being remarketed by BPA, such power shall continue to be included in the amount of Firm Power billed by BPA as if delivered to the Company.

(B)    BPA may sell the Excess Firm Energy to the Qualified Purchaser(s) as arranged by the Company under options section 18(b)(2)(A) and section 18(b)(2)(B) or dispose of such power on whatever alternative terms that BPA may separately arrange. In either event, BPA shall credit the Company for the Excess Firm Energy revenues based on the price(s) agreed to

between the Company and the Qualified Purchaser(s) net of the amounts specified in section 18(b)(4)(C).

(C)    BPA shall determine the revenues for Excess Firm Energy delivered during a month by subtracting from the amount paid by the Qualified Purchaser (or the amount agreed to be paid or credited if BPA elects not to remarket to the Qualified Purchaser, disposes of or uses the Excess Firm Energy under section 18(b)(2)(D), or remarkets the Excess Firm Energy under section 18(b)(2)(C)): (i) any applicable transmission charges or losses specified in section 18(b)(4)(F); and (ii) the remarketing fee, as specified in Exhibit B. The fee or the pro rata share of the fee that the Company would have paid to another entity under a transaction under section 18(b)(2)(B) shall be deducted from revenues when BPA elects to retain the Excess Firm Energy for itself. No charges shall apply under section 18(b)(4)(C)(i) and section 18(b)(4)(C)(ii) when BPA uses such Excess Firm Energy for its own use or disposes of such Excess Firm Energy under section 18(b)(2)(D).

(D)    BPA shall credit the Company's wholesale power bill for revenues from sales of Excess Firm Energy in the month in which BPA uses such Excess Firm Energy for its own use or disposes of such Excess Firm Energy under section 18(b)(2)(D), BPA is paid for such Excess Firm Energy under section 18(b)(2)(C), or BPA is paid for such Excess Firm Energy by the Qualified Purchaser. If the amount of the credit during any month exceeds the power bill amount, then BPA shall pay the Company the amount of the difference.

(E)    BPA shall credit the Company for sales made under section 18(b)(2)(C) on Company's behalf subject to the

07/16/02  13:30 FAX                                                      ☑054

limitations in this paragraph. For sales of 1 month duration or less, if BPA notified the Company at the start of a transaction that it was subject to daily remarketing limitations and BPA is simultaneously remarketing power for the Company and selling nonfirm energy on a daily basis, then the Company shall receive credit for the energy that BPA remarkets on the Company's behalf on such days at BPA's average sale price for nonfirm energy (including remarketed energy) for such day; **provided, however,** BPA shall have no obligation to credit the Company at such average daily price to the extent that the total amount of Excess Firm Energy remarketed under similar contract provisions for the Company and other entities providing for daily remarketing limitations exceeds the following limits:

| If BPA's actual daily average sales (excluding remarketed amounts) are | | Limit to total amount of remarketed energy |
|---|---|---|
| equal to or greater than (aMW) | but less than (aMW) | (aMW) |
| 0 | 600 | 25% of BPA actual sales |
| 600 | 1,000 | 200 |
| 1,000 | 1,500 | 250 |
| 1,500 | 3,000 | 300 |
| 3,000 | 4,000 | 400 |
| 4,000 | 5,000 | 500 |
| 5,000 | -- | 600 |

In the event the above limits are exceeded, the Company shall be credited for its pro rata share of remarketed energy at the average daily price. All sales of remarketed energy for each day under the daily remarketing limitations shall be considered made under a single active schedule to determine remarketing fees. Sales of remarketed energy under the daily remarketing limitations shall be considered made over the southern intertie during the months of April through July, and

in the Pacific Northwest during other months. The Company may request that BPA remarket the remainder of its Excess Firm Energy at the best available price for additional energy, or the Company may arrange to store the Excess Firm Energy for sale at another time. BPA shall not discriminate against the Company in the storage or disposal of such remaining Excess Firm Energy.

(F)    There are no additional transmission charges for Excess Firm Energy except when:

    (i)    BPA incurs incremental transfer costs, including losses,

    (ii)    the Qualified Purchaser receiving delivery would have paid a charge for low-voltage delivery higher than the charge, if any, paid by the Company.

The Company shall pay such incremental costs. Any deliveries of Excess Firm Energy over BPA's interties shall be charged BPA's standard intertie tariffs. Losses will be valued at the price of the remarketed power.

## 19.    LOAD REGULATION, UNBUNDLED PRODUCTS, AND OTHER TRANSMISSION PRODUCTS

(a)    **Purchase of Load Regulation**

If the Company is within BPA's Control Area, or if BPA provides load regulation services to the Company through a third party, the Company shall purchase load regulation from BPA. The charge for load regulation shall be as specified in Exhibit C.



**Department of Energy**

Bonneville Power Administration
P.O. Box 3621
Portland, Oregon  97208-3621

POWER BUSINESS LINE

March 23, 1998

In reply refer to: PSB/Spokane

Amendatory Agreement No. 1 to
Contract No. 95MS-94861

Mr. Peter Forsyth
Vice President, NW External Affairs
Kaiser Aluminum & Chemical Corporation
825 NE. Multnomah, Suite 960
Portland, OR  97232

Dear Mr. Forsyth:

This letter agreement (Amendatory Agreement) constitutes an amendment to Contract No. 95MS-94861
(Power Sales Agreement) between the Bonneville Power Administration (BPA) and Kaiser Aluminum &
Chemical Corporation (Company).  BPA and the Company are hereinafter sometimes referred to
individually as "Party" and collectively as "Parties."  BPA and the Company have executed an interim
transmission services agreement (hereinafter referred to as "Interim PTP Service Agreement") under
which BPA has provided Point-to-Point Transmission Service over the Federal Columbia River
Transmission System (FCRTS) pursuant to the terms and conditions of the Point-to-Point Transmission
Services tariff and the 1996 Point-to-Point Firm Transmission Rate Schedule (PTP-96).  The Parties are
negotiating the terms and conditions of a final transmission service agreement (Final PTP Service
Agreement) which will supersede the Interim PTP Service Agreement.  The Parties have agreed to
amend the Power Sales Agreement as follows:

    1.       **EFFECTIVE DATE.**  This Amendatory Agreement, when executed, shall become
effective as of the date that the Interim PTP Service Agreement becomes effective.

    2.       **DEFINITIONS.**  All capitalized terms used herein shall be as defined in the Power
Sales Agreement or, if not defined in the Power Sales Agreement, as defined in the General Rate
Schedule Provisions, unless otherwise specified in this Amendatory Agreement.

    "PTP Service Agreement" shall mean the Interim or Final PTP Service Agreement, as
applicable.

    3.       **AMENDMENT OF POWER SALES AGREEMENT.**  The Power Sales Agreement is
amended as follows:

        (a)      Section 8(b)(2) is deleted and replaced by the following:

07/16/02  13:30 FAX                                                        ☒057

4

section 14, minus the Measured Energy for Firm Power delivered under this
Agreement."

(k)     A new section 18(b)(1)(C) is added as follows:

"(C)    the assignment to BPA of that portion of its rights under the PTP Service
Agreement, associated with the energy to be remarketed and necessary to allow BPA to
use such assigned rights to remarket Excess Firm Energy for the Company, subject to the
assignment provisions of the Point-to-Point Transmission Services tariff and the terms of
section 18(b)(4)(F)."

(l)     Section 19(d) is deleted and replaced by the following:

"(d)    **Unbundled Products and Other Transmission Services.** BPA shall offer to
the Company the ancillary services, the network integration transmission product, the
point-to-point transmission product, and the intertie transmission products that BPA
offers to its utility customers. BPA may offer to the Company other unbundled services.
If the Company elects to purchase such products, the Parties agree to amend the
appropriate provisions of this Agreement and/or the PTP Service Agreement."

(m)     Section 19(f) is deleted in its entirety.

(n)     Section 20(a) is deleted and replaced by the following:

"(a)    **Delivery to Company's Firm Load.** BPA shall make available Firm Power at
the points of interconnection specified in Exhibit C-1 of the PTP Service Agreement.
Delivery of such Firm Power over the Network to the Company's Plant Load shall be as
provided for in the PTP Service Agreement."

(o)     Section 20(b) is deleted and replaced by the following:

"(b)    **Other Provisions Relating to Delivery.** Other provisions applicable to delivery
(1) at the points of interconnection specified in Exhibit C-1 of the PTP Service
Agreement shall be as specified in Exhibit A of this Agreement, and (2) over the
Network to the Company's Plant Load shall be as specified in the PTP Service
Agreement."

(p)     Section 26 is deleted and replaced by the following:

"**26.     DAMAGES FOR FAILURE BY BPA TO DELIVER.** In the event BPA fails
to deliver the hourly amounts of Firm Energy scheduled by the Company under this
Agreement to the plant's Point of Delivery, and such delivery is not restricted by BPA
pursuant to its Reserve rights under this Agreement, or pursuant to the curtailment rights
under the PTP Service Agreement, or such delivery is not excused by section 4(f) of
Exhibit A, BPA shall pay the Company (on the date payment by the Company for the
Firm Energy would otherwise have been due under this Agreement):

Contract No. 95MS-94861

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Puget Sound Energy, Inc., et al.            )            Docket Nos.   EL01-10-000
                                            )                          EL01-10-001



## AFFIDAVIT OF WITNESS

I, Joseph P. Hoerner, being duly sworn, depose and say that the

statements and exhibits contained in the testimony on behalf of Kaiser Aluminum

& Chemical Corporation is this proceeding are true and correct to the best of my

knowledge, information and belief.

Executed on this 24 day of August, 2001.


_Joseph P. Hoerner_
Joseph P. Hoerner

COUNTY OF MULTNOMAH
STATE OF OREGON

Subscribed and sworn to before me this 24 day of August, 2001.

My Commission Expires: _May 4, 2004_


Notary Public

OFFICIAL SEAL
JOEY LIU
NOTARY PUBLIC – OREGON
COMMISSION NO. 334239
MY COMMISSION EXPIRES MAY 4, 2004

EXHIBIT 5

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Puget Sound Energy, Inc., | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | |
| v. | ) | Docket Nos. EL01-10-000 |
| | ) | EL01-10-001 |
| All Jurisdictional Sellers of Energy | ) | |
| And/or Capacity at Wholesale Into | ) | |
| Electric Energy And/or Capacity | ) | |
| Markets in the Pacific Northwest, | ) | |
| Including Parties to the Western | ) | |
| Systems Power Pool Agreement, | ) | |
| | ) | |
| Respondents. | | |

PREPARED ANSWERING TESTIMONY OF
JOSEPH P. HOERNER
FOR
KAISER ALUMINUM & CHEMICAL CORPORATION


1   Q.    PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.
2
3   A.    I am Joseph P. Hoerner. My business address is:

4                    Joseph P. Hoerner
5                    Energy Supply Manager
6                    Kaiser Aluminum & Chemical Corporation
7                    534 East Trent Ave., Suite 300
8                    Spokane, Washington 99202
9
10  Q.    PLEASE DESCRIBE YOUR EDUCATION AND EXPERIENCE.

11  A.    I graduated from Gonzaga University in 1988 with a Bachelor of Science degree in

12       Electrical Engineering. I was enrolled in the MBA Program at Gonzaga University from

13       1993-1995. Starting in 1989, I have been employed by Kaiser Aluminum & Chemical

1      Corporation ("Kaiser"). Since 1995, I have been the Energy Supply Manager with

2      responsibility for managing electricity and natural gas purchases at Kaiser's Northwest

3      manufacturing facilities.

4  Q.    WHAT IS THE PURPOSE OF YOUR TESTIMONY?

5  A.    My testimony responds to the testimony of Wayne W. Nelson (WWN-1) submitted by

6      Clark Public Utilities ("Clark") that addresses a power purchase agreement between

7      Clark and the Bonneville Power Administration ("BPA"). Mr. Nelson characterized that

8      agreement as on sale of power from Kaiser to Clark, which is incorrect. To address other

9      issues in this proceeding, Kaiser supports the testimony submitted by other members of

10     the Transaction Finality Group.

11  Q.   PLEASE DESCRIBE KAISER'S FACILITIES IN THE NORTHWEST?

12  A.   Kaiser owns and operates two primary aluminum smelters and an aluminum rolling mill

13     in Washington State. At full operation, Kaiser employs approximately 2160 people and

14     Kaiser's electric load at these three facilities is approximately 630 MW. Kaiser is a direct

15     service industrial customer and, as such, BPA is authorized to sell power directly to

16     Kaiser for consumption.   Kaiser is interconnected directly to BPA's high-voltage

17     transmission system.

18  Q.   DESCRIBE KAISER'S CURRENT POWER SALE CONTRACT WITH BPA.

19  A.   In 1995, Kaiser signed a five (5) year power sales contract with BPA for service from

20     October 1, 1996 through September 30, 2001. Sales under this contract are at BPA's

21     1996 Industrial Power Rate, which was established by BPA under the Pacific Northwest

22     Electric Power Planning and Conservation Act.

1    The federal power sold under this contract was initially a delivered product, but in 1998,

2    Kaiser signed a long-term, point-to-point transmission agreement with BPA and

3    unbundled the power sale.  When purchasing federal power Kaiser takes delivery and

4    purchases at BPA's "System Point of Integration," where BPA's generation is

5    interconnected with BPA's transmission system. BPA then delivers the power under the

6    PTP transmission agreement to Kaiser's manufacturing facilities for consumption.

7    Kaiser's obligation to purchase under its power sale contract with BPA is to take-or-pay.

8    To provide mitigation for this take-or-pay obligation, the contract includes a one-time

9    option to select either a right to curtail for a fixed fee or a remarketing arrangement.

10   (Excerpts from the 1995 Power Sales Contract are attached hereto as Exhibit JPH-1).

11   Kaiser selected the remarketing arrangement.

12   Q.    TO WHAT POWER DOES THE REMARKETING ARRANGEMENT APPLY?

13   A.    This contractual arrangement applies to federal power that becomes excess to Kaiser's

14         needs due to a reduction in Kaiser's plant operations.

15   Q.    DOES KAISER PURCHASE AND RESELL FEDERAL POWER UNDER THIS

16         CONTRACTUAL ARRANGEMENT?

17   A.    No. BPA did not give Kaiser a contractual right to resell federal power but insisted that

18         BPA must sell any federal power which Kaiser did not take. To balance the risks to

19         Kaiser of the take-or-pay obligation, BPA agreed to contractual provisions by which a

20         credit was determined for federal power which Kaiser did not take due to reduced

21         manufacturing operations.  Under these contractual arrangements, BPA sells federal

22         power to another buyer, instead of selling to Kaiser.

1   Q.   PLEASE SUMMARIZE KAISER'S RIGHTS AND OBLIGATIONS UNDER THIS

2        CONTRACTUAL ARRANGEMENT?

3   A.   Kaiser gives notice to BPA of the amount and duration of the curtailment of its

4        manufacturing operations and requests that BPA sell the federal power to an entity other

5        than Kaiser. Kaiser may identify a buyer willing to purchase from BPA at specified

6        terms or request BPA to find a purchaser.

7   Q.   PLEASE  SUMMARIZE  BPA'S  RIGHTS  UNDER  THIS  CONTRACTUAL

8        ARRANGEMENT?

9   A.   Following requisite notice, BPA has at least 24 hours to decide on several options under

10       the contract. BPA can sell the power to a different purchaser with public preference on

11       the same terms as Kaiser's notice; BPA can retain the power for its own use or dispose of

12       the power on whatever alternative terms BPA may separately arrange; or BPA may offer

13       a contract for sale of the power to the buyer in Kaiser's notice.

14       If BPA chooses to sell the power to the buyer in Kaiser's notice, then BPA will offer a

15       power sales contract to the buyer and, if accepted, BPA also will agree with Kaiser for

16       crediting of payments as required by the contractual arrangement in the 1995 Contract.

17       BPA bills and collects revenue from this buyer and disburses net revenue to Kaiser. If

18       BPA sells to a different buyer at a different price or retains the power for its own use,

19       BPA still credits Kaiser for sale revenue based on the price in Kaiser's notice. The notice

20       price establishes the mitigation to Kaiser for not purchasing the federal power; the notice

21       does not determine the price or to whom BPA sells the power.

WAS:89253 1

1   Q.   UNDER THIS CONTRACTUAL ARRANGEMENT, DOES KAISER HAVE THE

2        FINAL SAY REGARDING WHETHER THE POWER WILL BE RETAINED BY BPA

3        OR SOLD TO A THIRD PARTY?

4   A.   No.

5   Q.   UNDER THIS CONTRACTUAL ARRANGEMENT, DOES KAISER ULTIMATELY

6        DETERMINE WHO WILL BUY THE POWER FROM BPA?

7   A.   No.

8   Q.   UNDER THIS CONTRACTUAL ARRANGEMENT, IS KAISER ALWAYS

9        ENTITLED TO KNOW TO WHOM THE POWER IS SOLD OR THE PRICE AT

10       WHICH THE POWER IS SOLD?

11  A.   No.  If BPA decides to retain the power or sell to a different purchaser with public

12       preference other than the buyer in Kaiser's notice, BPA is not obligated to inform Kaiser

13       of the buyer or the price.

14  Q.   UNDER THIS CONTRACTUAL ARRANGEMENT, WHEN THE POWER IS

15       DISPOSED OF BY SALE TO A THIRD PARTY, IS THE CONTRACT FOR THE

16       SALE OF POWER ENTERED INTO BETWEEN KAISER AND THIS THIRD PARTY

17       PURCHASER OF POWER?

18  A.   No.

19  Q.   UNDER THIS CONTRACTUAL ARRANGEMENT, COULD KAISER SET THE

20       PRICE FOR OTHER AMOUNTS OF ENERGY SOLD BY BPA TO THIRD PARTIES,

21       OR FOR ANY ENERGY SOLD BY THIRD PARTIES?

22  A.   No.

1    Q.    DURING THE PERIOD BETWEEN DECEMBER 25, 2000 AND JUNE 20, 2001 DID

2          KAISER CURTAIL ITS INDUSTRIAL OPERATIONS IN THE NORTHWEST?

3    A.    Yes, and Kaiser exercised this contractual arrangement to request BPA to sell the federal

4          energy that Kaiser would no longer buy to another purchaser by submitting notices to

5          BPA.

6    Q.    WHO SUBMITTED THESE NOTICES TO BPA?

7    A.    I submitted those notices to BPA on behalf of Kaiser.

8    Q.    HOW DID YOU ATTEMPT TO IDENTIFY A POTENTIAL BUYER TO WHOM

9          YOU WOULD PROPOSE THAT BPA SELL POWER?

10   A.    I called three or four marketers and asked each one if it was interested in buying an

11         amount of power from BPA during a defined period and, if so, what price would the

12         buyer offer. I also reviewed estimated forward price quotes provided by TFS Energy and

13         price quote information available to Kaiser from the Enron on-line service. I was not

14         setting prices, but taking price quotes. Based on the prices offered by the potential

15         buyers, their credit worthiness, and other factors, I narrowed the field and identified my

16         preference in the notice to BPA.

17   Q.    DID ALL NOTICES TO BPA RESULT IN A SALE BY BPA TO THE BUYER IN

18         KAISER'S NOTICE?

19   A.    No. Sometimes BPA decided to retain the energy for its own use. Sometimes, after the

20         minimum 24 hour notice period that BPA has under the 1995 power sales contract to

21         consider its options, the buyer would decide not to sign the power sale agreement when

22         offered by BPA and Kaiser would withdraw its notice.

1   Q.   DID KAISER EXERCISE CONTROL OVER BPA'S SALES IN THE MARKET

2         PLACE?

3   A.   No. BPA could and did refuse to offer a contract to the buyer in the notice and, instead,

4         BPA chose to retain the power for its own use or sell the power under terms unknown to

5         Kaiser.

6   Q.   WHO INITIATED BPA'S SALE TO CLARK?

7   A.   A consultant for Clark, Mr. Dana Zentz, contacted me in January 2001. He told me that

8         Clark had an open position for August and September 2001 and knew that BPA may have

9         a block of federal power for sale because Kaiser had curtailed its manufacturing

10       operations.

11   Q.   HOW DID YOU RESPOND?

12   A.   I told Mr. Zentz that Kaiser had not yet submitted a notice to BPA for all the federal

13       energy which Kaiser would not purchase from BPA in August and September 2001.

14       Because Kaiser was interested in submitting a notice to BPA with a named buyer that

15       would resell the energy it purchased from BPA for consumption in the Northwest, we

16       agreed that Kaiser and Clark would independently approach other potential buyers and

17       sellers to determine a price for August and September 2001 that could be included in

18       Kaiser's notice to BPA for a potential BPA sale to Clark.

19       Kaiser offered to discount the price because the power would stay in the Northwest and

20       in the expectation that Clark would publicly acknowledge that the BPA sale was below

21       market quotes Clark had received from other sellers and provided a savings to Clark.

22   Q.   WHAT WAS THE PRICE IN THE NOTICE SUBMITTED TO BPA?

23   A.   The notice to BPA included a price of $325 per MWH.

1   Q.   WHAT WAS THE PURPOSE OF THE LETTER AGREEMENT (EXHIBIT WWN-2)

2         BETWEEN CLARK AND KAISER DISCUSSED IN MR. NELSON'S TESTIMONY?

3   A.   Mr. Zentz asked for a written statement to put before Clark's Board that explained the

4         mechanics of Kaiser's notice to BPA, explained the possibility that BPA may choose not

5         to sell the power at all or not to sell the power to Clark, explained that Clark's power sale

6         contract, if offered by BPA, would be with BPA for federal power, committed Kaiser to

7         keep its notice to BPA open long enough for Clark to obtain financing, and showed the

8         discounting of the price to be included in the notice to a present value payment. Clark

9         was concerned with Kaiser's creditworthiness and wanted clarification that Clark's power

10        sales contract, if offered, would be with BPA for federal power, and not with Kaiser.

11  Q.   DID THE LETTER AGREEMENT COMMIT KAISER TO SELL POWER TO

12        CLARK?

13  A.   No.  Kaiser cannot and did not resell federal power. The letter agreement is not a power

14        sales contract, but only an agreement to submit the notice to BPA.

15  Q.   DID THE LETTER AGREEMENT COMMIT CLARK TO BUY POWER FROM BPA?

16  A.   No.  BPA did not become obligated by Kaiser's notice to offer a power sales contract to

17        Clark.  Even if BPA decided to offer a power sales contract to Clark, the letter agreement

18        did not commit Clark to sign BPA's contract.

19  Q.   DID YOU SUBMIT A NOTICE TO BPA IDENTIFYING CLARK AS THE

20        POTENTIAL BUYER FROM BPA?

21  A.   Yes.  I submitted a notice on February 2, 2001.

1  Q.  DID BPA EXECUTE A POWER SALES AGREEMENT WITH CLARK FOR

2      AUGUST AND SEPTEMBER 2001?

3  A.  Yes, BPA decided to offer a power sales contract to Clark rather than retain the power for

4      its own use or sell the power to another buyer on the same or different terms.  Only when

5      BPA offered and Clark decided to sign the BPA power sales contract for this two-month

6      sale did Clark become obligated to purchase this federal energy.  Clark's purchase

7      obligation is with BPA.

8  Q.  HAVE YOU REVIEWED THIS AGREEMENT?

9  A.  Yes, it is included as Exhibit WWN-3 to Mr. Nelson's testimony.  It provides that the

10     BPA sale to Clark is for surplus federal power.  BPA sells surplus federal power only

11     under its FPS-96 rate.  The reference contract in this agreement is Clark's 1981 Power

12     Sales Contract with BPA.

13 Q.  WITH WHOM WERE YOUR DISCUSSIONS WITH CLARK?

14 A.  Except for the one instance discussed below, I am the only person with Kaiser that

15     discussed these matters with Clark or its consultant.  All my discussions were with Mr.

16     Zentz, except one brief phone conversation on February 2, 2001, in which I was joined by

17     Pete Forsyth, Kaiser Vice President for Northwest Regional Affairs, and Mr. Zentz was

18     joined by Mr. Nelson.  The only matter discussed during this call was that Mr. Forsyth

19     and I informed Mr. Nelson that Kaiser had agreed to send a letter to him that committed

20     Kaiser not to withdraw its notice to BPA through February 6, 2001.

1  Q.   BASED UPON YOUR KNOWLEDGE OF THE FACTS AND CIRCUMSTANCES
2       ASSOCIATED WITH CLARK'S PURCHASE OF POWER FROM BPA, DO YOU
3       BELIEVE THAT CLARK SHOULD BE DUE A REFUND FROM KAISER?

4  A.   No. My testimony shows that Kaiser did not sell power to Clark, and Kaiser had no
5       control over the terms and conditions of BPA's sale of power to Clark. As a result, there
6       is no nexus between Kaiser and any claim Clark may assert.

7  Q.   IF CLARK'S EFFORT TO RENEGOTIATE THE PRICE OF ITS TRANSACTION
8       WITH BPA IS ULTIMATELY IS SUCCESSFUL, WHAT WOULD BE THE
9       CONSEQUENCE?

10 A.   Industrial customers that are contractually entitled to release power under their contracts,
11      thereby allowing BPA and other utilities to sell that power into the market when the
12      market is seeking additional energy (for instance, because of a relatively dry year), will
13      be discouraged from doing so.  Instead, these industrial customers will have a greater
14      incentive to consume that power, and avoid any contingent financial exposure.  This
15      result would reduce the aggregate amount of power available for sale on the open market
16      at just the time when the market is signaling that it needs additional supplies.  This could
17      result in area-wide black-outs rather than voluntary, economic curtailments by industrial
18      customers.

19 Q.   DOES THIS CONCLUDE YOUR TESTIMONY?
20
21 A.   Yes, it does.

07/16/02  13:32 FAX                                                    ☑069

Contract No. 95MS-94861
October 30, 1995

# POWER SALES AGREEMENT

between the

## UNITED STATES OF AMERICA

## DEPARTMENT OF ENERGY

acting by and through the

## BONNEVILLE POWER ADMINISTRATION

and

## KAISER ALUMINUM & CHEMICAL CORPORATION

## Index to Sections

| Section | | Page |
|---|---|---|
| 1. | Effective Date and Term | 3 |
| 2. | Deliveries of Firm Power Between the Effective Date and Commencement Date | 3 |
| 3. | Commencement of Deliveries of Firm Power | 4 |
| 4. | Termination of Prior Contract and Other Contracts | 4 |
| 5. | Termination of This Agreement | 5 |
| 6. | Definitions | 9 |
| 7. | Exhibits; Interpretation | 16 |
| 8. | Contract Revisions and Waivers | 17 |
| 9. | Purchase and Sale of Annual Take-or-Pay Firm Energy | 18 |
| 10. | Monthly, Weekly, Daily, and Hourly Amounts of Firm Power | 19 |
| 11. | Rate Test Compliance | 22 |
| 12. | Rates and Charges | 23 |
| 13. | Billing and Payment | 23 |
| 14. | Relief from Take-or-Pay Obligation | 27 |
| 15. | Unauthorized Increase Charges | 28 |
| 16. | Changes in Firm Power Amounts | 29 |
| 17. | Reserves | 29 |
| 18. | Curtailment or Remarketing | 36 |
| 19. | Load Regulation, Unbundled Products, and Other Transmission Products | 42 |
| 20. | Provisions Relating to Delivery of Firm Power | 45 |
| 21. | Assignment of Agreement | 45 |
| 22. | Dispute Resolution | 45 |
| 23. | Force Majeure | 49 |

## Index to Sections

| Section | | Page |
|---|---|---|
| 24. | Notices | 50 |
| 25. | Hold Harmless | 51 |
| 26. | Damages for Failure by BPA to Deliver | 51 |
| 27. | Obligations During Performance of This Agreement | 52 |
| 28. | Third Parties | 52 |
| 29. | Severability | 52 |
| 30. | Entire Agreement | 53 |
| 31. | Signature Clause | 54 |
| | | |
| Exhibit A | (General Contract Provisions) | 16 |
| Exhibit B | (Fees for Remarketing) | 16 |
| Exhibit C | (Rate Schedule) | 16 |
| Exhibit D | (Monthly Amounts of Firm Power) | 16 |
| Exhibit E | (Points of Delivery) | 16 |
| Exhibit F | (Unrecoverable Costs and Transfer Costs) | 16 |
| Exhibit G | (Stability Reserve Scheme(s)) | 16 |
| Exhibit H | (Arbitration Procedures) | 16 |
| Exhibit I | (Use-of-Facilities Charge) | 16 |

This POWER SALES AGREEMENT, executed ___11/6___, 1995, by the UNITED STATES OF AMERICA (Government), Department of Energy, acting by and through the BONNEVILLE POWER ADMINISTRATION (BPA or Bonneville), and KAISER ALUMINUM & CHEMICAL CORPORATION (Company), a corporation incorporated under the laws of the State of Delaware. BPA and the Company are hereinafter sometimes referred to individually as "Party" and collectively as "Parties."


WITNESSETH:


WHEREAS pursuant to section 5(d) of the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act), BPA is authorized to sell power to the Company; and


WHEREAS on August 31, 1981, BPA and the Company entered into Contract No. DE-MS79-81BP-90351, hereinafter referred to as "Prior Contract"; and


WHEREAS this Agreement provides for the termination of the Prior Contract; and

6.    **DEFINITIONS**

(a)    "Agreement" means this Power Sales Agreement, Contract No. 95MS-94861.

(b)    "Commencement Date" means the date that deliveries commence under this Agreement.

(c)    "Contract Demand" means the maximum integrated hourly rate of delivery that the Company may request under this Agreement and is equal to 669.54 megawatts.  The Contract Demand shall not be increased except through:

(1)    a process conducted pursuant to section 5(d)(3) of the Northwest Power Act that provides for BPA to acquire increased reserves from its direct service industrial companies; or

(2)    a technological allowance which BPA shall grant upon the Company's demonstration to BPA that such allowance meets the criteria for a technological allowance under the Prior Contract.

(d)    "Contract Year" means the period that begins on October 1 and ends on the following September 30.

(e)    "Control Area" or "Load Control Area" means the electrical (not necessarily geographical) area within which a controlling utility operating under all North American Electric Reliability Council standards has the responsibility to adjust its generation on an instantaneous basis to match internal load and power flow across interchange boundaries to other Control Areas.  A utility operating a Control Area is called a "controlling utility."

(f)     "Demand" means the maximum integrated hourly rate of delivery during each month of each Contract Year for Firm Power deliveries under this Agreement, as specified in Exhibit D.

(g)     "Effective Date" means the date that this Agreement is signed by BPA.

(h)     "Event" means the period during which BPA restricts service to the Company under this Agreement to obtain Operating Reserves or Stability Reserves. The Event shall commence with the reduction in deliveries to the Company under this Agreement due to a BPA request for Operating Reserves or a transfer trip or signal that initiates Stability Reserves restriction. Unless reinstated as provided herein, the Event shall end when BPA's dispatcher notifies the Company that the load restricted for such reserves can be restored to service. Notwithstanding the foregoing, the Event will end (subject to reinstatement as provided herein) when system conditions occur that would result in tripping the Company for undervoltage or underfrequency load shedding. Any BPA restriction or series of BPA restrictions that make up an SR Event shall be treated as part of a single Event.

After an Event has ended, the Event shall be reinstated and continue as follows:

(1)     if the Event Magnitude was less than (Federal Load) x (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 10 hours;

(2)     if the Event Magnitude was equal to or greater than (Federal Load) x (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 21 hours;

07'16/02  13:33 FAX                                                    ☑073

(3)  if the Event Magnitude was equal to or greater than (Federal Load) x (30 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 42 hours;

(4)  if the Event Magnitude was equal to or greater than (Federal Load) x (60 minutes), then the Event shall be reinstated if BPA requests Reserves again within 84 hours; and

(5)  if the Event Magnitude was equal to or greater than (Federal Load) x (90 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 126 hours.

(i)  "Event Duration" means the total cumulative Event Minutes of the Event.

(j)  "Event Magnitude" means a value calculated for each Event as the sum of: (Requested Operating Reserves x Event Minutes associated with the use of Operating Reserves) + (Amount of Load Tripped for Stability Reserves x duration of the SR Event in minutes) for each restriction during the Event. The Event Magnitude shall not include loads restricted pursuant to operating reserves and stability reserve rights that BPA has under other contracts.

(k)  "Event Magnitude Limit" means the Federal Load multiplied by 90 minutes.

(l)  "Event Minute(s)" means the minute(s) of restriction (or any portion thereof) during an Event.

(m)  "Excess Firm Energy" means Firm Energy that would have been delivered to the Company for service to its expected Plant Load but is excess due to a reduction in the Company's actual Plant Load.

(n)  "Federal Load" means an hourly amount of energy equal to the lesser of (1) 50 percent of the Process Load operating immediately prior to the Event,

07/16/02  13:33 FAX

or (2) the sum of (A) 50 percent of the Firm Energy either scheduled to the Company, remarketed to other Qualified Purchasers, used by BPA, or any combination thereof, plus (B) 50 percent of the energy scheduled by Washington Water Power Company under its Firm Energy Sale Agreement with BPA, Contract No. 95MS-95104, **provided**, that the amount under section 6(n)(2)(B) shall not exceed 58 average megawatts.

(o)  "FERC" means the Federal Energy Regulatory Commission, or its successor.

(p)  "Firm Energy" means the Federal energy that the Company has agreed to purchase from BPA under this Agreement.

(q)  "Firm Power" means the monthly amounts of Demand and Firm Energy (HLH and LLH) purchased by the Company under this Agreement.

(r)  "Heavy Load Hours" or "HLH" means those hours that begin at 6 a.m. and end at 10 p.m., Monday through Saturday.

(s)  "Light Load Hours" or "LLH" means all hours that are not HLH.

(t)  "Material Plant Damage" means the inability of the Company to resume industrial production at all or any portion of its plant because of damage to plant production facilities resulting from a restriction; for example, the inability to resume electrolysis in one or more pots without rebuilding or substantially repairing such pot(s).

(u)  "Non-Federal Service" means, for the purposes of section 18(a) of this Agreement, the monthly amounts of demand, HLH energy and LLH energy that the Company chooses to acquire from non-Federal entities to serve a portion of its Plant Load during the term of this Agreement. The Company agrees that such amounts must be supplied to the Plant Load. The Company

may purchase additional amounts of non-Federal energy that will not be used in calculating the amount of curtailed energy

(v)   "Occurrence" means a system condition that results in the need for Reserves.

(w)   "Operating Reserves" means nonspinning reserves, provided by the Company under this Agreement, that are necessary to enable BPA either to reestablish its load/resource balance after loss of generation or transmission facilities, or to meet any of its other existing nonspinning operating reserve obligations. Operating Reserves provided under this Agreement shall not include, without limitation: (1) Stability Reserves provided by the Company in this Agreement; (2) operating reserves provided by the Company in any other contract; and (3) any other reserves that BPA has acquired under other arrangements.

(x)   "Plant Load" means the total electrical energy load at Company facilities eligible for BPA service during any given time period whether the Company has chosen to serve its load with BPA power or non-Federal power.

(y)   "Process Load" means, for an aluminum facility or a chlor-alkali facility, the electrolytic load.

(z)   "Qualified Purchaser" shall mean a utility or entity which: (1) is capable of performing the financial obligations undertaken for a sale or for an option to buy; (2) meets BPA's standards of service, including having an available transmission path; and (3) if required by State or Federal law, the purchaser has received all necessary approvals from appropriate regulatory bodies to conduct the transaction with BPA.

(aa)  "Rate Schedule" means the Industrial Firm Power Rate Schedule (IP-96.5), the Point-to-Point Transmission Rate Schedule, exclusive of the Delivery Charge therein (PTP-96.5), Ancillary Products and Services Rate Schedule

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Jointly Administered** |
| | : | |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION,** | : | **Chapter 11** |
| a Delaware corporation, <u>et al.</u>, | : | |
| | : | **Hearing Date: 1/15/03 @ 10:00 a.m.** |
| Debtors. | : | **Response Date: 1/13/03 @ 4:00 p.m.** |
| | : | |
| | : | |
| **PUBLIC UTILITY DISTRICT NO. 1 OF** | : | |
| **CLARK COUNTY,** | : | |
| | : | |
| Movant, | : | |
| | : | |
| vs. | : | **Re: Docket No. 1555** |
| | : | **Re: Agenda Item No. 1** |
| **KAISER ALUMINUM & CHEMICAL** | : | |
| **CORPORATION,** | : | |
| | : | |
| Respondent. | : | |

### OBJECTION OF DEBTOR AND DEBTOR IN POSSESSION KAISER ALUMINUM & CHEMICAL CORPORATION TO EMERGENCY MOTION OF PUBLIC UTILITY DISTRICT NO. 1 OF CLARK COUNTY FOR LIMITED RELIEF FROM THE AUTOMATIC STAY

Kaiser Aluminum & Chemical Corporation ("KACC"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby files this Objection to the Emergency Motion of Public Utility District No. 1 of Clark County for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (the "Motion"), filed by the Public Utility District No 1 of Clark County d/b/a Clark Public Utilities ("Clark")  In support hereof, KACC incorporates by reference the Declaration of Joseph Patrick

Hoerner, which is attached hereto as Exhibit A[1] (the "Hoerner Dec "), and respectfully represents as follows:

<u>**Preliminary Statement**</u>

1.    Clark's Motion should be denied because as demonstrated below, Clark simply seeks to conduct a fishing expedition under the guise of obtaining additional evidence to submit to the Federal Energy Regulatory Commission (the "FERC" or the "Commission") during the FERC's review of the Administrative Law Judge's Recommendations and Proposed Findings of Fact in the Puget Sound Proceeding (as defined below)  Instead, Clark should be required to file a claim in KACC's bankruptcy case, and the Court, if necessary, can determine the amount of Clark's claim based on the FERC's decision.[2]  Under these circumstances, the automatic stay should be maintained and Clark's Motion for relief from the automatic stay denied

2.    As noted in Clark's Motion, there is pending before the FERC a proceeding that, among things, involves a dispute between KACC and Clark regarding purchases of electricity that were made by Clark for delivery during August and September 2001. Although the transactional documents prove otherwise, Clark claims that KACC was the seller of the electricity, and in the ongoing proceeding before the FERC, Clark has sought an order from the FERC requiring KACC to refund amounts associated with the alleged sales  The FERC proceeding is styled <u>Puget Sound Energy, Inc. v. All Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including</u>

---

[1]    The Hoerner Dec  was previously filed in support of KACC's objection to Clark's first Motion for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum & Chemical Corporation (D I. 795), which was denied at a hearing on July 23, 2002

[2]    The Motion should also be denied because Clark has previously indicated that it needs the additional discovery in order to bring another lawsuit for damages against KACC alleging violations of the Federal Power Act, 16 U S C  §§ 791-828c  The Court denied Clark's request to bring another lawsuit at the July 23, 2002 hearing.

<u>Parties to the Western Systems Power Pool Agreement</u>, FERC Docket No EL01-10-000, <u>et al.</u>
(the "Puget Sound Proceeding")

   3  More important, however, Clark's and KACC's versions of the facts were
already presented to the FERC at an evidentiary hearing in the Puget Sound Proceeding. Clark
had full opportunity to conduct discovery (which it did) prior to the Administrative Law Judge's
("ALJ") recommendation, which was based upon the evidentiary presentations as well as a
voluminous record developed at that hearing. The ALJ's recommendation would bar the
payment of any amount to Clark  <u>Puget Sound Energy, Inc. v. All Sellers of Energy and/or</u>
<u>Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest,</u>
<u>Including Parties to the Western Systems Power Pool Agreement</u>, 96 FERC ¶ 63,044 (2001) (the
"Recommended Decision").

   4  Although the Recommended Decision currently is pending before the full
Commission, the Commission granted a motion filed by the City of Tacoma to reopen the
evidentiary record in the Puget Sound Proceeding. (<u>See</u> Order on Motions to Reopen
Evidentiary Record dated December 19, 2002, issued by the Commission in the Puget Sound
Proceeding (the "Discovery Order"), attached as Exhibit 1 to the Affidavit of Mark Sundback
(the "Sundback Aff "),which is attached hereto as Exhibit B)  The Discovery Order reopened
the record to <u>allow</u> additional discovery to be conducted; it did <u>not</u> require that additional
discovery be conducted as Clark contends in its Motion. (Motion at p. 8). Based on the
Discovery Order, Clark filed the Motion, on an expedited basis, in order to conduct its fishing
expedition under the pretext that Clark needed to pursue additional evidence to prevent the