improper determination of its claim by the FERC [3]  The Motion is, in reality, an attempt to conduct additional discovery in order to relitigate its claims it lost in the hearing before the ALJ and to pursue additional claims against KACC. The Bankruptcy Court should deny Clark's request and order Clark to file a proof of claim, like all other creditors, for the amount of its claim (if any), which can then be addressed during the claims resolution process after the FERC has rendered its decision.

     5    Moreover, Clark has not raised anything in its Motion that has not previously been raised before the FERC or of which the FERC is not well aware. Clark has not even attempted to show what additional or new evidence it believes it can obtain from KACC, let alone why this additional discovery might be necessary or helpful to the FERC. Instead, Clark states that it "anticipates that it will only need to send to Kaiser" a "data request" (which in all likelihood involves multiple interrogatories and requests for documents), five depositions and requests for admission. This is not limited discovery  Rather, it is a classic fishing expedition, which the automatic stay was designed to prevent. Moreover, to the extent the stay is lifted, KACC would be exposed to the data requests of other parties  In the Puget Sound Proceeding, one source has served on numerous targeted companies a data request with over 250 separately numbered requests (including separately designated sub-parts)  What Clark thus seeks through its Motion is an opportunity for a second bite at the apple where it has previously lost Specifically, Clark seeks an order lifting the automatic stay so that it can relitigate issues that, at least preliminarily, have been decided against it by the ALJ.

---

[3]    Clark's Motion now also complains of procedures adopted in the first phase of the FERC proceeding  Yet Clark did not voice such complaints at the time, and in fact agreed to accept the procedural schedule and waived opportunities to seek cross-examination.  It was only after Clark's effort to extract refunds was given no support by the Presiding Judge that Clark seems to have developed objections to the Commission's procedures.

6    Finally, there will be an enormous cost to KACC if Clark is allowed to start down the trail of relitigation. There will be the cost of filing appropriate pleadings, conducting and responding to discovery (including discovery from parties aside from Clark), possibly filing of testimony and the like. Moreover, all of this extra cost and effort will be for naught if the FERC issues a decision in the Puget Sound Proceeding finding that KACC was not the seller of the electricity or finds that Clark is not entitled to a refund. Furthermore, given the fact that the general bar date in the Debtors' chapter 11 proceedings has not yet expired and the claims resolution process has not yet begun, Clark will not be prejudiced if the automatic stay is maintained at least until the FERC rules in the Puget Sound Proceeding and determines whether Clark is entitled to a claim.

## Factual Background

### *The Power Sales Agreement Between KACC and The BPA*

7.    KACC owns two primary aluminum smelters and an aluminum rolling mill in Washington State. (Hoerner Dec. ¶ 2.) In order to obtain electric energy for its Washington facilities, in 1995 KACC signed a five-year Power Sales Agreement (the "PSA") with the Bonneville Power Administration (the "BPA") for service from October 1, 1996 through September 30, 2001. The PSA obligated the BPA to deliver electric energy to KACC and imposed a take-or-pay obligation upon KACC. The power sold under the PSA was "federal power" sold under the authority granted to the BPA by the Pacific Northwest Electric Power Planning and Conservation Act (the "Northwest Power Act"). (Hoerner Dec. ¶ 3.)

8.    Subsequent to entering into the PSA, KACC reduced production from its Washington facilities. As a direct consequence of reducing operations, KACC curtailed purchases of power from the BPA. Under the PSA, if KACC desired to curtail purchases from the BPA, it had to provide the BPA with notice of the amount and duration of the curtailment. In

conjunction with reduced consumption, KACC could request that the BPA, not KACC, sell the power to another entity. Thus, under the PSA, KACC could request that the BPA find a purchaser for the power, or KACC had the option to identify a designated third-party that was willing to pay a specified price for the power. (Hoerner Dec. ¶ 4.)

9. If KACC curtailed its purchases from the BPA, the BPA had a wide range of options. The BPA could sell the power to a different purchaser with public preference on the same terms as KACC's notice; the BPA could retain the power for its own use or dispose of the power on whatever alternative terms the BPA might separately arrange; or the BPA could offer a contract for sale of the power to the entity identified in KACC's notice. (Hoerner Dec. ¶ 5.)

10. If the BPA choose to sell the power to the entity designated in KACC's notice, the BPA would offer a power sales contract to the entity and, if accepted, the BPA would credit KACC for the payments under the terms of the PSA. If the BPA elected to sell to a different buyer at a different price or retain the power for its own use, the BPA would still credit KACC based on the price in KACC's notice. The notice price thus established the mitigation to KACC for not purchasing the federal power; the notice did not determine the price at which, or to whom, the BPA would sell the power. (Hoerner Dec. ¶ 6.)

11. Thus, KACC did not have a right, statutorily, contractually or otherwise, to dictate whether the BPA would sell the power to a third party or retain it for its own use. KACC likewise did not have the right, statutorily, contractually or otherwise, to determine to whom the BPA would sell the power if the BPA chose to sell it to a third party. Additionally, KACC did not have the right to establish the price at which the BPA would sell the power to parties that bought power from the BPA. KACC also did not have the right to sell the power itself. In fact, the BPA insisted that the BPA itself had to be the seller of any federal power that KACC did not take. (Hoerner Dec. ¶ 7.)

12    Prior to late 2000, the BPA changed the anniversary date of its contracts Instead of July 31 anniversary/termination dates, the BPA switched to a termination date of October 1, 2001. In fact, the BPA made this change in policy in 1998, more than two years before the contract negotiations when Clark claims to have finally become aware of the policy However, Clark did not act based upon this change in anniversary dates when the change was made. Instead, Clark waited until late 2000 to begin negotiations with the BPA to roll over contracts that were to expire July 31, 2001. At that time, Clark finally recognized that it would have an interregnum (i.e., August 1 - September 30, 2001) when prior the BPA contracts would have lapsed but any new contracts with the BPA would not yet be effective. Of course, had Clark simply remained aware of the BPA's contracting policies, it could have taken steps well before 2001 to obtain supplies during the interregnum. But Clark did not.

13.    In January 2001, a consultant for Clark contacted KACC. The consultant advised KACC that Clark needed electricity for August and September 2001 and he was aware that the BPA might have a block of federal power for sale because KACC had curtailed its manufacturing operations. Thereafter, KACC and Clark independently approached other potential buyers and sellers to determine a market price for power for August and September 2001. They each obtained price information so that KACC could name Clark as a party willing to buy power from the BPA at a specified price in the notice KACC would provide to the BPA of the curtailment of KACC's own August and September 2001 purchases. The price ultimately set forth in the notice was below the market quotes Clark had received from other sellers (Hoerner Dec. ¶ 8.)

14.    On February 2, 2001, at the request of Clark's consultant, KACC provided Clark with a letter indicating how a sale from the BPA to Clark would be implemented if the BPA chose to sell power to Clark. A factor precipitating the letter was Clark's concern with

KACC's creditworthiness  The letter clearly noted that Clark's power sale contract, if offered, would be with the BPA for federal power, and not with KACC; similarly, Clark would pay the BPA, not KACC  (Hoerner Dec. ¶ 9 )

### Clark's Agreement With the BPA

15.    On February 2, 2001, KACC also submitted a notice to the BPA indicating that it intended to curtail purchases for August and September 2001  The notice identified Clark as a potential purchaser at the below-market price, which was developed based upon Clark's and KACC's market intelligence  (Hoerner Dec ¶ 10 )

16.    After receiving KACC's notice, the BPA elected to sell power to Clark  Consistent with the BPA's election to sell power to Clark, the BPA and Clark executed an agreement that unambiguously identifies the BPA as the Seller and Clark as the Buyer for a term commencing on August 1, 2001 and terminating on September 30, 2001.  (Hoerner Dec ¶ 12 )

### Proceedings Before the FERC

17.    On October 26, 2000, Puget Sound Energy, Inc. ("Puget Sound") filed with the FERC a complaint in which it asked the FERC to place a cap on the price that could be charged for energy sold under the Western Systems Power Pool Agreement into Pacific Northwest wholesale power markets  It was this complaint that initiated the Puget Sound Proceeding  (Hoerner Dec. ¶ 13 )

18.    Subsequent to the interventions of many parties in the proceeding, the filing of almost 150 pleadings and ultimately unsuccessful settlement discussions before the FERC's Chief Administrative Law Judge, on July 25, 2001, the FERC issued an order initiating an evidentiary proceeding to develop a factual record on whether there may have been unjust and unreasonable charges for spot market bilateral sales of energy in the Pacific Northwest during the period December 25, 2000 through June 20, 2001  San Diego Gas & Electric Company v.

<u>Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent</u>

<u>System Operator Corporation and the California Power Exchange, et al.</u>, 96 FERC ¶ 61,120 at

61,520 (2001). (Hoerner Dec ¶ 14.)

      19    More than nine months after Puget Sound filed its complaint, Clark filed a

motion for leave to intervene out of time in the Puget Sound Proceeding  In that motion, Clark

expressly represented it would accept the procedural schedule as it stood. (<u>See</u> Motion of Clark

Public Utility for Leave to Intervene Out of Time (the "Clark Intervention"), filed August 7,

2001, attached as Exhibit 2 to the Sundback Aff). Clark's motion was granted  Clark never filed

its own complaint, but simply attempted to piggyback off of the complaint filed by Puget Sound.

On August 17, 2001, Clark filed prepared testimony in the proceeding  (Hoerner Dec. ¶ 15.)

Clark's prepared testimony filed in the Puget Sound Proceeding at the FERC contains the same

factual allegations that Clark raised in support of its first request for relief from the automatic

stay.[4]

      20.    Subsequent to the filing of Clark's prepared testimony in the Puget Sound

Proceeding, KACC filed prepared answering testimony. KACC's answering testimony explained

the contractual arrangements between KACC and the BPA under the PSA. (Hoerner Dec. ¶ 21.)

KACC also explained that the BPA, not KACC, had sold the electricity in question to Clark

---

[4]    Clark's claim that it was unable to locate a supplier with enough capacity to serve Clark's
needs, however, is not entirely consistent with its representation to the FERC that
"suppliers willing to make a commitment [for the August and September 2001 time
period] were fairly scarce." Exhibit 4 to Hoerner Dec. at page 5, lines 12-14
Additionally, Clark conveniently fails to advise the Court that the prices then available
from sources other than the BPA-marketed power ranged from $350 to $500 per MWh,
and "prices for those months were predicted to exceed $1000 for daily purchases in those
months " <u>Id.</u> at page 5, lines 15-18. Thus, Clark's own testimony at the FERC
corroborated KACC's position that the price Clark paid for the electricity in question was
at a discount from prevailing prices.

KACC's testimony concluded that the PSA and the agreement between the BPA and Clark showed that KACC had no control over the terms and conditions of the BPA's sale of power to Clark, and as a result, Clark should not be due any money from KACC. A copy of KACC's prepared answering testimony filed in the Puget Sound Proceeding is attached as Exhibit 5 to Hoerner Dec.

 21. Prior to the hearing in the Puget Sound Proceeding, thousands of discovery requests were served by dozens of the parties. The discovery processes available to Clark at that time included requests for admissions, requests for production of documents, interrogatories and depositions. See 18 C.F.R. Part 385.400 et seq. (2002) (specifying "Discovery Procedures For Matters Set For Hearing . . .") In fact, Clark sent data requests in the first phase of the proceeding. Clark's data request posed approximately 40 separately designated questions or subparts to KACC. KACC was also served with discovery by other parties to the Puget Sound Proceeding as well.

 22. Following the submission of the prepared testimony, an evidentiary hearing was held before the ALJ in which a record was developed on the circumstances faced in Pacific Northwest power markets during the period December 25, 2000 through June 20, 2001. Clark and KACC were given the opportunity during that evidentiary hearing to conduct live cross-examination of each other's witnesses. Clark waived its opportunity to cross-examine on KACC's testimony, as well as on relevant testimony filed by the BPA. (See FERC Tr. at pp. 1057-59, 1257-58, attached as Exhibit 3 to the Sundback Aff.)) Thereafter, each party filed post-hearing briefs and proposed findings of fact with the ALJ. (Hoerner Dec. ¶ 22.) Clark's proposed findings of fact and conclusions of law did not make any assertion that it had been deprived of due process or disadvantaged by the procedural schedule.

23      The ALJ subsequently issued her recommendations to the full Commission. In her Recommended Decision, the ALJ concluded that the prices in the Pacific Northwest during the relevant time period were the result of a number of factors, including a shortage of supply, excess demand, a drought, increased natural gas prices and price signals from California markets. Recommended Decision, 96 FERC at ¶ 65,385. She also concluded that the Pacific Northwest is a competitive market, and that the transactions at issue in the case resulted from bilateral agreements between the parties. Id. She further concluded that "[u]nder these circumstances, the prices charged were not unjust or unreasonable and refunds should not be ordered in this proceeding." Id. Thus, she recommended that the Commission terminate the proceeding. Id.

24      After the issuance of the Recommended Decision, numerous parties, including Clark and KACC, submitted comments to the full Commission advocating their various positions to the FERC. For its part, Clark disagreed with the ALJ's recommendations and requested that the FERC order refunds from KACC to Clark either in the Puget Sound Proceeding, or alternatively suggested that refunds be ordered in another proceeding before the FERC, entitled Investigation of Wholesale Rates of Public Utility Sellers of Energy and Ancillary Services in the Western Systems Coordinating Council, FERC Docket No. EL01-68, initiated by the FERC in April 2001 (the "WSCC Proceeding"). This alternative suggestion was somewhat odd in that neither Clark nor KACC were parties to the WSCC Proceeding [5] (Hoerner Dec ¶ 24.) Clark's comments did not contend that the proceeding had been procedurally flawed.

25      Moreover, following the filing of its Comments on the Recommended Decision, Clark decided to ignore the Commission's procedural schedule and filed an additional

---

[5]      Clark sought to intervene in the WSCC Proceeding, but Clark's request was denied.

out-of-time pleading on November 20, 2001  Apparently dissatisfied with its prior efforts,

Clark's belated November 20, 2001 pleading recapitulated its prior points, although re-arranged

in the new pleading  (Hoerner Dec ¶ 25 )

      26.    Subsequent to the ALJ issuing the Recommended Decision for

consideration by the Commission, the City of Tacoma filed a motion in which it requested that

the Commission reopen the evidentiary record in the Puget Sound Proceeding to allow further

investigation and discovery into the actions of participants in the Pacific Northwest power

market  On December 19, 2002, the Commission issued the Discovery Order, allowing parties in

the Puget Sound Proceeding to conduct additional discovery for the period January 1, 2000 to

June 20, 2001 and to submit to the Commission "additional evidence and new and/or modified

proposed findings of fact concerning potential refunds for spot market bilateral sales transactions

in the Pacific Northwest" for the period in question  (Discovery Order at ¶ 12)  Pursuant to the

Discovery Order, discovery that parties choose to undertake, and evidence they choose to file,

must be submitted directly to FERC by February 28, 2003  (Id. at ¶ 12 ) Once those parties that

seek to place evidence before the Commission have made their filings, the Commission will take

up the filings, with the ALJ's Recommended Decision.  (Id. at ¶ 13.)

### The Clark Lift Stay Motion

      27.    The Motion requests relief from the automatic stay on two alternative

grounds:  (a) a declaration by the Court that Clark's participation in the reopened Puget Sound

Proceeding is not stayed by virtue of section 362(b)(4) of the Bankruptcy Code; or (b) allowing

relief from the automatic stay under section 362(d) of the Bankruptcy Code so that Clark may

participate in the reopened Puget Sound Proceeding for the limited purpose of taking additional

discovery and submitting new and/or modified proposed findings of fact to the Commission.  As

explained below, both of these grounds are meritless

<u>Argument</u>

**A.    Clark Cannot Show a Public Purpose to Act Under the Police Power Exception**

28    Clark's argument that its pursuit of its refund claim against KACC in the FERC proceeding is excepted from the automatic stay is based entirely on the flawed contention that because the automatic stay does not prevent the FERC's actions in the Puget Sound Proceeding against KACC, Clark's participation is likewise not prohibited   (Motion at 8) Nowhere in Clark's Motion for relief from stay to participate in the Puget Sound Proceeding does it demonstrate or show that it is pursuing a public purpose or interest  Instead, Clark merely argues at length that the FERC's regulatory powers are not barred by the automatic stay. Because the FERC has reopened the Puget Sound Proceeding on a limited basis, Clark asserts that it, likewise, is not prohibited by the automatic stay from pursuing discovery against KACC. This contention is meritless.

29    As stated above, the Puget Sound Proceeding conducted by FERC is a proceeding to determine the "just and reasonable" rates for power that was sold in the Pacific Northwest during the period December 2000 through June 2001.  This is a regulatory proceeding subject to the police power exception under section 362(b)(4) of the Bankruptcy Code   Clark's Motion, however, fails to establish a public purpose for its actions against KACC in the Puget Sound Proceeding.  Moreover, Clark is a private party in the Puget Sound Proceeding that is seeking money from one or more parties   In such circumstances, Clark is not acting under any police or regulatory authority and its actions are not excepted from the automatic stay

30    Nonetheless, to bolster its request to conduct additional discovery on KACC, Clark asserts that because the Discovery Order "mandates" Clark to conduct additional discovery in the Puget Sound Proceeding, it can do so under the guise of FERC's police power exception under section 362(b)(4) of the Bankruptcy Code   First, the Discovery Order does <u>not</u>

mandate that any party (including Clark) conduct additional discovery and submit new findings of fact. The Discovery Order is permissive, it <u>allows</u> a party to conduct additional discovery and to submit new findings of fact  (Discovery Order at ¶ 12 )  Clark, moreover, is not acting as a regulatory authority in this proceeding, but instead, is simply pursuing as a private entity any and every avenue to create a refund claim against KACC  Such actions do not demonstrate a public purpose or interest being pursued by Clark that would except its actions from the automatic stay under section 362(b)(4) of the Bankruptcy Code, but rather constitute the pursuit of a private right of action against KACC in violation of the automatic stay

**B.     Clark is Not Entitled to Relief From the Automatic Stay**

31.     Clark is bound by the automatic stay and is prohibited from pursuing discovery against KACC unless it obtains relief from the stay   As demonstrated below, Clark cannot show "cause" for relief from the automatic stay

*<u>The Standards for Relief from the Automatic Stay</u>*

32.     The automatic stay is an essential element of the reorganization process as it "prevents the dissipation or diminution of the bankrupt's assets while rehabilitative efforts are undertaken *and prohibits the proliferation of numerous claims in different forums against the debtor*." <u>S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In re S.I. Acquisition, Inc.)</u>, 817 F 2d 1142, 1146 (5th Cir. 1987) (citing H R. Rep. No. 95-595, 95th Cong , 2d Sess. 340 (1978), <u>reprinted in</u> 1978 U S.C C A N. 5787, 5963, 6297- 98) (emphasis added).  Therefore, relief from the stay may only be granted for good reason  See <u>In re Stranahan Gear Company, Inc.</u>, 67 B.R. 834, 836 (Bankr E D Pa 1986)

33.     Section 362(d)(1) permits the Court to lift or modify the stay only for "cause."  The Bankruptcy Code does not define the term "cause."  Rather, a determination of whether cause exists for relief from the automatic stay is a matter for the court's discretion in

light of all the circumstances presented  See In re Robert Frank-Leonard Wilson, 116 F.3d 87,

90 (3d Cir. 1997).

        34.    Courts in this District have stated that at least three factors should be

considered to determine cause under section 362(d)(1) to lift the stay to allow a party to continue

to prosecute a claim in litigation:

        (a)    Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;

        (b)    Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and

        (c)    The probability of the creditor prevailing on the merits.

In re Pursuit Athletic Footwear, Inc., 193 B.R. 713, 718 (Bankr. D. Del. 1996); see In re

Integrated Health Servs., Inc., No. 00-389-MWF, 2000 Bankr. LEXIS 1319, at *5 (Bankr. D.

Del. Aug. 11, 2000)  The Movant bears the burden of proof with respect to whether cause exists

to lift the stay  In re Pacor, Inc., 74 B.R. 20, 22 (E.D. Pa. 1987)  Only then does the burden shift

to the Debtors to rebut this showing  In re Pursuit Athletic Footwear, 193 B.R. at 718; In re

Salvatore J. Mazzeo, 167 F.3d 139, 142 (2d Cir. 1999).  Furthermore, courts have recognized

that, early in a debtor's chapter 11 cases, an unsecured, unliquidated claimholder should not be

permitted to pursue litigation against the debtor in another court unless extraordinary

circumstances are shown.  See, e.g., In re I. Burack, Inc., 132 B.R. 814, 817 (Bankr. S.D.N.Y.

1991) (stating that during the exclusivity period, "an unsecured, unliquidated claimholder should

not be permitted to pursue litigation against the debtor in another court unless extraordinary

circumstances are shown "); In re Pioneer Commercial Funding Corp., 114 B.R. 45 (Bankr.

S.D.N.Y 1990) (same).

35.    As described below, each of the factors here weighs heavily against lifting the automatic stay at this stage, and Clark has certainly not established the requisite extraordinary circumstances.

*Cause Does Not Exist to Lift the Stay*

36    Clark asserts that it must be granted relief from the automatic stay so that it can participate in the reopened Puget Sound Proceeding for the limited purpose of taking additional discovery and submitting proposed findings of fact before the February 28, 2003 deadline  (Motion at pp  13-14).  To support its assertion that there is "cause" to lift the stay in this case, Clark argues that (a) a decision by FERC will be binding and have preclusive effect on Clark in KACC's bankruptcy case and will completely resolve all the issues between KACC and Clark, including whether Clark has a claim against KACC, (b) the FERC has exclusive jurisdiction to resolve Clark's rate claim against KACC because FERC has exclusive jurisdiction to set just and reasonable power rates and (c) the FERC is a highly specialized agency designed to deal exclusively with issues arising from wholesale power sales and therefore is uniquely qualified to resolve the dispute between Clark and KACC.  Putting aside the argument that Clark's purported claims are within FERC's exclusive jurisdiction to establish just and reasonable charges for electric energy sold at wholesale, Clark ignores (a) the lack of hardship on Clark if the stay is maintained given the fact that, although the Puget Sound Proceeding has been reopened, Clark has already had a full opportunity to present its claims to the FERC, which were denied; (b) the complete lack of merit to Clark's claim that KACC was the seller of the electricity; and (c) the issue of whether the BPA sales are within the FERC's jurisdiction.  Each of these factors, however, strongly favor keeping the stay in place.

(1)     ***Clark's Issue Preclusion and Jurisdiction Arguments Do Not Constitute "Cause"***

37     Clark argues that any ruling by FERC in the Puget Sound Proceeding will bind (i.e., have preclusive effect on) Clark in KACC's bankruptcy case and will determine if Clark has a claim against KACC. Clark complains that it did "not have the opportunity to fully develop its case     due to the     expedited discovery schedule which prevented the parties from taking discovery regarding market manipulation in the Pacific Northwest." (Motion at p. 3). In its motion, Clark further complains that it was "not heard." (Motion at p. 4) Without citation, Clark goes on to repeatedly conjecture that it was for these reasons that the Commission re-opened the record in the Puget Sound Proceeding (Motion at pp. 6, 9). Thus, Clark asserts that unless it is afforded the opportunity to complete the development of its position in the Puget Sound Proceeding, FERC's ruling could leave Clark without a forum to litigate its rate claim Clark's attempts to mislead this Court into believing that it did not have the opportunity to litigate its rate claims against KACC before the ALJ should be rejected.

38.     Clark's contentions that it did not have the opportunity to litigate its claims are demonstrably wrong or disingenuous. Clark was not, contrary to its erroneous assertion, prevented from taking discovery or presenting evidence on its claims (including alleged market manipulation) in the Puget Sound Proceeding. By KACC's count, thousands of discovery requests were served before the hearing, which is hardly evidence that the schedule "prevented the parties from taking discovery" on market manipulation More importantly, Clark declined the opportunity to cross-examine witnesses presented by KACC as well as the BPA in the Puget Sound Proceeding (See FERC Tr. at pp. 1057-59, 1257-58 (Exhibit 3 to the Sundback Aff.)). By seeking additional discovery, Clark is clearly attempting to relitigate its claims that it lost in the ALJ proceeding and revisit tactical decisions it made therein.

39    Moreover, Clark's attack on the procedural schedule is all the more remarkable given that at the hearing, Clark never registered the procedural objections it now makes  As noted above, although Clark had the opportunity to cross-examine the witnesses of KACC (as well as BPA) at the Puget Sound Proceeding, it declined the opportunity, resulting in the entry of testimony without cross-examination  In Clark's half dozen pleadings filed with the Commission in the Puget Sound Proceeding prior to KACC's bankruptcy filing[6], Clark never complained about the schedule  Once the schedule had been established by order of the Presiding Judge issued August 2, 2001, Clark affirmatively represented that it would "accept the procedural schedule as [it] stands[s] ." (See Clark Intervention at p. 2 (Exhibit 2 to the Sundback Aff.))  In its post-hearing comments, Clark never once raised any objections to the procedures  Clark also is demonstrably incorrect by contending that its arguments were not heard.  This contention ignores the fact that the Presiding Judge specifically set up a mechanism to brief what was characterized as the "dispute between KACC" and Clark  Both Clark and KACC availed themselves of that opportunity, as the Recommended Decision of the Presiding Judge demonstrates on its face[7].

40    As stated above, the Discovery Order does not require every participant to conduct discovery or submit new findings  Under Clark's interpretation, more than 150 parties to the proceeding must serve discovery and file testimony  But there was no requirement in the

---

[6]    See "Motion of Clark Public Utilities For Leave To Intervene Out of Time"; "Statement of Clark Public Utilities identifying It as a Member of the Northwest Net Purchasers Group"; "Clark Public Utilities Supplemental Proposed Findings of Fact and Conclusions of Law"; "Comments of Clark Public Utilities"; "Supplemental Comments of Clark Public Utilities"; "Post Hearing Brief of Clark Public Utilities"; "Joint Post-Hearing Brief Of The Pacific Northwest Net Purchasers Group"; "Pacific Northwest Net Purchasers Group's Proposed Findings of Fact and Conclusions of Law", all in Puget Sound Energy, Inc. v. All Jurisdictional Sellers, Docket Nos. EL01-10, et seq.

[7]    See Puget Sound Energy, Inc., 96 FERC ¶ 63,044 at 65,301 (2001).

first phase that a party file testimony, and it is hard to understand why the Commission in this phase would compel such a result  More importantly, Clark has not and cannot identify what additional evidence it will request from KACC on the market manipulation issue that it has not previously obtained [8]  Clark has already litigated and lost the issues and claims it has against KACC, and should not be allowed to conduct additional discovery on KACC since it was previously afforded an opportunity to develop and present its positions in the Puget Sound Proceeding.  Clark, thus, has not shown any basis to serve KACC with additional discovery, nor cause for relief from the automatic stay.

        41  Clark also argues that the FERC has <u>exclusive</u> jurisdiction and primary jurisdiction to decide Clark's claim against KACC because the FERC has exclusive jurisdiction to set power rates and order refunds to buyers of power  Thus, according to Clark, the Bankruptcy Court cannot determine Clark's claim because of the FERC's exclusive rate setting and refund jurisdiction  Clark, however, is blurring the line between the FERC's exclusive jurisdiction and the Bankruptcy Court's claim determination jurisdiction.  The Bankruptcy Court has the jurisdiction to determine the amount of Clark's claim, 11 U S C  § 502, and can do so by simply reviewing the FERC's decision and whether or not Clark was allowed a claim in the Puget Sound Proceeding.  Clark simply must file a proof of claim with the Bankruptcy Court, allow KACC to respond by objection (if necessary)  The Bankruptcy Court can then determine Clark's claim based upon the FERC's decision.  Clark's argument (without citation) that the FERC's exclusive rate making and refund jurisdiction deprives the Bankruptcy Court of

---

[8]  Clark's request to conduct discovery regarding whether KACC participated in market manipulation is simply an attempt to further pursue it prior "exercise of market power" argument, which it lost

jurisdiction to determine the amount, if any, of Clark's claim is groundless and does not provide "cause" to lift the automatic stay to conduct additional discovery [9]

(2)    *KACC Will Suffer Great Prejudice if the Automatic Stay is Not Maintained*

       42.    If the Court lifts the automatic stay for Clark to seek additional discovery, KACC will suffer great prejudice by having to expend substantial time and resources as a result of the additional discovery. The only purpose in obtaining additional discovery would be to attempt to introduce it into evidence on the various theories Clark previously raised, but which were rejected.[10] As shown above, Clark has had ample opportunity to litigate its claims before the FERC, and the ALJ's Recommended Decision rejected all of Clark's claims currently pending before the Commission. Thus, there is nothing more to do in that docket in terms of hearings. By seeking additional discovery, Clark simply intends to relitigate the issues it at least preliminarily has lost in the Puget Sound Proceeding.[11]

---

[9]    Clark also attempts to support its "exclusive jurisdiction" position by stating that "FERC has the sole authority ... to determine whether a particular transaction is within its regulatory authority, including whether a particular entity is a "seller" of power " (Motion at p. 16). Tellingly, it is Clark's intention to seek additional discovery to relitigate its claim that KACC was a "seller" of power without authorization from the FERC. As stated above, this argument has been rejected by the ALJ in her Recommended Decision and the Court should preclude any discovery on this issue.

[10]    Although the Commission reopened the proceeding in light of alleged activities that may have been undertaken by Enron Corp. in the Pacific Northwest, nowhere in Clark's Motion does it state that it solely seeks discovery on this issue. Moreover, there has been no allegation that Enron played a role in the transactions at issue. KACC asserts that Clark will conduct discovery on claims it lost in the hearing before the ALJ and attempt to relitigate those issues under the guise of obtaining discovery on alleged market manipulation.

[11]    In its first motion for relief from stay, Clark sought authority to file a new complaint against KACC on the theory that KACC violated the Federal Power Act by selling power to Clark without obtaining FERC authorization for such sale. The ALJ's Recommended Decision, however, rejected this contention, and this issue is currently before the FERC in the Puget Sound Proceeding. Nonetheless, Clark states it needs to conduct additional discovery on this theory (Motion at p. 16). KACC is at a loss as to what additional

43.    Moreover, relitigation in the Puget Sound Proceeding in itself would be a waste of administrative economy. It is axiomatic that judicial economy weighs against allowing a party to relitigate issues. FERC's policy also strongly disfavors relitigation. See Central Kansas Power Co., 5 FERC ¶ 61,291 at 61,621 (1978) (affirming the ALJ's conclusion that to decide issues previously afforded a full hearing "would ill serve the goal of administrative efficiency and would not further the interests of the parties"). Here, Clark neither has asserted, nor can justify relitigation of its claims against KACC. The issues as to whether KACC was the seller of the power and whether amounts are due to Clark in respect of such putative sales (and thus the liquidation of Clark's claim) are already before the FERC in the Puget Sound Proceeding, and the FERC can decide the issues based upon the existing record and the ALJ's Recommended Decision. The interests of judicial economy, expeditious resolution of litigation and FERC policy weigh heavily against allowing Clark to attempt to reopen these issues at the FERC by seeking additional discovery and procedures in the Puget Sound Proceeding. Accordingly, if relief from the stay is granted to allow Clark to obtain additional discovery, substantial prejudice would be occasioned on the Debtors.

---

(continued   )

discovery would be obtained that is not already in the FERC record. Moreover, the FERC has access to its own files and regularly takes official notice of their contents. See 18 C.F.R. 385.508(d) (permitting official notice); Nevada Power Co., et al. V. Duke Energy Trading and Marketing, L.L.C., 99 FERC ¶ 61,047 (2002); California Independent System Operator Corp., 98 FERC ¶ 61,335 n 34 (2002) (taking official notice of a deposition); Kern River Gas Transmission Co., 95 FERC ¶ 61,022 n.3 (2001) (taking office notice of record in another docket); Entergy Services, Inc., 58 FERC ¶ 61,234 at p. 61,752 (1992) (official notice of materials in Commission files in another matter). Thus, the FERC surely is aware that KACC never has applied for, nor has the FERC granted it, authority to sell power in interstate commerce. Thus, Clark's feigned need to raise the absence of KACC's authorization to sell power is simply an excuse to enable Clark to attempt to get a second bite at the apple.

44      Clark also contends that, although it intends to serve additional discovery on KACC regarding alleged market manipulation by KACC, granting relief from the automatic stay will have very little negative impact on KACC's estate and its bankruptcy proceedings (Motion at pp. 16-17)   According to Clark, KACC has already retained counsel to represent it in the Puget Sound Proceeding and fully participated in such proceeding. Clark's "market manipulation" argument, however, is simply a recast of its prior "exercise of market power" argument that Clark asserted at the hearing before the ALJ and submitted as part of the Pacific Northwest Net Purchasers Group's Proposed Findings of Fact and Conclusions of Law (the "PNNPG Brief"). A copy of the PNNPG Brief is attached as Exhibit 4 to the Sundback Aff. The ALJ, however, rejected the "exercise of market power" argument. Recommended Decision, 96 FERC ¶ 63,044 at 65,369-70 (2001). Thus, if Clark is given the opportunity to serve additional discovery, KACC asserts that Clark is simply being afforded the opportunity to conduct additional discovery in order to relitigate claims, including any "market manipulation claim, it lost in the hearing before the ALJ. Moreover, allowing Clark to serve additional discovery will allow Clark to search for other grounds to assert new claims against KACC, which will require KACC's lawyers to undertake all of the activities associated with reviewing and responding to any new claims, including discovery by KACC and determining where discovery requests are objectionable, associated hearing briefs and litigation of these claims.[12] Contrary to Clark's claims in its Motion, substantial prejudice to the Debtors will likely occur if the stay is lifted.

---

[12]    Indeed, Wayne Nelson, who submitted an affidavit in support of Clark's Motion, was quoted in a recent newspaper article as warning that any new litigation could take years and run up legal bills of several hundred thousand dollars.

45    With respect to the hardship on Clark if the stay is maintained, any hardship is of Clark's own making. Clark had ample opportunity to litigate its claims before the FERC and the ALJ's Recommended Decision rejected Clark's claims that are currently pending before the Commission. Clark should not be allowed to relitigate its claims that it lost.[13]

46.    Additionally, Clark has not even proffered why the sought after discovery is available only from KACC and not from any other source. Indeed, this is the crux of the problem here — Clark essentially is seeking carte blanche authority to pursue discovery it already had the opportunity to request.

47    In addition to the lack of hardship to Clark if the stay is maintained and the substantial prejudice to the Debtors if the stay is lifted, Clark is very unlikely to succeed on the merits. Clark has already lost on these arguments. Thus, not only does it have the burden of proof on its motion, but it also carries the burden of overturning the FERC's ruling in the Puget Sound Proceeding.

48.    As explained above, Clark's request to conduct additional discovery is merely an attempt by a litigant, dissatisfied with how it presented its case initially, to recast its claim or assert new claims. The ALJ's Recommended Decision denied Clark's claims in the Puget Sound Proceeding and Clark has failed to demonstrate what additional evidence it believes it can obtain from KACC to support its claims or that it has a chance of succeeding on its claims

## Conclusion

For all of the foregoing reasons, Clark's Motion should be denied

---

[13]    As demonstrated in its motion, Clark is on the prowl for relief from its own failure to act in a prudent and informed fashion, and wants to burden KACC because of those failings.

Dated: January 13, 2003
Wilmington, Delaware

Respectfully submitted,

*Patrick Leath*

Daniel J. DeFranceschi (DE 2732)
Paul Heath (DE 3704)
Patrick Leathem (DE 4114)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Richard I. Werder, Jr. (OH I.D. 0011533)
Kevyn D. Orr (D.C. I.D. 443074)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone: (216) 469-3939
Facsimile: (216) 579-0212

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
David G. Adams (TX 00793227)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201-1515
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

---

(continued  )

    Similarly, if Clark is allowed to conduct additional discovery, KACC will want to
explore what other offers were made to sell power to Clark

**Kaiser Aluminum Corp., et al.**
**Case No. 02-10429 (JKF)**

**SUMMARY SHEET OF EXHIBITS**

**EXHIBIT A**
Declaration of Joseph Patrick Hoerner

**EXHIBIT B**
Mark Sundback Affidavit

**EXHIBIT B**

( -13-2003  04:55·m  From·ANDREWS & KJR·· LLP  202-662-2730          +2026622739          ·-E53  P 002/007  F-277

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Jointly Administered |
| | : | |
| | : | Case No. 02-10429 (JKF) |
| KAISER ALUMINUM CORPORATION, | : | |
| a Delaware Corporation, et al., | : | Chapter 11 |
| | : | |
| Debtors | : | |

AFFIDAVIT OF MARK SUNDBACK IN SUPPORT OF
OBJECTION OF KAISER ALUMINUM & CHEMICAL CORPORATION
TO EMERGENCY MOTION OF PUBLIC UTILITY DISTRICT NO. 1 OF
CLARK COUNTY FOR RELIEF FROM THE AUTOMATIC STAY

CITY OF WASHINGTON    )
                     ) ss.:
DISTRICT OF COLUMBIA )

MARK SUNDBACK, being duly sworn, deposes and says:

1.          I am a partner of Andrews & Kurth L.L.P., which is outside energy

counsel to Kaiser Aluminum & Chemical Corporation ("KACC"), on the above-

captioned matter and before the Federal Energy Regulatory Commission ("FERC") in

Docket No. EL01-10, the Puget Sound proceeding  In this capacity, I am familiar with

the facts and circumstances set forth herein and submit this affidavit in support of the

Objection to Emergency Motion of Public Utility District No. 1 of Clark County for

Limited Relief From the Automatic Stay Protecting KACC (the "Objection").

2.          Attached hereto as Exhibit 1 is a true and complete copy of the Order on

Motions to Reopen Evidentiary Record Evidentiary Record dated December 19, 2002

issued by the FERC in an action captioned Puget Sound Energy, Inc. v. All Jurisdictional

Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity

Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool

Agreement, Docket No. EL01-10-000 (the "Puget Sound Proceeding")

DL1-5740419v1

C -13-2003   04:55am   From-ANDREWS & KJR- LLP   202-082-2758         +202E022738         "-E63  P 009/007  F-277

3.       Attached hereto as Exhibit 2 is a true and correct copy of the Motion of

Clark Public Utility for Leave to Intervene Out of Time, filed on August 7, 2001 in the

Puget Sound Proceeding.

4.       Attached hereto as Exhibit 3 is a true and correct copy of excerpted pages

of the Hearing Transcript in the Puget Sound Proceeding held on September 6, 2001.

5.       Attached hereto as Exhibit 4 is a true and correct copy of the Pacific

Northwest Net Purchasers Group's Proposed Findings of Fact and Conclusions of Law,

filed on September 18, 2001 in the Puget Sound Proceeding.


_Mark F. Sundback_
Mark F. Sundback


Sworn to before me on this 13th day of January 2003.


_Lindo_
Notary Public

JACQUELINE LINDO
Notary Public, State of Maryland
My Commission Expires Dec 1, 2005

**EXHIBIT 1**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION
101 FERC ¶ 61,304

Before Commissioners: Pat Wood. III, Chairman;
William L Massey, and Nora Mead Brownell

| | | |
|---|---|---|
| Puget Sound Energy, Inc , et al,<br>　　　　Complainant, | )<br>) | Docket Nos  EL01-10-000<br>　　　　EL01-10-001 |
| | ) | |
| 　　　v | ) | |
| | ) | |
| All Jurisdictional Sellers of Energy and/or | ) | |
| Capacity at Wholesale Into Electric Energy | ) | |
| and/or Capacity Markets in the Pacific | ) | |
| Northwest, Including Parties to the Western | ) | |
| Systems Power Pool Agreement, | ) | |
| 　　　　Respondents | ) | |

ORDER ON MOTIONS TO REOPEN EVIDENTIARY RECORD

(Issued December 19, 2002)

1.    In this order, we grant in part and deny in part motions seeking to reopen the evidentiary record in the EL01-10, et al docket for the purpose of allowing parties to submit additional evidence concerning potential refunds for spot market bilateral sales transactions in the Pacific Northwest for the period January 1, 2000 through June 20, 2001. In taking this action, our goal is to provide all parties an opportunity to ensure that all relevant evidence is adduced in this proceeding, but also to bring closure and certainty to this proceeding (to sellers and customers alike) fairly and quickly.

**I. Background**

2    On October 26, 2000, Puget Sound Energy, Inc  (Puget Sound) filed a complaint alleging that spot market prices in the Pacific Northwest were unjust and unreasonable  In a December 15, 2000 order (December 15 Order),[1] the Commission declined to implement a region-

---

[1]San Diego Gas & Electric Company v  Sellers of Energy and Ancillary Services, et al , 93 FERC ¶ 61,294 (2000), reh'g denied, 97 FERC ¶ 61,275 (2001)

Docket Nos. EL01-10-000 and EL01-10-001

- 2 -

wide price cap, as Puget Sound had requested. Puget Sound and others timely sought rehearing of the December 15 Order's determination not to impose a regional price cap or other mitigation. However, on June 22, 2001, Puget Sound filed a motion to dismiss its complaint and its subsequent rehearing request. Instead, in a July 25, 2001 order (July 25 Order)[2], the Commission established a preliminary evidentiary hearing pertaining to the Northwest for the period beginning December 25, 2000 through June 20, 2001 to help facilitate development of a factual record on whether there may have been unjust and unreasonable charges for spot market bilateral sales in the Pacific Northwest. In the July 25 Order the Commission also stated that it would decide at a later time whether to allow Puget Sound to withdraw the complaint. On September 24, 2001, the Presiding Administrative Law Judge (ALJ) issued recommendations and proposed findings of fact in the case, finding no basis to order refunds[3]

**Motions**

3       On May 13, 2002, the City of Tacoma, Washington (Tacoma) filed a motion in which it requests that the Commission reopen the evidentiary record in the EL01-10, et al docket to allow a "hearing on all issues related to refunds for wholesale energy transactions in excess of the market clearing price in the Pacific Northwest" and permit further investigation and discovery into the actions of specific participants in the Pacific Northwest power market. Tacoma states that since the issuance of Puget Sound, material evidence has become available that demonstrates that the Presiding Judge's conclusions in that decision are "clearly erroneous." On September 9, 2002 and October 2, 2002, Tacoma filed supplements to its motion in which it identifies the existence of additional evidence it alleges is material and relevant to this proceeding.

---

[2] San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services, et al., 96 FERC ¶ 61,120 (2001)

[3] See Puget Sound Energy Company v. Sellers of Energy and Ancillary Services, 96 FERC ¶ 63,044 (2001) (Puget Sound)