1   Exhibits BPA-1 through 5 are admitted into evidence.

2              (Exhibits BPA-1 through 5 received.)

3         PRESIDING JUDGE:  Go ahead.  The panel is on.

4         MR. BURGER:  May Mr. Oliver be dismissed?

5         PRESIDING JUDGE:  Mr. Oliver may be dismissed.

6   Go ahead and catch your flight.  Go ahead, Mr. Watkiss.

7         MR. WATKISS:  Thank you, your Honor, the

8   Transaction Finality Group at this time would like to call

9   Dr. Scott Jones, Dr. Richard Tabors, Mr. Christopher

10  Stelzer, Mr. Seabron Adamson and Mr. Van Vactor to the

11  witness stand.  On behalf of the Transaction Finality

12  Group, we appreciate your Honor allowing us to present our

13  case through this panel.

14        I placed before each of the witnesses a copy of

15  the witnesses' prefiled testimony and exhibits.  Because

16  they originally filed these testimonies, your Honor, on

17  behalf of their individual sponsoring companies, the

18  identifying exhibit nomenclature reflected the company but

19  what we're doing now, because they are appearing on behalf

20  of the group and you might want to take this down, if

21  you're keeping track of exhibits, and we can send out a

22  follow-up e-mail later today also doing this translation.

23        ENR-1 through 29, which was the Enron exhibits

24  become TFG-26 to 50.  PWX, which was the Powerex

25  exhibits --

79115.0
JB

1    A E-7 are admitted into evidence.

2          (Exhibits AE-5 through 7 received.)

3          PRESIDING JUDGE:  Bonneville, I have all the

4    exhibits admitted into evidence?

5          MR. BARTUS:  Your Honor, counsel for Bonneville

6    asked me -- they had to catch a plane so they asked me to

7    speak for them.  Your Honor, remember this afternoon,

8    there was some stipulations that counsel of Bonneville

9    read into the record and you asked for copies, and counsel

10   left them with me to give to you.  Do you want to mark

11   them as exhibits?

12         PRESIDING JUDGE:  No, they were part of the

13   record and all the exhibits for Bonneville that been

14   admitted into the record.  Do you have copies for all the

15   other parties?

16         MR. BARTUS:  No, I do not.  But they're

17   typed-up versions of what counsel for Bonneville read into

18   the record.

19         PRESIDING JUDGE:  BP Energy, do I have anybody

20   in the room for BP Energy -- I'm sorry, Kaiser Aluminum,

21         MR. WISEMAN:  Yes, your Honor.  I have two

22   exhibits on behalf of Kaiser Aluminum.  Exhibit number

23   KACC-1 is the prepared answering testimony of Joseph P.

24   Hoerner.

25         PRESIDING JUDGE:  What are you calling that?

79115 0
79        JB
JE

1258

1       MR. WISEMAN:  KACC-1, the prepared answering

2   testimony of Joseph P. Hoerner for Kaiser Aluminum and

3   Chemical Corporation, and I would mark as KACC-2 excerpts

4   from the power sales agreement between Bonneville Power

5   Administration and Kaiser Aluminum, and I would move the

6   admission of KACC-1 and 2, your Honor.

7       PRESIDING JUDGE:  Was KACC-1 the testimony of

8   Hoerner?

9       MR. WISEMAN:  Yes.

10      PRESIDING JUDGE:  Any objections to the

11  admission of KACC-1 or 2?  There being no objections, the

12  exhibits are admitted into evidence.

13          (Exhibits KACC-1 and 2 received.)

14      PRESIDING JUDGE:  Chelan already admitted their

15  exhibits.  Constellation.

16      MR. CARROLL:  My name is Ron Carroll, I

17  previously introduced my appearance.  I'd like to enter my

18  appearance on behalf of Constellation so I can move their

19  testimony into the record.  I have the prepared direct

20  testimony of Thomas Q. Marlatt.  It is designated as

21  CPS-1.  I'd like to move it into the record now.

22      PRESIDING JUDGE:  Hand the reporter two copies.

23  Any objections to CPS-1?

24          There being no objections, CPS-1 admitted into

25  evidence.

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700          800-336-6646          410-684-2550

1300

<u>CERTIFICATE OF OFFICIAL REPORTER</u>

This is to certify that the attached proceedings before the

FEDERAL ENERGY REGULATORY COMMISSION in the Matter of:

Name of Proceeding:    PUGET SOUND ENERGY, INC., COMPLAINANT,
v. ALL JURISDICTIONAL SELLERS OF ENERGY
AND/OR CAPACITY AT WHOLESALE INTO
ELECTRIC ENERGY AND/OR CAPACITY MARKETS
IN THE PACIFIC NORTHWEST, INCLUDING
PARTIES TO THE WESTERN SYSTEMS POWER
POOL AGREEMENT, RESPONDENTS.

HEARING

Docket No.:    EL01-10-000 AND EL01-10-001

Place:    WASHINGTON, D.C.

Date:    THURSDAY, SEPTEMBER 6, 2001

were held as herein appears, and that this is the original

transcript thereof for the file of the Federal Energy Regulatory

Commission, and is a full correct transcription of the

proceedings.

Official Reporter

**EXHIBIT 4**

 

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Puget Sound Energy, Inc., | ) | |
| | ) | |
| *Complainant,* | ) | |
| | ) | |
| v. | ) | Docket Nos.  EL01-10-000 |
| | ) | EL01-10-001 |
| All Jurisdictional Sellers of Energy | ) | |
| and/or Capacity at Wholesale Into | ) | |
| Electric Energy and/or Capacity | ) | |
| Markets in the Pacific Northwest, | ) | |
| Including Parties to the Western | ) | |
| Systems Power Pool Agreement, | ) | |
| | ) | |
| *Respondents.* | ) | |

FILED OFFICE OF THE SECRETARY
2001 SEP 18 PM 4: 39
FEDERAL ENERGY REGULATORY COMMISSION

### PACIFIC NORTHWEST NET PURCHASER'S GROUP'S
### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Presiding Administrative Law Judge's Order Confirming Rulings issued on September 7, 2001, the Net Purchasers Group respectfully submits the following proposed findings of fact and conclusions of law on behalf of the City of Seattle, Washington, the City Tacoma, Washington, the Port of Seattle, Washington, Northern Wasco County People's Utility District, and Clark County Utility District.

### PROPOSED FINDINGS OF FACT

1.  The majority of Pacific Northwest load-serving utilities participating in this proceeding -- whether in favor of or opposed to refunds -- have testified that Pacific Northwest spot market sales include transactions of up to a year  *See, e g.,* NPG-1 at 11 (Seattle); PacifiCorp-1 at 2 (PacifiCorp); NPG-74 at 7 (Eugene Water & Electric Board); GT-1 at 6-7 (Grant County PUD, Benton County PUD, Franklin County PUD, Grays Harbor County PUD).  There is also substantial evidence in the record supporting refunds

01091q 0044-1

**DOCKETED** 

in connection with all purchases made during the refund period under contracts or service schedules of any duration tied to Pacific Northwest daily price indices. NPG-33 at 17-18 (City of Tacoma, Port of Seattle); NPG-45 at 17-18 (Northern Wasco).

2.  Pacific Northwest spot market sales and price indexed contracts and service schedules of any duration, including longer than one year, were directly affected by the price distortions in the California PX and ISO spot markets. *See, e g.*, June 19 Order, 95 FERC ¶ at 62,547; Exh. NPG-1 at 9; Exh. NPG-27 at 13, line 284, Saleba, NPG-53 at 3. *See also*, Tr 620, lines 2-7. The Dow Jones Mid-Columbia Index rate for on and off-peak time periods is a public index developed each day of trading and subject to the spot market pricing on a twenty-four hour basis. NPG-27 at 5-6, lines 102-105. The experts for the Transaction Finality Group ("TFG") acknowledged that market clearing prices in the California spot markets directly affected Pacific Northwest spot market sales and daily price indices in the Pacific Northwest. *See* Exh. ENR-10 at 19; Exh. PPL-1 at 17-18.

3.  The Pacific Northwest spot market bilateral sales include all purchases under contracts and service schedules of any duration at prices tied to Pacific Northwest daily price indices. NPG-60 at 3, lines 9-17, 23-26

4.  The Dow Jones Mid-Columbia Index rate for on and off-peak time periods is a public index developed each day of trading and subject to spot market pricing on a twenty-four hour basis. NPG-27 at 5-6, lines 102-105.

5.  Trades in the wholesale electricity market in the Western United States occur between parties located throughout the Pacific Northwest and California. NPG-16 at 4, lines 117-118. Existing transmission infrastructure allows delivery of power from

2

generators located throughout the Western System Coordinating Council. NPG-16 at 4, lines 118-120. All energy trades in the Northwestern United States are bilaterally negotiated rather than going through a central power exchange or system operator. NPG-16 at 4, lines 120-121

6. Participants in the Pacific Northwest power market transact deals in the hourly, or real-time market; the pre-schedule or day-ahead market; or for varying delivery periods of longer than one day. See NPG-16 at 5-6, lines 122-124.

7. Outside of California, any supplier has the right to package hourly supplies in whatever fashion the market dictates. Spot purchases tend to reflect the longer operational needs of the ultimate consumers. See NPG-1 at 9, lines 13-18.

8. The WSCC has operated a unified energy market for some time. NPG-27 at 6, line 112.

9. The recent events in California's sub-market have directly affected the availability and the price of natural gas and electricity and the Pacific Northwest sub-market. See NPG-27 at 6, lines 112-114.

10. In 2000, available power supplies were not adequate to meet California's peak demand for electricity. See NPG-16 at 13, lines 295-296. There is a legitimate question as to why the expected adequate supplies were not available. See NPG-16 at 13, lines 296-297. Generators with two years of experience with the California ISO and the California PX knew how to maximize their profits by conducting transactions in the California ISO imbalance markets. See NPG-16 at 13, lines 297-300. On May 22, 2000, the California market saw a reduction in supply roughly equivalent to 8,000 megawatts

3

*See* NPG-16 at 13, lines 300-301  From May through November, this shift was mainly the product of a dramatic increase in the prices bid into the California Power Exchange by the major California generators  *See* NPG-16 at 13, lines 301-03  From November through May, the same generators averaged approximately 8,000 MW of forced outages. *See* NPG-16 at 13, lines 303-04.  In addition, the investor owned utilities had been discouraged from entering into longer term forward market purchases and were relying overwhelmingly on short-term markets to serve their loads. *See* NPG-16 at 14, lines 306-08.  Wholesale electricity market prices were quite low in the years leading up to the crisis. *See* NPG-16 at 14, lines 308-11.

11. The traditional trading patterns between California and its northern neighbors – electricity shipped from the Northwest to California in the summer and returned by California to the Northwest in the winter – failed in the winter of 2000-2001 because California had no surplus electricity to offer to northwest utilities in the winter. *See* NPG-16 at 16, lines 363-367.

## DEFINITION OF "BILATERAL SPOT MARKET SALES"

12. In its Order of July 25, 2001, the Commission noted that "[w]hat is a 'spot market' sale for bilateral transactions in the Pacific Northwest may differ from what is a 'spot market' sale in the California ISO and PX organized spot markets." *San Diego Gas & Electric Co* , 96 FERC ¶ 61,120, 61,520 n.74 (2001) ("July 25 Order").

13. In the July 25 Order, Commissioner Massey stated that "I believe spot sale in the Pacific Northwest could include sales up to a month's duration or even longer." July 25 Order, 96 FERC at 61,522-23 (Massey, Comm'r, dissenting in part and concurring in part).

4

14. The Pacific Northwest spot market bilateral sales include hourly, daily, weekly, balance of the month, monthly, quarterly and longer purchase transactions up to one year, for scheduled delivery anytime up to one year from the date of the transaction. *See* following findings.

15. In the Pacific Northwest, all hourly, daily, bi-weekly, balance of month, and longer term purchase transactions that are either directly indexed to the spot market price or that are affected by changes in the market clearing price should be considered in the determination of unjust and unreasonable charges. NPG-45 at 17, lines 12-16.

16. The bilateral transactions for which refunds should be permitted should also include all sales during the refund period under contracts or service schedules of any duration tied to Pacific Northwest daily price indices. Tr. at 1141.

17. The majority of Pacific Northwest load-serving utilities participating in this proceeding testified that Pacific Northwest spot market sales include transactions of up to one year. *See* Exh. NPG-1 at 11; Exh. NPG-33 at 17-18; Exh. NPG-45 at 17-18; Exh. NPG-74 at 7; Exh. PacifiCorp-1 at 2; Exh. GT-1 at 6-7.

18. Even Pacific Northwest load-serving utilities not requesting refunds in this proceeding, including members of the Transaction Finality Group ("TFG"), have testified that the Pacific Northwest spot market encompasses transactions for periods in excess of 24 hours. *See* Exh. PacifiCorp-1 at 2; Exh. GT-1 at 6-7.

19 Commission Staff has testified that the definition of "spot market" in the Pacific Northwest electricity market should include "transactions which are for an hourly, daily, monthly basis and can be up to one year" based on the "acceptable business

5

practice of pricing transactions for the entities located within the Pacific Northwest Region." Exh. S-1 at 17; FERC Transcript at 1241

20. Pacific Northwest spot market sales encompass monthly, quarterly and yearly transactions because all such transactions involve "standardized products" traded on the "spot" at transparent and fluctuating prices. *See* Exh. GT-1 at 6; Exh. NPG-1 at 11; Exh. PacifiCorp-1 at 2-3

21. Participants in the Pacific Northwest Power market transact deals in the hourly, or real-time market; the pre-schedule or day-ahead market; or for varying delivery periods of longer than one day. NPG-16 at 5-6, lines 122-124.

22. Outside of California, any supplier has the right to package hourly supplies in whatever fashion the market dictates. Spot purchases tend to reflect the longer operational needs of the ultimate consumers. NPG-1 at 9, lines 13-18.

23. Hourly, daily, monthly, quarterly and yearly transactions in the Pacific Northwest are typically traded during a brief telephone call either involving a broker or person-to-person contact. *See* Exh. AE-1 at 12-13.

24. The TFG admits that balance-of-the-month electricity transactions are a prevalent form of trading in the Pacific Northwest. *See* Exh. ENR-25 at 6

25. As a TFG expert testified, balance-of-the-month transactions "us[e] much the same process as described for the bilateral day-ahead market (except for the fact that the period being traded is the remainder of the month)." Exh. AE-1 at 13.

6

26  The Pacific Northwest spot market reflects the scheduling difficulties imposed by widespread reliance on hydroelectric generation, which dominates the Northwest Power Pool generation mix. *See* Exh. NPG-1 at 6.

27. Hydro power supplies approximately 60 to 70 percent of the electricity in the Pacific Northwest. *See* Exh. S-1 at 8; Exh. AE-1 at 3.

28. The Pacific Northwest Coordination Agreement, which controls how the major hydroelectric projects are dispatched in the Pacific Northwest, envisages that all purchases and thermal dispatch will be block loaded to stretch the available supply of hydroelectricity  *See* Exh. NPG-1 at 11.

29. Hydroelectric resources in the Pacific Northwest are fuel limited, not capacity limited, and operate very differently from thermal systems like those in California.  *See* Exh. NPG-1 at 5-6.

30  Because Pacific Northwest hydroelectric projects do not have enough water to meet all loads and cannot run all of the time, Pacific Northwest load-serving utilities must make hourly, daily, weekly, monthly, quarterly, and yearly spot purchases  *See* Exh. NPG-1 at 6-7; Exh. PacifiCorp-1 at 3.

31. Pacific Northwest load-serving utilities must purchase standard products of up to a year in order to balance their expected load and resource needs and requirements  *See* Exh. NPG-1 at 6-7; Exh. PacifiCorp-1 at 3.

32. The TFG's experts do not base their definition of "spot market" on the markets and standardized products in the Pacific Northwest. Rather, the TFG's experts

7

based their definition of "spot market" on "our experience in other markets, our experience in other regions and so on and so forth . . . ." FERC Transcript at 1116.

33. The sources of definitions on which the TFG relies are not drawn from the Pacific Northwest, and do not define the term "immediate delivery" as delivery within any specific period of time. *See* Exh. ENR-26; Exh. ENR-27; Exh. ENR-28; Exh. ENR-29.

34. The sources from which the TFG draws its generic definitions do not apply to products or commodities such as electricity. Rather, the TFG's excerpts from the Chicago Board of Trade's Commodity Training Manual apply only to "actual physical commodit[ies] someone is buying or selling, *e.g.*, soybeans, corn, gold, silver, Treasury bonds, etc." *See* Attachment A to Joint Post-Hearing Brief of the Pacific Northwest Net Purchasers Group (filed September 17, 2001). The TFG's excerpts from the Bloomberg website as to the definition of "spot price" relate only to a "commodity," which is defined as "food, metal, or another fixed physical substance." *See* Attachment B to Joint Post-Hearing Brief of the Pacific Northwest Net Purchasers Group (filed September 17, 2001).

35. One of the TFG's experts conducted an "informal survey" and four telephone interviews but with only employees of TFG members. *See* FERC Transcript at 1145.

36. At least five of the 26 TFG member employees surveyed by the TFG's expert were actually witnesses for TFG members in this proceeding. *See* FERC Transcript at 1145.

37. Only two or three of the 26 TFG member employees surveyed by the TFG's expert represented Pacific Northwest load-serving utilities. *See* FERC Transcript at 1148.

## DEFINITION OF THE PACIFIC NORTHWEST POWER MARKET

38. The geographic scope of the Northwest Power Pool ("NWPP") includes the utilities that are active in trading electricity within the Pacific Northwest. *See* Exh. NPG-1 at 2-3.

39. The area encompassed by the NWPP is a "definition of very long standing" because the NWPP has been in operation since 1957, and the Pacific Northwest Coordination Agreement, which governs the relationship among Northwest utilities, was signed in 1962. *See* Exh. NPG-1 at 3; Exh. GT-1 at 7-8.

40. The geographic area defined in the Pacific Northwest Electric Power Planning and Conservation Act (the "PNEPPCA"), at 16 U.S.C. § 839a(14) (1994), covers a narrow 75-mile band around the Columbia River and its tributaries. *See* Exh. NPG-68 at 7

41. The geographic area defined in the PNEPPCA is significantly smaller than, and is fully encompassed within, the NWPP. *See* Exh. NPG-1 at 3-4.

42. The geographic area defined in the PNEPPCA arbitrarily divides the service areas of various load-serving utilities, such as PacifiCorp. *See* Exh. NPG-1 at 3-4. The geographic area defined in the PNEPPCA "has more to do with the environmental issues in the [PNEPPCA] than anything to do with [the Western Systems Coordinating Council market]," because it was intended to cover "the anadromous fisheries that have

9

been severely threatened by hydroelectric projects along the Columbia River " *See* Exh. NPG-68 at 7; 16 U S C § 839(6) (1994).

## UNJUST AND UNREASONABLE PRICES

43  The Commission has previously found that "the existing [California power] market structure and market rules, in conjunction with an imbalance of supply and demand in California, have caused and, until remedied, will continue to have the potential to cause, unjust and unreasonable rates   …." *San Diego Gas & Electric Co* , 93 FERC ¶ 61,121, 61,366 (2000) ("November 1 Order")

44. The Commission has found that "[t]he electric power situation in California has worsened since our November 1 Order was issued" and that, unless remedial measures were taken, "wholesale markets will continue to be dysfunctional." *San Diego Gas & Electric Co* , 93 FERC ¶ 61,294, 61,981 (2000).

45. The Commission has determined that the "deficient market mechanisms" in California led to "a dysfunctional market place both in California and the remainder of the West," including the Pacific Northwest. *See* June 19 Order, 95 FERC at 62,556.

46. Commissioner *Massey* commented that "[b]uyers in the Northwest paid outrageous prices for power that caused much economic dislocation." July 25 Order, 96 FERC at 61,522 (Massey, Comm'r, dissenting in part and concurring in part).

47  There is substantial evidence in the record in this proceeding that confirms the Commission's previous finding that California and the WSCC markets are integrated *See*, *e g.*, Exh. NPG-68 at 18; Exh NPG-45 at 13, line 5; Exh. ENR-1 at 7-8; Exh. ENR-10 at 19, 23; Exh. PPL-1 at 17-18; Puget Complaint at 7; Exh CAL-5 at 10, lines 4-5.

10

48. There is substantial evidence in the record in this proceeding that Pacific Northwest spot market sales were directly affected by the price distortions in the California PX and ISO spot markets. *See San Diego Gas & Electric Co.*, 95 FERC ¶ 61,418, 62,547 (2001) ("June 19 Order"); Exh. NPG-1 at 9; Exh. NPG-33 at 13; Exh. NPG-45 at 13; Exh. CAL-5 at 9; Exh. ENR-10 at 19; Exh. PPL-1 at 17-18; Puget Complaint at 8.

49. Pacific Northwest daily price indices, including the Dow Jones Mid-Columbia Electricity Price Index, were directly affected by the distorted market clearing prices in the California PX and ISO spot markets. *See* Exh. NPG-33 at 17; Exh. NPG-45 at 16.

50. The dysfunction in the California PX and ISO markets negatively impacted the prices at which power was bought and sold in the Pacific Northwest under price indexed contracts and service schedules. *See* Exh. NPG-33 at 17; Exh. NPG-60 at 3.

51. The high prices in *the* dysfunctional California spot markets drove up the prices of the longer term, *e.g.*, weekly, monthly, quarterly, and yearly standardized products traded in the Pacific Northwest spot market. *See* Exh. NPG-1 at 9-10; Exh. PWX-1 at 28-29.

52. There is substantial evidence in this proceeding that confirms the Commission's finding that Pacific Northwest spot market prices during the refund period were well above marginal cost, and therefore unjust and unreasonable. *See, e.g.*, Exh. NPG-1; Exh. NPG-33; Exh. NPG-45; Exh. NPG-74; Exh. CAL-1; Exh. SMD-1.

53. The City of Seattle ("Seattle") has submitted substantial evidence that the rates it paid in the Pacific Northwest spot market from December 25, 2000, to June 20,

2001, were significantly above benchmarks based on the marginal cost of the last unit that would have been dispatched, absent the price distortions in the California PX and ISO spot markets, or that was dispatched. Based on this evidence, Seattle is entitled to refunds totaling $278,000,000. *See generally* Exh. NPG-1; Item by Reference NPG-70 at 2; Exh. S-8.

54. The City of Tacoma ("Tacoma") has submitted substantial evidence that the rates it paid in the Pacific Northwest spot market from December 25, 2000, to June 20, 2001, were significantly above benchmarks based on the marginal cost of the last unit that would have been dispatched, absent the price distortions in the California PX and ISO spot markets, or that was dispatched. Based on this evidence, Tacoma is entitled to refunds totaling $65,407,755. *See generally* Exh. NPG-33; Item by Reference NPG-71; Exh. S-8.

55. The Port of Seattle has submitted substantial evidence that the rates it paid in the Pacific Northwest spot market from December 25, 2000, to June 20, 2001, were significantly above benchmarks based on the marginal cost of the last unit that would have been dispatched, absent the price distortions in the California PX and ISO spot markets, or that was dispatched. Based on this evidence, the Port of Seattle is entitled to refunds totaling $9,371,660. *See generally* Exh. NPG-33; Item by Reference NPG-71; Exh. S-8.

56. Northern Wasco People's Utility District ("Northern Wasco") has submitted substantial evidence that the rates it paid in the Pacific Northwest spot market from December 25, 2000, to June 20, 2001, were significantly above benchmarks based on the marginal cost of the last unit that would have been dispatched, absent the price distortions

12

in the California PX and ISO spot markets, or that was dispatched. Based on this

evidence, Northern Wasco is entitled to refunds totaling $4,089,364. *See generally* Exh.

NPG-45; Item by Reference NPG-72; Exh. S-8.

57. The California parties have submitted substantial evidence that the rates they

paid in the Pacific Northwest spot market from December 25, 2000, to June 20, 2001,

were significantly above benchmarks based on the marginal cost of the last unit that

would have been dispatched, absent the price distortions in the California PX and ISO

spot markets, or that was dispatched. Based on this evidence, the California parties are

entitled to refunds totaling $1,466,098,964. *See generally* Exh. CAL-1; Exh. S-8.

58. Eugene Water and Electric Board ("EWEB") has submitted substantial

evidence that the rates it paid in the Pacific Northwest spot market from December 25,

2000, to June 20, 2001, were significantly above benchmarks based on the marginal cost

of the last unit that would have been dispatched, absent the price distortions in the

California PX and ISO spot markets, or that was dispatched. Based on this evidence,

EWEB is entitled to refunds totaling $39,719,000. *See generally* Exh. NPG-74; Exh S-8

59. The Sacramento Municipality Utility District ("SMUD") has submitted

substantial evidence that the rates it paid in the Pacific Northwest spot market from

December 25, 2000, to June 20, 2001, were significantly above benchmarks based on the

marginal cost of the last unit that would have been dispatched, absent the price distortions

in the California PX and ISO spot markets, or that was dispatched. Based on this

evidence, SMUD is entitled to refunds totaling $4,587,511.72. *See generally* Exh. SMD-

1; Exh. S-8.

13

60  The total amount of refunds claimed to date in this proceeding is approximately $1,931,354,858. *See* Exh. S-8.

## METHODOLOGIES FOR DETERMINING THE REFUND BENCHMARK

61  Absent the distortions in the California market that set prices for the entire WSCC market, the Pacific Northwest market prices would have been set by the marginal cost of the last unit dispatched in the Pacific Northwest. *See* Exh. NPG-68 at 2-3.

62. Robert McCullough determined the monthly benchmark prices by first determining the actual loads during the refund period for the NWPP. *See* Exh. NPG-1 at 13, lines 1-5.

63. Mr. McCullough identified the portion of the actual loads for the NWPP that were met by hydroelectric generation under then-existing drought conditions, generation from the WPPSS 2 nuclear station, and "other generation" that generally is not subject to economic dispatch. *See* Exh. NPG-1 at 13, lines 4-5.

64. Mr. McCullough then determined the thermal resources in the Pacific Northwest that would have been available to meet the remaining NWPP load, and adjusted those available resources for planned outages and the actual Hunter outage. *See* Exh. NPG-1 at 14, lines 3-5.

65. Mr. McCullough performed a dispatch analysis by first dispatching the coal resources in the Pacific Northwest region to meet the remaining load, then the combined cycle units, and finally the high cost natural gas units. *See* Exh. NPG-1 at 14, lines 7-10.

66. Mr. McCullough's dispatch analysis indicated that: 1) the Pacific Northwest's coal resources would have been dispatched to serve load in the Pacific Northwest during

14

the months prior to November 2000 and after March 2001; 2) low cost natural gas units would have been operated from November 2000 through March 2001; and 3) high cost natural gas units would have been operated in December 2000 and February 2001. *See* Exh. NPG-1 at 15, lines 1-3.

67. Mr. McCullough's determination of the benchmark price is conservative because he used the marginal cost of the highest cost unit for each resource (i.e. coal, low-cost natural gas, high-cost natural gas) even though that unit actually may not have been dispatched. *See* Exh. NPG-1 at 15

68. Mr. McCullough's determination of the benchmark price is also conservative because there were thousands of megawatts of low cost generation in California that would have been available to supply power to the Pacific Northwest during the refund period. *See* Exh. NPG-1 at 15, lines 16-17; Exh. NPG-68 at 3.

69. FERC's California methodology for calculating market clearing prices is fairly straight forward and provides a reasonable benchmark for determining the maximum price buyers would expect for spot purchases in a functional market. However, this methodology contains a variety of elements that are incorporated into the calculation that may not be appropriate for calculating a market clearing price in the PNW. Specifically, the gas price, marginal unit heat rate data, and the credit worthiness adder should be PNW sub-market specific. *See* NPG-33 at 19, lines 16-21; NPG-45 at 18-19, lines 22, 1-5.

15

70. Mr. Movish recommends that a marginal unit heat rate be determined for the PNW sub-market and applied across all hours in calculating the associated market clearing prices. *See* NPG-33 at 20, lines 5-9; NPG-45 at 19, lines 11-14

71. Mr. Movish recommended using a hypothetical combustion turbine heat rate based on the average of the least efficient, gas fired combustion turbine units in the region. *See* NPG-33 at 20, lines 16-19; NPG-45 at 19-20, lines 22, 1-3.

72. To the extent that Tacoma Power made purchases during the relevant time period it did not engage in those transactions as a willing buyer since it bought at these times because it had an obligation to serve firm load. *See* NPG-16 at 8, lines 164-167.

73. The financial impact upon retailers such as the Port of Seattle has been severe. *See* NPG-27 at 6, lines 115-116.

74. SCL was forced to implement a 9.9% surcharge on electricity rates to cover increased power purchase costs. Council also agreed to pass on to customers the increases in BPA rates, which resulted in a 10.5% rate increase. *See* NPG-4 at 21, lines 504-510.

75. Unfortunately, because of increased costs directly caused by high wholesale electricity prices, rates will not return to their previous low levels. The bad news is that Tacoma Power's customers rates will increase by as much as 27% to 52% from the base levels set in 1995. *See* NPG-16 at 20-21, lines 463-470.

76. As reflected in TFG-20, Powerex exercised market power by dictating price with respect to CERS. *See* Tr. at 982, lines 11-13.

16

transactions in the Pacific Northwest for the period December 25, 2000 through June 20, 2001 and what is the extent of potential refunds?

77. Any refunds received by members of the NPG will go entirely into customer's pockets. *See, e.g.*, NPG-4 at 22, lines 537-38; NPG-16 at 22, lines 490-492; NPG-27 at 7-8, lines 148-151.

78. It is not impossible to undo the sheer volume of transactions to effect refund, as the information concerning purchases and sales either submitted in response to data requests, along with filed testimony, and with the required data template submittal, should provide adequate information. *See* NPG-60 at 17, lines 15-21.

## PARTIES

### A.    City of Seattle

79. Seattle City Light ("SCL") is an active participant in Northwest Wholesale spot markets, selling and buying surplus power to lower its overall net cost of power. *See* NPG-4 at 9, lines 204-05.

80. From January 2001 to July 2001, SCL purchased $431 million in power on the spot market, offset by sales of $75 million. *See* NPG-4 at 15, lines 325-328.

SCL's power requirements in 2000 were supplied from generating facilities owned by the City of Seattle (62.7%), by purchases from Bonneville Power Administration (16%) and through contractual agreements with Grand Coulee Project Hydroelectric Authority, Grant County Public Utility Districts, and treaties with Canada (20.9%). *See* NPG-4 at 8, lines 179-187.

17

B.    <u>Tacoma Power</u>

81. The City of Tacoma, Washington, is a municipal corporation under the

constitution and the laws of the State of Washington. *See* NPG-16 at 2, lines 39-40.

Tacoma Power is the Light Division of the City's Department of Public Utilities. *See*

NPG-16 at 2, lines 40-41.

82. Tacoma Power has an obligation to serve load (Tr. at 701, lines 11-13) and

provides electric service within its service area to nearly 148,000 customers (*see* NPG-

18) and indirectly serves other portions of the Tacoma metropolitan area through sales to

McChord Air Force Base, Fort Lewis Military reservation, the Town of Ruston, the City

of University Place, a portion of the Cities of Lakewood and Federal Way, and several

other customers. *See* NPG-16 at 4, lines 105-109. *See* NPG-16 at 2, lines 41-42.

83. Tacoma Power owns four hydroelectric generating projects that produce

approximately 50% of its total energy needs assuming average water conditions. *See*

NPG-16 at 3, lines 76-77.

84. Tacoma Power's remaining power supply is purchased through a variety of

contracts and market purchases. *See* NPG-16 at 4, lines 78-79, at 8, lines 185-194.

85. Tacoma Power's service area consists of a 180 square mile area, including the

entire 43 square miles comprising the City. *See* NPG-16 at 4, lines 104-105.

86. Tacoma Power is an active participant in the wholesale electricity market in

the western United States. *See* NPG-16 at 4, lines 116-117.

87. Washington State has been profoundly affected by restructuring efforts in

other Western states *See* NPG-16 at 6, lines 128-130.

18

88. Tacoma Power uses the *market* to optimize the value of the output of its hydroelectric resources. *See* NPG-16 at 9, lines 212-213  By purchasing energy during off-peak hours, when prices are typically lower than during the on-peak hours, Tacoma Power can store energy at its hydroelectric facilities for serving the needs during on-peak hours. *See* NPG-16 at 9-10, lines 213-216

89. Since late 2000, Tacoma Power's ability to use hydroelectric resources to restrict market purchases to off-peak periods has been greatly limited because of drought conditions. *See* NPG-16 at 10, lines 216-218.

90. If water levels exceed 65% of median, Tacoma Power expects to be a net seller into the wholesale electricity market. *See* NPG-16 at 10, lines 218-219. Water conditions of 65% of median have historically been exceeded 94% of the time. *See* NPG-16 at 10, lines 219-220. Under critical water conditions, Tacoma Power would be a net purchaser in the wholesale electricity market  *See* NPG-16 at 10, lines 220-222.

91. Tacoma Power's trading activities are limited to purchasing power to meet native loads, optimizing the value of Tacoma Power's power supply portfolio, and selling energy during times of surplus. *See* NPG-16 at 10, lines 229-231. During the winder and spring of 2000-2001, Tacoma Power purchased power from the market to optimize the use of its own resources to meet demand at the lowest cost. *See* NPG-16 at 10, lines 231-233.

92. Prior to the western electricity market crisis, Tacoma Power had retained earnings in excess of $130 million to serve as a cushion against poor water conditions and high market prices. *See* NPG-16 at 21, lines 478-80. By April 2001, this cash reserve had been entirely consumed by extremely high power purchase prices. *See* NPG-

16 at 21, lines 481-483. In May 2001, Tacoma Power borrowed $35 million to cover increased operating costs because of the crisis. *See* NPG-16 at 20, lines 449-452; 21, lines 483-484.

93. Tacoma spent approximately $60 million for power purchases in December 2000 forcing implementation of a 50% rate surcharge. *See* NPG-16 at 18, lines 395-406; NPG-33 at 15, lines 19-22.

94. For the period October 2, 2000 through June 20, 2001, Tacoma paid suppliers $81,754,393 above the market clearing price. For the period between December 25, 2000 and June 20, 2001, the amount equals $65,407,755. *See* NPG-33 at 24, lines 16-22.

95. Several large industrial customers have suspended or reduced operations due to high power prices. Louisiana Pacific shut down its production in Tacoma for 90 days. Pioneer Companies, Inc. announced a 50% curtailment of operations at its Tacoma facility due to high cost of its wholesale electricity market purchases. *See* NPG-16 at 21, lines 472-476.

## C.    Port of Seattle

96. The Port of Seattle is a port district and municipal corporation of the State of Washington, organized and operating under provisions of Washington law now codified at Title 53 (Port Districts) and Chapter 14.08 (Municipal Airports – 1945 Act), Revised Code of Washington (RCW). *See* NPG-27 at 2, lines 27-30.

97. The Port of Seattle's claims in this proceeding arise solely from its Airport operations. *See* NPG-27 at 3, lines 47-49.

20

98. The Airport provides the primary commercial air service for much of Washington State. *See* NPG-27 at 3, lines 51-53.

99. The Port of Seattle provides electric utility services as a municipal electric utility. *See* NPG-27 at 5, lines 82-84.

100. The Dow Jones Mid-Columbia Index rate for on and off-peak time periods is a public index developed each day of trading and subject to the spot market pricing on a twenty-four hour basis. *See* NPG-27 at 5-6, lines 102-05

101. As a result of the 2000-2001 energy price increase, the Port of Seattle raised tenant tariffs for electricity by 300%. *See* NPG-27 at 6, lines 123-126.

102. The Port of Seattle has no generating units and makes no wholesale sales. *See* NPG-27 at 7, line 145.

103. Port has a Wholesale Electric Service Agreement with Puget Sound Energy, Inc., agreeing to purchase exclusively wholesale electric power for purposes of reselling. The price term in this agreement is indexed to the spot market. *See* NPG-33 at 18, lines 12-19.

104. The contract between the Port of Seattle and Puget Sound Energy calls for the Port of Seattle to pay Puget Sound Energy the Dow Jones Mid-Columbia Index rate for its purchases of energy. *See* NPG-27 at 5, lines 96-98; NPG-29; NPG-60 at 14, lines 12-15.

105. As a result of the energy crisis, the Airport raised its Terminal Rental Landing Rates and Landing Fees from $2.50 per 1000 pounds to $3.24. *See* NPG-27 at 7-8, lines 149-150.

21

106    The Port of Seattle raised the rate for electricity to its tenants in February 2001 from $.085/KWH to $.25/KWH. *See* NPG-27 at 6, lines 107-118; NPG-32. The Port of Seattle increased its electricity energy charge from $.086/KWH to $.25/KWH for no demand general service; from $.082/KWH to $.25/KWH for small demand general service; and from $.078/KWH to $.25/KWH for large demand general service. *See* NPG-32.

### D.    Northern Wasco County People's Utility District

107.    Northern Wasco County People's Utility District ("the District") is a non-profit, consumer-owned electric utility that was founded pursuant to Oregon laws on September 6, 1939, and began operation on April 7, 1949 in order to serve residential, commercial, industrial and irrigation electric consumers of Wasco County, Oregon. *See* NPG-43 at 2, lines 15-16

108    The District is a municipal corporation, authorized by Section 12, Article XI of the Constitution of the State of Oregon. *See* NPG-43 at 4, lines 10-11  The District is organized under Title 24, Chapter 261 of the Oregon Revised Statutes. *See* NPG-43 at 4, lines 11-12.

109.    The District is engaged in the generation, transmission and distribution of electric capacity and energy to serve its customers  *See* NPG-43 at 4, lines 2-3.

110.    The District is located in the north-central portion of Oregon along the Columbia River, approximately 80 miles east of Portland, Oregon. *See* NPG-43 at 2, lines 20-22. The District's retail service area encompasses approximately seventy-two square miles of rural north-central Oregon. *See* NPG-43 at 2, lines 19-20  The District is headquartered in The Dalles, Oregon. The Dalles has a population of 11,600 (1997) and

22

is the largest city in the District's service territory. The population of Wasco County as a whole is 22,600 (1998). The economy of the county historically has centered around the local natural resources of forests and agriculture as well as the aluminum industry. *See* NPG-43 at 2-3, lines 19-1

111.    The District serves a total of 9,259 customers (as of December, 2000) within Wasco County, Oregon *See* NPG at 3, line 8. The District provides electric service to 7,833 residential consumers; 1220 small commercial customers; 158 large commercial and industrial customers; and 48 city street lighting and irrigation customers. *See* NPG-43 at 3, lines 8-13.

112    The current wholesale *power* supply market within which the District currently operates is characterized by an increasing number of non-federal wholesale power suppliers and a decreasing supply of power from federal generation resources comprising the Federal Columbia River Power System *See* NPG-43 at 6, lines 4-7.

113.    The District meets its requirements loads with the power from two sources: that produced by its own generating resources, and power purchases from the Bonneville Power Administration ("Bonneville"). *See* NPG-43 at 6, lines 11-13. Prior to 1997, the District purchased one hundred percent (100%) of its wholesale power requirements from Bonneville, *see* NPG-43 at 6, line 14-18. Since 1997, the District has met approximately eighty-five percent (85%) of its power supply needs with purchases from Bonneville. *See* NPG-43 at 6, lines 19-21. Bonneville's average rate for Priority Firm power to public preference utilities such as the District has been less than $25 per megawatt-hour for the past five years ending October 1, 2001. *See* NPG-43 at 7-8, lines 14-2. The remainder of the District's requirements power supply is provided by the

District's McNary Project, at an average of 38,800 megawatt hours per year  *See* NPG-43 at 6, lines 21-23 through 7, line 1.

114    The District undertook diversification of its wholesale power supply portfolio as a key part of its August 1996 strategic plan, in order to adequately position itself and respond to the competitive, deregulated electricity market.  *See* NPG-43 at 8, lines 14-17. From August 1998 to June 30, 2001, the District purchased approximately 25% of its power supply requirements at a market indexed price from Bonneville under the agreement pursuant to Bonneville's "Surplus Firm" rate schedule.  *See* NPG-43 at 8-9, lines 12-21.

115.    The District's bond rating in 1998 was upgraded, in part, because of its power supply diversification.  *See* NPG-43 at 9, lines 3-4

116.    To diversify its power supply portfolio, a portion of the District's requirements power purchases from Bonneville were priced at a market-indexed rate. From August 1998 through June 2001, the District agreed with Bonneville to purchase approximately twenty-five percent (25%) of its total system energy needs from Bonneville at a rate that was indexed to the Dow Jones Mid-Columbia Electricity Prices Index.  *See* NPG-43 at 8-9, lines 21-2.

117.    The average cost of wholesale power to the Northern Wasco County People's Utility District under its market-indexed purchases from December 25, 2000 through June 20, 2001 was $195.57/MWh  *See* NPG-43 at 9, lines 16-17.  The average cost of a comparable block of power shaped to match the District's market indexed purchases, if purchased under Bonneville's then-applicable Priority Firm rate ("PF96") from December 25, 2000 through June 20, 2001, would have cost the District

24

$21 23/MWh. *See* NPG-43 at 10, lines 14-17  The District implemented a twenty percent (20%) increase to meet its revenue requirements and recover the costs of its power supply purchases indexed to the market, in January 2001. *See* NPG-43 at 14, lines 6-8.

118.    The prices the District faced through this market index proved to be orders of magnitude greater than Bonneville's Priority Firm power rate. Compare NPG-43 at 9-10, lines 16-10 with NPG-43 at 10-11, lines 14-10.

119.    The District's exposure to market rates for this fraction of its load was partially mitigated through "swaps" of Bonneville's variable market rate product for a fixed price supply from third parties other than Bonneville. *See* NPG-43 at 11, lines 13-15.

120.    The District suffered losses in excess of $4,089,364 from December 25, 2000, through June 20, 2001; and losses in excess of $5,626,729 between October 2, 2000 and June 20, 2001, as a direct result of its Bonneville wholesale power purchases indexed to the market. *See* NPG-43 at 12, lines 14-17.  In contrast, the District's retail sales for the entire year 2000 garnered approximately $11.7 million in revenue, on sales of 282,112 megawatt hours. *See* NPG-43 at 3, lines 22-23.

121.    The District and Bonneville agreed in January 2001 to Amendment No. 4 to the Agreement, which established the maximum price (on a monthly basis) the District would be required to pay for its market-indexed power purchases under that contract between January 1, 2001 and June 30, 2001. *See* NPG-43 at 12, lines 4-7.

122.    The District implemented a twenty percent (20%) increase to meet its revenue requirements in January, 2001. *See* NPG-43 at 14, lines 6-7.  The District's

consumers have been adversely financially impacted by excessive costs incurred by the
District for that portion of its requirements power purchases that was purchased at
market-indexed rates. *See* NPG-43 at 14, lines 14-16.

123.    50% of Northern Wasco County People's Utility District's revenue from
the sale of electric energy is from residential consumers, 14% is from small commercial
customers and 35% is from large commercial and industrial customers. *See* NPG-43 at 3,
lines 15-20.

124.    The District's cost of purchasing a block of power from Bonneville was
determined by the volume weighted average of the Firm and Non-Firm on-peak daily
closing prices and the Firm and Non-Firm off-peak daily closing prices of the Dow-Jones
Mid-Columbia Electricity Price Indexes as reported by Bridge Telerate. *See* NPG-43 at
9, lines 9-13.

**E.    Clark Public Utilities**

125.    Clark, a municipal corporation in the State of Washington, provides
electric service to approximately 150,000 customers throughout Clark County,
Washington. *Exh. NPG-55 at 2.*

126.    Clark was historically a full requirements customer of BPA. *Exh NPG-55
at 3.*

127.    In 1996, Clark diversified its power supply portfolio, signing partial
requirements contracts with other suppliers. *Exh NPG-55 at 3.*

128   Those contracts expired on July 31, 2001, to coincide with the expiration of Clark's contract with BPA and with the traditional date for renewal of BPA contracts. *Exh NPG-55 at 3.*

129.   In 1998, BPA shifted its standard contract expiration date to September 30, to coincide with its fiscal year. *Exh NPG-55 at 3.*

130   Because of BPA's shift in contract expiration year, in 2000, when Clark sought to return to BPA as a full requirements customer, BPA would only offer Clark a contract beginning on October 1, 2001, which created a two-month gap in Clark's supply portfolio *Exh NPG-55 at 3*

131.   Clark was obliged to close this gap during a time of market uncertainty resulting from the events in California and the WSCC. *Exh. NPG-55 at 4-6; Exh NPG-53 at 5-6.*

## PROPOSED CONCLUSIONS OF LAW

132.   The Commission *instituted* an investigation under Section 206 of the Federal Power Act ("FPA") into the reasonableness of the rates for wholesale sales in the spot markets in the Western Systems Coordinating Council ("WSCC"). As a result of that investigation, the Commission determined that the prices in the spot markets throughout the West were unjust and unreasonable. *See Federal Power Comm'n v Sierra Pacific Power Co*, 350 U S. 348, 353 (1956) ("The condition precedent to the Commission's exercise of its power under [FPA Section] 206(a) is a finding that the existing rate is 'unjust, unreasonable, unduly discriminatory or preferential.'").

27

133    The Commission has found "a dysfunctional market place in California and the remainder of the West." June 19 Order, 95 FERC at 62,556

134.   The Commission has determined that Pacific Northwest spot market sales were directly affected by the price distortions in the California PX and ISO spot markets. *See* June 19 Order, 95 FERC at 62,547 ("There is a critical interdependence among the prices in the ISO's organized spot markets, the prices in the bilateral spot markets in California and the rest of the West, and the prices in forward markets.").

135.   Even if the Commission finds no specific exercises of market power, "there is clear evidence that the California market structure and rules provide the opportunity for sellers to exercise market power when supply is tight, and can result in unjust and unreasonable rates under the FPA." November 1 Order, 93 FERC at 61,350.

136    Prices may be unjust and unreasonable regardless of whether market power has been exercised, if the prices are outside a zone of reasonableness *See* December 15 Order, 93 FERC at 61,999 ("[W]e disagree that, absent exercise of market power, prices are necessarily just and reasonable. Our analysis must be . . . based on a determination of whether the rate falls within a zone of reasonableness").

137.   The Pacific Northwest spot market includes the geographic area encompassed by the Northwest Power Pool ("NWPP"), which reflects the long-standing realities of electric power marketing in the Pacific Northwest. To the contrary, the geographic area specified in the Pacific Northwest Electric Power Planning and Conservation Act of 1980 ("PNEPPCA") was demarcated for purposes of fish and wildlife management. *See* 16 U.S.C. § 839(6) (1994) (purpose of PNEPPCA is "to

protect, mitigate and enhance the fish and wildlife ... of the Columbia River and its

tributaries, particularly anadromous fish").

138.   Tacoma and the Port of Seattle, in order to meet their firm electric retail

load obligations, purchased substantial amounts of electric energy during the period

October 2, 2000 through June 20, 2001, at rates that were unjust and unreasonable.

These transactions occurred in interstate commerce and were in violation of Section

205(a) of the Federal Power Act, 16 U.S.C. Sec. 824d(a).

139.   The issuance of refunds in this proceeding is an appropriate and legal

remedy under the FPA.  *See* 16 U.S.C. § 824e(b) (1994) ("the Commission may order the

public utility to make refunds of any amounts paid, for the period subsequent to the

refund effective date ... in excess of those which would have been paid under the just

and reasonable rate").

Respectfully submitted,

Philip L. Chabot, Jr.          /s
Philip L. Chabot, Jr.
Jennifer Lokenvitz Schwitzer
T. Alana Deere
Amy L. Wagenfeld
McGuireWoods LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Phone: 202-857-1742

G. Philip Nowak          /ols
G. Philip Nowak
Kurt H. Jacobs
Jeffrey T. Cook
Sidley Austin Brown & Wood
1501 K Street, N. W.
Washington, D. C.  20005
Phone: 202-736-8084

*Counsel for the City of Seattle*

*Counsel for City of Tacoma and Port
of Seattle and Lead Counsel for the Pacific
Northwest Purchasers Group*

29

*Shelly Richardson*                    *George N. Williams, Jr.*

Shelly Richardson                      George H. Williams, Jr., Esq.
Attorney at Law                        John J. Bartus, Esq.
P.O. Box 61845                         Robert Platt, Esq.
Vancouver, WA 98666                    Cameron McKenna LLP
Phone: 360-737-2464                    2175 K Street, N. W
                                       Fifth Floor
*Counsel for Northern Wasco County*    Washington, D. C. 20037
*People's Utility District*            Phone: 202-466-0060

                                       *Counsel for Clark Public Utilities*

September 18, 2001

30

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing document to be served upon each party to this proceeding as reflected on the official service list compiled by the Secretary of the Commission.

Dated at Washington, D.C., this 18th day of September 2001.

Philip L. Chabot, Jr.

## CERTIFICATE OF SERVICE

I, Patrick M. Leathem, do hereby certify that on the 13th day of January, 2003, I caused copies of the foregoing to be served upon the parties referenced as the core group accompanying the attached notice, the All Notices list as applicable pursuant to the Order Establishing Case Management Procedures and Hearing Schedule [Docket No. 455], and any list so attached referencing special parties by Federal Express or hand delivery as indicated

- *Objection of Debtor and Debtor in Possession Kaiser Aluminum & Chemical Corporation to Emergency Motion of Public Utility District No. 1 of Clark County for Limited Relief from the Automatic Stay*

Dated: January 13, 2003

Patrick M. Leathem (DE 4114)

**By Hand Delivery:**
Lee C. Goldstein
615 West 18th Street
Wilmington, DE  19802

**By Federal Express:**
Christopher F. Graham
Thacher Proffitt & Wood
11 West 42nd St.
New York, NY  10036

George Williams
Cameron McKenna LLP
2175 K Street, NW, Fifth Fl.
Washington, D.C.  20037