Exhibit 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

KAISER ALUMINUM CORPORATION,
A Delaware Corporation, *et al.,*

                Debtors.

Jointly Administered

Case No. 02-10429 (JKF)

Chapter 11

Hearing Date: November 14, 2005

*STAY REQUESTED

## RESPONSE TO THE VERIFIED MOTION OF DEBTOR AND DEBTOR IN POSSESSION KAISER ALUMINUM & CHEMICAL CORPORATION FOR AN ORDER DISALLOWING CLAIMS FILED BY CLARK PUBLIC UTILITIES [DOCKET NO. 7480]

TO THE HONORABLE JUDITH K. FITZGERALD:

Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities ("Clark"), hereby responds to and answers the Verified Motion of Debtor and Debtor in Possession Kaiser Aluminum & Chemical Corporation for an Order Disallowing Claims Filed by Clark Public Utilities (Docket No. 7480) (the "Claims Objection") and hereby states as follows:

## I.
## RESPONSE

**A.** **Kaiser's Argument that All of Clark's Claims Are Finally Resolved by the Puget Sound Proceeding Is Inequitable.**

    1.    The Claims Objection represents Kaiser's most recent attempt handcuff Clark into a Catch-22 position that prevents Clark from receiving a determination and accurate valuation of its claims. Prior to Kaiser's bankruptcy filing, Clark intervened and participated in the Puget

Sound Proceeding and asked the Federal Energy Regulatory Commission ("FERC") to determine whether the rate Kaiser charged Clark for power it sold in 2001 was unjust and unreasonable. Since the beginning of the bankruptcy process in this case, Clark has adamantly tried to preserve its right to litigate and liquidate its claims against Kaiser before FERC. Clark filed no fewer than three motions to lift the automatic stay so that it could participate fully in the Puget Sound Proceeding (described below), in which FERC considered whether sellers of electrical power in the Pacific Northwest charged unjust and unreasonable rates for such power from December 2000 through June 2001.[1] At every turn, Kaiser and the Official Committee of Unsecured Creditors (the "Committee") vehemently objected. Kaiser and the Committee argued consistently that Clark had previously participated in the Puget Sound Proceeding and sought only to relitigate issues on which it had "lost." Kaiser and the Committee also argued that the issue of whether Kaiser was a seller had been previously presented to FERC in the Puget Sound Proceeding.

2.    Kaiser argued before this Court that Clark should wait until the resolution of the Puget Sound Proceeding and the bankruptcy court objection process to take up Clark's claims. According to the Kaiser:

> Furthermore, at a minimum the stay should be maintained until the FERC rules in the Puget Sound Proceeding. The ruling will certainly affect Clark's new theory for its claims and *could completely moot the need for a new proceeding (e.g., if the FERC rules that KACC was not the seller). There is likewise no need for*

---

[1] On June 14, 2002, Public Utility District No. 1 of Clark County filed its Motion of Public Utility District No. 1 of Clark County for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation found at Docket No. 644.

On January 7, 2003, Public Utility District No. 1 of Clark County filed its Emergency Motion of Public Utility District No. 1 of Clark County for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation found at Docket No. 1555.

On July 18, 2003, Public Utility District No. 1 of Clark County filed its Emergency Motion of Public Utility District No. 1 of Clark County for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation found at Docket No. 2598.

> *Clark to rush to liquidate its [Unauthorized Sale Claim] at this early stage of the*
> *Debtor's chapter 11 cases.*    No claims bar date has been set and given the
> complicated issues involved . . . the Debtors' restructuring and claim resolution
> process will take a substantial period of time.  Maintenance of the stay until the
> FERC at least has the opportunity to rule in the Puget Sound Proceeding will not
> prejudice Clark.

*See* Objection of the Debtor and Debtor in Possession Kaiser Aluminum and Chemical

Corporation to Motion of Public Utility District No. 1 of Clark County for Limited Relief from

the Automatic Stay (D.I. 644) (Docket No. 795) at ¶ 38 (emphasis added).  Likewise, this Court

tended to agree with Kaiser when it stated, "But [the Unauthorized Sale Claim] is nothing other

than a damage claim.  That is a pure, simple, basic bankruptcy issue.  That one you should file a

claim for, and if the Debtor has an objection, you'll hear it."  Transcript of Motions Hearing

Dated July 23, 2002 at 91:21-25 (No. 02-10429).  This Court further noted, "I don't see a need at

this point to go forward on a new theory. . . .  I think . . . this is premature."  Transcript of

Hearing, *supra*, at 91:24-25, 92:14-16 (No. 02-10429).

　　　3.　　　Despite the debtor's and the Court's insistence that the stay not be lifted – and that

Clark should wait for the claims resolution process – Kaiser repeatedly argued before this Court

that Clark would be bound by the FERC decision.  Clark raised this issue at the hearing to

consider its second motion to lift the stay, which it filed to participate in the reopening of the

Puget Sound Proceeding to take additional evidence.  Clark urged the Court that

> the bar date is rapidly approaching and Clark does intend to file proofs of claim
> and one of the proofs of claim will be for the generic proceeding.  It's apparent
> from Kaiser's papers that Kaiser will expect the Court to rely upon FERC's ruling
> in the generic Puget Sound Proceeding.  Therefore, it's very important that Clark
> be able to fully participate in the reopened discovery.  We're talking about due
> process here, Your Honor.

Transcript of Hearing dated January 15, 2003 at 8:9-16 (No. 02-10429).  The Court lifted the

stay in order for Clark to conduct extremely limited discovery in the Puget Sound Proceeding;

notably, Kaiser was given the opportunity to review and comment on Clark's draft filing prior to its submission.

4.    In a final blow to Clark's attempts to maintain its full panoply of non-bankruptcy rights in the Puget Sound Proceeding, Kaiser objected to Clark's request[2] to perfect its right to bring an appeal of the June 25th Decision rendered by FERC in the Puget Sound Proceeding,[3] which found that the issue of whether providers of electrical power in the Pacific Northwest charged unjust and unreasonable rates was simply too complicated to untangle and, therefore, no refunds would be awarded.[4]  The Court granted Kaiser's objection and denied Clark's motion for relief on July 23, 2003.

5.    In light of Kaiser's staunch waffling – urging Clark to file its proofs of claim and wait for the claims resolution process, while simultaneously arguing that the Puget Sound Proceeding would be the determinative forum, yet objecting to all of Clark's claims and objecting to all of Clark's requests to participate in that forum – its current Claims Objection is disingenuous.  Kaiser now claims that the Puget Sound Proceeding is *res judicata* on *both* of Clark's claims, including its Unauthorized Sale Claim, described below.

6.    Kaiser should be bound by the Puget Sound Proceeding in this claims resolution process to the same extent it has argued Clark should be bound.  The June 25th Decision in the

---

[2]  *See* Emergency Motion of Public Utility District No. 1 of Clark County for Limited Relief from the Automatic Stay (Docket No. 2598).

[3]  *See* Objection of Debtor and Debtor in Possession Kaiser Aluminum & Chemical Corporation to Emergency Motion of Public Utility District No. 1 of Clark County for Limited Relief from the Automatic Stay (Docket No. 2612).

[4]  FERC chose not to issue any refunds because it did not want to untangle the complex transactions that had taken place among numerous participating parties and the adverse consequences such action would have on the market.  FERC specifically ruled that "even if prices were unjust and unreasonable, it is not possible to fashion a remedy that would be equitable to all the participants in the Pacific Northwest market."  103 FERC ¶ 61,348, at P 53 (2003).

Puget Sound Proceeding made only one clear decision: that the determination of whether electrical power providers charged unjust and unreasonable rates was too complex. That decision is on appeal, and until that appeal is resolved in some form or fashion by the Court of Appeals for the Ninth Circuit or FERC, Clark's claim no. 3122 is not resolved and cannot be disallowed.

7.    Furthermore, FERC did not adjudicate in the June 25th decision the issue of whether Kaiser was an unauthorized seller under the FPA of electrical power to Clark. Therefore, Clark's claim no. 7245 is ready to move forward, just as Kaiser has conceded.[5] Kaiser's attempt to argue to the contrary is inequitable.

**B.    The Claims Objection Is Premature and Inappropriate.**

8.    Kaiser's attempt to dispose of both Proofs of Claim based upon the unfinished determination of the Puget Sound Proceeding alone is premature and inappropriate. Therefore, this Court should deny the Claims Objection.

9.    Clark timely filed two proofs of claim in this Bankruptcy Case, each of which is based upon specific rights to payment from Kaiser arising under the Federal Power Act, 16 U.S.C. § 791 *et seq.* ("FPA").[6] Clark filed claim nos. 7245 and 3122 (collectively, the "Proofs of Claim"). The Proofs of Claim relate to the sale of electric power from Kaiser to Clark between August and September 2001. The Claims Objection purports to apply to both proofs of claim, but fails to substantively address either. In its Objection, Kaiser alleges that the Proofs of Claim should be disallowed and expunged in their entirety because, according to Kaiser, "the June 25th Decision [arising out of the Puget Sound Proceeding] eliminated any prospect for Clark to

_____

[5] *See* Para. 2, *supra.*
[6] Specifically, 16 U.S.C §§ 824 & 824d.

5

recover amounts from [Kaiser] in connection with the purchase of BPA power for the months of August and September 2001." (Claims Objection at ¶17).

10.    Kaiser either misunderstands or misrepresents the nature of the Puget Sound Proceeding and the effect that the June 25th Decision has on the Proofs of Claim. Although the Puget Sound Proceeding before FERC was the proper forum to determine whether the rates charged for power in the Pacific Northwest were just and reasonable, FERC's June 25th Decision has been appealed. Clark's inability to participate in the appeal of the June 25th Decision – due to this Court's denial of Clark's request for rehearing with FERC – does not eliminate Clark from benefiting from any affirmative relief that the Ninth Circuit Court of Appeals, or FERC, may order once the appeal process is complete. Therefore, Kaiser prematurely objects to Claim No. 3122, and its Claims Objection as to Claim No. 3122 should be denied.

11.    Kaiser also attempts characterize the scope of the Puget Sound Proceeding as much broader than it is, by arguing that it applies to Claim No. 7245, which represents a separate and distinct claim under the FPA. If Kaiser is found to have participated in an unauthorized sale under the FPA, then Kaiser must disgorge the profits it received from that sale, regardless of whether the rate charged by Kaiser was just and reasonable. The unauthorized sale of power was not an issue that was apropriate to raise in the Puget Sound Proceeding. As such, no adjudicative body has heard substantive arguments or been able to decide whether Kaiser must disgorge its profits from the power sale (Claim No. 7245). Kaiser has not objected to Clark's Claim No. 7245 on any substantive basis, and its Claims Objection as to Claim No. 7245 should be denied.

i.    The Clark/Kaiser Transaction.

12.    Clark is a customer-owned municipal corporation operating under the laws of the state of Washington and providing electricity to approximately 170,000 customers throughout Clark County, Washington. In 1981, Clark entered into a power contract with the Bonneville Power Administration ("BPA"), which expired on June 30, 2001. In the year 2000, Clark sought to purchase power beyond June 30, 2001. Due to an internal accounting change, BPA would only offer Clark a net requirements contract beginning on October 1, 2001. Clark was able to find power for the month of July, but faced a looming two-month gap (August and September 2001) in its supply portfolio. Because of the well publicized and documented volatility in the energy market in early 2001, as well as the prospect that the rates for electrical power could go even higher in August and September 2001, Clark was compelled to fill this gap as soon as possible. Consequently, on February 2, 2001, Clark entered into a remarketing letter agreement (the "Remarketing Agreement") with Kaiser. Under the Remarketing Agreement, Clark committed to purchase from Kaiser 140 Megawatts of power for the period August 1, 2001 through September 30, 2001, at the rate of $325 per Megawatt hour (the "Transaction").

13.    In order to meet its supply obligation under the Remarketing Agreement, Kaiser assigned some of its rights to jurisdictional power under a contract it maintained with BPA (the "BPA/Kaiser PSA," copy attached as Exhibit 1). Pursuant to Kaiser's direction, BPA delivered certain of Kaiser's excess power to Clark under terms and conditions set by Kaiser.[7]    To

---

[7] This excess power was subject to FERC's jurisdiction. Under Section 18(b)(2) of the BPA/Kaiser PSA, Kaiser had the right to elect to remarket excess power it did not use by finding its own purchaser for such excess power or by requesting that BPA find a purchaser. (*See* BPA/Kaiser PSA at § 18(b)(2)). If Kaiser found its own purchaser -- as it did in finding Clark -- BPA had a first option to repurchase the power. *Id.* at § 18(b)(4)(B). However, if BPA did not exercise that option, BPA was required to deliver the power to Kaiser's purchaser on Kaiser's terms and conditions. BPA did not exercise its option of repurchasing Kaiser's excess power and

complete the Kaiser Transaction, BPA entered into two confirmation agreements, one with Clark (the "Clark Confirmation Agreement," copy attached as Exhibit 2) and another with Kaiser (the "Kaiser Confirmation Agreement," copy attached as Exhibit 3) confirming the terms agreed to by Kaiser and Clark in the Remarketing Agreement.  The Clark Confirmation Agreement stipulated that Clark would pay $64,080,603 to BPA on March 28, 2001 for the remarketed Kaiser power. *See* Exh. 2 at 2.  Thereafter, in accordance with the Kaiser Confirmation Agreement, BPA would transfer $59,842,404 to Kaiser, with the balance of $4,238,199 to be retained by BPA to cover the costs to Kaiser of the remarketed Kaiser power.  *See* Exh. 3 at 1.  Kaiser was responsible for the costs of transmitting the remarketed Kaiser power to Clark.  *See* Exh. 2 at 2.

14.    As a consequence of the extraordinarily high price Clark paid for Kaiser's power, Clark was forced to raise rates to its customers by twenty percent.  Kaiser, on the other hand, profited $59,842,404 from the Transaction.

ii.    Clark's Claims Against Kaiser Arising Out of the Transaction.

15.    Clark has two claims against Kaiser arising out of the Transaction.  First, Clark has a claim against Kaiser for Kaiser's unauthorized sale of power to Clark, which is governed by sections 201 and 205 of the FPA.  Second, Clark has a claim against Kaiser for the unjust and unreasonable rate Kaiser charged Clark for the power it sold to Clark, which is governed by section 205 of the FPA.  Clark preserved its claims in Kaiser's bankruptcy case by filing two proofs of claim on or before the bar date.  Kaiser has objected to both proofs of claim in the Claims Objection.

---

was therefore obligated to follow Kaiser's direction.

*Clark's Unauthorized Sale of Power Claim.*

16.    On January 30, 2003, Clark filed Claim No. 7245 (the "Unauthorized Sale Claim"), which alleges that Kaiser violated the FPA when it sold Clark 140 Megawatts of power for the period August 1, 2001 through September 30, 2001.  This power sale was subject to FERC's jurisdiction as a "sale of electric energy at wholesale in interstate commerce" under Section 201(b)(1) of the FPA.  16 U.S.C. § 824(b)(1).  As such, the Transaction was subject to notice and authorization requirements under the FPA.  Clark avers that Kaiser's sale of the power violated the FPA by not complying with Section 205(c), which requires public utilities[8] to file schedules "showing all rates and charges for any . . . sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services."  16 U.S.C. § 824d(c).  Kaiser also did not comply with Section 205(d), which requires FERC approval of a rate or charge before it can go into effect.  16 U.S.C. § 824d(d). Contrary to the allegations in Kaiser's Claims Objection, the Puget Sound Proceeding has nothing to do with Kaiser's unauthorized sale of power that forms the basis for Claim No. 7245.  The Puget Sound Proceeding only concerns whether market dysfunctions in the Pacific Northwest resulted in "unjust and unreasonable" rates being charged by sellers in jurisdictional sales.  *See Puget Sound Energy, Inc.,* 96 FERC ¶ 63,044, at 65,300 (2001).  The Puget Sound Proceeding does *not* address whether sellers such as Kaiser were authorized to make "jurisdictional" power sales in the first place.  *Id.*

---

[8] A "public utility" is an entity (not otherwise exempt, such as a state or federal instrumentality) that engages in jurisdictional activity under the FPA.  16 U.S.C. § 824(e)-(f).  Because Kaiser is not otherwise exempt, it is a public utility for purposes of this proceeding.

17.     As set forth in the Unauthorized Sale Claim, Kaiser made a "jurisdictional" power sale to Clark by assigning Clark its rights to receive power from the BPA under the BPA/Kaiser PSA.  According to FERC opinions, a customer such as Kaiser makes a "jurisdictional" sale of power when such customer reduces its power purchases from one party, such as the BPA, and then redirects that jurisdictional power (or assigns the rights to such jurisdictional power) to another party, such as Clark, under terms set by the customer (i.e., Kaiser).  *See Removing Obstacles to Increased Electric Generation and Natural Gas Supply in the Western United States*, 94 FERC ¶ 61,272, at 61,972 (Mar. 14, 2001), *order on rehearing*, 95 FERC ¶ 61,225, at 61,771 (May 16, 2001), *order on rehearing*, 96 FERC ¶ 61,155, at 61,678-79 (Jul. 27, 2001) ("Removing Obstacles Orders").

18.     The appropriate remedy for the unauthorized sale of power is for the seller to disgorge to the buyer all revenues in excess of costs.  *See Cent. Maine Power Co.,* 56 FERC ¶ 61,200, at 61,817-18 (1991), *rehearing denied in part,* 57 FERC ¶ 61,083, at 61,304 (1991) (announcing that FERC would strictly enforce its filing requirement and ensure compliance by requiring sellers that did not meet such requirements to refund all amounts collected in excess of costs); *see also Prior Notice and Filing Requirements Under Part II of the Federal Power Act,* 64 FERC ¶ 61,139, at 61,979-80 (1993), *order on rehearing,* 65 FERC ¶ 61,081 (1993) (implementing, for failure to timely file market based rates, a remedy of disgorgement of the time value of the revenues collected for the time period during which the rate was collected without FERC's authorization).  In this case, due to the instability of the West Coast and Pacific Northwest power markets in 2001, Clark paid $64,080,603 to Kaiser for power that cost Kaiser only $4,200,000.  As such, Clark is entitled to a claim for disgorgement of $59,706,317 plus

interest of $4,010,000, as of February 12, 2002, the date Kaiser filed its bankruptcy petition (the "Petition Date") for a total of $63,716,317.

### Clark's Claim Based Upon Kaiser's Unjust and Unreasonable Rates.

19.    On January 30, 2003, Clark also filed claim no. 3122, seeking a refund of the unjust and unreasonable rate Kaiser charged Clark for power (the "Unreasonable Rate Claim"). The Unreasonable Rate Claim alleges that the $325 per Megawatt hour that Kaiser charged Clark was an unjust and unreasonable rate under the FPA and FERC regulations.    The legal determination of whether a seller of electrical power has charged a just and reasonable rate under the FPA falls within FERC'S exclusive jurisdiction.[9]    Clark has asked FERC to determine whether the rate that Kaiser charged Clark was just and reasonable under the FPA, as a participant in the "Puget Sound Proceeding" that is described below.

20.    On or about October 26, 2000, Puget Sound Energy Inc., another utility company affected by electrical power market volatility in the Pacific Northwest, filed a complaint with FERC pursuant to Section 206 of the FPA for an order capping the prices for power and capacity sales in the Pacific Northwest during the period of December 1, 2000 through June 20, 2001. This action was captioned *Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Pool Agreement,* Docket No. EL01-10-000, *et al.* In response to this complaint, FERC instituted a generic proceeding (the "Puget Sound Proceeding") to determine whether sellers of electrical power in the Pacific Northwest charged

---

[9] Federal Courts have exclusive jurisdiction over violations of the FPA. *See Cal. Ex. Rel Lockyer v. Transcanada Power, L.P.*, 110 Federal Appx. 839, 841 (9th Cir. Oct. 12, 2004) (citing 16 U.S.C. § 825p). Within the federal courts, FERC itself has the "exclusive authority to determine the reasonableness of wholesale [electricity] rates" under the FPA. 16 U.S.C. § 824(a) & (c); *Cal. Ex. Rel. Lockyer,* 110 Fed. Appx. At 841.

buyers unjust and unreasonable rates for such power and to determine the just and reasonable rate (a so-called "ceiling price") for all spot market sales in the Pacific Northwest from December 2000 through June 2001.[10]  On July 25, 2001, FERC ordered "a preliminary evidentiary proceeding" to explore settlement and to establish "the extent of potential refunds."[11] Clark intervened in the Puget Sound Proceeding on August 7, 2001 (FERC granted the motion to intervene on August 21, 2001) and alleged that Kaiser charged Clark unjust and unreasonable rates for the power it purchased from Kaiser pursuant to the Remarketing Agreement.  Clark sought an order from FERC requiring Kaiser to pay to Clark a refund in an amount equal to the excess price charged by Kaiser over just and reasonable electricity rates.  However, the administrative law judge did not take up the issue of whether Kaiser was an authorized Seller under the FPA; this issue was outside the ambit of the general Puget Sound Proceeding.

21.    On December 19, 2002, the Commissioners of FERC issued an Order on Motions to Reopen Evidentiary Record (the "December 19th Order") in the Puget Sound Proceeding, which reopened that proceeding for the submission of additional evidence.  FERC issued the December 19th Order because new information regarding alleged intentional manipulation of the western power markets had come to light since the record in the Puget Sound Proceeding was closed by the Administrative Law Judge.  Clark was able to participate in the new evidentiary submission to a very limited degree.[12]

_____

[10] Exactly what constitutes a "spot market sale" was left for resolution in the *Puget Sound Proceeding*.

[11] San Diego Gas & Electric, 96 FERC ¶61,120, at 61,520 (July 25, 2002).

[12] After the December 19th Order was issued, on January 7, 2003, Clark filed an Emergency Motion for Limited Relief from the Automatic Stay Protecting Kaiser to permit Clark to conduct additional discovery and submit modified proposed findings of fact in the Puget Sound Proceedings.  The Bankruptcy Court denied Clark's emergency motion, but allowed Clark to seek clarification from FERC as to whether the December 19th Order applied to Clark's claims against Kaiser.  On February 23, 2003 FERC clarified that it would be appropriate for

22.     On June 25, 2003, FERC issued a decision terminating the Puget Sound

Proceedings and denying refunds to any party based on the broad policy that FERC considered it

impossible to order a remedy that would be equitable to all entities that participated in the Pacific

Northwest market (the "June 25th Decision Order").   *Puget Sound Energy, Inc.,* 103 FERC ¶

61,348, at P 35 (2003).   FERC's decision did not address the specifics of Clark's claim against

Kaiser.   However, Clark concedes that the Puget Sound Proceeding was the proper forum to

determine whether Kaiser charged Clark a just and reasonable rate in the Transaction, and it will

be bound by the final outcome of that proceeding.   Notably, the June 25th Decision Order arising

out of the Puget Sound Proceeding has not resolved the issue.   Currently, the June 25th Decision

Order sits before the Court of Appeals for the Ninth Circuit.   *See Puget Sound Energy, Inc. v. All

Jurisdictional Sellers of Energy and/or Capacity at Wholesale into Electric Energy and/or

Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool

Agreement,* 103 FERC ¶ 61,348 (2003), *order denying rehearing,* 105 FERC ¶ 61,183 (2003),

*order denying request for rehearing,* 106 FERC ¶ 61,109 (2004), *appeal docketed,* No. 03-74139

(9th Cir. Nov. 14, 2003).

23.     Clark is not a party to the appeal, because the Bankruptcy Court did not permit

Clark to file a request for a rehearing with FERC (see Docket No. 2616), which is a prerequisite

to an appeal.   *See* 16 U.S.C. § 825l (2004).   This does not, however, effect Clark's right to relief

as an affected entity under any FERC order on remand from the Ninth Circuit if it grants the

appeal of the Puget Sound Proceeding.   Therefore, Clark submits that its Unreasonable Rate

---

Clark to seek additional discovery, which the bankruptcy court allowed, but greatly curtailed.
Clark's discovery was generally limited to Clark's transaction with Kaiser.   Furthermore, the
Bankruptcy Court allowed Kaiser to comment on Clark's discovery and accepted all of Kaiser's
comments and revisions.   *See* Docket No. 2000.

Claim must be preserved until such time as FERC both decides that the Clark/Kaiser transaction is properly before it in the Puget Sound proceeding and establishes the just and reasonable rate or the Ninth Circuit upholds the June 25th Decision.

## II.
## ANSWER

24.    Clark admits the averments in Paragraphs 1-4 and Footnote 1 of the Claims Objection to the extent such averments are supported by information readily available on the docket for the above-referenced bankruptcy case.

25.    Clark admits the averments in Sentence 1 of Paragraph 5 of the Claims Objection. Regarding Sentence 2 of Paragraph 5 of the Claims Objection, Clark admits that the actual allowance or disallowance of Clark's proofs of claim filed in this bankruptcy case are core matters pursuant to 28 U.S.C. § 157(b)(2); however, Clark believes that the substantive legal determination of the issues constituting Clark's claims in this case are non-core proceedings, and therefore denies that the whole of this matter is a core proceeding under 28 U.S.C. § 157(b)(2).

26.    Clark does not have information sufficient to admit or deny the averments in Footnote 2 of the Claims Objection, and therefore denies the same.

27.    Clark admits the averments in Sentence 1 of Paragraph 6 of the Claims Objection; however, there are now approximately 170,000 customers in Clark County, Washington. Clark does not have information sufficient to admit or deny the averments in Sentence 2 of Paragraph 6 of the Claims Objection, and therefore denies the same. Clark admits the averments in Sentences 3-5 of Paragraph 6 of the Claims Objection. Clark does not have information sufficient to admit or deny the averments in Sentence 6 of Paragraph 6 of the Claims Objection, and therefore denies the same. On information and belief, the termination date was June 30, 2001. Clark admits the averments in Sentence 7 of Paragraph 6 of the Claims Objection. Clark denies the

averments in Sentence 8 of Paragraph 6 of the Claims Objection; Clark was aware of the change in BPA's policy, but had not planned to go back to BPA to supply Clark's power needs since Clark had begun obtaining all but 10 megawatts of its load from other sources in the mid-1990s. Clark admits the averments in Sentence 9 of Paragraph 6 of the Claims Objection.

28.    Clark does not have information sufficient to admit or deny the averments in Sentences 1-7 of Paragraph 7 of the Claims Objection, and therefore denies the same.  Clark denies the averments in Sentence 8 of Paragraph 7 of the Claims Objection; BPA did not elect to sell Clark a block of power.  Under the terms of the PSA, BPA did not elect to repurchase Kaiser's excess power and, therefore, delivered that power to Clark under Kaiser's direction and on its terms and conditions.

29.    Clark admits the averments in Sentence 1 of Paragraph 8 of the Claims Objection. Clark denies the averments in Sentence 2 of Paragraph 8 to the extent that it implies that an administrative law judge issued the July 25, 2001 Order; this order was issued by FERC.  Clark denies the averments in Sentence 3 of Paragraph 8 to the extent that Kaiser implies that Clark's motion to intervene was related to its complaint; Clark's motion to intervene was filed August 7, 2001 in response to the July 25, 2001 Order.  Clark admits the averments in Sentences 4-5 of Paragraph 8 of the Claims Objection.  Clark admits the averments in Footnote 3 of the Claims Objection.  Clark denies the averments in Footnote 4 of the Claims Objection; Clark admits only that it received power in the months of August through September 2001 and that the ALJ allowed Clark to intervene in the Puget Sound Proceeding.

30.    Clark denies the averments in Sentence 1 of Paragraph 9 of the Claims Objection to the extent that the date that the ALJ issued her Recommendations and Proposed Findings of Fact on September 24, 2001 (not September 1, 2001); otherwise, Clark admits Sentence 1 of

Paragraph 9 of the Claims Objection. Clark admits the averments in Sentences 2-3 of Paragraph 9 of the Claims Objection. Clark denies the averments in Sentence 4 of Paragraph 9 to the extent it implies that the ALJ found that Clark specifically was not entitled to a refund; otherwise, Clark admits these averments.

31.    Clark admits the averments in Paragraph 10 of the Claims Objection.

32.    Clark denies the averments in Sentence 1 of Paragraph 11 of the Claims Objection. FERC actually granted (in part and denied in part) three motions to reopen the proceeding, including motions of city of Seattle and Public Utility District No. 1 of Grays Harbor. Clark admits the averments in Sentences 2-6 of Paragraph 11 of the Claims Objection.

33.    Clark admits the averments in Paragraph 12 of the Claims Objection.

34.    Clark admits the averments in Paragraph 13 of the Claims Objection.[13]

35.    Clark admits the averments in Paragraph 14 of the Claims Objection.

36.    Clark admits the averments in Paragraph 15 of the Claims Objection.

37.    Clark denies the averments in Sentence 1 of Paragraph 16 of the Claims Objection; the June 25th FERC Decision did not specify Kaiser or mention "outstanding liability." Clark admits the averments in Sentence 2 of Paragraph 16 of the Claims Objection to the extent that the FERC concluded that it would not order refunds; however, Clark denies that FERC refused to grant refunds because they were inequitable. FERC chose not to issue any refunds because it did not want to untangle the complex transactions that had taken place among numerous of the participating parties and the adverse consequences such action would have on the market. FERC specifically ruled that "even if prices were unjust and unreasonable, it is not possible to fashion a remedy that would be equitable to all the participants in the Pacific

---

[13] Note, however, that the correct cite for the quoted material is 103 FERC ¶ 61,348 at 62,362 (2003).

Northwest market."  103 FERC ¶ 61,348, at P 35 (2003).  Clark denies the averments in Sentence 3 of Paragraph 16 of the Claims Objection to the extent that the FERC ruling did not expressly refuse to issue a refund to Clark.  Clark denies the averments in Sentences 4-5 of Paragraph 16 of the Claims Objection.  Clark admits the averments in Footnote 5 of the Claims Objection to the extent that Clark is not a party to the appeal of the June 25th Decision only, and denies the remainder of the averments.

      38.    Clark denies the averment in Sentence 1 of Paragraph 17 of the Claims Objection.  Section 101 of the Bankruptcy Code is a definitional provision only, and does not provide the legal standard under which a creditor maintains an allowable claim under the Bankruptcy Code, the allowance or disallowance of claims or interests is governed by section 502 of the Bankruptcy Code.  Clark also denies the averments of Sentence 2 of Paragraph 17 to the extent that is implies that a creditor does not have a claim where the asserted liabilities are "not due and owing."  Section 101(5) defines that a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured  .  .  .  ."  11 U.S.C. § 101(5)(A).  Claims that are unliquidated, unmatured or contingent are not due and owing.  However, they fall within the definition of a claim.  Section 502 operates to allow or disallow claims based upon their nature.  *See* 11 U.S.C. § 502(b)(1).  Clark denies the averments in Sentence 3 of Paragraph 17 of the Claims Objection.

      39.    Clark does is not required to admit or deny the averments in Paragraph 18 of the Claims Objection because such averments appear to be Kaiser's reservation of rights.  However, for purposes of this pleading, Clark denies the same.

40.    Clark admits the averment in Sentence 1 of Paragraph 19 of the Claims Objection. Clark does not have information sufficient to admit or deny the remaining averments in Paragraph 19 of the Claims Objection, and therefore denies the same.

41.    Clark does not have information sufficient to admit or deny the averment in Paragraph 20 and therefore denies the same.

42.    Clark is not required to admit or deny the averments in the final paragraph of the Claims Objection because this paragraph appears to be Kaiser's declarations for various forms of relief.  However, Clark denies the same.

## CONCLUSION

Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities requests that this Court deny the Verified Motion of Debtor and Debtor in Possession Kaiser Aluminum & Chemical Corporation for an Order Disallowing Claims Filed by Clark Public Utilities and grant it any other relief to which it may be entitled at law or at equity.

JASPAN SCHLESINGER & HOFFMAN LLP

/s/ Frederick B. Rosner
Frederick B. Rosner (3995)
913 North Market Street 12th Floor
Wilmington, DE 19801
Tel: (302) 351-8000
Fax: (302) 351-8010

BRACEWELL & GUILIANI LLP

William A. Wood, III, Esq.
(Texas Bar ID 21916050)
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2781
Tel: (713) 223-2300
Fax: (713) 221-1212

George H. Williams, Esq.
2000 K Street, N.W., Suite 500
Washington, DC 20006
Phone: (202) 828-5800
Fax: (202) 223-1225

and

THACHER PROFFITT & WOOD LLP

Christopher F. Graham, Esq.
Louis A. Curcio, Esq.
Two World Financial Center
New York, New York 10281
Tel: (212) 912-7400
Fax: (212) 912-7751

*Counsel to Public Utility District No. 1 of
Clark County d/b/a Clark Public Utilities*