IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | **Jointly Administered** |
| **KAISER ALUMINUM CORPORATION,** | : | **Case No. 02-10429 (JKF)** |
| a Delaware Corporation, <u>et al.</u> | : | |
| | : | **Chapter 11** |
| Debtors. | : | |
| | : | |
| **KAISER ALUMINUM & CHEMICAL** | : | |
| **CORPORATION,** | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | |
| | : | |
| **PUBLIC UTILITY NO. 1 OF CLARK** | : | |
| **COUNTY, d/b/a CLARK PUBLIC** | : | |
| **UTILITIES,** | : | |
| | : | |
| Respondent. | : | |

KAISER ALUMINUM & CHEMICAL CORPORATION'S BRIEF
IN RESPONSE TO MOTION AND BRIEF OF CLARK PUBLIC UTILITIES
TO WITHDRAW THE REFERENCE OF THE DEBTORS' MOTION FOR
AN ORDER DISALLOWING CLAIMS FILED BY CLARK PUBLIC UTILITIES

Daniel J. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

ATTORNEYS FOR MOVANT KAISER
ALUMINUM & CHEMICAL CORPORATION

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 3

I.      The Power Sales Agreement Between KACC and the BPA ................................... 3

II.     Consultations Between Clark and KACC .............................................................. 5

III.    Clark's Agreement with BPA ................................................................................. 6

IV.     The Puget Sound Proceeding Before the ALJ ........................................................ 6

V.      The Puget Sound Proceeding Before the FERC and the Proceedings in the
        Bankruptcy Court ................................................................................................. 8

VI.     The Motion to Disallow Clark's Claims ............................................................... 11

ARGUMENT .................................................................................................................. 12

I.      Withdrawal of the Reference Is Not Mandated Because Resolution of the Motion
        to Disallow Does Not Require Any Interpretation of the Federal Power Act ....... 12

II.     There Are No Reasons for the District Court to Exercise its Discretion and
        Withdraw the Reference ...................................................................................... 17

        A.      This is a Core Proceeding ......................................................................... 17

        B.      Clark has not Requested a Jury Trial ........................................................ 19

        C.      There is Clearly no Cause for Withdrawal of the Reference Under the
                Pruitt Factors .......................................................................................... 19

CONCLUSION ............................................................................................................... 20

## TABLE OF AUTHORITIES

### FEDERAL CASES

Alamito Co.,
    43 FERC ¶ 61,274 (1988) .................................................................................................14

Beard v. Braunstein,
    914 F.2d 434 (3d Cir. 1990) ...........................................................................................18

Bradley v. Pittsburgh Bd. of Educ.,
    913 F.2d 1064 (3d Cir. 1990) .........................................................................................13

Central Kansas Power Co.,
    5 FERC ¶ 61,291 (1978) ................................................................................................14

Churchill v. Star Enter.,
    183 F.3d 184 (3d Cir. 1999) ...........................................................................................14

In re Columbia Gas System, Inc.,
    134 B.R. 808 (D. Del. 1991) ..........................................................................................13

Commissioner v. Sunnen,
    333 U.S. 591 (1948) .......................................................................................................13

Connecticut Valley Elec. Co.,
    208 F.3d 1037 (D.C. Cir. 2000) .....................................................................................15

In re Continental Airlines,
    138 B.R. 442 (D. Del. 1992) ..........................................................................................12

Dade Cty. Sch. Dist. v. Johns-Manville Corp. (In re Johns-Manville Corp.),
    53 B.R. 346 (Bankr. S.D.N.Y. 1985) .............................................................................18

First Options of Chicago, Inc. v. Kaplan,
    913 F. Supp. 377 (E.D. Pa. 1996) ..................................................................................14

Gaviota Terminal Co.,
    75 FERC ¶ 63,008 (1996) ..............................................................................................14

Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods.
    Corp.),
    896 F.2d 1384 (2d Cir. 1990) .........................................................................................19

Hatzel & Buehler, Inc. v. Central Hudson Gas & Elec.,
    106 B.R. 367 (D. Del. 1989) .....................................................................................17, 18

In re Homeland Stores, Inc.,
   204 B.R. 427 (Bankr. D. Del. 1997) ..................................................................12, 13

In re Marcus Hook Dev. Park Inc.,
   943 F.2d 261 (3d. Cir. 1991).......................................................................... ....18

Niagara Mohawk Power Corp. v. Fed. Power Comm'n.,
   379 F.2d 153 (D.C. Cir. 1967)...................................................................... ....15

In re Pruitt,
   910 F.2d 1160 (3d Cir. 1990).......................................................................17, 20

In re RBGSC Investment Corp.,
   253 B.R. 369 (E.D. Pa. 2000) ........................................................................18

Southeastern Sprinkler Co., Inc. v. Meyertech Corp. (In re Meyertech Corp.),
   831 F.2d 410 (3d Cir. 1987).......................................................................18, 19

In re Winstar Communications, Inc.,
   321 B.R. 761 (D. Del. 2005)...........................................................................17

## STATE CASES

In re Big V Holding Corp.,
   Case No. 00-04372, 2002 WL 1482392 (D. Del. July 11, 2002) ...........................17

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | **Jointly Administered** |
| **KAISER ALUMINUM CORPORATION,** | : | **Case No. 02-10429 (JKF)** |
| a Delaware Corporation, <u>et al.</u> | : | |
| | : | **Chapter 11** |
| Debtors. | : | |
| | : | |
| **KAISER ALUMINUM & CHEMICAL** | : | |
| **CORPORATION,** | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | |
| | : | |
| **PUBLIC UTILITY NO. 1 OF CLARK** | : | |
| **COUNTY, d/b/a CLARK PUBLIC** | : | |
| **UTILITIES,** | : | |
| | : | |
| Respondent. | : | |

**KAISER ALUMINUM & CHEMICAL CORPORATION'S BRIEF
IN RESPONSE TO MOTION AND BRIEF OF CLARK PUBLIC UTILITIES
TO WITHDRAW THE REFERENCE OF THE DEBTORS' MOTION FOR
<u>AN ORDER DISALLOWING CLAIMS FILED BY CLARK PUBLIC UTILITIES</u>**

Kaiser Aluminum & Chemical Corporation ("KACC"), one of the

above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby files this

Brief in Response to the Motion and Brief of Clark Public Utilities to Withdraw the Reference of

the Debtors' Motion for an Order Disallowing Claims ("Motion to Withdraw"), filed by the

Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities ("Clark"). In support

hereof, KACC respectfully states as follows:

**PRELIMINARY STATEMENT**

Well over a year before KACC filed its motion to disallow and expunge Clark's

claims from the Debtors' claim registry, the litigation to establish whether or not Clark had any

such claims had come to a conclusion. Clark lost on the merits before an Administrative Law

Judge (the "ALJ"), Clark lost on the merits before the Federal Energy Regulatory Commission

(the "FERC"), and, in an effort to finally bring an end to the matter and avoid any further

expenditure of estate resources defending a spurious claim, the bankruptcy court denied Clark

relief from the automatic stay to file a petition for re-hearing and appeal the decision of the

FERC. Clark did not appeal the bankruptcy court's order foreclosing Clark's ability to appeal the

FERC's decision.

Nonetheless, Clark now apparently views KACC's motion to expunge Clark's

claims as having somehow opened the door for Clark to seek to relitigate its claims.

Furthermore, recognizing that the bankruptcy court had expressed serious doubts about the

validity of the claims at three different hearings at which Clark requested relief from the

automatic stay to pursue additional discovery and/or assert new theories before the FERC, Clark

now seeks to have this Court, rather than the bankruptcy court, adjudicate KACC's request to

expunge the claims.

According to Clark, the reference should be withdrawn because the disallowance

of its claims requires a "material and substantial" interpretation of the Federal Power Act.

Specifically, Clark asserts that "[t]he precise substantive legal issues that must be decided to

resolve these claims are whether Kaiser (i) was a 'seller' of power in a transaction governed by

[the Federal Power Act]; (ii) sold power without authority; and (iii) charged an 'unjust and

unreasonable' rate for such power." (Motion to Withdraw at 2-3.) The disallowance of Clark's

claims does not require the resolution of any of those legal issues or any interpretation of the

Federal Power Act. The determination of whether Clark's claims should be expunged involves

nothing more than the straightforward application of well-established principles of bankruptcy

law and claim preclusion. Indeed, as explained below and as Clark has previously asserted, only

the FERC can grant Clark any relief with respect to the transaction involving Clark and KACC.

Thus, if Clark's claims were not already precluded, which they clearly are, this Court could not

adjudicate the claims in any event. Rather, a new FERC proceeding would have to be

commenced; a proceeding involving exactly the same facts and transaction, as well as the same

legal issue as to whether KACC was the seller, as the proceeding in which Clark has already lost

on the merits.

There is absolutely no reason to withdraw the reference on what amounts to a

routine request to expunge claims that have long ago been finally adjudicated in another forum.

Clark's Motion to Withdraw should be summarily denied.

## FACTUAL BACKGROUND[1]

### I.    The Power Sales Agreement Between KACC and the BPA

Upon information and belief, Clark is a customer-owned municipal corporation

that provides electricity to approximately 170,000 customers in Clark County, Washington.

Prior to 1996, Clark purchased all of its power through requirements contracts with the

Bonneville Power Administration (the "BPA") — the sole federal power marketing agency in the

Pacific Northwest and the region's major wholesaler of electricity. In late 1996, however, Clark

began purchasing power from other suppliers. Clark timed its agreements with these suppliers so

that they would expire on or about July 31, 2001 to coincide with the expiration of its other

---

[1]    The facts in this section, the vast majority of which are undisputed, are drawn from
previous pleadings filed before the bankruptcy court, including the Objection of KACC
to Motion of Public Utility District No. 1 of Clark County for Limited Relief From the
Automatic Stay (D.I. 795), the Declaration of Joseph Patrick Hoerner (the "Hoerner
Dec."), attached thereto as Exhibit A, and the Objection of KACC to Motion of Public
Utility District No. 1 of Clark County for Limited Relief From the Automatic Stay (D.I.
1580). A copy of those two objections and the Hoerner Dec. are attached hereto
collectively as Exhibit A and incorporated herein by reference. For ease of reference, the
citations to the relevant paragraphs of the Hoerner Dec. are included, where applicable.

supply contracts. Clark planned to negotiate a new contract with the BPA effective July 31,

2001 that would satisfy its future power needs. In 1998, however, the BPA announced that it

would henceforth change the anniversary/termination date of its contracts from July 31 to

October 1 to coincide with its fiscal year. Therefore, any new contract that Clark signed with the

BPA would not become effective until October 1, 2001, leaving Clark with a two-month gap in

its power supply. Clark was apparently unaware of the change in the BPA's policy until it

initiated contract negotiations with the BPA sometime late in the year 2000. At that time, Clark

began searching for a source of power for the months of August and September 2001.

KACC owns an aluminum rolling mill and previously owned two primary

aluminum reduction smelters in Washington State. To secure power for those facilities, KACC

executed a five-year Power Sales Agreement with the BPA for service from October 1, 1996 to

September 30, 2001 (the "PSA"). Well into the term of the PSA, as a result of business

conditions, KACC began reducing production at its Washington facilities and, as a direct result

of those reductions, curtailing its power purchases from the BPA. Under the PSA, if KACC

desired to curtail purchases from BPA, it had to provide BPA notice of the amount and duration

of the curtailment. It also could request that BPA sell the power to another entity. Further,

KACC had the option to identify a designated third-party that was willing to pay a specified

price for the power, or KACC could request that BPA find a purchaser for the power.

In the event KACC curtailed its purchases from BPA, BPA thus had a wide range

of options. BPA could sell the power to a different purchaser with public preference on the same

terms as KACC's notice; BPA could retain the power for its own use or dispose of the power on

whatever alternative terms BPA might separately arrange; or BPA could offer a contract for sale

of the power to the entity identified in KACC's notice. (Hoerner Dec. ¶ 5).

If BPA chose to sell the power to the entity designated in KACC's notice, BPA would offer a power sales contract to the entity and, if accepted, BPA also would agree with KACC for crediting of the payments under the terms of the PSA. If BPA elected to sell to a different buyer at a different price or retain the power for its own use, BPA would still credit KACC for sale revenue based on the price in KACC's notice. The notice price established the mitigation to KACC for not purchasing the federal power; the notice did not determine the price or to whom BPA would sell the power. (Hoerner Dec. ¶ 6).

Thus, KACC did not have a right, contractual or otherwise, to dictate whether BPA would sell the power to a third-party or retain it for its own use. KACC likewise did not have the right, contractual or otherwise, to determine to whom BPA would sell the power if BPA chose to sell it to a third-party. Additionally, KACC did not have (i) the right to establish the price at which BPA would sell the power to parties that bought power from BPA or (ii) the right to sell the power itself. In fact, BPA insisted that BPA itself had to be the seller of any federal power that KACC did not take. (Hoerner Dec. ¶ 7).

## II.    Consultations Between Clark and KACC

In January 2001, a consultant contacted KACC on behalf of Clark. The consultant was aware that because of KACC's reduced operations at its Washington facilities, the BPA might have a block of federal power for sale that would otherwise belong to KACC under the PSA. Thereafter, KACC and Clark independently approached other potential buyers and sellers to determine a market price for power for August and September 2001. They each obtained price information so that KACC could name Clark as a party willing to buy power from BPA at a specified price in the notice KACC would provide to the BPA of curtailment of KACC's own August and September 2001 purchases. The price ultimately set forth in the notice was below the market quotes Clark had received from other sellers. (Hoerner Dec. ¶ 8).

After the consultant and KACC negotiated regarding what would be an acceptable price for Clark's purchase of such available power, KACC sent Clark a letter on February 2, 2001 outlining how the sale from the BPA to Clark might be implemented. A factor precipitating the letter was Clark's concern with KACC's creditworthiness and desired clarification that Clark's power sale contract, if offered, would be with BPA for federal power, and not with KACC. (Hoerner Dec. ¶ 9).

### III.    Clark's Agreement with BPA

Also on February 2, 2001, KACC provided notice to the BPA that it intended to curtail its purchases under the PSA for the months of August and September 2001 and identified Clark as a potential purchaser of the curtailed power. Pursuant to the terms of the PSA, the BPA elected to sell Clark a block of power from the PSA for a term commencing on August 1, 2001 and terminating on September 30, 2001.

### IV.    The Puget Sound Proceeding Before the ALJ

Upon information and belief, on or about October 26, 2000, Puget Sound Energy, Inc. ("Puget Sound"), a utility company in the Pacific Northwest, filed a complaint with the Federal Energy Regulatory Commission (the "FERC") seeking the imposition of a cap on the price that could be charged for energy sold under the Western Systems Power Pool Agreement into Pacific Northwest Power Markets (the "Puget Sound Proceeding").[2] The FERC issued an order in the Puget Sound Proceeding on July 25, 2001 initiating an evidentiary proceeding to develop a factual record on whether there might have been unjust and unreasonable charges for spot market bilateral sales of energy in the Pacific Northwest during the period December 25,

---

[2]    The FERC proceeding is styled <u>Puget Sound Energy, Inc. v. All Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement</u>, FERC Docket No. EL01-10-000, <u>et al.</u>

2000 through June 20, 2001 and assigning the matter to a FERC ALJ. On August 7, 2001, more

than nine months after Puget Sound filed its complaint, Clark filed a motion for leave to

intervene out of time in the Puget Sound Proceeding, alleging that KACC had violated the

Federal Power Act by charging Clark unjust and unreasonable rates for the power Clark

purchased for the months of August and September 2001 (the "Unjust and Unreasonable Rate

Claim"). Clark requested that the FERC compel KACC to refund any amounts charged in excess

of a just and reasonable rate. The ALJ permitted Clark to intervene in the Puget Sound

Proceeding.[3] KACC opposed Clark's request for a refund by, among other things, explaining

that the BPA, not KACC, had sold the electricity in question to Clark.

After Clark and KACC each submitted prepared testimony, an evidentiary hearing

was held before the ALJ at which a record was developed on the circumstances faced in Pacific

Northwest power markets during the period December 25, 2000 through June 20, 2001. Clark

and KACC were given the opportunity during that evidentiary hearing to conduct live

cross-examination of each other's witnesses. Thereafter, each party filed post-hearing briefs and

proposed findings of fact with the ALJ.

The ALJ issued her Recommendations and Proposed Findings of Fact to the full

commission on September 1, 2001 (the "ALJ Report"). The ALJ concluded that the prices in the

Pacific Northwest during the relevant time period were the result of a number of factors,

including a shortage of supply, excess demand, a drought, increased natural gas prices and price

signals from California markets. She also concluded that the Pacific Northwest was a

competitive market, and that the transactions at issue in the case resulted from bilateral

---

[3]     Although the power was supplied to Clark in the months of August and September 2001,
        dates that fell outside the relevant range of dates for the Puget Sound Proceeding, the ALJ

agreements between the parties. Accordingly, the ALJ found that no refunds should be ordered, and she recommended that the FERC terminate the Puget Sound Proceeding.

After the issuance of the ALJ Report, numerous parties, including Clark and KACC, submitted comments to the full Commission advocating their various positions to the FERC. For its part, Clark disagreed with the ALJ's recommendations and requested that the FERC order refunds from KACC to Clark either in the Puget Sound Proceeding, or alternatively suggested that refunds be ordered in another proceeding before the FERC, entitled <u>Investigation of Wholesale Rates of Public Utility Sellers of Energy and Ancillary Services in the Western Systems Coordinating Council</u>, FERC Docket No. EL01-68, initiated by the FERC in April 2001 (the "WSCC Proceeding"). This alternative suggestion was somewhat odd in that neither Clark nor KACC were parties to the WSCC Proceeding.[4]  (Hoerner Dec. ¶ 24).

Moreover, following the filing of its Comments on the ALJ Report, Clark decided to ignore the Commission's procedural schedule and filed an additional pleading on November 20, 2001. Apparently dissatisfied with its prior efforts, Clark's belated November 20, 2001 pleading recapitulated its prior points, although rearranged in the new pleading.

## V.    The Puget Sound Proceeding Before the FERC and the Proceedings in the Bankruptcy Court

On June 14, 2002, Clark filed a Motion for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (D.I. 644) to (i) allow the FERC to issue orders allowing additional discovery in the Puget Sound Proceeding, and (ii) permit Clark to pursue an additional claim against KACC (a claim not previously articulated in any other

---

(continued...)
> allowed Clark to intervene because Clark negotiated and agreed to the sale during the relevant time period.

[4]    Clark later sought to intervene in the WSCC Proceeding, but Clark's request was denied.

forum) that KACC had violated the Federal Power Act by making a jurisdictional sale of power without obtaining prior FERC authorization (the "Unauthorized Sale Claim"). The request to belatedly pursue the Unauthorized Sale Claim was an obvious attempt by Clark to re-cast its claim under a new theory after it had become obvious that the Unjust and Unreasonable Rate Claim would not succeed. The Official Committee of Unsecured Creditors (the "Creditors' Committee") and KACC filed objections to Clark's motion (D.I. 783, 795), arguing, among other things, that Clark already had a full opportunity to present and litigate its claims and that lifting the automatic stay to permit Clark to attempt to assert the Unauthorized Sale Claim would give Clark an unwarranted second bite at the apple. On September 17, 2002, the bankruptcy court entered an order denying Clark's motion for limited relief from the automatic stay (D.I. 1090). Clark did not appeal that order.

On December 19, 2002, in the wake of disclosures regarding Enron Corporation's manipulation of wholesale electrical prices in the California market, the FERC granted a motion filed by the City of Tacoma to reopen the evidentiary record in the Puget Sound Proceeding. The FERC issued an order allowing parties in the Puget Sound Proceeding to conduct additional discovery and submit any additional evidence to the FERC by February 28, 2003 (the "Discovery Order"). On January 7, 2003, Clark filed its Emergency Motion for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (D.I. 1555) to permit Clark to conduct additional discovery and submit modified proposed findings of fact in the Puget Sound Proceeding. The Creditors' Committee and KACC filed objections (D.I. 1574, 1580). At a hearing on January 15, 2003, the bankruptcy court denied Clark's emergency motion, but allowed Clark to seek clarification from the FERC as to whether the Discovery Order applied to Clark's dispute with KACC.

On February 3, 2003, the FERC issued a clarification to the Discovery Order and concluded that it would be appropriate, subject to bankruptcy court authorization, to allow Clark to seek additional discovery regarding its transaction with KACC. Accordingly, on February 5, 2003, Clark filed an Emergency Motion for Reconsideration of Motion Dated January 7, 2003 Requesting Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (D.I. 1725). The bankruptcy court issued an oral order on February 11, 2003, granting Clark limited discovery regarding its transaction with KACC, (D.I. 1739), and on March 17, 2003, the bankruptcy court entered an Order Granting in Part and Denying in Part the Emergency Motion of Clark County for Reconsideration of January 7, 2003 Motion (D.I. 2000).

After considering the additional evidence provided pursuant to the terms of the Discovery Order, the FERC issued a decision on June 25, 2003 terminating the Puget Sound Proceeding and denying refunds to any party (the "June 25th FERC Decision"). The FERC concluded that "appropriate relief was provided by institution of the West-wide mitigation plan in June 2001 and that the equities do not justify refunds." (June 25th FERC Decision at 2). The FERC also adopted the conclusions of the ALJ that:

> [i]f the position of the refund claimants is accepted, they would be relieved of the consequences of their conscious economic decisions at the expense of a functioning competitive market in which a vast majority of the [Pacific Northwest] purchasers during this period accept responsibility for the choices they made.

(June 25th FERC Decision at ¶ 41) (modifications in the original).[5]

On July 18, 2003, Clark filed another Emergency Motion for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (D.I. 2598) to permit Clark to file a request for rehearing with the FERC as a jurisdictional prerequisite to an appeal of

---

[5]    A copy of the June 25th FERC Decision is attached hereto as Exhibit B and incorporated herein by reference.

the FERC's decision to the United States Circuit Court of Appeals for the Ninth Circuit. KACC filed an objection (D.I. 2612), arguing that allowing Clark "to continue pursuing its increasingly specious litigation will impose yet further inappropriate burdens on the Debtors' estates" and that the time had arrived for the bankruptcy court "to conclude Clark's actions in this matter." (Objection at 2). The bankruptcy court entered an order denying Clark's motion on July 23, 2003. (D.I. 2616). Clark did not appeal that order. The June 25th FERC Decision is currently on appeal before the Ninth Circuit Court of Appeals, but Clark is not a party to that appeal.

**VI.    The Motion to Disallow Clark's Claims**

On January 30, 2003, Clark filed two proofs of claim against KACC (collectively, the "Clark Claims"). One claim, Claim No. 3122, asserts a general, unsecured claim against KACC in an unliquidated amount for any refund ordered by the FERC in the Puget Sound Proceeding (i.e., the Unjust and Unreasonable Rate Claim). The other claim, Claim No. 7245, asserts a general, unsecured claim for $63,716,317 for any disgorgement or refund ordered by the FERC for KACC's alleged violation of the Federal Power Act for making a jurisdictional sale of power without prior FERC authorization (i.e., the Unauthorized Sale Claim").

Given that the June 25th FERC Decision established that KACC has no liability to Clark in respect of the transaction at issue and that the bankruptcy court had brought an end to Clark's further pursuit of its claims by denying Clark's request to appeal to the Ninth Circuit Court of Appeals, on October 10, 2005, KACC filed its verified motion for an order disallowing the Clark Claims (the "Motion to Disallow") (D.I. 7480). The Motion to Disallow is scheduled to be heard by the bankruptcy court on November 14, 2005.

On October 24, 2005, Clark filed (i) its Motion to Withdraw; and (ii) a brief and motion for determination that the Motion to Disallow is a non-core proceeding (D.I. 7582), and on October 25, 2005, Clark filed (iii) a response (D.I. 7593) (the "Response to the Motion to

Disallow") to the Motion to Disallow; (iv) an emergency motion (the "Emergency Stay Motion") (D.I. 7596) requesting that the bankruptcy court stay adjudication of the Motion to Disallow pending determination of the Motion to Withdraw; and (v) a motion to shorten notice (D.I. 7595) requesting that the bankruptcy court shorten notice with respect to the emergency motion for a stay.

Because the Motion to Disallow is simply a routine request to expunge claims that were long ago brought to a conclusion, in another forum and there is no basis whatsoever to withdraw the reference, KACC intends to oppose the Emergency Stay motion and seek to have the bankruptcy court adjudicate the Motion to Disallow on November 14, 2005. If the bankruptcy court does so, the Motion to Withdraw will obviously become moot, and KACC will file a supplemental pleading informing the Court that that has occurred.

## ARGUMENT

I.    **Withdrawal of the Reference Is Not Mandated Because Resolution of the Motion to Disallow Does Not Require Any Interpretation of the Federal Power Act.**

Under 28 U.S.C. 157(d), "[t]he district court shall on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires a consideration of both Title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. 157(d). This district deems withdrawal mandatory when "(1) consideration of federal law outside of the Bankruptcy Code is necessary to resolve the case or proceeding, and (2) such consideration of federal law outside the Bankruptcy Code is 'substantial and material.'" In re Homeland Stores, Inc., 204 B.R. 427, 430 (Bankr. D. Del. 1997); In re Continental Airlines, 138 B.R. 442, 444-45 (D. Del. 1992). The party seeking withdrawal of the reference "bears the burden of demonstrating that a substantial and material consideration of nonbankruptcy law is necessary to resolve the case." In re

Continental Airlines, 138 B.R. at 445. Further, the consideration of federal law outside the
bankruptcy code must be substantial and material, and the mere application of settled law does
not mandate withdrawal of the reference. In re Homeland stores, Inc., 204 B.R. at 430; In re
Columbia Gas System, Inc., 134 B.R. 808, 811 (D. Del. 1991).

        Clark argues that withdrawal of the reference is mandatory because resolution of
KACC's objections to Clark's claims requires a substantial and meaningful interpretation of the
Federal Power Act. Specifically, Clark asserts that "[t]he precise substantive legal issues that
must be decided to resolve these claims are whether Kaiser (i) was a "seller" of power in a
transaction governed by the FPA; (ii) sold power without authority; and (iii) charged an 'unjust
and unreasonable' rate for such power." (Motion to Withdraw at 2-3.) This argument, however,
is premised entirely on Clark's erroneous assumption that it is free to pursue its Unauthorized
Sale Claim, presumably based on the fact that, in denying Clark's claim for a refund in the Puget
Sound Proceeding, neither the ALJ nor the FERC reached the issue of whether KACC was a
seller of power. As explained below, the Unauthorized Sale Claim is unquestionably precluded
at this point by the June 25th FERC Decision, and the disallowance of that claim does not require
any interpretation of the Federal Power Act or any other federal statute for that matter. Rather,
disallowance of the claim requires nothing more than the straightforward application of well-
established principles of claim preclusion.

        The doctrine of res judicata forbids the re-examination of claims that a party
might have asserted, but did not assert, in a prior action. Commissioner v. Sunnen, 333 U.S.
591, 597 (1948) ("A final judgment on the merits of an action precludes the parties or their
privies from relitigating issues that were or could have been raised in that action"); see also
Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1070 (3d Cir. 1990). The purpose of claim

preclusion is to avoid piecemeal litigation of claims arising from the same events. Churchill v. Star Enter., 183 F.3d 184, 194 (3d Cir. 1999). Thus, where there is "no escaping from the fact that [a plaintiff] has relied on different legal theories to seek redress from the [same defendant] for a single course of wrongful conduct . . . [by] splitting a cause of action," claim preclusion will prohibit the prosecution of the second cause of action. Id. at 195. The June 25th FERC Decision is a final judgment and bars Clark from re-litigating any claim that was or could have been raised in the Puget Sound Proceedings.[6] Although the June 25th FERC Decision is currently on appeal to the Ninth Circuit, the finality of a federal judgment is not affected by a pending appeal. First Options of Chicago, Inc. v. Kaplan, 913 F. Supp. 377, 382 n.7 (E.D. Pa. 1996) ("The finality of a judgment, and therefore its preclusive effect, however, is not affected by a pending appeal.").[7]

The Unauthorized Sale Claim involves the same parties, the same facts, the same transaction, an alleged violation of the same statute and the same issue as to whether KACC was a seller that were involved in the Puget Sound Proceeding. Clark obviously concocted the Unauthorized Sale Claim after it was apparent that Clark had lost on its Unreasonable Rate Claim, and there can be no question that the Unauthorized Sale Claim could and should have

---

[6]    Indeed, the Unauthorized Sale Claim was precluded by the time ALJ issued her final report, well before the June 25th FERC Decision. In addition to claim preclusion, the FERC also has a "long-standing" policy prohibiting parties from relitigating issues, even issues that have yet to be finally decided, absent a showing of significant changed circumstances. Alamito Co., 43 FERC ¶ 61,274 at 61,753 (1988) ("Absent a showing of significant change in circumstances, the relitigation of an issue is simply not justified. Sound public policy reasons support the Commission's policy against relitigation of issues."). See also Central Kansas Power Co., 5 FERC ¶ 61,291 at 61,621 (1978) (affirming the ALJ's conclusion that to decide issues previously afforded a full hearing "would ill serve the goal of administrative efficiency and would not further the interests of the parties"); Gaviota Terminal Co., 75 FERC ¶ 63,008 (1996).

[7]    Furthermore, as noted above, Clark is not even a party in the appeal.

been brought in the Puget Sound Proceeding.[8]  Clark failed to do so.  Disallowance of the

Unauthorized Sale Claim merely requires the bankruptcy court to apply well-established

principles of claim preclusion.  The Federal Power Act is not implicated and an interpretation of

that statute is not required to resolve KACC's objections to Clark's proofs of claim.  Therefore,

withdrawal of the reference is not mandated by 28 U.S.C. 157(d).

    Furthermore, even if the bankruptcy court were to somehow conclude that the

Unauthorized Sale Claim is not precluded, which it clearly is, neither this Court nor the

bankruptcy court could adjudicate that claim.  If there is a violation of the Federal Power Act,

only the FERC has the statutory authority and the broad discretion to fashion a remedy.  See

Niagara Mohawk Power Corp. v. Fed. Power Comm'n., 379 F.2d 153, 158 (D.C. Cir. 1967) (the

FERC has broad statutory authority to fashion remedies in the public interest); Connecticut

Valley Elec. Co., 208 F.3d 1037, 1044 (D.C. Cir. 2000) (same).  In fact, although Clark now

represents to this Court that it can adjudicate the Unauthorized Sale Claim, Clark previously

represented to the bankruptcy court that the FERC has "exclusive jurisdiction" to hear Clark's

claims and "[o]nly FERC can decide whether . . . Kaiser violated the FPA by selling the power to

Clark Public Utilities."  (Memorandum of Law in Support of Motion for Relief From Stay (D.I.

645) at 1, 12.)  It is absurd, however, to think that Clark could commence a new FERC

proceeding at this point involving the exact same transaction and the same issue of whether

KACC was the seller as involved in the Puget Sound Proceeding.

---

[8]     Contrary to Clark's unsupported assertion that the Unauthorized Sale Claim "was not an
        issue that was apropriate (sic) to raise in the Puget Sound Proceeding," (Response to the
        Motion to Disallow at 6.), the ALJ placed no limits on a party's ability to raise arguments
        prior to the closure of the evidentiary record, and there was nothing that would have
        prevented Clark from bringing the Unauthorized Sale Claim in the Puget Sound
        Proceeding.

Clark also contends that its Unjust and Unreasonable Rate Claim "may only be resolved after substantial and material consideration of Section 205(o) of the FPA, which requires that sales be at rates determined by FERC to be 'just and reasonable.'" (Motion to Withdraw at 16). As noted above, Clark's Unjust and Unreasonable Rate Claim has already been fully adjudicated, with the FERC determining that no refund is warranted.

Although the bankruptcy court refused to permit Clark to file a petition for re-hearing to appeal the June 25th FERC Decision, presumably seeking to bring Clark's claim to an end, Clark nonetheless asserts that it still has a "right to relief as an affected entity" if the Ninth Circuit reverses and remands and the FERC orders refunds following the remand. (Id. at 11.) KACC disputes this contention, but even if Clark was correct, there is certainly no issue before the bankruptcy court requiring an interpretation of the Federal Power Act, let alone a material and substantial consideration of the statute. Rather, the only issue to be determined is whether Clark's claim is now finally resolved given that Clark is not a party in the appeal or, if the bankruptcy court determines that there is in fact some possibility that Clark could participate on remand, whether the claim should nonetheless be disallowed given (i) the extremely remote probability of Clark ever being entitled to a refund and (ii) Clark's ability to seek reconsideration of the claim under section 502(j) of the Bankruptcy Code. In fact, the bankruptcy court already found in conjunction with Clark's motions for relief from stay that Clark has "very little chance or likelihood of success on the merits" on its claim (Tr. of January 15, 2003 at 23.) Indeed, success on the Unjust and Unreasonable Rate Claim would require a series of unlikely events: (i) the Ninth Circuit, on a very deferential standard of review, would have to reverse the June 25th FERC Decision and remand for further proceedings; (ii) Clark would have to prevail in its contention that it could participate on remand notwithstanding it was not a party on appeal;

(iii) the FERC would have to make a determination that KACC was the "seller" of power to

Clark; and (iv) after previously deciding that refunds were neither justified nor possible, the

FERC would have to reverse itself and order refunds in all of the transactions at issue in the

Puget Sound Proceeding. Disallowance of the Unjust and Unreasonable Rate Claim requires the

bankruptcy court to do nothing more than apply traditional principles of bankruptcy law

applicable to the claims allowance and disallowance process.

## II.      There Are No Reasons for the District Court to Exercise its Discretion and Withdraw the Reference

Under 28 U.S.C. 157(d), the "district court may withdraw, in whole or in part, any

case or proceeding referred under this section, on its own motion or on timely motion of any

party, for cause shown." 28 U.S.C. 157(d). The requirement that cause be shown to justify

withdrawal of the reference suggests "that Congress intended to have bankruptcy proceedings

adjudicated in bankruptcy court, unless rebutted by a contravening policy." Hatzel & Buehler,

Inc. v. Central Hudson Gas & Elec., 106 B.R. 367, 371 (D. Del. 1989); In re Winstar

Communications, Inc., 321 B.R. 761, 763 (D. Del. 2005). Accordingly, the moving party bears

the burden to show cause. In re Big V Holding Corp., Case No. 00-04372, 2002 WL 1482392, at

*3 (D. Del. July 11, 2002). Although the statute itself does not define "cause," the Third Circuit

has stated that a court should consider "the goals of promoting uniformity in bankruptcy

administration, reducing forum shopping and confusion, fostering the economical use of the

debtors' and creditors' resources, and expediting the bankruptcy process." In re Pruitt, 910 F.2d

1160, 1168 (3d Cir. 1990). Courts should also consider whether the proceedings are core or non-

core, and whether the parties have requested a jury trial. Hatzel & Buehler, 106 B.R. at 371; Big

V Holding, 2002 WL 1482392 at *3.

## A.    This is a Core Proceeding

Since there are limitations to a bankruptcy court's authority to adjudicate non-core proceedings, a determination of whether a given proceeding is core or non-core is "crucial to the determination" of a motion to withdraw the reference. Hatzel, 106 B.R. at 371. The Motion to Disallow is clearly a core proceeding. Indeed, Clark admits as much: "Clark admits that the actual allowance or disallowance of Clark's proofs of claim filed in this bankruptcy case are core matters." (Response to Motion to Disallow at 14.)

Although core proceedings are not statutorily defined, section 157(b)(2) does provide a non-exhaustive list of examples and specifically provides that core proceedings include "allowance or disallowance of claims against the estate . . . ." 28 U.S.C. § 157(b)(2)(B). Accordingly, this is a core proceeding. See In re Marcus Hook Dev. Park Inc., 943 F.2d 261, 267 (3d. Cir. 1991) (holding that a proceeding was core because it comported with one of the examples provided by section 157); Southeastern Sprinkler Co., Inc. v. Meyertech Corp. (In re Meyertech Corp.), 831 F.2d 410, 418 (3d Cir. 1987) (same); In re RBGSC Investment Corp., 253 B.R. 369, 379 (E.D. Pa. 2000) ("28 U.S.C. § 157(b)(2)(B) provides that 'core' proceedings include 'allowance or disallowance of claims against the estate,' and an action that is rooted in a claim that may have accrued under state law against a debtor's estate prior to the bankruptcy falls under the set of proceedings provided for under 28 U.S.C. § 157(b)(2)(B)").

Additionally, the Third Circuit has held that a "'proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.'" Beard v. Braunstein, 914 F.2d 434, 444 (3d Cir. 1990) (internal citations omitted). The allowance or disallowance of claims is central to bankruptcy cases. Dade Cty. Sch. Dist. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 53 B.R. 346, 352 (Bankr. S.D.N.Y. 1985) (holding that the claims process is the "exclusive

framework for asserting claims against a debtor and adjudicating claim disputes"). The Motion to Disallow thus invokes a substantive right provided by title 11 and is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.

Clark argues that the disallowance of its claims is non-core because "the substantive determination of the underlying legal issues is non-core and does not fall within the Bankruptcy's Court's jurisdiction." (Motion for Determination at 7). The substantive determination of the underlying legal issues, however, was long ago concluded, and the FERC determined that Clark is not entitled to a refund under the Federal Power Act. Clark simply ignores the fact that the merits of its claims have been fully and completely litigated in, or otherwise foreclosed by, the Puget Sound Proceeding. Moreover, contrary to Clark's assertions, simply because the Clark Claims arise under the Federal Power Act does not mean this proceeding is non-core. Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.), 896 F.2d 1384, 1389 (2d Cir. 1990) (holding that in determining whether a proceeding is a core proceeding, the "relevant inquiry is whether the nature of the adversary proceeding, rather than the state or federal basis for the claim, falls within the core of federal bankruptcy power"); In re Meyertech Corp., 831 F.2d at 418 (holding that creditor's action for breach of warranty based on state law was correctly characterized as a claim against the debtor that was a core proceeding). Determination of whether the Clark Claims should be disallowed in light of the conclusion of the litigation of those claims in another forum is unquestionably a function of the claims allowance and disallowance process, and, accordingly, a core proceeding.

**B.    Clark has not Requested a Jury Trial**

Clark has not requested a jury trial, nor is it entitled to one.

**C.     There is Clearly no Cause for Withdrawal of the Reference Under the <u>Pruitt</u> Factors**

Finally, a consideration of the <u>Pruitt</u> factors confirms that there is no cause whatsoever to withdraw the reference. With respect to the first factor, leaving to the bankruptcy courts the determination of whether specific claims should be disallowed in light of the status of the litigation of the merits of the claims in another forum and the status of the bankruptcy proceeding helps promote uniformity in bankruptcy administration. The second factor, reducing forum shopping and confusion, likewise counsels against withdrawal of the reference. Here, it is apparent that Clark seeks to have this Court consider the disallowance of its claims because the bankruptcy court has already expressed serious reservations about the merits of those claims. The bankruptcy court also denied Clark's request for relief from the automatic stay to file a petition for re-hearing to appeal the June 25th FERC Decision, and Clark no doubt believes that the bankruptcy court will not be receptive to Clark's contention that the litigation is not over and Clark may further litigate its claim for a refund if there is a reversal and remand. Moreover, given that the bankruptcy court has already conducted three hearings on motions for relief from the automatic stay relating to the Clark Claims, the bankruptcy court is already familiar with the claims and is in the best position to adjudicate the request for disallowance expeditiously and efficiently. Accordingly, all of the <u>Pruitt</u> factors support denial of the Motion to Withdraw.

<b>CONCLUSION</b>

For the reasons stated above, Clark's motion to withdraw the reference should be denied.

Dated:  November 3, 2005
Wilmington, Delaware

Respectfully submitted,

_Kimberly D. Newmarch_ (signature) _____
Daniel J. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

                -and-

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

ATTORNEYS FOR MOVANT KAISER
ALUMINUM & CHEMICAL CORPORATION

**Kaiser Aluminum Corp., et al.**
**Case No. 02-10429 (JKF)**

SUMMARY SHEET OF EXHIBITS

## EXHIBIT A

Objection of KACC to Motion of Public Utility District No. 1 of Clark County for Limited Relief From the Automatic Stay [Docket No. 795]

Declaration of Joseph Patrick Hoerner

Objection of KACC to Motion of Public Utility District No. 1 of Clark County for Limited Relief From the Automatic Stay [Docket No. 1580]

## EXHIBIT B

FERC Decision

## EXHIBIT C

Unreported Opinion