**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Jointly Administered** |
| | : | |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION,** | : | |
| a Delaware Corporation, et al., | : | **Chapter 11** |
| | : | |
| **Debtors** | : | **Hearing Date: 07/23/02 @ 12:30 p.m.** |

### OBJECTION OF DEBTOR AND DEBTOR IN POSSESSION KAISER ALUMINUM AND CHEMICAL CORPORATION TO MOTION OF PUBLIC UTILITY DISTRICT NO. 1 OF CLARK COUNTY FOR LIMITED RELIEF FROM THE AUTOMATIC STAY (D.I. 644)

Kaiser Aluminum & Chemical Corporation ("KACC"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby files this Objection to the Motion of Public Utility District No. 1 of Clark County for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (D.I. 644) (the "Motion"), filed by the Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities ("Clark"). In support hereof, Kaiser respectfully submits the Declaration of Joseph Patrick Hoerner, which is attached hereto as Exhibit A and incorporated herein by reference (the "Hoerner Dec."), and states as follows:

### Preliminary Statement

1.      Clark's Motion should be denied because as demonstrated below, Clark seeks simply to relitigate issues that it has already lost on the merits before an Administrative Law Judge and that are presently on review by the Federal Energy Regulatory Commission (the "FERC" or the "Commission"). The automatic stay should be maintained at least until such time as the FERC rules on the review of the Administrative Law Judge's decision.

DLI-5704355v3

2.      As noted in Clark's Motion, there is pending before the FERC a proceeding, which among things, involves a dispute between KACC and Clark regarding purchases of electricity that were made by Clark for delivery during August and September 2001. Clark claims that KACC was the seller of the electricity, and in the ongoing proceeding before the FERC, Clark has sought an order from the FERC requiring KACC to refund amounts associated with the alleged sales. The FERC proceeding is styled Puget Sound Energy, Inc. v. All Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement, FERC Docket No. EL01-10-000, et al. ("the Puget Sound Proceeding").

3.      Clark's claim that KACC was the seller of that electricity, however, contradicts both the transactional documents that identify the Bonneville Power Administration ("BPA") as the seller of the electricity and the correspondence between KACC and Clark that identify BPA as the seller. (Hoerner Dec., ¶ 7). These facts are not discussed in the Clark Motion, nor are a host of other facts that show that Clark's request to obtain money from KACC has no merit.

4.      More important, however, Clark's and KACC's versions of the facts were already presented to the FERC at an evidentiary hearing in the Puget Sound Proceeding. Although Clark references the fact that a FERC Administrative Law Judge (the "ALJ") has issued a recommendation based upon the evidentiary record that was developed at that hearing, Clark does not disclose that the ALJ's recommendation, which was based upon the evidentiary presentations as well as a voluminous record that addresses the overall market circumstances in the Pacific Northwest where the electricity was produced and consumed, would bar the payment of any amount to Clark. Puget Sound Energy, Inc. v. All Sellers of Energy and/or Capacity at

Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement, 96 FERC ¶ 63,044 (2001) (the "Recommended Decision"). The Recommended Decision currently is pending before the full Commission.

      5.     Notwithstanding these facts, or more probably because of them, Clark filed its Motion seeking to have the Court lift the automatic stay (a) to allow Clark to seek authority from the FERC to conduct additional discovery and present additional evidence if the record in the Puget Sound Proceeding is re-opened, (b) to permit the FERC to order KACC to issue a refund in the Puget Sound Proceeding, or alternatively in a separate proceeding in which the FERC is conducting an investigation into the wholesale rates of sellers in the Western Systems Coordinating Council (the "WSCC Proceeding"),[1] if the FERC orders refunds in those proceedings and (c) to file a new complaint against KACC that would be based upon the same facts but would allege a new theory of liability, i.e., that KACC violated the Federal Power Act by selling power to Clark without requisite authority having been obtained from the FERC. Of course, the foundation for this new complaint would be that KACC in fact was the seller to Clark, which is already squarely at issue in the Puget Sound Proceeding.

      6.     Clark has not raised anything in its Motion that has not previously been raised before the FERC or of which the FERC is not well aware. All of the facts relied upon by Clark for its new complaint are before the FERC in the Puget Sound Proceeding. What Clark

---

[1]     This separate proceeding is styled Investigation of Wholesale Rates of Public Utility Sellers of Energy and Ancillary Services in the Western Systems Coordinating Council, FERC Docket No. EL01-68, and was initiated by the FERC in April 2001. Clark did not seek to intervene in the WSCC Proceeding until late January 2002. The FERC rejected Clark's attempt to intervene as untimely because of the potential for Clark's late

thus seeks through its Motion is an opportunity for a second bite at the apple. Specifically, Clark seeks an order lifting the automatic stay so that it can relitigate issues that, at least preliminarily, have been decided against it by the FERC ALJ.

7.    There will be an enormous cost to KACC if Clark is allowed to start down the trail of relitigation. There will be the cost of filing appropriate pleadings (including pleadings to dismiss Clark's new complaint), conducting and responding to discovery, participation in evidentiary hearings and the filing of post-hearing briefs. Resolution of the matter also likely would be delayed if a new proceeding is opened or an existing docket is re-opened. Moreover, all of this extra cost and effort will be for naught if the FERC issues a decision in the Puget Sound Proceeding finding that KACC was not the seller of the electricity or orders that Clark is entitled to a refund. Indeed, because Clark's proposed new complaint seeks the same damages as sought in the Puget Sound Proceeding, Clark even states in its Motion that, if it is permitted to proceed with its new complaint, it would not seek to recover in the aggregate in the two proceedings any more than the profit KACC made on the sale (i.e., Clark will only seek one recovery). (Memorandum of Law at 9). Furthermore, given the fact that it is still in the very early stages of the Debtors' chapter 11 proceedings, Clark will not be prejudiced if the automatic stay is maintained at least until the FERC rules in the Puget Sound Proceeding.

8.    As explained in more detailed below, Clark's Motion fails to establish sufficient "cause" for lifting the automatic stay and should be denied.

---

(continued...)

intervention to cause substantial prejudice to other parties. Thus, Clark is not even a party to the WSCC Proceeding.

## Factual Background

### *The Power Sales Agreement Between KACC and BPA*

9.      KACC owns two primary aluminum smelters and an aluminum rolling mill in Washington State. (Hoerner Dec., ¶ 2). In order to obtain electric energy for its Washington facilities, in 1995 KACC signed a five-year Power Sales Agreement (the "PSA") with BPA for service from October 1, 1996 through September 30, 2001. The PSA obligated BPA to deliver electric energy to KACC and imposed a take-or-pay obligation upon KACC. The power sold under the PSA was "federal power" sold under the authority granted to the BPA by the Pacific Northwest Electric Power Planning and Conservation Act (the "Northwest Power Act"). (Hoerner Dec., ¶ 3).

10.     Subsequent to entering into the PSA, KACC reduced production from its Washington facilities. As a direct consequence of reducing operations, KACC curtailed purchases of power from BPA. Under the PSA, if KACC desired to curtail purchases from BPA, it had to provide BPA notice of the amount and duration of the curtailment. It also could request that BPA sell the power to another entity. Further, KACC had the option to identify a designated third-party that was willing to pay a specified price for the power, or KACC could request that BPA find a purchaser for the power. (Hoerner Dec., ¶ 4).

11.     In the event KACC curtailed its purchases from BPA, BPA thus had a wide range of options. BPA could sell the power to a different purchaser with public preference on the same terms as KACC's notice; BPA could retain the power for its own use or dispose of the power on whatever alternative terms BPA might separately arrange; or BPA could offer a contract for sale of the power to the entity identified in KACC's notice. (Hoerner Dec., ¶ 5).

12.     If BPA choose to sell the power to the entity designated in KACC's notice, BPA would offer a power sales contract to the entity and, if accepted, BPA also would agree

with KACC for crediting of the payments under the terms of the PSA. If BPA elected to sell to a different buyer at a different price or retain the power for its own use, BPA would still credit KACC for sale revenue based on the price in KACC's notice. The notice price thus established the mitigation to KACC for **not** purchasing the federal power; the notice did **not** determine the price or to whom BPA would sell the power. (Hoerner Dec., ¶ 6).

13.    Thus, KACC did not have a right, contractual or otherwise, to dictate whether BPA would sell the power to a third-party or retain it for its own use. KACC likewise did not have the right, contractual or otherwise, to determine to whom BPA would sell the power if BPA chose to sell it to a third-party. Additionally, KACC did not have the right to establish the price at which BPA would sell the power to parties that bought power from BPA. KACC also did not have the right to sell the power itself. In fact, BPA insisted that BPA itself had to be the seller of any federal power that KACC did not take. (Hoerner Dec., ¶ 7).

### *Consultations Between Clark and KACC*

14.    In January 2001, a consultant for Clark contacted KACC. The consultant advised KACC that Clark needed electricity for August and September 2001 and he was aware that BPA might have a block of federal power for sale because KACC had curtailed its manufacturing operations. Thereafter, KACC and Clark independently approached other potential buyers and sellers to determine a market price for power for August and September 2001. They each obtained price information so that KACC could name Clark as a party willing to buy power from BPA at a specified price in the notice KACC would provide to BPA of curtailment of KACC's own August and September 2001 purchases. The price ultimately set forth in the notice was below the market quotes Clark had received from other sellers. (Hoerner Dec., ¶ 8).

15.     On February 2, 2001, at the request of Clark's consultant, KACC provided Clark with a letter indicating how a sale from BPA to Clark would be implemented if BPA chose to sell power to Clark. A factor precipitating the letter was Clark's concern with KACC's creditworthiness and desired clarification that Clark's power sale contract, if offered, would be with BPA for federal power, and not with KACC. (Hoerner Dec., ¶ 9).

## Clark's Agreement With BPA

16.     On February 2, 2001, KACC also submitted a notice to BPA indicating that it intended to curtail purchases for August and September 2001. The notice identified Clark as a potential purchaser at the below market price developed based upon Clark's and KACC's market intelligence. (Hoerner Dec., ¶ 10).

17.     After receiving KACC's notice, BPA elected to sell power to Clark. Consistent with the BPA's election to sell power to Clark, BPA and Clark executed an agreement that unambiguously identifies BPA as the Seller and Clark as the Buyer for a term commencing on August 1, 2001 and terminating on September 30, 2001. (Hoerner Dec., ¶ 12).[2]

## Proceedings Before the FERC

18.     On October 26, 2000, Puget Sound Energy, Inc. ("Puget Sound") filed with the FERC a complaint in which it asked the FERC to place a cap on the price that could be charged for energy sold under the Western Systems Power Pool Agreement into Pacific

---

[2]     In the past, BPA had not in all instances sold power to a qualified buyer identified in similar types of notices KACC had submitted to BPA. Sometimes BPA decided to retain the energy for its own use or sell the power under terms unknown to KACC. In other instances, the third party would decide not to sign a power sale agreement with BPA, which it could do because prior to entering into the agreement with BPA, the third party had no obligation to purchase the power. (Hoerner Dec., ¶ 11).

Northwest wholesale power markets. It was this complaint that initiated the Puget Sound Proceeding. (Hoerner Dec., ¶ 13).

19.  Subsequent to the interventions of many parties in the proceeding, the filing of almost 150 pleadings and ultimately unsuccessful settlement discussions before the FERC's Chief Administrative Law Judge, on July 25, 2001, the FERC issued an order initiating an evidentiary proceeding to develop a factual record on whether there may have been unjust and unreasonable charges for spot market bilateral sales of energy in the Pacific Northwest during the period December 25, 2000 through June 20, 2001. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator Corporation and the California Power Exchange, et al., 96 FERC ¶ 61,120 at 61,520 (2001). (Hoerner Dec., ¶ 14).

20.  Following the issuance of that order, Clark filed a motion for leave to intervene out of time in the Puget Sound Proceeding. Clark's motion was granted, and on August 17, 2001, Clark filed prepared testimony in the proceeding. (Hoerner Dec., ¶ 15).

21.  Clark's prepared testimony filed in the Puget Sound Proceeding at the FERC contains the same factual allegations that Clark raises in support of its request for relief from the automatic stay. Similarly, the draft complaint that Clark seeks to file at the FERC, attached as Exhibit 4 to the Affidavit of Wayne Nelson in support of Clark's Motion, raises the same factual allegations that previously were raised by Clark in the Puget Sound Proceeding.[3]

---

[3]     For instance, the factual allegations in paragraphs 3 through 8 of the Motion, paragraphs 3 through 9 of the Nelson Affidavit and pages 4 and 5 of the draft complaint are the same allegations made on page 3, lines 9-21, page 4, lines 1-13 and page 5, line 11 through page 6 line 15 in the Prepared Direct Testimony of Wayne Nelson on behalf of Clark filed in the Puget Sound Proceeding. See Hoerner Dec., ¶ 17; Exhibit 4 to Hoerner Dec. Clark's claim that it was unable to locate a supplier with enough capacity to serve Clark's

22.    Subsequent to the filing of Clark's prepared testimony in the Puget Sound Proceeding, KACC filed prepared answering testimony. KACC's answering testimony explained the contractual arrangements between KACC and BPA under the PSA. (Hoerner Dec., ¶ 21). KACC also explained that BPA, not KACC, had sold the electricity in question to Clark. KACC's testimony concluded that the PSA and the agreement between BPA and Clark showed that KACC had no control over the terms and conditions of BPA's sale of power to Clark, and, as a result, Clark should not be due any money from KACC. A copy of KACC's prepared testimony filed in the Puget Sound Proceeding is attached as Exhibit 5 to Hoerner Dec.

23.    Following the submission of the prepared testimony, an evidentiary hearing was held before the FERC ALJ in which a record was developed on the circumstances faced in Pacific Northwest power markets during the period December 25, 2000 through June 20, 2001. Clark and KACC were given the opportunity during that evidentiary hearing to conduct live cross-examination of each other's witnesses. Thereafter, each party filed post-hearing briefs and proposed findings of fact with the ALJ. (Hoerner Dec., ¶ 22).

24.    The ALJ subsequently issued her recommendations to the full Commission. In her Recommended Decision, the ALJ concluded that the prices in the Pacific Northwest during the relevant time period were the result of a number of factors, including a

---

(continued...)

needs, however, is not entirely consistent with its representation to the FERC that "suppliers willing to make a commitment [for the August/September 2001 time period] were fairly scarce." Exhibit 4 to Hoerner Dec at page 5, lines 12-14. Additionally, Clark conveniently fails to advise the Court that the prices then available from sources other than the BPA-marketed power ranged from $350 to $500 per MWh, and "prices for those months were predicted to exceed $1000 for daily purchases in those months." Id. at page 5, lines 15-18. Thus, Clark's own testimony at the FERC corroborated KACC's position that the price Clark paid for the electricity in question was at a discount from prevailing prices.

shortage of supply, excess demand, a drought, increased natural gas prices and price signals from California markets. Recommended Decision, 96 FERC at 65,385. She also concluded that the Pacific Northwest is a competitive market, and that the transactions at issue in the case resulted from bilateral agreements between the parties. Id. She further concluded that "[u]nder these circumstances, the prices charged were not unjust or unreasonable and refunds should not be ordered in this proceeding." Id. Thus, she recommended that the Commission terminate the proceeding. Id.

25.     After the issuance of the Recommended Decision, numerous parties, including Clark and KACC, submitted comments to the full Commission advocating their various positions to the FERC. For its part, Clark disagreed with the ALJ's recommendations and requested that the FERC order refunds from KACC to Clark either in the Puget Sound Proceeding, or alternatively suggested that refunds be ordered in the WSCC Proceeding. This alternative suggestion was somewhat odd in that neither Clark nor KACC were parties to the WSCC Proceeding.[4] (Hoerner Dec., ¶ 24).

26.     Moreover, following the filing of its Comments on the Recommended Decision, Clark decided to ignore the Commission's procedural schedule and filed an additional pleading on November 20, 2001. Apparently dissatisfied with its prior efforts, Clark's belated November 20, 2001 pleading recapitulated its prior points, although re-arranged in the new pleading, much as Clark once again desires to try yet another reformulation of its claims. (Hoerner Dec., ¶ 25).

---

[4]     As noted in footnote 1, supra, Clark did later seek to intervene in the WSCC Proceeding, but Clark's request was denied.

27.    Currently, the ALJ's Recommended Decision in the Puget Sound Proceeding is pending before the full Commission.  (Hoerner Dec., ¶ 26).

## Argument

### *The Standards for Relief from the Automatic Stay*

28.    The automatic stay is an essential element of the reorganization process as it "prevents the dissipation or diminution of the bankrupt's assets while rehabilitative efforts are undertaken *and prohibits the proliferation of numerous claims in different forums against the debtor.*"  S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In re S.I. Acquisition, Inc.), 817 F.2d 1142, 1146 (5th Cir. 1987) (citing H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 340 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6297- 98) (emphasis added).  Therefore, relief from the stay may only be granted for good reason.  See In re Stranahan Gear Company, Inc., 67 B.R. 834, 836 (Bankr. E.D. Pa. 1986).

29.    Section 362(d)(1) permits the Court to lift or modify the stay only for "cause."  The Bankruptcy Code does not define the term "cause."  Rather, a determination of whether cause exists for relief from the automatic stay is a matter for the court's discretion in light of all the circumstances presented.  See In re Robert Frank-Leonard Wilson, 116 F.3d 87, 90 (3d Cir. 1997).

30.    Courts in this District have stated that at least three factors should be considered to determine cause under section 362(d)(1) to lift the stay to allow a party to continue to prosecute a claim in litigation:

   (a)    Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;

   (b)    Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and

> (c)    The probability of the creditor prevailing on the merits.

In re Pursuit Athletic Footwear, Inc., 193 B.R. 713, 718 (Bankr. D. Del. 1996); see In re

Integrated Health Servs., Inc., No. 00-389-MWF, 2000 Bankr. LEXIS 1319, at *5 (Bankr. D.

Del. Aug. 11, 2000).  The Movant bears the burden of proof with respect to whether cause exists

to lift the stay.  In re Pacor, Inc., 74 B.R. 20, 22 (E.D. Pa. 1987).  Only then does the burden shift

to the Debtors to rebut this showing.  In re Pursuit Athletic Footwear, 193 B.R. at 718; In re

Salvatore J. Mazzeo, 167 F.3d 139, 142 (2d Cir. 1999).  Furthermore, courts have recognized

that, early in a debtor's chapter 11 cases, an unsecured, unliquidated claimholder should not be

permitted to pursue litigation against the debtor in another court unless extraordinary

circumstances are shown.  See, e.g., In re I. Burack, Inc., 132 B.R. 814, 817 (Bankr. S.D.N.Y.

1991) (stating that during the exclusivity period, "an unsecured, unliquidated claimholder should

not be permitted to pursue litigation against the debtor in another court unless extraordinary

circumstances are shown."); In re Pioneer Commercial Funding Corp., 114 B.R. 45 (Bankr.

S.D.N.Y. 1990) (same).

31.    As described below, each of the factors here weighs heavily against lifting

the automatic stay at this stage, and Clark has certainly not established the requisite

extraordinary circumstances.

### Cause Does Not Exist to Lift the Stay

32.    To support its assertion that there is "cause" to lift the stay in this case,

Clark argues that (a) the FERC is a highly specialized agency designed to deal exclusively with

issues arising from wholesale power sales and therefore is uniquely qualified to resolve the

dispute between Clark and KACC, (b) resolution by the FERC will completely resolve all the

issues between KACC and Clark and (c) without relief from the automatic stay, Clark's claim

never can be properly liquidated and, hence, asserted in this bankruptcy case. (Memorandum at

10-12). While it may be true that Clark's purported claims are within FERC's exclusive

jurisdiction to establish just and reasonable charges for electric energy sold at wholesale, Clark

ignores (a) the lack of hardship on Clark if the stay is maintained given the current status of the

Puget Sound Proceeding and the fact that Clark has already had a full opportunity to present its

claims, (b) the prejudice to the Debtors if Clark is permitted to assert its new complaint and

(c) the complete lack of merit to Clark's claim that KACC was the seller of the electricity. Each

of these factors, however, strongly favor keeping the stay in place.

33.     With respect to the hardship on Clark if the stay is maintained, any

hardship is of Clark's own making. Moreover, Clark clearly is wrong in arguing that its claim

never can be properly and fully liquidated if the Court does not grant it the opportunity to seek to

reopen the Puget Sound Proceeding or file a new complaint with the FERC.

34.     As is shown above, Clark has had ample opportunity to litigate its claim

before the FERC, and the ALJ's Recommended Decision that would reject Clark's claim

currently is pending before the Commission. There is nothing more to do in that docket in terms

of discovery or hearings.[5] However, if the Court lifts the automatic stay, Clark intends to seek

additional discovery. (Motion at 1). The only purpose in obtaining additional discovery would

be to attempt to introduce it into evidence. Thus, Clark presumably intends to move the FERC to

reopen the record so that Clark can relitigate the issues it at least preliminarily has lost in the

Puget Sound Proceeding as reflected in the ALJ's Recommended Decision.

---

[5]     Certain parties, not including Clark, have filed a request for the FERC to reopen the
record in the Puget Sound Proceeding based upon activities that they allege may have
been undertaken by Enron Corp. and which, according to them, may have affected prices
in the Pacific Northwest. However, if the proceeding is reopened for that purpose, the
evidence adduced would have nothing to do with the dispute between Clark and KACC.

35.     While relitigation in the Puget Sound Proceeding in itself would be a waste of administrative economy, Clark also wants the opportunity to relitigate the issues in a new proceeding that it would initiate at the FERC by the filing of a new complaint that would be based upon the very same factual circumstances at issue in the Puget Sound Proceeding.  Clark's claimed need to file a new complaint is that it now wishes to argue that KACC violated the Federal Power Act by selling power to Clark without having obtained FERC authorization to make such sales.  Of course, the predicate for the claim is precisely the issue that currently is before the FERC in the Puget Sound Proceeding:  Did KACC or BPA sell power to Clark?  And, Clark's alleged need to file a new complaint is illusory.  FERC has access to its own files and regularly takes official notice of their contents.[6]  Thus, the FERC surely is aware that KACC never has applied for, nor has the FERC granted it, authority to sell power in interstate commerce.  Thus, Clark's feigned need to raise the absence of KACC's authorization to sell power is simply an excuse to enable Clark to attempt to get a second bite at the apple.

36.     It goes without saying that judicial economy weighs against allowing a party to relitigate issues.  FERC's policy also strongly disfavors relitigation.  The FERC has a

---

[6]     See 18 C.F.R. 385.508(d) (permitting official notice); Nevada Power Co., et al v. Duke Energy Trading and Marketing, L.L.C., 99 FERC ¶ 61,047 (2002); California Independent System Operator Corp., 98 FERC ¶ 61,335 n.34 (2002) (taking official notice of a deposition); Kern River Gas Transmission Co., 95 FERC ¶ 61,022 n.3 (2001) (taking official notice of record in another docket); System Energy Resources, Inc., 92 FERC ¶ 61,119 nn.23, 26 (accord); Iroquois Gas Transmission System, L.P., 96 FERC ¶ 61,261 at p. 61,948 n.74 (1999) (Commission relies on reports filed with FERC outside of the docket in which ruling was issued); Williams Natural Gas Co., 77 FERC ¶ 61,277 at 62,193(1996) (Commission relies on report in its files not part of the record in the proceeding); Kentucky Utilities Co., 85 FERC ¶ 61,274 at p. 62,109 n.32 (1998); Transcontinental Gas Pipe Line Corp., 60 FERC ¶ 63,001 at p. 65,030 (1992) (official notice of materials in Commission's files outside of the proceeding); Entergy Services, Inc., 58 FERC ¶ 61,234 at p. 61,752 (1992) (official notice of materials in Commission files in another matter).

"long-standing" policy prohibiting parties from relitigating issues absent a showing of changed circumstances. Alamito Co., 43 FERC ¶ 61,274 at 61,753 (1988) ("Absent a showing of significant change in circumstances, the relitigation of an issue is simply not justified. Sound public policy reasons support the Commission's policy against relitigation of issues."). See also Central Kansas Power Co., 5 FERC ¶ 61,291 at 61,621 (1978) (affirming the ALJ's conclusion that to decide issues previously afforded a full hearing "would ill serve the goal of administrative efficiency and would not further the interests of the parties").

37.    Here, Clark neither has asserted, nor can claim, that there are changed circumstances justifying relitigation of its dispute with KACC. The issues as to whether KACC was the seller of the power and whether amounts are due to Clark in respect of such putative sales (and thus the liquidation of Clark's claim) are already before the FERC in the Puget Sound Proceeding, and the FERC can decide the issues based upon the existing record and the ALJ's Recommended Decision. The interests of judicial economy, expeditious resolution of litigation and FERC policy weigh heavily against allowing Clark to attempt to reopen these issues at FERC either in the context of seeking additional discovery and procedures in the Puget Sound Proceeding or in a context of filing a new complaint.

38.    Furthermore, at a minimum the stay should be maintained until the FERC rules in the Puget Sound Proceeding. The ruling will certainly affect Clark's new theory for its claims and could completely moot the need for a new proceeding (e.g., if the FERC rules that KACC was not the seller). There is likewise no need for Clark to rush to liquidate its new claim at this early stage of the Debtors' chapter 11 cases. No claims bar date has been set and given the complicated issues involved — including asbestos liabilities and a myriad of legacy cost issues — the Debtors' restructuring and claim resolution process will take a substantial period of

time. Maintenance of the stay until the FERC at least has the opportunity to rule in the Puget

Sound Proceeding will not prejudice Clark. Substantial prejudice, however, would be

occasioned on the Debtors if the stay is lifted.

      39.    With respect to the potential prejudice to the Debtors, Clark contends that

the expenses to litigate will be minimal because "[KACC's] attorneys are fully familiar with the

facts of the generic dispute and already have responded to Clark Public Utilities' claims."

(Memorandum at 10). But if Clark is given the opportunity to file a new complaint with the

FERC, rather than being at the conclusion of a proceeding that resolves the dispute (the Puget

Sound Proceeding), the parties will be at the nascent stages of a new proceeding. As a result,

KACC's lawyers will need to undertake all of the activities associated with a new proceeding

commencing with preparation of appropriate pleadings to be filed at the FERC seeking dismissal

of the complaint on the ground that it constitutes relitigation of the Puget Sound Proceeding.

And, if the FERC nonetheless allows the complaint proceeding to go forward, the process that

would ensue presumably would encompass several rounds of discovery by both sides, the filing

of prepared testimony and a new evidentiary hearing.[7]  Additionally, it is likely that BPA will

need to be joined as a necessary party to that litigation, necessitating additional procedures to

attempt to accomplish that result.[8]  Moreover, given that there are utilities other than Clark that

---

[7]    For instance, if the FERC matter were to be re-opened, a natural question would be, if (as Clark indicates) BPA's change in contract anniversary dates was a policy as of 1998, why was Clark unaware of that policy or unwilling to act to protect itself contractually in light of that policy until 2000. See Exh. 4, p. 4 to Affidavit of Wayne Nelson in Support of Motion. Clearly, Clark is on the prowl for relief from its own failure to act in a prudent and informed fashion, and wants to burden KACC because of Clark's failings. Similarly, KACC will want to explore what other offers were made to sell power to Clark.

[8]    Indeed, Wayne Nelson, who submitted an affidavit in support of Clark's Motion, was quoted in a recent newspaper article as warning that the new litigation could take years and run up legal bills of several hundred thousand dollars.

purchased electricity from BPA as a result of KACC's curtailment, it is possible that these other utilities will be encouraged to seek to intervene in a new FERC proceeding to raise their own new claims against KACC. Such an occurrence would result in additional discovery and delay. Contrary to Clark's claims in its Motion, substantial prejudice to the Debtors will likely occur if the stay is lifted.

40.    In addition to the lack of hardship to Clark if the stay is maintained and the substantial prejudice to the Debtors if the stay is lifted, Clark is very unlikely to succeed on the merits. As already explained, Clark's new claim is merely an attempt by a litigant, dissatisfied with how it presented its case initially, to recast its claim. And even if Clark's new claim is not summarily dismissed on preclusion grounds, there is no merit, based on the unambiguous documentation, to the assertion that KACC was the seller.

[Remainder of page intentionally left blank]

**Conclusion**

All these factors overwhelmingly support maintaining the stay, and Clark's

Motion should therefore be denied.

Dated: July 16, 2002
Wilmington, Delaware.

Respectfully submitted,

Daniel J. DeFranceschi (DE 2732)
Paul N. Heath (DE 3704)
Patrick M. Leathem (DE 4114)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Richard I. Werder, Jr. (OH I.D. 0011533)
Kevyn D. Orr (FL I.D. 384208)
JONES, DAY, REAVIS & POGUE
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone:  (216) 469-3939
Facsimile:  (216) 579-0212

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
JONES, DAY, REAVIS & POGUE
2727 North Harwood Street
Dallas, Texas  75201-1515
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Jointly Administered** |
| | : | |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION,** | : | |
| **a Delaware Corporation, et al.,** | : | **Chapter 11** |
| | : | |
| **Debtors** | : | |

### DECLARATION OF JOSEPH PATRICK HOERNER IN SUPPORT OF
### OBJECTION OF KAISER ALUMINUM & CHEMICAL CORPORATION
### TO MOTION OF PUBLIC UTILITY DISTRICT NO. 1 OF CLARK
### COUNTY FOR LIMITED RELIEF FROM THE AUTOMATIC STAY (D.I. 644)

I, Joseph Patrick Hoerner, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am Energy Supply Manager of Kaiser Aluminum & Chemical Corporation ("Kaiser"). I am familiar with the facts and circumstances set forth herein and submit this affidavit in support of the Objection to Motion Of Public Utility District No. 1 of Clark County For Limited Relief From the Automatic Stay protecting Kaiser.

2.      Kaiser owns two primary aluminum smelters and an aluminum rolling mill in Washington State.

3.      In 1995, Kaiser signed a five (5) year Power Sales Agreement ("PSA") with the Bonneville Power Administration ("BPA") for service from October 1, 1996 through September 30, 2001. Relevant excerpts from the PSA are attached hereto in Exhibit 1. The PSA obligated BPA to deliver and sell electric energy to Kaiser and imposed a take-or-pay obligation upon Kaiser. The power sold under the PSA was "federal power" sold under the authority granted to the BPA by the Pacific Northwest Electric Power Planning and Conservation Act ("Northwest Power Act").

4.      Subsequent to entering into the PSA, Kaiser reduced production from its Washington facilities. As a direct consequence of reducing operations, Kaiser curtailed purchases of power from BPA. Under the PSA, if Kaiser desired to curtail purchases from BPA, it had to provide BPA notice of the amount and duration of the curtailment. To determine the "damages" that Kaiser would pay BPA, or the "credit" that BPA would pay Kaiser, for the curtailed power under the take-or-pay contract provision, the contract provided a means to determine market prices as of the time of the curtailment. To determine the contact "damages" or "credit" amount, Kaiser had the contractual option to identify a third-party that was willing to pay a specified price to purchase the curtailed power from BPA, or Kaiser could request that BPA find a purchaser for the power.

5.      In the event Kaiser curtailed its purchases from BPA, BPA thus had a wide range of options. BPA could sell the power to a different purchaser with public preference on the same terms as Kaiser's notice; BPA could retain the power for its own use or dispose of the power on whatever alternative terms BPA might separately arrange; or BPA could offer a contract for sale of the power to the entity identified in Kaiser's notice.

6.      If BPA choose to sell the power to the entity designated in Kaiser's notice, BPA would offer a power sales contract to the entity. But whether BPA choose to sell the power to that entity or whether BPA elected to sell the power to a different buyer at a different price or retain the power for its own use, BPA would still credit Kaiser based on the price in Kaiser's notice. The notice price thus established the contract mitigation to Kaiser for **not** purchasing the federal power; the notice did **not** determine the price or to whom BPA would sell the power.

7.      Thus, Kaiser did not have a right, contractual or otherwise, to dictate whether BPA would sell the power to a third-party or retain it for its own use. Kaiser did not

have the right, contractual or otherwise, to determine to whom BPA would sell the power if BPA

chose to sell it to a third-party. Additionally, Kaiser did not have the right to establish the price

at which BPA would sell the power to parties that bought power from BPA. Kaiser also did not

have the right to sell the power itself. In fact, BPA insisted that BPA itself had to be the seller of

any federal power that Kaiser did not take.

        8.     In January 2001, a consultant for Clark contacted Kaiser. He advised

Kaiser that Clark needed electricity for August and September 2001, and he was aware that BPA

might have a block of federal power for sale because Kaiser had curtailed its manufacturing

operations. Thereafter, Kaiser and Clark independently approached other potential buyers and

sellers to determine a reasonable market price for power for August and September 2001. We

each obtained price information so that Kaiser could name Clark as a party willing to buy power

from BPA at a specified price in the notice Kaiser would provide to BPA for curtailment of

Kaiser's August and September 2001 purchases. The price ultimately set forth in the notice was

below the market quotes Clark had received from other sellers.

        9.     On February 2, 2001, at the request of Clark's consultant, Kaiser provided

Clark with a letter indicating how a sale from BPA to Clark would be implemented if BPA chose

to sell power to Clark. A factor precipitating the letter was that Clark was concerned with

Kaiser's creditworthiness and wanted clarification that Clark's power sale contract, if offered,

would be with BPA for federal power, and not with Kaiser. A copy of the February 2, 2001

letter is attached hereto as Exhibit 2.

        10.    On February 2, 2001, Kaiser also submitted a notice to BPA indicating

that it intended to curtail purchases for August and September 2001. The notice identified Clark

as a potential purchaser at the below market price developed based upon Clark's and Kaiser's market intelligence.

11.    In the past, BPA had not in all instances sold power to the qualified buyer identified in similar notices Kaiser had submitted to BPA. Sometimes BPA decided to retain the energy for its own use or sell the power under terms unknown to Kaiser. In other instances, the third party would decide not to sign a power sale agreement with BPA, which it could do because prior to entering into the agreement with BPA, the third party had no obligation to purchase the power.

12.    After receiving Kaiser's notice, BPA elected to sell power to Clark. Accordingly, BPA, not Kaiser, entered into an agreement to sell power to Clark during August and September 2001. Consistent with the BPA's election to sell power to Clark, BPA and Clark executed an agreement that unambiguously identifies BPA as the Seller and Clark as the Buyer for a term commencing on August 1, 2001 and terminating on September 30, 2001. That agreement is attached hereto as Exhibit 3.

13.    On October 26, 2000, Puget Sound Energy, Inc. ("Puget Sound") filed with the Federal Energy Regulatory Commission ("FERC") a complaint in which it asked the FERC to place a cap on the price that could be charged for energy sold into Pacific Northwest wholesale power markets. It was this complaint that initiated the Puget Sound Proceeding.

14.    Subsequent to the interventions of many parties in the proceeding, the filing of almost 150 pleadings and ultimately unsuccessful settlement discussions before the FERC's Chief Administrative Law Judge, on July 25, 2001, the FERC issued an order initiating an evidentiary proceeding to develop a factual record on whether there may have been unjust and unreasonable charges for spot market bilateral sales of energy in the Pacific Northwest during the

period December 25, 2000 through June 20, 2001. <u>San Diego Gas & Electric Company v.</u>
<u>Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent</u>
<u>System Operator Corporation and the California Power Exchange, et al.</u>, 96 FERC ¶61,120 at
61,520 (2001).

15.     Following the issuance of that order, Clark filed a motion for leave to
intervene out of time in the Puget Sound Proceeding. Clark's motion was granted, and on August
17, 2001, Clark filed prepared testimony in the proceeding.

16.     Clark's prepared testimony filed in the Puget Sound Proceeding at the
FERC contains the same factual allegations that Clark raises in support of its request for relief
from the automatic stay protection of the Bankruptcy Code.

17.     For instance, in Paragraph 3 of Clark's Motion, it describes how in 1996, it
began purchasing power from suppliers other than BPA, and it timed those purchases to expire
on or about July 31, 2001, at which time it wanted an option to enter into a new contract with
BPA. The same factual claims are raised in Paragraphs 3 through 5 of the Nelson Affidavit and
page 4 of Clark's draft Complaint. These allegations correspond to the allegation raised at page
3, lines 9-15 in the Prepared Direct Testimony of Wayne Nelson on behalf of Clark filed in the
Puget Sound Proceeding. A copy of Mr. Nelson's prepared testimony in the Puget Sound
Proceeding is attached hereto as Exhibit 4.

18.     In Paragraph 4 of the Motion, Clark describes how BPA changed its
standard contract expiration date such that it would not enter into a new contract with Clark with
an effective date earlier than October 1, 2001, necessitating Clark finding another source of
electricity to fill the two-month gap of August and September 2001. The same factual claims are
raised in Paragraph 6 of the Nelson Affidavit and page 4 of Clark's draft complaint. These

allegations correspond to the allegation raised at page 3, lines 15-21 in the Prepared Direct Testimony of Wayne Nelson on behalf of Clark filed in the Puget Sound Proceeding. See Exhibit 4.

19.    In Paragraphs 5 and 6 of its Motion, Clark describes how at the time it began the process of finding alternate supplies to provide power during the two month gap, the western power market was in a tumultuous state, experiencing prices that had risen substantially and price volatility. The same factual claims are raised in Paragraph 7 of the Nelson Affidavit and pages 4-5 of the draft Complaint. These allegations correspond to the allegation raised at page 4, lines 1-13 in the Prepared Direct Testimony of Wayne Nelson on behalf of Clark filed in the Puget Sound Proceeding. See Exhibit 4.

20.    In Paragraphs 7 and 8 of the Motion, Clark states that it was unable to locate a supplier with enough capacity to serve Clark's needs. Clark goes on to claim that it entered into a letter agreement with Kaiser for the sale of 140 MW of power at a rate of $325 per MWh. The same factual claims are raised in Paragraphs 8 through 9 of the Nelson Affidavit and page 5 of the draft Complaint. These allegations generally correspond to the allegation raised at page 5, line 11 through page 6, line 15 in the Prepared Direct Testimony of Wayne Nelson on behalf of Clark filed in the Puget Sound Proceeding. See Exhibit 4. However, Clark now raises for the first time the claim that it was unable to locate a supplier with enough capacity to serve Clark's needs. Before the FERC, Clark previously represented that "suppliers willing to make a commitment [for the August/September 2001 time period] were fairly scarce." Exhibit 4 at page 5, lines 12-14. Additionally, Clark conveniently fails to advise the Court that the prices then available from sources other than the BPA-marketed power ranged from $350 to $500 per MWh, and "prices for those months were predicted to exceed $1000 for daily purchases in those

months." Id. at page 5, lines 15-18. Thus, Clark's own testimony at the FERC corroborated Kaiser's position that power from sellers other than BPA was available and the price Clark paid to BPA for the electricity in question was at a discount from prevailing prices.

21.    Subsequent to the filing of Clark's prepared testimony in the Puget Sound Proceeding, Kaiser filed prepared answering testimony. Kaiser's answering testimony explained the contractual arrangements between Kaiser and BPA under the PSA. The explanation of the contractual arrangements between Kaiser and BPA corresponds to Paragraphs 3 through 7, supra. Kaiser also explained that BPA, not Kaiser, had sold the electricity in question to Clark. That explanation corresponds to Paragraphs 8 through 10, supra. Kaiser's testimony concluded that the PSA and the agreement between BPA and Clark showed that Kaiser had no control over the terms and conditions of BPA's sale of power to Clark, and, as a result, Clark should not be due any money from Kaiser. A copy of Kaiser's prepared testimony filed in the Puget Sound Proceeding is attached hereto as Exhibit 5.

22.    Following the submission of the prepared testimony, an evidentiary hearing was held before a FERC ALJ in which a record was developed on the circumstances faced in Pacific Northwest power markets during the period December 25, 2000 through June 20, 2001. Clark and Kaiser were given the opportunity during that evidentiary hearing to conduct live cross-examination of each other's witnesses. Thereafter, each party filed post-hearing briefs and proposed findings of fact with the ALJ.

23.    The ALJ subsequently issued her recommendations to the full Commission. In her Recommended Decision, the ALJ concluded that the prices in the Pacific Northwest during the relevant time period were the result of a number of factors, including a shortage of supply, excess demand, a drought, increased natural gas prices and price signals from

California markets. Recommended Decision, 96 FERC at 65,385. She also concluded that the Pacific Northwest is a competitive market, and that the transactions at issue in the case resulted from bilateral agreements between the parties. Id. She further concluded that "[u]nder these circumstances, the prices charged were not unjust or unreasonable and refunds should not be ordered in this proceeding." Id. Thus, she recommended that the Commission terminate the proceeding. Id.

24.    After the issuance of the Recommended Decision, numerous parties, including Clark and Kaiser, submitted comments to the full Commission advocating their various positions to the FERC. For its part, Clark disagreed with the ALJ's recommendations and requested that the FERC order refunds from Kaiser to Clark either in the Puget Sound Proceeding, or alternatively suggested that refunds be ordered in the WSCC Proceeding. This alternative suggestion was somewhat odd in that at the time that Clark made the suggestion, neither it nor Kaiser were parties to the WSCC Proceeding. Even today, neither are parties and Clark's motion to intervene in the WSCC Proceeding has been denied.

25.    Moreover, following the filing of its Comments on the Recommended Decision, Clark decided to ignore the Commission's procedural schedule and filed an additional pleading on November 20, 2001. Apparently dissatisfied with its prior efforts, Clark's belated November 20, 2001 pleading recapitulated its prior points, although re-arranged in the new pleading, much as Clark once again desires to try yet another reformulation of its claims.

26.     Currently, the ALJ's Recommended Decision in the Puget Sound Proceeding is pending before the full Commission.

I declare under penalty of perjury that the following is true and correct.

Dated:  July 16, 2002                    _____
                                         Joseph Patrick Hoerner

EXHIBIT 1

Contract No. 95MS-94861
October 30, 1995

# POWER SALES AGREEMENT

## between the

## UNITED STATES OF AMERICA

## DEPARTMENT OF ENERGY

## acting by and through the

## BONNEVILLE POWER ADMINISTRATION

## and

## KAISER ALUMINUM & CHEMICAL CORPORATION

### Index to Sections

| Section | | Page |
|---------|---|------|
| 1. | Effective Date and Term | 3 |
| 2. | Deliveries of Firm Power Between the Effective Date and Commencement Date | 3 |
| 3. | Commencement of Deliveries of Firm Power | 4 |
| 4. | Termination of Prior Contract and Other Contracts | 4 |
| 5. | Termination of This Agreement | 5 |
| 6. | Definitions | 9 |
| 7. | Exhibits; Interpretation | 16 |
| 8. | Contract Revisions and Waivers | 17 |
| 9. | Purchase and Sale of Annual Take-or-Pay Firm Energy | 18 |
| 10. | Monthly, Weekly, Daily, and Hourly Amounts of Firm Power | 19 |
| 11. | Rate Test Compliance | 22 |
| 12. | Rates and Charges | 23 |
| 13. | Billing and Payment | 23 |
| 14. | Relief from Take-or-Pay Obligation | 27 |
| 15. | Unauthorized Increase Charges | 28 |
| 16. | Changes in Firm Power Amounts | 29 |
| 17. | Reserves | 29 |
| 18. | Curtailment or Remarketing | 36 |
| 19. | Load Regulation, Unbundled Products, and Other Transmission Products | 42 |
| 20. | Provisions Relating to Delivery of Firm Power | 45 |
| 21. | Assignment of Agreement | 45 |
| 22. | Dispute Resolution | 45 |
| 23. | Force Majeure | 49 |

### Index to Sections

| Section | | Page |
|---|---|---|
| 24. | Notices .................................................................................................................... | 50 |
| 25. | Hold Harmless ...................................................................................................... | 51 |
| 26. | Damages for Failure by BPA to Deliver ......................................................... | 51 |
| 27. | Obligations During Performance of This Agreement.................................... | 52 |
| 28. | Third Parties ......................................................................................................... | 52 |
| 29. | Severability ........................................................................................................... | 52 |
| 30. | Entire Agreement ................................................................................................ | 53 |
| 31. | Signature Clause .................................................................................................. | 54 |
| | Exhibit A | (General Contract Provisions) ................................................... | 16 |
| | Exhibit B | (Fees for Remarketing) .............................................................. | 16 |
| | Exhibit C | (Rate Schedule) ............................................................................ | 16 |
| | Exhibit D | (Monthly Amounts of Firm Power) ........................................... | 16 |
| | Exhibit E | (Points of Delivery) ..................................................................... | 16 |
| | Exhibit F | (Unrecoverable Costs and Transfer Costs) .............................. | 16 |
| | Exhibit G | (Stability Reserve Scheme(s)) .................................................... | 16 |
| | Exhibit H | (Arbitration Procedures) ............................................................ | 16 |
| | Exhibit I | (Use-of-Facilities Charge) .......................................................... | 16 |

This POWER SALES AGREEMENT, executed ___11 / 6___, 1995, by the UNITED STATES OF AMERICA (Government), Department of Energy, acting by and through the BONNEVILLE POWER ADMINISTRATION (BPA or Bonneville), and KAISER ALUMINUM & CHEMICAL CORPORATION (Company), a corporation incorporated under the laws of the State of Delaware. BPA and the Company are hereinafter sometimes referred to individually as "Party" and collectively as "Parties."

## WITNESSETH:

WHEREAS pursuant to section 5(d) of the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act), BPA is authorized to sell power to the Company; and

WHEREAS on August 31, 1981, BPA and the Company entered into Contract No. DE-MS79-81BP-90351, hereinafter referred to as "Prior Contract"; and

WHEREAS this Agreement provides for the termination of the Prior Contract; and

2                                    Contract No. 95MS-94861

## 6.    DEFINITIONS

(a)    "Agreement" means this Power Sales Agreement, Contract No. 95MS-94861.

(b)    "Commencement Date" means the date that deliveries commence under this Agreement.

(c)    "Contract Demand" means the maximum integrated hourly rate of delivery that the Company may request under this Agreement and is equal to 669.54 megawatts.  The Contract Demand shall not be increased except through:

   (1)    a process conducted pursuant to section 5(d)(3) of the Northwest Power Act that provides for BPA to acquire increased reserves from its direct service industrial companies; or

   (2)    a technological allowance which BPA shall grant upon the Company's demonstration to BPA that such allowance meets the criteria for a technological allowance under the Prior Contract.

(d)    "Contract Year" means the period that begins on October 1 and ends on the following September 30.

(e)    "Control Area" or "Load Control Area" means the electrical (not necessarily geographical) area within which a controlling utility operating under all North American Electric Reliability Council standards has the responsibility to adjust its generation on an instantaneous basis to match internal load and power flow across interchange boundaries to other Control Areas.  A utility operating a Control Area is called a "controlling utility."

(f)    "Demand" means the maximum integrated hourly rate of delivery during each month of each Contract Year for Firm Power deliveries under this Agreement, as specified in Exhibit D.

(g)    "Effective Date" means the date that this Agreement is signed by BPA.

(h)    "Event" means the period during which BPA restricts service to the Company under this Agreement to obtain Operating Reserves or Stability Reserves. The Event shall commence with the reduction in deliveries to the Company under this Agreement due to a BPA request for Operating Reserves or a transfer trip or signal that initiates Stability Reserves restriction. Unless reinstated as provided herein, the Event shall end when BPA's dispatcher notifies the Company that the load restricted for such reserves can be restored to service. Notwithstanding the foregoing, the Event will end (subject to reinstatement as provided herein) when system conditions occur that would result in tripping the Company for undervoltage or underfrequency load shedding. Any BPA restriction or series of BPA restrictions that make up an SR Event shall be treated as part of a single Event.

After an Event has ended, the Event shall be reinstated and continue as follows:

(1)    if the Event Magnitude was less than (Federal Load) × (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 10 hours;

(2)    if the Event Magnitude was equal to or greater than (Federal Load) × (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 21 hours;

Contract No. 95MS-94861

    (3)    if the Event Magnitude was equal to or greater than (Federal Load) x (30 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 42 hours;

    (4)    if the Event Magnitude was equal to or greater than (Federal Load) x (60 minutes), then the Event shall be reinstated if BPA requests Reserves again within 84 hours; and

    (5)    if the Event Magnitude was equal to or greater than (Federal Load) x (90 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 126 hours.

(i)    "Event Duration" means the total cumulative Event Minutes of the Event.

(j)    "Event Magnitude" means a value calculated for each Event as the sum of: (Requested Operating Reserves x Event Minutes associated with the use of Operating Reserves) + (Amount of Load Tripped for Stability Reserves x duration of the SR Event in minutes) for each restriction during the Event. The Event Magnitude shall not include loads restricted pursuant to operating reserves and stability reserve rights that BPA has under other contracts.

(k)    "Event Magnitude Limit" means the Federal Load multiplied by 90 minutes.

(l)    "Event Minute(s)" means the minute(s) of restriction (or any portion thereof) during an Event.

(m)    "Excess Firm Energy" means Firm Energy that would have been delivered to the Company for service to its expected Plant Load but is excess due to a reduction in the Company's actual Plant Load.

(n)    "Federal Load" means an hourly amount of energy equal to the lesser of (1) 50 percent of the Process Load operating immediately prior to the Event,

or (2) the sum of (A) 50 percent of the Firm Energy either scheduled to the Company, remarketed to other Qualified Purchasers, used by BPA, or any combination thereof, plus (B) 50 percent of the energy scheduled by Washington Water Power Company under its Firm Energy Sale Agreement with BPA, Contract No. 95MS-95104, **provided**, that the amount under section 6(n)(2)(B) shall not exceed 58 average megawatts.

(o)     "FERC" means the Federal Energy Regulatory Commission, or its successor.

(p)     "Firm Energy" means the Federal energy that the Company has agreed to purchase from BPA under this Agreement.

(q)     "Firm Power" means the monthly amounts of Demand and Firm Energy (HLH and LLH) purchased by the Company under this Agreement.

(r)     "Heavy Load Hours" or "HLH" means those hours that begin at 6 a.m. and end at 10 p.m., Monday through Saturday.

(s)     "Light Load Hours" or "LLH" means all hours that are not HLH.

(t)     "Material Plant Damage" means the inability of the Company to resume industrial production at all or any portion of its plant because of damage to plant production facilities resulting from a restriction; for example, the inability to resume electrolysis in one or more pots without rebuilding or substantially repairing such pot(s).

(u)     "Non-Federal Service" means, for the purposes of section 18(a) of this Agreement, the monthly amounts of demand, HLH energy and LLH energy that the Company chooses to acquire from non-Federal entities to serve a portion of its Plant Load during the term of this Agreement. The Company agrees that such amounts must be supplied to the Plant Load. The Company

may purchase additional amounts of non-Federal energy that will not be used in calculating the amount of curtailed energy

(v)  "Occurrence" means a system condition that results in the need for Reserves.

(w)  "Operating Reserves" means nonspinning reserves, provided by the Company under this Agreement, that are necessary to enable BPA either to reestablish its load/resource balance after loss of generation or transmission facilities, or to meet any of its other existing nonspinning operating reserve obligations. Operating Reserves provided under this Agreement shall not include, without limitation: (1) Stability Reserves provided by the Company in this Agreement; (2) operating reserves provided by the Company in any other contract; and (3) any other reserves that BPA has acquired under other arrangements.

(x)  "Plant Load" means the total electrical energy load at Company facilities eligible for BPA service during any given time period whether the Company has chosen to serve its load with BPA power or non-Federal power.

(y)  "Process Load" means, for an aluminum facility or a chlor-alkali facility, the electrolytic load.

(z)  "Qualified Purchaser" shall mean a utility or entity which: (1) is capable of performing the financial obligations undertaken for a sale or for an option to buy; (2) meets BPA's standards of service, including having an available transmission path; and (3) if required by State or Federal law, the purchaser has received all necessary approvals from appropriate regulatory bodies to conduct the transaction with BPA.

(aa)  "Rate Schedule" means the Industrial Firm Power Rate Schedule (IP-96.5), the Point-to-Point Transmission Rate Schedule, exclusive of the Delivery Charge therein (PTP-96.5), Ancillary Products and Services Rate Schedule

Contract No. 95MS-94861

(APS-96), a rate schedule that includes the fixed curtailment fee for the option specified in section 18(a), and the General Rate Schedule Provisions established by BPA, and applicable to sales under this Agreement. When such Rate Schedule has received interim or final approval by FERC, then it shall be attached hereto as Exhibit C.

(bb)   "Rate Test" means: (1) the calculation of whether the total average price in mills per kilowatthour, using the Rate Schedule, to determine if such total average price is less than or equal to the price specified in section 11(a) of this Agreement; (2) the determination of whether the fixed curtailment fee, for purposes of section 18(a) of this Agreement, is less than or equal to the amount specified in section 11(b); and (3) the determination of whether the use-of-facilities charge, as may be revised pursuant to section 8(b)(2) and Exhibit I, is less than or equal to the amount determined pursuant to section 11(c). The Rate Test is further described in section 11 of this Agreement.

(cc)   "Requested Operating Reserves" means the amount of Operating Reserves, pursuant to section 17, that the BPA dispatcher requests the Company to trip for purposes of providing Operating Reserves.

(dd)   "Reserves" means the Stability Reserves and Operating Reserves provided by the Company under this Agreement.

(ee)   "SR Event" means the period during which BPA implements a Stability Reserve restriction. An SR Event shall be an Event for all purposes. The beginning of the SR Event shall be identified by a transfer trip or other signal from BPA to the Company restricting delivery of energy under this Agreement. Unless reinstated as provided herein, the end of the SR Event shall be identified by the BPA dispatcher's notification to Company that delivery of all energy to which Company is entitled under this Agreement can be restored. Notwithstanding the foregoing, the Event will end (subject to

Contract No. 95MS-94861

reinstatement as provided herein) when system conditions occur that result in tripping the Company for undervoltage or underfrequency load shedding. If such undervoltage or underfrequency load shedding signal is received by the Company prior to Event Minute 3 of the SR Event, then the restriction shall be deemed an event of Force Majeure until service is restored.

After an SR Event has ended, the SR Event shall be reinstated and continue as follows:

(1)    if the SR Event duration was 5 Event Minutes or less, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 2 hours or less of the last SR Event Minute;

(2)    if the SR Event duration was more than 5 Event Minutes but not more than 15 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 4 hours or less of the last SR Event Minute;

(3)    if the SR Event duration was more than 15 SR Event Minutes but not more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 6 hours or less of the last SR Event Minute; and

(4)    if the SR Event duration was more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 8 hours or less of the last SR Event Minute.

(ff)    "Stability Reserves" means those reserves, provided by the Company under this Agreement, that are necessary to ensure the stability of the Federal Columbia River Transmission System against losses of transmission facilities

pursuant to the scheme(s) in Exhibit G or any additional scheme(s) adopted
pursuant to section 17 herein. Stability Reserves provided under this
Agreement shall not include, without limitation: (1) stability reserves
provided by the Customer in the General Transmission Agreement or in
other agreements; (2) operating reserves or forced outage reserves that BPA
has acquired under this Agreement or under other agreements; and (3) any
other reserves that BPA has acquired under other arrangements.

(gg)   "Take-or-Pay Obligation" means the obligation, as modified by section 14, of
the Company to pay for the Firm Power purchased by the Company under
this Agreement. On an annual basis, the amounts of HLH and LLH Firm
Energy that the Company agrees to purchase from BPA is specified in
section 9(b) of this Agreement. The monthly amounts of HLH and LLH Firm
Energy shall be as specified in Exhibit D. The monthly Demand amounts, for
the purposes of this Take-or-Pay Obligation, shall be the monthly Demand
amounts specified in Exhibit D. If the calculation of the Take-or-Pay
Obligation for a Contract Year for which Demands are not yet required to be
specified under section 10(a) becomes relevant, then the Demands for such
Contract Year shall be calculated by dividing the annual HLH Firm Energy,
if any, for each such Contract Year, as specified in section 9(b), by the
number of HLH in a Contract Year. Weekly, daily, and hourly amounts of
HLH and LLH Firm Energy are the amounts submitted by the Company
pursuant to section 10 of this Agreement.

7.   **EXHIBITS; INTERPRETATION**

Exhibit A (General Contract Provisions), Exhibit B (Fees for Remarketing),
Exhibit C (Rate Schedule), Exhibit D (Monthly Amounts of Firm Power), Exhibit E
(Points of Delivery), Exhibit F (Unrecoverable Costs and Transfer Costs), Exhibit G
(Stability Reserve Scheme(s)), Exhibit H (Arbitration Procedures), and Exhibit I
(Use-of-Facilities Charge) are attached hereto and made a part of this Agreement. If
there is a conflict between the body of this Agreement and any exhibit, then the

(c)     **Other Purchases**

This Agreement does not limit the Company's right to purchase power from BPA, consistent with Federal statutes, under other agreements, or to purchase power from third parties.

(d)     **Minimum Demand for Transmission**

A Company may elect to specify a minimum level of Demand for transmission for any month for the remaining term of this Agreement at the time the Company makes its submission of monthly amounts of Firm Power. Any request to specify a minimum level of Demand made after February 1, 1996, shall be subject to available transmission capacity as described in section 10(a). The Company may assign any excess minimum Demand for transmission consistent with terms for Assignment of Transmission Service under BPA's Point-to-Point Transmission Service Tariff. The amount of minimum Demand for transmission as elected or assigned shall be specified in Exhibit D.

## 10.     MONTHLY, WEEKLY, DAILY, AND HOURLY AMOUNTS OF FIRM POWER

(a)     **Monthly Amounts of Firm Power**

Not later than the February 1, immediately prior to October 1 of each Contract Year, the Company shall specify monthly amounts of Demand and HLH and LLH Firm Energy for such Contract Year. The total of the monthly amounts of HLH and LLH Firm Energy shall equal the annual amounts specified in section 9(b) for such Contract Year. The Company may set its Demand in each month in the 1996-1997 Contract Year at any level up to its Contract Demand. Any increase in amounts of Demand for a specific month in a later Contract Year above the greater of: (1) the amount of Demand for such month in the previous Contract Year; or (2) the minimum level of Demand for transmission specified in Exhibit D; is subject to BPA's determination of available transmission capacity. If additional generating resources integrated at points with transmission capacity available to the

Company's points of delivery are available for BPA's use or purchase, then BPA shall determine that transmission capacity is available under this Agreement. BPA shall also treat as available any transmission capacity made available by the Company to BPA through a reduction in demand under any other transmission agreement with BPA. If BPA determines that firm transmission capacity is not available for the Company's request, BPA will notify the Company within 60 days of the approved level of Demand. Each year, Exhibit D shall be revised to reflect the amounts specified by the Company, consistent with this section 10(a).

(b)  **Weekly, Daily, and Hourly Amounts of Firm Power**

The Company shall either: (i) provide advance submittals of weekly, daily, and hourly amounts of Firm Energy and any Excess Firm Energy pursuant to section 10(b)(1), which will remain as submitted unless changed pursuant to section 10(b)(2); or (ii) provide such submittals pursuant to the terms of section 10(b)(2) only.

(1)  **Advance Submittals of Weekly, Daily, and Hourly Amounts of Firm Energy**

The Company may submit weekly, daily, and hourly amounts in advance of, but not later than allowed under section 10(b)(2). Such advance submittals shall specify HLH and LLH amounts of Firm Energy to be delivered hereunder until the Company changes its submittal. The Company may change any advance submittal pursuant to section 10(b)(2). All advance submittals shall include a beginning and ending hour.

Contract No. 95MS-94861

(6)     **Makeup Power**

At the Company's request, BPA shall sell and deliver to the Company energy in excess of the amount shown in Exhibit D (Makeup Power), at the applicable energy charge only established for Firm Energy in the Industrial Firm Power Rate in the Rate Schedule, to the extent that such energy is needed by the Company to restore its operations following a restriction. Such Makeup Power shall not subject the Company to any Unauthorized Increase or other charge.

18.   **CURTAILMENT OR REMARKETING**

The Company shall have a one-time option, at the time the Company makes its first submission of monthly amounts of Firm Power pursuant to section 10(a) of this Agreement, to either: curtail its purchases pursuant to section 18(a); or remarket Excess Firm Energy pursuant to section 18(b). Following the Company's election, BPA and the Company shall operate under the terms and conditions of either section 18(a) or section 18(b), as applicable.

(a)     **Curtailment of Excess Firm Energy for a Fixed Fee**

The Company may curtail its Plant Load below the sum of its Take-or-Pay Obligation plus any amount of Non-Federal Service the Company identifies at the time it elects this curtailment option. BPA shall relieve the Company of its Take-or-Pay Obligation for Demand and Firm Energy for any such curtailed amounts and the Company shall pay BPA the fixed curtailment fee in mills per kilowatthour for each kilowatthour of such curtailed amounts, as specified in the Rate Schedule. Selection of this curtailment option shall relieve the Company of its obligation to pay the use-of-facilities charge specified in Exhibit I for amounts of curtailed energy.

(1)     The Company shall provide BPA as much notice as possible, but not less than 48 hours, of any curtailment of Firm Power usage.

(2)  If the Company chooses to use Non-Federal Service for part of its Plant Load, the Company shall specify the monthly amounts of demand, HLH energy, and LLH energy of Non-Federal Service, if any, for the term of this Agreement. BPA shall not be obligated to serve these specified monthly amounts, and any service to these amounts shall be subject to an Unauthorized Increase charge, as provided for in section 15(c).

(3)  Curtailed energy shall be equal to the Company's Take-or-Pay Obligation for Firm Energy reduced by the relief from take-or-pay provisions of section 14, minus the Measured Energy for Firm Power delivered under this Agreement.

(4)  Election of this curtailment option operates to assign the Company's right to transmit an amount of energy equal to the curtailed energy to BPA.

(b)  **Remarketing Excess Firm Energy Without a Fixed Fee**

(1)  **Notice and Request to Remarket**
The Company shall request that BPA remarket Excess Firm Energy by notifying BPA of:

(A)  the amount and minimum duration of Excess Firm Energy to be remarketed; and

(B)  the manner pursuant to section 18(b)(2) in which the Company wants BPA to remarket the Excess Firm Energy.

(2)  **Remarketing Options**
The Company may select one or more of the following options for remarketing Excess Firm Energy:

(A)     The Company may identify one or more Qualified Purchasers that have agreed to purchase some or all of the Excess Firm Energy under specified terms and conditions at agreed-upon prices or price formulas and for agreed-upon amounts and durations. The Company shall provide BPA at least the notice specified in section 18(b)(3) prior to the date that deliveries are to begin under each proposed sale.

(B)     The Company may arrange in advance for a Qualified Purchaser(s) to purchase any Firm Power that becomes Excess Firm Energy during any period for which the Company and a Qualified Purchaser may agree. The Company shall provide BPA at least the notice specified in section 18(b)(3) prior to the date on which the prearrangement becomes effective. In addition, the Company shall notify BPA as required in section 10(b) when deliveries are to begin under the arrangement.

(C)     The Company may request that BPA find purchasers for the Excess Firm Energy. If the Company chooses, it may request that BPA seek sales of specified amounts for daily, weekly, monthly, or other specified durations, and the Company may specify minimum prices or price ranges for the sales. BPA and the Company shall agree on the price of the sale at the time of the transaction unless the daily limitations in section 18(b)(4)(E) apply. BPA shall promptly notify the Company of the sales made on the Company's behalf.

(D)     The Company and BPA may agree to a price for use in crediting the Company's wholesale power bill under section 18(b)(4). BPA shall have discretion to dispose of or use

Contract No. 95MS-94861

such Excess Firm Energy without regard to the procedures associated with other options for disposal, and the Company shall have no further rights with respect to such Excess Firm Energy that is subject to such agreement.

(3)  **Applicability of Preference Provisions**

Excess Firm Energy remarketed by BPA shall be subject to applicable statutory provisions regarding preference. BPA shall notify the Company within the time period specified below if BPA or another Qualified Purchaser with public preference has elected to perform the agreement.

| Duration of Sale | Minimum Notice Period to Notify BPA | Maximum Period for BPA to Respond to Company |
|---|---|---|
| Up to 1 month | 48 hours | 24 hours |
| Up to 6 months | 7 days | 2 days |
| Over 6 months | 14 days | 7 days |
| Prearrangements under section 18(b)(2)(B) | 21 days | 14 days |

(4)  **Crediting the Company's Wholesale Power Bill**

(A)  During months when Excess Firm Energy is being remarketed by BPA, such power shall continue to be included in the amount of Firm Power billed by BPA as if delivered to the Company.

(B)  BPA may sell the Excess Firm Energy to the Qualified Purchaser(s) as arranged by the Company under options section 18(b)(2)(A) and section 18(b)(2)(B) or dispose of such power on whatever alternative terms that BPA may separately arrange. In either event, BPA shall credit the Company for the Excess Firm Energy revenues based on the price(s) agreed to

Contract No. 95MS-94861

between the Company and the Qualified Purchaser(s) net of the amounts specified in section 18(b)(4)(C).

(C) BPA shall determine the revenues for Excess Firm Energy delivered during a month by subtracting from the amount paid by the Qualified Purchaser (or the amount agreed to be paid or credited if BPA elects not to remarket to the Qualified Purchaser, disposes of or uses the Excess Firm Energy under section 18(b)(2)(D), or remarkets the Excess Firm Energy under section 18(b)(2)(C)): (i) any applicable transmission charges or losses specified in section 18(b)(4)(F); and (ii) the remarketing fee, as specified in Exhibit B. The fee or the pro rata share of the fee that the Company would have paid to another entity under a transaction under section 18(b)(2)(B) shall be deducted from revenues when BPA elects to retain the Excess Firm Energy for itself. No charges shall apply under section 18(b)(4)(C)(i) and section 18(b)(4)(C)(ii) when BPA uses such Excess Firm Energy for its own use or disposes of such Excess Firm Energy under section 18(b)(2)(D).

(D) BPA shall credit the Company's wholesale power bill for revenues from sales of Excess Firm Energy in the month in which BPA uses such Excess Firm Energy for its own use or disposes of such Excess Firm Energy under section 18(b)(2)(D), BPA is paid for such Excess Firm Energy under section 18(b)(2)(C), or BPA is paid for such Excess Firm Energy by the Qualified Purchaser. If the amount of the credit during any month exceeds the power bill amount, then BPA shall pay the Company the amount of the difference.

(E) BPA shall credit the Company for sales made under section 18(b)(2)(C) on Company's behalf subject to the

Contract No. 95MS-94861

limitations in this paragraph. For sales of 1 month duration or less, if BPA notified the Company at the start of a transaction that it was subject to daily remarketing limitations and BPA is simultaneously remarketing power for the Company and selling nonfirm energy on a daily basis, then the Company shall receive credit for the energy that BPA remarkets on the Company's behalf on such days at BPA's average sale price for nonfirm energy (including remarketed energy) for such day; provided, however, BPA shall have no obligation to credit the Company at such average daily price to the extent that the total amount of Excess Firm Energy remarketed under similar contract provisions for the Company and other entities providing for daily remarketing limitations exceeds the following limits:

| If BPA's actual daily average sales (excluding remarketed amounts) are | | Limit to total amount of remarketed energy: |
|---|---|---|
| equal to or greater than (aMW) | but less than (aMW) | (aMW) |
| 0 | 600 | 25% of BPA actual sales |
| 600 | 1,000 | 200 |
| 1,000 | 1,500 | 250 |
| 1,500 | 3,000 | 300 |
| 3,000 | 4,000 | 400 |
| 4,000 | 5,000 | 500 |
| 5,000 | - - | 600 |

In the event the above limits are exceeded, the Company shall be credited for its pro rata share of remarketed energy at the average daily price. All sales of remarketed energy for each day under the daily remarketing limitations shall be considered made under a single active schedule to determine remarketing fees. Sales of remarketed energy under the daily remarketing limitations shall be considered made over the southern intertie during the months of April through July, and

in the Pacific Northwest during other months. The Company may request that BPA remarket the remainder of its Excess Firm Energy at the best available price for additional energy, or the Company may arrange to store the Excess Firm Energy for sale at another time. BPA shall not discriminate against the Company in the storage or disposal of such remaining Excess Firm Energy.

(F)   There are no additional transmission charges for Excess Firm Energy except when:

    (i)   BPA incurs incremental transfer costs, including losses,

    (ii)   the Qualified Purchaser receiving delivery would have paid a charge for low-voltage delivery higher than the charge, if any, paid by the Company.

The Company shall pay such incremental costs. Any deliveries of Excess Firm Energy over BPA's interties shall be charged BPA's standard intertie tariffs. Losses will be valued at the price of the remarketed power.

## 19.   LOAD REGULATION, UNBUNDLED PRODUCTS, AND OTHER TRANSMISSION PRODUCTS

(a)   **Purchase of Load Regulation**
If the Company is within BPA's Control Area, or if BPA provides load regulation services to the Company through a third party, the Company shall purchase load regulation from BPA. The charge for load regulation shall be as specified in Exhibit C.

Contract No. 95MS-94861



**Department of Energy**

Bonneville Power Administration
P.O. Box 3621
Portland, Oregon  97208-3621

POWER BUSINESS LINE

March 23, 1998

In reply refer to:  PSB/Spokane

Amendatory Agreement No. 1 to
Contract No. 95MS-94861

Mr. Peter Forsyth
Vice President, NW External Affairs
Kaiser Aluminum & Chemical Corporation
825 NE. Multnomah, Suite 960
Portland, OR  97232

Dear Mr. Forsyth:

This letter agreement (Amendatory Agreement) constitutes an amendment to Contract No. 95MS-94861
(Power Sales Agreement) between the Bonneville Power Administration (BPA) and Kaiser Aluminum &
Chemical Corporation (Company).  BPA and the Company are hereinafter sometimes referred to
individually as "Party" and collectively as "Parties."  BPA and the Company have executed an interim
transmission services agreement (hereinafter referred to as "Interim PTP Service Agreement") under
which BPA has provided Point-to-Point Transmission Service over the Federal Columbia River
Transmission System (FCRTS) pursuant to the terms and conditions of the Point-to-Point Transmission
Services tariff and the 1996 Point-to-Point Firm Transmission Rate Schedule (PTP-96).  The Parties are
negotiating the terms and conditions of a final transmission service agreement (Final PTP Service
Agreement) which will supersede the Interim PTP Service Agreement.  The Parties have agreed to
amend the Power Sales Agreement as follows:

    1.    **EFFECTIVE DATE.**  This Amendatory Agreement, when executed, shall become
effective as of the date that the Interim PTP Service Agreement becomes effective.

    2.    **DEFINITIONS.**  All capitalized terms used herein shall be as defined in the Power
Sales Agreement or, if not defined in the Power Sales Agreement, as defined in the General Rate
Schedule Provisions, unless otherwise specified in this Amendatory Agreement.

"PTP Service Agreement" shall mean the Interim or Final PTP Service Agreement, as
applicable.

    3.    **AMENDMENT OF POWER SALES AGREEMENT.**  The Power Sales Agreement is
amended as follows:

        (a)    Section 8(b)(2) is deleted and replaced by the following:

4

section 14, minus the Measured Energy for Firm Power delivered under this Agreement."

(k)    A new section 18(b)(1)(C) is added as follows:

"(C)    the assignment to BPA of that portion of its rights under the PTP Service Agreement, associated with the energy to be remarketed and necessary to allow BPA to use such assigned rights to remarket Excess Firm Energy for the Company, subject to the assignment provisions of the Point-to-Point Transmission Services tariff and the terms of section 18(b)(4)(F)."

(l)    Section 19(d) is deleted and replaced by the following:

"(d)    **Unbundled Products and Other Transmission Services.** BPA shall offer to the Company the ancillary services, the network integration transmission product, the point-to-point transmission product, and the intertie transmission products that BPA offers to its utility customers. BPA may offer to the Company other unbundled services. If the Company elects to purchase such products, the Parties agree to amend the appropriate provisions of this Agreement and/or the PTP Service Agreement."

(m)    Section 19(f) is deleted in its entirety.

(n)    Section 20(a) is deleted and replaced by the following:

"(a)    **Delivery to Company's Firm Load.** BPA shall make available Firm Power at the points of interconnection specified in Exhibit C-1 of the PTP Service Agreement. Delivery of such Firm Power over the Network to the Company's Plant Load shall be as provided for in the PTP Service Agreement."

(o)    Section 20(b) is deleted and replaced by the following:

"(b)    **Other Provisions Relating to Delivery.** Other provisions applicable to delivery (1) at the points of interconnection specified in Exhibit C-1 of the PTP Service Agreement shall be as specified in Exhibit A of this Agreement, and (2) over the Network to the Company's Plant Load shall be as specified in the PTP Service Agreement."

(p)    Section 26 is deleted and replaced by the following:

"26.    **DAMAGES FOR FAILURE BY BPA TO DELIVER.** In the event BPA fails to deliver the hourly amounts of Firm Energy scheduled by the Company under this Agreement to the plant's Point of Delivery, and such delivery is not restricted by BPA pursuant to its Reserve rights under this Agreement, or pursuant to the curtailment rights under the PTP Service Agreement, or such delivery is not excused by section 4(f) of Exhibit A, BPA shall pay the Company (on the date payment by the Company for the Firm Energy would otherwise have been due under this Agreement):

EXHIBIT 2

**KAISER ALUMINUM** HEADQUARTERS
NORTHWEST REGIONAL HEADQUARTERS

February 2, 2001                                              VIA FAX

Mr. Wayne Nelson
General Manager
Clark County PUD
(360) 992-3204

                Re: Kaiser's Remarketing Agreement

Dear Mr. Nelson:

                This letter will confirm our conversations on February 2, 2001 with
you and Mr. Dana Zentz of EES Consulting regarding Kaiser's right to remarket
energy under its 1996 Power Sales Contract with BPA. Under the contract,
Kaiser may request remarketing by submitting a notice to BPA stating the
Qualifying Purchaser (which would be Clark County PUD (PUD) in this instance),
the start and end date of the sale, the price, the delivery point, and any other
terms. BPA may either implement the sale to the PUD or, at its option, may
choose to purchase the energy for its own use at the same terms and conditions.
If the sale is for one month or less, BPA has 24 hours after Kaiser's notice to
decide if it wants to purchase the energy; if the sale is for more than one month
but no greater than 6 months, then BPA has 2 days to decide.

                If the sale to the PUD is implemented by BPA, then BPA will contract with
the PUD for the sale of the energy at the price, terms and conditions stated in

                                                      1

Kaiser's notice and other standard terms that BPA may request. The energy purchased by the PUD will be federal energy and the PUD's payment will be made to BPA. The energy will be delivered under Kaiser's PTP agreement with BPA. The POI will be the "BPA's System POI" and the point of delivery will be moved from Kaiser's facilities on a non-firm basis to the point of delivery named in Kaiser's notice and the PUD's contract with BPA. BPA will pay Kaiser for the remarketed energy under the terms of Kaiser's 1996 Power Sales Contract and a separate Confirmation Agreement with BPA consistent with the terms of Kaiser's notice. Therefore, pursuant to our discussions, the PUD and Kaiser (Parties) have agreed to the following:

Kaiser will submit a request to BPA on Friday, February 2, 2001 at approximately 4:30 p.m. PST to remarket 140 Mw of energy for the months of August 2001 and September 2001. BPA will have 48 hours to respond to this request and notify Kaiser if i) they will purchase the energy under the terms agreed to between the Parties or ii) facilitate the sale to the PUD.

With regard to the remarketing request, the PUD has requested that Kaiser's offer remain open until 12:00 noon on Tuesday, February 6, 2001, to allow the Board to approve the necessary financing arrangements for payment. This is acceptable, provided that Kaiser has the right to withdraw the offer at any time before the PUD executes a Confirmation Agreement with BPA.

2

Provided Kaiser can secure short-term firm transmission utilizing its PTP transmission agreement with BPA, BPA will deliver the energy to the ALCOA substation or other points as mutually agreed to by the Parties.

The Parties agree that the PUD shall pay to BPA on March 15, 2001 the amount of $53,934,878.00 as shown in the attached monetization table or if a different payment date is mutually agreed to by the Parties then the payment amount shall be adjusted consistent with the attached table.

Sincerely,

Joseph P. Hoemer

Energy Supply Manager

Please indicate your acceptance of the terms of this agreement by signing below and returning a copy to me. Fax: (509) 242-1098

_____

_____

Date

cc:   Mr. Dana Zentz, EES Consulting

3

# Clark Public Utility Power Remarketing Monetization

## February 1, 2001

| Month | Days | MW | MWhrs | Purchase Price | Undiscounted Cash Flow |
|-------|------|-----|--------|----------------|------------------------|
| Aug | | | | | |
| Sep | 31 | 140 | 104,160 | $325.00 | $ 33,852,000 |
| Oct | 30 | 140 | 100,800 | $325.00 | $ 32,760,000 |
| | | | | | $ 66,612,000 |

## Discount Calculation

3/16/01

| Curve Date | Total Rate | Discount Factor | Discounted Cash Flow |
|------------|-----------|-----------------|----------------------|
| Sep-01 | 6.50% | 0.9624 | $ 32,578,244 |
| Oct-01 | 6.50% | 0.9572 | $ 31,356,634 |
| Nov-01 | | | |
| | | | $ 63,934,878 |

EXHIBIT 3



POOR QUALITY ORIGINAL(S)

**Department of Energy**
Bonneville Power
Administration
P.O. Box 3621
Portland, OR 97208-3621

**POWER BUSINESS LINE**
Trader and Scheduling Phones

| | |
|---|---|
| Date: | February 06, 2001 |
| To: | Clark Public Utilities |
| | 1200 Ft Vancouver |
| | Vancouver, WA 98068 |
| Attn: | James Sanders |
| Phone: | 360-992-3452 |
| Fax: | 360-992-3140 |
| Preach: | 503-251-5196 |
| Real Time: | 503-251-5224 |
| PS/RT | 503-251-5201 |
| FAX: | |

| | |
|---|---|
| Brenda Anderson | (503) 230-6610 |
| Dan Le | (503) 230-3144 |
| Young Linn | (503) 230-3183 |
| Bill Lamb | (603) 230-3125 |
| Mark Miller | (503) 230-4003 |
| David Mills | (503) 230-7588 |
| BPA Trading Floor Fax | (503) 230-7463 |
| BPA Preschedule Fax | (503) 230-3039 |
| BPA SW Preschedule | (503) 230-3915 |
| BPA NW Preschedule | (503) 230-3813 |
| BPA S. Idaho Presch. | (503) 230-4311 |
| BPA Real Time | (503) 230-5241 |
| | or 230-4194 |

## CONFIRMATION AGREEMENT

The following memorializes the terms of a transaction agreed to by Bonneville Power Administration (BPA) and Clark Public Utilities (CPU). Transactions hereunder are in accordance with reference contract or enabling agreement DE-MS79-81BP90489.

**Transaction Date:** 2/6/01   **Traders:** Mark Miller (BPA) and James Sanders (CPU)

**BPA Contract:** 01PB-24068

---

| | |
|---|---|
| **Seller of Energy:** | BPA |
| **Buyer of Energy:** | Clark Public Utilities |
| **Product:** | Surplus firm power |
| **Point of Delivery:** | Alton Substation |
| **Alternate Point** | Where the Federal generating system interconnects with BPA's transmission |
| **of Delivery:** | network. Customer will provide transmission from the Federal generating system. Energy taken to an alternate POD is take-or-pay and liquidated damages do not apply. Customer is responsible for payment of energy if transmission is curtailed to APOD. |

| Start of Term | End of Term | Demand Limit | Hours | Amount (MWH/hr) | Total MWh | Price | Holiday Excluded | Revenue / Cost |
|---|---|---|---|---|---|---|---|---|
| 8/1/01 | 8/31/01 | 140 | ALL | 140 | 104,160 | $325.00 | | |
| 9/1/01 | 9/30/01 | 140 | ALL | 140 | 100,800 | $325.00 | | |

**Energy Transaction Total:**   See Additional Provisions below

Page 1 of 2 CPU 01PB-24068

Sent by: CLARK PUD ENERGY RESOURCES;    3609923140;    02/09/01 4:39PM; JetFax #905;Page 3/3

**Additional Provisions**
Transmission will be provided under Kaiser Aluminum & Chemical Corp. (KACS) Contract No. 89MS-96107. Payment for transmission will remain with KACS.

CPU shall pay to BPA $64,080,608.00 on March 28, 2001, which represents net payment/NPV of full payment for all energy purchased under this agreement. This confirmation agreement shall be modified on or before March 15, 2001, if a change to the payment date is required.

**Scheduling**
All energy will be shown in Pacific Prevailing Time
~ HLHs are defined as HE 0700 – HE 2200, Monday through Saturday (excludes Sundays and NERC holidays)
~ LLHs are defined as HE 0100 – HE 0600, HE 2300 and HE 2400, Monday through Saturday and all day Sundays and NERC holidays.
~ All or FLB is defined as HE 0100 – HE 2400.

Energy shall be prescheduled, with source and sink identified, by 1000, or as mutually agreed, on the day that both parties observe as a workday preceding the date of delivery. Schedules may only be changed due to uncontrollable forces as defined by the reference contract or by mutual agreement of both parties.

**Billing**
Billing and payment under this agreement shall be made consistent with and as a specific item in the Wholesale Power Bill.

Unless otherwise specified in this Agreement, all administrative and operational provisions required to perform this Agreement shall be those described in the reference contract, including provisions related to delivery, scheduling (if applicable), billing, payments, metering, access to facilities, dispute resolution, uncontrollable forces, continuity of services, and contract interpretation.

This confirmation agreement contains all of the terms and conditions of this transaction and expressly limits acceptance to the terms stated herein, and any additional or different terms proposed by Clark Public Utilities are rejected unless expressly agreed to in writing by BPA.

If the above accurately reflects your understanding of our agreement, please indicate your approval by signing a copy of this agreement and returning via fax to BPA.

**AGREED AND ACCEPTED**

Bonneville Power Administration      Clark Public Utilities

David E. Mills      Name: Wayne Nelson

Manager, Trading Floor      Title: General Manager/CEO

Date: 2/8/01      Date: 2-8-01

Page 2 of 2 CPU 01PB-24068

EXHIBIT 4

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Puget Sound Energy, Inc., | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | |
| v. | ) | Docket Nos. EL01-10-000 |
| | ) | and EL01-10-001 |
| All Jurisdictional Sellers of Energy | ) | |
| And/or Capacity at Wholesale Into | ) | |
| Into Electric Energy And/or Capacity | ) | |
| Markets in the Pacific Northwest, | ) | |
| Including Parties to the Western | ) | |
| Systems Power Pool Agreement, | ) | |
| | ) | |

PREPARED DIRECT TESTIMONY OF
WAYNE W. NELSON
WITNESS FOR
CLARK PUBLIC UTILITIES

1   Q.   PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.

2   A.   My name is Wayne W. Nelson.  I am the Chief Executive Officer of Clark

3        Public Utilities at 1200 Ft. Vancouver Way, Vancouver, WA.  Mailing

4        address Post Office Box 8900, Vancouver, WA 98668.

5   Q.   PLEASE DESCRIBE YOUR EDUCATION AND EXPERIENCE

6   A.   I received a Bachelor's degree in Political Science from the University of

7        Washington and a JD degree from the Northwestern School of Law in

8        Portland, Oregon.  I practiced law in the private sector from 1978 until

9        1989.  In 1989 I became General Counsel for Clark PUD and held that

10       position until January of 1999 when I became the Chief Executive Officer for

1      Clark. I have held the positions of CEO and General Counsel since that time.

2   Q.   WHAT IS THE PURPOSE OF YOUR TESTIMONY?

3   A.   My testimony will address the power purchase transaction entered into by

4      Clark Public Utilities ("Clark") in February of 2001. Simply put, I will

5      describe (1) the situation that Clark faced, (2) the actions that Clark took, (3)

6      the reasons why Clark took those actions, and (4) the consequences of

7      those actions.

8   Q.   DO YOU PRESENT ANY EXHIBITS?

9   A.   Yes. Exhibit PNG__ (WWN-2) is the letter agreement between Clark and

10     Kaiser. Exhibit PNG__ (WWN-3) is a BPA confirmation of the transaction.

11  Q.   PLEASE DESCRIBE CLARK.

12  A.   Clark is a customer-owned public utility district providing electric, water and

13     wastewater service in Clark County, Washington. The utility is a municipal

14     corporation organized under the laws of the State of Washington and was

15     formed by a vote of the people in 1938. The utility consists of four separate

16     operating systems, electric, generation, water and wastewater. Clark

17     provides electric service to about 152,000 customers, water service to

18     nearly 25,000 customers, and wastewater service to about 600 customers.

19     The generating system consists of the 248 MW River Road Generating Plant

20     with a combined cycle, combustion turbine that entered commercial

21     operation in late 1997. The utility is governed by a three-member elected

22     board of commissioners. Each member serves a six-year term with one of

1     the positions open every two years.

2    Q.   WHO DOES CLARK SERVE?

3    A.   Clark serves the electrical needs within the political boundaries of Clark

4       County, Washington. In CY 2000, the utility sold approximately 4.2 billion

5       kWh to residential, commercial and industrial customers located within Clark

6       County. Clark's historical peak load occurred in December of 1998 at

7       approximately 1,063 MW.

8    Q.   WHAT WAS CLARK'S POWER SUPPLY ACQUISITION STRATEGY.

9    A.   With minor exceptions, the utility was a requirements customer of the

10      Bonneville Power Administration (BPA) from its beginning through 1996. In

11      1981, Clark entered into power contracts with BPA which expired on July

12      31, 2001. In 1996, Clark elected to diversify its power supply and

13      constructed the River Road Generating Plant mentioned above and entered

14      into five-year power supply contracts with Avista Energy and PacifiCorp to

15      replace most of the BPA contract amount through July 31, 2001. In

16      1998,while Clark was relying primarily on non-BPA arrangements, BPA

17      decided to extend all of its contracts by two-months to shift its contract

18      expiration date to September 30 to coincide with its fiscal year. As a result,

19      in 2000 when Clark sought to return to BPA under its subscription process,

20      BPA would only offer Clark a net requirements contract beginning on

21      October 1, 2001, which created a two-month gap in Clark's supply portfolio.

22    Q.   PLEASE DESCRIBE THE CALIFORNIA ENERGY CRISES AND ITS EFFECT ON

1        THE NORTHWEST MARKET.

2    A.   The dysfunctional market in California had a profound effect on the markets

3         available to Northwest utilities.  The existence of north/south intertie

4         capacity brought the Northwest trading hubs into the turmoil existing in

5         California.  Any utility, Clark included, that needed to purchase power at one

6         of the trading hubs was subject to incredible volatility that mirrored the

7         California markets.

8    Q.   PLEASE DESCRIBE THE SITUATION THAT CLARK FACED IN THE FALL AND

9         WINTER OF 2000.

10   A.   The fall and winter of 2000 witnessed extreme volatility in both the natural

11        gas and electric markets caused by the instability in the California markets

12        for both these commodities.  Clark saw natural gas on the daily spot market

13        reach $40 per MMBTU and electricity reach $5,000 per MWH.  During that

14        same period of time, Clark discussed  with BPA, a potential purchase for the

15        months of August and September to fill the above-mentioned gap in ITS

16        resource picture due to the shift in BPA's  contract expiration date.  Until the

17        effects of the dysfunctional California market were felt in the Northwest, it

18        had been Clark's intent to purchase market-based power during those two

19        months possibly on a daily basis to fill in the gap.  When it became obvious

20        that the California situation had made that a very risky proposition, Clark

21        approached the BPA to make a purchase under its TACUL rate schedule (i.e.,

22        "Targeted Adjustment Charge for Uncommitted Loads") that was offered to

1    cover those utilities that had a gap in their resource picture due to BPA's

2    shift in contract year. In early 2001, BPA informed Clark that due to the

3    volatility of the markets in California the TACUL rate schedule would have to

4    be based on market rates in effect at the time. Clark then set about

5    attempting to find an alternate source that would not be subject to that

6    volatility and would be a firm delivery for the months of August and

7    September 2001. Clark's understanding from marketers and consultants

8    was that it would be difficult to find such an alternate source in view of the

9    volatility resulting from the California market.

10    Q.    WHAT DID CLARK DO?

11    A.    With the assistance of EES Consulting, Inc. (EES), Clark sought out suppliers

12          willing to provide power for the August/September period. Due to the

13          volatility of the market, suppliers willing to make a commitment that far out

14          were fairly scarce. Based upon the information from EES's surveys, it

15          became evident that Clark would need to tie up the supply since the futures

16          prices for August/September 2001 were ranging from $350 to $500 for

17          those months and prices were predicted to exceed $1000 for daily

18          purchases in those months.

19          In late January, EES was made aware of the availability of power from Kaiser

20          Aluminum and Chemical Corporation (Kaiser). Kaiser would sell power to

21          Clark in essence by redirecting part of Kaiser's BPA purchases to Clark.

22          Kaiser elected to shut down its facilities rather than take its contract