1   entitlement from BPA, and sell its BPA entitlement into the market that

2   existed in early 2001.  The sale of power from Kaiser to Clark was

3   memorialized in a letter agreement setting the price and terms for the

4   purchase.  Exhibit PNG___ (WWN-2)

5   Q.   HOW MUCH POWER WAS COVERED BY THE CONTRACT?

6   A.   The contract provided for 140 MW of average power, with 104,160 MWh in

7        August and 100,800 MWh in September.

8   Q.   WHAT WAS THE PRICE AND OTHER TERMS?

9   A.   The price was $325 per MWH for all MWH, take or pay.  The contract called

10       for BPA delivery to Clark, as an alternate Point of Delivery, on a non-firm

11       basis.

12  Q.   HOW WAS PAYMENT MADE UNDER THE CONTRACT?

13  A.   The contract called for payment for the power  on March 15, 2001, with

14       deliveries to begin August 1, 2001.  Clark paid the full amount,

15       $64,080,603 by wire transfer to BPA which, in turn, paid Kaiser.

16  Q.   DOES CLARK HAVE A BPA CONFIRMATION OF THIS TRANSACTION?

17  A.   Clark's obligation to purchase this power is memorialized in BPA

18       Confirmation Agreement #01PB-24068 dated 2/5/2001. A copy of the

19       confirmation is Exhibit PNG ___ (WWN-3).

20  Q.   WHY DID CLARK ENTER INTO THE CONTRACT TO PURCHASE POWER

21       FROM KAISER?

22  A.   Clark has an obligation to serve its customers, and, hence, was obligated to

1    assure that it had sufficient power to meet its customer's needs for the

2    August/September period. The deficiency Clark faced for that period could

3    only be fully met by purchasing additional supplies, and not by demand

4    reduction.   Clark was, as a result, forced to pay whatever the market

5    dictated to provide those customers with electricity.  Clark sought to

6    purchase Kaiser's full BPA entitlement of 190 MW to meet Clark's needs.

7    However, Kaiser was only willing to sell 140 MW to Clark. As a result,

8    shortly after entering into its agreement with Kaiser, Clark began the process

9    of installing temporary generators at a site within Clark County to provide 50

10   MW of electricity for the August/September period at a cost of $140 per

11   MWh. That installation was complete and the units are currently available

12   for service.

13   Q.   WHAT WAS THE RESULT?

14   A.   In order to provide sufficient electricity for the needs of Clark's customers in

15   the months of August and September, Clark was forced to pay $64 million

16   for 140 average megawatts.  Clark did not have sufficient funds on hand to

17   make the up-front lump-sum payment that Kaiser demanded. As a result,

18   Clark was compelled to borrow the money to finance the Kaiser transaction.

19   Q.   THANK YOU, I HAVE NO FURTHER QUESTIONS.

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Puget Sound Energy, Inc., et al.    )    Docket Nos. EL01-10-000
    )    EL01-10-001

## AFFIDAVIT OF WITNESS

I, Wayne W. Nelson, being duly sworn, depose and say that the

statements and exhibits contained in the testimony on behalf of Clark Public

Utilities in this proceeding are true and correct to the best of my knowledge,

information and belief.

Executed on this 16th day of August, 2001.

_____
                           Wayne W. Nelson

COUNTY OF Clark
STATE OF WASHINGTON, to-wit:

Subscribed and sworn to before me this __ day of August, 2001.

My Commission Expires: 11/1/01 _____

_____
                           Notary Public

# KAISER ALUMINUM & CHEMICAL CORPORATION
## NORTHWEST REGIONAL HEADQUARTERS

534 EAST TRENT AVENUE, SUITE 300 • SPOKANE, WA 99202
PHONE: (509) 242-1067 • FAX (509) 242-1098

---

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: Wayne Nelson | FROM: Joe Hoerner |
| FAX NUMBER: (360) 992-3204 | DATE: Feb. 2, 2001 |
| | TOTAL NO. OF PAGES INCLUDING COVER: 5 |
| COMPANY: Clark County PUD | |
| PHONE NUMBER: | PHONE NUMBER (509) 242-1074 |
| RE: | |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY

---

WAYNE- LETTER STATING OUR CONVERSATION
TODAY. IF YOU HAVE ANY QUESTIONS
FEEL FREE TO CALL ME THIS WEEKEND
CELL # (509) 995-1487 OR THROUGH DANA.

THANKS,
JOE

CC: DANA ZENTZ
252-5093

***IMPORTANT***

The information contained in this facsimile message is privileged and confidential information intended only for the use of the individual named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please destroy it and notify us immediately by telephone. Thank you.

**KAISER ALUMINUM**
NORTHWEST REGIONAL HEADQUARTERS

February 2, 2001                                        **VIA FAX**

Mr. Wayne Nelson
General Manager
Clark County PUD
(360) 992-3204

                    Re: Kaiser's Remarketing Agreement

Dear Mr. Nelson:

          This letter will confirm our conversations on February 2, 2001 with
you and Mr. Dana Zentz of EES Consulting regarding Kaiser's right to remarket
energy under its 1996 Power Sales Contract with BPA. Under the contract,
Kaiser may request remarketing by submitting a notice to BPA stating the
Qualifying Purchaser (which would be Clark County PUD (PUD) in this instance),
the start and end date of the sale, the price, the delivery point, and any other
terms. BPA may either implement the sale to the PUD or, at its option, may
choose to purchase the energy for its own use at the same terms and conditions.
If the sale is for one month or less, BPA has 24 hours after Kaiser's notice to
decide if it wants to purchase the energy; if the sale is for more than one month
but no greater than 6 months, then BPA has 2 days to decide.

          If the sale to the PUD is implemented by BPA, then BPA will contract with
the PUD for the sale of the energy at the price, terms and conditions stated in

                                        1

Kaiser's notice and other standard terms that BPA may request. The energy purchased by the PUD will be federal energy and the PUD's payment will be made to BPA. The energy will be delivered under Kaiser's PTP agreement with BPA. The POI will be the "BPA's System POI" and the point of delivery will be moved from Kaiser's facilities on a non-firm basis to the point of delivery named in Kaiser's notice and the PUD's contract with BPA. BPA will pay Kaiser for the remarketed energy under the terms of Kaiser's 1996 Power Sales Contract and a separate Confirmation Agreement with BPA consistent with the terms of Kaiser's notice. Therefore, pursuant to our discussions, the PUD and Kaiser (Parties) have agreed to the following:

Kaiser will submit a request to BPA on Friday, February 2, 2001 at approximately 4:30 p.m. PST to remarket 140 Mw of energy for the months of August 2001 and September 2001. BPA will have 48 hours to respond to this request and notify Kaiser if  i) they will purchase the energy under the terms agreed to between the Parties or ii) facilitate the sale to the PUD.

With regard to the remarketing request, the PUD has requested that Kaiser's offer remain open until 12:00 noon on Tuesday, February 6, 2001, to allow the Board to approve the necessary financing arrangements for payment. This is acceptable, provided that Kaiser has the right to withdraw the offer at any time before the PUD executes a Confirmation Agreement with BPA.

Provided Kaiser can secure short-term firm transmission utilizing its PTP transmission agreement with BPA, BPA will deliver the energy to the ALCOA substation or other points as mutually agreed to by the Parties.

The Parties agree that the PUD shall pay to BPA on March 15, 2001 the amount of $63,934,878.00 as shown in the attached monetization table or if a different payment date is mutually agreed to by the Parties then the payment amount shall be adjusted consistent with the attached table.

Sincerely,

Joseph P. Hoemer

Energy Supply Manager

Please indicate your acceptance of the terms of this agreement by signing below and returning a copy to me. Fax: (509) 242-1098

_____

_____

Date

cc:    Mr. Dana Zentz, EES Consulting

3

## Clark Public Utility Power Reconstitution Monetization
### February 2, 2001

| Month | Days | MW | MWhrs | Purchase Price | Undiscounted Cash Flow |
|-------|------|-----|---------|----------------|------------------------|
| Aug | 31 | 140 | 104,160 | $325.00 | $ 33,852,000 |
| Sep | 30 | 140 | 100,800 | $325.00 | $ 32,760,000 |
| Oct | | | | | |
| | | | | | $ 66,612,000 |

**Discount Calculation**                                            3/15/01

| Curve Date | Total Rate | Discount Factor | Discounted Cash Flow |
|------------|-----------|-----------------|----------------------|
| Sep-01 | 6.50% | 0.9624 | $ 32,578,244 |
| Oct-01 | 6.50% | 0.9572 | $ 31,356,634 |
| Nov-01 | | | |
| | | | $ 63,934,878 |



Department of Energy
Bonneville Power
Administration
P.O. Box 3621
Portland, OR 97208-3621

POWER BUSINESS LINE
Trader and Scheduling Phones

| | |
|---|---|
| Brenda Anderson | (503) 230-5610 |
| Dan Ie | (503) 230-3144 |
| Young Linn | (503) 230-3153 |
| Bill Lamb | (503) 230-9135 |
| Mark Miller | (503) 230-4003 |
| David Mills | (503) 230-7588 |
| BPA Trading Floor Fax | (503) 230-7463 |
| BPA Preschedule Fax | (503) 230-5039 |
| BPA SW Preschedule | (503) 230-3915 |
| BPA NW Preschedule | (503) 230-3813 |
| BPA S. Idaho Presch. | (503) 230-4311 |
| BPA Real Time | (503) 230-3341 |
| | or 230-4194 |

Date: February 06, 2001
To: Clark Public Utilities
1200 Ft Vancouver
Vancouver, WA 98668

Attn: James Sanders
Phone: 360-992-3462
Fax: 360-992-3140

Presch: 503-251-5198
Real Time: 503-251-5224
PS/RT 503-251-5201
FAX:

# CONFIRMATION AGREEMENT

The following memorializes the terms of a transaction agreed to by Bonneville Power Administration (BPA) and Clark Public Utilities (CPU). Transactions hereunder are in accordance with reference contract or enabling agreement DE-MS79-81BP90489.

Transaction Date: 2/6/01        Traders: Mark Miller (BPA) and James Sanders (CPU)

BPA Contract: 01PB-24068

Seller of Energy: BPA
Buyer of Energy: Clark Public Utilities
Product: Surplus firm power
Point of Delivery: Mid-Columbia
Alternate Point Where the Federal generating system interconnects with BPA's transmission
of Delivery: network. Customer will provide transmission from the Federal generating system. Energy taken to an alternate POD is take-or-pay and liquidated damages do not apply. Customer is responsible for payment of energy if transmission is curtailed to APOD.

| Start of Term | End of Term | Demand Limit | Hours | Amount (MWH/hr) | Total MWh | Price | Holiday Excluded | Revenue / Cost |
|---|---|---|---|---|---|---|---|---|
| 8/1/01 | 8/31/01 | 140 | ALL | 140 | 104,160 | $325.00 | | $33,852,000.0 |
| 9/1/01 | 9/30/01 | 140 | ALL | 140 | 100,800 | $325.00 | | $32,760,000.0 |
| Energy Transaction Total: | | | | | | | | $64,080,603.0 |
| | | | | | | | See Additional Provisions below |

Page 1 of 2 CPU 01PB-24068

**Additional Provisions**
Transmission will be provided under Kaiser Aluminum & Chemical Corp. (KACS) Contract No. 96MS-96107. Payment for transmission will remain with KACS.

CPU shall pay to BPA $64,050,603.00 on March 23, 2001, which represents net payment/NPV of full payment for all energy purchased under this agreement. This confirmation agreement shall be modified on or before March 15, 2001, if a change to the payment date is required.

**Scheduling**
All energy will be shown in Pacific Prevailing Time.
– HLHs are defined as HE 0700 – HE 2200, Monday through Saturday (excludes Sundays and NERC holidays).
– LLHs are defined as HE 0100 – HE 0600, HE 2300 and HE 2400, Monday through Saturday and all day Sundays and NERC holidays.
– All or FLH is defined as HE 0100 – HE 2400.

Energy shall be prescheduled, with source and sink identified, by 1000, or as mutually agreed, on the day that both parties observe as a workday preceding the date of delivery. Schedules may only be changed due to uncontrollable forces as defined by the reference contract or by mutual agreement of both parties.

**Billing**
Billing and payment under this agreement shall be made consistent with and as a specific item in the Wholesale Power Bill.

Unless otherwise specified in this Agreement, all administrative and operational provisions required to perform this Agreement shall be those described in the reference contract, including provisions related t delivery, scheduling (if applicable), billing, payments, metering, access to facilities, dispute resolution, uncontrollable forces, continuity of services, and contract interpretation.

This confirmation agreement contains all of the terms and conditions of this transaction and expressly limits acceptance to the terms stated herein, and any additional or different terms proposed by Clark Public Utilities are rejected unless expressly agreed to in writing by BPA.

If the above accurately reflects your understanding of our agreement, please indicate your approval by signing a copy of this agreement and returning via fax to BPA.

AGREED AND ACCEPTED

Bonneville Power Administration

David E. Mills
Manager, Trading Floor
Date: 2/8/01

Clark Public Utilities
Name: Wayne Nelson
Title: General Manager/CEO
Date: 2-8-01

Page 2 of 2 CPU 01PB-24068

(APS-96), a rate schedule that includes the fixed curtailment fee for the option specified in section 18(a), and the General Rate Schedule Provisions established by BPA, and applicable to sales under this Agreement. When such Rate Schedule has received interim or final approval by FERC, then it shall be attached hereto as Exhibit C.

(bb)  "Rate Test" means: (1) the calculation of whether the total average price in mills per kilowatthour, using the Rate Schedule, to determine if such total average price is less than or equal to the price specified in section 11(a) of this Agreement; (2) the determination of whether the fixed curtailment fee, for purposes of section 18(a) of this Agreement, is less than or equal to the amount specified in section 11(b); and (3) the determination of whether the use-of-facilities charge, as may be revised pursuant to section 8(b)(2) and Exhibit I, is less than or equal to the amount determined pursuant to section 11(c). The Rate Test is further described in section 11 of this Agreement.

(cc)  "Requested Operating Reserves" means the amount of Operating Reserves, pursuant to section 17, that the BPA dispatcher requests the Company to trip for purposes of providing Operating Reserves.

(dd)  "Reserves" means the Stability Reserves and Operating Reserves provided by the Company under this Agreement.

(ee)  "SR Event" means the period during which BPA implements a Stability Reserve restriction. An SR Event shall be an Event for all purposes. The beginning of the SR Event shall be identified by a transfer trip or other signal from BPA to the Company restricting delivery of energy under this Agreement. Unless reinstated as provided herein, the end of the SR Event shall be identified by the BPA dispatcher's notification to Company that delivery of all energy to which Company is entitled under this Agreement can be restored. Notwithstanding the foregoing, the Event will end (subject to

Contract No. 95MS-94861

reinstatement as provided herein) when system conditions occur that result in tripping the Company for undervoltage or underfrequency load shedding. If such undervoltage or underfrequency load shedding signal is received by the Company prior to Event Minute 3 of the SR Event, then the restriction shall be deemed an event of Force Majeure until service is restored.

After an SR Event has ended, the SR Event shall be reinstated and continue as follows:

(1)     if the SR Event duration was 5 Event Minutes or less, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 2 hours or less of the last SR Event Minute;

(2)     if the SR Event duration was more than 5 Event Minutes but not more than 15 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 4 hours or less of the last SR Event Minute;

(3)     if the SR Event duration was more than 15 SR Event Minutes but not more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 6 hours or less of the last SR Event Minute; and

(4)     if the SR Event duration was more than 22 Event Minutes, then the SR Event shall be reinstated if BPA restricts deliveries to Company pursuant to its Stability Reserve rights within 8 hours or less of the last SR Event Minute.

(ff)     "Stability Reserves" means those reserves, provided by the Company under this Agreement, that are necessary to ensure the stability of the Federal Columbia River Transmission System against losses of transmission facilities

pursuant to the scheme(s) in Exhibit G or any additional scheme(s) adopted pursuant to section 17 herein. Stability Reserves provided under this Agreement shall not include, without limitation: (1) stability reserves provided by the Customer in the General Transmission Agreement or in other agreements; (2) operating reserves or forced outage reserves that BPA has acquired under this Agreement or under other agreements; and (3) any other reserves that BPA has acquired under other arrangements.

(gg)  "Take-or-Pay Obligation" means the obligation, as modified by section 14, of the Company to pay for the Firm Power purchased by the Company under this Agreement. On an annual basis, the amounts of HLH and LLH Firm Energy that the Company agrees to purchase from BPA is specified in section 9(b) of this Agreement. The monthly amounts of HLH and LLH Firm Energy shall be as specified in Exhibit D. The monthly Demand amounts, for the purposes of this Take-or-Pay Obligation, shall be the monthly Demand amounts specified in Exhibit D. If the calculation of the Take-or-Pay Obligation for a Contract Year for which Demands are not yet required to be specified under section 10(a) becomes relevant, then the Demands for such Contract Year shall be calculated by dividing the annual HLH Firm Energy, if any, for each such Contract Year, as specified in section 9(b), by the number of HLH in a Contract Year. Weekly, daily, and hourly amounts of HLH and LLH Firm Energy are the amounts submitted by the Company pursuant to section 10 of this Agreement.

7.  **EXHIBITS; INTERPRETATION**

Exhibit A (General Contract Provisions), Exhibit B (Fees for Remarketing), Exhibit C (Rate Schedule), Exhibit D (Monthly Amounts of Firm Power), Exhibit E (Points of Delivery), Exhibit F (Unrecoverable Costs and Transfer Costs), Exhibit G (Stability Reserve Scheme(s)), Exhibit H (Arbitration Procedures), and Exhibit I (Use-of-Facilities Charge) are attached hereto and made a part of this Agreement. If there is a conflict between the body of this Agreement and any exhibit, then the

(c) **Other Purchases**

This Agreement does not limit the Company's right to purchase power from BPA, consistent with Federal statutes, under other agreements, or to purchase power from third parties.

(d) **Minimum Demand for Transmission**

A Company may elect to specify a minimum level of Demand for transmission for any month for the remaining term of this Agreement at the time the Company makes its submission of monthly amounts of Firm Power. Any request to specify a minimum level of Demand made after February 1, 1996, shall be subject to available transmission capacity as described in section 10(a). The Company may assign any excess minimum Demand for transmission consistent with terms for Assignment of Transmission Service under BPA's Point-to-Point Transmission Service Tariff. The amount of minimum Demand for transmission as elected or assigned shall be specified in Exhibit D.

10. **MONTHLY, WEEKLY, DAILY, AND HOURLY AMOUNTS OF FIRM POWER**

(a) **Monthly Amounts of Firm Power**

Not later than the February 1, immediately prior to October 1 of each Contract Year, the Company shall specify monthly amounts of Demand and HLH and LLH Firm Energy for such Contract Year. The total of the monthly amounts of HLH and LLH Firm Energy shall equal the annual amounts specified in section 9(b) for such Contract Year. The Company may set its Demand in each month in the 1996-1997 Contract Year at any level up to its Contract Demand. Any increase in amounts of Demand for a specific month in a later Contract Year above the greater of: (1) the amount of Demand for such month in the previous Contract Year; or (2) the minimum level of Demand for transmission specified in Exhibit D; is subject to BPA's determination of available transmission capacity. If additional generating resources integrated at points with transmission capacity available to the

19                                    Contract No. 95MS-94861

Company's points of delivery are available for BPA's use or purchase, then BPA shall determine that transmission capacity is available under this Agreement. BPA shall also treat as available any transmission capacity made available by the Company to BPA through a reduction in demand under any other transmission agreement with BPA. If BPA determines that firm transmission capacity is not available for the Company's request, BPA will notify the Company within 60 days of the approved level of Demand. Each year, Exhibit D shall be revised to reflect the amounts specified by the Company, consistent with this section 10(a).

(b)     **Weekly, Daily, and Hourly Amounts of Firm Power**

The Company shall either: (i) provide advance submittals of weekly, daily, and hourly amounts of Firm Energy and any Excess Firm Energy pursuant to section 10(b)(1), which will remain as submitted unless changed pursuant to section 10(b)(2); or (ii) provide such submittals pursuant to the terms of section 10(b)(2) only.

(1)     **Advance Submittals of Weekly, Daily, and Hourly Amounts of Firm Energy**

The Company may submit weekly, daily, and hourly amounts in advance of, but not later than allowed under section 10(b)(2). Such advance submittals shall specify HLH and LLH amounts of Firm Energy to be delivered hereunder until the Company changes its submittal. The Company may change any advance submittal pursuant to section 10(b)(2). All advance submittals shall include a beginning and ending hour.

Contract No. 95MS-94861

    (6)    **Makeup Power**

At the Company's request, BPA shall sell and deliver to the Company energy in excess of the amount shown in Exhibit D (Makeup Power), at the applicable energy charge only established for Firm Energy in the Industrial Firm Power Rate in the Rate Schedule, to the extent that such energy is needed by the Company to restore its operations following a restriction. Such Makeup Power shall not subject the Company to any Unauthorized Increase or other charge.

## 18.   CURTAILMENT OR REMARKETING

The Company shall have a one-time option, at the time the Company makes its first submission of monthly amounts of Firm Power pursuant to section 10(a) of this Agreement, to either: curtail its purchases pursuant to section 18(a); or remarket Excess Firm Energy pursuant to section 18(b). Following the Company's election, BPA and the Company shall operate under the terms and conditions of either section 18(a) or section 18(b), as applicable.

(a)    **Curtailment of Excess Firm Energy for a Fixed Fee**

The Company may curtail its Plant Load below the sum of its Take-or-Pay Obligation plus any amount of Non-Federal Service the Company identifies at the time it elects this curtailment option. BPA shall relieve the Company of its Take-or-Pay Obligation for Demand and Firm Energy for any such curtailed amounts and the Company shall pay BPA the fixed curtailment fee in mills per kilowatthour for each kilowatthour of such curtailed amounts, as specified in the Rate Schedule. Selection of this curtailment option shall relieve the Company of its obligation to pay the use-of-facilities charge specified in Exhibit I for amounts of curtailed energy.

(1)    The Company shall provide BPA as much notice as possible, but not less than 48 hours, of any curtailment of Firm Power usage.

    Contract No. 95MS-94861

(2)     If the Company chooses to use Non-Federal Service for part of its Plant Load, the Company shall specify the monthly amounts of demand, HLH energy, and LLH energy of Non-Federal Service, if any, for the term of this Agreement. BPA shall not be obligated to serve these specified monthly amounts, and any service to these amounts shall be subject to an Unauthorized Increase charge, as provided for in section 15(c).

(3)     Curtailed energy shall be equal to the Company's Take-or-Pay Obligation for Firm Energy reduced by the relief from take-or-pay provisions of section 14, minus the Measured Energy for Firm Power delivered under this Agreement.

(4)     Election of this curtailment option operates to assign the Company's right to transmit an amount of energy equal to the curtailed energy to BPA.

(b)   **Remarketing Excess Firm Energy Without a Fixed Fee**

(1)   **Notice and Request to Remarket**
The Company shall request that BPA remarket Excess Firm Energy by notifying BPA of:

(A)     the amount and minimum duration of Excess Firm Energy to be remarketed; and

(B)     the manner pursuant to section 18(b)(2) in which the Company wants BPA to remarket the Excess Firm Energy.

(2)   **Remarketing Options**
The Company may select one or more of the following options for remarketing Excess Firm Energy:

Contract No. 95MS-94861

(A)   The Company may identify one or more Qualified Purchasers
      that have agreed to purchase some or all of the Excess Firm
      Energy under specified terms and conditions at agreed-upon
      prices or price formulas and for agreed-upon amounts and
      durations. The Company shall provide BPA at least the notice
      specified in section 18(b)(3) prior to the date that deliveries are
      to begin under each proposed sale.

(B)   The Company may arrange in advance for a Qualified
      Purchaser(s) to purchase any Firm Power that becomes Excess
      Firm Energy during any period for which the Company and a
      Qualified Purchaser may agree. The Company shall provide
      BPA at least the notice specified in section 18(b)(3) prior to the
      date on which the prearrangement becomes effective. In
      addition, the Company shall notify BPA as required in
      section 10(b) when deliveries are to begin under the
      arrangement.

(C)   The Company may request that BPA find purchasers for the
      Excess Firm Energy. If the Company chooses, it may request
      that BPA seek sales of specified amounts for daily, weekly,
      monthly, or other specified durations, and the Company may
      specify minimum prices or price ranges for the sales. BPA and
      the Company shall agree on the price of the sale at the time of
      the transaction unless the daily limitations in
      section 18(b)(4)(E) apply. BPA shall promptly notify the
      Company of the sales made on the Company's behalf.

(D)   The Company and BPA may agree to a price for use in
      crediting the Company's wholesale power bill under
      section 18(b)(4). BPA shall have discretion to dispose of or use

such Excess Firm Energy without regard to the procedures associated with other options for disposal, and the Company shall have no further rights with respect to such Excess Firm Energy that is subject to such agreement.

(3) **Applicability of Preference Provisions**

Excess Firm Energy remarketed by BPA shall be subject to applicable statutory provisions regarding preference. BPA shall notify the Company within the time period specified below if BPA or another Qualified Purchaser with public preference has elected to perform the agreement.

| Duration of Sale | Minimum Notice Period to Notify BPA | Maximum Period for BPA to Respond to Company |
|---|---|---|
| Up to 1 month | 48 hours | 24 hours |
| Up to 6 months | 7 days | 2 days |
| Over 6 months | 14 days | 7 days |
| Prearrangements under section 18(b)(2)(B) | 21 days | 14 days |

(4) **Crediting the Company's Wholesale Power Bill**

(A) During months when Excess Firm Energy is being remarketed by BPA, such power shall continue to be included in the amount of Firm Power billed by BPA as if delivered to the Company.

(B) BPA may sell the Excess Firm Energy to the Qualified Purchaser(s) as arranged by the Company under options section 18(b)(2)(A) and section 18(b)(2)(B) or dispose of such power on whatever alternative terms that BPA may separately arrange. In either event, BPA shall credit the Company for the Excess Firm Energy revenues based on the price(s) agreed to

between the Company and the Qualified Purchaser(s) net of the amounts specified in section 18(b)(4)(C).

(C)    BPA shall determine the revenues for Excess Firm Energy delivered during a month by subtracting from the amount paid by the Qualified Purchaser (or the amount agreed to be paid or credited if BPA elects not to remarket to the Qualified Purchaser, disposes of or uses the Excess Firm Energy under section 18(b)(2)(D), or remarkets the Excess Firm Energy under section 18(b)(2)(C)): (i) any applicable transmission charges or losses specified in section 18(b)(4)(F); and (ii) the remarketing fee, as specified in Exhibit B. The fee or the pro rata share of the fee that the Company would have paid to another entity under a transaction under section 18(b)(2)(B) shall be deducted from revenues when BPA elects to retain the Excess Firm Energy for itself. No charges shall apply under section 18(b)(4)(C)(i) and section 18(b)(4)(C)(ii) when BPA uses such Excess Firm Energy for its own use or disposes of such Excess Firm Energy under section 18(b)(2)(D).

(D)    BPA shall credit the Company's wholesale power bill for revenues from sales of Excess Firm Energy in the month in which BPA uses such Excess Firm Energy for its own use or disposes of such Excess Firm Energy under section 18(b)(2)(D), BPA is paid for such Excess Firm Energy under section 18(b)(2)(C), or BPA is paid for such Excess Firm Energy by the Qualified Purchaser. If the amount of the credit during any month exceeds the power bill amount, then BPA shall pay the Company the amount of the difference.

(E)    BPA shall credit the Company for sales made under section 18(b)(2)(C) on Company's behalf subject to the

    Contract No. 95MS-94861

limitations in this paragraph. For sales of 1 month duration or less, if BPA notified the Company at the start of a transaction that it was subject to daily remarketing limitations and BPA is simultaneously remarketing power for the Company and selling nonfirm energy on a daily basis, then the Company shall receive credit for the energy that BPA remarkets on the Company's behalf on such days at BPA's average sale price for nonfirm energy (including remarketed energy) for such day; **provided, however,** BPA shall have no obligation to credit the Company at such average daily price to the extent that the total amount of Excess Firm Energy remarketed under similar contract provisions for the Company and other entities providing for daily remarketing limitations exceeds the following limits:

| If BPA's actual daily average sales (excluding remarketed amounts) are | | Limit to total amount of remarketed energy: |
|---|---|---|
| equal to or greater than (aMW) | but less than (aMW) | (aMW) |
| 0 | 600 | 25% of BPA actual sales |
| 600 | 1,000 | 200 |
| 1,000 | 1,500 | 250 |
| 1,500 | 3,000 | 300 |
| 3,000 | 4,000 | 400 |
| 4,000 | 5,000 | 500 |
| 5,000 | - - | 600 |

In the event the above limits are exceeded, the Company shall be credited for its pro rata share of remarketed energy at the average daily price. All sales of remarketed energy for each day under the daily remarketing limitations shall be considered made under a single active schedule to determine remarketing fees. Sales of remarketed energy under the daily remarketing limitations shall be considered made over the southern intertie during the months of April through July, and

in the Pacific Northwest during other months. The Company may request that BPA remarket the remainder of its Excess Firm Energy at the best available price for additional energy, or the Company may arrange to store the Excess Firm Energy for sale at another time. BPA shall not discriminate against the Company in the storage or disposal of such remaining Excess Firm Energy.

(F)     There are no additional transmission charges for Excess Firm Energy except when:

    (i)      BPA incurs incremental transfer costs, including losses.

    (ii)     the Qualified Purchaser receiving delivery would have paid a charge for low-voltage delivery higher than the charge, if any, paid by the Company.

The Company shall pay such incremental costs. Any deliveries of Excess Firm Energy over BPA's interties shall be charged BPA's standard intertie tariffs. Losses will be valued at the price of the remarketed power.

## 19. LOAD REGULATION, UNBUNDLED PRODUCTS, AND OTHER TRANSMISSION PRODUCTS

### (a) Purchase of Load Regulation

If the Company is within BPA's Control Area, or if BPA provides load regulation services to the Company through a third party, the Company shall purchase load regulation from BPA. The charge for load regulation shall be as specified in Exhibit C.



### Department of Energy

Bonneville Power Administration
P.O. Box 3621
Portland, Oregon 97208-3621

POWER BUSINESS LINE

March 23, 1998

In reply refer to: PSB/Spokane

Amendatory Agreement No. 1 to
Contract No. 95MS-94861

Mr. Peter Forsyth
Vice President, NW External Affairs
Kaiser Aluminum & Chemical Corporation
825 NE. Multnomah, Suite 960
Portland, OR 97232

Dear Mr. Forsyth:

This letter agreement (Amendatory Agreement) constitutes an amendment to Contract No. 95MS-94861
(Power Sales Agreement) between the Bonneville Power Administration (BPA) and Kaiser Aluminum &
Chemical Corporation (Company). BPA and the Company are hereinafter sometimes referred to
individually as "Party" and collectively as "Parties." BPA and the Company have executed an interim
transmission services agreement (hereinafter referred to as "Interim PTP Service Agreement") under
which BPA has provided Point-to-Point Transmission Service over the Federal Columbia River
Transmission System (FCRTS) pursuant to the terms and conditions of the Point-to-Point Transmission
Services tariff and the 1996 Point-to-Point Firm Transmission Rate Schedule (PTP-96). The Parties are
negotiating the terms and conditions of a final transmission service agreement (Final PTP Service
Agreement) which will supersede the Interim PTP Service Agreement. The Parties have agreed to
amend the Power Sales Agreement as follows:

1.   **EFFECTIVE DATE.** This Amendatory Agreement, when executed, shall become
effective as of the date that the Interim PTP Service Agreement becomes effective.

2.   **DEFINITIONS.** All capitalized terms used herein shall be as defined in the Power
Sales Agreement or, if not defined in the Power Sales Agreement, as defined in the General Rate
Schedule Provisions, unless otherwise specified in this Amendatory Agreement.

"PTP Service Agreement" shall mean the Interim or Final PTP Service Agreement, as
applicable.

3.   **AMENDMENT OF POWER SALES AGREEMENT.** The Power Sales Agreement is
amended as follows:

(a)   Section 8(b)(2) is deleted and replaced by the following:

section 14, minus the Measured Energy for Firm Power delivered under this Agreement."

(k)    A new section 18(b)(1)(C) is added as follows:

"(C)    the assignment to BPA of that portion of its rights under the PTP Service Agreement, associated with the energy to be remarketed and necessary to allow BPA to use such assigned rights to remarket Excess Firm Energy for the Company, subject to the assignment provisions of the Point-to-Point Transmission Services tariff and the terms of section 18(b)(4)(F)."

(l)    Section 19(d) is deleted and replaced by the following:

"(d)    **Unbundled Products and Other Transmission Services.** BPA shall offer to the Company the ancillary services, the network integration transmission product, the point-to-point transmission product, and the intertie transmission products that BPA offers to its utility customers. BPA may offer to the Company other unbundled services. If the Company elects to purchase such products, the Parties agree to amend the appropriate provisions of this Agreement and/or the PTP Service Agreement."

(m)    Section 19(f) is deleted in its entirety.

(n)    Section 20(a) is deleted and replaced by the following:

"(a)    **Delivery to Company's Firm Load.** BPA shall make available Firm Power at the points of interconnection specified in Exhibit C-1 of the PTP Service Agreement. Delivery of such Firm Power over the Network to the Company's Plant Load shall be as provided for in the PTP Service Agreement."

(o)    Section 20(b) is deleted and replaced by the following:

"(b)    **Other Provisions Relating to Delivery.** Other provisions applicable to delivery (1) at the points of interconnection specified in Exhibit C-1 of the PTP Service Agreement shall be as specified in Exhibit A of this Agreement, and (2) over the Network to the Company's Plant Load shall be as specified in the PTP Service Agreement."

(p)    Section 26 is deleted and replaced by the following:

"**26. DAMAGES FOR FAILURE BY BPA TO DELIVER.** In the event BPA fails to deliver the hourly amounts of Firm Energy scheduled by the Company under this Agreement to the plant's Point of Delivery, and such delivery is not restricted by BPA pursuant to its Reserve rights under this Agreement, or pursuant to the curtailment rights under the PTP Service Agreement, or such delivery is not excused by section 4(f) of Exhibit A, BPA shall pay the Company (on the date payment by the Company for the Firm Energy would otherwise have been due under this Agreement):

Contract No. 95MS-94861

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

Puget Sound Energy, Inc., et al.    )    Docket Nos.  EL01-10-000
                       )                               EL01-10-001

## AFFIDAVIT OF WITNESS

I, Joseph P. Hoerner, being duly sworn, depose and say that the

statements and exhibits contained in the testimony on behalf of Kaiser Aluminum

& Chemical Corporation is this proceeding are true and correct to the best of my

knowledge, information and belief.

Executed on this _24_ day of August, 2001.


Joseph P. Hoerner
_____
Joseph P. Hoerner

COUNTY OF MULTNOMAH
STATE OF OREGON

Subscribed and sworn to before me this _24_ day of August, 2001.

My Commission Expires: _May 4, 2004_


_____
Notary Public


OFFICIAL SEAL
JOEY LUU
NOTARY PUBLIC – OREGON
COMMISSION NO. 334239
MY COMMISSION EXPIRES MAY 4, 2004

EXHIBIT 5

# UNITED STATES OF AMERICA
## BEFORE THE
### FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Puget Sound Energy, Inc., | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | |
| v. | ) | Docket Nos. EL01-10-000 |
| | ) | EL01-10-001 |
| All Jurisdictional Sellers of Energy | ) | |
| And/or Capacity at Wholesale Into | ) | |
| Electric Energy And/or Capacity | ) | |
| Markets in the Pacific Northwest, | ) | |
| Including Parties to the Western | ) | |
| Systems Power Pool Agreement, | ) | |
| | ) | |
| Respondents. | | |

## PREPARED ANSWERING TESTIMONY OF
## JOSEPH P. HOERNER
## FOR
## KAISER ALUMINUM & CHEMICAL CORPORATION

1  Q.  PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.
2
3  A.  I am Joseph P. Hoerner. My business address is:

4           Joseph P. Hoerner
5           Energy Supply Manager
6           Kaiser Aluminum & Chemical Corporation
7           534 East Trent Ave., Suite 300
8           Spokane, Washington 99202
9
10  Q.  PLEASE DESCRIBE YOUR EDUCATION AND EXPERIENCE.

11  A.  I graduated from Gonzaga University in 1988 with a Bachelor of Science degree in

12     Electrical Engineering. I was enrolled in the MBA Program at Gonzaga University from

13     1993-1995. Starting in 1989, I have been employed by Kaiser Aluminum & Chemical

1

1      Corporation ("Kaiser"). Since 1995, I have been the Energy Supply Manager with

2      responsibility for managing electricity and natural gas purchases at Kaiser's Northwest

3      manufacturing facilities.

4  Q.    WHAT IS THE PURPOSE OF YOUR TESTIMONY?

5  A.    My testimony responds to the testimony of Wayne W. Nelson (WWN-1) submitted by

6      Clark Public Utilities ("Clark") that addresses a power purchase agreement between

7      Clark and the Bonneville Power Administration ("BPA"). Mr. Nelson characterized that

8      agreement as on sale of power from Kaiser to Clark, which is incorrect. To address other

9      issues in this proceeding, Kaiser supports the testimony submitted by other members of

10     the Transaction Finality Group.

11  Q.   PLEASE DESCRIBE KAISER'S FACILITIES IN THE NORTHWEST?

12  A.   Kaiser owns and operates two primary aluminum smelters and an aluminum rolling mill

13     in Washington State. At full operation, Kaiser employs approximately 2160 people and

14     Kaiser's electric load at these three facilities is approximately 630 MW. Kaiser is a direct

15     service industrial customer and, as such, BPA is authorized to sell power directly to

16     Kaiser for consumption.   Kaiser is interconnected directly to BPA's high-voltage

17     transmission system.

18  Q.   DESCRIBE KAISER'S CURRENT POWER SALE CONTRACT WITH BPA.

19  A.   In 1995, Kaiser signed a five (5) year power sales contract with BPA for service from

20     October 1, 1996 through September 30, 2001. Sales under this contract are at BPA's

21     1996 Industrial Power Rate, which was established by BPA under the Pacific Northwest

22     Electric Power Planning and Conservation Act.

1    The federal power sold under this contract was initially a delivered product, but in 1998,

2    Kaiser signed a long-term, point-to-point transmission agreement with BPA and

3    unbundled the power sale.  When purchasing federal power Kaiser takes delivery and

4    purchases at BPA's "System Point of Integration," where BPA's generation is

5    interconnected with BPA's transmission system. BPA then delivers the power under the

6    PTP transmission agreement to Kaiser's manufacturing facilities for consumption.

7    Kaiser's obligation to purchase under its power sale contract with BPA is to take-or pay.

8    To provide mitigation for this take-or-pay obligation, the contract includes a one-time

9    option to select either a right to curtail for a fixed fee or a remarketing arrangement.

10   (Excerpts from the 1995 Power Sales Contract are attached hereto as Exhibit JPH-1).

11   Kaiser selected the remarketing arrangement.

12   Q.   TO WHAT POWER DOES THE REMARKETING ARRANGEMENT APPLY?

13   A.   This contractual arrangement applies to federal power that becomes excess to Kaiser's

14        needs due to a reduction in Kaiser's plant operations.

15   Q.   DOES KAISER PURCHASE AND RESELL FEDERAL POWER UNDER THIS

16        CONTRACTUAL ARRANGEMENT?

17   A.   No. BPA did not give Kaiser a contractual right to resell federal power but insisted that

18        BPA must sell any federal power which Kaiser did not take. To balance the risks to

19        Kaiser of the take-or-pay obligation, BPA agreed to contractual provisions by which a

20        credit was determined for federal power which Kaiser did not take due to reduced

21        manufacturing operations.  Under these contractual arrangements, BPA sells federal

22        power to another buyer, instead of selling to Kaiser.

3

1  Q.  PLEASE SUMMARIZE KAISER'S RIGHTS AND OBLIGATIONS UNDER THIS

2      CONTRACTUAL ARRANGEMENT?

3  A.  Kaiser gives notice to BPA of the amount and duration of the curtailment of its

4      manufacturing operations and requests that BPA sell the federal power to an entity other

5      than Kaiser.  Kaiser may identify a buyer willing to purchase from BPA at specified

6      terms or request BPA to find a purchaser.

7  Q.  PLEASE  SUMMARIZE  BPA'S  RIGHTS  UNDER  THIS  CONTRACTUAL

8      ARRANGEMENT?

9  A.  Following requisite notice, BPA has at least 24 hours to decide on several options under

10     the contract.  BPA can sell the power to a different purchaser with public preference on

11     the same terms as Kaiser's notice; BPA can retain the power for its own use or dispose of

12     the power on whatever alternative terms BPA may separately arrange; or BPA may offer

13     a contract for sale of the power to the buyer in Kaiser's notice.

14     If BPA chooses to sell the power to the buyer in Kaiser's notice, then BPA will offer a

15     power sales contract to the buyer and, if accepted, BPA also will agree with Kaiser for

16     crediting of payments as required by the contractual arrangement in the 1995 Contract.

17     BPA bills and collects revenue from this buyer and disburses net revenue to Kaiser.  If

18     BPA sells to a different buyer at a different price or retains the power for its own use,

19     BPA still credits Kaiser for sale revenue based on the price in Kaiser's notice.  The notice

20     price establishes the mitigation to Kaiser for not purchasing the federal power; the notice

21     does not determine the price or to whom BPA sells the power.

4.

1   Q.   UNDER THIS CONTRACTUAL ARRANGEMENT, DOES KAISER HAVE THE

2        FINAL SAY REGARDING WHETHER THE POWER WILL BE RETAINED BY BPA

3        OR SOLD TO A THIRD PARTY?

4   A.   No.

5   Q.   UNDER THIS CONTRACTUAL ARRANGEMENT, DOES KAISER ULTIMATELY

6        DETERMINE WHO WILL BUY THE POWER FROM BPA?

7   A.   No.

8   Q.   UNDER THIS CONTRACTUAL ARRANGEMENT, IS KAISER ALWAYS

9        ENTITLED TO KNOW TO WHOM THE POWER IS SOLD OR THE PRICE AT

10       WHICH THE POWER IS SOLD?

11  A.   No.  If BPA decides to retain the power or sell to a different purchaser with public

12       preference other than the buyer in Kaiser's notice, BPA is not obligated to inform Kaiser

13       of the buyer or the price.

14  Q.   UNDER THIS CONTRACTUAL ARRANGEMENT, WHEN THE POWER IS

15       DISPOSED OF BY SALE TO A THIRD PARTY, IS THE CONTRACT FOR THE

16       SALE OF POWER ENTERED INTO BETWEEN KAISER AND THIS THIRD PARTY

17       PURCHASER OF POWER?

18  A.   No.

19  Q.   UNDER THIS CONTRACTUAL ARRANGEMENT, COULD KAISER SET THE

20       PRICE FOR OTHER AMOUNTS OF ENERGY SOLD BY BPA TO THIRD PARTIES,

21       OR FOR ANY ENERGY SOLD BY THIRD PARTIES?

22  A.   No.

1  Q.  DURING THE PERIOD BETWEEN DECEMBER 25, 2000 AND JUNE 20, 2001 DID

2       KAISER CURTAIL ITS INDUSTRIAL OPERATIONS IN THE NORTHWEST?

3  A.  Yes, and Kaiser exercised this contractual arrangement to request BPA to sell the federal

4       energy that Kaiser would no longer buy to another purchaser by submitting notices to

5       BPA.

6  Q.  WHO SUBMITTED THESE NOTICES TO BPA?

7  A.  I submitted those notices to BPA on behalf of Kaiser.

8  Q.  HOW DID YOU ATTEMPT TO IDENTIFY A POTENTIAL BUYER TO WHOM

9       YOU WOULD PROPOSE THAT BPA SELL POWER?

10  A.  I called three or four marketers and asked each one if it was interested in buying an

11       amount of power from BPA during a defined period and, if so, what price would the

12       buyer offer. I also reviewed estimated forward price quotes provided by TFS Energy and

13       price quote information available to Kaiser from the Enron on-line service. I was not

14       setting prices, but taking price quotes. Based on the prices offered by the potential

15       buyers, their credit worthiness, and other factors, I narrowed the field and identified my

16       preference in the notice to BPA.

17  Q.  DID ALL NOTICES TO BPA RESULT IN A SALE BY BPA TO THE BUYER IN

18       KAISER'S NOTICE?

19  A.  No. Sometimes BPA decided to retain the energy for its own use. Sometimes, after the

20       minimum 24 hour notice period that BPA has under the 1995 power sales contract to

21       consider its options, the buyer would decide not to sign the power sale agreement when

22       offered by BPA and Kaiser would withdraw its notice.

1   Q.   DID KAISER EXERCISE CONTROL OVER BPA'S SALES IN THE MARKET

2        PLACE?

3   A.   No. BPA could and did refuse to offer a contract to the buyer in the notice and, instead,

4        BPA chose to retain the power for its own use or sell the power under terms unknown to

5        Kaiser.

6   Q.   WHO INITIATED BPA'S SALE TO CLARK?

7   A.   A consultant for Clark, Mr. Dana Zentz, contacted me in January 2001. He told me that

8        Clark had an open position for August and September 2001 and knew that BPA may have

9        a block of federal power for sale because Kaiser had curtailed its manufacturing

10      operations.

11  Q.   HOW DID YOU RESPOND?

12  A.   I told Mr. Zentz that Kaiser had not yet submitted a notice to BPA for all the federal

13      energy which Kaiser would not purchase from BPA in August and September 2001.

14      Because Kaiser was interested in submitting a notice to BPA with a named buyer that

15      would resell the energy it purchased from BPA for consumption in the Northwest, we

16      agreed that Kaiser and Clark would independently approach other potential buyers and

17      sellers to determine a price for August and September 2001 that could be included in

18      Kaiser's notice to BPA for a potential BPA sale to Clark.

19      Kaiser offered to discount the price because the power would stay in the Northwest and

20      in the expectation that Clark would publicly acknowledge that the BPA sale was below

21      market quotes Clark had received from other sellers and provided a savings to Clark.

22  Q.   WHAT WAS THE PRICE IN THE NOTICE SUBMITTED TO BPA?

23  A.   The notice to BPA included a price of $325 per MWH.

1   Q.   WHAT WAS THE PURPOSE OF THE LETTER AGREEMENT (EXHIBIT WWN-2)

2        BETWEEN CLARK AND KAISER DISCUSSED IN MR. NELSON'S TESTIMONY?

3   A.   Mr. Zentz asked for a written statement to put before Clark's Board that explained the

4        mechanics of Kaiser's notice to BPA, explained the possibility that BPA may choose not

5        to sell the power at all or not to sell the power to Clark, explained that Clark's power sale

6        contract, if offered by BPA, would be with BPA for federal power, committed Kaiser to

7        keep its notice to BPA open long enough for Clark to obtain financing, and showed the

8        discounting of the price to be included in the notice to a present value payment. Clark

9        was concerned with Kaiser's creditworthiness and wanted clarification that Clark's power

10       sales contract, if offered, would be with BPA for federal power, and not with Kaiser.

11  Q.   DID THE LETTER AGREEMENT COMMIT KAISER TO SELL POWER TO

12       CLARK?

13  A.   No.  Kaiser cannot and did not resell federal power. The letter agreement is not a power

14       sales contract, but only an agreement to submit the notice to BPA.

15  Q.   DID THE LETTER AGREEMENT COMMIT CLARK TO BUY POWER FROM BPA?

16  A.   No.  BPA did not become obligated by Kaiser's notice to offer a power sales contract to

17       Clark.  Even if BPA decided to offer a power sales contract to Clark, the letter agreement

18       did not commit Clark to sign BPA's contract.

19  Q.   DID YOU SUBMIT A NOTICE TO BPA IDENTIFYING CLARK AS THE

20       POTENTIAL BUYER FROM BPA?

21  A.   Yes.  I submitted a notice on February 2, 2001.

8

WAS:89253.1

1   Q.   DID BPA EXECUTE A POWER SALES AGREEMENT WITH CLARK FOR

2         AUGUST AND SEPTEMBER 2001?

3   A.   Yes, BPA decided to offer a power sales contract to Clark rather than retain the power for

4        its own use or sell the power to another buyer on the same or different terms.  Only when

5        BPA offered and Clark decided to sign the BPA power sales contract for this two-month

6        sale did Clark become obligated to purchase this federal energy.  Clark's purchase

7        obligation is with BPA.

8   Q.   HAVE YOU REVIEWED THIS AGREEMENT?

9   A.   Yes, it is included as Exhibit WWN-3 to Mr. Nelson's testimony.  It provides that the

10        BPA sale to Clark is for surplus federal power.  BPA sells surplus federal power only

11        under its FPS-96 rate.  The reference contract in this agreement is Clark's 1981 Power

12        Sales Contract with BPA.

13  Q.   WITH WHOM WERE YOUR DISCUSSIONS WITH CLARK?

14  A.   Except for the one instance discussed below, I am the only person with Kaiser that

15        discussed these matters with Clark or its consultant.  All my discussions were with Mr.

16        Zentz, except one brief phone conversation on February 2, 2001, in which I was joined by

17        Pete Forsyth, Kaiser Vice President for Northwest Regional Affairs, and Mr. Zentz was

18        joined by Mr. Nelson.  The only matter discussed during this call was that Mr. Forsyth

19        and I informed Mr. Nelson that Kaiser had agreed to send a letter to him that committed

20        Kaiser not to withdraw its notice to BPA through February 6, 2001.

9

1    Q.    BASED UPON YOUR KNOWLEDGE OF THE FACTS AND CIRCUMSTANCES

2        ASSOCIATED WITH CLARK'S PURCHASE OF POWER FROM BPA, DO YOU

3        BELIEVE THAT CLARK SHOULD BE DUE A REFUND FROM KAISER?

4    A.    No. My testimony shows that Kaiser did not sell power to Clark, and Kaiser had no

5        control over the terms and conditions of BPA's sale of power to Clark. As a result, there

6        is no nexus between Kaiser and any claim Clark may assert.

7    Q.    IF CLARK'S EFFORT TO RENEGOTIATE THE PRICE OF ITS TRANSACTION

8        WITH BPA IS ULTIMATELY IS SUCCESSFUL, WHAT WOULD BE THE

9        CONSEQUENCE?

10    A.    Industrial customers that are contractually entitled to release power under their contracts,

11        thereby allowing BPA and other utilities to sell that power into the market when the

12        market is seeking additional energy (for instance, because of a relatively dry year), will

13        be discouraged from doing so. Instead, these industrial customers will have a greater

14        incentive to consume that power, and avoid any contingent financial exposure. This

15        result would reduce the aggregate amount of power available for sale on the open market

16        at just the time when the market is signaling that it needs additional supplies. This could

17        result in area-wide black-outs rather than voluntary, economic curtailments by industrial

18        customers.

19    Q.    DOES THIS CONCLUDE YOUR TESTIMONY?

20

21    A.    Yes, it does.

10

Contract No. 95MS-94861
October 30, 1995

## POWER SALES AGREEMENT

between the

UNITED STATES OF AMERICA

DEPARTMENT OF ENERGY

acting by and through the

BONNEVILLE POWER ADMINISTRATION

and

KAISER ALUMINUM & CHEMICAL CORPORATION

### Index to Sections

| Section | | Page |
|---|---|---|
| 1. | Effective Date and Term | 3 |
| 2. | Deliveries of Firm Power Between the Effective Date and Commencement Date | 3 |
| 3. | Commencement of Deliveries of Firm Power | 4 |
| 4. | Termination of Prior Contract and Other Contracts | 4 |
| 5. | Termination of This Agreement | 5 |
| 6. | Definitions | 9 |
| 7. | Exhibits; Interpretation | 16 |
| 8. | Contract Revisions and Waivers | 17 |
| 9. | Purchase and Sale of Annual Take-or-Pay Firm Energy | 18 |
| 10. | Monthly, Weekly, Daily, and Hourly Amounts of Firm Power | 19 |
| 11. | Rate Test Compliance | 22 |
| 12. | Rates and Charges | 23 |
| 13. | Billing and Payment | 23 |
| 14. | Relief from Take-or-Pay Obligation | 27 |
| 15. | Unauthorized Increase Charges | 28 |
| 16. | Changes in Firm Power Amounts | 29 |
| 17. | Reserves | 29 |
| 18. | Curtailment or Remarketing | 36 |
| 19. | Load Regulation, Unbundled Products, and Other Transmission Products | 42 |
| 20. | Provisions Relating to Delivery of Firm Power | 45 |
| 21. | Assignment of Agreement | 45 |
| 22. | Dispute Resolution | 45 |
| 23. | Force Majeure | 49 |

## Index to Sections

| Section | | Page |
|---|---|---|
| 24. | Notices | 50 |
| 25. | Hold Harmless | 51 |
| 26. | Damages for Failure by BPA to Deliver | 51 |
| 27. | Obligations During Performance of This Agreement | 52 |
| 28. | Third Parties | 52 |
| 29. | Severability | 52 |
| 30. | Entire Agreement | 53 |
| 31. | Signature Clause | 54 |
| | Exhibit A    (General Contract Provisions) | 16 |
| | Exhibit B    (Fees for Remarketing) | 16 |
| | Exhibit C    (Rate Schedule) | 16 |
| | Exhibit D    (Monthly Amounts of Firm Power) | 16 |
| | Exhibit E    (Points of Delivery) | 16 |
| | Exhibit F    (Unrecoverable Costs and Transfer Costs) | 16 |
| | Exhibit G    (Stability Reserve Scheme(s)) | 16 |
| | Exhibit H    (Arbitration Procedures) | 16 |
| | Exhibit I    (Use-of-Facilities Charge) | 16 |

This POWER SALES AGREEMENT, executed ___11 / 6___, 1995, by the UNITED STATES OF AMERICA (Government), Department of Energy, acting by and through the BONNEVILLE POWER ADMINISTRATION (BPA or Bonneville), and KAISER ALUMINUM & CHEMICAL CORPORATION (Company), a corporation incorporated under the laws of the State of Delaware. BPA and the Company are hereinafter sometimes referred to individually as "Party" and collectively as "Parties."

## WITNESSETH:

WHEREAS pursuant to section 5(d) of the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act), BPA is authorized to sell power to the Company; and

WHEREAS on August 31, 1981, BPA and the Company entered into Contract No. DE-MS79-81BP-90351, hereinafter referred to as "Prior Contract"; and

WHEREAS this Agreement provides for the termination of the Prior Contract; and

6. **DEFINITIONS**

(a)    "Agreement" means this Power Sales Agreement, Contract No. 95MS-94861.

(b)    "Commencement Date" means the date that deliveries commence under this Agreement.

(c)    "Contract Demand" means the maximum integrated hourly rate of delivery that the Company may request under this Agreement and is equal to 669.54 megawatts. The Contract Demand shall not be increased except through:

(1)    a process conducted pursuant to section 5(d)(3) of the Northwest Power Act that provides for BPA to acquire increased reserves from its direct service industrial companies; or

(2)    a technological allowance which BPA shall grant upon the Company's demonstration to BPA that such allowance meets the criteria for a technological allowance under the Prior Contract.

(d)    "Contract Year" means the period that begins on October 1 and ends on the following September 30.

(e)    "Control Area" or "Load Control Area" means the electrical (not necessarily geographical) area within which a controlling utility operating under all North American Electric Reliability Council standards has the responsibility to adjust its generation on an instantaneous basis to match internal load and power flow across interchange boundaries to other Control Areas. A utility operating a Control Area is called a "controlling utility."

(f)    "Demand" means the maximum integrated hourly rate of delivery during each month of each Contract Year for Firm Power deliveries under this Agreement, as specified in Exhibit D.

(g)    "Effective Date" means the date that this Agreement is signed by BPA.

(h)    "Event" means the period during which BPA restricts service to the Company under this Agreement to obtain Operating Reserves or Stability Reserves. The Event shall commence with the reduction in deliveries to the Company under this Agreement due to a BPA request for Operating Reserves or a transfer trip or signal that initiates Stability Reserves restriction. Unless reinstated as provided herein, the Event shall end when BPA's dispatcher notifies the Company that the load restricted for such reserves can be restored to service. Notwithstanding the foregoing, the Event will end (subject to reinstatement as provided herein) when system conditions occur that would result in tripping the Company for undervoltage or underfrequency load shedding. Any BPA restriction or series of BPA restrictions that make up an SR Event shall be treated as part of a single Event.

After an Event has ended, the Event shall be reinstated and continue as follows:

(1)    if the Event Magnitude was less than (Federal Load) x (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 10 hours;

(2)    if the Event Magnitude was equal to or greater than (Federal Load) x (15 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves from the Company again within 21 hours;

Contract No. 95MS-94861

      (3)    if the Event Magnitude was equal to or greater than (Federal Load) × (30 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 42 hours;

      (4)    if the Event Magnitude was equal to or greater than (Federal Load) × (60 minutes), then the Event shall be reinstated if BPA requests Reserves again within 84 hours; and

      (5)    if the Event Magnitude was equal to or greater than (Federal Load) × (90 minutes), then the Event shall be reinstated if BPA requests or obtains Reserves again within 126 hours.

(i)    "Event Duration" means the total cumulative Event Minutes of the Event.

(j)    "Event Magnitude" means a value calculated for each Event as the sum of: (Requested Operating Reserves × Event Minutes associated with the use of Operating Reserves) + (Amount of Load Tripped for Stability Reserves × duration of the SR Event in minutes) for each restriction during the Event. The Event Magnitude shall not include loads restricted pursuant to operating reserves and stability reserve rights that BPA has under other contracts.

(k)    "Event Magnitude Limit" means the Federal Load multiplied by 90 minutes.

(l)    "Event Minute(s)" means the minute(s) of restriction (or any portion thereof) during an Event.

(m)    "Excess Firm Energy" means Firm Energy that would have been delivered to the Company for service to its expected Plant Load but is excess due to a reduction in the Company's actual Plant Load.

(n)    "Federal Load" means an hourly amount of energy equal to the lesser of (1) 50 percent of the Process Load operating immediately prior to the Event,

Contract No. 95MS-94861

or (2) the sum of (A) 50 percent of the Firm Energy either scheduled to the Company, remarketed to other Qualified Purchasers, used by BPA, or any combination thereof, plus (B) 50 percent of the energy scheduled by Washington Water Power Company under its Firm Energy Sale Agreement with BPA, Contract No. 95MS-95104, **provided**, that the amount under section 6(n)(2)(B) shall not exceed 58 average megawatts.

(o)  "FERC" means the Federal Energy Regulatory Commission, or its successor.

(p)  "Firm Energy" means the Federal energy that the Company has agreed to purchase from BPA under this Agreement.

(q)  "Firm Power" means the monthly amounts of Demand and Firm Energy (HLH and LLH) purchased by the Company under this Agreement.

(r)  "Heavy Load Hours" or "HLH" means those hours that begin at 6 a.m. and end at 10 p.m., Monday through Saturday.

(s)  "Light Load Hours" or "LLH" means all hours that are not HLH.

(t)  "Material Plant Damage" means the inability of the Company to resume industrial production at all or any portion of its plant because of damage to plant production facilities resulting from a restriction; for example, the inability to resume electrolysis in one or more pots without rebuilding or substantially repairing such pot(s).

(u)  "Non-Federal Service" means, for the purposes of section 18(a) of this Agreement, the monthly amounts of demand, HLH energy and LLH energy that the Company chooses to acquire from non-Federal entities to serve a portion of its Plant Load during the term of this Agreement. The Company agrees that such amounts must be supplied to the Plant Load. The Company

Contract No. 95MS-94861

may purchase additional amounts of non-Federal energy that will not be used in calculating the amount of curtailed energy

(v)    "Occurrence" means a system condition that results in the need for Reserves.

(w)    "Operating Reserves" means nonspinning reserves, provided by the Company under this Agreement, that are necessary to enable BPA either to reestablish its load/resource balance after loss of generation or transmission facilities, or to meet any of its other existing nonspinning operating reserve obligations. Operating Reserves provided under this Agreement shall not include, without limitation: (1) Stability Reserves provided by the Company in this Agreement; (2) operating reserves provided by the Company in any other contract; and (3) any other reserves that BPA has acquired under other arrangements.

(x)    "Plant Load" means the total electrical energy load at Company facilities eligible for BPA service during any given time period whether the Company has chosen to serve its load with BPA power or non-Federal power.

(y)    "Process Load" means, for an aluminum facility or a chlor-alkali facility, the electrolytic load.

(z)    "Qualified Purchaser" shall mean a utility or entity which:  (1) is capable of performing the financial obligations undertaken for a sale or for an option to buy; (2) meets BPA's standards of service, including having an available transmission path; and (3) if required by State or Federal law, the purchaser has received all necessary approvals from appropriate regulatory bodies to conduct the transaction with BPA.

(aa)    "Rate Schedule" means the Industrial Firm Power Rate Schedule (IP-96.5), the Point-to-Point Transmission Rate Schedule, exclusive of the Delivery Charge therein (PTP-96.5), Ancillary Products and Services Rate Schedule

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Jointly Administered** |
| | : | |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION,** | : | **Chapter 11** |
| a Delaware corporation, et al., | : | |
| | : | **Hearing Date: 1/15/03 @ 10:00 a.m.** |
| Debtors. | : | **Response Date:  1/13/03 @ 4:00 p.m.** |
| _____ | : | |
| | : | |
| **PUBLIC UTILITY DISTRICT NO. 1 OF** | : | |
| **CLARK COUNTY,** | : | |
| | : | |
| Movant, | : | |
| | : | |
| vs. | : | **Re:  Docket No. 1555** |
| | : | **Re:  Agenda Item No. 1** |
| **KAISER ALUMINUM & CHEMICAL** | : | |
| **CORPORATION,** | : | |
| | : | |
| Respondent. | : | |

### OBJECTION OF DEBTOR AND DEBTOR IN POSSESSION KAISER ALUMINUM & CHEMICAL CORPORATION TO EMERGENCY MOTION OF PUBLIC UTILITY DISTRICT NO. 1 OF CLARK COUNTY FOR LIMITED RELIEF FROM THE AUTOMATIC STAY

Kaiser Aluminum & Chemical Corporation ("KACC"), one of the above-

captioned debtors and debtors in possession (collectively, the "Debtors"), hereby files this

Objection to the Emergency Motion of Public Utility District No. 1 of Clark County for Limited

Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (the

"Motion"), filed by the Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities

("Clark"). In support hereof, KACC incorporates by reference the Declaration of Joseph Patrick

Hoerner, which is attached hereto as Exhibit A[1] (the "Hoerner Dec."), and respectfully represents as follows:

## Preliminary Statement

1.    Clark's Motion should be denied because as demonstrated below, Clark simply seeks to conduct a fishing expedition under the guise of obtaining additional evidence to submit to the Federal Energy Regulatory Commission (the "FERC" or the "Commission") during the FERC's review of the Administrative Law Judge's Recommendations and Proposed Findings of Fact in the Puget Sound Proceeding (as defined below). Instead, Clark should be required to file a claim in KACC's bankruptcy case, and the Court, if necessary, can determine the amount of Clark's claim based on the FERC's decision.[2]  Under these circumstances, the automatic stay should be maintained and Clark's Motion for relief from the automatic stay denied.

2.    As noted in Clark's Motion, there is pending before the FERC a proceeding that, among things, involves a dispute between KACC and Clark regarding purchases of electricity that were made by Clark for delivery during August and September 2001. Although the transactional documents prove otherwise, Clark claims that KACC was the seller of the electricity, and in the ongoing proceeding before the FERC, Clark has sought an order from the FERC requiring KACC to refund amounts associated with the alleged sales.  The FERC proceeding is styled <u>Puget Sound Energy, Inc. v. All Sellers of Energy and/or Capacity at</u> <u>Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including</u>

---

[1]    The Hoerner Dec. was previously filed in support of KACC's objection to Clark's first Motion for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum & Chemical Corporation (D.I. 795), which was denied at a hearing on July 23, 2002.

[2]    The Motion should also be denied because Clark has previously indicated that it needs the additional discovery in order to bring another lawsuit for damages against KACC alleging violations of the Federal Power Act, 16 U.S.C. §§ 791-828c.  The Court denied Clark's request to bring another lawsuit at the July 23, 2002 hearing.

Parties to the Western Systems Power Pool Agreement, FERC Docket No. EL01-10-000, et al. (the "Puget Sound Proceeding").

        3.     More important, however, Clark's and KACC's versions of the facts were already presented to the FERC at an evidentiary hearing in the Puget Sound Proceeding. Clark had full opportunity to conduct discovery (which it did) prior to the Administrative Law Judge's ("ALJ") recommendation, which was based upon the evidentiary presentations as well as a voluminous record developed at that hearing. The ALJ's recommendation would bar the payment of any amount to Clark. Puget Sound Energy, Inc. v. All Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement, 96 FERC ¶ 63,044 (2001) (the "Recommended Decision").

        4.     Although the Recommended Decision currently is pending before the full Commission, the Commission granted a motion filed by the City of Tacoma to reopen the evidentiary record in the Puget Sound Proceeding. (See Order on Motions to Reopen Evidentiary Record dated December 19, 2002, issued by the Commission in the Puget Sound Proceeding (the "Discovery Order"), attached as Exhibit 1 to the Affidavit of Mark Sundback (the "Sundback Aff."),which is attached hereto as Exhibit B). The Discovery Order reopened the record to allow additional discovery to be conducted; it did not require that additional discovery be conducted as Clark contends in its Motion. (Motion at p. 8). Based on the Discovery Order, Clark filed the Motion, on an expedited basis, in order to conduct its fishing expedition under the pretext that Clark needed to pursue additional evidence to prevent the

improper determination of its claim by the FERC.[3]  The Motion is, in reality, an attempt to

conduct additional discovery in order to relitigate its claims it lost in the hearing before the ALJ

and to pursue additional claims against KACC.  The Bankruptcy Court should deny Clark's

request and order Clark to file a proof of claim, like all other creditors, for the amount of its

claim (if any), which can then be addressed during the claims resolution process after the FERC

has rendered its decision.

       5.     Moreover, Clark has not raised anything in its Motion that has not

previously been raised before the FERC or of which the FERC is not well aware.  Clark has not

even attempted to show what additional or new evidence it believes it can obtain from KACC, let

alone why this additional discovery might be necessary or helpful to the FERC.  Instead, Clark

states that it "anticipates that it will only need to send to Kaiser" a "data request" (which in all

likelihood involves multiple interrogatories and requests for documents), five depositions and

requests for admission.  This is not limited discovery.  Rather, it is a classic fishing expedition,

which the automatic stay was designed to prevent.  Moreover, to the extent the stay is lifted,

KACC would be exposed to the data requests of other parties.  In the Puget Sound Proceeding,

one source has served on numerous targeted companies a data request with over 250 separately

numbered requests (including separately designated sub-parts).  What Clark thus seeks through

its Motion is an opportunity for a second bite at the apple where it has previously lost.

Specifically, Clark seeks an order lifting the automatic stay so that it can relitigate issues that, at

least preliminarily, have been decided against it by the ALJ.

---

[3]     Clark's Motion now also complains of procedures adopted in the first phase of the FERC
proceeding.  Yet Clark did not voice such complaints at the time, and in fact agreed to
accept the procedural schedule and waived opportunities to seek cross-examination.  It
was only after Clark's effort to extract refunds was given no support by the Presiding
Judge that Clark seems to have developed objections to the Commission's procedures.

6.      Finally, there will be an enormous cost to KACC if Clark is allowed to start down the trail of relitigation. There will be the cost of filing appropriate pleadings, conducting and responding to discovery (including discovery from parties aside from Clark), possibly filing of testimony and the like. Moreover, all of this extra cost and effort will be for naught if the FERC issues a decision in the Puget Sound Proceeding finding that KACC was not the seller of the electricity or finds that Clark is not entitled to a refund. Furthermore, given the fact that the general bar date in the Debtors' chapter 11 proceedings has not yet expired and the claims resolution process has not yet begun, Clark will not be prejudiced if the automatic stay is maintained at least until the FERC rules in the Puget Sound Proceeding and determines whether Clark is entitled to a claim.

## Factual Background

### *The Power Sales Agreement Between KACC and The BPA*

7.      KACC owns two primary aluminum smelters and an aluminum rolling mill in Washington State. (Hoerner Dec. ¶ 2.) In order to obtain electric energy for its Washington facilities, in 1995 KACC signed a five-year Power Sales Agreement (the "PSA") with the Bonneville Power Administration (the "BPA") for service from October 1, 1996 through September 30, 2001. The PSA obligated the BPA to deliver electric energy to KACC and imposed a take-or-pay obligation upon KACC. The power sold under the PSA was "federal power" sold under the authority granted to the BPA by the Pacific Northwest Electric Power Planning and Conservation Act (the "Northwest Power Act"). (Hoerner Dec. ¶ 3.)

8.      Subsequent to entering into the PSA, KACC reduced production from its Washington facilities. As a direct consequence of reducing operations, KACC curtailed purchases of power from the BPA. Under the PSA, if KACC desired to curtail purchases from the BPA, it had to provide the BPA with notice of the amount and duration of the curtailment. In

conjunction with reduced consumption, KACC could request that the BPA, not KACC, sell the power to another entity. Thus, under the PSA, KACC could request that the BPA find a purchaser for the power, or KACC had the option to identify a designated third-party that was willing to pay a specified price for the power. (Hoerner Dec. ¶ 4.)

9       If KACC curtailed its purchases from the BPA, the BPA had a wide range of options. The BPA could sell the power to a different purchaser with public preference on the same terms as KACC's notice; the BPA could retain the power for its own use or dispose of the power on whatever alternative terms the BPA might separately arrange; or the BPA could offer a contract for sale of the power to the entity identified in KACC's notice. (Hoerner Dec. ¶ 5.)

10.       If the BPA choose to sell the power to the entity designated in KACC's notice, the BPA would offer a power sales contract to the entity and, if accepted, the BPA would credit KACC for the payments under the terms of the PSA. If the BPA elected to sell to a different buyer at a different price or retain the power for its own use, the BPA would still credit KACC based on the price in KACC's notice. The notice price thus established the mitigation to KACC for **not** purchasing the federal power; the notice did **not** determine the price at which, or to whom, the BPA would sell the power. (Hoerner Dec. ¶ 6.)

11.       Thus, KACC did not have a right, statutorily, contractually or otherwise, to dictate whether the BPA would sell the power to a third party or retain it for its own use. KACC likewise did not have the right, statutorily, contractually or otherwise, to determine to whom the BPA would sell the power if the BPA chose to sell it to a third party. Additionally, KACC did not have the right to establish the price at which the BPA would sell the power to parties that bought power from the BPA. KACC also did not have the right to sell the power itself. In fact, the BPA insisted that the BPA itself had to be the seller of any federal power that KACC did not take. (Hoerner Dec. ¶ 7.)

12.    Prior to late 2000, the BPA changed the anniversary date of its contracts. Instead of July 31 anniversary/termination dates, the BPA switched to a termination date of October 1, 2001. In fact, the BPA made this change in policy in 1998, more than two years before the contract negotiations when Clark claims to have finally become aware of the policy. However, Clark did not act based upon this change in anniversary dates when the change was made. Instead, Clark waited until late 2000 to begin negotiations with the BPA to roll over contracts that were to expire July 31, 2001. At that time, Clark finally recognized that it would have an interregnum (i.e., August 1 - September 30, 2001) when prior the BPA contracts would have lapsed but any new contracts with the BPA would not yet be effective. Of course, had Clark simply remained aware of the BPA's contracting policies, it could have taken steps well before 2001 to obtain supplies during the interregnum. But Clark did not.

13.    In January 2001, a consultant for Clark contacted KACC. The consultant advised KACC that Clark needed electricity for August and September 2001 and he was aware that the BPA might have a block of federal power for sale because KACC had curtailed its manufacturing operations. Thereafter, KACC and Clark independently approached other potential buyers and sellers to determine a market price for power for August and September 2001. They each obtained price information so that KACC could name Clark as a party willing to buy power from the BPA at a specified price in the notice KACC would provide to the BPA of the curtailment of KACC's own August and September 2001 purchases. The price ultimately set forth in the notice was below the market quotes Clark had received from other sellers. (Hoerner Dec. ¶ 8.)

14.    On February 2, 2001, at the request of Clark's consultant, KACC provided Clark with a letter indicating how a sale from the BPA to Clark would be implemented if the BPA chose to sell power to Clark. A factor precipitating the letter was Clark's concern with

KACC's creditworthiness. The letter clearly noted that Clark's power sale contract, if offered, would be with the BPA for federal power, and not with KACC; similarly, Clark would pay the BPA, not KACC. (Hoerner Dec. ¶ 9.)

## Clark's Agreement With the BPA

15.    On February 2, 2001, KACC also submitted a notice to the BPA indicating that it intended to curtail purchases for August and September 2001. The notice identified Clark as a potential purchaser at the below-market price, which was developed based upon Clark's and KACC's market intelligence. (Hoerner Dec. ¶ 10.)

16.    After receiving KACC's notice, the BPA elected to sell power to Clark. Consistent with the BPA's election to sell power to Clark, the BPA and Clark executed an agreement that unambiguously identifies the BPA as the Seller and Clark as the Buyer for a term commencing on August 1, 2001 and terminating on September 30, 2001. (Hoerner Dec. ¶ 12.)

## Proceedings Before the FERC

17.    On October 26, 2000, Puget Sound Energy, Inc. ("Puget Sound") filed with the FERC a complaint in which it asked the FERC to place a cap on the price that could be charged for energy sold under the Western Systems Power Pool Agreement into Pacific Northwest wholesale power markets. It was this complaint that initiated the Puget Sound Proceeding. (Hoerner Dec. ¶ 13.)

18.    Subsequent to the interventions of many parties in the proceeding, the filing of almost 150 pleadings and ultimately unsuccessful settlement discussions before the FERC's Chief Administrative Law Judge, on July 25, 2001, the FERC issued an order initiating an evidentiary proceeding to develop a factual record on whether there may have been unjust and unreasonable charges for spot market bilateral sales of energy in the Pacific Northwest during the period December 25, 2000 through June 20, 2001. San Diego Gas & Electric Company v.

Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent

System Operator Corporation and the California Power Exchange, et al., 96 FERC ¶ 61,120 at

61,520 (2001). (Hoerner Dec. ¶ 14.)

19      More than nine months after Puget Sound filed its complaint, Clark filed a

motion for leave to intervene out of time in the Puget Sound Proceeding. In that motion, Clark

expressly represented it would accept the procedural schedule as it stood. (See Motion of Clark

Public Utility for Leave to Intervene Out of Time (the "Clark Intervention"), filed August 7,

2001, attached as Exhibit 2 to the Sundback Aff.). Clark's motion was granted. Clark never filed

its own complaint, but simply attempted to piggyback off of the complaint filed by Puget Sound.

On August 17, 2001, Clark filed prepared testimony in the proceeding. (Hoerner Dec. ¶ 15.)

Clark's prepared testimony filed in the Puget Sound Proceeding at the FERC contains the same

factual allegations that Clark raised in support of its first request for relief from the automatic

stay.[4]

20.      Subsequent to the filing of Clark's prepared testimony in the Puget Sound

Proceeding, KACC filed prepared answering testimony. KACC's answering testimony explained

the contractual arrangements between KACC and the BPA under the PSA. (Hoerner Dec. ¶ 21.)

KACC also explained that the BPA, not KACC, had sold the electricity in question to Clark.

---

[4]      Clark's claim that it was unable to locate a supplier with enough capacity to serve Clark's
needs, however, is not entirely consistent with its representation to the FERC that
"suppliers willing to make a commitment [for the August and September 2001 time
period] were fairly scarce." Exhibit 4 to Hoerner Dec. at page 5, lines 12-14.
Additionally, Clark conveniently fails to advise the Court that the prices then available
from sources other than the BPA-marketed power ranged from $350 to $500 per MWh,
and "prices for those months were predicted to exceed $1000 for daily purchases in those
months." Id. at page 5, lines 15-18. Thus, Clark's own testimony at the FERC
corroborated KACC's position that the price Clark paid for the electricity in question was
at a discount from prevailing prices.

KACC's testimony concluded that the PSA and the agreement between the BPA and Clark showed that KACC had no control over the terms and conditions of the BPA's sale of power to Clark, and as a result, Clark should not be due any money from KACC. A copy of KACC's prepared answering testimony filed in the Puget Sound Proceeding is attached as Exhibit 5 to Hoerner Dec.

21.    Prior to the hearing in the Puget Sound Proceeding, thousands of discovery requests were served by dozens of the parties. The discovery processes available to Clark at that time included requests for admissions, requests for production of documents, interrogatories and depositions. See 18 C.F.R. Part 385.400 *et seq.* (2002) (specifying "Discovery Procedures For Matters Set For Hearing . . . ."). In fact, Clark sent data requests in the first phase of the proceeding. Clark's data request posed approximately 40 separately designated questions or subparts to KACC. KACC was also served with discovery by other parties to the Puget Sound Proceeding as well.

22.    Following the submission of the prepared testimony, an evidentiary hearing was held before the ALJ in which a record was developed on the circumstances faced in Pacific Northwest power markets during the period December 25, 2000 through June 20, 2001. Clark and KACC were given the opportunity during that evidentiary hearing to conduct live cross-examination of each other's witnesses. Clark waived its opportunity to cross-examine on KACC's testimony, as well as on relevant testimony filed by the BPA. (See FERC Tr. at pp. 1057-59, 1257-58, attached as Exhibit 3 to the Sundback Aff.)) Thereafter, each party filed post-hearing briefs and proposed findings of fact with the ALJ. (Hoerner Dec. ¶ 22.) Clark's proposed findings of fact and conclusions of law did not make any assertion that it had been deprived of due process or disadvantaged by the procedural schedule.

23.    The ALJ subsequently issued her recommendations to the full Commission. In her Recommended Decision, the ALJ concluded that the prices in the Pacific Northwest during the relevant time period were the result of a number of factors, including a shortage of supply, excess demand, a drought, increased natural gas prices and price signals from California markets. Recommended Decision, 96 FERC at ¶ 65,385. She also concluded that the Pacific Northwest is a competitive market, and that the transactions at issue in the case resulted from bilateral agreements between the parties. Id. She further concluded that "[u]nder these circumstances, the prices charged were not unjust or unreasonable and refunds should not be ordered in this proceeding." Id. Thus, she recommended that the Commission terminate the proceeding. Id.

24.    After the issuance of the Recommended Decision, numerous parties, including Clark and KACC, submitted comments to the full Commission advocating their various positions to the FERC. For its part, Clark disagreed with the ALJ's recommendations and requested that the FERC order refunds from KACC to Clark either in the Puget Sound Proceeding, or alternatively suggested that refunds be ordered in another proceeding before the FERC, entitled Investigation of Wholesale Rates of Public Utility Sellers of Energy and Ancillary Services in the Western Systems Coordinating Council, FERC Docket No. EL01-68, initiated by the FERC in April 2001 (the "WSCC Proceeding"). This alternative suggestion was somewhat odd in that neither Clark nor KACC were parties to the WSCC Proceeding.[5] (Hoerner Dec. ¶ 24.) Clark's comments did not contend that the proceeding had been procedurally flawed.

25.    Moreover, following the filing of its Comments on the Recommended Decision, Clark decided to ignore the Commission's procedural schedule and filed an additional

---

[5]    Clark sought to intervene in the WSCC Proceeding, but Clark's request was denied.

out-of-time pleading on November 20, 2001. Apparently dissatisfied with its prior efforts, Clark's belated November 20, 2001 pleading recapitulated its prior points, although re-arranged in the new pleading. (Hoerner Dec ¶ 25.)

        26.    Subsequent to the ALJ issuing the Recommended Decision for consideration by the Commission, the City of Tacoma filed a motion in which it requested that the Commission reopen the evidentiary record in the Puget Sound Proceeding to allow further investigation and discovery into the actions of participants in the Pacific Northwest power market. On December 19, 2002, the Commission issued the Discovery Order, allowing parties in the Puget Sound Proceeding to conduct additional discovery for the period January 1, 2000 to June 20, 2001 and to submit to the Commission "additional evidence and new and/or modified proposed findings of fact concerning potential refunds for spot market bilateral sales transactions in the Pacific Northwest" for the period in question. (Discovery Order at ¶ 12). Pursuant to the Discovery Order, discovery that parties choose to undertake, and evidence they choose to file, must be submitted directly to FERC by February 28, 2003. (Id. at ¶ 12.) Once those parties that seek to place evidence before the Commission have made their filings, the Commission will take up the filings, with the ALJ's Recommended Decision. (Id. at ¶ 13.)

**The Clark Lift Stay Motion**

        27.    The Motion requests relief from the automatic stay on two alternative grounds: (a) a declaration by the Court that Clark's participation in the reopened Puget Sound Proceeding is not stayed by virtue of section 362(b)(4) of the Bankruptcy Code; or (b) allowing relief from the automatic stay under section 362(d) of the Bankruptcy Code so that Clark may participate in the reopened Puget Sound Proceeding for the limited purpose of taking additional discovery and submitting new and/or modified proposed findings of fact to the Commission. As explained below, both of these grounds are meritless.

## Argument

**A.    Clark Cannot Show a Public Purpose to Act Under the Police Power Exception**

        28.    Clark's argument that its pursuit of its refund claim against KACC in the FERC proceeding is excepted from the automatic stay is based entirely on the flawed contention that because the automatic stay does not prevent the FERC's actions in the Puget Sound Proceeding against KACC, Clark's participation is likewise not prohibited.  (Motion at 8). Nowhere in Clark's Motion for relief from stay to participate in the Puget Sound Proceeding does it demonstrate or show that it is pursuing a public purpose or interest.  Instead, Clark merely argues at length that the FERC's regulatory powers are not barred by the automatic stay. Because the FERC has reopened the Puget Sound Proceeding on a limited basis, Clark asserts that it, likewise, is not prohibited by the automatic stay from pursuing discovery against KACC. This contention is meritless.

        29.    As stated above, the Puget Sound Proceeding conducted by FERC is a proceeding to determine the "just and reasonable" rates for power that was sold in the Pacific Northwest during the period December 2000 through June 2001.  This is a regulatory proceeding subject to the police power exception under section 362(b)(4) of the Bankruptcy Code.  Clark's Motion, however, fails to establish a public purpose for its actions against KACC in the Puget Sound Proceeding.  Moreover, Clark is a private party in the Puget Sound Proceeding that is seeking money from one or more parties.  In such circumstances, Clark is not acting under any police or regulatory authority and its actions are not excepted from the automatic stay.

        30.    Nonetheless, to bolster its request to conduct additional discovery on KACC, Clark asserts that because the Discovery Order "mandates" Clark to conduct additional discovery in the Puget Sound Proceeding, it can do so under the guise of FERC's police power exception under section 362(b)(4) of the Bankruptcy Code.  First, the Discovery Order does <u>not</u>

mandate that any party (including Clark) conduct additional discovery and submit new findings

of fact. The Discovery Order is permissive, it <u>allows</u> a party to conduct additional discovery and

to submit new findings of fact. (Discovery Order at ¶ 12.) Clark, moreover, is not acting as a

regulatory authority in this proceeding, but instead, is simply pursuing as a private entity any and

every avenue to create a refund claim against KACC. Such actions do not demonstrate a public

purpose or interest being pursued by Clark that would except its actions from the automatic stay

under section 362(b)(4) of the Bankruptcy Code, but rather constitute the pursuit of a private

right of action against KACC in violation of the automatic stay.

**B.    Clark is Not Entitled to Relief From the Automatic Stay**

31.    Clark is bound by the automatic stay and is prohibited from pursuing

discovery against KACC unless it obtains relief from the stay. As demonstrated below, Clark

cannot show "cause" for relief from the automatic stay.

### *The Standards for Relief from the Automatic Stay*

32.    The automatic stay is an essential element of the reorganization process as

it "prevents the dissipation or diminution of the bankrupt's assets while rehabilitative efforts are

undertaken *and prohibits the proliferation of numerous claims in different forums against the*

*debtor.*" <u>S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In re S.I. Acquisition, Inc.)</u>,

817 F.2d 1142, 1146 (5th Cir. 1987) (citing H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 340

(1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5963, 6297- 98) (emphasis added). Therefore,

relief from the stay may only be granted for good reason. <u>See In re Stranahan Gear Company,</u>

<u>Inc.</u>, 67 B.R. 834, 836 (Bankr. E.D. Pa. 1986).

33.    Section 362(d)(1) permits the Court to lift or modify the stay only for

"cause." The Bankruptcy Code does not define the term "cause." Rather, a determination of

whether cause exists for relief from the automatic stay is a matter for the court's discretion in

light of all the circumstances presented. See In re Robert Frank-Leonard Wilson, 116 F.3d 87,

90 (3d Cir. 1997).

          34.    Courts in this District have stated that at least three factors should be

considered to determine cause under section 362(d)(1) to lift the stay to allow a party to continue

to prosecute a claim in litigation:

> (a)    Whether any great prejudice to either the bankrupt estate or the
> debtor will result from continuation of the civil suit;

> (b)    Whether the hardship to the non-bankrupt party by maintenance of
> the stay considerably outweighs the hardship to the debtor; and

> (c)    The probability of the creditor prevailing on the merits.

In re Pursuit Athletic Footwear, Inc., 193 B.R. 713, 718 (Bankr. D. Del. 1996); see In re

Integrated Health Servs., Inc., No. 00-389-MWF, 2000 Bankr. LEXIS 1319, at *5 (Bankr. D.

Del. Aug. 11, 2000). The Movant bears the burden of proof with respect to whether cause exists

to lift the stay. In re Pacor, Inc., 74 B.R. 20, 22 (E.D. Pa. 1987). Only then does the burden shift

to the Debtors to rebut this showing. In re Pursuit Athletic Footwear, 193 B.R. at 718; In re

Salvatore J. Mazzeo, 167 F.3d 139, 142 (2d Cir. 1999). Furthermore, courts have recognized

that, early in a debtor's chapter 11 cases, an unsecured, unliquidated claimholder should not be

permitted to pursue litigation against the debtor in another court unless extraordinary

circumstances are shown. See, e.g., In re I. Burack, Inc., 132 B.R. 814, 817 (Bankr. S.D.N.Y.

1991) (stating that during the exclusivity period, "an unsecured, unliquidated claimholder should

not be permitted to pursue litigation against the debtor in another court unless extraordinary

circumstances are shown."); In re Pioneer Commercial Funding Corp., 114 B.R. 45 (Bankr.

S.D.N.Y. 1990) (same).

35.    As described below, each of the factors here weighs heavily against lifting the automatic stay at this stage, and Clark has certainly not established the requisite extraordinary circumstances.

### *Cause Does Not Exist to Lift the Stay*

36.    Clark asserts that it must be granted relief from the automatic stay so that it can participate in the reopened Puget Sound Proceeding for the limited purpose of taking additional discovery and submitting proposed findings of fact before the February 28, 2003 deadline. (Motion at pp. 13-14). To support its assertion that there is "cause" to lift the stay in this case, Clark argues that (a) a decision by FERC will be binding and have preclusive effect on Clark in KACC's bankruptcy case and will completely resolve all the issues between KACC and Clark, including whether Clark has a claim against KACC, (b) the FERC has exclusive jurisdiction to resolve Clark's rate claim against KACC because FERC has exclusive jurisdiction to set just and reasonable power rates and (c) the FERC is a highly specialized agency designed to deal exclusively with issues arising from wholesale power sales and therefore is uniquely qualified to resolve the dispute between Clark and KACC. Putting aside the argument that Clark's purported claims are within FERC's exclusive jurisdiction to establish just and reasonable charges for electric energy sold at wholesale, Clark ignores (a) the lack of hardship on Clark if the stay is maintained given the fact that, although the Puget Sound Proceeding has been reopened, Clark has already had a full opportunity to present its claims to the FERC, which were denied; (b) the complete lack of merit to Clark's claim that KACC was the seller of the electricity; and (c) the issue of whether the BPA sales are within the FERC's jurisdiction. Each of these factors, however, strongly favor keeping the stay in place.

**(1)**    _Clark's Issue Preclusion and Jurisdiction Arguments Do Not Constitute "Cause"_

37.    Clark argues that any ruling by FERC in the Puget Sound Proceeding will bind (i.e., have preclusive effect on) Clark in KACC's bankruptcy case and will determine if Clark has a claim against KACC. Clark complains that it did "not have the opportunity to fully develop its case ... due to the ... expedited discovery schedule which prevented the parties from taking discovery regarding market manipulation in the Pacific Northwest." (Motion at p. 3). In its motion, Clark further complains that it was "not heard." (Motion at. p. 4). Without citation, Clark goes on to repeatedly conjecture that it was for these reasons that the Commission re-opened the record in the Puget Sound Proceeding (Motion at pp. 6, 9). Thus, Clark asserts that unless it is afforded the opportunity to complete the development of its position in the Puget Sound Proceeding, FERC's ruling could leave Clark without a forum to litigate its rate claim. Clark's attempts to mislead this Court into believing that it did not have the opportunity to litigate its rate claims against KACC before the ALJ should be rejected.

38.    Clark's contentions that it did not have the opportunity to litigate its claims are demonstrably wrong or disingenuous. Clark was not, contrary to its erroneous assertion, prevented from taking discovery or presenting evidence on its claims (including alleged market manipulation) in the Puget Sound Proceeding. By KACC's count, thousands of discovery requests were served before the hearing, which is hardly evidence that the schedule "prevented the parties from taking discovery" on market manipulation. More importantly, Clark declined the opportunity to cross-examine witnesses presented by KACC as well as the BPA in the Puget Sound Proceeding. (See FERC Tr. at pp. 1057-59, 1257-58 (Exhibit 3 to the Sundback Aff.)). By seeking additional discovery, Clark is clearly attempting to relitigate its claims that it lost in the ALJ proceeding and revisit tactical decisions it made therein.

39      Moreover, Clark's attack on the procedural schedule is all the more

remarkable given that at the hearing, Clark never registered the procedural objections it now

makes. As noted above, although Clark had the opportunity to cross-examine the witnesses of

KACC (as well as BPA) at the Puget Sound Proceeding, it declined the opportunity, resulting in

the entry of testimony without cross-examination. In Clark's half dozen pleadings filed with the

Commission in the Puget Sound Proceeding prior to KACC's bankruptcy filing[6], Clark never

complained about the schedule. Once the schedule had been established by order of the

Presiding Judge issued August 2, 2001, Clark affirmatively represented that it would "accept the

...procedural schedule as [it] stands[s]..." (See Clark Intervention at p. 2 (Exhibit 2 to the

Sundback Aff.)). In its post-hearing comments, Clark never once raised any objections to the

procedures. Clark also is demonstrably incorrect by contending that its arguments were not

heard. This contention ignores the fact that the Presiding Judge specifically set up a mechanism

to brief what was characterized as the "dispute between KACC" and Clark. Both Clark and

KACC availed themselves of that opportunity, as the Recommended Decision of the Presiding

Judge demonstrates on its face[7].

40.     As stated above, the Discovery Order does not require every participant to

conduct discovery or submit new findings. Under Clark's interpretation, more than 150 parties to

the proceeding must serve discovery and file testimony. But there was no requirement in the

---

[6]      See "Motion of Clark Public Utilities For Leave To Intervene Out of Time"; "Statement
of Clark Public Utilities identifying It as a Member of the Northwest Net Purchasers
Group"; "Clark Public Utilities Supplemental Proposed Findings of Fact and Conclusions
of Law"; "Comments of Clark Public Utilities"; "Supplemental Comments of Clark
Public Utilities"; "Post Hearing Brief of Clark Public Utilities"; "Joint Post-Hearing Brief
Of The Pacific Northwest Net Purchasers Group"; "Pacific Northwest Net Purchasers
Group's Proposed Findings of Fact and Conclusions of Law", all in Puget Sound Energy,
Inc. v. All Jurisdictional Sellers, Docket Nos. EL01-10, et seq.

[7]      See Puget Sound Energy, Inc., 96 FERC ¶ 63,044 at 65,301 (2001).

first phase that a party file testimony, and it is hard to understand why the Commission in this phase would compel such a result. More importantly, Clark has not and cannot identify what additional evidence it will request from KACC on the market manipulation issue that it has not previously obtained.[8] Clark has already litigated and lost the issues and claims it has against KACC, and should not be allowed to conduct additional discovery on KACC since it was previously afforded an opportunity to develop and present its positions in the Puget Sound Proceeding. Clark, thus, has not shown any basis to serve KACC with additional discovery, nor cause for relief from the automatic stay.

41.    Clark also argues that the FERC has <u>exclusive</u> jurisdiction and primary jurisdiction to decide Clark's claim against KACC because the FERC has exclusive jurisdiction to set power rates and order refunds to buyers of power. Thus, according to Clark, the Bankruptcy Court cannot determine Clark's claim because of the FERC's exclusive rate setting and refund jurisdiction. Clark, however, is blurring the line between the FERC's exclusive jurisdiction and the Bankruptcy Court's claim determination jurisdiction. The Bankruptcy Court has the jurisdiction to determine the amount of Clark's claim, 11 U.S.C. § 502, and can do so by simply reviewing the FERC's decision and whether or not Clark was allowed a claim in the Puget Sound Proceeding. Clark simply must file a proof of claim with the Bankruptcy Court, allow KACC to respond by objection (if necessary). The Bankruptcy Court can then determine Clark's claim based upon the FERC's decision. Clark's argument (without citation) that the FERC's exclusive rate making and refund jurisdiction deprives the Bankruptcy Court of

---

8    Clark's request to conduct discovery regarding whether KACC participated in market manipulation is simply an attempt to further pursue it prior "exercise of market power" argument, which it lost.

jurisdiction to determine the amount, if any, of Clark's claim is groundless and does not provide "cause" to lift the automatic stay to conduct additional discovery.[9]

**(2)**    ***KACC Will Suffer Great Prejudice if the Automatic Stay is Not Maintained***

42.    If the Court lifts the automatic stay for Clark to seek additional discovery, KACC will suffer great prejudice by having to expend substantial time and resources as a result of the additional discovery. The only purpose in obtaining additional discovery would be to attempt to introduce it into evidence on the various theories Clark previously raised, but which were rejected.[10] As shown above, Clark has had ample opportunity to litigate its claims before the FERC, and the ALJ's Recommended Decision rejected all of Clark's claims currently pending before the Commission. Thus, there is nothing more to do in that docket in terms of hearings. By seeking additional discovery, Clark simply intends to relitigate the issues it at least preliminarily has lost in the Puget Sound Proceeding.[11]

---

[9]    Clark also attempts to support its "exclusive jurisdiction" position by stating that "FERC has the sole authority... to determine whether a particular transaction is within its regulatory authority, including whether a particular entity is a "seller" of power." (Motion at p. 16). Tellingly, it is Clark's intention to seek additional discovery to relitigate its claim that KACC was a "seller" of power without authorization from the FERC. As stated above, this argument has been rejected by the ALJ in her Recommended Decision and the Court should preclude any discovery on this issue.

[10]    Although the Commission reopened to the proceeding in light of alleged activities that may have been undertaken by Enron Corp. in the Pacific Northwest, nowhere in Clark's Motion does it state that it solely seeks discovery on this issue. Moreover, there has been no allegation that Enron played a role in the transactions at issue. KACC asserts that Clark will conduct discovery on claims it lost in the hearing before the ALJ and attempt to relitigate those issues under the guise of obtaining discovery on alleged market manipulation.

[11]    In its first motion for relief from stay, Clark sought authority to file a new complaint against KACC on the theory that KACC violated the Federal Power Act by selling power to Clark without obtaining FERC authorization for such sale. The ALJ's Recommended Decision, however, rejected this contention, and this issue is currently before the FERC in the Puget Sound Proceeding. Nonetheless, Clark states it needs to conduct additional discovery on this theory (Motion at p. 16). KACC is at a loss as to what additional

43.    Moreover, relitigation in the Puget Sound Proceeding in itself would be a waste of administrative economy. It is axiomatic that judicial economy weighs against allowing a party to relitigate issues. FERC's policy also strongly disfavors relitigation. See Central Kansas Power Co., 5 FERC ¶ 61,291 at 61,621 (1978) (affirming the ALJ's conclusion that to decide issues previously afforded a full hearing "would ill serve the goal of administrative efficiency and would not further the interests of the parties"). Here, Clark neither has asserted, nor can justify relitigation of its claims against KACC. The issues as to whether KACC was the seller of the power and whether amounts are due to Clark in respect of such putative sales (and thus the liquidation of Clark's claim) are already before the FERC in the Puget Sound Proceeding, and the FERC can decide the issues based upon the existing record and the ALJ's Recommended Decision. The interests of judicial economy, expeditious resolution of litigation and FERC policy weigh heavily against allowing Clark to attempt to reopen these issues at the FERC by seeking additional discovery and procedures in the Puget Sound Proceeding. Accordingly, if relief from the stay is granted to allow Clark to obtain additional discovery, substantial prejudice would be occasioned on the Debtors.

---

(continued...)

discovery would be obtained that is not already in the FERC record. Moreover, the FERC has access to its own files and regularly takes official notice of their contents. See 18 C.F.R. 385.508(d) (permitting official notice); Nevada Power Co., et al. V. Duke Energy Trading and Marketing, L.L.C., 99 FERC ¶ 61,047 (2002); California Independent System Operator Corp., 98 FERC ¶ 61,335 n.34 (2002) (taking official notice of a deposition); Kern River Gas Transmission Co., 95 FERC ¶ 61,022 n.3 (2001) (taking office notice of record in another docket); Entergy Services, Inc., 58 FERC ¶ 61,234 at p. 61,752 (1992) (official notice of materials in Commission files in another matter). Thus, the FERC surely is aware that KACC never has applied for, nor has the FERC granted it, authority to sell power in interstate commerce. Thus, Clark's feigned need to raise the absence of KACC's authorization to sell power is simply an excuse to enable Clark to attempt to get a second bite at the apple.

44. Clark also contends that, although it intends to serve additional discovery on KACC regarding alleged market manipulation by KACC, granting relief from the automatic stay will have very little negative impact on KACC's estate and its bankruptcy proceedings (Motion at pp. 16-17). According to Clark, KACC has already retained counsel to represent it in the Puget Sound Proceeding and fully participated in such proceeding. Clark's "market manipulation" argument, however, is simply a recast of its prior "exercise of market power" argument that Clark asserted at the hearing before the ALJ and submitted as part of the Pacific Northwest Net Purchasers Group's Proposed Findings of Fact and Conclusions of Law (the "PNNPG Brief"). A copy of the PNNPG Brief is attached as Exhibit 4 to the Sundback Aff. The ALJ, however, rejected the "exercise of market power" argument. Recommended Decision, 96 FERC ¶ 63,044 at 65,369-70 (2001). Thus, if Clark is given the opportunity to serve additional discovery, KACC asserts that Clark is simply being afforded the opportunity to conduct additional discovery in order to relitigate claims, including any "market manipulation claim, it lost in the hearing before the ALJ. Moreover, allowing Clark to serve additional discovery will allow Clark to search for other grounds to assert new claims against KACC, which will require KACC's lawyers to undertake all of the activities associated with reviewing and responding to any new claims, including discovery by KACC and determining where discovery requests are objectionable, associated hearing briefs and litigation of these claims.[12] Contrary to Clark's claims in its Motion, substantial prejudice to the Debtors will likely occur if the stay is lifted.

---

[12]    Indeed, Wayne Nelson, who submitted an affidavit in support of Clark's Motion, was quoted in a recent newspaper article as warning that any new litigation could take years and run up legal bills of several hundred thousand dollars.

45.     With respect to the hardship on Clark if the stay is maintained, any hardship is of Clark's own making. Clark had ample opportunity to litigate its claims before the FERC and the ALJ's Recommended Decision rejected Clark's claims that are currently pending before the Commission. Clark should not be allowed to relitigate its claims that it lost.[13]

46.     Additionally, Clark has not even proffered why the sought after discovery is available only from KACC and not from any other source. Indeed, this is the crux of the problem here — Clark essentially is seeking carte blanche authority to pursue discovery it already had the opportunity to request.

47     In addition to the lack of hardship to Clark if the stay is maintained and the substantial prejudice to the Debtors if the stay is lifted, Clark is very unlikely to succeed on the merits. Clark has already lost on these arguments. Thus, not only does it have the burden of proof on its motion, but it also carries the burden of overturning the FERC's ruling in the Puget Sound Proceeding.

48.     As explained above, Clark's request to conduct additional discovery is merely an attempt by a litigant, dissatisfied with how it presented its case initially, to recast its claim or assert new claims. The ALJ's Recommended Decision denied Clark's claims in the Puget Sound Proceeding and Clark has failed to demonstrate what additional evidence it believes it can obtain from KACC to support its claims or that it has a chance of succeeding on its claims.

### Conclusion

For all of the foregoing reasons, Clark's Motion should be denied.

---

[13]     As demonstrated in its motion, Clark is on the prowl for relief from its own failure to act in a prudent and informed fashion, and wants to burden KACC because of those failings.

Dated: January 13, 2003
Wilmington, Delaware.

Respectfully submitted,

*Patrick Leath* (signature)

Daniel J. DeFranceschi (DE 2732)
Paul Heath (DE 3704)
Patrick Leathem (DE 4114)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Richard I. Werder, Jr. (OH I.D. 0011533)
Kevyn D. Orr (D.C. I.D. 443074)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone:  (216) 469-3939
Facsimile:  (216) 579-0212

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
David G. Adams (TX 00793227)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201-1515
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

---

(continued ...)

Similarly, if Clark is allowed to conduct additional discovery, KACC will want to explore what other offers were made to sell power to Clark.