**EXHIBIT B**

103 FERC ¶ 61,348

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Pat Wood, III, Chairman;
                    William L. Massey, and Nora Mead Brownell.

| | |
|---|---|
| Puget Sound Energy, Inc. | Docket Nos. EL01-10-000 |
| | EL01-10-001 |
| v. | EL01-10-007 and |
| | EL01-10-009 |
| All Jurisdictional Sellers of Energy and/or Capacity at Wholesale into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement | |

ORDER GRANTING REHEARING, DENYING REQUEST TO
WITHDRAW COMPLAINT AND TERMINATING PROCEEDING

(Issued June 25, 2003)

1. In this order, we grant Puget Sound Energy Inc.'s (Puget's) request for rehearing of our December 15, 2000 order[1] (December 15 Order) in which we dismissed Puget's complaint asking the Commission to prospectively implement a region-wide price cap for wholesale sales of energy or capacity into the Pacific Northwest. The relief that Puget requested has already been provided in our June 19, 2001 order (June 19 Order), which prescribed price mitigation in the electricity spot markets throughout the West.[2]

2.    In addition to Puget's request for a prospective price cap, certain participants in the proceeding (Puget not included) sought to expand the complaint proceeding and the requested remedy. They sought retroactive refunds for spot market bilateral sales in the

---

[1]San Diego Gas & Electric Co., et al., 93 FERC ¶ 61,294 at 62,019 and Ordering Paragraph (K) (2000).

[2]San Diego Gas & Electric Co., et al., 95 FERC ¶ 61,418 (2001), order on reh'g, 97 FERC ¶ 61,275 (2001), order on reh'g, 99 FERC ¶ 61,160 (2002), appeal sub nom. Public Utilities Comm. of the State of California, et al. v. FERC, Nos. 01-71051 et al. (9th Cir. June 29, 2001 and later).

Docket No. EL01-10-000, et al.                                                    - 2 -

Pacific Northwest.  Based on the totality of the circumstances presented, including the large number of sellers and magnitude of transactions in the Northwest and the fact that the majority of sales that took place are not within our jurisdiction, the Commission concludes that appropriate relief was provided by institution of the West-wide mitigation plan in June 2001 and that the equities do not justify refunds.  With regard to the request for refunds, the record established in the preliminary evidentiary hearing before Presiding Administrative Law Judge (ALJ) Cintron in this proceeding[3] demonstrates that it is not possible to fashion an equitable remedy that would do justice to all the participants in the Pacific Northwest electricity spot markets.  Our reasoning on this difficult set of circumstances is discussed at length later in the order.

3.      This order benefits customers because it will provide greater certainty and stability in the Pacific Northwest electricity spot markets.

**Background**

   **Puget Sound Energy Complaint**

4.      On October 26, 2000, Puget filed a complaint petitioning the Commission for an order capping the prices at which sellers subject to Commission jurisdiction, including sellers of energy or capacity under the Western Systems Power Pool (WSPP) Agreement, may sell energy or capacity into the Pacific Northwest's wholesale power markets.[4]  Puget made clear that it was only seeking prospective relief in the form of a price cap.  Yet, it also requested that "to the extent any refund is called for in response to [Puget's] petition, [Puget] respectfully requests that the refund effective date be set, in accordance with Section 206 of the Federal Power Act (16 U.S.C. § 824e(b)), sixty (60) days after the date of filing of this Complaint."[5]

5.      The Commission dismissed Puget's complaint in the December 15, 2000 Order.

6.      Puget sought timely rehearing of that order on January 12, 2001.  Subsequently, on June 22, 2001, Puget submitted a motion to dismiss its complaint and a notice of

---

   [3]Puget Sound Energy, Inc., et al., 96 FERC ¶ 63,044 (2001) (ALJ Recommendations).

   [4]Puget stated that, for purposes of its complaint, "Pacific Northwest" has the meaning set forth in the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. § 839a(14) (2002).

   [5]Puget Complaint at para. 17.

withdrawal of its complaint and its subsequent rehearing, explaining that the
Commission's June 19 Order satisfied its complaint because it implemented price
mitigation measures on wholesale sales throughout the West.

7.     Several entities filed answers to Puget's motion.  Amongst them, the City of Seattle
opposed the motion and argued that the proceeding should be kept open because non-
California market participants have paid prices that are unjust and unreasonable, and
because retaining the proceeding would permit the Commission greater flexibility in
determining the scope and effective date for refunds.  The City of Tacoma and Port of
Seattle opposed Puget's motion for similar reasons.

8.     On June 22, 2001, unaware of Puget's motion filed on the same day, the
Commission issued an order clarifying that parties in the settlement proceedings related to
what has come to be known as the "California refund proceeding," Docket No. EL00-95
et al., could also discuss a settlement related to sales in the Pacific Northwest.

**The July 25 Order**

9.     In a July 25, 2001 order (July 25 Order), the Commission noted that, according to
the Chief Judge's Report in the settlement discussions (mentioned above), there was little
time to address the issues raised by the Pacific Northwest parties.[6]  These parties did not
have data on what they claimed they were owed, or on an amount of refunds due them,
and certain parties filed comments requesting additional process to document the harm
suffered and to engage in meaningful settlement discussions with affected sellers.  The
July 25 Order then stated:

> In light of the complexities associated with these retroactive bilateral
> calculations and the absence of any further development of this issue
> in the settlement proceeding, and in recognition that the prior
> settlement proceeding focused primarily on California, we will
> establish a separate preliminary evidentiary proceeding pertaining to
> the Northwest.  The proceeding is intended to facilitate development
> of a factual record on whether there may have been unjust and
> unreasonable charges for spot market bilateral sales in the Pacific

---

[6]San Diego Gas & Electric Company, et al., 96 FERC ¶ 61,120 at 61,520 (2001).

Docket No. EL01-10-000, et al.                                                              - 4 -

> Northwest for the period beginning December 25, 2000 through June
> 20, 2001.[⁷]

10.    The Commission explained that December 25, 2000, 60 days after Puget filed its
complaint, is the earliest refund effective date the Commission could establish for Puget's
complaint if the Commission determined that it was appropriate to deny Puget's motion to
withdraw the complaint and, further, to grant rehearing of the Commission's previous
dismissal of the complaint.  The Commission, however, did not set the complaint for
hearing under FPA section 206 or establish a refund effective date in the July 25 Order.
The Commission also stated that it would decide at a later time, after completion of the
preliminary evidentiary hearing, whether to grant Puget's request to withdraw the
complaint.

## Preliminary Evidentiary Hearing and The ALJ's Recommendations

11.     The preliminary evidentiary hearing was conducted before Presiding Judge
Cintron during three days in early September 2001.

12.    On September 24, 2001, the ALJ issued her recommendations and proposed
findings of fact.  She concluded that the proper definition of the Pacific Northwest
bilateral sales spot market included "all sales for 24 hours or less that are entered into one
day in advance or, before weekends, holidays, or WSCC scheduler conferences, up to 48
hours in advance, and within the month and balance of the month transactions . . . ."[8]
Further, she adopted the definition of "Pacific Northwest" set forth in the Pacific
Northwest Electric Power Planning and Conservation Act.

13.    The ALJ recommended to the Commission that no refunds are warranted for
wholesale power sales made in the Pacific Northwest between December 25, 2000 and
June 20, 2001.[9]  In essence, she concluded that evidence demonstrates that the Pacific
Northwest market for spot sales of electricity was competitive and functional during the
relevant period of time, and because prices were not unreasonable.[10]  The ALJ found that,
while California electric energy prices affected electric energy prices in the Pacific
Northwest, prices in the region were driven up by a combination of factors, including

---

[7]Id.

[8]ALJ Recommendations, 96 FERC ¶ 63,044 at 65,386.  See also Id., at 65,331.

[9]Id., at 65,370.

[10]Id., at 65,367.

reduced available power due to drought, increased demand, and relatively high natural gas prices.

14.     In making her determination, the ALJ noted the differences between the California and Pacific Northwest power markets. While "inextricably interrelated," she said the California and Pacific Northwest wholesale power markets differ greatly in that California has a centralized spot market with a single auction price, while the Pacific Northwest's spot market operates through individually negotiated, bilateral contracts and relies heavily on hydropower. Besides Pacific Northwest utilities relying more heavily on forward contracts, the ALJ commented that demand in the Pacific Northwest is more elastic than in other parts of the West due to the presence of aluminum smelting and other energy-intensive industries in the region.[11]

15.     The ALJ also noted that Pacific Northwest utilities have numerous supply options, including self-supply and purchases on spot and forward markets.[12] Pacific Northwest utilities had the ability to reduce their exposure to volatile spot market prices by assembling a portfolio of long-, medium- and short-term contracts. Thus, she found that the paid prices were the result of arm's-length negotiations and reflected the value that willing buyers and sellers placed on those transactions in the face of supply constraints. The ALJ blamed "market fundamentals, exacerbated by financial uncertainty and confusion" as the cause of Pacific Northwest's high power prices, and stated that "the evidence shows that the Pacific Northwest performed just as workably competitive markets would under adversity."[13]

16.     Having found that rates were not unjust and unreasonable in the Pacific Northwest during the relevant period of time, the ALJ did not make findings regarding the price and volume of sales in the Pacific Northwest or the appropriate methodology for determining potential refunds.[14] Rather, she recommended that, since Puget Sound is no longer pursuing its complaint and requested withdrawal from the proceeding, and only intended to seek prospective remedies, the Commission affirm the December 15, 2000 order dismissing the Puget complaint and allow Puget to withdraw its rehearing request.

_____

[11]Id., at 65,336.

[12]Id., at 65,368-69.

[13]Id., at 65,367.

[14]The ALJ identified the total extent of potential refunds claimed to date as $1.9 billion based on the claims asserted by eight parties to the proceeding. Id., 96 FERC at 65,336.

Docket No. EL01-10-000, et al.                                                    - 6 -

17.    Parties that filed briefs on exception are identified in Appendix A.

**100-Day Evidence Proceeding**

18.    In a December 19, 2002 order (December 19 Order), the Commission, acting on motions to reopen the evidentiary record, allowed parties in the proceeding to conduct additional discovery for the period January 1, 2000 to June 20, 2001.[15]  The December 19 Order also stated that parties had until February 28, 2003 to submit directly to the Commission "additional evidence concerning potential refunds for spot market bilateral sales transactions in the Pacific Northwest for the period January 1, 2000 through June 20, 2001, and proposed new and/or modified findings of fact."[16]  In a February 10, 2003 order, the Commission allowed parties an opportunity to respond to the February 28 submissions.[17]  In a subsequent order, the Commission extended the filing deadline until March 3, 2003, with reply comments due by March 20.[18]

19.    Clark Public Utilities (Clark) and Californians for Renewable Energy (CARE) filed testimony one day late.  In addition, Clark filed a request for clarification, as directed by the Bankruptcy Court administering the Kaiser Aluminum bankruptcy, that Clark could file testimony on the issue of the appropriate definition of "spot market."

---

[15]Puget Sound Energy, Inc., et al., 101 FERC ¶ 61,304 (2002).

[16]Id. at P 11.

[17]Puget Sound Energy, Inc., et al., 102 FERC ¶ 61,163 (2003) (February 10 Order). The City of Tacoma, Washington and The Port of Seattle filed a request for clarification or, in the alternative, rehearing of the February 10 Order.  They argued that, pursuant to fundamental due process rights, the Commission should allow parties the opportunity to respond to new material filed on March 20, 2003.  In fact, the March 20 pleadings were reply comments, filed in response to new evidence and proposed new findings of fact filed by Tacoma, the Port and other parties seeking refunds.  Thus, Tacoma and the Port seek an opportunity to file and answer to an answer, which is not permitted by our Rules. 18 C.F.R. § 385.213(a) (2003).  Moreover, the opportunity to submit further responsive pleadings is at the discretion of the Commission. E.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 543-46 (1978). Accordingly, we deny the request for clarification or, in the alternative, rehearing of Tacoma and the Port.

[18]San Diego Gas & Electric Co., et al., 102 FERC ¶ 61,194 (2003).

Docket No. EL01-10-000, et al.                                                              - 7 -

### Oral Argument

20.     On May 6, 2003, the Transaction Finality Group (TFG) filed a request for oral argument before the Commission regarding the legal factual and policy issues raised in the proceeding.  Oral argument was held before the Commission on June 2, 2003.

## Discussion

### A. Procedural Matters

#### 1. Late Filings

21.     For good cause shown, we accept Clark's late filing in the 100-day evidence proceeding based on its explanation that (1) it was delayed by the Bankruptcy Court's ruling on the afternoon of March 3, 2003, which required Clark to revise its filing; (2) Clark started the electronic filing process prior to the close of business on March 3; and (3) the filing one day late will not prejudice any party to this proceeding because Clark served its filing on all parties on March 3.  However, we deny Clark's request for clarification, and will not accept new testimony (which Clark filed under seal) related to the appropriate definition of spot market.

22.     CARE offered no explanation for its late filing, and it is accordingly rejected. Further, it appears that CARE has not intervened in this proceeding.

#### 2. Puget's Motion to Withdraw its Pleadings

23.     The Commission dismissed Puget's complaint in the December 15, 2000 Order and Puget filed for rehearing; on July 24, 2001, Puget filed to withdraw its complaint and rehearing request, but several motions opposing the withdrawal were timely filed and the Commission has not yet acted on that withdrawal.[19]  The ALJ recommends that the Commission affirm its decision to dismiss the complaint and grant the motion to withdraw.  Since the original complainant has no interest in pursuing its claim, this proceeding arguably could be terminated on this basis alone.  If so, intervenors would not

---

[19]Puget argues that its petition to withdraw was granted by operation of law since no party to the proceeding objected and the Commission failed to act within 15 days.  But this argument is incorrect since several non-parties filed timely objections to Puget's petition.  Rule 216 does not state that the motion opposing the notice of withdrawal must be filed by a party.  In any event, these non-parties also moved for late intervention, which was subsequently granted, making them parties to the proceeding.

be able to pursue their refund requests based on a dismissed complaint which the complainant seeks to abandon.

24.    Furthermore, Puget's original complaint sought refunds only as a prospective remedy.  The ALJ remarks that she agreed with the Transaction Finality Group's view that, "[b]y seeking relief beyond that sought by Puget, Tacoma, Seattle, the California Parties, and other claimants have not taken the record as they found it, but have sought to dramatically alter and expand its nature and scope.  The request for refunds under these circumstances violates the Commission's longstanding policy prohibiting intervenors from expanding complaints initiated by others.  To the extent parties wish to prosecute claims beyond the scope of a complaint, such parties must initiate a new Section 206 proceeding."[20]

25.    Although this case could be dismissed solely on procedural grounds, we decline to do so.  There are a number of other cases before us that involve questions of refunds and questions about whether to reform contracts.  It would be unfair to the parties of the Pacific Northwest to use these procedural issues to avoid addressing their concerns.  Further, as the City of Seattle points out, intervenors that are now seeking refunds could have filed separate complaints with the Commission but instead reasonably relied on the Puget complaint, which raised similar issues, as an appropriate forum for addressing their overlapping claims.  After allowing intervenors to pursue a preliminary hearing through the Puget complaint until now, it would be unfair to deny relief based on procedural issues and leave them with no other forum to pursue their complaints.  The refund effective date under a new section 206 complaint would not capture the relevant time frame.

26.    Accordingly, we deny Puget's motion to withdraw its pleadings.

## B. Puget's Request for Rehearing

27.    The December 15, 2000 Order explained that "we will decline to adopt a region-wide price cap at this time" because "there are no organized electricity markets outside of California to which a price cap could be applied since the majority of transactions that

_____

[20]ALJ Recommendations, 96 FERC ¶ 63,044 at 65,376, 65,383-84.

occur in the region do so on a bilateral basis."[21]  The Commission dismissed the Puget complaint, stating that a region-wide price cap "is impracticable given the market structure in the Northwest, nor has the burden of proof been met to justify such an action."[22]

28.    In its request for rehearing, Puget argued that California and the Pacific Northwest are part of an integrated wholesale market and that a soft cap order can be implemented for wholesale power sales even where there is no single price auction mechanism.

29.    The Commission grants rehearing.  While the Commission in the December 15, 2000 Order denied Puget's requested relief "at this time," the Commission several months later directed its Staff to conduct an investigation of the reasonableness of the rates for wholesale sales of electricity in the spot markets in the Western Systems Coordinating Council (WSCC).[23]  Based upon the conclusions of Staff in its investigation, the Commission in the June 19 Order implemented price mitigation measures on wholesale sales throughout the West.  The Commission directed that during reserve deficiency hours, when reserves in California fall below seven percent, the California Independent System Operator (ISO) marketing clearing price would apply as the maximum price to all sales in the WSCC spot markets.[24]

30.    In granting Puget's request for rehearing, we determine that the relief requested by Puget in its complaint was provided by the June 19, 2001 Order.  Puget sought a prospective price cap, as was granted in our June 19 Order.  As mentioned above, while Puget did not directly seek refunds for a prior period, it did ask the Commission to set a refund effective date.  While we technically may have authority to require refunds for at

---

[21]December 15 Order, 93 FERC ¶ 61,294 at 62,019.

[22]Id.

[23]San Diego Gas & Electric Co., et al., 95 FERC ¶ 61,115 (2001) (April 26 Order). In April 2002, the WSCC and other Western councils merged to form the Western Electric Coordinating Council.

[24]June 19 Order, 95 FERC ¶ 61,418 at 62,546-47, 62,556.

Docket No. EL01-10-000, et al.                                                            - 10 -

least a short prior period,[25] we find that refunds would be inequitable for reasons explained below.

### C. Commission Determination Regarding Refunds

31.     The Commission instituted the preliminary evidentiary hearing in this proceeding to "facilitate development of a factual record on whether there may have been unjust and unreasonable charges for spot market bilateral sales in the Pacific Northwest for the period beginning December 25, 2000 through June 20, 2001."[26]  In this regard, we consider the hearing and the efforts expended by participants in developing a record on the matter worthwhile and helpful in assisting the Commission in understanding the Pacific Northwest spot market and the proper action to be taken in this proceeding.

32.     The Presiding ALJ found based on the evidence - and we believe that it is beyond question - that electricity prices in the region "rose dramatically" during the relevant period.[27]  While there is no evidence in the record of dysfunction in the Pacific Northwest spot market itself, or the presence of market power in the Pacific Northwest spot market,[28] the ALJ determined that dysfunctions in the spot markets operated by the ISO and California Power Exchange (PX) affected the prices in the Pacific Northwest.[29]  This latter finding is consistent with our previous determinations that recognize the integrated nature of the Western markets.[30]  However, the ALJ found - and we agree that the record

---

[25]The statute dictates that the Commission could set a refund effective date, at the earliest, of December 25, 2000, 60 days after the date that Puget filed its complaint.  The latest refund effective date would be five months after the 60-day period, or May 26, 2001.  16 U.S.C. § 824e(b) (2000).

[26]July 25 Order, 96 FERC ¶ 61,120 at 61,520.

[27]ALJ Recommendations, 96 FERC ¶ 63,044 at 65,367.

[28]Id., at 65,370.

[29]Id., at 65,367, 65,369.

[30]December 15 Order, 93 FERC ¶ 61,294 at 61,357-58; June 19 Order, 95 FERC ¶ 61,418 at 62,547, 62,556.

Docket No. EL01-10-000, et al.                                                    - 11 -

establishes - that other factors related to supply and demand fundamentals contributed to the dramatic prices in the region.[31]

33.    As discussed above, in its June 19 Order, the Commission instituted prospective price mitigation measures:

> the Commission here is instituting a two-part approach to price mitigation for spot markets to cover all hours for California and the WSCC. Because these markets are integrated, the mitigation proposals must establish the same prices for all markets in order to prevent arbitrage where power is diverted from the lower priced market to the higher priced. The mitigation plan further has to recognize the differences between the California market, which has an organized auction, and the remainder of the WSCC, which does not have a similar centrally organized market. The plan adopted by the Commission is tailored to provide a uniform scheme of mitigation that at the same time recognizes the differences between these markets.[[32]]

34.    While Western power prices had begun to decline after the issuance of the April 26 Order,[33] the implementation of the West-wide mitigation plan resulted in a further "moderation" in electricity spot market prices.[34] Thus, the mitigation plan provided the relief requested by Puget, and on a forward basis the relief sought by other participants in the complaint proceeding.

---

[31]ALJ Recommendations, 96 FERC ¶ 63,044 at 65,366-69 (discussing the supply and demand conditions that contributed to high prices).

[32]June 19 Order, 95 FERC ¶ 61,418 at 62,556.

[33]See Id., at 62,546.

[34]ALJ Recommendations, 96 FERC ¶ 63,044 at 65,368. Both refund claimants and TFG agree that prices moderated in June 2001, although they disagree on the cause. TFG explained that prices "returned to normal levels" due to market forces such as a significant drop in consumption, a return to normal weather and new generation coming on-line. Id. Refund claimants contend that the market correction that occurred in late June 2001 resulted from the implementation of the Commission's mitigation plan. See, e.g., California Parties' Post-Hearing Comments at 11.

Docket No. EL01-10-000, et al.                                                    - 12 -

35.     What remains, however, is the claims for refunds during the potential legal window for refunds in the proceeding.  Based on the record established in the preliminary evidentiary hearing, the Commission concludes that, even if prices were unjust and unreasonable, it is not possible to fashion a remedy that would be equitable to all the participants in the Pacific Northwest market.  The circumstances of this proceeding prevent an even and fair allocation of refunds, if they were found to be warranted.  We elaborate below on the considerations that lead us to this conclusion.

## 1. Governmental Entities

36.     The ALJ concluded that the rationale previously used by the Commission to assert jurisdiction over certain transactions of governmental entities in the California refund proceeding, Docket No. EL00-95, does not apply to the Pacific Northwest bilateral spot market because of differences between the Pacific Northwest and the markets operated by the ISO and PX.[35]  The Commission agrees with the ALJ's conclusion on this issue.

37.     Governmental entities are not subject to the jurisdiction of the Commission.[36]  However, the Commission determined that "under the specific circumstances presented" in the California refund proceeding, it could properly assert section 206 jurisdiction over certain transactions of governmental entities.[37]  The Commission explained that it has jurisdiction over the subject matter of sales made into the organized power markets of the ISO and PX, both entities established under Commission authority and Commission-approved market rules.  It also noted that all sellers in the organized markets agreed to accept the same clearing price for any given sale.

38.     In contrast, the ALJ in the current proceeding found that the Pacific Northwest has never had a centralized power exchange and has no central clearing price, and energy is bought and sold continuously on a bilateral basis with each utility free to choose how to meet its firm load requirements.[38]  Lacking such centralized markets in the Pacific Northwest, the Commission does not have authority over the rates of the governmental entities.  Accordingly, under the conditions present in the Pacific Northwest during the relevant time frame, the Commission does not have FPA section 206 jurisdiction over

---

[35]ALJ Recommendations, 96 FERC ¶ 63,044 at 65,370.

[36]See FPA section 201(f), 16 U.S.C. § 824(f) (2000).

[37]July 25 Order, 96 FERC ¶ 61,120 at 61,511-13.

[38]ALJ Recommendations, 96 FERC ¶ 63,044 at 65,365.

governmental entities' transactions and could not compel refunds for the transactions at issue in this proceeding.[39]

39.    A large portion of the power bought and sold in the Pacific Northwest is by governmental entities, including the largest seller in the region, BPA.[40]  Moreover, the record establishes that electricity in the Pacific Northwest region is traded an average of six times between the point of generation to the last wholesale purchaser in the chain.[41] Government entities, like most market participants in the Pacific Northwest, were both buyers and sellers in the region.  Since the Commission lacks authority to impose refund obligations on sales by governmental entities in the present circumstances, "the burden of paying refunds will fall on a limited class of jurisdictional sellers in the region; and the benefit of receiving refunds will be available only to buyers who bought from those same sellers."[42]  This result is inequitable and unbalanced.  Moreover, the handful of parties that are asserting refund claims in this proceeding are all governmental entities.  It would not do justice to allow these parties to receive refunds for their high-priced purchases while they are exempt from providing refunds for any high priced sales they may have made.

---

[39]Nor does the application of the West-wide mitigation plan to governmental entities provide a basis for directing governmental entities to make refunds in the Pacific Northwest proceeding.  In the June 19 Order, the Commission invoked its conditioning authority and explained that, as a condition of selling into the ISO's markets and as a condition of using the ISO's interstate transmission grid, all sellers located in the WSCC, including governmental entity sellers, must abide by the West-wide price mitigation plan. Id., 95 FERC ¶ 61,418 at 62,570.  The Pacific Northwest complaint, in contrast, does not involve a prospective condition on wholesale sales, nor does it involve a market operated and controlled by a Commission-jurisdictional entity such as the ISO.  Moreover, on rehearing, the Commission reversed its earlier determination and stated that the price mitigation measures set forth in the June 19 Order do not apply to governmental entities in the West outside of California's organized markets.  San Diego Gas & Electric Co., et al., 97 FERC ¶ 61.275 at 62,252.

[40]Exh. BPA-1 at 3 (BPA's sales account for 40 percent of the electric power consumed in the Pacific Northwest).  See also Joint Post-Hearing brief of City of Tacoma, Port of Seattle and Wasco, at 45, describing BPA as the "predominant power marketer" in the region.

[41]ALJ Recommendations, 96 FERC ¶ 63,044 at 65,384, citing Exh. PWX-9 at 7.

[42]Id., at 65,370.

Docket No. EL01-10-000, et al.                                              - 14 -

### 2. Refunds Would Unfairly Reward Entities That Relied on the Spot Market

40.    The ALJ found that purchasers in the Pacific Northwest had numerous options in developing a portfolio of power supply and for years have been free to enter into short, medium, and long-term contracts to achieve a hedged and balanced portfolio.[43]  These options, including hedge instruments, remained available leading up to and during the time period at issue.[44]  The ALJ also found that Pacific Northwest utilities were "generally forewarned" of potential supply shortages, noting that in 1999 BPA had expressed concerns about a potential energy deficit in the region.[45]

41.    According to the ALJ, City of Tacoma accepted the risk of high spot market prices when it chose to sell its interest in the Centralia generation plant based on "environmental risk associated with the operation of the coal burning [Centralia] plant."[46]  The City of Seattle also sold its share in this generation plant.  As the ALJ explained:

> [i]f the position of the refund claimants is accepted, they would be relieved of the consequences of their conscious economic decisions at the expense of a functioning competitive market in which a vast majority of the [Pacific Northwest] purchasers during this period accept responsibility for the choices they made.  For instance, Seattle recognized in September, 2000 that the Centralia sale left it "more dependent on the market than we have been historically."  Exh. PPL-1 at 21 n. 10.[[47]]

42.    The current proceeding only concerns spot transactions, and not long-term sales and purchases in the Pacific Northwest.  Thus, it would be unfair and inequitable to allow those market participants that relied heavily on the spot market to receive refunds, while those who perhaps more prudently engaged in a procurement strategy that included a

---

[43]Id., at 65,366, citing Exhibits NGP-74 at 6, PWX-1 at 16, 21.

[44]Id., at 65,368-69, citing Tr. at 656-657, 689-90; Exhibit IE-2 at 14.

[45]Id., at 65,367.

[46]Id., at 65,343, 65,368, citing Exh. NPG-57 at 3.

[47]Id. at 65,368.

Docket No. EL01-10-000, et al.                                                                    - 15 -

higher balance of long-term instruments would not receive refunds.[48]  As two State
Commissions note, utilities that bought power in longer-term markets are unfairly
punished since they would not receive refunds, but might be obligated to pay refunds for
power purchased in the longer-term markets that was later sold in short-term markets.[49]

43.    Given these findings of the ALJ, which the Commission adopts, we conclude that
it would be inequitable to allow refunds in this proceeding.

### 3.  Allowing Refunds Would have Adverse Consequences to the Market

44.    The State Commissions are concerned that allowing refunds would effectively
"rewrite" the rules on which buyers and sellers in the Pacific Northwest reasonably relied.
This would "undermine the credibility of the regulatory process and could jeopardize
investment" in energy infrastructure that could ultimately undermine service to retail
customers.[50]

45.    Likewise, the ALJ concluded that evidence indicates that refunds would have a
negative impact on the Pacific Northwest market.[51]  She describes testimony and other
evidence to the effect that the ordering of refunds in the particular conditions that existed
in the Pacific Northwest would cause a loss of confidence in the market, have a chilling
effect on trading, cause costs to customers to increase as market participants demand
additional risk premiums and additional security for their transactions, create a hesitancy
to conduct business in times of scarcity, and discourage investment in needed
infrastructure.[52]  The ALJ concluded that refunds "would not provide even short-term
benefits to the few market participants seeking them as the evidence indicates that

---

[48]In December 2000, the Commission warned market participants, "those who
remain in the spot market for buying their residual load or selling their residual supply
should be there in full recognition of the effects on price of last minute sales and
purchases." December 15 Order, 93 FERC at 61,996.

[49]October 29, 2001, Post-Hearing "Joint Comments" filed by the Washington
Utilities and Transportation Commission, Oregon Office of Energy, and Oregon Public
Utility Commission (State Commissions) at 3-4.

[50]State Commissions' Joint Comments at 4.

[51]ALJ Recommendations, 96 FERC ¶ 63,044 at 65,384.

[52]Id.

'Nothing is more likely to drive potential sellers away from a buyer than a re-trade.  This business relies on finality of deals and reliance on your trading partner.' "[53]

46.    The Commission adopts the ALJ's proposed findings and recommendations on this issue.

## 4.  Ripple Claims

47.    The ALJ concluded that because of the highly active nature of the Pacific Northwest wholesale electricity market, there would be an immense number of transactions subject to refund in this case.[54]  It was estimated that electricity in the region is traded an average of six times between the point of generation to the last wholesale purchaser in the chain, and that approximately 500,000 transactions would have to be recalculated if refunds are required in this case.[55]  The ALJ determined that all parties reserved their rights to pursue claims if the Commission was to direct further proceedings to determine refunds.[56]

48.    The volume of transactions involved in the bilateral spot market in the Pacific Northwest during the relevant time period is massive and would require prolonged time and effort to unravel.  More importantly, we are concerned that, in the end, a fair result would not be achieved.

49.    The ALJ explained that "[t]he evidence shows that … it may be impossible for purchasers to recover ripple liability given the large number of sellers in the PNW that are not subject to the Commission's jurisdiction and the inability to trace upstream sellers in every transaction…."[57]  Further, she found that, because most buyers and sellers purchase and sell from a portfolio of resources, and in many instances a particular seller's resource portfolio is an aggregate of a wide variety of supply rights, "it would be nearly impossible

---

[53]Id., quoting  Exh. IE-1 at 10.

[54]Id., at 65,384-85.

[55]Id., at 65,385.

[56]Id., at 65,300.

[57]Id. at 65,385.  See also Proposed Finding of Fact No. 45 ("as a factual matter, it may be impossible for purchasers to recovery their ripple refund claims because of the difficulty of tracing upstream sellers in every transaction").

to match a particular sale with its source or to calculate the alleged refund due with precision."[58]

50.    As we have discussed above, since many of the buyers and sellers in the Pacific Northwest are governmental entities, there will be few chains of transactions that will not contain a non-jurisdictional transaction, which would effectively drop the burden of the refund into the lap of the last downstream jurisdictional transaction in the chain.  On top of the practical difficulty of determining the chains of transactions, this would unfairly concentrate the burden of those claims on the jurisdictional sellers.  Such an outcome is not equitable.

### 5. Other Considerations

51.    The Washington Utilities and Transportation Commission, Oregon Office of Energy, and Oregon Public Utility Commission all agree that this proceeding should be terminated and that the Commission should direct its attention to prospective mitigation measures.[59]  Based on many of the same considerations that we have articulated above, these State Commissions are concerned that, regardless of whether bilateral spot market rates were unjust and unreasonable in the region during the relevant time period, refunds would not remedy the injuries caused by such rates and would not produce an equitable and balanced outcome for all affected buyers and sellers.  Rather, "refunds would only serve inequitably to redistribute that damage."[60]  We give due respect to the position of these State agencies, given their responsibility to protect many of the ultimate customers of energy in the region from unjust prices.

52.    Finally, we take note that, of the hundreds of market participants in the region,[61] and of the estimated 500,000 transactions that occurred in the region during the relevant period of time, only a handful of entities have chosen to pursue claims for refunds in this

_____

[58]Id.

[59]ALJ Recommendations, 96 FERC ¶ 63,044 at 65,370.  See also October 29, 2001, Post-Hearing "Joint Comments" filed by the State Commissions.

[60]State Commissions' Joint Comments at 3.

[61]During the relevant period of time, there were 226 members of the WSPP.  ALJ Recommendations, 96 FERC ¶ 63,044 at 65,370.  Of this number, only 56 members complied with the ALJ's requirement to provide transaction data required by the ALJ, id. at 65,353, and only eight chose to pursue claims, leaving us to conclude that the others' unwillingness to participate or respond reflects an unwillingness to change their contracts.

Docket No. EL01-10-000, et al.                                                    - 18 -

proceeding.[62]  While the ALJ determined that all parties reserved their rights to pursue claims if the Commission was to direct further proceedings to determine refunds, most market participants have chosen not to pursue such claims but would rather end the matter without further proceedings.  Most telling, at oral argument, Pinnacle West explained that, although it was a net purchaser of power during the period at issue, it does not want a refund in this proceeding but, like most other participants, "wants this case to end and want[s] to move on."[63]

## Conclusion

53.    Based on the totality of the circumstances as we have described above in some length, we conclude that, even if prices were unjust and unreasonable, the directing of refunds in this proceeding would not result in an equitable resolution of the matter.[64]  Accordingly, we  will not require refunds and terminate this matter without further proceedings.

The Commission orders:

(A) Puget Sound Energy, Inc.'s request to withdraw its complaint and request for rehearing is hereby denied, as discussed in the body of this order.

(B) Puget Sound Energy Inc.'s request for rehearing is hereby granted, as discussed in the body of this order.

(C) This proceeding is hereby terminated, as discussed in the body of this order.

_____

[62]The ALJ identifies eight claimants, several of which would be eliminated if we were to adopt the ALJ's recommendations regarding the appropriate definition of "Pacific Northwest spot market" and the region defined as the "Pacific Northwest" for purposes of this proceeding.  ALJ Recommendations, 96 FERC ¶ 63,044 at 65,336.

[63]June 2, 2003, Oral Argument Trans. at 73.

[64]See Heckler v. Cheney, et al., 470 U.S. 821, 831 (1985) (an agency's decision not to enforce is generally committed to an agency's absolute discretion); Towns of Concord, Norwood, and Wellesley, Massachusetts v. FERC, 955 F.2d 67, 72-74 (D.C. Cir. 1992) (Commission's broad discretion includes authority to determine that it would be inappropriate in a particular case to provide a remedy); Niagara Mohawk Power Corp. v. FPC, 379 F.2d 153, 159 (D.C. Cir. 1967) (where the Commission exercises its remedial authority, its discretion is "if anything, at zenith").

Docket No. EL01-10-000, <u>et</u> <u>al.</u>                                    - 19 -

By the Commission.  Commissioner Massey dissented with a separate
                    statement attached.
( S E A L )         Commissioner Brownell concurred with a separate
                    statement attached.


                        Magalie R. Salas,
                          Secretary.

Docket No. EL01-10-000, et al.                                          - 20 -

## APPENDIX A

Briefs on Exception

Alcoa, Inc.

Atofina Chemicals, Inc., Columbia Falls Aluminum Company and Golden Northwest Aluminum, Inc.

Bonneville Power Administration (BPA)

California Parties (The People of the State of California, Ex rel. Bill Lockyer, Attorney General, the California Electricity Oversight Board, and the California Public Utilities Commission)

City of Seattle

City of Tacoma, Washington; the Port of Seattle, Washington; and Northern Wasco County People's Utility District (collectively "Tacoma")

Clark Public Utilities

Commission Trial Staff

Duke Trading and Marketing L.L.C.

El Paso Merchant Energy, LP

Eugene Water & Electric Board

Kaiser Aluminum & Chemical Corporation

Merchants Serving DWR/CERS or "Merchants" (Mirant Americas Energy Marketing, LP; Powerex Corp.; TransaAlta Energy Marketing (U.S.), Inc.; TransCanada Energy Ltd; adn Williams Energy Marketing and Trading)

Modesto Irrigation District

The Montana Power Company

Morgan Stanley Capital Group Inc.

Docket No. EL01-10-000, et al.                                      - 21 -

Non-Public Utility Municipal Systems

Northern California Power Agency

Public Service Company of New Mexico

Public Systems (Public Utility District No.1 of Chelan County, Washington; Sacramento
Municipal Utility District; Public Utility District No. 2 of Grant County, Washington;
Public Utility District No.1 of Franklin County, Washington; Public Utility District No.1
of Grays Harbor County, Washington; and Northern California Power Agency)

Sacramento Municipal Utility District

Salt River Project Agricultural Improvement and Power District

Springfield Utility Board

Transaction Finality Group (TFG)

Truckee Donner Public Utility District

Washington State Attorney General (Washington AG)

Washington Utilities and Transportation Commission, Oregon Office of Energy, and
Oregon Public Utility Commission (Joint Comments)

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Puget Sound Energy, Inc.                                 EL01-10-000
       v.                                               EL01-10-001
All Jurisdictional Sellers of Energy and/or              EL01-10-007 and
Capacity at Wholesale into Electric Energy               EL01-10-009
and/or Capacity Markets in the Pacific
Northwest, Including Parties to the Western
Systems Power Pool Agreement

(Issued June 25, 2003)

MASSEY, Commissioner, <u>dissenting</u>:


I strongly disagree with today's order.  I would set a refund effective date of
December 25, 2000 and order refunds for spot market transactions (defined as one month
or less) through June 20, 2001.

Puget filed a complaint on October 26, 2000 requesting the Commission to cap
prices for sales into Pacific Northwest wholesale power markets.  The Commission could
set a refund effective date of December 25, 2000.  Thus, refund protection could be
available for much of the time that prices throughout the West, including the Northwest,
were at their highest due to the Western power crisis.  Today's order notes that this
Commission has recognized the integrated nature of the Western markets and notes that
the ALJ in this case determined that the dysfunctions in the California spot markets
affected prices in the Pacific Northwest.  I would note that the Commission found as early
as November 2000 that conditions in California caused and continued to have the
potential to cause unjust and unreasonable rates and that market power could be
exercised.[65]  Unjust and unreasonable California spot prices during the relevant period
drove Pacific Northwest prices to unlawful levels as well, and the staff's Western Markets
Report details evidence of epidemic market manipulation that influenced prices
throughout the West.

Yet today's order finds that refunds would be "inequitable" and refuses to order
any refunds to customers in the Northwest, a region that suffered some of the heaviest
economic consequences of the Western market meltdown.  I strongly disagree with this
conclusion.  This market crisis had a significant impact upon the economy of the Pacific
Northwest.  Consumers were harmed, thousands of jobs were lost, and businesses closed.
The aluminum industry virtually exited the Pacific Northwest.

---

[65]93 FERC ¶ 61,121 (2000) at 61,349.

2

The order sets out a number of unpersuasive reasons for not requiring refunds. First, the order is concerned that the burden of paying refunds will fall on a limited class of jurisdictional sellers in the region. This is because a large portion of the power in the Northwest is bought and sold by government entities whose sales are not jurisdictional to the Commission, and such entities are embedded in the chain of power purchases and resales that occurred in the region. Nonetheless, the majority order perpetuates an inequity that is much worse by comparison, namely, customers paying unjust and unreasonable rates that are unlawful under the Federal Power Act. The Commission has always taken its limited jurisdiction as it found it and made the best of it. We must do so here. We would never, for example, refuse to remedy the undue discrimination by jurisdictional utilities by arguing that we have no power to remedy the same conduct of non-jurisdictional entities. I do not believe that section 206 of the Federal Power Act gives us the luxury of discretion when it comes to remedying unlawful rates. The fact that we cannot do complete justice is not an excuse for doing no justice.

Another rationale given in today's order is that refunds would unfairly reward entities that relied on the spot market. Even if the Commission has the discretion not to remedy unjust and unreasonable rates, which I do not concede, this is a curious rationale given the majority's decision in the long term contract cases decided today. In those orders, the majority also refuses to provide any relief to those purchasing utilities, including some in the Northwest, that followed the Commission's admonition in the December 2000 order to move load out of the spot market, and signed forward contracts in an out of control market. The instant order and the concurrent long term contract orders breathe life into the old saying "damned if you do and damned if you don't."

The order also holds that refunds would have adverse consequences on the market in that ordering them would rewrite the rules that participants relied upon, would undermine the credibility of the regulatory process, and jeopardize investment. How one characterizes the consequences of a refund decision probably depends on which side of the market one sits. I would strongly argue that not providing refund relief would have many of the same consequences. The Commission wisely rejected these same arguments in ordering nine months of refunds to compensate for unjust and unreasonable spot prices in the California markets. Market participants in the Pacific Northwest will quickly lose faith in competitive markets if the Commission fails to protect them from unjust and unreasonable prices arising from a dysfunctional market that allowed the opportunity to exercise market power, and where market prices were driven in part by serious market manipulation.

And finally, the order is concerned with the time and effort that might result from the potential ripple claims as a result of a refund order here and the need to unravel

3

perhaps as many as 500,000 transactions. Boiled down to its essence, the Commission is confessing that it is just too hard to remedy the economic injustices that resulted from unjust and unreasonable rates that were charged in jurisdictional markets. Again, I do not believe the Federal Power Act gives us the luxury of discretion.

In fixing just and reasonable prices, and measuring refund liability, I would use the mitigated market clearing price (MMCP) methodology established in the California spot markets and set out in a series of Commission orders, most recently in an order of March 26, 2003.[66] This methodology would have to be modified to fit daily and up to monthly transactions, but it would provide a rational benchmark for determining refund liability in the Pacific Northwest.

For these reasons, I dissent from today's order.

William L. Massey
Commissioner

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Puget Sound Energy, Inc.
v.                                              Docket Nos. EL01-10-000
All Jurisdictional Sellers of Energy and/or                   EL01-10-001

---

[66]San Diego Gas & Electric Company, 102 FERC ¶ 61,317 (2003).

Capacity at Wholesale into Electric Energy
and/or Capacity Markets in the Pacific
Northwest, Including Parties to the Western
Systems Power Pool Agreement

EL01-10-007
EL01-10-009

(Issued June 25, 2003)

BROWNELL, Commissioner, concurring

1.    I support the conclusion and reasoning of this order.  An additional basis for my
decision is the fact that this case involves bilateral transactions, the bulk of which were
entered into under the WSPP Agreement.  The Commission is concluding in another
order being issued concurrently that modifications to contracts under the WSPP
Agreement are subject to the Mobile-Sierra public interest standard of review.[67]  I agree
with the ALJ's finding that the refund claimants have not met that standard here.[68]

                                        Nora Mead Brownell

---

[67]PacifiCorp v. Reliant Energy Services, Inc., et al., 103 FERC ¶        (2003).

[68]Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy, et al., 96 FERC
¶ 63,044 at 65,384 (2001).